UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA L. AGUILAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Case No. 07-0546 (RMU) |
| | ) |
| DIRK KEMPTHORNE, Secretary, | ) |
| U.S. Department of the Interior, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MOTION FOR SUMMARY JUDGMENT

Plaintiff brings this action against Dirk Kempthorne ("Defendant"), Secretary, United States Department of the Interior ("DOI" or "Agency") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, ("Title VII"), alleging that Defendant intentionally discriminated against Plaintiff based upon her race and/or national origin when the National Park Service ("NPS") did not select her for a specific advertised position.  Defendant hereby moves pursuant to Federal Rule of Civil Procedure ("Rule") 56, because there is no genuine issue of material fact which would prevent a judgment as a matter of law in Defendant's favor.

In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities, Statement of Undisputed Facts, and attached exhibits. Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. *See* L. Civ. R. 7(m).

Dated:  August 22, 2008
         Washington, DC

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

         /s/
_____
BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA L. AGUILAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Case No. 07-0546 (RMU) |
| | ) |
| DIRK KEMPTHORNE, Secretary, | ) |
| U.S. Department of the Interior, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Dirk Kempthorne ("Defendant"), Secretary, United States Department of the Interior ("Agency" or "DOI"), by and through his undersigned counsel, respectfully submits this memorandum of points and authorities in support of his motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(b).

## PRELIMINARY STATEMENT

In this action, Plaintiff, Sandra Aguilar ("Plaintiff"), asserts a single count of disparate treatment discrimination based upon her race (Hispanic) and/or national origin (Mexican American).[1] Plaintiff alleges that she was intentionally discriminated against when she applied and was not selected for a specific advertised position with the National Capital Region ("NCR") of the National Park Service ("NPS" or "Park Service"), a component of DOI. Plaintiff's claim, however, lacks support in the material facts adduced in discovery in this action and in applicable

---

[1]     Although Plaintiff's Complaint alleges some statistics purporting to show that Hispanics are underrepresented in the Agency and NPS (*see* Compl. at ¶¶ 27-36), Plaintiff has not pled a disparate impact claim. Tellingly, Plaintiff did not designate any expert to conduct any statistical analyzes or opine upon the necessary statistical deviations that are the hallmarks of a disparate impact claim. Further, as the EEOC Administrative Judge found, Plaintiff did not allege a disparate impact claim at the administrative level, and thus, has not properly exhausted such a claim. *See* EEOC AJ Decision, Attached Ex. 1.

law.  In sum, despite her extensive discovery efforts, Plaintiff cannot show any genuine issue of material fact that could prevent judgment as a matter of law in Defendant's favor in this action.

Plaintiff has simply failed to show that the Park Service's stated reasons for not selecting Plaintiff were somehow pretextual, or adduce any evidence upon which a reasonable juror could conclude that NPS officials, in not selecting Plaintiff for the Position (defined below), were at all motivated by Plaintiff's race and/or national origin.  That is, Plaintiff -- an outside applicant for the Position who had not been employed in the two years prior to her application -- was not interviewed or selected for the Position because she was a Non-Status Applicant that lacked any current Park Service experience.  By contrast, Ms. Dottie Marshall, the selectee for the Position, had extensive experience with the Park Service and, in particular, was a current employee within the National Capital Region of NPS -- *i.e.*, the region to which the Position was assigned. Tellingly, no candidate listed on the certificate of eligibles that contained Plaintiff's name was interviewed for the Position.  That is, the selecting officials decided to interview and select a candidate from the Status Certificates, and return the Non-Status Certificates (one of which listed Plaintiff) unused.

In a desperate attempt to avoid these undisputed facts, Plaintiff has attempted to argue that the selection process used by the Agency for the Position was somehow flawed.  For example, Plaintiff herself has stated that the process was flawed because the Park Service *did not* take into account her race, and only technically followed its diversity hiring initiatives. Moreover, Plaintiff remarkably argues that an applicant's familiarities with the operations of the Agency, the Park Service and/or the National Capital Region (*i.e.*, the agency, component and region in which the Position is located) are impermissible factors in considering whom to interview and hire for the Position.  This argument is nonsensical and unsupportable.  Simply

put, there is no evidence that Plaintiff was intentionally discriminated against based upon her race or national origin in the selection process used to fill the Position.

In the alternative, summary judgment is appropriate on Plaintiff's claims for compensatory damages and equitable relief because Plaintiff herself alleges that Defendant preselected Ms. Marshall, and would have taken the same action regardless of any impermissible motives.

## STATEMENT OF THE PARTIES

For the convenience of the Court, Defendant briefly introduces the most relevant persons in the events giving rise to this action.

### A.    Plaintiff and her "Expert".

As fully set forth below, Plaintiff Sandra Aguilar is a Hispanic woman.  Plaintiff had no prior employment or experience with the Agency, the Park Service or the National Capital Region when she applied for the Position.  *See* Aguilar Tr. at 130-31, Attached Ex. 2.  Indeed, Plaintiff concedes that she did not have any knowledge of the inner workings of the Park Service, the National Capital Region or the Department of the Interior at that time.  *See id.*

Plaintiff had previously been employed in the Department of Health and Human Services ("HHS"), as the Deputy Director for the Office of Intergovernmental Affairs ("OIA") from 1997 through 2001.  *See* Aguilar Tr. at 49-50, Attached Ex. 2.  Following her employment with HHS, however, Plaintiff did not seek another job before applying for the Position.  *See id.* at 60-61 ("Q: After that deputy director position . . . what did you do?  A: I took two years off).  That is, when she applied for the Position, Ms. Aguilar had been unemployed for the two immediately-preceding years and did not perform any human resources duties, even on a voluntary basis, during that time period.  *See id.* at 61.    Additionally, during her two year period of

unemployment, Ms. Aguilar held a volunteer position in which (a) she was only in charge of a $10,000 budget; and (b) she only had "minor" procurement duties.  *See id.* at 62-63.

Plaintiff has designated Mr. Arnold J. Gerber, as purported expert in human resources. Mr. Gerber's opinion testimony, however, is ultimately inadmissible at trial, and in any event, is irrelevant to Plaintiff's sole claim of disparate treatment (*i.e.*, intentional) discrimination. Notably, although Mr. Gerber is not an attorney and has no legal training, he purports to summarily offer the ultimate legal conclusion that the selection process used by the Agency for the Position "constituted a prohibited personnel practice based on nonmerit and discriminatory factors in violation of 5 U.S.C. 2302(b)(1), (4), (6), (11), and (12)."  *See* Gerber Decl. at ¶ 5, Attached Ex. 3.  Despite this broad sweeping opinion, even Mr. Gerber could not conclude that the selection process used by the Agency was based upon intentional discrimination.  *See, infra*, at 21-22.

> **B.      Agency Employees and Officials.**

As fully set forth below, Ms. Leslie Newman, a Supervisory Human Resource Specialist in the Division of Administration for NCR, was generally responsible for overseeing the administrative components of the selection process for the Position.  Ms. Joyce Sasser, a Human Resource Specialist in the NCR, was generally responsible for reviewing the basic qualifications of, and rating and ranking the Non-Status Applicants (*i.e.*, applicants who were not employed by the federal government when they applied for the Position).  Messrs. Terry Carlstrom and Joseph Lawler were the selecting officials for the Position.  Ms. Dottie Marshall (Caucasian female) was the selectee for the Position, and Mr. Dick Powers was her predecessor.

Unlike Plaintiff, Ms. Marshall had extensive experience with the Park Service.  *See* Marshall App., Attached Ex. 4.  Indeed, prior to her selection for the Position, "Ms Marshal [ ]

held a number of progressively more responsible positions in the National Park Service and National Capital Region over the [preceding] 27 years." *See* Memo Requesting Appointment of 05/16/03, Attached Ex. 5. Further, Ms. Marshall had extensive experience in budgeting formulation and execution, including in the 2 years prior to applying for the Position. *See id.*, Marshall App., Attached Ex. 4. Ms. Marshall's extensive experience with the Park Service and her qualifications for the Position were described in detail by her when she applied for the Position. *See* Marshall App., Attached Ex. 4.

## STATEMENT OF FACTS

### I.    THE AGENCY ANNOUNCES A VACANCY FOR THE POSITION.

In early-2003, Mr. Dick Powers indicated to the Agency that he was going to retire from his position as Associate Regional Director for Administration for the National Capital Region of the Park Service (the "Position"), which was an Administrative Officer position with the grade and series of GS-341-15. *See* Newman EEO Tr. at 21-23, Attached Ex. 6.

Accordingly, NCR began to prepare an announcement to solicit applications of candidates to replace Mr. Powers. *See id.* at 21-23. Ms. Leslie Newman, a Supervisory Human Resource Specialist in the Division of Administration for NCR, was responsible for preparing the announcement, drafting "the duties, qualifications, knowledge, skills and abilities" contained therein, and supervising the administrative processing of the applications. *See id.* at 20-21. After she drafted the initial Vacancy Announcement ("Initial Announcement"), she forwarded it to Mr. Powers and Mr. Terry Carlstrom (who was Mr. Powers' supervisor and one of the two selecting officials for the Position) for their review. *See id.* at 21. After Messrs. Powers and Carlstrom approved the Initial Announcement, it was issued to the public on or around March 10, 2003. *See id.* at 22. The Initial Announcement for the Position limited the applicant pool to

current employees of the Agency and only advertised the Position at the GS-15 level.  *See* Init. Announce. at 1, Attached Ex. 7.

Subsequently, the Park Service discovered that there was an error in the Initial Announcement.  *See* Newman EEO Tr. at 23-24, Attached Ex. 6; Carlstrom EEO Tr. at 78-79, Attached Ex. 8.  Specifically, pursuant to a policy memorandum designed to promote diversity in the Agency (*see* "Stanton Memo" of 02/12/1999, Attached Ex. 9), the vacancy announcement for the Position should have been advertised to "All Sources," and should have been advertised at multiple grade levels (*i.e.*, also as a GS-14 position).  *See* Newman EEO Tr. at 23-24, Attached Ex. 6; Carlstrom EEO Tr. at 78-79, Attached Ex. 8.  This error was brought to Mr. Carlstrom's attention,[2] who admitted it was an oversight on his part and "a hundred percent" agreed that the Position should be re-advertised to comply with the Stanton Memo.[3]  *See* Carlstrom EEO Tr. at 80-81, Attached Ex. 8.  Therefore, the Agency re-advertised the Position through an amended Vacancy Announcement ("Amended Announcement"), which "amend[ed] the grade of the position to GS-14/15, the salary range, the area of consideration to all sources, the qualifications and also extend[ed] the closing date to April 14, 2003."  *See* Amd. Announce. at 1, Attached Ex. 10.  This Amended Announcement undoubtedly complied with the Stanton Memo and the Agency's diversity hiring policies.  *See* Aguilar EEO Tr. at 21, Attached Ex. 11 ("[NPS] opted to follow the criteria of this memo which was to open the vacancy to all sources").

---

[2]     It is unclear who brought this error to Mr. Carlstrom's attention.  Mr. Carlstrom testified that Mr. Mel Reid of NCR's EEO office contacted him.  *See* Carlstrom EEO Tr. at 80-81, Attached Ex. 8.  By contrast, Ms. Newman claims that she noticed the error and raised it with Mr. Powers who in turn discussed it with Mr. Carlstrom.  *See* Newman EEO Tr. at 23-28, Attached Ex. 6.  In any event, this discrepancy is not material to this Motion as Mr. Carlstrom concedes the issue was raised with him and that he agreed the Position should be re-advertised.

[3]     Notably, the Stanton Memo only addresses advertisement of positions, not whether an applicant's prior experience with the Agency, NPS or NCR is a relevant factor to use in considering which applicants should be interviewed or offered any particular position.  Indeed, the Stanton Memo itself was designed in part to "provide greater flexibility to selecting officials."  Stanton Memo at 1, Attached Ex. 9.

## II.    THE AMENDED ANNOUNCEMENT STATES THAT AN APPLICANT'S EXPERIENCE WILL BE A FACTOR FOR CONSIDERATION.

As noted above, the Position to be filled was the Associate Regional Director for Administration for the NCR.  The "Major Duties" for the Position were described in the amended Vacancy Announcement ("Amended Announcement"), in part, as follows:

> The position has a direct line authority for the planning, policy, execution, management and supervision of all administrative, informational system, and financial management activities through the [NCR].  This includes such activities as human resources, finance, contracting, property, office services, fiscal management and information technology.  The primary functions of the position are to provide effective and efficient delivery of administrative services throughout the [NCR].  Provides administrative and technical support and advisory services to approximately 14 parks/monuments/historic sites, as well as the [NCR] Director's staff.

Amd. Announce. at 3, Attached Ex. 10.  The Amended Announcement further provided a "Summary of the Qualifications Required," which for the GS-15 level listed the following:

> [A]pplicants must possess one (1) year of progressively responsible specialized experience at the GS-14 level that has equipped the applicant with the particular knowledge, skills and abilities to perform successfully the duties of the position that is typically in or related to the work of the position.

*Id.* at 3.  Later in the Amended Announcement, applicants were instructed to address the following knowledge, skills and abilities ("KSAs") in a narrative statement within their application for the Position:

1. Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.

2. Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels.

3. Ability to develop, analyze, review and appraise the effectiveness of administrative policies, programs, and practices.

4. Ability to interact and communicate at all levels.

- 7 -

5.      Ability as a manager to direct a support staff comprised of a range of technical and professional individuals.

*Id.* at 6.  The Amended Announcement further instructed that narrative statement should be "no more than one page per KSA" in length.  *Id.* at 7; *see also* Init. Announce. at 5, Attached Ex. 7. Lastly, the Amended Announcement instructed applicants to include in their application their prior work experience, implicitly notifying the applicants that it would be considered:

(4)      WORK EXPERIENCE - give the following information for your paid and nonpaid work experience related to the job for which you are applying:

(a) job title (include series and grade if Federal job); (b) duties and accomplishments; (c) employer's name and address; (d) supervisor's name and phone number; (e) starting and ending dates (month and year); (f) hours per week; (g) salary.  Indicate if we may contact your current supervisor.

Amd. Announce. at 7, Attached Ex. 10; *see also* Init. Announce. at 5, Attached Ex. 7.  As noted below, based upon the information requested by the Amended Announcement and permissible factors, such as experience in the National Capital Region and knowledge of the NPS, the selecting officials excluded all Non-Status Applicants, including Plaintiff, and sincerely believed that Ms. Marshall was the best applicant for the Position.

## II.      PLAINTIFF SUBMITS HER APPLICATION FOR THE POSITION, AND AN INITIAL REVIEW OF ELIGIBILITY IS CONDUCTED.

### A.      <u>Plaintiff Submits Her Application for the Position.</u>

On March 26, 2003, before the Agency issued the Amended Announcement,[4] Plaintiff submitted her application for the Position.  *See* Aguilar EEO Stmt. at 7, Attached Ex. 12. Plaintiff included in her application (a) a cover letter, in which she described her relevant experience and why she should be selected for the Position (Pl's App. at 1-2, Attached Ex. 13);

---

[4]      Even though Plaintiff submitted her application under the Initial Announcement, which was only open to current Agency employees, NPS nonetheless considered her application when it expanded the applicant pool through the Amended Announcement to include all sources.  Aguilar EEO Tr. at 22, Attached Ex. 11.

(b) a SF-171 optional application for federal employment, in which she further detailed her education and her relevant work experience (*id.* at 28-51);[5] (c) a narrative statement addressing the above noted KSAs, in which Plaintiff further described her relevant work experience (*id.* at 15-27);[6] (d) her last SF-50 Notification of Personnel Action and performance appraisal from her prior employment with the federal government (*id.* at 4-14);[7] and (e) an optional Applicant Background Survey ("RNO Form"), in which she identified herself as a "Hispanic or Latino" and as a woman. *Id.* at 3.

### B.    Plaintiff's RNO Form Was Removed From Her Application.

On March 27, 2003, Plaintiff's application was stamped received by NCR's human resources office. *See* Pl's Stamped App. at 1, Attached Ex. 14. Pursuant to the practice of the human resources office of NCR, when applications are received by the office, the relevant office assistant -- which for the Position was Ms. Jeanette Organ (*see* Amd. Announce. at 3, Attached Ex. 10; Newman EEO Tr. at 75-76, Attached Ex. 6) -- immediately removes any RNO Forms from the applications, sets them aside, and, after the application period is closed, sends them to the Agency's EEO office without maintaining copies of them. *See* Newman EEO Tr. at 76-77, Attached Ex. 6; Newman EEO Stmt. at 19-20, Attached Ex. 15. Given this procedure, Ms. Newman does not recall seeing Ms. Aguilar's RNO Form. *See* Newman EEO Tr. at 84, Attached Ex. 6.

---

[5]    Notably, in her SF-171, Plaintiff identified that her husband, Mr. William Nieto, Jr., was a current employee of the Park Service. *See* Pl's App. at 51, Attached Ex.13.

[6]    Plaintiff's narrative statement failed to comply with the one-page per KSA limitation set forth in the Initial and Amended Announcements. Pl's App. at 15-27, Attached Ex. 13.

[7]    As noted above, although Plaintiff was unemployed for two years before applying for the Position and performed no human resources and only minor budgeting and procurement activities during that period of time, Plaintiff was previously employed with HHS.

Plaintiff concedes that her RNO Form did not play a role in the selection process; but remarkably believes that segregating the RNO Forms and conducting the selection process without regard to her race (*i.e.*, by *not* identifying her as a Hispanic-woman during the selection process) was somehow discriminatory. *See* Pl's Rebut. To Newman[8] at 42, Attached Ex. 16 ("I included a completed Applicant Background Survey in the application package I sent in for this position. I self identified as an (sic) Hispanic woman. I was discriminated against because no one took notice that a Hispanic woman applied for the position . . . No one took notice of the Survey I submitted.").

### C.    The Applications Were Reviewed for Basic Qualifications.

After the applications for the Position were received and the RNO Forms removed, the applications were reviewed by Ms. Newman and a member of her staff, Ms. Joyce Sasser, for basic qualifications. *See* Newman EEO Tr. at 49-50, Attached Ex. 6; Sasser Tr. at 7-9, 12-13, Attached Ex. 17. Based upon this review, a certain number of applicants were deemed not qualified. *See* Newman EEO Tr. at 50, Attached Ex. 6; Newman EEO Stmt. at 7, Attached Ex. 15. The qualified applications, including Plaintiff's application, were scheduled to be rated and ranked. *See* Newman EEO Tr. at 49-50, Attached Ex. 6; Sasser Tr. at 7-9, 12-13, Attached Ex. 17.

Plaintiff again has remarkably asserted that her race should have been considered at this stage. Pl's Rebut. To Newman at 41, Attached Ex. 16 ("Actually consideration toward race and

---

[8]    At the administrative level, Plaintiff submitted lengthy "Rebuttal Statements" to the statements made by the Agency officials who were interviewed by the EEO investigator. Each such Rebuttal Statement generally consists of a preface, specific responses to statements made by each Agency official (usually preceded with the word "Rebuttal"), and proposed follow-up questions for each Agency official. Plaintiff drafted the totality of these rebuttal statements herself. *See* Letter from Aguilar to Diaz of 12/8/2003, Attached Ex. 18. Although Defendant believes that these Rebuttal Statements are relevant and contain important admissions, in order to reduce the burden on the record before the Court, Defendant has omitted the exhibits to these statements in the attached exhibits hereto.

national origin should have been given before the rating and ranking process began."). Obviously implicit in Plaintiff's statement is the admission that her race and national origin were not considered in the review of her basic qualifications.

## III.    THE NON-STATUS AND STATUS APPLICANTS ARE RATED AND RANKED.

### A.    A Crediting Plan Was Developed and the Applications Were Rated and Ranked.

Before the applications for the Position were screened for basic qualifications, and subsequently rated and ranked, Ms. Newman created crediting plans (one for GS-15 qualified applicants, the other for GS-14 qualified applicants) to use in evaluating the eligible candidates. *See* Newman EEO Tr. at 42-44, Attached Ex. 6; Newman EEO Stmt. at 6-7, Attached Ex. 15. Ms. Newman developed the crediting plans based upon the KSAs contained in the Amended Announcement and other similar crediting plans previously used by NPS. *See* Newman EEO Tr. at 42, Attached Ex. 6. Generally, the crediting plans consisted of a three-tiered rubric for each KSA listed on the Amended Announcement against which the applications could be compared to develop a numerical score. *See, e.g.*, GS-15 Crediting Plan, Attached Ex. 19.

In the rating process, after reviewing their narratives and applications, each candidate was assigned a score for each KSA (ranging from 1 to 3) based upon the crediting plan's rubric, which was then multiplied by the weight assigned for each KSA (ranging from 1x to 3x), and totaled to give an overall evaluation score.[9] *See, e.g.,* GS-15 Crediting Plan, Attached Ex. 19; Newman EEO Tr. at 42-45, Attached Ex. 6. After each applicant's overall evaluation score was computed using this process, any applicable veterans' preference points were then added to reach

---

[9]    The overall evaluation score was then converted into a 100 point based score pursuant to an OPM transmutation table. *See* Newman EEO Tr. at 44-45, Attached Ex. 6. In practical effect, 70 points (representing points allotted for satisfying the basic qualifications for the Position) were added to each eligible candidate's evaluation score. *See* Sasser Tr. at 7-8, 10, Attached Ex. 17; OPM Transmutation Table, Attached Ex. 20.

a final score for each applicant. *See* Newman EEO Stmt. at 14, Attached Ex. 15; Sasser Tr. at 10, Attached Ex. 17.

> **B.     The Status Applicants Were Rated and Ranked Using a Panel.**

Pursuant to Ms. Newman's understanding of NPS personnel procedures, because there were more than 10 qualified "status" or "promotion eligible" applicants -- *i.e.*, applicants that were current federal employees ("Status Applicants") -- a panel was convened to rate and rank the Status Applicants. *See* Newman EEO Tr. at 42-43, 51-52, Attached Ex. 6; Newman EEO Stmt. at 7, Attached Ex. 15; NPS Merit Promotion Plan, Implementation Guidelines at 2, Attached Ex. 21 ("If there are more than 10 promotion eligibles, rating and ranking must be completed by a Personnel Specialist, SME or a rating panel."). The rating panel consisted of subject matter experts -- *i.e.*, NPS employees at the grade level of the advertised position or higher with knowledge of the position. *See* Newman EEO Tr. at 60-61, Attached Ex. 6. In this case, the panel consisted of Vicky McGraw and John Hale (GS-15 Park Superintendents), and John Tyler from NPS's Washington Office, who was previously an Administrative Officer. *See* Newman EEO Tr. at 61-62, Attached Ex. 6; Def's Resps. to Pl's 1st Interrogs. At 7, Attached Ex. 22. Further, Ms. Joy Harris from the NCR's EEO office was invited to the panel session to ensure fairness and equality, and to answer any questions of the panel members. *See* Newman EEO Tr. at 62-63, Attached Ex. 6. Each panel member independently rated each qualified Status Applicant against the crediting plan using the above described rating process. *See id.* at 63. The panel's scores were then averaged to produce each Status Applicant's overall evaluation score. *See id.* at 46-47. A cutoff score was then determined for each category of applicants (*i.e.*, Status Applicants eligible for the Position at a GS-14 level, Status Applicants eligible for the Position at

the GS-15 level).  *See* Newman EEO Stmt. at 8, Attached Ex. 15.[10]  Those Status Applicants

with scores above the cutoff were deemed to be the "best-qualified" Status Applicants and were

moved forward in the selection process.  *See* Def's Resps. To Pl's 1st Interrogs. at 5, Attached

Ex. 22.

### C.    The Non-Status Applicants Were Ranked by a Specialist.

The "non-status" applicants -- *i.e.*, applicants who were not employed by the federal

government when they applied for the Position ("Non-Status Applicants") -- were ranked and

rated by a Human Resource Specialist, Ms. Joyce Sasser.[11]  *See* Sasser Tr. at 13-14, Attached Ex.

17; Newman EEO Tr. at 66, Attached Ex. 6.  Ms. Sasser, as opposed to the aforementioned

panel, rated and ranked the Non-Status Applicants because (a) Ms. Newman believed that NPS's

Merit Promotion Implementation Guidelines did not request "non-status" applicants -- *i.e.*,

applicants who were not employed by the federal government when they applied for the Position

("Non-Status Applicants") -- to be ranked and rated by a panel (*see* Newman EEO Stmt. at 7-8,

17, Attached Ex. 15), and (b) there were not that many Non-Status Applicants.  *See* Newman

EEO Tr. at 66, Attached Ex. 6.  Although Ms. Sasser ranked and rated the Non-Status

Applicants, all applicants regardless of status or category were rated against the same crediting

plan.  *See* Newman EEO Stmt. at 16, Attached Ex. 15.  Further, the remainder of the rating and

ranking process as applied to Non-Status Applicants (including setting a cutoff scores, and

---

[10]    As prescribed by the NPS's Merit Promotion Plan, the cutoff score (*i.e.* the dividing points between the best-qualified and the qualified applicants) was set at a number that would allow the selecting officials to chose from a reasonable number of applicants and where there was a score difference that was significant (*e.g.*, a gap in scores, or a score that would unreasonably increase the number of best-qualified applicants).  *See* NPS Merit Promotion Plan, Implementation Guidelines at 2, Attached Ex. 21.  The Agency's Merit Promotion Handbook describes that this determination is left to bureau discretion.  *See* DOI Personnel Handbook at 6, Attached Ex. 23.

[11]    Ms. Newman decided that Ms. Sasser, as opposed to herself, should rank and rate the Non-Status Applicants, because the eventual selectee for the Position would be Ms. Newman's direct supervisor and wanted to avoid any appearance that she "was selecting [her] own boss."  *See* Newman EEO Stmt. at 16, Attached Ex. 15.

determining which Non-Status Applicants were "best-qualified"), mirrored the process employed by NPS for the Status Applicants. *See* Newman EEO Stmt. at 8, Attached Ex. 15.

Using the crediting plan, Ms. Sasser gave Plaintiff a score of 97, three points shy of a perfect overall evaluation score. *See* Pl's Rating Sheet, Attached Ex. 24. That is, despite Plaintiff having been unemployed for the two years prior to her application, the only KSA on which Plaintiff did not receive the highest score possible from Ms. Sasser was KSA No. 2, "Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels," on which Ms. Sasser gave Plaintiff the second highest possible score. *Compare id. with* GS-15 Crediting Plan, Attached Ex. 19. Based upon Plaintiff's rating, she was deemed to be a "best-qualified" Non-Status Applicant for the GS-15 level Position.

Given that Plaintiff passed this rating and ranking step of the selection process and received nearly a perfect score, it is remarkable that Plaintiff nonetheless maintains that she was discriminated against because she was rated by Ms. Sasser instead of the Panel. *See* Aguilar EEO Tr. at 17-20, 23, Attached Ex. 11. Plaintiff, however, has adduced no evidence in discovery to support any contention that her race and/or national origin was a motivating factor in evaluating and scoring her application; or that she was treated differently than any other Non-Status Applicant.

Rather, Plaintiff's argument in this regard centers on the unsupported contention that the NPS's rating and ranking procedure violated some policy, rule or procedure. *See* Pl's Rebut. To Newman at 14-15, 16, Attached Ex. 16. Plaintiff's own "human resources expert," Mr. Gerber, however, testified that he did not know of any DOI or NPS policy that required the Non-Status

Applicants to be ranked by a panel.  *See* Gerber Tr. at 126, Attached Ex. 25.[12]  In any event, even if the Agency technically violated some, as of yet unidentified, rule or procedure (for which there is no support), based upon the facts adduced in discovery no reasonable juror could conclude that the decision to have Ms. Sasser rate and rank the Non-Status Applicants was motivated by Plaintiff's race and/or national origin, as all Non-Status Applicants, regardless of race, were rated and ranked by Ms. Sasser.  Tellingly, Plaintiff's own expert concedes that the evidence shows that Ms. Newman -- the person who decided that Ms. Sasser would rate and rank the Non-Status Applicants -- did not even know Plaintiff's ethnicity.  *See* Gerber Decl. at ¶ 7, Attached Ex. 3 ("Neither Carlstrom nor Newman was aware of the ethnicity of the candidates on the selection certificates[.]").

## IV.  CERTIFICATES OF ELIGIBLES ARE FORMULATED BASED UPON THE BEST-QUALIFIED APPLICANTS.

Based upon the best-qualified, eligible candidates identified in the rating process, Ms. Newman's assistant, Ms. Organ, prepared certificates of eligibles.  *See* Newman EEO Tr. at 90-91, Attached Ex. 6; Sasser Tr. at 19-20, Attached Ex. 17.  Due to the various status and eligibility levels of the "best-qualified" applicants, a total of seven certificates were prepared:

   (i)     a Non-Status GS-14 Certificate (consisting of best-qualified Non-Status Applicants eligible for the Position at the GS-14 level);

   (ii)    a Status GS-14 Promotion Certificate (consisting of best-qualified Status Applicants eligible for the Position at the GS-14 level who were GS-13s at the time they applied);

   (iii)   a Status GS-14 Reassignment Certificate (consisting of a best-qualified Status Applicant eligible for the Position at the GS-14 level who was already a GS-14 at the time she applied);

---

[12]     As noted above, Mr. Gerber's testimony is inadmissible opinion testimony.  However, Defendant herein explains why such testimony also fails to create a genuine issue of material fact that could preclude judgment in Defendant's favor as a matter of law.  Defendant does not intend to waive and expressly reserves his right to seek exclusion of Mr. Gerber's testimony should any of Plaintiff's claims survive this Motion.

(iv)    a Non-Status GS-15 Certificate (consisting of best-qualified Non-Status Applicants eligible for the Position at the GS-15 level), which included Plaintiff;

(v)    a Status GS-15 Promotion Certificate (consisting of best-qualified Status Applicants eligible for the Position at the GS-15 level who were GS-14s at the time they applied), which included Ms. Marshall;

(vi)    a Status GS-15 Reassignment Certificate (consisting of best-qualified Status Applicants eligible for the Position at the GS-15 level who were already a GS-15s at the time they applied); and

(vii)    a Status GS-15 Repromotion Certificate (consisting of a best-qualified Status Applicant eligible for the Position at the GS-15 level who was a GS-14 at the time he applied, but had previously been a GS-15 in his federal career).

*See* Non-Status Certificates, Attached Ex. 26; Status Certificates, Attached Ex. 27; Newman EEO Stmt. at 8, Attached Ex. 15.[13]    Pursuant to the Personnel Handbook for DOI's Merit Promotion Plan, the best-qualified applicants on the Status Certificates (*i.e.*, the merit promotion certificates) were listed in alphabetical order.    *See* DOI Personnel Handbook at 7, Attached Ex. 23.    By contrast, pursuant to Office of Personnel Management ("OPM") regulations, the best-qualified applicants on the Non-Status Certificates (*i.e.*, the competitive examination certificates) were listed in the order of their final scores.    *See* Sasser Tr. at 18-19, Attached Ex. 17; 5 C.F.R. § 332.401.    The selectee, Ms. Dottie Marshall, a GS-14 NPS employee at the time of this process, appeared on the Status GS-15 Promotion Certificate.    *See* Status Certificates at 3, Ex. 27.

Plaintiff appeared on the Non-Status GS-15 Certificate.    *See* Non-Status Certificates at 2, Attached. Ex. 26.    On that certificate, Plaintiff was the sixth person ranked out of six candidates -- *i.e.*, four other Non-Status Applicants were rated and ranked higher than Plaintiff on her certificate.    *See id.*    Among these four higher-rated Non-Status Applicants, three were veterans'

---

[13]    The word "DOB" and other information appearing in dark handwriting on the some of the certificates appears to have been subsequently added by the EEO investigator (as is evident from the Non-Status GS-15 Certificate and the Status GS-15 Promotion Certificate, which were taken from another source and do not contain this handwriting).    These copies of these certificates were taken from the administrative ROI and counsel has in his possession other less clear copies that do not contain this dark handwriting.

preference eligibles, meaning that additional points were added to their overall evaluation scores due to their veterans' status. *See id.*; Newman EEO Stmt. at 14, Attached Ex. 15; *see also* 5 C.F.R. § 211.102(c) ("Preference eligibles are entitled to have 5 or 10 points added to their earned score on a civil service examination."). Given these preference points, even if Plaintiff had received a perfect overall evaluation score of 100, she would have been listed below the three veterans. *See* Non-Status Certificates at 2, Attached Ex. 26.

Plaintiff has adduced no evidence during discovery that the preparation and formulation of the certificates of eligibles was somehow motivated by Plaintiff's race and/or national origin. Indeed, Plaintiff herself has stated "[t]he practice of issuing multiple certificates of eligibles is a requirement. It is a way to separate individual applicants by grade and status." *See* Pl's Rebut. To Newman at 18, Attached Ex. 16. Further, although Plaintiff's "expert" summarily concludes that the "[u]se of separate certificates constituted a deliberate and willful act intended to circumvent consideration of veterans and Complaint" (*see* Gerber Decl. at p. 6, ¶ 10, Attached Ex. 3), he was unable to cite any authority that prohibits such a practice and admitted that there are situations in which multiple certificates may be used. *See* Gerber Tr. at 126, 38, Attached Ex. 25. Quite simply, in this stage of the selection process, as with all other stages, Plaintiff was treated the same as all other similarly situated Non-Status Applicants, without regard to her race or national origin.

## IV.    THE SELECTING OFFICIALS DECIDE TO INTERVIEW APPLICANTS WITH NATIONAL PARK SERVICE EXPERIENCE.

### A.    Messrs. Carlstrom and Lawler Decide to Interview Four Status Applicants

After the certificates were prepared Ms. Newman forwarded the certificates to Messrs. Carlstrom and Lawler for their review. *See* Newman EEO Tr. at 68-69, 94-96, Attached Ex. 6. Along with the certificates, Ms. Newman instructed Mr. Carlstrom that the Agency's Personnel

Handbook, which described the Agency's Merit Promotion Plan (*i.e.*, guidelines concerning Status Applicants), stated that "if one [Status] candidate is interviewed, all other [Status] candidates should be interviewed. However, if only certain [Status] candidates are chosen to be interviewed, the choice must be based on a job-related criteria." *See* DOI Personnel Handbook at 7, Attached Ex. 23; Newman EEO Tr. at 68-69, Attached Ex. 6.

After discussing the matter, Messrs. Lawler and Carlstrom decided to utilize only the Status Certificates and interview only those individuals on the Status Certificates that were current NPS employees. *See* Lawler EEO Stmt. at 7-10, Attached Ex. 28; Carlstrom EEO Stmt. at 10-11, 16, Attached Ex. 29; Carlstrom EEO Tr. at 89-90, 96-97, Attached Ex. 8. Messrs. Carlstrom and Lawler chose to interview only current NPS employees (*i.e.*, the applicants with current knowledge of the operations of the NPS), because there was a sufficient number of Status Applicants and they viewed NPS experience as a critical, key attribute for the Position, which would permit the selectee to "perform real quickly at a top rate." Lawler EEO Stmt. at 8-9, 13-14, Attached Ex. 28; Carlstrom EEO Tr. at 89-90, Attached Ex. 8; Carlstrom EEO Stmt. at 11-12, Attached Ex. 29.[14]

Based upon this decision, Messrs. Carlstrom and Lawler returned both Non-Status Certificates to Ms. Newman unused (*see* Non-Status Certificates, Attached Ex. 26), and extended interview offers to five Status Applicants, of which four accepted: (1) Dottie Marshall, then a GS-14 Park Manager assigned to the George Washington Memorial Parkway, within the National Capital Region of NPS; (2) Kenneth Brodie, then a GS-13 Supervisory Human Resources Specialist assigned to the National Capital Region within NPS; (3) Ricardo Portillo,

---

[14]    Although Plaintiff and her "expert" remarkably contend that these considerations were somehow not job-specific or based upon merit, Plaintiff elsewhere states, "I understand how institutional knowledge and experience gained by an applicant can be a plus when a position opens within the same organization an applicant works for." *See* Pl's Rebut. To Carlstrom at 59, Attached Ex. 30.

then a GS-13 Administrative Officer assigned to the Pacific West Region within NPS; and (4) Thomas Ferranti, then a GS-15 Administrative Officer assigned to the Alaska Region of NPS. *See* Status Certificates, Attached Ex. 27; Lawler EEO Stmt. at 10, Attached Ex. 28. During their interviews, Messrs. Lawler and Carlstrom asked each of the four interviewees the same set of questions. *See* Carlstrom EEO Tr. at 29, 72, 89-90, 94-95, Attached Ex. 8; Lawler EEO Stmt. at 11, Attached Ex. 28. Based on Mr. Carlstrom's and Mr. Lawler's understanding, of the four interviewees, one was an African-American male (Mr. Brodie), and one was a Hispanic male (Mr. Portillo). *See* Lawler EEO Stmt. at 14, Attached Ex. 28; Carlstrom EEO Stmt. at 18-19, Attached Ex. 29; Carlstrom EEO Tr. at 99, 122, Attached Ex. 8.

  **B.** **Plaintiff Has Adduced No Evidence that the Selection of Interviewees Was Procedurally Improper.**

  Plaintiff concedes that Messrs. Carlstrom and Lawler decided as a threshold matter that Non-Status Applicants would not be interviewed. *See, e.g.*, Pl's Rebut. To Newman at 30-31, Attached Ex. 16 ("The perception is that it did not matter who scored and rated high, if a candidate was no already a government employee they would not be considered. Further, it didn't matter if the candidates were government employees, they would not be considered further because they were not National Park Service Employees, more specifically, National Capital Region employees."); Pl's Rebut. To Carlstrom at 29, Attached Ex. 30 ("The selecting officials specifically chose only the candidates that were/are park service employees with park service experience and knowledge."); Pl's Rebut to Lawler at 24, Attached Ex. 31 (same); *see also* Gerber Tr. at 107-08, Attached Ex. 25 (acknowledging that, based upon his review, all applicants on the Non-Status Certificate that contained Plaintiff's name were excluded from further consideration). Further, Plaintiff acknowledges that it is within the selecting officials' discretion to utilize some certificates while not utilizing others in deciding whom to interview. *See* Pl's

Rebut. To Newman at 33, Attached Ex. 16 ("selecting officials . . . have the option of selecting from among the multiple certificates"); Aguilar EEO Stmt. at 24-25, Attached Ex. 12 ("there's some pretty soft areas in policy and law whereby managers . . . can choose to select applicants from . . . any certificate").

Although Plaintiff's expert summarily asserts that NPS's decision not to utilize the Non-Status Certificates was improper (*see* Gerber Decl. at ¶¶ 9.c, 12.b, Attached Ex. 3), when asked at his deposition, Plaintiff's "expert" stated that he did not know what type of discretion Agency officials had in selecting whom to interview for the Position, and that there were no OPM guidelines on the matter. *See* Gerber Tr. at 39-40, Attached Ex. 25. In actuality, OPM regulations state that the Agency may choose to utilize its merit promotion procedures, instead of competitive procedures, to fill vacancies, and select or not select from among a group of best qualified candidates. *See* 5 C.F.R. § 335.102(a), 335.103(b)(4) ("Selection procedures will provide for management's right to select or not select from among a group of best qualified candidates. They will also provide for management's right to select from other appropriate sources, such as reemployment priority lists, reinstatement, transfer, handicapped, or Veteran Recruitment Act eligibles or those within reach on an appropriate OPM certificate. In deciding which source or sources to use, agencies have an obligation to determine which is most likely to best meet the agency mission objectives, contribute fresh ideas and new viewpoints, and meet the agency's affirmative action goals."). Further, the central premise for Mr. Gerber's unsupported conclusions -- *i.e.*, that NPS and/or NCR experience was an impermissible consideration in the selection process (*see* Gerber Decl. at ¶¶ 5, 9.a.) -- is nonsensical and plainly refuted by DOI's Personnel Handbook regarding its Merit Promotion Plan and OPM regulations, which state that any "job-related" criteria may be used in selecting which Status Applicants to interview. *See*

DOI Personnel Handbook at 7, Attached Ex. 23; 5 C.F.R. § 335.103(b)(1).  Consequently, there is no evidence supporting Plaintiff's contention that the selection process was somehow procedurally flawed.  *See also* Newman EEO Stmt. at 15, Attached Ex. 15.[15]

### C.    Plaintiff's Race and/or National Origin Was Not a Motivating Factor in Selecting the Interviewees.

Most significantly, there is nothing about Messrs. Lawler's and Carlstrom's selection of the interviewees upon which a reasonable juror could conclude that such a decision was motivated by any discriminatory animus.  Significantly, Plaintiff's expert conceded that all applicants on the Non-Status Certificates were excluded "regardless of their race, ethnicity, gender, national origin, [and/or] disability."  *See* Gerber Tr. at 125, Attached Ex. 25.  Even Plaintiff herself concedes that the other applicants on the Non-Status Certificates were not interviewed because "[n]one of them were National Capital Region Park employees, or employees [of] [N]PS, or DOI employees."  Aguilar Tr. at 93-95, Attached Ex. 2.  Plaintiff also concedes that Mr. Lawler had no reason to know that she was Hispanic, aside from her name being associated with her husband's.[16]  *See id.* at 116.

Not surprisingly, Plaintiff's own "expert" refused to conclude that Plaintiff's non-selection for the Position was a product of intentional discrimination.  *See* Gerber Tr. at 206,

---

[15]    Furthermore, had Messrs. Carlstrom and Lawler utilized the Non-Status Certificate on which Plaintiff's name appeared, Plaintiff could not have been selected pursuant to OPM regulations.  OPM regulations require that agencies use the "rule of three" in selecting candidates from completive (as opposed to merit promotion) certificates.  *See* 5 C.F.R. § 332.404.  That is, the Position would have had to have been filled by one of "the highest three eligibles on the certificate who are available for appointment."  *See id.*  Without question, four individuals (including three veterans' preference candidates) were rated higher than Plaintiff on the Non-Status GS-15 Certificate, and thus, even if her certificate had been used, Plaintiff could not have been selected for the Position.

[16]    Plaintiff, without support, claims that Mr. Carlstrom wrote her husband's last name, "Nieto," next to hers on the Non-Status Certificate.  *See* Aguilar Tr. at 177, Attached Ex. 2.  Although Plaintiff has adduced no evidence in discovery that supports this assertion, even if Plaintiff were correct, it does not indicate that race or ethnicity was a factor in choosing not to interview Non-Status Applicants.  Indeed, as noted above, Plaintiff herself indicated in her application that her husband worked in the National Capital Region of the Park Service.  *See, supra,* at 9, n.5.  In sum, Plaintiff has adduced no evidence that this handwritten note was written by Mr. Carlstrom or was anything but a notation of fact -- *i.e.,* that she was the wife of Mr. Nieto, a NCR employee.

Attached Ex. 25 ("I don't know if the discrimination was intentional."); *see also id.* at 61, 63-64.

Remarkably, Plaintiff herself agreed that the selection process discriminated against all Non-Status Applicants, which included members of various races and ethnicities. *See* Aguilar Tr. at 122, Attached Ex. 2. Consequently, it is beyond dispute, that Plaintiff and the rest of the candidates on the Non-Status Certificates were treated the same irrespective of their races or ethnicities, and not a single Non-Status Applicant was interviewed for the Position. *See also* Pl's Rebut. To Carlstrom at 56, Attached Ex. 30 ("Mr. Carlstrom interviewed only park service employees regardless of which list they appeared on while ignoring and not interviewing other individuals whose names were listed with these park service employees.").

## V.    THE SELECTING OFFICIALS SELECT MS. MARSHALL BECAUSE THEY SINCERELY BELIEVED THAT SHE WAS THE BEST APPLICANT.

After the interviews were conducted, Mr. Lawler and Mr. Carlstrom discussed their thoughts and concluded that Ms. Dottie Marshall was the best candidate for the Position primarily due to her lengthy experience with the NPS, her knowledge about the National Capital Region, and her expertise in budgeting. Lawler EEO Stmt. at 12-13, Attached Ex. 28; *see also* Carlstrom EEO Stmt. at 13-14, Attached Ex. 29. As Mr. Lawler described:

> Dottie Marshall brought all those experiences to us. Probably the best person in this region, including our current budget officer, in terms of her knowledge and expertise in developing a budget, especially a budget that goes through the NPS budget process.
>
> She's been doing that. She was previously our budget office for the region. So she brings a tremendous amount of expertise from the technical side as well as the strategic side of it because she knows the committee processes. She knows that very well. Knows the staff very well. Extremely in depth knowledge of budget. That's one.
>
> Two, her most recent experience has been in a very active park setting as the Deputy Superintendent where she had lots of responsibilities for the operations of the park. So she would be able to do her new job with a tremendous background in what our superintendents are facing as they try to accomplish their mission in the parks because she's been there recently.

> She knows what the problems they're facing so she brings that knowledge to us, as well as her detailed knowledge of budget. And she's worked her way through the ranks. She knows an awful lot about administration because of her previous background as administrative officer in several parks.

> She's got a long, successful track record in this region and throughout the Park Service. She's well known and well respected.

Lawler EEO Stmt. at 12-13, Attached Ex. 28; *see also* Carlstrom EEO Stmt. at 13-14, Attached Ex. 29. Notably, the reasons Messrs. Lawler and Carlstrom have given for selecting Ms. Marshall are consistent with the "Major Duties" described in the Amended Announcement. *See, supra*, at 7.

Nevertheless, despite these compelling rationales, Plaintiff, in part, contends that she was better qualified than Ms. Marshall and that Ms. Marshall had simply been "preselected" for the Position. *See* Aguilar Tr. at 74-77, Attached Ex. 2; Aguilar EEO Stmt. at 17-18, Attached Ex. 12; Aguilar EEO Tr. at 54-55, Attached Ex. 11 ("They chose not to deal with anybody on those lists because they had already predetermined who they wanted and how they were going to get to that person"); Compl. at ¶¶ 16-26. Indeed, Plaintiff herself believes that NPS's decision was motivated by other reasons than just her race (including Mr. Carlstrom's desire to select specifically Mr. Marshall and his desire to select a Park Service employee), and that Mr. Carlstrom would have selected Ms. Marshall regardless of who applied. *See* Aguilar Tr. at 74-76, Attached Ex. 2; Aguilar EEO Stmt. at 17-18, Attached Ex. 12; Aguilar EEO Tr. at 54-55, Attached Ex. 11; Compl. at ¶¶ 16-26.

\*   \*   \*

In sum, throughout the selection process Plaintiff was treated the same as all other similarly situated Non-Status Applicants -- *i.e.*, her basic qualifications were reviewed by the same people that reviewed all Non-Status Applicants, she was rated and ranked by the same person who rated and ranked all Non-Status Applicants, her name appeared on the same

certificate of eligibles as all similarly situated Non-Status Applicants, and she was not selected because the selecting officials decided to not to use any Non-Status Certificate. The relevant Agency employees and officials confirm this and that Plaintiff's race and national origin were not factors in the selection process for the Position. *See* Carlstrom EEO Stmt. at 17-18, Attached Ex. 29; Lawler EEO Stmt. at 14, Attached Ex. 28; Newman EEO Stmt. at 19, Attached Ex. 15.

## ARGUMENT

There exists no genuine issue of any material fact that could prevent summary judgment in Defendant's favor on Plaintiff's claims in this action.

## I.     THE RELEVANT LEGAL STANDARDS.

## A.     The Legal Standard for Summary Judgment Under Rule 56.

"Summary judgment is appropriate when the pleadings and the evidence demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 154 (D.D.C. 2007) (Bates, J.), *quoting* Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial responsibility of showing an absence of a genuine issue of material facts. *Id.* In deciding whether a genuine issue of material facts exists, the court must "accept all evidence and make all inferences in the non-movant's favor." *Id.*, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "A non-moving party, however, must establish more than the mere existence of a scintilla of evidence in support of its position." *Id.* (citations and internal quotation marks omitted). That is, "'[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.*, *quoting Anderson,* 477 U.S. at 249-50.

Furthermore, "[s]elf-serving testimony does not create genuine issues of material fact[.]" *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) (Robertson, J.) (granting

summary judgment on plaintiff's Title VII discrimination and retaliation claims); *see also Bonieskie v. Mukasey*, --- F. Supp. 2d ---, 2008 WL 839051, at *3 (D.D.C. Mar. 31, 2008) (Friedman, J.) ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements."); *Lindsey v. Rice*, 524 F. Supp. 2d 55, 60 (D.D.C. 2007) (Collyer, J.) (granting summary judgment where plaintiff's "self-serving statements [were] too conclusory to survive [defendant's] summary judgment motion"). That is, "'conclusory allegations' and 'unsubstantiated speculation' do not create genuine issues of material fact." *Bonieskie*, 2008 WL 839051, at *3 (citations omitted); *see also Short v. Chertoff*, 555 F. Supp. 2d 166, 171 (D.D.C. 2008) (granting motion for summary judgment, noting "[t]he nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit [only] if he supports his allegations with facts in the record[.]") (internal quotation marks omitted). "Indeed, for the court to accept anything less 'would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.'" *Short*, 555 F. Supp. 2d at 171, *quoting Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Under this standard, summary judgment is appropriate in Defendant's favor.

**B.    Legal Standards Governing Disparate Treatment Claims Under Title VII.**

In *Fogg v. Gonzales*, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, inter alia, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played

a "motivating part" or was a "substantial factor" in the employment decision.  *Id.* at 451.[17]

Under either theory, plaintiff must demonstrate discrimination by a preponderance of the

evidence and may rely on direct or circumstantial evidence to meet that burden.  *Desert Palace,*

*Inc. v. Costa*, 539 U.S. 90, 92-102 (2003).

Regardless of the theory, in the absence of direct evidence, Plaintiff's circumstantial

evidence is analyzed using the scheme first set forth in *McDonnell-Douglas Corp. v. Green*, 411

U.S. 792 (1973).[18]    Under that scheme, the plaintiff must first, by a preponderance of the

evidence, establish a prima facie case of discrimination.  *See St. Mary's Honor Center v. Hicks*,

509 U.S. 502, 506 (1993).  If the employee succeeds:

> [T]he employer must articulate a legitimate, non-discriminatory
> reason for its action. The employer need not persuade the court that
> it was actually motivated by the proffered reasons. Rather, the
> defendant must clearly set forth, through the introduction of
> admissible evidence, reasons for its actions which, if believed by
> the trier of fact, would support a finding that unlawful
> discrimination was not the cause of the employment action.

*Short*, 555 F. Supp. 2d at 166 (internal quotation marks omitted), *citing Tex. Dep't of Cmty.*

*Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981), *and St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502 (1993).

After the employer articulates a legitimate non-discriminatory reason, in a single-motive

or "pretext" case:

> the McDonnell Douglas framework -- with its presumptions and

---

[17]    *See also Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008) ("There are two ways of establishing liability in a Title VII case. A plaintiff may pursue a "single-motive case," in which he argues race (or another prohibited criterion) was the sole reason for an adverse employment action and the employer's seemingly legitimate justifications are in fact pretextual.  Alternatively, he may bring a "mixed-motive case," in which he does not contest the bona fides of the employer's justifications but rather argues race was also a factor motivating the adverse action.") (internal quotation marks and citations omitted).

[18]    Reliance on the *McDonnell Douglas* scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability.  *See Fogg v. Gonzales*, 492 F.3d at 451 n.*; *see also Ginver v. District of Columbia*, 527 F.3d 1340, 1344-45 (D.C. Cir. 2008).

> burdens -- disappears, and the sole remaining issue is discrimination *vel non.* [That is,] [t]he district court need resolve only one question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Short*, 555 F. Supp. 2d at 166 (internal quotation marks and other citations omitted), *citing Brady*

*v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir.

2008).

Similarly, in a mixed-motive case, Plaintiff must show that, notwithstanding the employer's legitimate non-discriminatory reasons, "'discrimination or retaliation played a "motivating part" or was a "substantial factor" in the employment decision,' 'without proving that the impermissible consideration was the sole or but-for motive for the employment action.'" *Fogg*, 492 F.3d at 451, *quoting Porter v. Natsios*, 414 F.3d 13, 18-19 (D.C. Cir. 2005). In a mixed-motive case, however, 42 U.S.C. § 2000e-5(g)(2)(B) provides the employer with a "limited affirmative defense," that restricts a plaintiff's remedies. *See Fogg*, 492 F.3d at 451. That is, if a "defendant 'demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor,' then the district court may grant declaratory or injunctive relief and attorney's fees, but 'shall not award damages or issue an order requiring any . . . reinstatement, hiring, promotion, or payment.'" *Id.*, *quoting* 42 U.S.C. § 2000e-5(g)(2)(B).

Whichever standard is applied to this case, Plaintiff fails to meet her burden of coming forward with evidence to create a triable issue.

## II.    PLAINTIFF HAS FAILED TO ESTABLISH THAT HER RACE WAS A MOTIVATING FACTOR IN HER NON-SELECTION OR THAT DEFENDANT'S REASON FOR NOT SELECTING HER WERE PRETEXTUAL.

Quite simply, Plaintiff has failed to establish that her race was a motivating factor in her non-selection. The undisputed evidence clearly shows that Plaintiff was not selected because she

was a Non-Status Applicant and had no National Park Service experience. Indeed, Plaintiff herself implicitly concedes by arguing that her race and/or national origin *should have* played a role in the selection process, that her race and national in fact played no role in that process.

Furthermore, Plaintiff has adduced no evidence that Defendant's legitimate, non-discriminatory reason for not selecting Plaintiff was pretextual. It is beyond dispute that Plaintiff was not even interviewed because Messrs. Carlstrom and Lawler's chose to use the Status Certificates, instead of the Non-Status Certificates.

Notably, this very Court has previously addressed a case almost identical to this one. In *Ward v. Kennard*, 133 F. Supp. 2d 54, 58-59 (D.D.C. 2000) (Urbina, J.), the Court granted defendant-employer's motion for summary judgment on plaintiff's Title VII claims premised upon non-selection. The vacancy in *Ward*, as here, was open to "all sources." *Id.* at 56. As in this action, the plaintiff in *Ward* had prior federal experience in a similar position, but was not a current federal employee when he applied for the relevant position. *Id.* As here, the plaintiff in *Ward* alleged that he was discriminated against when the defendant agency "chose to utilize the Merit Promotion Candidates list rather than the Non-status Candidates list of the Non-competitive Candidates List[.]" *Id.* at 58. Lastly, as here, the plaintiff in *Ward* alleged that the defendant agency's "selection of another person for the [ ] position violated both merit-system principles and government personnel practices." *See id.* at 56. When presented with these facts, this Court in *Ward* concluded that the plaintiff failed to show that the agency's legitimate, non-discriminatory reasons were somehow pretextual.

This Court has also considered a second almost identical case. In *Montgomery v. Chao*, 495 F. Supp. 2d 2, 17 (D.D.C. 2007) (Urbina, J.), the plaintiff asserted a host of claims, including

several non-selection discrimination claims.  On one of plaintiff's claims, the Court explained

plaintiff's claim and reasoned as follows:

> The defendant moves for summary judgment on the claim that the failure to select
> the plaintiff for the . . . position constitutes discrimination and retaliation.
> Specifically, the defendant argues that the defendant did not even consider non-
> status applicants because it chose a status applicant.  The plaintiff attempts to
> show that the defendant's proffered reason is pretextual by stating that "[t]he goal
> . . . is to get the best qualified candidate for the job" and by attempting to show
> that he was more qualified than the individual who was ultimately selected for the
> position.  But, it is immaterial that the plaintiff may be better qualified than the
> individual selected because the defendant considered status candidates first, and,
> having selected a status candidate, the defendant did not consider applications
> from non-status candidates.  That is, the defendant, consistent with its selection
> procedures, never considered the plaintiff's application for the . . . position
> because it had found a suitable candidate from the status list.  The plaintiff,
> moreover, has not shown that the defendant intentionally altered its selection
> procedures so as to avoid selecting him, or that he was treated differently than any
> other non-status candidate.  Because the plaintiff presents no evidence to rebut the
> defendant's proffered explanation, the court grants summary judgment for the
> defendant on the claim that the plaintiff's non-selection for the . . . position
> constitutes discrimination and retaliation.

*Id.* at 16-17.

Other courts addressing similar non-selection claims have reached similar results.  For

example, in *Thompson v. Kelso*, 122 F.3d 1063, 1997 WL 570870, *1 (4th Cir. Sept. 16, 1997),

the Fourth Circuit addressed an even more extreme, but similar claim.  The plaintiff in

*Thompson*, an African-American male, applied for a federal position as a "status" employee.  *Id.*

Due to an administrative error, however, the applications of the two status candidates (*i.e.*,

plaintiff and one other white, male applicant) were not forwarded to the selecting official.  *Id.*

The Fourth Circuit nonetheless affirmed the district court's grant of summary judgment to the

defendant on plaintiff's discrimination claim, because all status applicants were treated in the

same manner despite the procedural error.  *Id.*

Plaintiff's claim in this action does not differ in any material respects from plaintiffs'

claims in *Ward*, *Montgomery*, and *Thompson*.  Ms. Aguilar, as with those plaintiffs, was treated

in the same fashion as others in the non-status category, without regard to her race or national origin. Accordingly, Plaintiff has failed to establish that her race or national origin motivated her non-selection or that Defendant's legitimate, non-discriminatory reasons for not selecting her were pretextual.

### III.  IN THE ALTERNATIVE, PLAINTIFF'S CLAIMS FOR COMPENSATORY DAMAGES AND EQUITABLE RELIEF SHOULD BE DISMISSED.

Even if Plaintiff could somehow show that her race or national origin was a motivating factor in her non-selection (which as noted above, she cannot), Plaintiff has conceded that the Agency would have taken the same action regardless of Plaintiff's race or national origin. That is, Plaintiff has consistently maintained that Ms. Marshall was preselected and the selection process was just a sham. *See* Aguilar Tr. at 74-77, Attached Ex. 2; Aguilar EEO Stmt. at 17-18, Attached Ex. 12; Aguilar EEO Tr. at 54-55, Attached Ex. 11 ("They chose not to deal with anybody on those lists because they had already predetermined who they wanted an how they were going to get to that person"); Compl. at ¶¶ 16-26. Although Defendant maintains that there is no genuine issue of material fact that (a) Plaintiff's race was not a factor; and (b) Ms. Marshall was not preselected; at the very least, if Plaintiff could establish that race was a motivating factor (which she cannot), Defendant agrees that NPS would have nonetheless selected Ms. Marshall for the Position. Accordingly, pursuant to 42 U.S.C. § 2000e-5(g)(2)(B), summary judgment should be entered in Defendant's favor on Plaintiff's claims to the extent they seek equitable relief and/or compensatory damages.

*    *    *

## **CONCLUSION**

For the foregoing reasons, the Court should enter summary judgment in Defendant's favor on Plaintiff's claims.

Dated: August 22, 2008
       Washington, DC

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


       /s/
_____
BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SANDRA L. AGUILAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 07-0546 (RMU) |
| | ) | |
| DIRK KEMPTHORNE, Secretary, | ) | |
| U.S. Department of the Interior, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DEFENDANT'S STATEMENT OF UNDISPUTED FACTS</u>

Pursuant to Local Civil Rule 7(h), Defendant Dirk Kempthorne ("Defendant"), Secretary, U.S. Department of the Interior ("Agency" or "DOI"), by and through his counsel, respectfully submits this statement of material facts as to which there exists no genuine issue:

1.      Plaintiff had no prior employment or experience with the Agency, the Park Service or the National Capital Region when she applied for the Position.  *See* Aguilar Tr. at 130-31, Attached Ex. 2.

2.      Plaintiff did not have any knowledge of the inner workings of the Park Service, the National Capital Region or the Department of the Interior at the time she applied for the Position.  *See id.*

3.      When she applied for the Position, Ms. Aguilar had been unemployed for the two immediately-preceding years and did not perform any human resources duties, even on a voluntary basis, during that time period.  *See* Aguilar Tr. at 61, Attached Ex. 2.

4.    During her two year period of unemployment, Ms. Aguilar held a volunteer position in which (a) she was only in charge of a $10,000 budget; and (b) she only had "minor" procurement duties.  *See id.* at 62-63.

5.    Plaintiff has designated Mr. Arnold J. Gerber, as purported expert in human resources.

6.    Unlike Plaintiff, Ms. Dottie Marshall had extensive experience with the Park Service.  *See* Marshall App., Attached Ex. 4.

7.    Prior to her selection for the Position, "Ms Marshal [ ]  held a number of progressively more responsible positions in the National Park Service and National Capital Region over the [preceding] 27 years."  *See* Memo Requesting Appointment of 05/16/03, Attached Ex. 5.

8.    Ms. Marshall had extensive experience in budgeting formulation and execution, including in the 2 years prior to applying for the Position.  *See id.*, Marshall App., Attached Ex. 4.

9.    Ms. Marshall's extensive experience with the Park Service and her qualifications for the Position were described in detail by her when she applied for the Position.  *See* Marshall App., Attached Ex. 4.

10.    In early-2003, Mr. Dick Powers indicated to the Agency that he was going to retire from his position as Associate Regional Director for Administration for the National Capital Region of the Park Service (the "Position"), which was an Administrative Officer position with the grade and series of GS-341-15.  *See* Newman EEO Tr. at 21-23, Attached Ex. 6.

11.     Accordingly, NCR began to prepare an announcement to solicit applications of candidates to replace Mr. Powers.  *See id.* at 21-23.

12.     Ms. Leslie Newman, a Supervisory Human Resource Specialist in the Division of Administration for NCR, was responsible for preparing the announcement, drafting "the duties, qualifications, knowledge, skills and abilities" contained therein, and supervising the administrative processing of the applications.  *See id.* at 20-21.

13.     After she drafted the initial Vacancy Announcement ("Initial Announcement"), she forwarded it to Mr. Powers and Mr. Terry Carlstrom (who was Mr. Powers' supervisor and one of the two selecting officials for the Position) for their review.  *See id.* at 21.

14.     After Messrs. Powers and Carlstrom approved the Initial Announcement, it was issued to the public on or around March 10, 2003.  *See id.* at 22.

15.     The Initial Announcement for the Position limited the applicant pool to current employees of the Agency and only advertised the Position at the GS-15 level.   *See* Init. Announce. at 1, Attached Ex. 7.

16.     Subsequently, the Park Service discovered that there was an error in the Initial Announcement.  *See* Newman EEO Tr. at 23-24, Attached Ex. 6; Carlstrom EEO Tr. at 78-79, Attached Ex. 8.

17.     Pursuant to a policy memorandum designed to promote diversity in the Agency (*see* "Stanton Memo" of 02/12/1999, Attached Ex. 9), the vacancy announcement for the Position should have been advertised to "All Sources," and should have been advertised at multiple grade levels (*i.e.*, also as a GS-14 position).  *See* Newman EEO Tr. at 23-24, Attached Ex. 6; Carlstrom EEO Tr. at 78-79, Attached Ex. 8.

18.     The Stanton Memo only addresses advertisement of positions, not whether an applicant's prior experience with the Agency, NPS or NCR is a relevant factor to use in considering which applicants should be interviewed or offered any particular position.  *See* Stanton Memo, Attached Ex. 9.

19.     The Stanton Memo itself was designed in part to "provide greater flexibility to selecting officials."  Stanton Memo at 1, Attached Ex. 9.

20.     The aforementioned error in the Initial Announcement was brought to Mr. Carlstrom's attention, who admitted it was an oversight on his part and "a hundred percent" agreed that the Position should be re-advertised to comply with the Stanton Memo.  *See* Carlstrom EEO Tr. at 80-81, Attached Ex. 8.

21.     The Agency re-advertised the Position through an amended Vacancy Announcement ("Amended Announcement"), which "amend[ed] the grade of the position to GS-14/15, the salary range, the area of consideration to all sources, the qualifications and also extend[ed] the closing date to April 14, 2003."  *See* Amd. Announce. at 1, Attached Ex. 10.

22.     The Amended Announcement complied with the Stanton Memo and the Agency's diversity hiring policies.  *See* Aguilar EEO Tr. at 21, Attached Ex. 11 ("[NPS] opted to follow the criteria of this memo which was to open the vacancy to all sources").

23.     The "Major Duties" for the Position were described in the amended Vacancy Announcement ("Amended Announcement"), in part, as follows:

> The position has a direct line authority for the planning, policy, execution, management and supervision of all administrative, informational system, and financial management activities through the [NCR].  This includes such activities as human resources, finance, contracting, property, office services, fiscal management and information technology.  The primary functions of the position are to provide effective and efficient delivery of administrative services throughout the [NCR].  Provides administrative and technical support and

- 4 -

advisory services to approximately 14 parks/monuments/historic sites, as well as the [NCR] Director's staff.

Amd. Announce. at 3, Attached Ex. 10.

24.     The Amended Announcement further provided a "Summary of the Qualifications Required," which for the GS-15 level listed the following:

[A]pplicants must possess one (1) year of progressively responsible specialized experience at the GS-14 level that has equipped the applicant with the particular knowledge, skills and abilities to perform successfully the duties of the position that is typically in or related to the work of the position.

*Id.* at 3.

25.     Later in the Amended Announcement, applicants were instructed to address the following knowledge, skills and abilities ("KSAs") in a narrative statement within their application for the Position:

1.     Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.

2.     Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels.

3.     Ability to develop, analyze, review and appraise the effectiveness of administrative policies, programs, and practices.

4.     Ability to interact and communicate at all levels.

5.     Ability as a manager to direct a support staff comprised of a range of technical and professional individuals.

*Id.* at 6.

26.     The Amended Announcement further instructed that narrative statement should be "no more than one page per KSA" in length.  *Id.* at 7; *see also* Init. Announce. at 5, Attached Ex. 7.

27.    The Amended Announcement also instructed applicants to include in their application their prior work experience:

(4)    WORK EXPERIENCE - give the following information for your paid and nonpaid work experience related to the job for which you are applying:

(a) job title (include series and grade if Federal job); (b) duties and accomplishments; (c) employer's name and address; (d) supervisor's name and phone number; (e) starting and ending dates (month and year); (f) hours per week; (g) salary.   Indicate if we may contact your current supervisor.

Amd. Announce. at 7, Attached Ex. 10; *see also* Init. Announce. at 5, Attached Ex. 7.

28.    On March 26, 2003, before the Agency issued the Amended Announcement, Plaintiff submitted her application for the Position.  *See* Aguilar EEO Stmt. at 7, Attached Ex. 12.

29.    Even though Plaintiff submitted her application under the Initial Announcement, which was only open to current Agency employees, NPS nonetheless considered her application when it expanded the applicant pool through the Amended Announcement to include all sources. Aguilar EEO Tr. at 22, Attached Ex. 11.

30.    Plaintiff included in her application (a) a cover letter, in which she described her relevant experience and why she should be selected for the Position (Pl's App. at 1-2, Attached Ex. 13); (b) a SF-171 optional application for federal employment, in which she further detailed her education and her relevant work experience (*id.* at 28-51); (c) a narrative statement addressing the above noted KSAs, in which Plaintiff further described her relevant work experience (*id.* at 15-27); (d) her last SF-50 Notification of Personnel Action and performance appraisal from her prior employment with the federal government (*id.* at 4-14); and (e) an optional Applicant Background Survey ("RNO Form"), in which she identified herself as a "Hispanic or Latino" and as a woman.  *Id.* at 3.

31.     In her SF-171, Plaintiff identified that her husband, Mr. William Nieto, Jr., was a current employee of the Park Service.  *See* Pl's App. at 51, Attached Ex.13.

32.     Plaintiff's narrative statement failed to comply with the one-page per KSA limitation set forth in the Initial and Amended Announcements.  Pl's App. at 15-27, Attached Ex. 13.

33.     On March 27, 2003, Plaintiff's application was stamped received by NCR's human resources office.  *See* Pl's Stamped App. at 1, Attached Ex. 14.

34.     Pursuant to the practice of the human resources office of NCR, when applications are received by the office, the relevant office assistant -- which for the Position was Ms. Jeanette Organ (*see* Amd. Announce. at 3, Attached Ex. 10; Newman EEO Tr. at 75-76, Attached Ex. 6) -- immediately removes any RNO Forms from the applications, sets them aside, and, after the application period is closed, sends them to the Agency's EEO office without maintaining copies of them.  *See* Newman EEO Tr. at 76-77, Attached Ex. 6; Newman EEO Stmt. at 19-20, Attached Ex. 15.

35.     Given this procedure, Ms. Newman does not recall seeing Ms. Aguilar's RNO Form.  *See* Newman EEO Tr. at 84, Attached Ex. 6.

36.     At the administrative level, Plaintiff submitted lengthy "Rebuttal Statements" to the statements made by the Agency officials who were interviewed by the EEO investigator. Plaintiff drafted the totality of these rebuttal statements herself.  *See* Letter from Aguilar to Diaz of 12/8/2003, Attached Ex. 18.

37.     Plaintiff's RNO Form did not play a role in the selection process.  *See* Pl's Rebut. To Newman at 42, Attached Ex. 16 ("I included a completed Applicant Background Survey in the application package I sent in for this position.  I self identified as an (sic) Hispanic woman.  I

was discriminated against because no one took notice that a Hispanic woman applied for the position . . . No one took notice of the Survey I submitted.").

38.    After the applications for the Position were received and the RNO Forms removed, the applications were reviewed by Ms. Newman and a member of her staff, Ms. Joyce Sasser, for basic qualifications. *See* Newman EEO Tr. at 49-50, Attached Ex. 6; Sasser Tr. at 7-9, 12-13, Attached Ex. 17.

39.    Based upon this review, a certain number of applicants were deemed not qualified. *See* Newman EEO Tr. at 50, Attached Ex. 6; Newman EEO Stmt. at 7, Attached Ex. 15.

40.    The qualified applications, including Plaintiff's application, were scheduled to be rated and ranked. *See* Newman EEO Tr. at 49-50, Attached Ex. 6; Sasser Tr. at 7-9, 12-13, Attached Ex. 17.

41.    Plaintiff's race and national origin were not considered at this stage of the selection process. Pl's Rebut. To Newman at 41, Attached Ex. 16 ("Actually consideration toward race and national origin should have been given before the rating and ranking process began.").

42.    Before the applications for the Position were screened for basic qualifications, and subsequently rated and ranked, Ms. Newman created crediting plans (one for GS-15 qualified applicants, the other for GS-14 qualified applicants) to use in evaluating the eligible candidates. *See* Newman EEO Tr. at 42-44, Attached Ex. 6; Newman EEO Stmt. at 6-7, Attached Ex. 15.

43.    Ms. Newman developed the crediting plans based upon the KSAs contained in the Amended Announcement and other similar crediting plans previously used by NPS. *See* Newman EEO Tr. at 42, Attached Ex. 6.

44.    Generally, the crediting plans consisted of a three-tiered rubric for each KSA listed on the Amended Announcement against which the applications could be compared to develop a numerical score. *See, e.g.*, GS-15 Crediting Plan, Attached Ex. 19.

45.    In the rating process, after reviewing their narratives and applications, each candidate was assigned a score for each KSA (ranging from 1 to 3) based upon the crediting plan's rubric, which was then multiplied by the weight assigned for each KSA (ranging from 1x to 3x), and totaled to give an overall evaluation score. *See, e.g.,* GS-15 Crediting Plan, Attached Ex. 19; Newman EEO Tr. at 42-45, Attached Ex. 6.

46.    The overall evaluation score was then converted into a 100 point based score pursuant to an OPM transmutation table.   *See* Newman EEO Tr. at 44-45, Attached Ex. 6.  In practical effect, 70 points (representing points allotted for satisfying the basic qualifications for the Position) were added to each eligible candidate's evaluation score. *See* Sasser Tr. at 7-8, 10, Attached Ex. 17; OPM Transmutation Table, Attached Ex. 20.

47.    After each applicant's overall evaluation score was computed using this process, any applicable veterans' preference points were then added to reach a final score for each applicant. *See* Newman EEO Stmt. at 14, Attached Ex. 15; Sasser Tr. at 10, Attached Ex. 17.

48.    Pursuant to Ms. Newman's understanding of NPS personnel procedures, because there were more than 10 qualified "status" or "promotion eligible" applicants -- *i.e.*, applicants that were current federal employees ("Status Applicants") -- a panel was convened to rate and rank the Status Applicants.  *See* Newman EEO Tr. at 42-43, 51-52, Attached Ex. 6; Newman EEO Stmt. at 7, Attached Ex. 15; NPS Merit Promotion Plan, Implementation Guidelines at 2, Attached Ex. 21 ("If there are more than 10 promotion eligibles, rating and ranking must be completed by a Personnel Specialist, SME or a rating panel.").

49.    The rating panel consisted of subject matter experts -- *i.e.*, NPS employees at the grade level of the advertised position or higher with knowledge of the position.  *See* Newman EEO Tr. at 60-61, Attached Ex. 6.  In this case, the panel consisted of Vicky McGraw and John Hale (GS-15 Park Superintendents), and John Tyler from NPS's Washington Office, who was previously an Administrative Officer.  *See* Newman EEO Tr. at 61-62, Attached Ex. 6; Def's Resps. to Pl's 1st Interrogs. At 7, Attached Ex. 22.

50.    Further, Ms. Joy Harris from the NCR's EEO office was invited to the panel session to ensure fairness and equality, and to answer any questions of the panel members.  *See* Newman EEO Tr. at 62-63, Attached Ex. 6.

51.    Each panel member independently rated each qualified Status Applicant against the crediting plan using the above described rating process.  *See id.* at 63.

52.    The panel's scores were then averaged to produce each Status Applicant's overall evaluation score.  *See id.* at 46-47.

53.    A cutoff score was then determined for each category of applicants (*i.e.*, Status Applicants eligible for the Position at a GS-14 level, Status Applicants eligible for the Position at the GS-15 level).  *See* Newman EEO Stmt. at 8, Attached Ex. 15.

54.    As prescribed by the NPS's Merit Promotion Plan, the cutoff score (*i.e.* the dividing points between the best-qualified and the qualified applicants) was set at a number that would allow the selecting officials to chose from a reasonable number of applicants and where there was a score difference that was significant (*e.g.*, a gap in scores, or a score that would unreasonably increase the number of best-qualified applicants).  *See* NPS Merit Promotion Plan, Implementation Guidelines at 2, Attached Ex. 21.  The Agency's Merit Promotion Handbook

describes that this determination is left to bureau discretion. *See* DOI Personnel Handbook at 6, Attached Ex. 23.

55.     Those Status Applicants with scores above the cutoff were deemed to be the "best-qualified" Status Applicants and were moved forward in the selection process. *See* Def's Resps. To Pl's 1st Interrogs. at 5, Attached Ex. 22.

56.     The "non-status" applicants -- *i.e.*, applicants who were not employed by the federal government when they applied for the Position ("Non-Status Applicants") -- were ranked and rated by a Human Resource Specialist, Ms. Joyce Sasser. *See* Sasser Tr. at 13-14, Attached Ex. 17; Newman EEO Tr. at 66, Attached Ex. 6.

57.     Ms. Newman decided that Ms. Sasser, as opposed to herself, should rank and rate the Non-Status Applicants, because the eventual selectee for the Position would be Ms. Newman's direct supervisor and wanted to avoid any appearance that she "was selecting [her] own boss." *See* Newman EEO Stmt. at 16, Attached Ex. 15.

58.     Ms. Sasser, as opposed to the aforementioned panel, rated and ranked the Non-Status Applicants because (a) Ms. Newman believed that NPS's Merit Promotion Implementation Guidelines did not request "non-status" applicants -- *i.e.*, applicants who were not employed by the federal government when they applied for the Position ("Non-Status Applicants") -- to be ranked and rated by a panel (*see* Newman EEO Stmt. at 7-8, 17, Attached Ex. 15), and (b) there were not that many Non-Status Applicants. *See* Newman EEO Tr. at 66, Attached Ex. 6.

59.     Although Ms. Sasser ranked and rated the Non-Status Applicants, all applicants regardless of status or category were rated against the same crediting plan. *See* Newman EEO Stmt. at 16, Attached Ex. 15.

60.    The remainder of the rating and ranking process as applied to Non-Status Applicants (including setting a cutoff scores, and determining which Non-Status Applicants were "best-qualified"), mirrored the process employed by NPS for the Status Applicants.  *See* Newman EEO Stmt. at 8, Attached Ex. 15.

61.    Using the crediting plan, Ms. Sasser gave Plaintiff a score of 97, three points shy of a perfect overall evaluation score.  *See* Pl's Rating Sheet, Attached Ex. 24.

62.    The only KSA on which Plaintiff did not receive the highest score possible from Ms. Sasser was KSA No. 2, "Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels," on which Ms. Sasser gave Plaintiff the second highest possible score.  *Compare id. with* GS-15 Crediting Plan, Attached Ex. 19.

63.    Based upon Plaintiff's rating, she was deemed to be a "best-qualified" Non-Status Applicant for the GS-15 level Position.  *See* Non-Status Certificates at 2, Attached Ex. 26.

64.    Plaintiff's "human resources expert," Mr. Gerber, testified that he did not know of any DOI or NPS policy that required the Non-Status Applicants to be ranked by a panel.  *See* Gerber Tr. at 126, Attached Ex. 25.

65.    All Non-Status Applicants, regardless of race, were rated and ranked by Ms. Sasser.  *See* Sasser Tr. at 13-14, Attached Ex. 17; Newman EEO Tr. at 66, Attached Ex. 6.

66.    Plaintiff's own expert believes that the evidence shows that Ms. Newman did not know Plaintiff's ethnicity.  *See* Gerber Decl. at ¶ 7, Attached Ex. 3 ("Neither Carlstrom nor Newman was aware of the ethnicity of the candidates on the selection certificates[.]").

67.     Based upon the best-qualified, eligible candidates identified in the rating process, Ms. Newman's assistant, Ms. Organ, prepared certificates of eligibles.  *See* Newman EEO Tr. at 90-91, Attached Ex. 6; Sasser Tr. at 19-20, Attached Ex. 17.

68.     Due to the various status and eligibility levels of the "best-qualified" applicants, a total of seven certificates were prepared:

(i)     a Non-Status GS-14 Certificate (consisting of best-qualified Non-Status Applicants eligible for the Position at the GS-14 level);

(ii)    a Status GS-14 Promotion Certificate (consisting of best-qualified Status Applicants eligible for the Position at the GS-14 level who were GS-13s at the time they applied);

(iii)   a Status GS-14 Reassignment Certificate (consisting of a best-qualified Status Applicant eligible for the Position at the GS-14 level who was already a GS-14 at the time she applied);

(iv)    a Non-Status GS-15 Certificate (consisting of best-qualified Non-Status Applicants eligible for the Position at the GS-15 level), which included Plaintiff;

(v)     a Status GS-15 Promotion Certificate (consisting of best-qualified Status Applicants eligible for the Position at the GS-15 level who were GS-14s at the time they applied), which included Ms. Marshall;

(vi)    a Status GS-15 Reassignment Certificate (consisting of best-qualified Status Applicants eligible for the Position at the GS-15 level who were already a GS-15s at the time they applied); and

(vii)   a Status GS-15 Repromotion Certificate (consisting of a best-qualified Status Applicant eligible for the Position at the GS-15 level who was a GS-14 at the time he applied, but had previously been a GS-15 in his federal career).

*See* Non-Status Certificates, Attached Ex. 26; Status Certificates, Attached Ex. 27; Newman EEO Stmt. at 8, Attached Ex. 15.

69.     Pursuant to the Personnel Handbook for DOI's Merit Promotion Plan, the best-qualified applicants on the Status Certificates (*i.e.*, the merit promotion certificates) were listed in alphabetical order.  *See* DOI Personnel Handbook at 7, Attached Ex. 23.

70.     Pursuant to Office of Personnel Management ("OPM") regulations, the best-qualified applicants on the Non-Status Certificates (*i.e.*, the competitive examination certificates) were listed in the order of their final scores.  *See* Sasser Tr. at 18-19, Attached Ex. 17; 5 C.F.R. § 332.401.

71.     The selectee, Ms. Dottie Marshall, a GS-14 NPS employee at the time of this process, appeared on the Status GS-15 Promotion Certificate.  *See* Status Certificates at 3, Ex. 27.

72.     Plaintiff appeared on the Non-Status GS-15 Certificate.  *See* Non-Status Certificates at 2, Attached. Ex. 26.

73.     On that certificate, Plaintiff was the sixth person ranked out of six candidates -- *i.e.*, four other Non-Status Applicants were rated and ranked higher than Plaintiff on her certificate.  *See id.*

74.     Among these four higher-rated Non-Status Applicants, three were veterans' preference eligibles, meaning that additional points were added to their overall evaluation scores due to their veterans' status.  *See id.*; Newman EEO Stmt. at 14, Attached Ex. 15; *see also* 5 C.F.R. § 211.102(c) ("Preference eligibles are entitled to have 5 or 10 points added to their earned score on a civil service examination.").

75.     Plaintiff herself has stated "[t]he practice of issuing multiple certificates of eligibles is a requirement.  It is a way to separate individual applicants by grade and status."  *See* Pl's Rebut. To Newman at 18, Attached Ex. 16.

76.     Plaintiff's "expert" was unable to cite any authority that prohibits the use of multiple certificates of eligibles and admitted that there are situations in which multiple certificates may be used.  *See* Gerber Tr. at 126, 38, Attached Ex. 25.

77.     At this stage of the selection process Plaintiff was treated the same as all other similarly situated Non-Status Applicants.  *See* Non-Status Certificates, Attached Ex. 26.

78.     After the certificates were prepared Ms. Newman forwarded the certificates to Mesrrs. Carlstrom and Lawler for their review.  *See* Newman EEO Tr. at 68-69, 94-96, Attached Ex. 6.

79.     Along with the certificates, Ms. Newman instructed Mr. Carlstrom that the Agency's Personnel Handbook, which described the Agency's Merit Promotion Plan (*i.e.*, guidelines concerning Status Applicants), stated that "if one [Status] candidate is interviewed, all other [Status] candidates should be interviewed.  However, if only certain [Status] candidates are chosen to be interviewed, the choice must be based on a job-related criteria."  *See* DOI Personnel Handbook at 7, Attached Ex. 23; Newman EEO Tr. at 68-69, Attached Ex. 6.

80.     After discussing the matter, Messrs. Lawler and Carlstrom decided to utilize only the Status Certificates and interview only those individuals on the Status Certificates that were current NPS employees.  *See* Lawler EEO Stmt. at 7-10, Attached Ex. 28; Carlstrom EEO Stmt. at 10-11, 16, Attached Ex. 29; Carlstrom EEO Tr. at 89-90, 96-97, Attached Ex. 8.

81.     Messrs. Carlstrom and Lawler chose to interview only current NPS employees (*i.e.*, the applicants with current knowledge of the operations of the NPS), because there was a sufficient number of Status Applicants and they viewed NPS experience as a critical, key attribute for the Position, which would permit the selectee to "perform real quickly at a top rate." Lawler EEO Stmt. at 8-9, 13-14, Attached Ex. 28; Carlstrom EEO Tr. at 89-90, Attached Ex. 8; Carlstrom EEO Stmt. at 11-12, Attached Ex. 29.

82.    Plaintiff "understands how institutional knowledge and experience gained by an applicant can be a plus when a position opens within the same organization an applicant works for." *See* Pl's Rebut. To Carlstrom at 59, Attached Ex. 30.

83.    Based upon this decision, Messrs. Carlstrom and Lawler returned both Non-Status Certificates to Ms. Newman unused (*see* Non-Status Certificates, Attached Ex. 26).

84.    Messrs. Carlstrom and Lawler extended interview offers to five Status Applicants, of which four accepted: (1) Dottie Marshall, then a GS-14 Park Manager assigned to the George Washington Memorial Parkway, within the National Capital Region of NPS; (2) Kenneth Brodie, then a GS-13 Supervisory Human Resources Specialist assigned to the National Capital Region within NPS; (3) Ricardo Portillo, then a GS-13 Administrative Officer assigned to the Pacific West Region within NPS; and (4) Thomas Ferranti, then a GS-15 Administrative Officer assigned to the Alaska Region of NPS.  *See* Status Certificates, Attached Ex. 27; Lawler EEO Stmt. at 10, Attached Ex. 28.

85.    During their interviews, Messrs. Lawler and Carlstrom asked each of the four interviewees the same set of questions.  *See* Carlstrom EEO Tr. at 29, 72, 89-90, 94-95, Attached Ex. 8; Lawler EEO Stmt. at 11, Attached Ex. 28.

86.    Based on Mr. Carlstrom's and Mr. Lawler's understanding, of the four interviewees, one was an African-American male (Mr. Brodie), and one was a Hispanic male (Mr. Portillo).  *See* Lawler EEO Stmt. at 14, Attached Ex. 28; Carlstrom EEO Stmt. at 18-19, Attached Ex. 29; Carlstrom EEO Tr. at 99, 122, Attached Ex. 8.

87.    Messrs. Carlstrom and Lawler decided as a threshold matter that Non-Status Applicants would not be interviewed.  *See, e.g.*, Pl's Rebut. To Newman at 30-31, Attached Ex. 16 ("The perception is that it did not matter who scored and rated high, if a candidate was no

already a government employee they would not be considered.  Further, it didn't matter if the candidates were government employees, they would not be considered further because they were not National Park Service Employees, more specifically, National Capital Region employees."); Pl's Rebut. To Carlstrom at 29, Attached Ex. 30 ("The selecting officials specifically chose only the candidates that were/are park service employees with park service experience and knowledge."); Pl's Rebut to Lawler at 24, Attached Ex. 31 (same); *see also* Gerber Tr. at 107-08, Attached Ex. 25 (acknowledging that, based upon his review, all applicants on the Non-Status Certificate that contained Plaintiff's name were excluded from further consideration).

88.     It is within the selecting officials' discretion to utilize some certificates while not utilizing others in deciding whom to interview.  *See* Pl's Rebut. To Newman at 33, Attached Ex. 16 ("selecting officials . . . have the option of selecting from among the multiple certificates"); Aguilar EEO Stmt. at 24-25, Attached Ex. 12 ("there's some pretty soft areas in policy and law whereby managers . . . can choose to select applicants from . . . any certificate").

89.     When asked at his deposition, Plaintiff's "expert" stated that he did not know what type of discretion Agency officials had in selecting whom to interview for the Position, and that there were no OPM guidelines on the matter.  *See* Gerber Tr. at 39-40, Attached Ex. 25.

90.     OPM regulations state that the Agency may choose to utilize its merit promotion procedures, instead of competitive procedures, to fill vacancies, and select or not select from among a group of best qualified candidates.  *See* 5 C.F.R. § 335.102(a), 335.103(b)(4) ("Selection procedures will provide for management's right to select or not select from among a group of best qualified candidates.  They will also provide for management's right to select from other appropriate sources, such as reemployment priority lists, reinstatement, transfer, handicapped, or Veteran Recruitment Act eligibles or those within reach on an appropriate OPM

certificate.  In deciding which source or sources to use, agencies have an obligation to determine which is most likely to best meet the agency mission objectives, contribute fresh ideas and new viewpoints, and meet the agency's affirmative action goals.").

91.    DOI's Personnel Handbook regarding its Merit Promotion Plan and OPM regulations state that any "job-related" criteria may be used in selecting which Status Applicants to interview.  *See* DOI Personnel Handbook at 7, Attached Ex. 23; 5 C.F.R. § 335.103(b)(1). Consequently, there is no evidence supporting Plaintiff's contention that the selection process was somehow procedurally flawed.  *See also* Newman EEO Stmt. at 15, Attached Ex. 15.

92.    All applicants on the Non-Status Certificates were excluded "regardless of their race, ethnicity, gender, national origin, [and/or] disability."  *See* Gerber Tr. at 125, Attached Ex. 25.

93.    The other applicants on the Non-Status Certificates were not interviewed because "[n]one of them were National Capital Region Park employees, or employees [of] [N]PS, or DOI employees."  Aguilar Tr. at 93-95, Attached Ex. 2.

94.    Mr. Lawler had no reason to know that Plaintiff was Hispanic, aside from her name being associated with her husband's.  *See id.* at 116.

95.    Plaintiff's own "expert" refused to conclude that Plaintiff's non-selection for the Position was a product of intentional discrimination.  *See* Gerber Tr. at 206, Attached Ex. 25 ("I don't know if the discrimination was intentional."); *see also id.* at 61, 63-64.

96.    Plaintiff and the rest of the candidates on the Non-Status Certificates were treated the same irrespective of their races or ethnicities, and not a single Non-Status Applicant was interviewed for the Position.  *See also* Pl's Rebut. To Carlstrom at 56, Attached Ex. 30 ("Mr. Carlstrom interviewed only park service employees regardless of which list they appeared on

while ignoring and not interviewing other individuals whose names were listed with these park service employees.").

97.    After the interviews were conducted, Mr. Lawler and Mr. Carlstrom discussed their thoughts and concluded that Ms. Dottie Marshall was the best candidate for the Position primarily due to her lengthy experience with the NPS, her knowledge about the National Capital Region, and her expertise in budgeting.  Lawler EEO Stmt. at 12-13, Attached Ex. 28; *see also* Carlstrom EEO Stmt. at 13-14, Attached Ex. 29.

98.    Ms. Marshall was selected for many reasons including:

[She is] [p]robably the best person in this region, including our current budget officer, in terms of her knowledge and expertise in developing a budget, especially a budget that goes through the NPS budget process.

She's been doing that. She was previously our budget office for the region. So she brings a tremendous amount of expertise from the technical side as well as the strategic side of it because she knows the committee processes.  She knows that very well.  Knows the staff very well.  Extremely in depth knowledge of budget. That's one.

Two, her most recent experience has been in a very active park setting as the Deputy Superintendent where she had lots of responsibilities for the operations of the park.  So she would be able to do her new job with a tremendous background in what our superintendents are facing as they try to accomplish their mission in the parks because she's been there recently.

She knows what the problems they're facing so she brings that knowledge to us, as well as her detailed knowledge of budget.  And she's worked her way through the ranks. She knows an awful lot about administration because of her previous background as administrative officer in several parks.

She's got a long, successful track record in this region and throughout the Park Service.  She's well known and well respected.

Lawler EEO Stmt. at 12-13, Attached Ex. 28; *see also* Carlstrom EEO Stmt. at 13-14, Attached Ex. 29.

99.     The reasons Messrs. Lawler and Carlstrom have given for selecting Ms. Marshall are consistent with the "Major Duties" described in the Amended Announcement. *See, supra*, at 7.

100.     Plaintiff, in part, that Ms. Marshall had been "preselected" for the Position. *See* Aguilar Tr. at 74-77, Attached Ex. 2; Aguilar EEO Stmt. at 17-18, Attached Ex. 12; Aguilar EEO Tr. at 54-55, Attached Ex. 11 ("They chose not to deal with anybody on those lists because they had already predetermined who they wanted and how they were going to get to that person"); Compl. at ¶¶ 16-26.  Indeed,

101.     Plaintiff believes that NPS's decision was motivated by other reasons than just her race (including Mr. Carlstrom's desire to select specifically Mr. Marshall and his desire to select a Park Service employee), and that Mr. Carlstrom would have selected Ms. Marshall regardless of who applied.  *See* Aguilar Tr. at 74-76, Attached Ex. 2; Aguilar EEO Stmt. at 17-18, Attached Ex. 12; Aguilar EEO Tr. at 54-55, Attached Ex. 11; Compl. at ¶¶ 16-26.

102.     Plaintiff's race and national origin were not factors in the selection process for the Position.  *See* Carlstrom EEO Stmt. at 17-18, Attached Ex. 29; Lawler EEO Stmt. at 14, Attached Ex. 28; Newman EEO Stmt. at 19, Attached Ex. 15.

Dated: August 22, 2008
       Washington, DC

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


          /s/
_____
BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

# EXHIBIT 1

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
**Washington Field Office**
**1801 L Street, N.W., Suite 200**
**Washington, D.C. 20005**

| | | |
|---|---|---|
| Sandra Aguilar | ) | |
| | ) | |
| Complainant, | ) | EEOC No. 100-2004-00510X |
| | ) | |
| v. | ) | |
| | ) | |
| Department Of Interior | ) | Agency No. FNP-2003-064 |
| | ) | |
| Agency. | ) | Date: February 9, 2005 |
| | ) | |

## DECISION

This Decision is issued pursuant to 29 C.F.R. § 1614.109(g) (2000). This office issued an Acknowledgment Order on June 2, 2004. I sent a Notice of Summary Judgment to the parties on November 1, 2004. The Agency filed its Agency Motion for Summary Judgment on December 3, 2004 (Agency Motion). Complainant filed her Summary Judgment Motion on the same date (Complainant's Motion).

## ISSUE

The issue is whether the Agency discriminated against Complainant because of her race (Hispanic), national origin (Mexican-American) and age (51) when:

1.  She was not selected for the position(s) of Administrative Officer, (GS-341-15), under Vacancy Announcement Number(s) NPS-NCR-03-19.
    *Report of Investigation* ("*ROI*") at 2.

Complainant has satisfied the procedural prerequisites for a hearing, but the evidence does not warrant one. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). I find that the agency did not discriminate against Complainant.

## ANALYSIS

The burden of establishing a *prima facie* case is not onerous. To establish a *prima facie* case of disparate treatment, a Complainant may demonstrate that he/she was treated less favorably than a similarly situated employee outside his/her protected group. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567 (1978). Absent comparative data, Complainant may also establish a *prima facie* case by setting forth sufficient evidence to create an inference of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981), n. 6; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

If Complainant establishes a *prima facie* case of discrimination, the burden then is on the Agency to articulate a legitimate, nondiscriminatory reason for its challenged actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the Agency does so, the *prima facie* inference drops from the case. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 510-11 (1993). Complainant then has to prove by a preponderance of the evidence that the proffered explanation is a pretext for unlawful discrimination. *Hicks,* 509 U.S. at 511; *Burdine*, 450 U.S. at 252-53; *McDonnell Douglas*, 411 U.S. at 804. Complainant always retains the ultimate burden of persuading the trier of fact that the agency unlawfully discriminated against him/her. *Hicks*, 509 U.S. at 511; *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

I find that the Agency's Motion for Summary Judgment correctly states the material facts and applicable legal standards. There are no *genuine* issues of *material* fact or credibility that require resolution at a hearing. Summary judgment in favor of the Agency is therefore appropriate for the reasons stated in the Agency's motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The Agency Motion correctly points out that Complainant: failed to establish her superior qualifications to those of the selectee; failed to show that there was any requirement that the Agency interview non-status candidates; failed to rebut the Agency's articulation that because of the veteran's preference status of some of her fellow non-status candidates, she was ranked fourth on the non-status candidate(s) list and therefore would not have made the "top three" candidate(s) eligible for interview(s) on the non-status list. Additionally, none of the non-status candidates were considered by the selecting official(s), so Complainant was not treated any differently than similarly situated candidate(s) and failed to rebut the Agency's articulated reason(s) for its selection. *Agency Motion* at 2-12.

Complainant 's Motion focused a great deal of attention (approximately the first 17 pages) on a disparate impact theory alleging a violation of the Agency's affirmative employment obligation(s). *See Complainant's Motion*. This case, as accepted by the Agency, is not about disparate impact or affirmative employment issue(s) and Complainant's Motion has failed to convince me otherwise *Id.*

-2-

Complainant has failed to set forth adequate material evidentiary facts that support his allegations of discrimination. Conclusory assertions that the agency's intention and motivation are questionable are not enough to withstand a summary judgment motion. *Goldberg v. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1987); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365(4th Cir. 1985).

After a careful review of the sworn witness statements and the documentary evidence in the ROI, I find that the totality of the record fails to sustain Complainant's claim that she was discriminated against because of her race (Hispanic), national origin (Mexican-American) and age (51). Accordingly, the Agency's Motion for Summary Judgment is hereby **GRANTED**.

Varice E. Henry,
Administrative Judge

# EXHIBIT
# 2

Capital Reporting Company

Page 1

DISTRICT OF COLUMBIA:

IN THE UNITED STATES DISTRICT COURT

-----------------------x

SANDRA L. AGUILAR,        :
         Plaintiff        :
              v.          : CA No.: 07-0546

DIRK KEMPTHORNE,          :

SECRETARY OF INTERIOR     :

         Defendant.       :

-----------------------x

                    Washington, DC

              Friday, June 20, 2008

    Deposition of:

              SANDRA L AGUILAR

    called for oral examination by counsel for

Defendant, pursuant to notice, at the Department of

Justice, Civil Division, 501 3rd Street, NW, 4th Floor,

Washington, DC 20001, before Natalia Kornilova,

beginning at 1:47 p.m., when were present on

behalf of the respective parties:

# Capital Reporting Company

Page 2

```
 1            A P P E A R A N C E S
 2   On behalf of the Plaintiff:
 3      CLARISSA H. WU, ESQUIRE
 4      Gebhardt & Associates, LLP.
 5      1101 17th Street, NW
 6      Suite 807
 7      Washington, DC 20036
 8      (202) 496-0400
 9         and
10   On behalf of the Defendant:
11      BRIAN HUDAK, ESQUIRE
12      Department of Justice, US Attorney's Office
13      555 4th Street, NW
14      4th Floor
15      Washington, DC 20001
16      (202) 514-7700
17
18
19
20
21
22
```

Page 3

```
 1            C O N T E N T S
 2   EXAMINATION BY:                    PAGE
 3   Counsel for Defendant         4/182
 4   Counsel for Plaintiff         158
 5
 6   AGUILAR DEPOSITON EXHIBIT*         PAGE
 7   1  Second Vacancy Announcement      132
 8
 9
10
11
12
13
14
15   (*Exhibits attached to transcript)
16
17
18
19
20
21
22
```

Page 4

```
 1            P R O C E E D I N G S
 2   Whereupon,
 3                 SANDRA AGUILAR,
 4   called as a witness, having been duly sworn, was
 5   examined and testified as follows:
 6      EXAMINATION BY COUNSEL FOR DEFENDANT
 7   BY MR. HUDAK:
 8      Q   Good morning -- or good afternoon, Miss
 9   Aguilar. Would you please state your full name for the
10   record?
11      A   Sure. It's Sandra Lee Aguilar.
12      Q   And your current home address.
13      A   It's 2338 Tawny, T-A-W-N-Y, Drive, Waldorf,
14   Maryland 20601.
15      Q   Have you ever had your deposition taken
16   before?
17      A   Yes.
18      Q   And how many times?
19      A   Approximately three.
20      Q   Three. When was the first?
21      A   First was for a divorce/child custody issue.
22      Q   Okay. When was the second time?
```

Page 5

```
 1      A   The second time it was for a automobile
 2   accident.
 3      Q   Were you a party to that?
 4      A   Yes.
 5      Q   Were you the defendant or the plaintiff?
 6      A   I was the plaintiff.
 7      Q   When did that automobile accident occur?
 8      A   It -- the automobile accident occurred 1981.
 9      Q   Okay. That's fine. And the third time?
10      A   Third time was a deposition for this MPS case.
11      Q   Now, is that the administrative level?
12      A   The administrative level meaning the --
13      Q   Meaning you understand you've filed a
14   complaint in Federal District Court?
15      A   Uh-huh.
16      Q   That's a yes?
17      A   That's -- this is the first time for -- I'm
18   giving a deposition for Federal District Court.
19      Q   Okay.
20      A   The last time I gave a deposition for the MPS
21   case that this case is referring to was in -- gosh, I'm
22   sorry, I don't remember. It was for the EEOC.
```

2 (Pages 2 to 5)

Capital Reporting Company

Page 46

1    Q    Okay.  How do you know you were being
2  considered for two positions?
3    A    I was told.
4    Q    Told by whom?
5    A    Well, I was given a choice of where I wanted
6  to -- that I was told that -- or I -- let me back up a
7  little bit so you can understand this.
8    Q    Sure.  No, that would be -- I'd appreciate
9  that.
10    A    Office of Consumer Affairs was going to close.
11    Q    Okay.
12    A    Congress is no longer going to fund the
13  office.  I kept the office going for three years longer
14  than there was really an intent for it to be open.
15    Q    Okay.
16    A    Because of the reduction in Government that
17  was going on at the time.
18        The -- when Congress decided not to fund the
19  office, I then went back to White House personnel and
20  requested to apply to another position.
21    Q    Okay.
22    A    They indicated there were two openings at HHS

Page 47

1  and I would have an option of choosing between one or
2  the other.
3        When the secretary learned that I was applying
4  to HHS, she had asked that I be appointed to the
5  Legislative Affairs.  But Intergovernmental Affairs also
6  indicated that they needed somebody with my kind of
7  knowledge and skill.  And, so, that's how I came about
8  choosing where I was going to work.
9    Q    Okay.  Do you know if a special -- were you a
10  political appointee as a special assistant?
11    A    It was still as a political appointee.
12    Q    Okay.
13    A    These were political appointing --
14  appointments.
15    Q    They weren't in the Civil Service?
16    A    No.
17    Q    Okay.  Do you know how many people applied for
18  the GS-14 position with the -- that you assumed?
19    A    I don't know.
20    Q    And what did your -- how did the application
21  -- what was your application -- or strike that.  Sorry.
22  It's Friday.

Page 48

1        What did your application consist of for that
2  position?
3    A    It was a one-page application form from the
4  White House.
5    Q    Okay.  And let me just focus in on the special
6  assistant position first.
7        What did your position entail?
8    A    Outreach to Governors, Legislators, and
9  Mayors.
10    Q    Did you have any human resources
11  responsibilities?
12    A    Not in that position, no.
13    Q    Did you have any budgeting responsibilities?
14    A    No.
15    Q    Did you have any procurement responsibilities?
16    A    No.
17    Q    Did you have any contracting responsibilities?
18    A    No.
19    Q    How many people did you supervise in that
20  position?
21    A    None.
22    Q    Okay.  At what point did you change from being

Page 49

1  in the special assistant position and going to the
2  deputy director?
3    A    A position opened up for deputy and I applied
4  to it.
5    Q    Okay.  And that was in what year?
6    A    '97.  Let's see, May -- let's see, May -- yes,
7  September of '97.
8    Q    Okay.  So, you were only in that special
9  assistant position for a very --
10    A    Very, very short time.
11    Q    Okay.  Now you said it -- the deputy director
12  position opened up.
13        What do you mean by that?
14    A    There was a director, but they hadn't
15  appointed anyone for the deputy director position.  And
16  when they were ready to open the position up
17  competitively I applied to it.
18    Q    Okay.  Was it a Civil Service position?
19    A    It was a -- another political appointment.
20    Q    Okay.  And I assume you submitted an
21  application for that position?
22    A    It -- I submitted my resume for the position,

13 (Pages 46 to 49)

Page 50

1 yes.
2    Q    Was it a competitive appointment?
3    A    It was competitive. It -- the selecting
4 official were -- the selecting officials were both the
5 director and the assistant secretary.
6    Q    How many people applied for that position?
7    A    I don't know but there were two of us hired
8 for that position.
9    Q    Who was the other person that was hired for
10 that position?
11    A    The individual's name, Andrew Hyman.
12    Q    And where did he come from immediately before,
13 if you know?
14    A    General Counsel, Office of the Secretary.
15    Q    Within HHS?
16    A    Within HHS, yes.
17    Q    Okay. Did anyone tell you what the deputy
18 director position might consist of before you applied
19 for it?
20    A    Oh, we had -- well, it was in the -- you know,
21 the vacancy announcement outlined everything that was
22 there.

Page 51

1        I'd like to make another amendment to my
2 previous statement about working for the Hispanic
3 Festival.
4    Q    Okay. Let me go back up there.
5    A    Okay.
6    Q    The 24th Latino Festival?
7    A    Right.
8    Q    Okay.
9    A    That position -- in my position as a director
10 for that festival, I hired three primary staff people.
11 One staff person was to procure vendors; second staff
12 person was to procure entertainment, global
13 entertainment; and the third was my public relations
14 person. We hired -- or I hired approximately 25
15 volunteers.
16    Q    Unpaid?
17    A    Unpaid volunteers; however, the other three
18 were paid.
19    Q    Okay.
20    A    All right. And the -- in that position I just
21 wanted you to understand that, as the director, I had to
22 solicit bids for hotels -- official hotel -- the

Page 52

1 official hotel for the festival. It was -- we procured
2 -- or we brought in I want to say 250 vendors. So, we
3 interviewed 250 vendors and took applications probably
4 from about 400 vendors for the position -- for the
5 festival.
6        We brought in entertainment globally. We
7 procured stage construction and stage managers. We
8 brought in radio stations from around the region. We --
9 let me see. I had to secure licensing -- various
10 licenses from the City of Washington, as well as from
11 National Parks Service. I had to secure by petition
12 over 200 signatures of vendors and residents up and down
13 Pennsylvania Avenue.
14        So, just -- I just want to make it clear that
15 just simply the title for the festival is very
16 deceiving. The work in this festival was extensive. We
17 brought in over a million people for a three-day event.
18 It was also soliciting applicants for a two-and-a-half-
19 hour parade.
20        We contracted with the Duke Ellington
21 Theater. There were a number of things that we -- we
22 contracted also with a couple of the Smithsonian Museums, to

Page 53

1 utilize their museums as fundraising facilities. There
2 was fundraising that was going on all the time. So, it
3 just -- it's not just a director of an office, it was
4 full hands on, on every aspect of pulling together a
5 huge event.
6    Q    Okay. So, over 1 million people attended that
7 event?
8    A    Yes, and that was well documented by MPS.
9    Q    Okay. Getting back to where we were, your
10 application for this deputy director position --
11    A    Uh-huh.
12    Q    -- GS-15 level, a political appointment.
13        You said there was a vacancy announcement?
14    A    Uh-huh.
15    Q    That's a yes?
16    A    Yes.
17    Q    And did it have knowledge, skills, and
18 abilities requirements on that vacancy announcement?
19    A    Yes.
20    Q    Okay. And do you recall what KSAs were on
21 that vacancy announcement?
22    A    I don't remember what the KSAs were.

14 (Pages 50 to 53)

Capital Reporting Company

| Page 58 | Page 60 |
|---|---|
| 1    A    -- to ensure that they had the information | 1    fact that you had been a special assistant in that same |
| 2    that they needed to get the program up and running. | 2    office? |
| 3    Q    How many people did you work with within the | 3    A    Well, sure.  They knew that I -- well, yeah, I |
| 4    Office of Intergovernmental Affairs in that position as | 4    did.  But -- |
| 5    a special assistant? | 5    Q    That's my only question.  Let me -- after -- |
| 6    A    Within IGA?  All of them. | 6    what was your -- in your role as deputy director what |
| 7    Q    Okay.  And how many people were there? | 7    were your responsibilities? |
| 8    A    Well, it's ten regions and the -- as well as | 8    A    The role of deputy director and what -- my |
| 9    Headquarters, so, over 70. | 9    responsibility encompassed all operations of the |
| 10    Q    Okay.  Okay.  And you believe your | 10    Headquarters in all ten regional offices. |
| 11    interactions in that special assistant position with | 11    Q    Okay.  Was there budgeting and duties |
| 12    those 70 folks help you in the performance of your duty | 12    associated with that position? |
| 13    -- duties as the deputy director subsequently? | 13    A    Yes.  I had total -- full and total budgetary |
| 14    A    In a -- | 14    authority. |
| 15    MS. WU:  Objection.  Calls for speculation. | 15    Q    Was there procurement responsibilities? |
| 16    But you can answer, if you know. | 16    A    Yes, I had full and total procurement |
| 17    A    Interpersonal relationships -- | 17    authority. |
| 18    BY MR. HUDAK: | 18    Q    Was there human resources responsibilities? |
| 19    Q    Sure. | 19    A    Yes, I had full and total human resource |
| 20    A    -- yes.  Yeah, I -- | 20    authority. |
| 21    Q    They knew you, they developed a -- perhaps an | 21    Q    Okay.  After that deputy director position, |
| 22    opinion as to the skill of your work favorably and it | 22    where did you -- what did you do? |

| Page 59 | Page 61 |
|---|---|
| 1    helped you accomplish your goals in the deputy director | 1    A    I took two years off. |
| 2    position? | 2    Q    Okay.  And why did you leave your position? |
| 3    A    I suppose, but they didn't have any say in me | 3    A    The position, because it's a political |
| 4    getting the job. | 4    appointment, you serve at the pleasure of the President, |
| 5    Q    Okay.  No, no, no, I understand.  I | 5    and there was an administrative change. |
| 6    completely -- | 6    Q    Okay.  And you took two years off? |
| 7    A    Yeah. | 7    A    Yes. |
| 8    Q    -- understand that. | 8    Q    And what did you do during those two years? |
| 9    But your experience as a special assistant was | 9    A    I didn't do anything. |
| 10    certainly relevant when you applied for a deputy | 10    Q    Professionally? |
| 11    director position in that same -- | 11    A    Professionally I did not do anything. |
| 12    MS. WU:  Objection.  Calls for speculation, | 12    Q    So, that's from 2001 to 2003? |
| 13    but you can answer if -- | 13    A    Right. |
| 14    A    I'm trying -- I don't understand what -- | 14    Q    Okay.  Did you have any -- did you do any |
| 15    MS. WU:  I'm sorry, can I clarify? | 15    human resources work during that period of time? |
| 16    MR. HUDAK:  Yeah, can you repeat the | 16    A    I did some volunteer work for a nonprofit |
| 17    question? | 17    association. |
| 18    (Record played back as requested.) | 18    Q    Okay.  And was there human resources |
| 19    MR. HUDAK:  Okay.  Thank you. | 19    responsibilities with that? |
| 20    BY MR. HUDAK: | 20    A    No.  There was administrative |
| 21    Q    When you applied for the deputy director | 21    responsibilities, but not a human resource |
| 22    position in HHS, did you include on your application the | 22    responsibilities. |

16 (Pages 58 to 61)

Capital Reporting Company

Page 62

1  Q   Okay.  Was there any budgeting
2  responsibilities that you performed --
3      A   Yes.
4      Q   -- during that period of time?
5          And what type of budgeting responsibilities
6  was that?
7      A   There -- it -- there was a $10,000 budget.
8  And the conference that I was assisting with had to stay
9  within a particular allocated budget amount for the
10 conference.  And, so, I had to track all budgetary
11 expenditures and any -- and get -- and I had to get some
12 approval to expend money.
13     Q   Okay.  And that was budget was roughly
14 $10,000?
15     A   Uh-huh.
16     Q   That's a yes?
17     A   Yes.
18     Q   Okay.  I'm sorry.
19     A   I'm sorry.  Yes.  I'm sorry.
20     Q   It's fine.  It's fine.
21     A   I've got to work on this.
22     Q   I do it, too.  So, I'm not meaning to be rude

Page 63

1  when I follow up with, is that a yes, it's just I want
2  to make sure the record is clear.
3          Was there any procurement responsibilities in
4  this volunteer position?
5      A   Yes, minor procurement, insofar as procuring
6  materials and gifts for the conference.
7      Q   What was the general cost of these materials?
8      A   Since that was the majority of the cost for
9  the conference, I'd like to say probably oh, $4,000.
10     Q   $4,000.
11         All right.  And then I -- after 2003 -- I
12 understand in 2003 you applied for the position at
13 question in this action, right?
14     A   Yes.
15     Q   Okay.  And after 2003 what job did you hold?
16     A   I just did -- I continued doing some volunteer
17 work with nonprofits.
18     Q   Did you have any --
19     A   For a particular -- I should say a particular
20 nonprofit.
21     Q   Okay.  Did you have any -- when did you apply
22 for the position, if you recall a month?

Page 64

1      A   For this position?
2      Q   Yes.
3      A   In March of 2003.
4      Q   So, March of '03.  Okay.
5          And when did you hear word that you had not
6  been selected for the position?
7      A   I would say the end of June or first part of
8  July.  I don't remember the exact date.
9      Q   June/July of '03?
10     A   June/July of '03.
11     Q   Okay.  After June/July of '03 -- let's just
12 call it July -- July of '03, for the rest of 2003 did
13 you hold any paid position?
14     A   No.
15     Q   Okay.  2004 did you hold any paid position?
16     A   Paid -- no.
17     Q   2005 did you hold any paid position?
18     A   I babysat.
19     Q   Okay.  Beyond baby-sitting did you have any --
20     A   No.
21     Q   -- paid position?
22         2006 did you have any paid position?

Page 65

1      A   No.
2      Q   And 2007 did you have any paid position?
3      A   No.
4      Q   And currently during this year do you have any
5  paid position?
6      A   Yes.
7      Q   Okay.
8      A   I did a contract this year.
9      Q   Contract?
10     A   Uh-huh.
11     Q   Okay.  And what was that contract for?
12     A   It was 2,500.  And I received a $5,000 bonus.
13     Q   Okay.  And who was that contract for?
14     A   Los Padres Foundation.
15     Q   Okay.  And what did your contract entail?
16     A   I was the conference coordinator for their
17 2008 Youth College Training and Assistance -- I'm sorry,
18 College Tuition and Assistance Training Conference.
19     Q   Okay.  Was -- you say you received 2,500 plus
20 a $5,000 bonus.
21         Was that $5,000 bonus a contractual term of
22 the arrangement?

17  (Pages 62 to 65)

Capital Reporting Company

Page 74

1 because you were -- well, strike that.
2      Do you believe that anyone within the National
3 Park Service consciously thought or said in their mind
4 that, I do not want to select Sandra Aguilar because she
5 is Hispanic.
6    A    With regard to this case?
7    Q    Yes.
8    A    Yes.
9    Q    You believe someone did that?
10   A    Yes.
11   Q    Okay.  And who?
12   A    I believe Terry Carlstrom did.
13   Q    He -- you believe that Terry Carlstrom
14 consciously in his mind said, I do not want to select
15 Sandra Aguilar because she is Hispanic?
16   A    Yes.
17   Q    Do you believe it was motivated by any other
18 reason, his nonselection of you?
19   A    I think there were a number of reasons, being
20 Hispanic is one of them.
21   Q    Okay.  What are the other reasons?
22   A    I believe he had predetermined who he wanted

Page 76

1 have no knowledge of her indicating that.  It's
2 information provided by the selecting officials that
3 took part in the selection process, that they in turn
4 have identified her.
5    Q    Okay.  You have never asked -- you don't have
6 any personal knowledge, other than --
7    A    No, I don't have any personal knowledge.
8    Q    Okay.  Do you have any personal knowledge of
9 anything regarding the selection process from beginning
10 to end?  Personal.
11      Did you witness the selection process at all
12 from beginning to end for this position?
13   A    No.
14   Q    Okay.  I just want -- if you can just say no,
15 I mean, we don't have to go into any of the details of
16 that, although, there may be a few things I might ask
17 you about.
18      Do you believe that you were simply just not
19 selected because of this preselection, that he made up
20 his mind, you know, you're not Dottie Marshall, so,
21 you're not getting this job?
22   A    I think that was part of it.

Page 75

1 for that position.  And he had predetermined that he did
2 not want anyone other than a National Parks Service
3 employee for that position.
4    Q    Okay.  And who's the person that you believe
5 that he preselected for the position?
6    A    The person that was selected for the position,
7 Dottie Marshall.
8    Q    Okay.  And had you met Dottie Marshall before
9 --
10   A    No.
11   Q    -- this action?
12   A    No.
13   Q    If she walked -- if three people walked in the
14 room right now, one of them was Dottie Marshall, would
15 you recognize who she is?
16   A    No.
17   Q    Okay.  Do you know if Dottie Marshall is
18 Hispanic?
19   A    I know that she's not.
20   Q    How do you know that?
21   A    She's indicated in her testimony that she's
22 Caucasian.  Not to -- she -- I'm sorry.  She is not -- I

Page 77

1    Q    Okay.  Do you believe that he wanted to hire
2 Dottie Marshall because she's Caucasian?
3    A    Yes.
4    Q    Okay.  Do you believe that he wanted to hire
5 Dottie Marshall because she's a woman?
6    A    Yes.
7      MS. WU:  Brian, do you mind if we take a
8 restroom break?
9      MR. HUDAK:  Oh, sure.  Yeah, yeah, yeah.
10 Whenever you need a break, that's fine.
11      (Pause in proceedings.)
12 BY MR. HUDAK:
13   Q    Before the break I think we were talking a
14 little bit about why you believe you were not selected
15 for the position.
16      And I believe that you said that one of the
17 reasons was your -- you being Hispanic; is that correct?
18   A    Yes.
19      MS. WU:  I'm sorry, are you -- this position
20 or the others?
21      MR. HUDAK:  I'm just talking about this
22 position right now.

20  (Pages 74 to 77)

Page 90

1   Q    There's not an Italian American in the United
2  States with the last name of Nieto?
3   A    Not to my knowledge there isn't.
4   Q    Okay.  And had --
5   A    Is --
6   Q    What have you done for research of that fact?
7   A    Well, actually my husband's done research to
8  determine that the name Nieto comes directly from Spain
9  --
10   Q    Okay.
11   A    -- as a Hispanic name.
12   Q    Okay.  And is it possible that, you know,
13  centuries ago someone moved to Italy with the last name
14  of Nieto and became an Italian American and later --
15   A    I --
16   Q    -- integrated to the country?
17   A    I can't answer to that.
18   Q    Okay.
19   A    I don't know that.
20   Q    You don't know that, right?
21        Because it's impossible to determine someone's
22  ethnicity from the last name; isn't that true?

Page 91

1   A    In this instance, no, it's -- the
2  determination of an individual's ethnicity is the
3  individual that is an employee there -- or was an
4  employee at the time at the National Capital Region --
5  Regional Office working under the regional director, who
6  self-identified as Hispanic and was one of the only
7  Hispanics in that regional office for years.
8   Q    And Mr. Nieto specifically told Mr. Carlstrom
9  at some point, I am Hispanic.
10   A    Absolutely he did.
11   Q    Okay.  When was that?
12   A    I can't tell you exactly when that was.
13   Q    All right.  Do you know in what context he
14  said that?
15   A    He was hired as the Hispanic Employment
16  Program Manager, which required a bilingual, bicultural
17  individual to fill that position.  Bilingual meaning
18  English and Spanish; bicultural meaning Spanish and
19  American.
20   Q    So, that position was only open to Hispanics?
21   A    Yes, it was.
22   Q    Okay.  And did you believe it was

Page 92

1  discrimination that that position was only opened to
2  Hispanic individuals and not other people from other
3  races?
4   A    I don't know anything about that position, how
5  it was advertised, who applied to it.  I know nothing
6  about it, only that the individual who filled the
7  position, who was hired for that position is Hispanic.
8  The entire region knows that he's Hispanic and he is my
9  husband.
10   Q    Okay.  What's your basis for the statement
11  that the entire region knows he's Hispanic?
12   A    He worked the entire region.
13   Q    Have you spoke with everyone in the region to
14  verify that they --
15   A    I don't have to speak to everyone.  I'm not --
16  I don't fill his job.  I didn't fill his job.
17   Q    Okay.  Well, I'm just asking what you said.
18  You said that everyone in the region knows he's
19  Hispanic.
20   A    According to my husband he's well-known
21  throughout the region because his job was to assist
22  those park managers throughout the region with their

Page 93

1  public affairs --
2   Q    Okay.  And --
3   A    -- with regard to the Hispanic community.
4   Q    Okay.  The -- his assisting park managers
5  throughout the region, with regards to Hispanic
6  community, doesn't necessarily mean that a person is
7  Hispanic?
8   A    No, but in this instance in the position that
9  he held, yes, it does.
10   Q    Okay.  Let's look at Mr. Roger Heller here at
11  the top of the list.
12        Do you know who he is?
13   A    No.
14   Q    Do you know if he's Hispanic?
15   A    No.
16   Q    Do you know if he's white?
17   A    No.
18   Q    Okay.  Francis Wilson.  Do you know who that
19  is?
20   A    No.
21   Q    Do you know if she's Hispanic?
22   A    No.

24  (Pages 90 to 93)

Page 94

1    Q    Do you know if it's a she or a he?
2    A    No.
3    Q    Do you know if this person is white?
4    A    No.
5    Q    Leon Craig, Jr. Do you know this person?
6    A    No.
7    Q    Do you know if this person is Hispanic?
8    A    No.
9    Q    Samuel Feinberg. Do you know this person?
10   A    No.
11   Q    Do you know the ethnicity of this person?
12   A    No.
13   Q    Phillip Westerman. Do you know this person?
14   A    No.
15   Q    Do you know the ethnicity of this person?
16   A    No.
17   Q    Joyce Sasser. Do you know this person?
18   A    No.
19   Q    Do you know the ethnicity of this person?
20   A    No.
21   Q    Mr. Lawler down at the bottom. Do you know
22   this person?

Page 95

1    A    No.
2    Q    Do you know his ethnicity?
3    A    No.
4    Q    Okay. Based upon your knowledge and whatever
5    that knowledge is based upon, were any of these
6    individuals interviewed for this position?
7    A    Unless they submitted a self-identifying form,
8    no, I don't know.
9    Q    I'm not asking about the race or ethnicity.
10        Were any of these individuals interviewed for
11   the position at question in this litigation?
12   A    As far as I know, no, they were not.
13   Q    Okay. And why were they not?
14        MS. WU: Objection. Calls for speculation.
15        MR. HUDAK: Okay. Based --
16        MS. WU: You can answer, if you know.
17   BY MR. HUDAK:
18   Q    Based upon your knowledge, why were they not
19   interviewed?
20   A    None of them were National Capital Region Park
21   employees, or employees, or MPS employees, or DOI
22   employees.

Page 96

1    Q    Okay. Thank you. All right. What is the
2    basis for your assertion -- and I think you made this
3    earlier -- that Dottie Marshall was preselected for the
4    position?
5    A    My assertion is that Dottie Marshall was not
6    Hispanic and, therefore -- or she -- because she wasn't
7    Hispanic she was hired for the position.
8    Q    Okay. Do you believe that she was preselected
9    for the position? I believe you said that earlier.
10   A    Well, preselection in that she wasn't
11   Hispanic.
12   Q    So, you believe the only reason that you were
13   selected was because you weren't Hispanic?
14   A    Well, I -- there's -- that's one of the
15   reasons.
16   Q    Okay. And the other --
17   A    That's one of the reasons.
18   Q    And the other reason I think you previously
19   testified, were that Dottie Marshall had been
20   preselected by her managers and that --
21   A    Well, according to the --
22   Q    Hold on --

Page 97

1    A    Uh-huh.
2    Q    -- let me just finish my question.
3    A    Uh-huh.
4    Q    Hold on one second.
5        But I believe that you said previously -- and
6    correct me if I'm wrong -- that Dottie Marshall was
7    preselected -- well, that you believe the reasons that
8    you were not selected for the position were because you,
9    A, were Hispanic; B, because Dottie Marshall was
10   preselected for the position; and, C, because you did
11   not have MPS experience; is that an accurate statement?
12   Are those three reasons that you were not selected?
13   A    And what accurate?
14   Q    Is that an accurate?
15   A    An accurate statement?
16        Those are part of the reasons --
17   Q    Okay.
18   A    -- yes.
19   Q    Beyond those three is there other reasons you
20   were not selected --
21   A    Well --
22   Q    -- in your mind?

25 (Pages 94 to 97)

Capital Reporting Company

Page 114

1    Q    Okay.  And your name didn't appear on that
2    list, right?
3    A    No.
4    Q    Okay.  And none of those individuals received
5    an interview based on your knowledge?
6    A    Not to my knowledge.
7    Q    Okay.  Do you believe that, again, based upon
8    your understanding of the word discrimination, do you
9    believe that all of those individuals were not given an
10   interview for discriminatory reasons?
11       MS. WU:  Objection.  Calls for legal
12   speculation.  You can answer, if you know.
13       MR. HUDAK:  I'm not asking for legal
14   speculation.
15   BY MR. HUDAK:
16   Q    Or, I mean, if you have a belief.  If you
17   don't have a belief, say you don't have a belief.
18   A    I don't know that any of those individuals
19   submitted a self-identifying form.
20   Q    Okay.  So, the question would turn on whether
21   they submitted a self-identifying form?
22   A    Yeah.  And if any of them had determined that

Page 115

1    they were Hispanic, I believe that they would not have
2    been given an interview because they were Hispanic.
3    Q    Okay.  But none of them got an interview,
4    right?
5    A    As far as I know they didn't.
6    Q    Okay.  And that's based upon your review of
7    the record, right?
8    A    Yes.
9    Q    And the fact that on that certificate it says
10   upon use -- returning on use.
11   A    You know, for the fact that --
12   Q    I'm just -- please just answer my questions,
13   because I -- it's getting late in the day and I want to
14   get out of here and I think I can finish up quicker if
15   we just stick to the questions.
16       None of those -- never mind.  I think we've
17   covered it.
18       Now, we've been through why you believe that
19   everyone knew your husband was Hispanic.  Obviously it's
20   possible that your husband being Hispanic could have
21   married someone that was not Hispanic, right.
22   A    Well, sure.

Page 116

1    Q    Okay.  So, let me just -- have you ever met
2    Mr. Lawler before?
3    A    No.
4    Q    Okay.
5    A    I never met him.
6    Q    Okay.  Do you have any reason to believe that
7    he knew you were Hispanic at this selection time?
8    A    Other than my name being associated with my
9    husband's --
10   Q    Other than your name being Aguilar?
11   A    -- and -- no, he didn't know me personally.
12   Q    Okay.  Now, let's probe -- have you ever met
13   Miss Newman?
14   A    Not at that time, no.
15   Q    Okay.  You attended her deposition in the
16   administrative --
17   A    Right.
18   Q    -- EEO process?
19       At that time, talking about knowledge gained
20   after that time, but at that time do you have any reason
21   to believe that -- beyond your name -- that Miss Newman
22   knew you were Hispanic.

Page 117

1    A    Yes.
2    Q    What is the basis of that?
3    A    I submitted and ID 1395 self-identifying form
4    indicating that I am Hispanic.  That form was submitted
5    with my application and it went to her office.
6    Q    Who -- do you remember who you submitted your
7    form -- or your entire application to, who you actually
8    sent it to?
9    A    I sent it to that office.
10   Q    Okay.  Did you send --
11   A    To her administrative office.
12   Q    Did you send it to Miss Newman?
13       Was it addressed to Miss Newman?
14   A    No, it was addressed, I believe, to attention
15   Janette Oregon.
16   Q    Okay.
17   A    Who was her -- who was Miss Newman's
18   assistant.
19   Q    Okay.  Do you have any knowledge, given --
20   based upon your review of the record, that Miss Newman
21   actually saw that form?
22   A    Personal knowledge -- I do not have personal

Page 122

1  ranked by the panel was discriminatory?
2     A  Yes.
3     Q  Okay.  And you believe that it was
4  discriminatory because you were Hispanic?
5     A  No.  I believe it was discriminatory, because
6  once the applicants were determined to be qualified, the
7  rating and ranking process of those qualified applicants
8  should have been the same across the board.  Instead
9  there was a segregation.  The segregation occurred where
10  the nonstatus went to a single human resource specialist
11  for rating and ranking, and that person was at a GS-13
12  that had no personal knowledge or experience of a GS-15
13  managerial position, making a determination whether or
14  not these individuals were -- how well qualified they
15  were by rating number and then by ranking; compared to
16  the said -- compared to the group of status applicants
17  who went on to a peer group of three GS-15s.  And then
18  that was discriminatory absolutely.  It's a barrier.
19     Q  Okay.  And it's --
20     A  It's a huge barrier.
21     Q  It's discriminatory against everyone that was
22  nonstatus, right?

Page 123

1     A  Yes.
2     Q  Okay.  Okay.  And then the process -- what
3  other things do you believe Miss Newman did beside that
4  decision that were discriminatory?
5     A  I believe that she shared the certificates
6  with the selecting officials before the selecting
7  process had even finished going -- before it was
8  appropriate for the selecting officials to even see the
9  certificates.
10     Q  Okay.  And what is the basis of that
11  allegation?
12     A  It's based on the testimony given by both
13  Carlstrom and Lawler and Newman herself.
14     Q  That what?
15     A  That the certificates were given to the
16  selecting official -- officials, and the selecting
17  officials determine that 40-plus applications were too
18  much for them to go through and review.  They never
19  should have gotten them at that point in time.  It
20  should have all been narrowed down to the final
21  selecting certificates, instead they got certificates of
22  eligibility -- of eligibles to look at.  And, so, for

Page 124

1  that the selecting officials had the opportunity to
2  review, or thumb through, or identify any of the
3  applicants there and determine who they were going --
4  who they wanted to move on through the selection
5  process.  And in this instance they had already
6  predetermined who they wanted to interview, but they
7  hadn't even gotten the rating and ranking from a panel
8  yet.
9     Q  Okay.  So, you believe the certificates of
10  eligibles were given before the rating and ranking were
11  complete?
12     A  Yes.  Yes.
13     Q  Okay.
14     A  And that's according to Lawler's testimony.
15     Q  Were any of the individuals on the
16  status certificates Hispanic?
17       MS. WU:  Objection.  Relevance.
18  BY MR. HUDAK:
19     Q  Can you -- do you know?
20     A  How would I know?  I did not have access to
21  the file -- to the self-identifying forms.  I don't know
22  who self-identified and who didn't.

Page 125

1     Q  Okay.  Based upon your review of the record,
2  do you know if any other status applicants were
3  Hispanic?
4     A  I know that there was at least one status
5  applicant that was identified as Hispanic by the
6  selecting officials.
7     Q  Okay.
8     A  Now, whether or not that individual was
9  Hispanic or not, I don't know.
10     Q  Okay.  You couldn't tell from his last name?
11     A  Well, that wouldn't matter.  I mean, he could
12  have been adopted.  He could have -- Hispanic isn't
13  Hispanic until they self-identify that they're Hispanic,
14  according to Federal Government.  They've got to self-
15  identify before they can be identified in any of the
16  statistics as Hispanic.
17     Q  Okay.  So, you couldn't tell from his last
18  name that he was Hispanic?
19     A  It wasn't up to me.  You're asking me --
20     Q  Yeah.
21     A  -- could I --
22     Q  Could you tell from his last name that he was

32 (Pages 122 to 125)

Page 130

1  position?
2      A   At NCR?
3      Q   Yes.
4      A   No, it was a regional position.
5      Q   Okay. Beyond the fact that you were a GS-15,
6  and beyond the fact that you had been an administrative
7  officer before in the national level, how else were you
8  better qualified than Miss Marshall?
9      A   I had years of experience with management,
10 years of experience with different types of personnel,
11 years of experience with budgets, years of experience
12 with procurements, different types of experience with
13 interagency relationships. I -- and communications,
14 yes.
15     Q   Okay. Did Miss Marshall have any of those
16 things you listed?
17     A   I suppose she did.
18     Q   Okay.
19     A   But she didn't have them at a national level.
20     Q   Okay. Did you have any knowledge of the inner
21 workings of the National Park Service prior to being --
22 prior to applying for the job?

Page 131

1      A   I didn't need any.
2      Q   Okay. So -- but you didn't have any?
3      A   I didn't need any.
4      Q   I'm not asking did you need any. I'm asking
5  did you have any?
6      A   No, I didn't have any. I didn't need any to
7  apply for the position.
8      Q   Okay. Did you have any experience with the
9  inner workings of the National Capital Region before
10 applying for this position?
11     A   I didn't need any.
12     Q   Did you have any?
13     A   I didn't have any, but I didn't need any.
14     Q   Okay. Had you -- did you have any experience
15 with the inner workings of the Department of the
16 Interior before applying to this position?
17     A   I didn't have any, I didn't need any, and they
18 weren't part of the KSAs for the qualify -- to qualify
19 for the position.
20     Q   Was being a prior GS-15 on a national level
21 part of the KSAs?
22     A   No, but it was part of the criteria for the

Page 132

1  position. You had to have held the position. You had
2  to have held -- I believe the requirement was knowledge
3  and experience of the position for at least a year
4  before the -- before the next grade.
5          So, that was a GS-15. I already had the
6  experience and the knowledge, so, I could qualify -- I
7  did qualify for the position, having fulfilled in-grade
8  requirements.
9          MR. HUDAK: Okay. Let's mark this as Aguilar
10 1.
11         (Aguilar Exhibit Number 1 was marked for
12         Identification.)
13         THE WITNESS: Thank you.
14         MR. HUDAK: I'll give you a copy. Don't worry
15 about -- Miss Aguilar, I'll give you a copy we're going
16 to get it marked right now.
17 BY MR. HUDAK:
18     Q   I'm handing you what's been marked Aguilar 1.
19         Can you please take a look at this?
20         Do you recognize this?
21     A   Uh-huh.
22     Q   And what is this?

Page 133

1      A   It's a vacant -- second vacancy announcement.
2      Q   Okay. This is the amended vacancy
3  announcement, right?
4      A   Right.
5      Q   And this is ultimately what governed the
6  selection of the position, right?
7      A   Right.
8      Q   Okay. Now, can you please point out to me
9  where it says that you have to have one year of GS-15
10 experience before applying for the position?
11     A   Well, basically at the bottom it says, note,
12 if filled at the GS -- let's see -- if filled at a GS-14
13 level position has promotional potential to a GS-15
14 without further competition once all the legal and
15 regulatory requirements are met; however, promotion is
16 neither automatically guaranteed and then again --
17     Q   Uh-huh.
18     A   -- it should say -- let me see. Under summary
19 of qualifications required for a GS-15 level --
20     Q   Okay.
21     A   -- applicants must possess one year --
22     Q   Uh-huh.

34 (Pages 130 to 133)

Page 174

1 any, to form that belief?
2    A    The statistics of hires for the region.
3    Q    Okay.
4    A    Particularly the statistics identifying job
5 series, gender, and race.
6    Q    Okay. You referenced the Stanton Memo. Do
7 you know when -- or the approximate year that the
8 Stanton Memo came out?
9    A    The Stanton Memo came out -- it was signed in
10 February of 1999.
11      MR. HUDAK: I'll object. Lack of foundation,
12 lack of personal knowledge.
13 BY MS. WU:
14    Q    Okay. And do you know if your husband ever
15 used the Stanton Memo in his daily work?
16    A    Yes. He tried to get the regional leadership
17 to follow the Stanton Memo on a regular basis.
18    Q    Okay. Do you have any reason to believe that
19 the leadership didn't follow the Stanton Memo?
20    A    Let me qualify that. I shouldn't say that he
21 personally. He as a member of the EEO Office --
22    Q    Uh-huh.

Page 175

1    A    -- and his boss in particular --
2    Q    Uh-huh.
3    A    -- on a regular basis encouraged leadership to
4 follow the Stanton Memo when a vacancy was open.
5    Q    Okay. And do you have any reason to believe
6 that the leadership would not follow the Stanton Memo,
7 absent your husband's efforts?
8    A    Yeah, if there wasn't anybody there to push
9 it, they would ignore it altogether. And they did.
10      MR. HUDAK: I'll object. Lack of foundation,
11 lack of personal knowledge, speculative. Move to
12 strike.
13      COURT REPORTER: What was the last one, I'm
14 sorry?
15      MR. HUDAK: Move to strike. I'm sorry, I'll
16 speak up. I know I'm not speaking into the microphone.
17 I apologize. Let's move it close.
18 BY MS. WU:
19    Q    Are you relying on any specific facts to
20 support that belief?
21    A    Well, the very fact that the Stanton Memo
22 existed -- has been in existence since February 1999.

Page 176

1    Q    Uh-huh.
2    A    I applied to the position in March of 2003.
3 The Stanton Memo calls for positions and a GS-13 and
4 above --
5    Q    Uh-huh.
6    A    -- to be opened to all sources -- vacancies
7 for positions at a 13 and above to be opened to all
8 sources.
9       The impetus of that memo was to encourage the
10 recruitment and hiring of minorities, particularly
11 Hispanics. For the fact that the vacancy announcement
12 was limited to department only indicates that they had
13 no regard and no intention -- no regard for the memo,
14 and no intention of following that memo, no regard for
15 the premise of the -- and the purpose of the memo.
16    Q    Okay.
17      MR. HUDAK: I'll object. Move to strike.
18 Lack of foundation, lack of personal knowledge,
19 speculation.
20      MS. WU: Brian, could you pass me what we had
21 marked as Gerber 3 again?
22      MR. HUDAK: Sure.

Page 177

1      MS. WU: Thank you.
2      MR. HUDAK: There you go.
3 BY MS. WU:
4    Q    Okay. And what I've placed before us on the
5 table is the exhibit marked Gerber 3.
6       You said that this word written next to your
7 name is Nieto?
8    A    Yes.
9    Q    And that's your husband's last name?
10    A    Yes.
11    Q    All right. How do you -- you stated earlier
12 that you believe that that is Terry Carlstrom's
13 handwriting; is that correct?
14    A    Yes.
15    Q    Have you ever seen Terry Carlstrom's
16 handwriting before?
17    A    Yes.
18    Q    Where?
19    A    We have samples of his writing, of the notes
20 that he took for the interviews that he conducted as
21 part of the ROI.
22    Q    Okay. And you know that those notes are

45 (Pages 174 to 177)

## Capital Reporting Company

Page 186

1    Q    Okay.  Do you ever believe that, in form or
2 substance, in words or just his mental thought, that
3 Mr. Powers consciously said, Miss Aguilar should not be
4 hired for this position because she is Hispanic?
5    A    I have no way of knowing that.
6    Q    Okay.  Do you believe it?
7    A    I believe that Mr. Powers did not want anyone,
8 other than whom he felt should be hired for that
9 position, and that person was not me.
10    Q    Okay.  And that person was Dottie Marshall,
11 though?
12    A    Dottie Marshall got the job, yes.
13    Q    Okay.  Have you ever heard Mr. Powers -- I'm
14 going to use that phrase pejorative again that we
15 defined earlier -- have you ever heard Mr. Powers use a
16 pejorative for Hispanic, or Latino, or Mexican American
17 people?
18    A    I have not.
19    Q    Okay.  Have you ever heard that he uses
20 pejoratives for Hispanic people, Latinos, or Mexican
21 Americans?
22    A    "Heard" as in hearsay from other people?

Page 187

1    Q    Heard -- you know, other people have come up
2 to you and say, you know, this guy is saying some
3 offensive term for Hispanic people?
4    A    No.
5    Q    No?
6    A    No.
7        MR. HUDAK:  Okay.  I don't have any further
8 questions.
9        MS. WU:  I don't either.
10        We'd like to read and sign.
11        Reading and signing is a process where she'll
12 send the deposition transcript to us -- thank you, guys
13 very much.
14        MR. HUDAK:  You're welcome.
15        MS. WU:  Okay.  I know it's like, wow, he's
16 off like a shot.  Stop at 5:30.  Where they send us a
17 deposition transcript, and then you get to take a look
18 at it, and if anything has been transcribed incorrectly,
19 in terms of names, or spelling, or this word for that
20 word, you can correct it.  And then at the end you sign
21 it and that acknowledges that you've read it, and that
22 it's true to the best of your knowledge.

Page 188

1        MS. AGUILAR:  Okay.
2        MS. WU:  Okay.
3        MS. AGUILAR:  Okay.
4        MS. WU:  And then that usually happens in, you
5 know, a couple of weeks.
6        (Whereupon, at 3:23 p.m. the deposition
7        was concluded.)

Page 189

1        CERTIFICATE OF NOTARY PUBLIC
2    I, Natalia Kornilova, the officer before whom
      the foregoing hearing was taken, do hereby
3 certify that the witness whose testimony appears in
      the foregoing deposition was duly sworn by me; that
4 the testimony of said witness was taken by me by
5 audio recording and thereafter reduced to typewriting
6 under my direction; that said deposition is a true
7 record of the testimony given by said witness; that
8 I am neither counsel for, related to, nor employed
9 by and of the parties to the action in which this
10 deposition was taken; and, further, that I am not a
11 relative or employee of any counsel or attorney
12 employed by the parties hereto, nor financially or
13 otherwise interested in the outcome of this action.
14
15
16        Natalia Kornilova
17        Notary Public in and for the
18        District of Columbia
19
20
21 My commission expires:
22 April 14, 2012

48  (Pages 186 to 189)

Capital Reporting Company

| Page 190 |
|---|
| 1  A C K N O W L E D G E M E N T  O F  D E P O N E N T |
| 2 |
| 3 |
| 4  I, SANDRA AGUILAR, do hereby acknowledge I |
| 5  have read and examined the foregoing pages of |
| 6  testimony, and the same is a true, correct and |
| 7  complete transcription of the testimony given by me, |
| 8  and any changes or corrections, if any, appear |
| 9  in the attached errata sheet signed by me. |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19  _____    _____ |
| 20  Date              SANDRA AGUILAR |
| 21 |
| 22 |

Page 191

1  Clarissa H. Wu
2  Gebhardt & Associates, L.L.P.
3  1101 17th Street, NW Suite 807
4  Washington, DC 20036
5
6  IN RE:  SANDRA L. AGUILAR V. DIRK KEMPTHORNE
7  Dear Ms. Wu:
8      Enclosed please find your copy of the
9  deposition of SANDRA AGUILAR, along with the
10  original signature page.  As agreed, you will
11  be responsible for contacting the witness
12  regarding signature.
13      Within 30 days of receipt, please forward
14  errata sheet and original signed signature page to
15  William D. Belanger and Scott Daniels.
16      If you have any questions, please do not
17  hesitate to call.   Thank you.
18  Yours,
19  Natasha Kornilova
20  Reporter/Notary
21  cc:  Brian Hudak, Esq.
22      Mel S. Hutson, Esq.

Page 192

1  Capital Reporting Company
2  1821 Jefferson Place, Northwest
3  Third Floor
4  Washington, D.C. 20036
5  (202) 857-DEPO
6          E R R A T A  S H E E T
7  Case Name: Sandra L. Aguilar v. Dirk Kempthorne
8  Witness Name:  Sandra Aguilar
9  Deposition Date:  Friday, June 20, 2008
10  Page No.  Line No.      Change/Reason for Change
11
12
13
14
15
16
17
18
19
20  _____    _____
21  Signature                Date

49  (Pages 190 to 192)

# EXHIBIT
# 3

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Washington Field Office

| | | |
|---|---|---|
| SANDRA L. AGUILAR, | : | |
| Complainant, | : | EEOC No. 100-2004-00510X: |
| | : | Agency No. FNP-2003-064 |
| v. | : | |
| | : | |
| GALE NORTON, | : | Date: November 29, 2004 |
| Secretary, | : | |
| U.S. Department of the Interior, | : | |
| | : | Varice Henry |
| Agency. | : | Administrative Judge |
| | : | |

## DECLARATION OF ARNOLD J. GERBER

**Arnold J. Gerber** declares as follows:

1. I, Arnold J. Gerber, am a Human Resources Consultant in private practice located at 7 Malibu Court, Ruxton, Maryland, 21204-2047, 410-494-1911.

2. I conduct a general human resources consulting practice with emphasis on Federal position classification, pay, Fair Labor Standards Act, employee relations, equal opportunity and employment cases. I have been in private practice since June 2003, when I retired from Federal service with the Department of Veterans Affairs (VA).

3. I have been a human resources manager and specialist for 35 years.

4. Most of my professional experience as a human resources specialist with the government and in private practice has been in the Federal employment area, with strong emphasis in the area of diversity recruitment, position management, classification, and personnel management program evaluation and review. In my 12 years with the VA I served as: Director of

Position Management, Classification and Personnel Management Evaluation; Senior HR Consultant; and Director for HR Oversight and Accountability. In my capacity as Director of Position management and as Director for Oversight, I was responsible for planning, directing and reporting on departmentwide investigations conducted by my staff of charges of prohibited personnel practices, and for recommending appropriate corrective actions for substantiated allegations of prohibited personnel practices filed by Federal employees. For two years prior to my retirement, I served on an Intergovernmental Personnel Act (IPA) assignment as Director of Research and Policy for the National Association of Hispanic Federal Executives (NAHFE), a nonprofit organization dedicated to improving the representation of Hispanic employees at executive and managerial levels in Federal service. While serving with OPM, I personally wrote Government-wide occupational position classification and qualification standards, including the General Schedule Supervisory Guide (GSSG), the General Schedule Leader Grade Evaluation Guide, and the Budget Analysis Series, GS-560. In addition, I served as project leader/editor on several other OPM standards and guides to include the Administrative Analysis Grade Evaluation Guide, the Introduction to the Classification Standards and the Classifier's Handbook, the titles of which are listed in Exhibit 1. A copy of my resume, which summarizes my human resources and other experience, is attached hereto as "Exhibit 1."

5. I was retained by Sandra L. Aguilar, the Complainant in the above-captioned discrimination complaint proceeding, on/about August 20, 2004, to review the case file and render my professional expert opinion as to whether Ms. Aguilar was subjected to discrimination and/or one or more prohibited personnel practices when she was not interviewed or selected for the competitive status position of Administrative Officer, GS-0341-15, advertised as NPS-NCR-03-19 (hereinafter referred to as "the vacancy announcement") on or about July 9, 2003, when

she initially learned of her nonselection by the agency. Based upon my review of the EEO investigation files and related discovery materials (including the depositions cited below), and for the reasons and authorities set forth below, it is my professional opinion that the decision to nonselect Ms. Aguilar under the vacancy announcement constituted a prohibited personnel practice based on nonmerit and discriminatory factors in violation of 5 U.S.C. 2302(b)(1), (4), (6), (11), and (12).

6. The competitive selection action advertised in the vacancy announcement was an "appointment," or cognizable "personnel action," under the Federal merit personnel system. See 5 U.S.C. 2302(a)(2)(A)(i), which defines "personnel action" to include "an appointment." Ms. Aguilar was obviously seeking an appointment to the competitive service based upon her prior exemplary Federal service and experience in a GS-15 excepted service position with the Department of Health and Human Services.

7. *Section 2302(b)(1) violation*. Nowhere in the records I reviewed did the defendant articulate a legitimate, nondiscriminatory reason for not interviewing or selecting the Complainant. In fact, after having taken the time and the trouble to readvertise the vacancy announcement to expand the competitive area to "all sources," it made no sense whatsoever that the selecting officials Carlstrom and Lawler did not interview Ms. Aguilar or any of the other highly ranked candidates on the non-status "outside" certificate (refer to Carlstrom deposition, 8.c., pages 35 and 36). In addition, agency officials did not make a reasonable effort to ensure that selection was made from a diverse group of candidates, as evidenced by the statements of Carlstrom and Newman in their depositions. Neither Carlstrom nor Newman was aware of the ethnicity of the candidates on the selection certificates (refer to Newman Deposition, 8.b., pages 79-80). Finally, and as further discussed below under Section 2302(b)(4) violations, the selecting

3

officials selected Ms. Dottie Marshall based upon a reason that was discriminatory on its face in violation of the agency's own anti-discrimination policies, i.e., prior National Park Service and National Capital Region experience, which was not a listed selection factor. Therefore, it is my opinion that the Complainant was discriminated against on the basis of her national origin (Hispanic) in violation of Section 2302(b)(1).

8. *Section 2302(b)(4) violations*. The evidence of record clearly shows that the selecting officials, Terry Carlstrom, Regional Director, National Capital Region, National Park Service (NPS), and his Deputy, Joseph Lawler, relied on nonmerit criteria to nonselect the Complainant under the vacancy announcement. Specifically, Carlstrom admitted that he relied on prior NPS experience, which was not required in the vacancy announcement KSAs (refer to Carlstrom deposition, 8.c., pages 35 and 36), but was stated in the application of the selectee, Ms. Dottie Marshall, and relied upon that same experience as a basis for her selection. Since prior NPS experience was not a required KSA, none of the candidates for the vacancy were aware it should be addressed in their applications. Use of the prior experience factor was also in contravention of the Berry and Stanton policy memos regarding filling of managerial positions (reference 6.). In so doing, Carlstrom effectively denied Complainant consideration for the position. As such, the evidence establishes that the agency willfully obstructed the Complainant's right to compete under the vacancy announcement in violation of Section 2302(b)(4).

9. *Section 2302(b)(6) violations*.

The agency committed numerous violations of Section 2302(b)(6):

a. The evidence of record clearly shows that in relying on prior NPS experience as a basis for differentiating between candidates, selecting officials Carlstrom and Lawler gave Ms. Marshall, the selectee, an unauthorized preference or advantage so as to

4

improve Marshall's employment prospects and to injure the employment prospects of the Complainant (refer to Carlstrom Deposition, 8.c., pages 35-36). This is borne out by the deposition of Leslie Newman on 10/28/04, sec. 72, in which she stated "the choice must be based on job related criteria." Ms. Newman's statement is without merit or logic and contradicts the applicable vacancy announcement. A selection cannot be based on criteria not specified in the vacancy announcement (reference 4, Vacancy Announcement NPS-NCR-03-19, KSAs 1-5), whether "job-related" or not.

b. Carlstrom's decision not to interview all of the candidates, status and non-status, represented a failure to follow agency Merit Promotion Plan (MPP). Unfair competition under the vacancy announcement was in violation of Section 2302(b)(6).

c. Use of separate certificates for in-house "status" candidates and all sources "non-status candidates" clearly injured the employment prospects of the Complainant, since the Complainant was referred on the "all sources" certificate and selecting officials Carlstrom and Lawler admittedly did not interview or consider candidates on the "all sources" certificate (refer to Carlstrom Deposition, document 8.c., page 40). The agency's stated purpose for readvertising the vacancy was to broaden the area of consideration by opening competition to "all sources" as required by its diversity hiring policy (reference 6). Carlstrom's decision not to consider Complainant, who is Hispanic, was therefore in violation of the agency's own diversity hiring policy and in violation of Section 2302(b)(6).

10. *__Section 2302(b)(11) violation__*. The agency and Mr. Carlstrom knowingly circumvented veterans preference laws, rules and regulations by failing to consider three (3) preference eligible veterans referred on the "non-status" certificate. The record indicates that Ms.

5

Newman advised Carlstrom of interview requirements (i.e., if he interviews one, he must interview all) and Veterans preference requirements, including the "rule of three," prior to the selection (refer to Newman deposition, 8.b., pages 68 and 69), and that Carlstrom chose to disregard that advice in failing to interview Complainant or any of the veterans. The agency argument that Complainant was not within reach on the "non-status" certificate due to the presence of veterans ranked above her is specious and without merit since Carlstrom did not interview any of those veterans and therefore could not have known whether any veteran was available or interested in the position before he selected Marshall (refer to Carlstrom Deposition, 8.c., page 35). The record shows that the non-status certificate was signed and returned unused, but the document does not bear a return date, which is certainly improper - if not illegal (refer to Newman Deposition, 8.b., Page 94). Use of separate certificates constituted a deliberate and willful act intended to circumvent consideration of veterans and Complainant, in direct violation of Section 2302(b)(11).

11. *__Section 2302(b)(12) violations__*.  Under this prohibited personnel practice section, it is improper to take or fail to take a personnel action if the action violates any law, rule or regulation that "implements" or "directly concerns" any of the "merit system principles" under Section 2301.  In the selection action at issue, it appears that the agency violated at least one Office of Personnel Management (OPM) rule or regulation that implemented or directly concerned applicable merit system principles when it knowingly made a selection from an expired certificate of eligibles (refer to 10 below, OPM DEU Handbook 2003, Section E, Lost Consideration Due to Erroneous Certification, i.e., failure to give bona fide consideration to an eligible in connection with a competitive certificate in violation of the law). Carlstrom admitted that he knowingly made his selection from a certificate of eligibles that had expired 4 days

6

earlier, and that he did not request an extension of the certificate (refer to Carlstrom deposition, 8.c., page 40). In so doing, the agency also knowingly failed to follow its own procedures which, as stated in its MPP, copy attached, required prior approval to extend the date of the promotion certificate. The record and deposition of Carlstrom provide evidence of that violation and show that agency officials Carlstrom and Newman were aware of this error. The record and their depositions also show that Carlstrom and Newman did not attempt to correct or otherwise regularize this error after the fact (i.e., following Ms. Marshall's selection on 5/27/03) as required by OPM (reference 10). The record further shows that Carlstrom sent a memo forward to the Bureau director on May 16, 2003, requesting the Director's approval to select/promote Marshall. That memo is evidence of preselection since Carlstrom did not sign the selection certificate until 5/27/03, some eleven days later, but well before the Director's Office approved the selection recommendation on 6/13/03. For the reasons expressed earlier, the evidence also establishes that the agency nonselected the Complainant under the vacancy announcement based on nonmerit factors, and it denied her equal opportunity based on fair and open competition as required by Section 2301(b)(1). Accordingly, it is my opinion that the evidence of record also establishes a violation of Section 2302(b)(12).

12. The agency knowingly and deliberately violated its own diversity hiring policies and procedures in initially advertising the vacancy as limited to DOI candidates (reference 6). After readvertising the vacancy as open to "all sources," as required by the Stanton memo, the agency again failed to follow its own diversity hiring policies and procedures by:

a. Establishing separate certificates for nonstatus "outside candidates" and status "in-house" eligibles;

b. Failing to interview or even consider any of the outside candidates;

c. Using different methods for rating and ranking outside candidates (i.e., an HR Specialist) vs. in-house candidates (i.e., a panel of subject matter experts);

d. Failing to interview or consider Complainant, who met all KSAs and experience requirements in the vacancy announcement, and in addition had demonstrated outstanding performance for over 2 years in a GS-15 position (in comparison, the selectee Marshall had never served at the GS-15 level and was promoted by Carlstrom from GS-14 to GS-15);

e. Failing to consider or interview outside candidates with comparable or higher rating scores than the selectee;

f. Failing to ensure that selection was made from a diverse group of candidates (Berry memo attached); and

g. Failing to properly maintain applicant flow records for the selection action.

13. **SUMMARY OF EXPERT OPINION**

The agency selected Ms. Dottie Marshall on 5/27/03 from an expired selection certificate in violation of agency and OPM policies and procedures, thus rendering her selection and promotion invalid. In so doing, the agency imposed artificial selection criteria (KSAs) after the fact as a bar to employment and relied upon separate selection certificates to circumvent consideration of Complainant. In my opinion, the manner in which Carlstrom and Lawler artificially limited their consideration to "status" candidates and selected Marshall without considering well-qualified - if not better qualified and higher-ranked - "non-status" candidates, including Complainant, evidenced preselection of Marshall from start to finish in violation of the letter and spirit of merit principles. In addition, the manner in which the agency conducted the selection action in Vacancy Announcement No. NPS-NCR-03-19 discriminatorily operated as an artificial bar to the proper consideration of qualified outside candidates, especially qualified

8

Hispanic applicants, in violation of the letter and spirit of merit system principles and agency affirmative action recruitment and hiring policies and procedures. According to FEORP statistics, as of the end of FY 2003, Hispanic employees constituted less than 5% of the workforce, a figure that remained static from FY 2002. The selection of Dottie Marshall was conducted in such a manner as to effectively screen out qualified Hispanic candidates, including Complainant, which resulted in perpetuating the agency's longstanding under-representation of Hispanic employees.

14. I declare that the foregoing information is true and accurate to the best of my knowledge and belief. Executed at Ruxton, Maryland this 29th day of November, 2004.

Arnold J. Gerber

Attachment

---

**REFERENCED DOCUMENTS and INFORMATION REVIEWED:**

To prepare my opinion, I reviewed the following documents, copies of which are either attached, in the EEO ROI File or readily available on agency websites:

1. US Office of Personnel Management (OPM), Title 5, Code of Federal Regulations (CFR)

2. DOI/NPS Regulations and subchapters on selection and placement

3. AGENCY EEO Guidelines for Headquarters Placement Offices and Placement Officials

4. Vacancy Announcement NPS-NCR-03-19, KSAs 1-5

5. EEOC, Uniform Guidelines on Employee Selection

6. NPS Memo P66 (2653) dated Feb 12, 1999 from Bob Stanton, Director, Subject: Modified Plan for Management Succession

7. Application Forms for GS-341-15 and placement forms

8. Discovery Materials: Depositions of Subject persons below re Aguilar VS. Department of Interior, EEOC No. 100-2004-00510X, Agency No. FNP-2003-064:

    a. Deposition of SANDRA L. AGUILAR, taken on Thursday, October 21, 2004;

    b. Deposition of LESLIE J. NEWMAN, taken on Thursday, October 28, 2004;

    c. Deposition of TERRY R. CARLSTROM, taken on Tuesday, October 26, 2004.

9. OSC definitions of Prohibited Personnel Practices under 5 CFR 2302 b.

10. OPM DEU Handbook 2003, Section E – Priority Consideration, Lost Consideration Due To Erroneous Certification

11. EEO ROI File

10

Exhibit 1.

*Arnold J. Gerber*

**Human Resources Consultant/Expert Witness**

36 years of in-depth human resources management policy, consulting and operating experience, to include:

- *Development, interpretation and application of position classification and qualification standards*
- *Direction of Federal civilian salary and wage programs*
- Direction of VA Departmental classification appeals program
- Direction of VA Departmental personnel management evaluation program
- *Development and application of Fair Labor Standards Act policies and guidelines*
- *Policy and operating experience in staffing, training and employee relations*
- *Private Sector human resources management (HR) consulting*
- *Expert testimony in arbitrations, hearings and depositions*
- Contract consultant to private sector attorneys and their clients and Federal agencies, specializing in investigating, researching, analyzing and recommending options for resolving Classification and Pay Complaints and appeals, Federal Grievances, EEO Complaints, OSC Actions and MSPB Appeals.
- Served as advisor and consultant to clients on pay, hazard pay, classification, compensation, FLSA, EEO complaints grievances, and appeals, and employee relations issues.
- Consultant and advisor on salary and wage issues, organizational design, merit pay, employee relations, recruitment and placement to large group medical and dental practices. Implemented and administered salary and wage systems and merit based performance plans.

*Recent Expert Witness and Consulting Cases*

July 29, 2004 – Designated by arbitrator to conducted classification desk under settlement agreement with plaintiff and defendant to resolve NIH back pay case. My findings and recommendations were accepted and implemented by the respective parties.

June 25, 2004 – Provided expert classification determination to plaintiff's attorney and to agency in Equal Pay Act case involving back pay issues after I was named in the settlement agreement as the deciding classification official.

June 22, 2004 – I provided sworn expert witness testimony in a deposition on behalf of the plaintiff in an Equal Pay Act case. My deposition was taken by a private sector attorney representing the National Credit Union Administration (defendant). I also served as consultant and advisor to plaintiff's attorney while taking the deposition of defendant's expert witness.

11

June 9, 2004 – I was named in absentia to perform a desk audit to resolve a classification dispute raised by AFGE 2419 with NIH/HHS, in which the Agency agrees to abide by my classification determination. The Arbitrator, before whom I have made a prior appearance in a different case, qualified me as an expert.

May 17, 2004 – Provided classification decision and report of findings and recommendations to Department of State in EEO complaint involving back pay issues. Both the agency and the plaintiff agreed in advance to accept my findings as conclusive.

May 11, 2004 - I served as an expert witness for the plaintiff in an arbitration hearing in a back pay classification and qualification case filed against the Social Security Administration. Prior to my testimony, the Arbitrator qualified me as an expert witness.

April, 2003 - I was named in a settlement agreement between the plaintiff and the VA to serve as the classification expert assigned to determine the proper grade level of the position in question; I completed that grade determination in June 2004 and my classification findings and recommendations were implemented by the respective parties.

January 6, 2004, - I provided sworn testimony as an expert witness in a case against Ft. Bragg, NC involving involuntary FLSA overtime and changes to alternate work schedules. I learned in June, 2004, that my testimony had contributed to an arbitration decision in favor of the plaintiffs whom I represented.

October 22, 2003 - Gave deposition to US Attorney while serving as expert witness in classification and back pay EEO case against the Health Care Financing Administration. Also prepared and provided sworn affidavits in the form of an initial classification determination and an expert witness rebuttal to the US Attorney's request for summary judgment.

June 26, 2003 - Prepared to testify as expert witness for plaintiffs in arbitration hearing held at Ft. Detrick in back pay case; the case was settled for the plaintiffs moments before I was scheduled to testify.

May, 2003 - Prepared expert witness testimony in case brought against AGENCY concerning pay setting upon promotion; case was settled for plaintiff before I was to testify.

March 8, 2003 - Provided expert witness deposition on behalf of plaintiff in EEO case involving nonselection due to age discrimination filed against Nuclear Regulatory Commission. My testimony was later excluded by the presiding judge at the request of the agency as it was severely damaging to their case.

*FEDERAL MANAGERIAL and TECHNICAL EXPERIENCE*

06/02 – 05/03: Acting Director, HR Program Oversight & Effectiveness, Dept. of Veterans Affairs
- Responsible for Department's HR review, compliance and reporting program
- Planned and designed classification and position management review of all VA SES positions
- Developed career ladder structure and PDs for the VA Career Intern Program

06/00 – 05/02: Director for Research and Policy, National Association of Hispanic Federal Executives
- Senior policy advisor to NAHFE's President and CEO
- Planning, budgeted for, organized and conducted national conferences, meetings, seminars, training courses, special events, partnership initiatives, diversity projects and Hispanic employment initiatives
- Developed issue papers, reports, briefings, written handouts and educational materials
- Planned, organized, lead and facilitated SES workshops for NAHFE Summits and training conferences
- Provided consulting advice, developed and presented briefings to Federal department and agency heads and Congresspersons on programs and issues affecting Hispanic representation
- Networked with government and private sector groups to improve diversity, and initiated, implemented and monitored NAHFE Partnership Agreements with Federal departments and agencies
- Established pilot diversity hiring projects for OPM Federal Executive Boards and State Department Foreign Service Officer recruitment
- Designed NAHFE recruiting brochure, event announcements, logo, labels, podium seal, flag and banner

09/97 – 05/00: Senior Human Resources Management Consultant, Department of Veterans Affairs
- Senior HR Policy advisor and Consultant to VA headquarters and field facilities
- SES Position Management Officer for VA responsible for coordinating, reviewing and evaluating requests to establish or redescribe SES positions
- Consultant to the Director and HRM staff of the VA Maryland Health Care System (VAMHCS)
- Advised on and assisted in the consolidation and integration of Human Resources Services programs and staff at three hospitals and several outpatient clinics
- Developed and implemented VAMHCS HR strategic action plan, timeline and transition plan
- Created and trained Deming Process Action Teams to implement VAMHCS HR goals and objectives to ensure continuous improvement of work processes and systems

<u>02/91 -- 08/97: Director, VA Position Management and Classification Service</u>
- Managed nationwide position classification, GS and FWS appeals and personnel management evaluation (PME) programs covering 200,000 employees in over 160 white collar and 50 blue collar occupations at 172 medical centers and 50 veterans benefits regional offices
- Directed classification of SES and centralized positions through grade GS-15
- Established department-wide policy, adjudicating position classification appeals, administering the Fair Labor Standards Act, and conducting personnel management evaluations throughout all field offices, medical centers and regional benefits offices
- Managed Classification Business Plan, developed and marketed classification products (e.g., guides, model PDs and classification advisories), policies (e.g., delegations of authority), and services (e.g., problem-oriented reimbursable site evaluations) strategically aligned with business needs

<u>07/77 -- 01/91: Chief, Classification Policy and Projects Office, US Office of Personnel Management</u>
- Directed teams of occupational specialists in the development of OPM classification and qualification standards

<u>07/76 -- 06/77: Classification Analyst, Bureau of Disability Insurance, Social Security Administration</u>
- Analyzed, planned and developed the agency's policy on classifying GS supervisory positions, nationwide

<u>07/74 -- 06/76: Director, Position & Pay Management, Walter Reed Medical Center</u>
- Directed all phases of classification and compensation, including determinations of FLSA coverage and amounts payable under FWS and GS hazard pay, overtime and special rates covering 5000 GS and FWS employees in several locality wage areas. Advised JAG and US Attorney on classification and pay issues in courtroom setting.

*EDUCATION and TRAINING*
- Master of Science in Administration, the George Washington University, Washington DC
- Basic, intermediate and advanced facilitating, consulting, team leadership, organizational design, span of control and quality management techniques
- OPM courses in budget formulation and budget execution
- VA Carey (Baldrige) Award Examiner

PUBLICATIONS
*Author/co-author, and/or editor of OPM government-wide position classification standards including:*
- ✓ *GS Team Leader Grade Evaluation Guide*
- ✓ *General Schedule Supervisory Guide*
- ✓ *Administrative Analysis Grade Evaluation Guide*
- ✓ *Budget Analysis Series, GS-560*
- ✓ *Mine Safety and Health Series, GS-1822*
- ✓ *Classifier's Handbook*

14

- ✓ *Introduction to the Classification Standards*
- ✓ *VA Guide on Classification of Security Officers, GS-080*
- ✓ *VA Guide on GS Team Leader classification*
- ✓ *Research papers on history of Federal classification, span of control, streamlining and delayering*
- ✓ *Final reports on Hispanic Federal Executives Summits II, III and IV*

**Expert Testimony:**

1. I testified as an expert witness at a formal arbitration in the case of Gugliuzza V. SSA on May 11, 2004. The arbitrator decided in favor of the Plaintiff, Mr. Complainant Gugliuzza.

2. I provided a deposition under oath on June 22, 2004, in the Equal Pay Act case of Albin v. NCUA; that case is with EEOC pending decision.

3. I provided a deposition under oath on October 22, 2003, to the Assistant US Attorney in the case of Johnson v. HHS. I also drafted and provided a rebuttal to the defendant's request for summary judgment. Following the EEOC judge's refusal to grant summary judgment on triable issues cited in my disclosure, defendant offered plaintiff a favorable settlement.

4. I provided expert testimony by telephone on/about June 2004 in a case involving FLSA issues at Ft. Bragg, NC.

5. I submitted expert testimony on behalf of plaintiffs but was not required to take the stand due to settlement by defendant prior to trial in June, 2003, in the case of Department of Army, USAMRAA grievants regarding classification, pay and merit selection procedures and issues.

6. In May, 2003, I prepared expert testimony but was not required to testify due to prior settlement in the case of a Postal Service employee on issues relating to selection and pay setting upon promotion.

7. I testified by deposition in January, 2003, in the case of Himes v. NRC, which involved expert interpretation and application of agency employment and selection procedures and rating and ranking of candidates under OPM qualification standards.



New User    |    About the Agency    |    What's New    |    Quick Index    |    Operating Status

You are here: Home > deu> Handbook 2003

*Working for America*



---

## Section E - Priority Consideration

| | |
|---|---|
| **Introduction** | Priority consideration is a special placement priority that is given to an eligible who was previously denied consideration due to an administrative error or a law of regulatory violation. It is important to remember that there is no situation where an eligible must be selected, except for the special selection priority of a well-qualified eligible in the Interagency Career Transition Assistance Program (ICTAP) (5 CFR Part 330). |
| | This section explains how and what to do to complete the certification process to include priority consideration. |

---

| | |
|---|---|
| **Contents** | This section contains the following topics: |

| Topic |
|---|
| Lost Consideration Due to Erroneous Certification |
| Lost Employment Consideration |
| Lost Certification |

---

### Lost Consideration Due to Erroneous Certification

---

| | |
|---|---|
| **Definition** | An erroneous certification is an inadvertent misranking, noncertification, or failure to give bona fide consideration to an eligible in connection with a competitive certificate. The erroneous certification must be the result of an administrative error for the remedies listed in the following section to apply. |

Cases of knowing or intentional manipulation of the examining system are handled based on their unique characteristics and will typically be referred to the Office of Special Counsel.

| | |
|---|---|
| **Two types of erroneous certification** | Erroneous certification occurs when an eligible does not appear in the correct order on the certificate (i.e., was misranked on a certificate or did not appear on the certificate at all) or when an eligible appeared on the certificate but did not receive appropriate consideration.<br><br>There are two principle types of erroneous certification, those that:<br><br>1. Involve a violation of law (e.g., "rule of three" or <u>Veterans' Preference Act of 1944</u>), and<br>2. Do not involve a violation of law (e.g., an administrative error). |
| **Correcting an erroneous appointment** | In the case of erroneous certification, you always have the option of regularizing the appointment by removing the incumbent, if the selectee enters on duty before the error is discovered. (See <u>Error of the Commission Principle</u> below). |
| **Error of the commission principle** | This prinicple was first explained in a 1917 Attorney General's decision (Civil Service - Erroneous Certification, April 19, 1917.31 U.S. Op. Att. Gen. 110, 1917. WL 729 (U.S.A.G.)). In this decision, the Attorney General concluded that regularizing appointments from an erroneous certificate was unduly harsh to the selectee and contrary to the intent of Congress.<br><br>The error of the commission is intended to correct administrative errors on the part of the examining office. The examining office must consult with their headquarters in the resolution of the erroneous action. |
| **Notification** | If an erroneous certification is discovered and an eligible is affected, you should notify the eligible immediately, particularly if the error was due to a legal violation. |
| **Documentation** | In all cases of erroneous certification, the case file should be documented with the facts of the case. Follow-up action should also be taken, (e.g., review of processing procedures and additional staff training) to preclude recurrence of the problem. |

**Lost Employment Consideration**

| | |
|---|---|
| **Introduction** | The more serious type of erroneous certification is in cases where there is a violation of law (e.g., Title 5 of the United States Code and the <u>Veterans' Preference Act of 1944</u>). This is known as Lost Employment Consideration or Loss of Bona Fide Employment Consideration. When considering your options for correcting any lost employment consideration actions, you should be mindful of any hiring restrictions of other placement assistance programs (e.g., CTAP, ICTAP, RPL), for the geographical areas. |

**Conditions for a legal violation**  In order for there to be a legal violation, **all** four conditions must be met:

1. A selection must be made from the erroneous certificate;
2. When the erroneous certification is corrected, the misranked eligible must move within reach of selection;
3. When the erroneous certification is corrected, the selectee must move out of selection range; and
4. The misranked eligible must meet all the qualification requirements for the job.

**Correcting the violation**  You should take the following steps to correct an erroneous certification where there has been a legal violation, i.e., all four criteria were met.

| Step | Action |
|---|---|
| 1 | If you discover the erroneous certification before a selection is made, you should contact the selecting official immediately and inform him or her not to extend any selection offers until the certificate is amended to add or rerank the eligible. |
| 2 | If you determine that an eligible lost consideration on a certificate, the selecting official can make a voluntary offer of non-competitively appointing the eligible to one of the following positions:<br><br>• an **identical** job (same series, same grade, same promotion potential, same tenure, same geographic location or any location the eligible deems acceptable), or<br>• an **equivalent** job (same grade, same promotion potential, and same tenure) for which the eligible qualifies in the same geographic area in which the eligible lost consideration or in any geographic area that the eligible considers acceptable.<br><br>**Note:** If the eligible accepts or declines one of the appointment offers described above, no further action is necessar |

**Mandatory action for lost employment consideration**  If either **a)** the selecting official declines to make any of the voluntary offers listed above or **b)** the eligible declines a position because it is not in either the same location or in one which he or she indicated was acceptable, then the following steps are mandatory:

1. Eligible must receive priority consideration for the next appropriate position

(see chart below) announced under competitive procedures; and

2. Eligible would be listed on a certificate of eligibles as the first eligible candidate for consideration under the "rule of three."

---

**Options for lost employment consideration**

The appointing official has the option of offering the eligible either or both of the following. (**Note:** Option 1 applies only for 10-point preference eligibles).

| Option | Description |
|--------|-------------|
| 1 | Offer employment to any equivalent job (same grade, same promotion potential and same tenure) within the agency for which the eligible is **minimally** qualified in any geographic area that the eligible deems acceptable. |
| 2 | Offer employment to any equivalent job (same grade, same promotion potential and same tenure) within the agency for which the eligible is **well-qualified** in any geographic area that the eligible deems acceptable. |

---

**Determining the number of priority considerations**

The following table describes a recommended method of determining the number of priority considerations an eligible should receive under the case examining and competitor inventory environment.

| IF... | THEN... |
|-------|---------|
| case examining | number of priority considerations would equal the number of selections made from the original certificate. |
| competitor inventory | eligible would continue to receive priority considerations until appointed or until the eligible has received the number of bona fide employment considerations that he/she would have received had the fault not occurred, whichever comes first. |

In cases where it is not possible to determine the exact number of lost employment consideration opportunities, an appropriate number of priority consideration opportunities should be given to the eligible based on:

- Activity of the inventory;
- Length of time consideration was lost, and
- Eligible's qualifications relative to others on the inventory.

---

## Lost Certification

---

**Introduction**

Lost certification is the second type of erroneous certification. This type of erroneous certification does not involve a violation of law (i.e., it does not meet the four criteria of a legal violation).

---

| Definition | Lost certification occurs when an eligible is misranked on or left off a certificate but correcting the error would not give the eligible real employment consideration. |
|---|---|

**Lost Certification Example**    Examples of lost certification.

| Example | Description |
|---|---|
| 1 | An eligible was left off a certificate but would not have been within reach for selection even if he/she had received proper treatment. |
| 2 | An eligible was misranked on a certificate and is within reach when the error is corrected. The selectee also stays within reach after the adjustment is made. |

| Correcting an erroneous certification | When there has been no legal violation, there is no obligation on the part of the selecting official or the examining office to give the eligible any priority consideration. |
|---|---|

| Order of selection | In cases of lost employment consideration and lost certification, well-qualified ICTAP eligibles **must** be selected before anyone on the certificate, including the eligible that is receiving priority consideration. (5 CFR Part 330) |
|---|---|



Office of Personnel Management

Site Index [    ] go

1900 E Street NW, Washington, DC 20415-1000 | (202) 606-1800 | TTY (202) 606-2532

Contact Us | Forms | FAQ's | Products & Services

Page 7, Section 7. Referral and Selection

Page 7. Referrals.

All National Park Service Merit Promotion Certificates will be valid for no more than 120 calendar days. Extensions to the certificate may be made in rare situations up to a total of 180 days. No selections or extensions may be made from the certificates after the 180 day period has expired. If additional identical positions become vacant during the next 90 days after the 180 day period, the certificate may be reissued to meet this need. However, the total life of this reissued certificate may not exceed 60 days.

Page 8, Section 9. Complaints and Release of Information

Page 9. Corrective Actions.

Applicants who lose consideration due to administrative error will be given priority consideration for the next like position within the region/support office/Center/park/WASO. Priority consideration will be given for the same position, at the same grade, and for the same organizational unit from which consideration was lost. An applicant may accept or decline any and all such positions. If an applicant accepts or declines a position, their priority consideration ends. If an applicant applies for and is accepted for a position anywhere in the NPS, then their eligibility for priority consideration ceases. There is no Servicewide consideration for administrative error.

# EXHIBIT
# 4

**Ms. Dottie Perks Marshall**
407 North Barton Street
Arlington, VA 22201
703-243-1038 (Home)
703-289-2500 (Work)
Email: Dottie_Marshall@NPS.Gov

| | |
|---|---|
| **Social Security Number:** | ▓▓▓▓▓▓ |
| **Country of Citizenship:** | United States of America |
| **Veteran's Preference:** | No |
| **Highest Grade:** | GS-025-15, 12/2001 - 03/2002 |
| **Contact Current Supervisor:** | Yes |

## VACANCY INFORMATION:

Announcement Number: NPS-NCR-03-19
Job Title: Administrative Officer
Grade(s) applying for: 15

## OBJECTIVE:

I am seeking a management position that offers diverse challenges in an organization that promotes inovative thinking.

## WORK EXPERIENCE:

| | |
|---|---|
| **George WAshington Memorial Parkway**<br>**McLean, VA 22101**<br>**USA** | **Dates Employed: 02/1995-Present**<br>**Grade Level: GS14** |

Deputy Superintendent, 025
As Deputy Superintendent I share in the management, planning and direction of the parkway operation with direct line aurhtority over the Maintenance Division, the Division of Interpretation and Resource Management, as well as the Safety Officer and Concession management analyst. In addition, I supervise the site managers at Arlington House, the Robert E. Lee Memorial, Great Falls Park, Clara Barton National Historic Site, and Glen Echo Park. I have primary responsibility for developing strategic plans as well as annual work plans for these functional and geographic areas. I execute a budget of a $8 million+ annually with 125 FTE's. I serve as a liaison to park partners such as Arlington National Cemetery, Claude Moore Colonial Farm, and Women in the Military Services Museum. I function as project manager for major development/construction projects such as the Great Falls Management Plan, road reconstruction (FLHP), and repair/rehabilitation of resources.

I have full responsibility for the day to day operation of the park including the prioritization of work and quality control (Supervisor's Name: Audrey F. Calhoun. Phone: 703-289-2500.)

Exhibit 2
Page 98 of 117 pages

National Park Service                    Dates Employed: 08/1986-01/1995
National Capital Region                  Grade Level: GS 14
1100 Ohio Dr. S.W.
Washington, DC 20242

Budget Officer, 560

PLANNING AND DEVELOPMENT-I was responsible for coordination of the region's program. I assisted parks in identifying requirements and coordinated the generation of supporting justifications. I responded to agency requests for candidate projects with recommended strategy for regional priorities to assure cometitive submission.

OPERATIONS-I supervised the compilation of the region's annual request to the agency for inclusion in the President's Budget. I identified specific areas of deficiency to target emphasis for additional funding. I reviewed park needs for compliance with Administration policy and priorities of the Director and Regional Director, offering strategies for competitive requests.

BUDGET EXECUTION- I developed allocations for park/offices. I initiated reprogramming actions to support Regional Director's objectives and changing priorities. I review park/office variance reports to assure compliance with approved budget allocations.

FINANCE- I supervised the region's financial management program to include cash management, debt collection, audits and evaluations and maintainance of the general ledger for real and personal property.

EXECUTIVE RESIDENCE AT THE WHITE HOUSE/U.S. HOLOCAUST MEMORIAL MUSEUM

I was responsible for budget formulation, execution and all financial services for these small independent agencies. In addition, for the museum, I coordinated all administative services provided by the National Capital Region. My work included preparation of all submissions to OMB, the Congress, and the U.S. Treasury. I served as the agency contact for Congressional and OMB staff. (Supervisor's Name: Richard Powers. Phone: 202-619-7200.)

**EDUCATION:**

West Virginia University
Morgantown, WV 25404
Bachelor of Fine Arts, 1976
Major: Theatre Arts
Minor: Journalism

Charles Town High School
Charles Town, WV 25414
High School, 1976

**JOB-RELATED TRAINING COURSES:**

Environmental Planning - National Capital Region -1997
Total Safety Culture Leaders Workshop -2000
Discilinary/Adverse Action - 1995
See attached

Exhibit 2
Page 99 of 117 pages

## JOB-RELATED HONORS, AWARDS, MEMBERSHIPS, ETC.:

DOI Meritorious Service Award -2002
Special Act Service Award - 12/01, 09/98, 01/98,12/97

Exhibit 2
Page 100 of 117 pages

1. Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.

I have managed administrative programs in a small park (Manassas NBP, 15 FTE, and $500,000 Budget) and a large park (NCP-Central, 400+FTE, and $12,000,000 Budget). As budget officer for the National Capital Region I directed the formulation and execution of a $150,000,000+ operating budget and a construction program with projects ranging from $750,000 to $15,000,000.

Through a cooperative agreement I served as Budget Officer and Administrative Liaison for the U.S. Holocaust Memorial Museum. In this role, I guided the development of this independent Federal Agency from an initial appropriation of $80,000 to an annual appropriation of $18,000,000. I served as the chief technical advisor to the Museum Director to design organizational structures to support the construction of the facility as well as its operation. As a part of this process we developed agency level staffing for human resources, budget, finance, property management, contracting/procurement and administrative support services. I monitored and assisted in classification, qualification evaluation, and placement of employees to perform these functions. In the opening of the museum I developed a procurement plan to support the completion of the building, as well as its fit out for interpretive media, and administrative space. I coordinated the execution of procurement actions between the agency procurement staff, the NCR Contracting Division and a purchasing agent reporting directly to me. I wrote legislation which was enacted by the Congress to merge the private side of the U.S. Holocaust Memorial Council with the Federal Entity, and assisted in assimilating Council employees to the Museum under a Federal takeover. During its first 18 months of operation, I was asked to monitor the museum operation for efficiency and effectiveness in fulfilling its mission and made substantive recommendations for adjustments to the organization structure to improve performance.

As budget officer for the Executive Residence at the White House, in formulating and executing the Residence accounts, I assisted in planning routine maintenance as well as rehabilitation of major components of the President's home. I was successful in establishing a construction appropriation for the Residence which resulted in the first major exterior renovation of the White House since the Truman Administration. I provided technical advice on position management, and maintained the general ledger for property which included sensitive negotiations regarding large gifts from American donors as well as foreign countries. While the Residence appropriation is not subject to Federal Acquisition Regulations, I assisted in developing procurement plans which would demonstrate that purchasing incorporated the tenets of the Federal Acquisition Regulations.

As the park Deputy Superintendent I manage a budget of $10,000,000+ and 140 employees. I oversee the development of plans and specifications for procurement actions ranging in size from $10,000 to $5,000,000. I am an active participant in all

Exhibit 2
Page 101 of 47 pages

aspects of human resources including position management, staffing and employee relations. I have developed internal programs to use Youth Conservation Corps, Student Conservation Corps, Interns, Parks as Classrooms and hiring authorities to increase staff cultural diversity. I have experience in resolving discipline issues such as alcohol and drug abuse, sexual harassment, discrimination, work place violence, leave abuse and insubordination. I have developed an effective program to reduce employee compensation for workplace injuries. I actively promote and support our employee recognition program. We recently completed a 100% inventory of all park property and resolved longstanding discrepancies in supporting documentation. I am responsible for park collections management which includes collections at Great Falls Park, Clara Barton House; Arlington House and Glen Echo Park. I was successful in reconciling the Arlington House inventory which had been at issue for more than a decade

2.  **Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels.**

Our park structure includes 3 site managers and two division chiefs who must work collaboratively to accomplish goals. As their supervisor, much of my time is devoted to assisting them in adjusting priorities within their work plans to assure that the most important work is accomplished.

I have managed large projects, such as the dredging of Columbia Island and Daingerfield Island Marina. This project had significant Congressional interest and required negotiating with the concessioner, and with regional and agency level officials to establish a funding. Sensitive components of the project included placement of dredge material and timing in that it required total closure of the Columbia Island facility. I conducted lengthy negotiations with officials from the District of Columbia regarding sediment content, and placement as well as use of the Blue Plains Sewage treatment plant property. I worked with the Corps of Engineers in planning and executing the project to assure that it was accomplished within the established schedule and within budget.

I am the primary park contact with the Friends of Claude Moore Colonial Farm who operate the farm under a cooperative agreement with us. Because of their location adjacent to the Central Intelligence Agency and the Turner Fairbanks Research Facility, public access to the farm has been problematic since September 11, 2001. I have lead responsibility for the construction of a new entrance road for the farm. This project has been followed closely by several members of Congress as well as the DOT Secretary.

I was detailed as Special Assistant to the Regional Director to respond to and develop an implementation plan for the National Association of Public Administration study of the U.S. Park Police. This plan examined Force position management, fiscal management, property management, and strategic planning. The implementation plan required interfacing with National Capital, Northeast and Pacific West Regions,

Exhibit 2
Page 10Y of 11 pages

agency and Departmental officials, as well as officials from other Federal and local jurisdictions. I also served as the Regional Director's point of contact for the realignment of the Chief to report to the Director, one of the plan recommendations. I coordinated with U.S. Park Police employees at all levels to develop a plan that would best serve the Force as well as the parks they service. Because this report was requested by the Congress, the implementation plan was scrutinized and debated by all levels in the agency and department.

I was the park representative for the implantation plan for the National Associate of Public Administration's review of the Denver Service Center.

I was a lead member of the negotiating team for transfer from the National Park System of the John F. Kennedy Center for the Performing Arts.

I had lead responsibility for the agreement which transferred the National Visitor Center (Union Station) from the Department of Interior to the Department of Transportation.

I have twice served on negotiating teams to develop cooperative agreements for the delivery of services by the U.S. Park Police to Golden Gate National Recreation Area and Gateway National Recreation Area.

As Deputy Superintendent of a linear park in the Nation's Capital, I must constantly work with other park managers, and officials from other Federal or local jurisdictions to facilitate special events, or projects which may have an impact on park resources or visitor programs. Most of these activities will quickly escalate to very high levels if they are not managed sensitively. Many escalate regardless of what we do. I must approach resolving every issue as if it will be reviewed by the Secretary of Interior because it very often will be.

3. **Ability to develop, analyze, review, and appraise the effectiveness of administrative polices, programs, and practices.**

I have demonstrated my ability to sustain an effective administrative program in a small park (Manassas NBP) and at a large park (NCP-Central). At the U.S. Holocaust Memorial Museum, I was instrumental in developing their administrative policies, programs and practices and was then called upon to review their effectiveness.

I have developed administrative polices, programs and practices in the areas of budget and finance which were used by the region as well as the U.S. Holocaust Memorial Museum.

I have analyzed policy guidance from the Office of Management and Budget in order to incorporate it into regional programs and practices.

Exhibit 2
Page 103 of 117 pages

I serve on the Region's Competitive Sourcing team which requires skill in review and analysis all park programs to assure that park business is performed efficiently and effectively.

In my current position I review and analyze all Departmental and Agency policy and make adjustments to park programs to conform to this guidance.

In August, 2002, the Chief, U.S. Park Police requested that I be detailed to evaluate the effectiveness of their budget and finance program. During this period, I directed the close-out of their FY02 appropriation, developed their FY03 operating program, and formulated their FY04 budget request. As a part of this assignment, I met with agency and Office of Management and Budget staff to recommend practices to be adopted in response to past Congressional criticism of the Force fiscal program

4. **Ability to interact and communicate at all levels**

As Deputy Superintendent I give and receive information through a formal chain of command as well as person to person with our employees. I have developed a rapport with our employees that makes them comfortable in seeking me out to share their ideas with the understanding that any actions will be implemented within the established structure.

I am frequently called upon to represent the park and/or the National Park Service in public meetings, meeting with other Federal Agencies or with local jurisdictions. In these arenas, clear, concise communication is imperative to avoid obfuscating the agency position.

As a budget officer I communicated frequently with peers, subordinates, Regional Directors, Associate Directors, the Director, Office of Management and Budget (OMB) staff, Congressional Staff and Congressional Members. I was required to provide concise information and clearly articulate issues. I served as a witness in Congressional hearings and served as the primary agency spokesperson with the OMB.

I am called upon frequently to be an instructor at Mather Training Center primarily in the area of Budget/Finance.

I have experience in synthesizing complex policy and/or procedures into written instructions so that they can be implemented by employees at all levels.

I draft correspondence responding to a variety of issues from the public, Congressional members, other Federal Agencies and state or local jurisdictions.

5. **Ability as a manager to direct a support staff comprised of a range of technical and professional individuals.**

Exhibit 2
Page 104 of 117 pages

I currently manage a workforce that includes professional and technical employees in a wide variety of fields including resource management, visitor services, concessions, safety, design, construction and maintenance as well as trades and crafts. While much work is accomplished independently, most projects require collaboration between all groups.

As NCR Budget Officer I supervised professional and technical employees in the areas of budget, finance and general administration. My staff was required to service all of the parks, and U.S. Park Police in addition to two small independent agencies. On a daily basis I directed the organization in meeting simultaneous deadlines which could have substantial impact on existing fiscal resources as well as future appropriations. The outstanding work of this organization was frequently recognized by park managers, the Regional Director as well as the agency heads.

Exhibit 7
Page 105 of 117 pages

# EXHIBIT
# 5

**FILE COPY**

5-16-03

P72 (NCR-RD)

Memorandum

To:     Director

From:   Regional Director    **TERRY R. CARLSTROM**

Subject:  Request to Appoint Dottie Marshall as Associate Regional Director,
            Administration, National Capital Region

We are pleased to submit the name of Ms. Dottie Marshall for the position of Associate Regional Director, Administration, National Capital Region, GS-341-15. The position was advertised government wide. All applications were rated and ranked and four candidates were interviewed for the position.

Ms. Marshall has held a number of progressively more responsible positions in the National Park Service, National Capital Region over the past 27 years. She is currently the Deputy Superintendent, George Washington Memorial Parkway, where she manages most of the operational and support components for this complex, urban park unit. Ms. Marshall previously served as the Regional Budget Officer for National Capital Region, and has also served as the Administrative Officer at both National Capital Parks-Central, and at Manassas National Battlefield. This combination of park administrative experience coupled with her intimate working knowledge of all aspects of budget formulation and execution makes Ms. Marshall an outstanding candidate for this critical position.

Ms. Marshall has developed an excellent rapport with our field leadership working among them as a Deputy Superintendent for the last eight years. She is an outstanding communicator, both orally as well as with the written media, and has led a number of special sensitive studies for National Capital Region over the years. Throughout her career, she also has developed effective means of communicating with Congress and at the highest levels of government including derivation and presentation of the budget for the Executive Residence.

We were fortunate to have a number of well-qualified candidates for the position. While I realize that a number of the candidates could probably function effectively in the position, we believe that Ms. Marshall is the best person for this position. A copy of her application is attached. I would appreciate your approval of my recommendation.

Attachment

I approve: _____    _____
           Director, National Park Service          Date

EXHIBIT 15
Page 1 of 2 pages

# EXHIBIT
# 6

LESLIE J. NEWMAN
Aguilar v. Department of the Interior                                      10/28/2004

1

1                    UNITED STATES OF AMERICA

           EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

1                      Washington Field Office

2       ----------------------------x

3    SANDRA L. AGUILAR,              :        EEOC NO.

4                                    :    100-2004-00510X

5             Complainant,     :         Agency No.

6         vs.                        :    FNP-2003-064

7                                    :      Varice Henry

8    DEPARTMENT OF INTERIOR,       :Administrative Judge

9              Agency.              :

10      ----------------------------x

11                     Arlington, Virginia

12                     Thursday, October 28, 2004

13   Deposition of:

14              LESLIE J. NEWMAN,

15   the witness, was called for examination by counsel

16   for the Complainant, pursuant to notice,

17   commencing at 10:03 a.m., at the law offices of

18   Riselli & Pressler, P.C., 1737 King Street,

19   Suite 350, Alexandria, Virginia, before Dawn A.

20   Jaques, Certified Shorthand Reporter and Notary

21   Public in and for the Commonwealth of Virginia,

22   when were present on behalf of the respective parties:

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                                    10/28/2004

---

**Page 2**

1  APPEARANCES:

2  On behalf of the Complainant:

3      MICHAEL J. RISELLI, ESQ.

4      Riselli & Pressler, P.C.

5      1737 King Street, Suite 360

6      Alexandria, Virginia 22314

7      PHONE: (703) 837-1785

8      FAX:   (703) 837-1790

9

10  On behalf of the Agency:

11      PHYLLISINA LESLIE, ESQ.

12      U.S. DEPARTMENT OF THE INTERIOR

13      1849 C Street, N.W.

14      MS 7308

15      Washington, D.C. 20240

16      PHONE: (202) 208-6848

17      FAX:   (202) 208-3230

18

19

20

21

22

---

**Page 3**

1              I-N-D-E-X

2  WITNESS:              PAGE:

3  LESLIE J. NEWMAN

4      Examination by Ms. Riselli  ......  4

5      Examination by Ms. Leslie  .......  99

6

7

8          E-X-H-I-B-I-T-S

9  NEWMAN EXHIBIT: PAGE:   NEWMAN EXHIBIT: PAGE:

10     No. 1 ...  7      No. 10 ...  80

11     No. 2 ...  21     No. 11 ...  84

12     No. 3 ...  27     No. 12 ...  86

13     No. 4 ...  37     No. 13 ...  88

14     No. 5 ...  39     No. 14 ...  89

15     No. 6 ...  42     No. 15 ...  89

16     No. 7 ...  55     No. 16 ...  89

17     No. 8 ...  70     No. 17 ...  94

18     No. 9 ...  73

19

20

21

22

---

**Page 4**

1              P R O C E E D I N G S

2  Whereupon,

3          LESLIE J. NEWMAN,

4  Was called as a witness and, after having been

5  first duly sworn by the Notary Public, was

6  examined and testified as follows:

7      EXAMINATION BY COUNSEL FOR THE COMPLAINANT

8      BY MR. RISELLI:

9      Q.  Good morning, Ms. Newman. I'm Mike

10  Riselli. I'm the attorney for Sandra Aguilar in

11  the case of Sandra Aguilar versus the Department

12  of Interior, EEOC No. 100-2004-00510X, Agency

13  No. FNP-2003-064.

14          This is an EEO complaint that

15  Mrs. Aguilar has filed as an applicant claiming

16  national origin based on Hispanic and age

17  discrimination in connection with her

18  non-selection for the position of Administrative

19  Officer, Associate Regional Director,

20  Administration GS-341-1415, and that was

21  MPS Vacancy Announcement No. MPS-NCR-03-19, which

22  took place in 2003. So as you can see, time moves

---

**Page 5**

1  very quickly in these proceedings.

2          Have you ever had your deposition taken

3  before?

4      A.  No.

5      Q.  Well, then, I think it would be helpful

6  if I give you a few instructions on how I plan to

7  proceed with the deposition this morning.

8          Basically I'm going to be asking you

9  some questions, which you will be answering under

10  oath, which you've just taken, and, of course, you

11  should respond truthfully to all questions. The

12  purpose of this deposition is to learn everything

13  that you know about the facts of this particular

14  EEO complaint.

15          You should also make it a point to

16  answer all of my questions verbally so that the

17  court reporter can take them down. For example,

18  if I ask you a question and you nod or shake your

19  head in response, the reporter will not be able to

20  record that, so just try to remember to answer

21  with complete verbal responses.

22          And to also help the reporter, we should

---

2 (Pages 2 to 5)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                          **10/28/2004**

**6**

1  both try not to talk over each other. I will try
2  to let you finish answering the question before I
3  ask you another question. Sometimes I'm not very
4  good at that. You can remind me. If you do the
5  same with your answers coming back to me, I'm sure
6  that the reporter will appreciate that also.
7      If you do not understand a question,
8  just let me know, and I will be glad to repeat it
9  or have the reporter read it back to you. If you
10  answer a question, I will assume that you
11  understood the question and that you're giving me
12  a full and complete answer to the question. If
13  you need to take a break at any time for any
14  reason, restroom or whatever, just give me the
15  high sign and I'll be glad to accommodate you.
16      Is there any reason today why you cannot
17  give full and complete answers to any questions?
18      A. No.
19      Q. Are you currently under any medical
20  treatment or taking any medications that might
21  inhibit your ability to understand and answer
22  questions?

**7**

1      A. No.
2      Q. Do you understand my instructions?
3      A. Yes.
4      Q. Are you ready to proceed?
5      A. Yes.
6      Q. Thank you.
7      A. You're welcome.
8      Q. Would you please state your full name?
9      A. My name is Leslie J. Newman.
10      Q. Could you spell your last name for the
11  record, please?
12      A. N-E-W-M-A-N.
13      Q. And what is your business address and
14  phone number?
15      A. I work for the National Capital Region,
16  1100 Ohio Drive, Southwest, Washington, D.C. The
17  zip code is 20242, and my phone number is
18  (202) 619-7224.
19      (Newman Deposition Exhibit No. 1 was
20      marked for identification.)
21      BY MR. RISELLI:
22      Q. Ms. Newman, I've asked the reporter to

**8**

1  mark as Deposition Exhibit No. 1 a copy of the
2  Notice of Oral Depositions that I issued to the
3  Agency, care of Ms. Leslie, in connection with
4  this matter, noting, among others, your
5  deposition. Have you seen this document before?
6      A. Yes.
7      Q. Directing your attention to the bottom
8  of page 1 and the top of page 2, there are three
9  categories of documents that I directed towards
10  all of the deponents to bring with them as
11  applicable, and I would ask you if you have any
12  documents that fall into any of these three
13  categories in your possession or you provided them
14  to anyone, such as Ms. Leslie?
15      A. They've been provided.
16      Q. What did you have? What documents did
17  you have?
18      A. The documents were the merit promotion
19  file, as well as the delegated examining unit
20  file.
21      Q. When you say the merit promotion file,
22  you mean for the selection action?

**9**

1      A. Yes.
2      Q. Were you the custodian of that?
3      A. Yes.
4      Q. And the delegated examining unit file,
5  what is that exactly?
6      A. That's the case file for the non-status
7  candidates.
8      Q. And what's a delegated examining unit?
9      A. The delegated examining unit is the
10  custodian for those applications that come in --
11  we're sort of a mini OPM. We went to training to
12  become a delegated examining unit for the National
13  Capital Region.
14      Q. So you're sort of like the agent for the
15  OPM with respect to those selection actions?
16      A. Yes.
17      Q. Anything else in your possession that
18  you've turned over?
19      A. No.
20      Q. What have you done to prepare for your
21  deposition today?
22      A. Nothing.

3 (Pages 6 to 9)

**LESLIE J. NEWMAN**

**Aguilar v. Department of the Interior**                    **10/28/2004**

18

1  Q. Who showed it to you?
2  A. They were passed out by Mr. Powers.
3  Q. When was that?
4  A. I don't recall the exact date.
5  Q. Was it recently, or several years ago?
6  A. Well, it's been a couple of years
7  because he has since retired.
8  Q. When did he retire?
9  A. He retired January of last year, I
10 believe.
11 Q. Do you still keep in touch with
12 Mr. Powers?
13 A. No.
14 Q. Do you have an official training record
15 that's kept in your personnel file?
16 A. Yes.
17 Q. Have you received any training or
18 instruction in remedying the underrepresentation
19 of minorities in the National Park Service or
20 National Capital Region?
21 A. It's been a while.
22 Q. So you have?

19

1  A. It's been a while, yes.
2  Q. Can you give me a ballpark on when you
3  had the training?
4  A. It had to be the late '80s or early
5  '90s.
6  Q. Late '80s? Would there be a record of
7  that in your training file?
8  A. There should be.
9  Q. As a Supervisory HR Specialist for the
10 National Capital Region, have you been aware of
11 the fact that Hispanic females have been
12 underrepresented in the workforce?
13 A. No, I have not.
14 Q. Are you familiar with the National Park
15 Service Human Capital Review Report for 2002-2003?
16 A. No, I'm not.
17 Q. Has anybody shown that to you?
18 A. No.
19 Q. Directing your attention to your EEO
20 statement to Mr. Bradley at page 5, line 4, he
21 asked you what your involvement was in the
22 selection action that's at issue in this case --

20

1  and I might shorten that up and say the
2  administrative officer selection action so that we
3  know what we're talking about -- and according to
4  your answer, you told him that you were
5  responsible for announcing the position, gathering
6  the applications, and doing the basic rating and
7  ranking of the applications.
8  Were you responsible for any other part
9  of the selection process?
10 A. No.
11 Q. Let's take those functions that you
12 describe one at a time. The first one is
13 announcing the position.
14 What action did you take, or what was
15 your role in that part of the process, announcing
16 the position?
17 A. I was responsible for preparing a draft
18 of the duties, qualifications, knowledge, skills
19 and abilities, and once the draft was prepared, it
20 is sent to my supervisor and the selecting
21 official for approval.
22 Once they approve it, then I prepare it

21

1  in final, put opening and closing dates on it, and
2  make up a promotion file for status and
3  non-status, and wait for the applications to come
4  in.
5  Q. And so who was the selecting official or
6  were the selecting officials for this particular
7  vacancy?
8  A. The person responsible for the
9  administrative officer is Mr. Terry Carlstrom
10 and/or Joe Lawler, who is his deputy.
11 Q. And where was Mr. Powers in this whole
12 thing?
13 A. Mr. Powers, at that time, was preparing
14 to retire, I believe.
15 Q. Did he play any role?
16 A. Yes.
17 Q. What was his involvement?
18 A. He approved the draft that I prepared,
19 along with Mr. Carlstrom.
20 (Newman Deposition Exhibit No. 2 was
21 marked for identification.)
22 BY MR. RISELLI:

6 (Pages 18 to 21)

**LESLIE J. NEWMAN**

Aguilar v. Department of the Interior                                    10/28/2004

---

22

1    Q.  Ms. Newman, I've asked the reporter to
2  mark as Deposition Exhibit 2 a copy of the initial
3  vacancy announcement that was issued for the
4  administrative officer selection action under
5  NPS-NCR-03-19, and just for your information, this
6  is a copy of the vacancy announcement that appears
7  in the official EEO investigative file, and I just
8  copied it to you to make it a little easier so we
9  don't have to keep flipping through the book in
10  front of you.  Do you recognize this document?
11    A.  Yes.
12    Q.  And what is it?
13    A.  This is what we call a vacancy
14  announcement that's prepared to go out to the
15  public to recruit for the position of
16  Administrative Officer, GS-15.
17    Q.  And if I understood your earlier
18  testimony, you and/or your office worked up a
19  draft, and then got it approved?
20    A.  Yes.
21    Q.  And Mr. Powers was involved in that, and
22  the selecting official, Mr. Carlstrom, was

---

23

1  involved in that?
2    A.  Yes.
3    Q.  And then it was issued?
4    A.  Then it was issued to the public.
5    Q.  Would that have been issued on or about
6  March 10th, 2003?
7    A.  We normally try to prepare them and get
8  them out at least three days prior to the opening
9  date in order for it to get to the public in a
10  timely fashion.
11    Q.  Now, at your EEO statement, also on
12  page 5, at lines 19 through 20, you told
13  Mr. Bradley that, quote, there was then an error
14  found, based on a memo dated February 12th of
15  1999, that the position should have gone to grade
16  levels, so we re-announced it and amended it to
17  close April 14th, unquote.  What was the error?
18    A.  The error was that it did not go out to
19  grade levels, and that it did not go out to all
20  sources.  It was limited to department wide.
21    Q.  Now, is that something that you picked
22  up, or did somebody call that to your attention?

---

24

1    A.  That's something that I picked up and
2  called to Mr. Powers' attention.
3    Q.  Can you explain why you didn't bring it
4  to his attention when you were initially drafting
5  the vacancy announcement?
6    A.  Initially I believe that there was some
7  discussion as to the interpretation of the 1999
8  memo.  There are several people throughout the
9  Park Service that will interpret it one way, and
10  others interpret it in a different way.
11    Q.  When did this discussion take place?
12    A.  I'm not sure when the discussion between
13  Mr. Powers and Mr. Carlstrom took place, but it
14  may have been a day or two after I received the
15  note to go department wide.
16    Q.  What was the discussion?  What was the
17  different interpretation?
18    A.  The discussion I believe was in regard
19  to what is considered key positions, and then it
20  was decided that this particular announcement
21  would be amended and re-advertised to go to grade
22  levels, as well as all sources.

---

25

1    Q.  So did you call that to Mr. Powers'
2  attention or Mr. Carlstrom's attention before the
3  vacancy announcement was initially issued?
4    A.  The vacancy announcement I believe had
5  already gone out, but it was like a day or two,
6  and I only spoke with Mr. Powers.
7    Q.  And you called to his attention what?
8    A.  I showed him a copy of the 1999 memo.
9    Q.  And I'm going to be referring to that as
10  the so-called Stanton memo.
11    A.  Mr. Bob Stanton.
12    Q.  Did you have a discussion with
13  Mr. Powers at that time about the Stanton memo?
14    A.  I showed him a copy of it, and he took
15  it and went and discussed it with Mr. Carlstrom.
16    Q.  Were you present for that discussion?
17    A.  No, I was not.
18    Q.  After Mr. Powers had a discussion with
19  Mr. Carlstrom, did he come back and speak with
20  you?
21    A.  He came back and told me to amend it.  I
22  amended it to grade levels, I changed the area of

---

7 (Pages 22 to 25)

LESLIE J. NEWMAN

Aguilar v. Department of the Interior                                                10/28/2004

|  | 26 |
|---|---|
| 1 | consideration, and I also extended the closing |
| 2 | date in order for those candidates who were |
| 3 | non-status had the opportunity to apply. |
| 4 | Q.  Now, if I understand your testimony |
| 5 | today, and you correct me, but I believe you've |
| 6 | told us that you called the Stanton memo to the |
| 7 | attention of Mr. Powers? |
| 8 | A.  Yes. |
| 9 | Q.  Did you discuss the Stanton memo with |
| 10 | anybody in the National Park Service EEO office? |
| 11 | A.  No. |
| 12 | Q.  Or the Department of Interior EEO |
| 13 | office? |
| 14 | A.  No. |
| 15 | Q.  So this was solely done by you? |
| 16 | A.  What was solely done by me? |
| 17 | Q.  Called the Stanton memo's attention to |
| 18 | Mr. Powers. |
| 19 | A.  To the attention of Mr. Powers. |
| 20 | Q.  And, again, why did you wait until the |
| 21 | first vacancy announcement went out to do that? |
| 22 | Why didn't you bring it up to his attention when |

|  | 27 |
|---|---|
| 1 | you were drafting the initial vacancy |
| 2 | announcement? |
| 3 | A.  To be perfectly honest, I didn't think |
| 4 | about it at the time.  He sent me a handwritten |
| 5 | note to get this announcement out right away and |
| 6 | to advertise department wide. |
| 7 | (Newman Deposition Exhibit No. 3 was |
| 8 | marked for identification.) |
| 9 | BY MR. RISELLI: |
| 10 | Q.  Ms. Newman, I've asked the reporter to |
| 11 | mark as Deposition Exhibit 3 a copy of the Stanton |
| 12 | memo, dated February 12th, 1999, that we've been |
| 13 | just talking about.  Do you recognize this? |
| 14 | A.  Yes. |
| 15 | Q.  Prior to the issuance of the vacancy |
| 16 | announcement for the Administrative Officer |
| 17 | position, were you aware of the Stanton memo? |
| 18 | A.  Yes, I was aware of the Stanton memo, |
| 19 | and there was some discussion about it not being |
| 20 | valid since Mr. Stanton had retired. |
| 21 | Q.  And who was involved in that discussion? |
| 22 | A.  I believe it was just myself and |

|  | 28 |
|---|---|
| 1 | Mr. Powers. |
| 2 | Q.  And what was the discussion?  What did |
| 3 | you say to him, and what did he say to you? |
| 4 | A.  Well, I don't remember the exact words, |
| 5 | but the gist of the conversation was is this still |
| 6 | a valid document since the director was no longer |
| 7 | there? |
| 8 | Q.  And when did you have that discussion |
| 9 | with Mr. Powers? |
| 10 | A.  I can't give you an exact date. |
| 11 | Q.  Was it before or after the vacancy |
| 12 | announcement was issued? |
| 13 | A.  I'm not sure.  I can't give you an exact |
| 14 | date. |
| 15 | Q.  And what was the bottom line?  Was it |
| 16 | still valid or not? |
| 17 | A.  I believe Mr. Powers had discussions |
| 18 | with some key staff members over at National Park |
| 19 | Service, and they said it was still valid. |
| 20 | Q.  Now, at the time the Stanton memo was |
| 21 | issued in 1999, you were a Supervisory Human |
| 22 | Resource Specialist for the region; is that right? |

|  | 29 |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  Did you have any training on the |
| 3 | implementation or the requirements of this memo |
| 4 | for staffing or placement actions? |
| 5 | A.  No. |
| 6 | Q.  Have you been involved in other |
| 7 | selection or placement actions for positions at |
| 8 | the GS-13 through 15 level in the National Capital |
| 9 | Region? |
| 10 | A.  I haven't been involved in the |
| 11 | selections.  I've been involved in preparing the |
| 12 | administrative side of it. |
| 13 | Q.  For 13 through 15s? |
| 14 | A.  Yes. |
| 15 | Q.  How many? |
| 16 | A.  Most of our superintendents are 14s and |
| 17 | 15s, and the delegation is limited to the regional |
| 18 | office for filling those types of positions, so |
| 19 | I'm responsible for the recruiting and rating and |
| 20 | ranking. |
| 21 | Q.  And they would be at what grade levels? |
| 22 | A.  Some of them are 13s, some of them are |

8 (Pages 26 to 29)

**LESLIE J. NEWMAN**

**Aguilar v. Department of the Interior**                                      **10/28/2004**

---

42

1    Q.  Is it in the DEU folder?

2    A.  Not this particular one.  The DEU book

3  has since been updated, and they've done a

4  different matrix.

5    Q.  What did you rely upon specifically to

6  prepare the KSAs?

7    A.  What did I rely upon?

8    Q.  Yeah.  What did you base each of the

9  KSAs on?

10    A.  I based them on the crediting plan that

11  I received from another region, and the position

12  description.

13    Q.  Meaning the PD for the AO position in

14  your region?

15    A.  Yes.

16    Q.  And you came up with five?

17    A.  Yes.

18        (Newman Deposition Exhibit No. 6 was

19        marked for identification.)

20        BY MR. RISELLI:

21    Q.  Ms. Newman, I've asked the reporter to

22  mark as Deposition Exhibit 6 a copy of a document

---

43

1  called "Delegated Examining Unit KSA Definition

2  Form" for the position of Associate Regional

3  Director, Administration, GS-341-14, prepared I

4  guess in connection with NCR Vacancy Announcement

5  No. NCR-03-19.  Do you recognize this document?

6    A.  Yes.

7    Q.  And what is this?

8    A.  This is what we call a crediting plan,

9  and normally when we receive more than ten

10  promotion eligibles, we're required to conduct a

11  panel, and the panel has to have something to rate

12  the applications against, and this was created for

13  that purpose, to try to bring to the selecting

14  official the best at least five to six, or

15  possibly 20, qualified candidates for him or her

16  to choose from.

17    Q.  Just walk me through this now.  For

18  example, at page 1, you've got, "KSA Title:

19  Knowledge of administrative/management support

20  functions such as human resources, budget,

21  contracting/procurement, property management,

22  information management, and any other related

---

44

1  administrative support services."

2        And then below that there's a heading

3  called "Level Description," and then there are

4  three levels, Level III, II and I.  Did you

5  prepare the writing there that's under levels III,

6  II and I?

7    A.  Yes.

8    Q.  What did you base each of those

9  descriptions on?

10    A.  I believe I based it on something I

11  received as an example from another region, as

12  well as the competencies that the Park Service

13  puts out along with the PD, to come up with the

14  levels.

15        Level III would be outstanding, Level II

16  would be successful, and Level I would be average.

17    Q.  And what do those handwritten numbers in

18  the right-hand margin mean, 6, 4 and 2?

19    A.  Depending on how heavily they're

20  weighted, if you look down below, "Factor

21  Weight 2," you would multiply Level III times 2 to

22  come up with 6, and so on.

---

45

1    Q.  And is that based on a formula from

2  somewhere?

3    A.  There's a transmutation table that OPM

4  has developed in order to score candidates from

5  100 down to 70.  In other words, if you add up all

6  these Level IIIs, they should equate to 100 --

7  well, they don't equate to 100, but on a

8  transmutation sheet, whatever this total, it would

9  equate to 100.

10    Q.  Would that be the same for the Level IIs

11  and the Level IIIs?

12    A.  Yes.

13    Q.  Everything comes out on the

14  transmutation chart to 100?

15    A.  No.  I don't know if you have a copy of

16  the transmutation.

17    Q.  We have it somewhere.  You gave it to

18  us.

19    A.  But depending on the top fully

20  successful level score, that normally equates to

21  100; and depending on the scores that are given by

22  the panel members, you add them up and go to the

---

12 (Pages 42 to 45)

**LESLIE J. NEWMAN**

**Aguilar v. Department of the Interior**                              **10/28/2004**

---

46

1  transmutation sheet to correlate the scores.
2      Q.  Is that something that your office does
3  after the rating panel looks at it?
4      A.  No.  The rating panel will read the
5  application, look at these levels, and determine
6  what score or where the applicant falls, then all
7  the scores are added up.
8      Q.  So in other words, hypothetically, if
9  they look at candidate X's application, and they
10  think that he or she deserves -- you know, he's in
11  Level III under KSA, do they just automatically
12  give a 6?
13      A.  There's a sheet for each KSA that they
14  write their scores in there, and then they're
15  totaled up, and depending on how many panel
16  members, it's divided by -- normally there's three
17  panel members, and it's divided by 3, and you come
18  up with an average.
19      Q.  But like on this one that we're looking
20  at here, Deposition Exhibit 6, under the first
21  KSA, can a ranking panel member give a 5?
22      A.  No.

---

47

1      Q.  Does it have to be a 6?
2      A.  Yes.
3      Q.  So in other words, they're picking
4  either 1, 2 or 3?
5      A.  Yeah.
6      Q.  And that's your copy of your signature
7  down there?
8      A.  Yes.
9      Q.  On all the pages?
10      A.  I hope so, yes.
11      Q.  Do you know when you prepared this
12  document?
13      A.  I probably prepared this document when I
14  realized that I was going to receive more than ten
15  applications.
16      Q.  Would it have been around the same time
17  as you did the job analysis?
18      A.  No.  It probably would have been while
19  the vacancy was being advertised.
20      Q.  And what's the significance of more than
21  ten?
22      A.  Well, I believe in the Merit Promotion

---

48

1  Plan, or the one we previously had, it required
2  that if you have more than ten qualified promotion
3  eligibles, there should be a panel of subject
4  matter experts conducted to rate and rank them.
5      Q.  And that's what happened here?
6      A.  Yes.
7      Q.  We'll get to that in a little while.
8  Okay, now just a couple more questions about
9  the -- we're still on Deposition Exhibit 6, the
10  KSA definition form.
11          Was there any KSA for this
12  Administrative Officer position that required an
13  applicant to be familiar with National Park
14  Service or National Capital Region functions and
15  operations?
16      A.  I don't believe so since it went all
17  sources.  They would just have to be knowledgeable
18  in not National Park Service functions, but
19  administrative policy programs in general.
20      Q.  But nothing in here specifically
21  requiring an applicant to have knowledge of NPS or
22  NCR operations or functions as a KSA?

---

49

1      A.  No.
2      Q.  Okay, let's go back to your statement to
3  Mr. Bradley at page 5 where you talked about what
4  your role was in the selection process, and the
5  second thing you said was gathering the
6  applications.  What did that entail?
7      A.  Well, normally the applications come via
8  mail, they come via fax, some are hand carried in,
9  and I was responsible for gathering them and
10  putting them in the file until after the closing
11  date.
12      Q.  Was that just you, or was that
13  somebody --
14      A.  It could have been my secretary or my
15  assistant at the time if I was not available.
16      Q.  And I realize this is a while back, and
17  I'm not expecting anybody to give me precise
18  numbers, but do you have a recollection of how
19  many applications were received for this position,
20  this vacancy announcement?
21      A.  I'd say between 40 to 60.  There was
22  quite a few.

---

13 (Pages 46 to 49)

**LESLIE J. NEWMAN**

Aguilar v. Department of the Interior                              10/28/2004

|  | 50 |
|---|---|
| 1 | Q. At page 7 of your statement to |
| 2 | Mr. Bradley, down around lines 18 and 19, you said |
| 3 | there's approximately 60 applications for this |
| 4 | particular job, and I believe 40 some odd |
| 5 | candidates were rated. |
| 6 | A. Uh-huh. |
| 7 | Q. Does that ring a bell with you? |
| 8 | A. Yes. I probably received that many, but |
| 9 | only 40 qualified based on OPM's qualification |
| 10 | standards. |
| 11 | Q. Who makes that determination? |
| 12 | A. The human resource specialist. |
| 13 | Q. Is that you? |
| 14 | A. That was me for this particular case. |
| 15 | Q. Could you give me an example of an |
| 16 | applicant who wouldn't have qualified? |
| 17 | A. I believe I had one applicant who was a |
| 18 | supervisory parking lot attendant, who clearly |
| 19 | would not qualify, so it was evident that he did |
| 20 | not read the announcement. |
| 21 | Q. Would these also be things like timing |
| 22 | of submitting the applications? |

|  | 51 |
|---|---|
| 1 | A. Your application must be submitted no |
| 2 | later than the closing date. However, we do allow |
| 3 | five days for postmarks because of the anthrax |
| 4 | scare, you know, things of that nature. Some |
| 5 | applications may come from as far away as Alaska |
| 6 | or Puerto Rico, and it takes a while to get here, |
| 7 | and some of them have come -- they were eradiated |
| 8 | through the mail. |
| 9 | Q. To check to make sure there was no |
| 10 | anthrax? |
| 11 | A. Yeah. So sometimes they take a while to |
| 12 | get here. |
| 13 | Q. So in other words, the applications came |
| 14 | in, roughly 60, you screened them to see if they |
| 15 | met the basic or minimum quals, if they were on |
| 16 | time or whatnot, and then that knocked out some of |
| 17 | them? |
| 18 | A. Yes. |
| 19 | Q. And there were roughly 40 left? |
| 20 | A. Yes. |
| 21 | Q. And we've had testimony from other |
| 22 | people that there may have been more than 40, but |

|  | 52 |
|---|---|
| 1 | I understand. |
| 2 | Getting back to your earlier testimony, |
| 3 | I think you were telling us that when there were |
| 4 | more than 10 applications that came in, that's |
| 5 | when, under the rules, I guess, that were in |
| 6 | effect at that time, you could make a decision or |
| 7 | recommendation to have a panel? |
| 8 | A. 10 promotion eligibles. |
| 9 | Q. 10 promotion eligibles. |
| 10 | A. Yes. |
| 11 | Q. How do you define "promotion eligible"? |
| 12 | A. Those status candidates who were |
| 13 | eligible to be promoted from a 13 to 14, or from a |
| 14 | 14 to 15. |
| 15 | Q. And where did the non-status people fit |
| 16 | into that? |
| 17 | A. Depending on the volume of applications, |
| 18 | it probably was determined that they could be |
| 19 | scored, rated and ranked by a qualified human |
| 20 | resource specialist. |
| 21 | Q. And where was that authority? What |
| 22 | authority do you rely upon for that? |

|  | 53 |
|---|---|
| 1 | A. Normally I rely on my judgment. |
| 2 | Q. I guess what I'm asking you is, if you |
| 3 | know, is there a specific Department of Interior |
| 4 | or National Park Service rule or regulation that |
| 5 | authorizes that? |
| 6 | A. No, not to my knowledge. |
| 7 | Q. Now, I want to ask you about the |
| 8 | applications in this case. A while ago I sent a |
| 9 | discovery request to the Agency, care of |
| 10 | Ms. Leslie, and one of the requests for production |
| 11 | of documents was I requested a copy of the entire |
| 12 | selection action file that you mentioned earlier |
| 13 | that you were responsible for compiling, and I got |
| 14 | a package back, and there are only two |
| 15 | applications in that file, Mrs. Aguilar's and |
| 16 | Ms. Marshall's, and we've heard the number 60, 40 |
| 17 | applications thrown around. |
| 18 | Do you know where the other applications |
| 19 | are? |
| 20 | A. They should be in the file. |
| 21 | Q. And if they're not in the file, where |
| 22 | would they be? |

14 (Pages 50 to 53)

**LESLIE J. NEWMAN**

Aguilar v. Department of the Interior                                      10/28/2004

58

1  included in your selection action file.
2      A.  Uh-huh.
3      MS. LESLIE:  If I can correct it, this
4  document was not in Ms. Newman's possession. As I
5  told you before, there were documents that you did
6  request which I interpreted as a request for
7  additional documents, so I was providing them.
8  This could have been one of those documents that
9  was not in Ms. Newman's possession, but still, in
10  an effort to provide the documents in good faith,
11  I put the documents together.
12      BY MR. RISELLI:
13      Q.  Ms. Newman, do you understand that this
14  memo from Ms. Harris's office, referring to the
15  EEO directive that's mentioned, required the
16  Agency to keep a copy of all applications?
17      A.  Yes.
18      Q.  So once again, so there's no confusion,
19  I'm asking you to both go back and look and
20  provide a copy of those applications.
21      MS. LESLIE:  Mr. Riselli, as I stated
22  before, the objections that I made before, I'm

59

1  still making those objections, so I'm telling you
2  right now I'm not going to produce that
3  information.  If there's something that we need to
4  discuss or raise before Judge Henry, we will do
5  that.
6      MR. RISELLI:  And what's the basis of
7  your objection?
8      MS. LESLIE:  The basis of the objection
9  is that the information that was provided to you
10  is relevant to the non-selection allegation that
11  Mrs. Aguilar made against the Agency.  We did
12  provide the information that relates to the
13  selectee, as well as to Mrs. Aguilar.
14      MR. RISELLI:  How is Mrs. Aguilar
15  supposed to attempt to prove her case if you don't
16  provide the rest of the applications?
17      MS. LESLIE:  In terms of who was
18  selected, all she needs to do is compare herself
19  to the selectee.
20      MR. RISELLI:  No, that's not who she
21  needs to look at.  The Agency is also supposed to
22  keep track of all the applicant flow information,

60

1  applicant flow data, and if we don't know who the
2  other applicants were or information about them,
3  it makes it almost impossible for her to prosecute
4  her claim.
5      MS. LESLIE:  I believe that what you
6  have in front of you, which was provided when we
7  met earlier this week, was a list that indicated
8  names of people who did apply, and it indicated --
9  I believe it was in a table form.  I don't have
10  the document in front of me, but that does include
11  the names of the people, I believe, who applied.
12      MR. RISELLI:  I have that.  We'll talk
13  about that later, but I'm going to -- we'll have
14  to talk about this after the deposition.
15      MS. LESLIE:  Okay.
16      MR. RISELLI:  I'm still asking you to
17  search for the applications and produce them.
18      BY MR. RISELLI:
19      Q.  Okay, back to page 5 of your statement
20  to Mr. Bradley where you talked about your role in
21  the selection process, and the next thing you
22  mentioned was doing the basic rating and ranking

61

1  of the applications.
2      Now, what was your specific role in the
3  rating and ranking of the applications for this
4  selection action?
5      A.  Well, as I recall, I did the basic
6  rating.  I made an attempt to try to find three
7  subject matter experts to prepare for a panel.  I
8  recruited a Ms. Joyce Sasser from one of the parks
9  as the Human Resource Specialist to conduct the
10  panel, and we set up dates and times for the
11  panel, and when the subject matter experts could
12  be available.
13      Q.  What's a subject matter expert?
14      A.  A subject matter expert is anyone at
15  that grade level or higher who has knowledge of
16  the position itself.
17      Q.  And when you say "at that grade level,"
18  what grade level are you referring to?
19      A.  The 15.
20      Q.  And did you find the subject matter
21  experts?
22      A.  Yes.

16 (Pages 58 to 61)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                              10/28/2004

---

62

1    Q.  Who were they?
2    A.  Two of them were, I believe,
3  superintendents at the GS-15, and one was a
4  gentleman that I recruited from the Washington
5  office who, at that time, I believe, was the
6  training officer, but who had been an
7  Administrative Officer previously.
8    Q.  And what were their names?
9    A.  Okay, I'm trying to remember off the top
10  of my head.  John Hale, Vicki Keyes.
11   Q.  Keyes?
12   A.  K-E-Y-E-S.  John Tyler, and the EEO
13  representative was Joy Harris.
14   Q.  Where did Ms. Harris come from?
15   A.  Ms. Harris was the EEO representative
16  from our EEO office.
17   Q.  From the National Park Service?
18   A.  From the National Park Service, National
19  Capital Region.
20   Q.  And what was her role in the process?
21   A.  Her role was to be sure that we did not
22  have any violations of EEO, or if the panel had

---

63

1  any particular EEO questions, she was there to
2  represent the Equal Employment Office.
3    Q.  Now, was she actually sitting in on
4  panel meetings, or is she just there?
5    A.  We invite EEO, whenever we conduct a
6  panel, to sit in to make sure that everything is
7  fair and equal.
8    Q.  Do you know if she did that?
9    A.  Yes, she did.
10   Q.  How would you know that?
11   A.  Because I was there.
12   Q.  You were where?
13   A.  The panel was conducted in the
14  conference room in order for them to have enough
15  room to spread out, read each application and rate
16  them based on the crediting plan.
17   Q.  So was that like a one-day thing?
18   A.  Because of the volume of applications, I
19  don't recall.  I would have marked the dates on
20  the evaluation sheet that was in the Merit
21  Promotion File.
22      Normally panels only run one day, but

---

64

1  sometimes they may be carried over.
2    Q.  And your recollection is you were there
3  for all panel deliberations?
4    A.  I was there?
5    Q.  Yes.
6    A.  Not all the time.  If I had a phone
7  call, I would exit the room while the panel was
8  still being conducted, but there was Ms. Joyce
9  Sasser, who was the Human Resource Specialist that
10  I recruited from out in the field, sitting in.
11   Q.  And also Ms. Harris?
12   A.  Yes.
13   Q.  And where would that have taken place?
14   A.  I believe this particular panel was held
15  in our conference room on the second floor of the
16  National Capital Region.
17   Q.  Now, you mentioned Hale, Keyes and
18  Tyler.  Who were the superintendents?
19   A.  Vicki Keyes is a superintendent;
20  Mr. Hale, who has since retired, was a
21  superintendent.
22   Q.  And Mr. Tyler was the training person?

---

65

1    A.  Yes, and I believe he has since retired.
2    Q.  Who's left then, if you know?
3    A.  What do you mean who's left?
4    Q.  Who hasn't retired?
5    A.  Vicki Keyes.
6    Q.  And she's the Superintendent from where?
7    A.  She's the Superintendent of what we call
8  National Capital Parks Central.
9    Q.  Which is in this region?
10   A.  Yes.
11   Q.  And who is Ms. Sasser?
12   A.  Ms. Sasser is one of my seasoned Human
13  Resource Specialists that works out in one of my
14  parks.
15   Q.  And why did you bring her into this
16  matter?
17   A.  Well, I felt since this person was going
18  to be my subordinate, that I should have another
19  staffing specialist conduct the panel and do the
20  rating and ranking of the applications -- or the
21  rating and ranking of the non-status applications
22  as well.

---

17 (Pages 62 to 65)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                                      10/28/2004

---

66

1     Q.  When you say subordinate, you mean
2  superior?
3     A.  This person would be my supervisor.
4     Q.  You mean the AO?
5     A.  Yes.
6     Q.  Where did Ms. Sasser come from?
7     A.  She came from one of the parks that we
8  call National Capital Parks East.
9     Q.  And what's her grade level, or what was
10  it at the time?
11     A.  Ms. Sasser is a Human Resource
12  Specialist, GS-11.
13     Q.  Now, how were the applicants rated and
14  ranked for this selection action?
15     A.  Which ones?
16     Q.  All.
17     A.  The non-status were rated and ranked by
18  Ms. Sasser because there weren't that many.  The
19  status candidates, those were the promotion
20  eligibles, were rated and ranked by the panel
21  members.
22     Q.  Was there any rule or regulation that

---

67

1  prohibited the non-status applicants from being
2  rated and ranked by the panel?
3     A.  No.
4     Q.  You mentioned these panel members,
5  Mr. Hale, Ms. Keyes and Mr. Tyler.  Did any of
6  them work with Ms. Marshall?
7     A.  Not to my knowledge.
8     Q.  And where was she working at that time?
9     A.  Who?
10     Q.  Ms. Marshall.
11     A.  Ms. Marshall was the Deputy
12  Superintendent at the George Washington Memorial
13  Parkway, which is a park within this region.
14     Q.  Was she under the direct or indirect
15  supervision of Mr. Hale or Ms. Keyes?
16     A.  No.
17     Q.  Now, were any of the applicants
18  interviewed?
19     A.  Yes, I believe they were.
20     Q.  What do you know about that, the
21  interview process?
22     A.  What do you mean what do I know about

---

68

1  it?
2     Q.  How many were interviewed?
3     A.  I'm not sure off the top of my head.
4     Q.  Did you play any role in the interview
5  process?
6     A.  Any role?  You mean sitting in on the
7  interviews?
8     Q.  Let's take that, sure.
9     A.  No.
10     Q.  Did you make a recommendation regarding
11  the interview process?
12     A.  No.  I gave Mr. Carlstrom instructions
13  in reference to what's in the Merit Promotion Plan
14  about the interview process that says, if you
15  interview one, you should interview all.  However,
16  if that's not the case, you should be prepared, in
17  case somebody calls asking why or what were they
18  lacking or why they weren't selected, you should
19  be prepared to answer those questions.
20     Q.  Who made the decision to interview?
21     A.  That was totally up to Mr. Carlstrom and
22  Mr. Lawler, the selecting officials.

---

69

1     Q.  Was Mr. Powers around when the
2  interviews were conducted?
3     A.  I don't believe so.
4     Q.  When you say you provided instructions
5  to Mr. Carlstrom, what exactly did you give him?
6  Did you give him a document?
7     A.  I gave him instructions on each
8  certificate, particularly the one for the
9  non-status, because you're required to go through
10  what we call the rule of three --
11     Q.  Dealing with veterans?
12     A.  Dealing with veterans, yes.
13     Q.  So if you can recall, what, if anything,
14  did you provide to Mr. Carlstrom in terms of
15  written instructions?
16     A.  I didn't provide him with any written
17  instructions -- for the interview?
18     Q.  Yes.
19     A.  No, I didn't provide him with any
20  written instructions.
21     Q.  I know they asked the applicants who
22  were interviewed questions.  Did you have any role

---

18 (Pages 66 to 69)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                                   10/28/2004

---

74

1  use, and sometimes we still do, when the EEO
2  office -- or the main Interior EEO office asks for
3  reports and things of that nature.
4         Since the race and ethnic form is
5  immediately taken off the applications and sent to
6  EEO, then sometimes things in EEO are not
7  available.  Sometimes I ask my assistant to use
8  this chart, but this is something we made up a
9  while back.
10     Q.  Your office?
11     A.  I believe our office or my Human
12  Resource Specialists together.
13     Q.  Now, this form obviously does not record
14  applicant flow data or information for all the
15  applicants who apply; is that correct?
16     A.  Well, normally we only go by the ones
17  who filled out the race and ethnic form, and as I
18  recall in this particular case, not that many
19  filled the form out.  It's a voluntary form that
20  goes with the vacancy announcement.
21         And sometimes I'm not sure, if they get
22  the vacancy announcement off the OPM Web site,

75

1  that particular sheet may not be on there.
2     Q.  So according to this form, which again
3  was included in the package of documents that was
4  released to me as being in a selection file by
5  Ms. Leslie, it looks like you had information on
6  one Hispanic female applicant.  There's a 1 next
7  to that, do you see that?
8     A.  Yes.
9     Q.  And then it says "White Not of Hispanic
10  Origin," and there's a 1 next to male and a 1 next
11  to female, and I assume that means one male and
12  one female not of Hispanic origin?
13     A.  Yes.
14     Q.  And then there's some handwriting over
15  in the margin on the right-hand side that says one
16  applicant is Asian/Native, Hawaiian or other
17  Pacific Islander/White Male.  Do you know whose
18  handwriting that is?
19     A.  I believe that might be my assistant's
20  handwriting.
21     Q.  And your assistant is who?
22     A.  Jeanette Organ.

76

1     Q.  Where would this information have been
2  gathered from, those RNO forms that you're talking
3  about?
4     A.  Yes.
5     Q.  Just so that I understand, the
6  application comes into your office, usually
7  there's -- or there's supposed to be, not always,
8  an RNO, meaning race/national origin,
9  questionnaire attached to the application?
10     A.  The form is optional.
11     Q.  So some people send it in, some people
12  don't?
13     A.  Yes.
14     Q.  But it initially comes in to your
15  office?
16     A.  It should be stapled to the application.
17     Q.  And if there was an RNO form attached to
18  an application, what would your office do with
19  that?
20     A.  They have been instructed to immediately
21  take them off.  They don't go immediately to EEO.
22  I believe my assistant waits until all the

77

1  applications are in, and then she sends them
2  collectively in a blue envelope to the EEO office.
3     Q.  Do you keep copies of those?
4     A.  No.
5     Q.  And so from the RNO forms, do you
6  extract the information from there and put it onto
7  this Applicant Flow Data By Vacancy Announcement
8  form?
9     A.  Yes.
10     Q.  And I'm not trying to hold you to
11  anything here, but does that mean, for this
12  vacancy announcement, only three people filled out
13  RNO forms?
14     A.  I can't speak for Jeanette, because it
15  appears she did this, and I notice down here that
16  she didn't list the number of veterans that
17  applied either, so I don't think it's accurate or
18  complete.
19     Q.  With respect to the collection of this
20  Applicant Flow Data, identifying the race and
21  national origin, for this particular vacancy
22  announcement, when was it determined that this

---

20 (Pages 74 to 77)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                    10/28/2004

---

82

1    Q.  Is there any reason why you didn't tell
2  me about that at the beginning of your deposition
3  this morning?
4    A.  Because I just saw this form and you
5  just asked me about it.
6    Q.  No, you said you saw it a couple days
7  ago and you thought it was in response to
8  number 3.
9    A.  I thought nothing of it because it's
10  EEO's and I have no involvement in it.
11    Q.  Did you provide this form to Ms. Leslie?
12    A.  Yes.
13    Q.  What information is shown on this
14  document?
15    A.  As I stated to you before, you'll have
16  to talk to EEO about it because I'm not that
17  familiar with the form.
18    Q.  Well, let's look at the form a little
19  bit, okay?  There are 23 names listed on the first
20  two pages, and it says, "All Applicants For a
21  Vacancy With a Certificate."  What does that mean?
22    A.  I don't know.  You'll have to ask EEO.

83

1    Q.  Were these the names of the people or
2  applicants who appeared on selection certificates
3  for this action?
4    A.  It appears that some of them were on
5  selection certificates.
6    Q.  And under the heading of RNO, which is
7  over towards the right, there are numbers and
8  letters.  Do you know what those things mean?
9    A.  No, not off the top of my head.  It
10  appears that, I guess based on filling out the
11  race and ethnic form, these coincide with that
12  form.
13    Q.  Do you know what number 9 means?
14    A.  Not off the top of my head.  I'd have to
15  probably look at the form.
16    Q.  Let's take a little break here.
17    (A break was taken at 12:03 p.m.)
18    (Resume at 12:17 p.m.)
19    BY MR. RISELLI:
20    Q.  We're back on the record, and we were
21  talking about Deposition Exhibit 10, which is a
22  document, Ms. Newman, that you said you saw a

84

1  couple days ago, Ms. Harris showed it to you?
2    A.  Yes.
3    Q.  And we were talking about the RNO
4  listing, and I was asking you about if you knew
5  what the codes were.  Let's have that marked as
6  No. 11.
7    (Newman Deposition Exhibit No. 11 was
8    marked for identification.)
9    BY MR. RISELLI:
10    Q.  What I've handed you and asked the
11  reporter to mark as Deposition Exhibit 11 is a
12  copy of the Applicant Background Survey, or
13  sometimes called the RNO form, information form,
14  that Mrs. Aguilar filled out for this particular
15  selection action.  And with respect to her
16  ethnicity, she listed herself, she circled D,
17  Hispanic or Latino; F, female; and indicated she
18  had no disabilities.
19    Do you recall seeing that document when
20  the application came in?
21    A.  No, I don't.
22    Q.  Referring to Deposition Exhibit 10, on

85

1  the second page, for the name Sandra Aguilar,
2  under RNO is the number 9.  Shouldn't that be a D?
3    A.  This is an EEO form, and I'm not that
4  familiar with it, so I don't know what it should
5  or should not be.
6    Q.  Well, for example, E on Deposition
7  Exhibit 11 is White, and let's take a look at
8  Dottie Marshall.  Under the RNO form, the column
9  next to her name is listed E, which would seem to
10  correspond to the RNO form, correct?
11    A.  This is an EEO form.  I don't know what
12  they're doing with this or how they mark it, how
13  they determine whose race or ethnicity is.
14    Q.  Do you know what number 9 means?
15    A.  Normally it's listed on the Applicant
16  Background Survey, but it appears that this is an
17  old Applicant Background Survey, and it has been
18  revised since then, and I think on the revised one
19  it would give you more information about what
20  number 9 means.  I don't know.
21    Q.  So is it fair to state that Ms. Harris
22  should know?

22 (Pages 82 to 85)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                               10/28/2004

90

1  "Competitive," and Grade Level Certified is the
2  14, and it's the one that has the first name of
3  Kenneth E. Brodie. Do you have that?
4      A. Yes.
5      Q. There's some handwriting there under
6  Brodie, R/NO-C. Do you recognize that
7  handwriting?
8      A. No.
9      Q. Do you know who put that handwriting on
10 this document?
11     A. No, I don't.
12     Q. What is this document?
13     A. This is a selection certificate for
14 promotion eligibles at the GS-14.
15     Q. And that would have been --
16     A. Issued to the Regional Director from my
17 office.
18     Q. After the rating/ranking process was
19 done?
20     A. Yes.
21     Q. Did you have any role in preparing this
22 document?

91

1      A. No. My assistant did it.
2      Q. And is that Ms. Sasser?
3      A. That's Ms. Jeanette Organ. My assistant
4  is the one that, after the panel is convened, she
5  gets the applications and types up the names that
6  are to go forward to the selecting official.
7      Q. I notice Ms. Sasser signed this as the
8  issuing officer.
9      A. Yes.
10     Q. Why wouldn't Ms. Organ have signed it?
11     A. Because Ms. Organ is not a specialist,
12 she's an assistant.
13     Q. And according to this document,
14 Ms. Sasser signed this on April 24, '03?
15     A. Yes.
16     Q. And down at the bottom of the page it
17 says, "This certificate is valid through close of
18 business May 23, 2003."
19     A. Yes.
20     Q. What's the significance of that?
21     A. Normally the rules under the OPM
22 regulations and the Merit Promotion Plan, we allow

92

1  30 days for the selecting official to try and make
2  a decision. However, they can call and request
3  another 30 days if they feel that they need more
4  time. They might have a huge volume of
5  applications. The normal is that you can request
6  an extension of 30-day increments up to 90 days.
7      Q. And did Mr. Lawler and Mr. Carlstrom do
8  that, make such a request?
9      A. I don't recall.
10     Q. Are you aware of any written
11 documentation coming from Mr. Lawler or
12 Mr. Carlstrom in this matter requesting an
13 extension of this certificate?
14     A. No, but it's not unusual for a
15 certificate to be sent back down to me a couple of
16 days late. Managers do it all the time.
17     Q. Meaning what exactly?
18     A. Meaning that sometimes there might be a
19 weekend or there might be a holiday that they
20 can't get the certificate back to me. They might
21 leave early, and they bring it back to me like on
22 a Monday.

93

1      Q. Are you saying that it's okay to sign an
2  expired certificate?
3      A. No, I'm not saying it's okay, but I'm
4  saying it's not unusual for the managers of the
5  National Capital Region to return things late.
6  They may have called and said something to myself
7  or Jeanette, my assistant, you know, "Today's
8  Friday, I'll make sure it's delivered to you
9  Monday."
10     Q. But your testimony here is that you're
11 not aware of any request to extend the
12 certificate?
13     A. They may have called on the phone. I
14 don't know. I don't recall.
15     Q. And as you sit here today, are you aware
16 of any documentation to that effect that confirms
17 that they may have called?
18     A. I'm not aware of any documentation.
19     Q. Okay. Look, if you would, please, at
20 the one I had marked as No. 16, which is -- I
21 guess these would be the non-status people.
22     A. Correct.

24 (Pages 90 to 93)

**LESLIE J. NEWMAN**

Aguilar v. Department of the Interior                                    10/28/2004

94

1    Q.   There's some handwriting down at the
2    bottom, "Certificate returned unused. Selection
3    made from Merit Promotion Procedures."
4          Do you know whose handwriting that is?
5    A.   That's my assistant, Jeanette Organ.
6    Q.   Do you know when Mr. Lawler signed off
7    on this document?
8    A.   No, I don't. There's no date.
9          (Newman Deposition Exhibit No. 17 was
10         marked for identification.)
11         BY MR. RISELLI:
12   Q.   I've asked the reporter to mark as
13   No. 17 a two-page document, Standard Form -- I
14   think that says 29, but I'm not sure about that,
15   called "Request for Referral of Eligibles."
16         Do you recognize this document?
17   A.   This is the Standard Form 39, which is
18   the front cover of the Certificate of Eligibles of
19   the non-status candidates.
20   Q.   So what is this form?
21   A.   It's the cover sheet for the certificate
22   of the non-status list of eligibles.

96

1    along with this form?
2    A.   Normally, for the selecting official,
3    there's a cover memorandum from myself with the
4    certificate.
5    Q.   And down there under Section II where it
6    says "CERTIFICATION," what is being certified to?
7    A.   I'm not understanding your question.
8    Q.   You see the block that says
9    "II CERTIFICATION"?
10   A.   Yes.
11   Q.   "To Requesting Office." What's being
12   certified?
13   A.   This Certificate of Eligibles.
14   Q.   And it says, "The attached list of
15   eligibles is provided in response to the above
16   request. This certificate must be returned WITHIN
17   30 DAYS OF RECEIPT OR BY," and then over to the
18   right they've got May 23rd. "Extensions must be
19   authorized by the issuing office," and then your
20   name is on there down at the bottom.
21   A.   When the cert is returned, it's my
22   responsibility to check and make sure it has been

95

1    Q.   So would this have gone to Mr. Carlstrom
2    and Mr. Lawler just with Exhibit 16?
3    A.   No, not necessarily, because they don't
4    know what it was. The instructions would have
5    gone along with the certificate and a memorandum
6    from me.
7    Q.   Okay. So something other than the
8    non-status certificates could have gone along with
9    this?
10   A.   These instructions and a cover
11   memorandum from myself would have gone to the
12   selecting official.
13   Q.   What about the certificates, do they go
14   separately to the selecting official?
15   A.   All the certificates go together in a
16   package.
17   Q.   They go with this form?
18   A.   They go with the instructions and a
19   memorandum from myself.
20   Q.   And this form?
21   A.   No, I did not say that.
22   Q.   Well, what would ordinarily be attached

97

1    properly documented.
2    Q.   Did you do that in this case?
3    A.   Well, it wasn't necessary because the
4    cert was returned unused, so there was no
5    documentation, except for the fact that it was
6    returned unused.
7    Q.   So are you saying here that the only
8    thing that came back to you was the non-status
9    cert?
10   A.   No, I'm not saying that. You asked me
11   if I did properly check to see the documentation,
12   and I said there was no documentation with the
13   exception of this statement that the certificate
14   was returned unused.
15   Q.   What about the other certificates?
16   A.   What about them?
17   Q.   Did they come back?
18   A.   I don't recall if they all came back
19   together. They may not have. Some may have been
20   reviewed and been returned, because they don't
21   like to keep things like that because they have a
22   tendency to get lost or misplaced.

25 (Pages 94 to 97)

LESLIE J. NEWMAN

**Aguilar v. Department of the Interior**                                              10/28/2004

98

1      Q.  When the other certificates came back
2  for the status people, did you check those over?
3      A.  Normally what I check is to see that
4  they're properly documented with the
5  non-selections, the selections, any declarations,
6  and that they're signed by the selecting official.
7      Q.  Did you check the documents to see if
8  they were signed before they expired?
9      A.  I didn't have them in my possession.
10  They were at Mr. Carlstrom's office.
11      Q.  When they came back to you.
12      A.  Normally I probably would have just
13  looked to see if they had signed and dated them.
14      Q.  In this case, referring to
15  Exhibit Nos. 14 and 15, did you notice that
16  Mr. Lawler and Mr. Carlstrom had signed off on the
17  27th of May?
18      A.  I probably didn't pay attention to that.
19      Q.  At any time after you received these
20  documents, did you call to their attention that
21  they had signed expired certificates?
22      A.  No, I don't recall.

99

1      Q.  As you sit here today, are you aware of
2  any action that has been taken by the Agency to
3  correct the fact that the certificates were signed
4  after they expired?
5      A.  No, I'm not aware of any action that was
6  taken.
7      Q.  I have nothing further.
8      EXAMINATION BY COUNSEL FOR THE AGENCY
9      BY MS. LESLIE:
10      Q.  I just have one question.  Ms. Newman,
11  based on your testimony today and your testimony
12  contained in the Report of Investigation, is there
13  anything that you would like to have on the record
14  at this time to either add, clarify, or state in
15  this particular complaint?
16      A.  No.
17      MS. LESLIE:  No further questions.
18      (Whereupon, at 12:41 p.m., the taking of
19      the deposition was concluded.)
20
21
22

100

1      ACKNOWLEDGMENT OF DEPONENT
2      I, LESLIE J. NEWMAN, do hereby
3  acknowledge that I have read and examined pages 4
4  through 99 of the transcript of my deposition
5  taken on Thursday, October 28, 2004, and that:
6  (Check appropriate box):
7
8      (  ) the same is a true, correct and
9      complete transcription of the answers
10      given by me to the questions therein
11      recorded.
12
13      (  ) except for the changes noted in the
14      attached errata sheet, the same is a
15      true, correct and complete transcription
16      of the answers given by me to the
17      questions therein recorded.
18
19
20
21
22      DATE          SIGNATURE

101

1      CERTIFICATE OF NOTARY PUBLIC
2      I, DAWN A. JAQUES, a Notary Public in
3  and for the Commonwealth of Virginia, before whom
4  the foregoing deposition was taken, do hereby
5  certify that witness whose testimony appears in
6  the foregoing pages was duly sworn by me; that the
7  testimony of said witness was taken by me in
8  shorthand at the time and place mentioned in the
9  caption hereof and thereafter reduced to
10  typewriting under my supervision; that said
11  deposition is a true record of the testimony given
12  by said witness; that I am neither counsel for,
13  related to, nor employed by any of the parties to
14  the action in which this deposition is taken; and,
15  further, that I am not a relative or employee of
16  any attorney or counsel employed by the parties
17  thereto, nor financially or otherwise interested
18  in the outcome of the actions.
19      Dawn A. Jaques, C.S.R.
20      Notary Public in and for
21      Commonwealth of Virginia
22  My commission expires: August 30, 2007.

26 (Pages 98 to 101)

# EXHIBIT
# 7



1

# United States Department of the Interior

NATIONAL PARK SERVICE

National Capital Region

1100 Ohio Drive, S.W.

Washington, D.C. 20242

Vacancy Announcement

IN REPLY REFER TO:

DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

---

The National Park Service is an Equal Opportunity employer. Selection for this position will be made solely on the basis of merit, fitness, and qualifications without regard to race, sex, color, creed, age, marital status, national origin, sexual orientation, non-disqualifying handicap conditions, or any other non-merit factors.

**NOTE: UNITED STATES CITIZENSHIP IS REQUIRED FOR FEDERAL EMPLOYMENT.**

---

Vacancy Announcement Number: NPS-NCR-03-19

Opening Date: March 10, 2003
Closing Date: March 31, 2003

Position:    Administrative Officer
             (Associate Regional Director,
             Administration)
             GS-341-15

Salary:  $94,924 - $123,388 per annum

FULL PERFORMANCE LEVEL: GS-15

LOCATION:    NATIONAL PARK SERVICE
             NATIONAL CAPITAL REGION
             OFFICE OF THE REGIONAL DIRECTOR
             OFFICE OF ADMINISTRATION
             WASHINGTON, DC

**NOTE: AS A RESULT OF THE CURRENT MAIL SITUATION, APPLICATIONS TO OUR OFFICE ARE BEING DELAYED, THEREFORE, WE STRONGLY SUGGEST THAT YOU FAX, FEDERAL EXPRESS OR COURIER, OR HAND-DELIVER YOUR EMPLOYMENT APPLICATION TO US, OTHERWISE, YOU MAY LOSE TIMELY CONSIDERATION.**

---

AREA OF CONSIDERATION:    DEPARTMENTWIDE

Only current career or career-conditional employees of the Department of the Interior may apply.

---

**NOTE:** Travel, transportation, and relocation expenses will be paid by the Agency.

---

PAY, BENEFITS, AND WORK SCHEDULE:

This is a permanent full-time position with benefits.

---

Exhibit 2
Page 21 of 117 pages

**CONDITIONS OF EMPLOYMENT:** Incumbent of this position is required to file an OGE-450, Confidential Financial Disclosure Report. Frequent travel may be required. This is a managerial position. If appointed to this position, you must serve a one-year managerial probationary period, unless you already completed one as a manager.

---

**SUPERVISORY OR MANAGERIAL ABILITIES:** Candidates must have demonstrated in their work experience or training that they possess, or have the potential to develop, the qualities of successful supervision, such as the ability to: Assign to and review work of subordinates, train and work effectively with subordinates from a variety of backgrounds and with different level/areas of training. Accomplish the quality and quantity of work expected within set limits of cost and time. Plan own work and carry out assignments effectively. Communicate with others effectively both orally and in writing in working out solutions to problems or questions relating to the work. Understand and further management goals as these affect day-to-day work operations. And develop improvements in or design new work methods and procedures.

---

FOR ADDITIONAL INFORMATION ABOUT THIS POSITION PLEASE CONTACT:

Jeanette Organ
202-619-7234

JOB INFORMATION HOTLINE
202-619-7256

SUBMIT YOUR APPLICATION PACKAGE TO:

NATIONAL PARK SERVICE
NATIONAL CAPITAL REGION
1100 OHIO DRIVE, SW, ROOM 244
WASHINGTON, DC  20242

OR VIA FAX: 202-619-7240

---

MAJOR DUTIES:

Incumbent serves as the Associate Regional Director, Administration for the National Region (NCR). The position has direct line authority for the planning, policy, execution, management and supervision of all administrative, informational systems, and financial management activities throughout the Region. This includes such activities as human resources, finance, contracting, property, office services, fiscal management, and information technology. The primary functions of the position are to provide effective and efficient delivery of administrative services throughout the Region. Provides administrative and technical support and advisory services to approximately 14 parks/monuments/historic sites, as well as the Regional Director's staff. The position is the primary advisory position for all administrative areas and manages all directly related program areas through

Exhibit 2
Page 22 of 117 pages

subordinate supervisory components and staff. The position supervises directly and indirectly 45 personnel within the NCR Regional Office and has responsibility for oversight of all administrative programs. The Office of Administration is comprised of Contracting, Human Resources, Office Services/Property, Finance, Budget and Information Technology Services. It has two primary roles: oversight and policy services as well as administrative program management. Incumbent supervises the National Capital Region Special Emphasis Recruitment Officer and in so doing, coordinates closely with the EO Manager in the development and implementation of the Regional affirmative action program.

## SUMMARY OF QUALIFICATIONS REQUIRED:

**For the GS-15 level**, applicants must possess one (1) year of progressively responsible specialized experience at the next lower grade level, that equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position, and that is typically in or related to the work of the position to be filled.

The National Capital Region provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application and hiring process, please notify the agency. The decision on granting reasonable accommodation will be on a case-by-case basis.

It is the applicant's responsibility to provide documentation/proof of claimed qualifications, education, veterans preference, status (SF-50), and/or verification of eligibility for non-competitive appointment. Applicants will not be solicited for additional information if that provided is determined to be inadequate/incomplete. If you are substituting education for experience, you must furnish a transcript of college work completed. Nonsubmission will result in your being rated ineligible.

## CTAP

If you are currently an employee of the hiring agency who has received a Reduction in Force (RIF) separation notice, a Certificate of Expected Separation (CES), or notice of proposed separation for declining a direct reassignment or transfer of function outside of the local commuting area, you may be entitled to special selection priority under the Career Transition Assistance Plan (CTAP). To receive this priority consideration you must:

1. Be a current career or career-conditional (tenure group I or II) competitive service employee who has received a RIF separation notice, a Certificate of Expected Separation (CES), or notice of proposed separation for declining a directed reassignment or transfer of function outside of the local commuting area, AND you are still on the rolls of the agency. You MUST submit a copy of the RIF notice, CES, or notice of proposed separation with your application.

2. Be applying for a position that is at or below the grade level of the position from which you are being separated. The position must not have a greater promotion potential than the position from which you are being separated.

3. Have a current (or last) performance rating of record of at least fully successful or equivalent. This MUST be submitted with your application package.

Exhibit 2
Page 23 of 117 pages

4. Be currently employed by the hiring agency in the same commuting area of the position for which you are requesting selection priority.

5. Be rated well qualified for the position. To be rated "well qualified," CTAP applicants must attain an eligibility rating as described in "Basis for Rating" or higher, not including points for veteran's preference.

**Well Qualified (CTAP)**. For CTAP, well-qualified means that the applicant meets the qualification standard and eligibility requirements for the position, meets minimum educational and experience requirements, meets all selective factors where applicable, and is able to satisfactorily perform the duties of the position upon entry.

---

**Narrative Statement**: Candidates should submit a narrative statement on a separate page(s) with specific responses to the knowledge, skills, and abilities (KSAs) in this announcement. Failure to submit your narrative response to the KSAs for this job may negatively affect your eligibility and/or rating for this position.

1. Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.
2. Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels.
3. Ability to develop, analyze, review, and appraise the effectiveness of administrative policies, programs, and practices.
4. Ability to interact and communicate at all levels.
5. Ability as a manager to direct a support staff comprised of a range of technical and professional individuals.

When using internet and USAJOBS touchscreen, it is the applicant's responsibility to follow the application guidelines (listed under instructions) in order to receive consideration for this vacancy.

Exhibit 2
Page 24 of 117 pages

U.S. NATIONAL PARK SERVICE
MERIT PROMOTION ANNOUNCEMENT APPLICATION GUIDELINES

HOW TO APPLY:

Applications must be mailed to the address indicated on the first page of the announcement.

In addition to any forms or information required on page 1 or 2 of the announcement, submit one of the following:

--OF-612, Optional Application for Federal Employment; or
--SF-171, Application for Federal Employment; or
--Resume or written application that contains information specified in OPM Form 510

THE FOLLOWING INFORMATION MUST BE INCLUDED IN YOUR APPLICATION.

(1)  JOB INFORMATION - announcement number, and title and grade of the job for which you are applying;

(2)  PERSONAL INFORMATION - Full name, mailing address (with ZIP Code) and day and evening phone numbers (with area code); social security number; country of citizenship; veterans preference; reinstatement eligibility (you must attach SF-50 for proof of your career or career-conditional status); and highest Federal civilian Grade held. (Also give job series and dates held.)

(3)  EDUCATION - High school name, city, state, (zip code if known) and date of diploma or GED; name and city and state (zip code if known) of colleges and universities attended, with majors, type and year of any degrees received (if no degree, show credits earned and indicate whether semester or quarter hours);

(4)  WORK EXPERIENCE - Give the following information for your paid and nonpaid work experience related to the job for which you are applying:

   (a) job title (include series and grade if Federal job); (b) duties and accomplishments; (c) employer's name and address; (d) supervisor's name and phone number; (e) starting and ending dates (month and year); (f) hours per week; (g) salary. Indicate if we may contact your current supervisor.

(5)  OTHER QUALIFICATIONS - Job related training courses (title and year); job related skills (for example; other languages, computer software/hardware, tools, machinery, typing speed); job related certificates and licenses (current only); and job related honors, awards, and special accomplishments (for example, publications, memberships in professional or honor societies, leadership activities, public speaking, and performance awards) give dates but do not send documents unless requested.

Narrative statement (no more than one page per KSA) of knowledge, skills, and abilities (KSA's). Describe experience (paid or unpaid), education, training, awards, and self-development as related to the KSA's. While not mandatory, failure to submit responses to the KSA factors may affect the rating you receive.

Exhibit 2
Page 25 of 117 pages

(Wage Grade/Wage Board only). In order to receive full consideration, it is essential that you submit the required supplemental experience statement specifically addressing each of the knowledges, skills, abilities, and other characteristics required for satisfactory performance in this position. Your qualifications for this position will be determined primarily by your responses. Failure to provide the specific information may result in an applicant receiving a lower rating in the evaluation process.

If claiming veterans' preference, submit copy of DD 214, Certificate of Release or Discharge from Active Duty. Current Federal employees must subject copy of most recent supervisory performance appraisal.

College Transcript or OPM Form 1170-17 (List of College Courses) if qualifying based on education.

Status candidates must submit proof of status (SF-50 showing current grade & tenure and an SF-50 showing highest (permanent) grade ever held, if different).

Applicants applying under special appointments (severely disabled, certain Vietnam era and disabled veterans, and volunteers from Peace Corps or Vista) must submit documentation, and indicate the type of special appointment sought on the application.

DI-1935, Department of the Interior Application Background Survey. (Submission of this form is voluntary. The information provided will be used for statistical purposes to monitor applicant response, and will not be maintained in the personnel office or forwarded to the selecting official).

ELIGIBILITY REQUIREMENTS

You must be a United States citizen, unless otherwise stated.

You must meet the Office of Personnel Management (OPM) Qualification Standards. These standards are available in any Federal personnel office for review.

Applicants must meet qualifications and time-in-grade requirements as of the closing date of the announcement in order to be considered.

As a condition of employment, male applicants born after December 31, 1959, must certify that they have registered with the Selective Service System, or are exempt from having to do so under Selective Service law.

Applications must be postmarked on or before the closing date and be received in the personnel office within 5 calendar days of the closing date in order to be considered.

Exhibit 2
Page 26 of 117 pages

GENERAL INFORMATION

If you are selected for Federal employment, you will be required to fill out a Declaration of Federal Employment, OF-306, prior to being appointed to determine your suitability for Federal employment and to authorize a background investigation. Failing to answer all questions truthfully and completely or providing false statements on your application may be grounds for not hiring you, or for firing you after you begin work. Also, you may be punished by fine or imprisonment (U.S. Code, Title 18, section 1001).

The selectee may be required to file one or more financial statements and/or a procurement integrity certification of compliance upon reporting and annually, some of which may be subject to public disclosure. National Park Service employees are subject to prohibitions against owning financial interests which conflict or appear to conflict with efficient and impartial performance of duty.

If you are selected for a supervisory or managerial position, you must serve a probationary period. Failure to complete the probationary period successfully can result in return to your former position, or to a position of no lower grade and pay than the one which you left to accept the supervisory or managerial position.

It is against the law to use Government envelopes or mail services (electronic included) to submit applications (18 USC 1719).

Your application contains information subject to the Privacy Act (P.L. 93-579, 5 USE 552a). The information is used to determine qualifications for employment and is authorized under Title 5, USC, Section 3302 and 3361.

Attachments not requested in the vacancy announcement may be returned or discarded. Applications will not be returned.

Applications received without all the required information will not be considered.

The Federal Government is an Equal Opportunity Employer.

Exhibit 2
Page 27 of 117 pages

U.S. DEPARTMENT OF THE INTERIOR

# APPLICANT BACKGROUND SURVEY

| GENERAL INSTRUCTIONS | YOUR PRIVACY IS PROTECTED |
|---|---|
| **In boxes 1 to 3, please print using capital letters only. Read each item thoroughly before circling the appropriate codes in boxes 4 and 5. Enclose this form with your application package or mail it directly to the same address.** | This information is needed to determine if our recruitment efforts are reaching all segments of the country, as required by Federal law. This is vital information not available from any other source. We can only get it directly from you.<br><br>Your voluntary responses are treated in a *highly confidential manner*. They are not released to the panel rating the applications, to the selecting official, to anyone else who can affect your application, or to the public. This form will be destroyed after the position is filled. |
| **1. Vacancy Announcement No.:** | The only information associated with your name in our computer system is whether you have returned the completed form, so that we may follow up if no response has been received. Your responses are stored as a tally for the *group of all applicants for this vacancy* in a manner that cannot be associated with any individual application. No information taken from this form is ever placed in a Personnel file or Personnel data base. |
| **2. Position Title:** | |
| **3. Name (Last, First, MI):** | Thank you for helping us provide better service. |

**4. How did you learn about this position?** (Circle up to three codes).

| | |
|---|---|
| 01– Private information service<br>02 – Magazine<br>03 – Newspaper<br>04 – Radio<br>05 – TV<br>06 – Poster<br>07 – Private Employment Office<br>08 – State Employment Office (Unemployment Office) | 09 – Agency Personnel Department (bulletin board or other announcement)<br>10 – Agency or other Federal government recruitment at school or college<br>11 – Federal, state, or local Job Information Center<br>12 – Religious organization<br>13 – School or college counselor or other official<br>14 – Friend or relative working for this agency<br>15 – Friend or relative not working for this agency<br>16 – Internet or World Wide Web<br>17 – Other (Specify) _____ |

**5. Identify yourself in each category:** (Circle the appropriate codes)

| Ethnicity: | Race (circle one or more) | Sex: |
|---|---|---|
| D – Hispanic or Latino<br><br>N – Not Hispanic or Latino | A – American Indian or Alaska Native<br>B – Asian<br>C – Black or African American<br>G – Native Hawaiian or Other Pacific Islander<br>E – White | M – Male<br><br>F – Female |

| Do you have any physical disabilities?<br><br>Y - Yes<br><br>N - No | If yes, do you have a targeted* disability? Y - Yes  N - No<br><br>* The Equal Employment Opportunity Commission targets the following disabilities for extra recruitment efforts: Deaf, Blind, Missing Extremities, Partial/Complete Paralysis, Convulsive Disorders, Mentally Retarded, Mental Illness or Distortion Limb/ Spine. |
|---|---|

SEE BACK OF THIS FORM FOR THE PRIVACY ACT STATEMENT,

PUBLIC BURDEN STATEMENT AND THE PAPERWORK REDUCTION ACT STATEMENT

DI Form - 1935 (12/98)1 of 2

Exhibit 2
Page 28 of 117 pages

# EXHIBIT
# 8

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                                    10/26/2004

```
                                                                    1
 1              UNITED STATES OF AMERICA

 2        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

 3              Washington Field Office

 4   - - - - - - - - - - - - - - X

 5   SANDRA L. AGUILAR,          :

 6         Complainant,          :  Case No. EEOC

 7   v.                          :  100-2004-00510X

 8   DEPARTMENT OF INTERIOR,     :  Agency No.

 9                               :  FNP-2003-64

10         Agency.              :

11   - - - - - - - - - - - - - - X

12           Tuesday, October 26, 2004

13              Alexandria, Virginia

14         Deposition of TERRY R. CARLSTROM, a

15   witness, called for examination by counsel for

16   Complainant, in the above-entitled matter,

17   pursuant to notice, taken at the offices of

18   Riselli & Pressler, P.C., 1737 King Street,

19   Suite 350, Alexandria, Virginia, beginning at

20   9:52 a.m., before Wanda L. Granger, CVR, CCR, a

21   Court Reporter and Notary Public in and for the

22   Commonwealth of Virginia.
```

Olender Reporting, Inc.          (888) 445-3376          WORLDWIDE
Washington, D.C.                 Baltimore, MD           Boca Raton, FL

---

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                                    10/26/2004

```
                                                                    2
 1   APPEARANCES:

 2       On behalf of the Complainant:

 3         Michael Riselli, Esquire

 4         RISELLI & PRESSLER, P.C.

 5         1737 King Street, Suite 350

 6         Alexandria, Virginia 22314

 7         703/837-1785

 8

 9       On behalf of the Agency:

10         Phyllisina Leslie

11         Agency Counsel

12         U.S. DEPARTMENT OF THE INTERIOR

13         1849 C Street, N.W., MS 7308

14         Washington, D.C. 20240

15         202/208-6848

16

17   ALSO PRESENT: Sandra L. Aguilar, Complainant

18

19

20

21

22
```

Olender Reporting, Inc.          (888) 445-3376          WORLDWIDE
Washington, D.C.                 Baltimore, MD           Boca Raton, FL

---

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                                    10/26/2004

```
                                                                    3
 1              C O N T E N T S

 2   WITNESS                                        PAGE

 3   TERRY R. CARLSTROM

 4       By Mr. Riselli . . . . . . . . . . .  11

 5

 6              E X H I B I T S

 7   CARLSTROM     DESCRIPTION                      PAGE

 8   No. 1    Notice of Deposition . . . . . .  12

 9   No. 2    Applicant Background Survey . .  16

10   No. 3    National Park Service, Type of

11            Report: Certificate of

12            Eligibility . . . . . . . . . .  16

13   No. 4    National Park Service, Type of

14            Report: Certificate of

15            Eligibility . . . . . . . . . .  17

16   No. 5    National Park Service, Type of

17            Report: Applicant Selected . . .  17

18   No. 6    National Park Service, Type of

19            Report: Certificate of

20            Eligibility . . . . . . . . . .  18

21

22
```

Olender Reporting, Inc.          (888) 445-3376          WORLDWIDE
Washington, D.C.                 Baltimore, MD           Boca Raton, FL

---

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                                    10/26/2004

```
                                                                    4
 1   CARLSTROM       DESCRIPTION                    PAGE

 2   No. 7    National Park Service, Type of

 3            Report: Certificate of

 4            Eligibility . . . . . . . . . .  18

 5   No. 8    List of applicants and selectee

 6            for the administrative officer

 7            position . . . . . . . . . . .  19

 8   No. 9    Composite documents relating to

 9            Vacancy Announcement No.

10            NCR-03-19 . . . . . . . . . . .  21

11   No. 10   Handwritten notes of Deponent,

12            dated 7/23/03 . . . . . . . . .  26

13   No. 11   Interview-related documentation

14            of Deponent . . . . . . . . . .  29

15   No. 12   Page 5 of the Human Capital

16            Review Report for 2002-2003 . .  54

17   No. 13   Page 9 of the Human Capital

18            Review Report for 2002-2003 . .  57

19   No. 14   Page 12 of the Human Capital

20            Review Report for 2002-2003 . .  57

21   No. 15   Page 19 of the Human Capital

22            Review Report for 2002-2003 . .  59
```

Olender Reporting, Inc.          (888) 445-3376          WORLDWIDE
Washington, D.C.                 Baltimore, MD           Boca Raton, FL

**TERRY R. CARLSTROM**

Aguilar v. Department of Interior                                    10/26/2004

5

| | CARLSTROM | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | No. 16 | Page 115 of the Human Capital | |
| 3 | | Review Report for 2002-2003 . . | 69 |
| 4 | No. 17 | Memorandum, dated February | |
| 5 | | 12th, 1999, "the Stanton | |
| 6 | | memo" . . . . . . . . . . . . | 72 |
| 7 | No. 18 | Vacancy Announcement | |
| 8 | | NPS-NCR-03-19 . . . . . . . . | 76 |
| 9 | No. 19 | Amendment to Vacancy Announcement | |
| 10 | | No. NPS-NCR-03-19 . . . . . . . | 82 |
| 11 | No. 20 | Selection certificates . . . . . | 105 |
| 12 | | | |
| 13 | No. 21 | Memo, dated 5-16-03, and | |
| 14 | | e-mail, dated 6-13-03 . . . . . | 111 |

---

**TERRY R. CARLSTROM**

Aguilar v. Department of Interior                                    10/26/2004

6

1                P R O C E E D I N G S
2     Whereupon,
3               TERRY R. CARLSTROM
4     was called for examination by counsel for
5     Complainant, and having been duly sworn, was
6     examined and testified as follows:
7          MR. RISELLI:  Good morning, Mr.
8     Carlstrom.
9          THE WITNESS:  Good morning.
10         MR. RISELLI:  I am Mike Riselli.  I am
11    an attorney and I represent Sandra Aguilar in
12    the case of Aguilar versus the Department of
13    Interior.  It's EEOC Number 100-2004-00510X,
14    Agency Number FNP-2003-64.
15         This is an EEO complaint proceeding in
16    which Ms. Aguilar is alleging that she was
17    discriminated against on the basis of her race,
18    Hispanic, her national origin, Mexican-American,
19    and her age, 51, when she was non-selected for
20    the position of Administrative Officer,
21    Associate Regional Director, GS 34115 under
22    Vacancy Announcement NPS-NCR-039- -- I'm sorry

---

**TERRY R. CARLSTROM**

Aguilar v. Department of Interior                                    10/26/2004

7

1     03-19.
2          And that was back in 2003, so time
3     moves slowly in these cases, as you can see.
4          MR. RISELLI:  Have you ever had your
5     deposition taken before?
6          THE WITNESS:  Yes.
7          MR. RISELLI:  In what context, sir?
8          THE WITNESS:  Not as a selecting
9     official, but in a case where a person was non-
10    selected for a position.
11         MR. RISELLI:  And that was while you
12    were employed by the Agency?
13         THE WITNESS:  Yes.
14         MR. RISELLI:  And how long ago was
15    that?
16         THE WITNESS:  Within the last year.
17         MR. RISELLI:  And was it or was it not
18    an EEO case?
19         THE WITNESS:  To my knowledge -- I'm
20    not sure if it was EEO or not.  It was a non-
21    selection.
22         I was the third-removed supervisor from

---

**TERRY R. CARLSTROM**

Aguilar v. Department of Interior                                    10/26/2004

8

1     the individual who made the selection.
2          MR. RISELLI:  Okay.  And do you know
3     what the outcome of that matter was?
4          THE WITNESS:  No.  It hasn't been
5     determined, as far as I know.
6          MR. RISELLI:  Do you know of the name
7     of the complainant in that matter?
8          THE WITNESS:  Yes.
9          MS. LESLIE:  Objection.
10         MR. RISELLI:  Go ahead and answer.
11         MS. LESLIE:  You can still answer.
12         THE WITNESS:  Vickky Gammon.
13         MR. RISELLI:  Vickky?
14         THE WITNESS:  V-i-c-k-k-y  G-a-m-m-o-n.
15         MR. RISELLI:  And who is Ms. Gammon?
16         THE WITNESS:  She is in the Office of
17    Concessions.  She is a concession specialist.
18         MR. RISELLI:  And is that in the
19    National Capital Regional Office?
20         THE WITNESS:  Yes, it is.
21         MR. RISELLI:  And so that matter is
22    still pending?

## Page 77

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

```
 1                 (Carlstrom Deposition
 2                 Exhibit Number 18 was marked
 3                 for identification.)
 4       BY MR. RISELLI:
 5       Q.  Now, Mr. Carlstrom, I've asked the
 6  reporter to mark as Deposition Exhibit 18 a copy
 7  of the vacancy announcement for this position
 8  and, just so that you know, all I've done is
 9  copied the copy of the vacancy announcement that
10  was included in the official report of
11  investigation as exhibit 2 and I believe that's
12  page 3- -- I'm sorry, 21 is where it starts in
13  the report of investigation.
14          This is just a copy of it, but if you
15  want to look at it, you can look at the
16  investigative file.  (Handing document.)  Do you
17  recognize that document?
18       A.  (Perusing document.)  Yes.
19       Q.  And what is this?
20       A.  It's the vacancy announcement for the
21  position you alluded to, administrative officer,
22  associate regional director, administration.
```

## Page 78

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

```
 1       Q.  All right.  And what was the area of
 2  consideration for this position listed on this
 3  vacancy announcement?
 4       A.  Department-wide.
 5       Q.  All right.  And did you review this
 6  document before it was issued?
 7       A.  Yes.
 8       Q.  And was this vacancy announcement
 9  issued in accordance with the requirements of
10  the Stanton memo?
11       A.  No.
12       Q.  What was wrong with it?
13       A.  Well, it should have been available at
14  multiple grades, it should have been available
15  to all sources, and it should have been opened
16  to other series, as well.
17       Q.  And what, if any, action did you
18  personally take to correct those deficiencies?
19       A.  I didn't -- I put the announcement out
20  without reference to the document that you
21  alluded to, the February 12th, '99 memorandum to
22  all employees from then Director Stanton, went
```

## Page 79

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

```
 1  ahead and advertised it as we normally would
 2  other positions.
 3          So at that time took no action until it
 4  was called to my attention that this memorandum
 5  was, indeed, in effect by my EEO person/EEO
 6  counselor, Mel Reid.
 7          And at that time, we withdrew this
 8  vacancy announcement and proceeded with a re-
 9  advertisement to be in conformance with the
10  Stanton memo of February 12th, '99.
11       Q.  Okay.
12          (Whereupon, copied documents were
13  delivered to Mr. Riselli.)
14       MR. RISELLI:  Let's just take a little
15  break here.
16          (Off the record.)
17       BY MR. RISELLI:
18       Q.  You testified a few minutes ago that
19  you were aware of the Stanton memo from the time
20  that it was issued.
21       A.  Right.
22       Q.  How was it that you approved the
```

## Page 80

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

```
 1  issuance of the vacancy announcement when you
 2  knew about the Stanton memo?
 3       A.  Four years later, I did not recollect
 4  the Stanton memo, nor had we used it in the
 5  recent times for a position at this level, this
 6  being the only one that we had directly in the
 7  regional office, so an oversight on my part.
 8          And the associate regional director
 9  didn't recall it being something that was in
10  effect.  It was a guidance sort of document.
11       Q.  All right.  Who called it to your
12  attention?
13       A.  Mel Reid.
14       Q.  And he's the head of the EEO office?
15       A.  Yes, he is.
16       Q.  And what did Mr. Reid tell you?
17       A.  Mr. Reid indicated that the Washington
18  office had indicated that this position should
19  be re-advertised.  I don't know who in the
20  Washington office provided him with that
21  information.
22       Q.  What does "Washington office" mean?
```

81

1     A.   It means headquarters of the National
2  Park Service.
3     Q.   And did you have any other discussion
4  with Mr. Reid about it?
5     A.   About?
6     Q.   Reissuing the vacancy.
7     A.   Yes, yes.
8     Q.   What did he say to you?
9     A.   That it would be appropriate to re-
10 advertise and the memo and I said, "I agree with
11 you a hundred percent," and we re-advertised the
12 position.
13    Q.   Did you have any other discussion with
14 Mr. Reid about this issue?
15    A.   We may have -- we probably discussed
16 the area of consideration, we probably discussed
17 the series and we probably discussed the
18 multiple grade levels that we would advertise
19 in.
20    Q.   Now, I think I understood you to say
21 just a few minutes ago that this memorandum had
22 not been used very much in connection with

82

1  advertising for positions at this grade level,
2  is that right?
3     A.   That was my understanding.
4     Q.   In your region?
5     A.   Right.
6     Q.   Do you know how many positions you
7  filled at the 13 through 15 grade levels in the
8  National Capital Region in the last five years?
9     A.   No, not without going through the
10 records.
11          (Carlstrom Deposition
12          Exhibit Number 19 was marked
13          for identification.)
14    BY MR. RISELLI:
15    Q.   Mr. Carlstrom, I've asked the reporter
16 to mark as Deposition Exhibit 19 a copy of a
17 document called the Amendment to the Vacancy
18 Announcement for Vacancy Announcement No. NPS-
19 NCR-03-19.
20          (Handing document.)  Do you recognize
21 this document?
22    A.   (Perusing document.)  Yes.

83

1     Q.   And again, what I've done here is I've
2  duplicated a copy of the amended vacancy
3  announcement that comes from the official
4  investigative file located at exhibit 2.  I
5  think it begins at page 29.
6          Is this a copy of the amended vacancy
7  announcement?
8     A.   Yes, it is.
9     Q.   Other than the change to, I think you
10 mentioned the grade levels that were advertised
11 for the position, which I assume you mean 14/15
12 --
13    A.   Right.
14    Q.   -- and the area of consideration, which
15 went to all *sources* --
16    A.   Correct.
17    Q.   -- were there any other changes that
18 were made to the -- and I know the date, you
19 know, that people had to respond by -- were
20 there any other changes, to your knowledge?
21    A.   Well, not without going back and
22 looking at them individually.

84

1          I believe those were the only changes
2  that this is reflective of, unless we -- unless
3  you ask me to look at it.
4          There are some administrative things
5  that are different.
6     Q.   Such as?
7     A.   Under, "Conditions of Employment,"
8  there's a statement that requires filing for
9  direct deposit net pay within 30 days of
10 entrance of duty.
11    Q.   Okay.
12    A.   That wasn't in the previous one.
13          The area of consideration where it
14 specifies all sources is greatly expanded upon
15 in the amended vacancy announcement.
16    Q.   Okay.
17    A.   I think you missed the part of the
18 section on major duties.  You missed a section
19 on the summary of qualifications required on the
20 copy you gave me.  That was exhibit number 18,
21 major duties.  And then you've got summary of
22 qualifications in the amended copy.

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                      10/26/2004

85

1       Q.  Changes under major duties.

2       A.  Oh, there weren't changes.  There's

3   something missing here.

4       You go exhibit 18 page 1, page 2, major

5   duties at the bottom, and it just goes directly

6   -- program areas through, and then the top of

7   the next page doesn't -- this goes to 4 and 5.

8       MS. LESLIE:  If I may, if you could

9   show Mr. Riselli the copy that you have.

10      MR. RISELLI:  It looks like a page is

11  missing, okay.  Let me just look at the

12  original.

13      (Perusing document.)  Okay, it looks

14  like what happened is we didn't copy page 23

15  from the board of investigation.  We can do

16  that.

17      THE WITNESS:  And it was expanded under

18  the summary of qualifications and describes what

19  the GS level 14 would involve.

20      In other words, it described if you

21  were a 13, you could perform at that level.

22      MR. RISELLI:  Right.

---

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                      10/26/2004

86

1       THE WITNESS:  So it made it available

2   to the 13 level.

3       There's an additional -- this thing is

4   copied right -- one, two, three, four, five --

5   well-qualified CTAP.

6       And it goes on to describe in the

7   amended one what the CTAP is and an ICTAP and it

8   describes what a well-qualified CTAP and ICTAP

9   is, the part of the announcement, a special

10  appointment authority.  It's in a slightly

11  different format.

12      It goes on to show special appointment

13  authority, the veteran's preference, narrative

14  statement of the KSAs, which number five, and

15  then has the attachment on the Merit Promotion

16  Program.

17      BY MR. RISELLI:

18      Q.  And changes in the KSAs between the

19  original and the amended?

20      A.  (Perusing documents.)  No, no changes

21  on the KSAs between the two of them,

22  announcements.  And it has the attachments that

---

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                      10/26/2004

87

1   are the same.

2       Q.  And did you approve the amended vacancy

3   announcement?

4       A.  Yes, I did.

5       Q.  With respect to Deposition Exhibit 19,

6   and again, looking over there at the KSAs, or

7   knowledge, skills and abilities, that were to be

8   -- the candidates were supposed to address,

9   there were five listed there; correct?

10      A.  Correct.

11      Q.  And to your knowledge, those are the

12  only five KSAs that were to be considered for

13  this position?

14      A.  Yes, they are.

15      Q.  Now, directing your attention to your

16  statement to Mr. Bradley, which is in the

17  investigative file, page 11 of your sworn

18  testimony, you told Mr. Bradley under oath that

19  you believe that, quote -- and directing your

20  attention to page 11 at line 6, quote, "This is

21  a very important position within the National

22  Capital Region and familiarity with what goes on

---

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                      10/26/2004

88

1   as it relates to the National Park Service and

2   as it relates to the National Capital Region is

3   critical"; correct?

4       A.  Right.

5       Q.  In fact, later on down at the bottom of

6   the page, you told him at line 23, quote, "So I

7   made that determination that that was primary,"

8   and continuing on to the next page, "and that

9   was a key element in my thinking as I went

10  through the interview process, who could best

11  meet the needs -- meet those needs and

12  requirements and familiarization with the

13  National Park Service and the way it functions

14  and the Region as it relates to the National

15  Park Service in these times of security needs

16  and competitive sourcing."

17      Now, familiarity with the operations of

18  the National Park Service and the National

19  Capital Region is not listed as one of the KSAs

20  in the vacancy announcement; isn't that

21  accurate?

22      A.  It's not a KSA.

89

1      Q.  But you used that factor to make a
2   determination of who you and Mr. Lawler would
3   interview; isn't that right?
4      A.  As to who we would interview?
5      Q.  Yes.
6      A.  As it related to the people that were
7   on the status list --
8      Q.  Well, let me just have you look at page
9   11 of the --
10     A.  Yeah, I've got it.
11     Q.  Okay.  Up there at line 3, Mr. Bradley
12  asked you, "Why weren't any of the non-status
13  applicants interviewed," and then you gave your
14  answer.
15     A.  Yeah.
16     Q.  So that was a determination as to who
17  you would interview?
18     A.  The determination as to who I would
19  interview was based upon the status and non-
20  status.
21         Within the status, there were adequate
22  applicants for the position.  So we made the

90

1   determination that we would look at the status
2   list of eligibles.
3         And within that status list of
4   eligibles, there were individuals -- all of the
5   things being equal, there were individuals who
6   had background in the National Park Service.
7         I also said in this proceeding that I
8   would -- as a part of my thinking, I would be
9   interested in those that -- if they did out of
10  those applicants have background related to the
11  functioning of the National Park Service in the
12  environs of the National Capital Region, all
13  other things being equal.
14        The job-related criteria that I
15  employed were based upon the five KSAs and the
16  series of questions that I asked of each
17  interviewee.
18        And that was one -- that was a
19  determining factor for me.  That was a key
20  element for me, all other things being equal,
21  among the status applicants.
22     Q.  Before you decided to make it a factor,

91

1   you know, familiarity with the National Capital
2   Region or the National Park Service operation,
3   did you run that by personnel or EEO to see if
4   you could consider that?
5      A.  The job-related criteria of making the
6   selection of who I would interview, did I run it
7   by EEO --
8      Q.  Right.
9      A.  -- or did I run it by the human
10  resources people?  Either one you're saying?
11     Q.  Either one, either or both.
12     A.  Yes.
13     Q.  You did?
14     A.  Yes.
15     Q.  And who did you talk to?
16     A.  I had a discussion with Dick Powers.
17     Q.  Okay.  And what did Mr. Powers tell
18  you?
19     A.  He indicated that limiting the number
20  -- I had the same discussion that I just alluded
21  to a few moments ago that, all other things
22  being equal, there were people on that status

92

1   list that we could have an interest in and that
2   we would like to narrow the interview down to
3   those that had the background in the National
4   Park Service, which numbered five.
5         One individual withdrew, so we
6   interviewed four.
7      Q.  So did he okay the use of that factor
8   to screen out some applicant?
9      A.  We used that as a basis for job-related
10  criteria to proceed with the interview.
11     Q.  And did you talk with anyone else in --
12  you know, in the office of administration?
13     A.  Not that I recall.
14     Q.  Did you talk to Ms. Newman about this
15  issue?
16     A.  About who we would interview?
17     Q.  Yes.
18     A.  I may have through Dick Powers, but we
19  usually would go to Mr. Powers and he would
20  provide me with information.
21     Q.  Did you check with Mr. Reid?
22     A.  Not that I recall.  I may have.

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                    10/26/2004

93

1    Q.  Did you ask Mr. Powers or anyone else
2  if focusing on candidates' familiarity with the
3  National Park Service or National Capital Region
4  operations was in accordance with agency hiring
5  rules?
6    A.  It wasn't identified as a KSA.  I
7  didn't give any consideration to it other than
8  --
9    Q.  Well, it was a factor that you relied
10 upon?
11   A.  It was a factor as it related to the
12 questions that I ask of each individual, if they
13 had that familiarity.
14       All of those four or five individuals
15 had some familiarity with the National Park
16 Service, yes.  They didn't all have familiarity
17 with the National Capital Region, no.
18   Q.  Well, you told Mr. Bradley it was a
19 critical factor, it was a key element of your
20 consideration; is that right?
21   A.  Which line are you referring to?
22   Q.  Well, let's see.  (Perusing document.)

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                    10/26/2004

94

1    A.  Keep using the word --
2    Q.  At line ten, you said, "And as it
3  relates to the National Capital Region is
4  critical."
5    A.  Okay.
6    Q.  And then down at the very last line of
7  the page, you said that, "so I made that
8  determination that that was primary."
9    A.  Right.
10   Q.  And then on the next page, you said,
11 "It was a key element in my thinking as I went
12 through the interview process."
13   A.  Correct.  But I did not call it a
14 factor.
15   Q.  Well, let's use the words that you used
16 before.  Did you check with anyone to see if
17 your determination, your primary determination
18 or your key element that you were considering
19 was in accordance with agency hiring rules?
20   A.  I had a list of questions that I
21 discussed with Mr. Powers.  Those list of
22 questions were based upon the KSAs.

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                    10/26/2004

95

1        And if you'll look at the questionnaire
2  I used, the KSAs are there where I go through an
3  evaluation of an individual.
4        The questions are job-related and they
5  help me select the individual for the position.
6  It is a key portion of what I always do when I
7  make selections.
8        And in making those selections, I
9  confide with Mr. Powers and with Mr. Lawler in
10 making a determination on the fairness of those
11 questions and the appropriateness of them as it
12 relates to the KSAs and, again, as it relates to
13 job-related criteria.  So in that regard, yes,
14 my advice was --
15   Q.  They told you that that consideration
16 of those factors or elements were in accordance
17 with the agency's hiring rules?
18   A.  They didn't say no.
19   Q.  Well, did they say yes, they're in
20 accordance with the agency's rules?
21   A.  Didn't ask the question.  I took the
22 advice.  I knew of no reason why they wouldn't

TERRY R. CARLSTROM
Aguilar  v. Department of Interior                    10/26/2004

96

1  be in accordance with the agency's hiring rules.
2    Q.  All right.  Now, is it fair to state
3  that the people -- the candidates who could only
4  satisfy those requirements would be insiders,
5  people who worked for the National Park Service
6  or, perhaps, formerly worked for the National
7  Park Service?
8    A.  Within the category of the status
9  applicants, yes.
10   Q.  So none of the outside applicants or
11 non-status applicants could ever satisfy that
12 requirement?
13   A.  I only -- I chose -- I didn't know
14 exactly who was on the non-status.
15       I had a status and a non-status.  I
16 selected the status to make the determination as
17 to whether we would interview all of them or
18 some of them.
19       I never considered going -- it's my
20 management prerogative.  I never considered
21 going to the non-status list.
22   Q.  But your prerogative was based on, all

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                    10/26/2004

97

1  other things being equal, as you said, the
2  candidates' familiarization with the National
3  Park Service or National Capital Region
4  operation?
5      A.  I said all other things being equal
6  within the status category, not non-status.  I
7  did not look at the non-status.
8      Q.  So is it accurate to state that none of
9  the non-status applicants were interviewed?
10     A.  That's correct.
11     Q.  And how many people were actually
12  interviewed?
13     A.  Four.
14     Q.  And let's see.  And you've testified
15  earlier when we were looking at your statement
16  to Mr. Bradley that you thought there was
17  something in the nature of 40-some-odd -- maybe
18  up to 46 or 47 -- I'm looking at page 6 of your
19  statement --
20     A.  Right, got you.
21     Q.  -- people that applied.  So that would
22  be the total number was --

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                    10/26/2004

98

1      A.  -- somewhere in that range.
2      Q.  Okay.  And you narrowed -- and there
3  were two lists: there was a status list and non-
4  status list?
5      A.  Correct.
6      Q.  Okay.  And of the people that made the
7  status and non-status list, you picked out four
8  to interview and they were from the status list?
9      A.  Correct.
10     Q.  And were they all --
11     A.  Well, I picked out -- we, not I -- we
12  picked out five and one declined.
13         You asked me previously how many I
14  interviewed.  I interviewed four; planned on
15  interviewing five, one declined.
16     Q.  When you say, "we," you mean you and
17  Mr. Lawler?
18     A.  Yes.
19     Q.  Okay.  And who was the person that
20  backed out?
21     A.  His name was -- he was from Gettysburg
22  Administrative, Officer McKenna.

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                    10/26/2004

99

1      Q.  And he was an employee of the Park
2  Service?
3      A.  Yes.
4      Q.  And do you remember what his race or
5  national origin was?
6      A.  I don't know for sure.
7      Q.  Okay.
8      A.  I can only guess.
9      Q.  And who were the four that you
10  interviewed?
11     A.  One was, of course, Dottie Marshall.
12     Q.  And what's her race or national origin?
13     A.  White female.
14     Q.  Okay.  Mr. Portillo was another one?
15     A.  Yes, Ricardo Portillo.
16     Q.  Do you know what his race or national
17  origin is?
18     A.  I thought it was Hispanic.  Ken Brodie
19  is African-American and Ferranti, I believe, is
20  a white male.
21     Q.  Now, I think you testified in your --
22  and you correct me if I'm wrong -- in your

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                    10/26/2004

100

1  statement to Mr. Bradley that you interviewed
2  four and from that group the final selection
3  came; that was Ms. Marshall?
4      A.  Correct.
5      Q.  But that you did either scan or skim
6  through the rest of the applications; is that
7  right?
8      A.  Correct.
9      Q.  So you actually looked at all of the
10  other applications?
11     A.  I didn't actually look and examine each
12  one.
13         I scanned through the list, through the
14  entire -- not the list, the entire packet that
15  had come in and -- well, that's what I did --
16     Q.  All right.
17     A.  -- with Dick Powers, and then made the
18  determination there are a lot of applicants
19  here.
20     Q.  Is it fair to state, though, that you
21  were focusing on the status -- list of status
22  applicants and, in particular, those four or

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

101

1  five people?

2      A.  Not until a list was provided to me.  I

3  had no idea what would be the status.

4      Q.  But it boiled to that at the end?

5      A.  What would be status or non-status,

6  again, I had no idea how that would break down.

7  When I received the materials -- when we

8  received the materials from the panel, we made

9  the determination to look at status.

10     Q.  Now, in discovery, I sent a request for

11  production of documents to the Agency to produce

12  the entire selection action file for this

13  vacancy announcement and in the documents that

14  were produced by Ms. Leslie on behalf of the

15  Agency, there are only two applications in the

16  file and that's Ms. Marshall's and Ms.

17  Aguilar's.

18          Do you know why all the applications

19  were not produced?

20     A.  I have no idea.

21     Q.  Do you know who would know why or where

22  the full contents of the selection file are at?

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

102

1      A.  I could only gather that it would be in

2  the -- down in human resources.

3      Q.  Would Ms. Newman know that?

4      A.  I would assume she would.  "Assume" is

5  a dangerous word, but I don't know where else it

6  would be.

7      Q.  Do you know what role Ms. Newman played

8  in connection with the selection action?

9      A.  Well, she didn't have -- it was a --

10  the person who selected would be the supervisor,

11  so she would have been in a subordinate position

12  to the associate for administration.

13          So my understanding is that the

14  applicants were provided to an outside part or

15  outside the headquarters office to look at the

16  entire packet.

17     Q.  You're talking about the ranking panel?

18     A.  I'm talking about the human resource

19  specialist in another part that was asked to

20  handle the entire process.

21     Q.  And do you know what her name was/is?

22     A.  Well, if she's at National Capital Park

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

103

1  East, then I believe the last name is Sasscer.

2      Q.  Okay.  Ms. Joyce Sasscer?

3      A.  I believe.  Did you have any

4  communications with her during the process?

5      A.  None whatsoever.

6      Q.  Do you know what specific role she

7  played in the process?

8      A.  Just organizing the panel and

9  proceeding with the appropriate action to go

10  through a rating system is all I know.

11     Q.  And how were the candidates rated and

12  ranked?

13     A.  Whatever the normal procedure is.  I

14  mean, I didn't have an involvement in the rating

15  or ranking of the individuals.

16     Q.  Well, to your knowledge then, were all

17  candidates rated and ranked the same way?

18     A.  They should have been.  Again, I have

19  no knowledge of what process they went through

20  to rank and rate individuals other than

21  following what the guidelines are for the

22  National Park Service and the government.

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

104

1      Q.  Well, let me ask it this way: Do you

2  know exactly how all applicants were rated and

3  ranked for this selection action?

4      A.  No.

5      Q.  But you do know that only people on the

6  status list were interviewed?

7      A.  Yes.

8      Q.  Who made that decision to only

9  interview people off the status list?

10     A.  Joel Lawler and I and Dick Powers.

11     Q.  And why didn't you interview anyone off

12  the non-status list?

13     A.  I had adequate applicants within the

14  status list to meet the criteria for the job.

15  They adequately met the KSAs.

16     Q.  What do you mean by "adequately"?

17     A.  They had the administrative background

18  within the status candidates that met all the

19  requirements of what an administrator does.

20          They had the budget background; they

21  had the human resources background; they had the

22  financial operations background; they had the IT

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

121

1    again, I'm not holding you to any specific

2    number here -- about -- there were about 47

3    applicants for the position.

4        It might be more; it might less.  I

5    don't know.

6        A.  I don't know either.

7        Q.  I'm not -- that's not my purpose.

8        A.  Right.

9        Q.  But that's the ball park number that

10   you believe you were working with that

11   eventually got boiled down to two lists, status

12   and non-status; then you screened out and

13   interviewed five, one guy dropped out and you

14   interviewed four off the status list?

15       A.  Off the status list, we made a

16   determination that we would interview five; one

17   dropped out, correct.

18       Q.  What, if any, action did you personally

19   take to determine that the pool of 47 applicants

20   was a diverse group of applicants?

21       A.  Out of the 47, I narrowed it to the

22   status list that we were going to select our

Olender Reporting, Inc.        (888) 445-3376        WORLDWIDE
Washington, D.C.               Baltimore, MD         Boca Raton, FL

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

122

1    interviewees from.

2        Q.  Okay.  But what I'm asking you is did

3    you look at the 47 to see if they were a diverse

4    group?

5        A.  No.  Again, I didn't look at the total

6    number of 47.  I looked at those that were

7    included within the status and I looked within

8    the group that we finally interviewed.

9        And we had a diverse group that we

10   interviewed, as I indicated before: an Hispanic

11   male, African-American male, white female and

12   one white male.

13       Q.  And that's of the four?

14       A.  Uh-huh.

15       Q.  How do you know that person, Mr.

16   Portillo, was Hispanic?

17       A.  I don't know that for sure.  I was

18   under the impression that he was.

19       Q.  At anytime during the selection

20   process, did you check with Mr. Reid or anyone

21   else in the EEO office to see if the applicant

22   pool was diverse?

Olender Reporting, Inc.        (888) 445-3376        WORLDWIDE
Washington, D.C.               Baltimore, MD         Boca Raton, FL

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

123

1        A.  That is done routinely throughout the

2    process.  And in that -- by that, I mean that

3    when the panel sits, there is a member of his

4    office that sits with the selecting panel.

5        Q.  And who was that?

6        A.  I don't know who it was.  It could have

7    been Mel Reid himself; it could have been Joy

8    Harris.  I'm not sure who it was, one of the

9    two.

10       Q.  So somebody from the EEO office sits on

11   the, what, rating and ranking panel?

12       A.  They should have, yes.

13       Q.  But you don't know who that was in this

14   case?

15       A.  No, I don't.

16       Q.  And I just want to ask for the record,

17   for this particular selection action, ARD,

18   Administrative Officer, National Capital Region,

19   to your knowledge, was there any special effort

20   made to target under-represented groups,

21   including Hispanic females, when this position

22   was advertised and filled?

Olender Reporting, Inc.        (888) 445-3376        WORLDWIDE
Washington, D.C.               Baltimore, MD         Boca Raton, FL

TERRY R. CARLSTROM
Aguilar v. Department of Interior                    10/26/2004

124

1        A.  I believe there was because we expanded

2    the area of consideration.  We also expanded the

3    vacancy announcement to read that it would be

4    available to the GS-13 level.

5        Q.  And that was after it was called to

6    your attention by the EEO officer?

7        A.  That's correct.

8        MR. RISELLI:  Nothing further at this

9    time.

10       (Whereupon, at 12:45 p.m., the

11   deposition was concluded.)

12       (Signature was not waived.)

13

14

15

16

17

18

19

20

21

22

Olender Reporting, Inc.        (888) 445-3376        WORLDWIDE
Washington, D.C.               Baltimore, MD         Boca Raton, FL

TERRY R. CARLSTROM
Aguilar v. Department of Interior                                      10/26/2004

125

```
1                   CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read the

4     foregoing pages of my deposition testimony in

5     the proceedings, and with the exception of

6     changes and/or corrections, if any, find them to

7     be a true and correct transcription thereof.

8

9          _____

10                        Deponent

11

12         _____

13                          Date

14                   NOTARY PUBLIC

15         Subscribed and sworn to before me this

16     _____ day of _____,

17     2004.

18         _____

19                      Notary Public

20         _____

21                     Expiration date

22
```

Olender Reporting, Inc.          (888) 445-3376          WORLDWIDE
Washington, D.C.                  Baltimore, MD          Boca Raton, FL

126

```
1                  CERTIFICATE OF NOTARY PUBLIC

2          I, Wanda L. Granger, the officer before whom the

3     foregoing deposition was taken, do hereby certify that

4     the witness whose testimony appears in the foregoing

5     deposition was duly sworn by me; that the testimony of

6     said witness was taken by me stenographically and

7     thereafter reduced to typewriting by me or under my

8     direction; that said deposition is a true record of the

9     testimony given by said witness; that I am neither

10    counsel for, related to, nor employed by any of the

11    parties to the action in which this deposition was taken;

12    and, further, that I am not a relative or employee of any

13    attorney or counsel employed by the parties hereto, nor

14    financially or otherwise interested in the outcome of the

15    action.

16                         _____

17

18                         Wanda L. Granger

19

20                         Notary Public in and for the

21                         Commonwealth of Virginia

22    My Commission Expires: February 28, 2007
```

Olender Reporting, Inc.          Toll Free:          (888) 445-3376
Washington, D.C.                  Baltimore, MD          Boca Raton, FL

# EXHIBIT
# 9



# United States Department of the Interior

**NATIONAL PARK SERVICE**
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO

P66(2653)

**FEB 1 2 1999**

Memorandum

To:         All Employees

From:       Director *Bl. Shanton*

Subject:    Modified Plan for Management Succession

A formal plan for management succession in the National Park Service, developed by a team of employees, was approved by the National Leadership Council (NLC) and distributed to all employees in 1997. The main goal of the plan was to "meet the National Park Service's need for management skills and work force diversity by the end of this century." While well conceived and designed, the plan was difficult to implement due to the vast size of the potential pool of management candidates and the need for extensive financial and human resources. Furthermore, the expected need to fill large numbers of vacancies in key management positions due to employee turnover (i.e., buy-outs, early retirements, etc.) was never fully realized. As a result, the NLC reexamined the plan at its September 1998 meeting and agreed to a modified approach that would reduce program costs, provide greater flexibility to selecting officials and meet the goal of the original plan. This memorandum explains the elements of the modified approach as agreed upon by the NLC members. Effective immediately, the following procedures will apply when filling any key management position:

- **DESIGNATION OF KEY MANAGEMENT POSITIONS**
For the purpose of succession planning, key management positions in central offices are defined as GS-13, GS-14 and GS-15 level deputy regional directors, associate regional directors, national program center directors and assistant directors, and team leaders/coordinators. This designation includes division chiefs or equivalent in the Washington Office and Harpers Ferry Center. Key management positions in field units include GS-13, GS-14 and GS-15 superintendents, and deputy and assistant superintendents.

- **RECRUITMENT FOR KEY MANAGEMENT VACANCIES**
When key management positions become vacant, they will be advertised as: Open to All Sources. Vacancies will be advertised as multi-series including, as a minimum, the current occupational series of the vacancy and the GS-340 Program Management Series as well. Other applicable series may also be considered, as well as the use of



multiple grades when possible.  These steps, coupled with an aggressive outreach to minority group recruitment sources, should help to ensure a larger and more diverse pool of candidates.  If a Regional or Associate Director has a strong reason why a key management vacancy should not be filled through this method, I will consider a written request for an exception.  Such requests are expected to be rare.

* RECOGNITION AND USE OF OTHER DEVELOPMENTAL PROGRAMS
The Department and other organizations sponsor nationally advertised leadership/management development programs (e.g., DOI Team Leadership Program) that produce highly skilled and extremely capable graduates. I fully endorse the continued participation of NPS employees in these programs and strongly encourage selecting officials to recognize these program graduates when filling their key vacancies. As I participate in future selections for participants in these programs, I will rely heavily on recommendations from Associate Directors and Regional Directors.

* NPS MID LEVEL INTAKE PROGRAM
In addition to the existing NPS Intake Program that focuses on the GS-5 through GS-9 levels, a new program will be established for employees at the GS-11 and GS-12 levels. The participants will include both NPS employees and outside applicants.  This program will emphasize the development of management skills and competencies to prepare graduates as candidates for management positions in the NPS. More information will be provided as the final plans are made.

Any questions concerning the modified plan for management succession should be directed to Paula Ehrenfeld, Office of Human Resources, on 202-208-5229.

# EXHIBIT 10

# United States Department of the Interior

NATIONAL PARK SERVICE
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

IN REPLY REFER TO:

Vacancy Announcement

DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
AMENDMENT

NOTE: THIS AMENDS THE GRADE OF THE POSITION TO GS-14/15, THE SALARY RANGE, THE AREA OF CONSIDERATION TO ALL SOURCES, THE QUALIFICATIONS AND ALSO EXTENDS THE CLOSING DATE TO APRIL 14, 2003.

The National Park Service is an Equal Opportunity employer. Selection for this position will be made solely on the basis of merit, fitness, and qualifications without regard to race, sex, color, creed, age, marital status, national origin, sexual orientation, non-disqualifying handicap conditions, or any other non-merit factors.

NOTE: UNITED STATES CITIZENSHIP IS REQUIRED FOR FEDERAL EMPLOYMENT.

Vacancy Announcement Number: NPS-NCR-03-19

Opening Date: March 10, 2003
Closing Date: April 14, 2003

Position:    Administrative Officer
             (Associate Regional Director,
             Administration)
             GS-341-14/15

Salary:
    GS-14 ($81,602 - $106,086 per annum)
    GS-15 ($95,987 - $124,783 per annum)

FULL PERFORMANCE LEVEL: GS-15

LOCATION:    NATIONAL PARK SERVICE
             NATIONAL CAPITAL REGION
             OFFICE OF THE REGIONAL DIRECTOR
             OFFICE OF ADMINISTRATION
             WASHINGTON, DC

NOTE: AS A RESULT OF THE CURRENT MAIL SITUATION, APPLICATIONS TO OUR OFFICE ARE BEING DELAYED, THEREFORE, WE STRONGLY SUGGEST THAT YOU FAX, FEDERAL EXPRESS OR COURIER, OR HAND-DELIVER YOUR EMPLOYMENT APPLICATION TO US, OTHERWISE, YOU MAY LOSE TIMELY CONSIDERATION.

NOTE: If filled at the GS-14 level, position has promotion potential to the GS-15 without further competition once all legal and regulatory requirements are met; however promotion is neither automatic nor guaranteed.

Exhibit 2
Page 28 of 117 pages

AREA OF CONSIDERATION: ALL SOURCES

The area of consideration is **ALL SOURCES**. Applications will be accepted from Career/Career Conditional Federal employees, reinstatement eligibles, those eligible under special appointing authorities, i.e. handicapped, VRA, disabled veterans, etc. and non-status applicants i.e. applicant from outside the Federal Service and without any special eligibility.

Applications will be accepted from status and non-status candidates. Status candidates who wish to be considered under both merit promotion and competitive procedures must submit two (2) complete applications. When one (1) application is received, it will be considered under the merit promotion announcement.

**NOTE: This is an open announcement for which current Federal employees, reinstatement eligibles, and applicants from outside the Federal Government may apply. Qualified veterans who apply will receive Veteran's Preference in accordance with current law and regulations.**

**NOTE:** Travel, transportation, and relocation expenses will be paid by the Agency.

PAY, BENEFITS, AND WORK SCHEDULE:

This is a permanent full-time position with benefits.

CONDITION OF EMPLOYMENT: New employees of the Department of the Interior must identify a financial institution for direct deposit of net pay within 30 days of entrance on duty.

CONDITIONS OF EMPLOYMENT: Incumbent of this position is required to file an OGE-450, Confidential Financial Disclosure Report. Frequent travel may be required. This is a managerial position. If appointed to this position, you must serve a one-year managerial probationary period, unless you already completed one as a manager.

SUPERVISORY OR MANAGERIAL ABILITIES: Candidates must have demonstrated in their work experience or training that they possess, or have the potential to develop, the qualities of successful supervision, such as the ability to: Assign to and review work of subordinates, train and work effectively with subordinates from a variety of backgrounds and with different level/areas of training. Accomplish the quality and quantity of work expected within set limits of cost and time. Plan own work and carry out assignments effectively. Communicate with others effectively both orally and in writing in working out solutions to problems or questions relating to the work. Understand and further management goals as these affect day-to-day work operations. And develop improvements in or design new work methods and procedures.

Exhibit 2
Page 30 of 117 pages

FOR ADDITIONAL INFORMATION ABOUT THIS POSITION PLEASE CONTACT:

Jeanette Organ
202-619-7234

JOB INFORMATION HOTLINE
202-619-7256

SUBMIT YOUR APPLICATION PACKAGE TO:

NATIONAL PARK SERVICE
NATIONAL CAPITAL REGION
1100 OHIO DRIVE, SW, ROOM 244
WASHINGTON, DC  20242

OR VIA FAX: 202-619-7240

---

MAJOR DUTIES:

Incumbent serves as the Associate Regional Director, Administration for the National Region (NCR).  The position has direct line authority for the planning, policy, execution, management and supervision of all administrative, informational systems, and financial management activities throughout the Region.  This includes such activities as human resources, finance, contracting, property, office services, fiscal management, and information technology.  The primary functions of the position are to provide effective and efficient delivery of administrative services throughout the Region.  Provides administrative and technical support and advisory services to approximately 14 parks/monuments/historic sites, as well as the Regional Director's staff.  The position is the primary advisory position for all administrative areas and manages all directly related program areas through subordinate supervisory components and staff.  The position supervises directly and indirectly 45 personnel within the NCR Regional Office and has responsibility for oversight of all administrative programs.  The Office of Administration is comprised of Contracting, Human Resources, Office Services/Property, Finance, Budget and Information Technology Services.  It has two primary roles: oversight and policy services as well as administrative program management.  Incumbent supervises the National Capital Region Special Emphasis Recruitment Officer and in so doing, coordinates closely with the EO Manager in the development and implementation of the Regional affirmative action program.

---

SUMMARY OF QUALIFICATIONS REQUIRED:

**For the GS-14 level,** applicants must possess one (1) year of progressively responsible specialized experience at the GS-13 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that is typically in or related to the work of the position.  **For the GS-15 level,** applicants must possess one (1) year of progressively responsible specialized experience at the GS-14 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that is typically in or related to the work of the position. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization.

NOTE: Applicants must meet time-in-grade requirements by the closing date of this announcement.

---

Exhibit 2
Page 31 of 117 pages

The National Capital Region provides reasonable accommodations to applicants with disabilities. If you need a reasonable accommodation for any part of the application and hiring process, please notify the agency. The decision on granting reasonable accommodation will be on a case-by-case basis.

It is the applicant's responsibility to provide documentation/proof of claimed qualifications, education, veterans preference, status (SF-50), and/or verification of eligibility for non-competitive appointment. Applicants will not be solicited for additional information if that provided is determined to be inadequate/incomplete. If you are substituting education for experience, you must furnish a transcript of college work completed.  Nonsubmission will result in your being rated ineligible.

## CTAP

If you are currently an employee of the hiring agency who has received a Reduction in Force (RIF) separation notice, a Certificate of Expected Separation (CES), or notice of proposed separation for declining a direct reassignment or transfer of function outside of the local commuting area, you may be entitled to special selection priority under the Career Transition Assistance Plan (CTAP). To receive this priority consideration you must:

1. Be a current career or career-conditional (tenure group I or II) competitive service employee who has received a RIF separation notice, a Certificate of Expected Separation (CES), or notice of proposed separation for declining a directed reassignment or transfer of function outside of the local commuting area, AND you are still on the rolls of the agency. You MUST submit a copy of the RIF notice, CES, or notice of proposed separation with your application.

2. Be applying for a position that is at or below the grade level of the position from which you are being separated. The position must not have a greater promotion potential than the position from which you are being separated.

3. Have a current (or last) performance rating of record of at least fully successful or equivalent. This MUST be submitted with your application package.

4. Be currently employed by the hiring agency in the same commuting area of the position for which you are requesting selection priority.

5. Be rated well qualified for the position. To be rated "well qualified," CTAP applicants must attain an eligibility rating as described in "Basis for Rating" or higher, not including points for veteran's preference.

## ICTAP

SPECIAL SELECTION PRIORITY PROVISIONS FOR DISPLACED FEDERAL EMPLOYEES UNDER THE INTERAGENCY CAREER TRANSITION ASSISTANCE PLAN (ICTAP)

If you are a displaced Federal employee, you may be entitled to receive special selection priority under the Interagency Career Transition Assistance Plan (ICTAP). To receive this priority you must:

Exhibit 2
Page 37 of 117 pages

1. Be a displaced Federal employee. You MUST submit with your application a copy of the appropriate documentation, such as a RIF separation notice, a Standard Form 50 reflecting your RIF separation, or a notice of proposed removal for declining a directed reassignment or transfer of function to another commuting area. The following categories of persons are considered displaced employees:

a. Current or former career or career-conditional (tenure group I or II) competitive service employees who:

1) Received a specific RIF separation notice; or
2) Separated because of a compensable injury or illness, whose compensation has been terminated, and whose former agency certifies that it is unable to place; or
3) Retired with a disability and whose disability annuity has been, or is being, terminated; or
4) Upon receipt of a RIF separation notice, retired on the effective date of the RIF and submits a Standard Form 50 that indicates "Retirement in lieu of RIF," or retired under the discontinued service retirement option; or
5) Received a notice of proposed removal for declining a directed reassignment or a transfer of function or directed reassignment to another commuting area.

OR

b. Former Military Reserve or National Guard Technicians who are receiving a special OPM disability retirement annuity under section §8337(h) or § 8456 of title 5 United States Code.

2. Applying for a position at or below the grade level of the position from which you have been separated. The position must not have a greater promotion potential than the position from which you were separated.

3. Have a current (or last) performance rating of record of at least fully successful or the equivalent. You MUST submit a copy of this performance rating with your application package. (This requirement does not apply to candidates who are eligible due to compensable injury or disability retirement.)

4. Occupy or be displaced from a position in the same local commuting area of the position for which you are requesting selection priority.

5. Be rated well qualified for the position. To be rated "well qualified," ICTAP applicants must attain an eligibility rating as indicated in the "Basis of Rating" section of this announcement, not including points for veteran's preference.

**Well Qualified (CTAP/ICTAP).** For CTAP and ICTAP, well-qualified means that the applicant meets the qualification standard and eligibility requirements for the position, meets minimum educational and experience requirements, meets all selective factors where applicable, and is able to satisfactorily perform the duties of the position upon entry.

Veterans who are preference eligibles or who have been separated from the armed forces under honorable conditions after 3 years or more of continuous active service may apply. **PLEASE PROVIDE A COPY OF YOUR DD-214 OR OTHER PROOF OF PREFERENCE WHEN YOU APPLY UNDER THIS ANNOUNCEMENT.**

Exhibit 2
Page 33 of 117 pages

**Special Appointment Authority**. Individuals who are eligible for consideration under a special hiring authority (e.g., 30% compensable veterans, VRA eligibles, severely handicapped individuals, former Peace Corps and VISTA Volunteers, etc.) will be accepted and considered non-competitively for this vacancy. Special hiring authority eligibles must indicate on their application if they are applying under a special program and submit proof of eligibility with their application. The VRA hiring authority is limited to positions at the GS-11 level and below. Applicants who wish to be considered under an appropriate special hiring authority as well as under the competitive examining process must submit two complete applications. When only one application is received from a special hiring authority eligible, it will be considered under the appropriate special hiring authority only.

**Veterans Preference**

You must clearly identify your claim for veterans' preference on your application.

5-POINT PREFERENCE. 5-point preference is granted to veterans who served prior to 1976 and served at least six months on active duty. Those who served after 1980 and 1982 must have served at least two years on active duty.
A 5-point preference is also granted to veterans who served on active duty during the Gulf War from August 2, 1990 through January 2, 1992. The law grants preference to anyone who is otherwise eligible and who served on active duty during this period regardless of where the person served or for how long. "Otherwise eligible" means that the person must have been released from the service under honorable conditions and must have served a minimum of two years on active duty, or if a Reservist, must have served the full period for which called to active duty.

If you are claiming a 5-point veteran preference please provide a DD-214, Certificate of Release or Discharge from Active Duty, or other proof of entitlement. Tentative preference will be granted in the absence of the paperwork.

10-POINT PREFERENCE. You may be entitled to a 10-point veteran preference if you are a disabled veteran; you have received the Purple Heart; you are the spouse or mother of a 100% disabled veteran; or, you are the widow, widower, or mother of a deceased veteran. If you are claiming 10-point veteran preference, you will need to submit an SF-15, Application for 10-point Veteran Preference, plus the proof required by that form.

---

**Narrative Statement**: Candidates should submit a narrative statement on a separate page(s) with specific responses to the knowledge, skills, and abilities (KSAs) in this announcement. Failure to submit your narrative response to the KSAs for this job may negatively affect your eligibility and/or rating for this position.

1.  Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.
2.  Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels.
3.  Ability to develop, analyze, review, and appraise the effectiveness of administrative policies, programs, and practices.
4.  Ability to interact and communicate at all levels.
5.  Ability as a manager to direct a support staff comprised of a range of technical and professional individuals.

When using internet and USAJOBS touchscreen, it is the applicant's responsibility to follow the application guidelines (listed under instructions) in order to receive consideration for this vacancy.

Exhibit 2
Page 34 of 42 pages

U.S.  NATIONAL  PARK  SERVICE
MERIT  PROMOTION  ANNOUNCEMENT  APPLICATION  GUIDELINES

HOW  TO  APPLY:

Applications  must  be  mailed  to  the  address  indicated  on  the  first
page  of  the announcement.

In  addition  to  any  forms  or  information  required  on  page  1  or  2
of the announcement,  submit  one  of  the  following:

--OF-612,  Optional  Application  for  Federal  Employment;  or
--SF-171,  Application  for  Federal  Employment;  or
--Resume  or  written  application  that  contains  information  specified  in
  OPM  Form  510

THE  FOLLOWING  INFORMATION  MUST  BE  INCLUDED  IN  YOUR  APPLICATION.

(1)  JOB  INFORMATION  -  announcement  number,  and  title  and  grade  of
     the job  for  which  you  are  applying;

(2)  PERSONAL  INFORMATION  -  Full  name,  mailing  address  (with  ZIP
     Code) and  day  and  evening  phone  numbers  (with  area  code);
     social security number;  country  of  citizenship;  veterans  preference;
     reinstatement  eligibility (you  must  attach  SF-50  for  proof  of
     your career  or  career-conditional  status);  and  highest  Federal
     civilian Grade  held.  (Also  give  job  series  and  dates  held.)

(3)  EDUCATION  -  High  school  name,  city,  state,  (zip  code  if  known)
     and date  of  diploma  or  GED;  name  and  city  and  state  (zip  code
     if known)  of  colleges  and  universities  attended,  with  majors,
     type and  year  of  any  degrees  received  (if  no  degree,  show
     credits earned  and  indicate  whether  semester  or  quarter  hours);

(4)  WORK  EXPERIENCE  -  Give  the  following  information  for  your  paid
     and nonpaid  work  experience  related  to  the  job  for  which  you
     are applying:

     (a)  job  title  (include  series  and  grade  if  Federal  job);  (b)
     duties and  accomplishments;  (c)  employer's  name  and  address;
     (d) supervisor's  name  and  phone  number;  (e)  starting  and  ending
     dates (month  and  year);  (f)  hours  per  week;  (g)  salary.
     Indicate if  we  may  contact  your  current  supervisor.

(5)  OTHER  QUALIFICATIONS  -  Job  related  training  courses  (title  and
     year); job  related  skills  (for  example;  other  languages,  computer
     software/hardware,  tools,  machinery,  typing  speed);  job  related
     certificates and  licenses  (current  only);  and  job  related
     honors, awards,  and  special  accomplishments  (for  example,
     publications, memberships  in  professional  or  honor  societies,
     leadership activities,  public  speaking,  and  performance  awards)
     give dates  but  do  not  send  documents  unless  requested.

Narrative  statement  (no  more  than  one  page  per  KSA)  of  knowledge,
skills,  and  abilities  (KSA's).  Describe  experience  (paid  or  unpaid),
education,  training,  awards,  and  self-development  as  related  to  the
KSA's.  While  not  mandatory,  failure  to  submit  responses  to  the  KSA
factors  may  affect  the  rating  you  receive.

Exhibit  2
Page  35  of  117  pages

(Wage Grade/Wage Board only).   In order to receive full consideration, it is essential that you submit the required supplemental experience statement specifically addressing each of the knowledges, skills, abilities, and other characteristics required for satisfactory performance in this position.   Your qualifications for this position will be determined primarily by your responses.   Failure to provide the specific information may result in an applicant receiving a lower rating in the evaluation process.

If claiming veterans' preference, submit copy of DD 214, Certificate of Release or Discharge from Active Duty. Current Federal employees must subject copy of most recent supervisory performance appraisal.

College Transcript or OPM Form 1170-17 (List of College Courses) if qualifying based on education.

Status candidates must submit proof of status (SF-50 showing current grade & tenure and an SF-50 showing highest (permanent) grade ever held, if different).

Applicants applying under special appointments (severely disabled, certain Vietnam era and disabled veterans, and volunteers from Peace Corps or Vista) must submit documentation, and indicate the type of special appointment sought on the application.

DI-1935, Department of the Interior Application Background Survey. (Submission of this form is voluntary.   The information provided will be used for statistical purposes to monitor applicant response, and will not be maintained in the personnel office or forwarded to the selecting official).

ELIGIBILITY REQUIREMENTS

You must be a United States citizen, unless otherwise stated.

You must meet the Office of Personnel Management (OPM) Qualification Standards.   These standards are available in any Federal personnel office for review.

Applicants must meet qualifications and time-in-grade requirements as of the closing date of the announcement in order to be considered.

As a condition of employment, male applicants born after December 31, 1959, must certify that they have registered with the Selective Service System, or are exempt from having to do so under Selective Service law.

Applications must be postmarked on or before the closing date and be received in the personnel office within 5 calendar days of the closing date in order to be considered.

Exhibit 2
Page 36 of 117 pages

GENERAL   INFORMATION

If you are selected for Federal employment, you will be required to fill out a Declaration of Federal Employment, OF-306, prior to being appointed to determine your suitability for Federal employment and to authorize a background investigation.   Failing to answer all questions truthfully and completely or providing false statements on your application may be grounds for not hiring you, or for firing you after you begin work.   Also, you may be punished by fine or imprisonment (U.S. Code, Title 18, section 1001).

The selectee may be required to file one or more financial statements and/or a procurement integrity certification of compliance upon reporting and annually, some of which may be subject to public disclosure. National Park Service employees are subject to prohibitions against owning financial interests which conflict or appear to conflict with efficient and impartial performance of duty.

If you are selected for a supervisory or managerial position, you must serve a probationary period.   Failure to complete the probationary period successfully can result in return to your former position, or to a position of no lower grade and pay than the one which you left to accept the supervisory or managerial position.

It is against the law to use Government envelopes or mail services (electronic included) to submit applications (18 USC 1719).

Your application contains information subject to the Privacy Act (P.L. 93-579, 5 USE 552a).   The information is used to determine qualifications for employment and is authorized under Title 5, USC, Section 3302 and 3361.

Attachments not requested in the vacancy announcement may be returned or discarded. Applications will not be returned.

Applications received without all the required information will not be considered.

The Federal Government is an Equal Opportunity Employer.

Exhibit 2
Page 32 of 117 pages

OMB Control No.: 1091-0001
Expiration Date: 01/30/2003

U.S. DEPARTMENT OF THE INTERIOR

# APPLICANT BACKGROUND SURVEY

| GENERAL INSTRUCTIONS | YOUR PRIVACY IS PROTECTED |
|---|---|
| In boxes 1 to 3, please print using capital letters only. Read each item thoroughly before circling the appropriate codes in boxes 4 and 5. Enclose this form with your application package or mail it directly to the same address. | This information is needed to determine if our recruitment efforts are reaching all segments of the country, as required by Federal law. This is vital information not available from any other source. We can only get it directly from you.<br><br>Your voluntary responses are treated in a *highly confidential* manner. They are not released to the panel rating the applications, to the selecting official, to anyone else who can affect your application, or to the public. This form will be destroyed after the position is filled. |
| **1. Vacancy Announcement No.:** | The only information associated with your name in our computer system is whether you have returned the completed form, so that we may follow up if no response has been received. Your responses are stored as a tally for the *group of all applicants for this vacancy* in a manner that cannot be associated with any individual application. No information taken from this form is ever placed in a Personnel file or Personnel data base. |
| **2. Position Title:** | |
| **3. Name (Last, First, MI):** | Thank you for helping us provide better service. |

**4. How did you learn about this position?** (Circle up to three codes).

| | |
|---|---|
| 01– Private information service<br>02 – Magazine<br>03 – Newspaper<br>04 – Radio<br>05 – TV<br>06 – Poster<br>07 – Private Employment Office<br>08 – State Employment Office (Unemployment Office) | 09 – Agency Personnel Department (bulletin board or other announcement)<br>10 – Agency or other Federal government recruitment at school or college<br>11 – Federal, state, or local Job Information Center<br>12 – Religious organization<br>13 – School or college counselor or other official<br>14 – Friend or relative working for this agency<br>15 – Friend or relative not working for this agency<br>16 – Internet or World Wide Web<br>17 – Other (Specify) _____ |

**5. Identify yourself in each category:** (Circle the appropriate codes)

| Ethnicity: | Race (circle one or more) | Sex: |
|---|---|---|
| D – Hispanic or Latino<br><br>N – Not Hispanic or Latino | A – American Indian or Alaska Native<br>B – Asian<br>C – Black or African American<br>G – Native Hawaiian or Other Pacific Islander<br>E – White | M – Male<br><br>F – Female |

| Do you have any physical disabilities?<br><br>Y - Yes<br><br>N - No | If yes, do you have a targeted* disability? Y - Yes  N - No<br><br>* The Equal Employment Opportunity Commission targets the following disabilities for extra recruitment efforts: Deaf, Blind, Missing Extremities, Partial/Complete Paralysis, Convulsive Disorders, Mentally Retarded, Mental Illness or Distortion Limb/ Spine. |
|---|---|

SEE BACK OF THIS FORM FOR THE PRIVACY ACT STATEMENT,

PUBLIC BURDEN STATEMENT AND THE PAPERWORK REDUCTION ACT STATEMENT

DI Form - 1935 (12/98)1 of 2

Exhibit 2
Page 38 of 117 pages

# EXHIBIT
# 11

Sandra Aguilar                                          Department of Interior
Deposition of Sandra Aguilar          vs.          Thursday, October 21, 2004

---

Page 1

1    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
2         WASHINGTON FIELD OFFICE
3         1400 L Street, N.W., Suite 200
4            Washington, D.C. 20005
5
6    SANDRA L. AGUILAR,     )
7         Complainant,  )EEOC No. 100-2004-00510X
8         vs.          )Agency No. FNP-2003-064
9    DEPARTMENT OF INTERIOR, )
10        Agency.      )
11         *    *    *    *    *    *
12
13
14
15
16         The deposition of SANDRA L. AGUILAR, was taken
17   on Thursday, October 21, 2004, commencing at 10:00 a.m.,
18   at the offices of Department of Interior, 1849 C. Street,
19   NW, Room 3013, Washington, D.C., before Lanieda Briggs,
20   CSR, Notary Public.
21
22         *    *    *    *    *    *

---

Page 2

1         A P P E A R A N C E S :
2
3    ON BEHALF OF THE PLAINTIFF:
4         MICHAEL J. RISELLI, ESQUIRE
5         Riselli & Pressler, P.C.
6         1737 King Street
7         Suite 350
8         Alexandria, Virginia 22314
9         Tel: (703) 837-1785
10        Fax: (703) 837-1790
11        MJRISELLI@RPLAW.NET
12
13   ON BEHALF OF THE DEPARTMENT OF INTERIOR:
14        PHYLLISINA LESLIE, ESQUIRE
15        Agency Counsel
16        Department of Interior
17        1849 C. Street, NW, Room 3013
18        Washington, D.C.
19        Tel:  (202) 208-6848
20        Fax: (202) 208-3230
21
22   (Appearances continued on the next page.)

---

Page 3

1    APPEARANCES (Continued):
2
3    ALSO PRESENT:
4         Kirk Gavigan
5         Candace Lei
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 4

1              I N D E X
2       DEPOSITION OF SANDRA L. AGUILAR
3            OCTOBER 21, 2004
4
5    EXAMINATION BY:              PAGE
6    Ms. Leslie              7
7    Mr. Riselli             97
8
9
10   AGUILAR DEPOSITION EXHIBIT      PAGE MARKED
11   None marked.
12
13
14
15
16
17
18
19
20
21
22

---

M.A.R. Reporting Group            Toll free (888) 534-1225         (703) 534-1225
Professional Stenotype Reporters                                  www.mar-reporting.com

Sandra Aguilar                                vs.                    Department of Interior
Deposition of Sandra Aguilar                                        Thursday, October 21, 2004

---

Page 5

1    P R O C E E D I N G S
2    - - - - -
3    Whereupon --
4              SANDRA L. AGUILAR
5    Having been first duly sworn by the Reporter, was examined
6    and testified on her oath as follows:
7        MS. LESLIE:  Thank you.  Ms. Aguilar, this is a
8    proceeding authorized by the U.S. Equal Opportunity
9    Commission in the case of Sandra Aguilar versus Gail
10   Norton, Department of Interior.  The EEOC number is
11   100-2004-0051X.  The Agency case number is FNP2003-064.
12   The deposition is being taken pursuant to the Code of
13   Federal Regulations found at 29 CFR 1614.109(B) the Agency
14   orally informed you or complainant's counsel on September
15   30th of its intent to depose you and confirmed Notice of
16   Deposition via facsimile to your attorney.  My name is
17   Phyllisina Leslie.  I represent the Agency in this case.
18   I'm going to ask you a series of questions starting off
19   with some background information.
20       Do you understand that you are being deposed in
21   a federal administrative proceeding?
22       THE WITNESS:  Yes, I do.

---

Page 6

1        MS. LESLIE:  Are you aware that under 18 United
2    States Code Section 12001 it is a criminal offense to
3    knowingly give a false statement in connection with this
4    proceeding?
5        THE WITNESS:  Yes, I do.
6        MS. LESLIE:  And do you understand that you are
7    testifying under the penalties of perjury?
8        THE WITNESS:  Yes, I do.
9        MS. LESLIE:  Do you understand therefore that
10   you are required to testify truthfully to all questions
11   that you are requested in this deposition?
12       THE WITNESS:  Yes.
13       MS. LESLIE:  Have you ever had your deposition
14   taken before today?
15       THE WITNESS:  Yes, I have.
16       MS. LESLIE:  When and for what purpose?
17       THE WITNESS:  The first time I had a deposition
18   taken was during a divorce proceeding in -- I'm trying to
19   remember, 1980.  I think it was 1980.  The second time I
20   had a deposition taken was because of an automobile
21   accident that I was in and I can't recall the exact date.
22   It was in the '80s.  I want to say about 1986.

---

Page 7

1        MS. LESLIE:  I will be asking you a series of
2    questions today.  If you don't understand the question,
3    please ask me to rephrase or repeat it.  Please don't ask
4    your attorney to clarify or ask any questions while I'm
5    questioning you.  If you don't ask me to repeat the
6    question, I'll assume that you understood it.  Please
7    audibly answer.  This is for the purposes of the court
8    reporter here today, and it's important that we both do
9    not speak at the same time so we can make sure our answers
10   are properly recorded.
11       THE WITNESS:  I have a bit of a learning
12   disability.  I sometimes don't hear the first part of a
13   sentence.
14       MS. LESLIE:  That's fine.  Concerning the time
15   frame, if you need a break, just let me know, and if we
16   get to a good stopping point and I feel it's appropriate,
17   I'll let you know as well.
18       THE WITNESS:  Thank you.
19           EXAMINATION
20       BY MS. LESLIE:
21       Q.  Here are some preliminary questions.  What is
22   your race?

---

Page 8

1        A.  I am Hispanic.
2        Q.  What is your national origin?
3        A.  I'm Mexican American.
4        Q.  What is your date of birth?
5        A.  [            ]
6        Q.  What is your residential address?
7        A.  With 2338 Tawny, T-A-W-N-Y, Drive.  Waldorf,
8    Maryland.  Do you need a zip code?
9        Q.  No, it's just background information.  What was
10   your previous residential address?
11       A.  It was 4422 Pembrook Village Drive.  Pembrook is
12   one word, P-E-M-B-R-O-O-K, Village Drive in Alexandria,
13   Virginia.
14       Q.  Are you married?
15       A.  Yes.
16       Q.  How long have you been married?
17       A.  I have been married three years.
18       Q.  What is the name of your spouse?
19       A.  William Nieto, N-I-E-T-O, Junior.
20       Q.  Where is he currently employed?
21       A.  He's employed with the National Parks Service at
22   the National Capitol Region in the Office of Civil Rights.

---

2 (Pages 5 to 8)

Sandra Aguilar                                                    Department of Interior
Deposition of Sandra Aguilar                    vs.              Thursday, October 21, 2004

Page 17

1    Q.  I'm going on names that you indicated in your
2  Response to the Agency's Discovery Request. There are, I
3  think, two other names that I recall seeing. Are you
4  alleging that Richard Powers treated you differently?
5    A.  Yes.
6    Q.  Are you alleging that Joyce Sasser treated you
7  differently?
8    A.  Yes.
9    Q.  Is there anyone else that you are alleging
10  treated you differently?
11    A.  Not at this time - not at this time.
12    Q.  You indicated that you are alleging that they
13  treated you differently because of your national origin.
14  What facts do you allege support that allegation?
15    A.  Well, first of all, I was treated differently
16  when management pre-selected Dottie Marshall, who is a
17  white Caucasian woman, for the position before it was
18  advertised. I was also treated differently based on my
19  race and national origin when management chose to ignore
20  the requirements of the February 12th, 2000, Robert
21  Stanton memo which directed the Agency to advertise
22  vacancies at a 13 and above, all sources. And until it

Page 18

1  was called to management's attention, primarily
2  Mr. Carlstrom's attention, by the EEO office, in which, by
3  the way, Mr. Carlstrom admits that Mel Reed, EEO director
4  -- or the civil rights director called it to his
5  attention and he referred to that in his EEO affidavit at
6  the time.
7    The purpose of the policy is to hire and recruit
8  minorities, particularly Hispanics, and they didn't do
9  that. I was treated differently because by sending in my
10  application, I forced management to follow the Stanton
11  memo requirements, the National Parks Service, National
12  Capitol Region, used a different application, screening
13  process for non-status, outside applicants from that used
14  from inside applicants like selecting Ms. Marshall, that
15  effectively denied me fair and equal opportunity
16  consideration and they shut me out of the screening
17  process.
18    NCR, National Capitol Region, retaliated against
19  me and treated me differently when they chose to rate and
20  rank the merit promotion status applicant by a panel of
21  three GS-15s, two of whom may have had personal knowledge
22  of the selectee and did not recuse themselves from the

Page 19

1  panel, while the non-status applicants, of which I was
2  one, were rated by one GS-12 personnel specialist, which I
3  believe, was an intentional screening process.
4    I was treated differently when management wrote
5  KSA's to fit the strength and weaknesses of the
6  pre-selected candidate, Ms. Marshall, who was actually
7  hired for the position. Again, that's a screening process
8  barrier.
9    I was treated differently when the selecting
10  officials added critical elements that were not part of
11  the vacancy to their selection criteria. I was treated
12  differently when management selected five applicants to be
13  interviewed based on the additional critical elements they
14  imposed effectively screening me out.
15    The National Capitol Region treated me
16  differently when Ms. Marshall -- when they -- let me start
17  again. The National Capitol Region treated me differently
18  when they did not follow the rule of three during the
19  interviewing process and that rule of three is that
20  basically if one applicant is interviewed, then they all
21  should be. They interviewed Ms. Marshall but they didn't
22  interview me.

Page 20

1    NCR treated me differently when of the 50
2  qualified applicants, eleven of whom were non-status
3  applicants, selected only five park service employees from
4  39 merit status applicants to be interviewed of which
5  Ms. Marshall was one. NCR treated me differently when
6  management made their selection from an expired selection
7  certificate which is in violation of the merit promotion
8  policy. And I believe they treated me differently because
9  I'm over 50 years of age, older than the selectee and
10  subject to completion of discovery, there may be other
11  ways that I was treated differently.
12    Q.  I'm going to ask you some questions on what you
13  have just said.
14    A.  Sure.
15    Q.  Concerning your allegation that management chose
16  to ignore the February 1999 Robert Stanton memo --
17    A.  Are you looking for the Stanton memo?
18    Q.  Yes.
19    A.  It's under Exhibit 2, page 40.
20    Q.  Thank you. Concerning the Robert Stanton memo,
21  is it your allegation that this memo specifically
22  encouraged the Agency to hire minorities?

5 (Pages 17 to 20)

Sandra Aguilar                          vs.                    Department of Interior
Deposition of Sandra Aguilar                                  Thursday, October 21, 2004

---

Page 21

1    A.  It encourages them to open the process so that
2  minorities have an equal opportunity to compete for
3  positions at upper management levels.
4    Q.  Concerning the vacancy announcement for this
5  administrative officer position, was that done?
6    A.  Initially it was not done, but based on this
7  memo after it was brought to their attention and after
8  they received my application, they opted to follow the
9  criteria of this memo which was to open the vacancy to all
10 sources.  They extended the closing date for two weeks and
11 they changed the GS-15 grade level to multilevel to
12 include GS-14, 15s.
13   Q.  What harm do you allege you suffered as a result
14 of change the Agency made in the vacancy announcement?
15   A.  Well, the harm is that -- first of all, if I
16 hadn't sent in my application, they never would have
17 changed the vacancy announcement.  Secondly, because they
18 didn't follow their own policy and procedures initially,
19 it was a blatant disregard for rules and regulations
20 within the department itself, within the Agency.
21        Mr. Carlstrom knew about this memo.  He was part
22 of the leadership counsel that developed this memo.  He

---

Page 22

1  was given the memo to distribute amongst his staff.  So
2  everyone there in that regional office should have known
3  about it.  If they didn't, they should have.  And in
4  addition to that, extending -- let me back up and think
5  through this here.  Your question again was what harm --
6    Q.  Yes.
7    A.  -- was do done to me because of this?
8    Q.  Can I clarify?  What harm do you allege occurred
9  as a result of the Agency amending the vacancy
10 announcement?
11   A.  From that point on after they amended it -- I
12 need to think more on that.  I'll come back to it.  I do
13 have a point.  I'm just not pulling it forward at the
14 moment.
15   Q.  Were you able to have your application
16 considered for the position as an administrative officer?
17   A.  Yes, they did accept my application.
18   Q.  I have a question about a statement that you
19 made concerning the screening process.  You allege that
20 there was discrimination as to how the screening process
21 was conducted, was that your testimony?
22   A.  Which screening process?

---

Page 23

1    Q.  I'm going on the note that I wrote down while
2  you were indicating what you believed were the reasons for
3  why the Agency supposedly discriminated against you.  And
4  the words that I did capture indicated that you mentioned
5  that you were discriminated as a result of the Agency's
6  screening process.
7    A.  First of all, when they didn't initially follow
8  the Stanton memo, that in itself was a screening process,
9  because that limited the pool of applicants to only
10 interior employees who can apply and by doing that
11 effectively reduces the number of applicants who would
12 apply for that position.
13        The second screening process that I'm indicating
14 is that the rating and ranking process was a screening
15 process, in that non-status applicants were rated by one
16 GS-12 personnel.  The merit promotion status applicants
17 were rated and ranked by three GS-15 panel members.  By
18 them rating -- by non-status applicants being allowed to
19 be rated by three GS-15 panels, gave those applicants the
20 opportunity to score far better than the applicants who
21 were rated by only one GS-13 -- excuse me, one GS-12 whose
22 never held the position of a GS-15, who isn't familiar

---

Page 24

1  with all of the responsibilities and requirements for that
2  position, the knowledge, the experience, et cetera;
3  therefore because that individual doesn't have that
4  experience to draw from, can't effectively rate and rank
5  GS-14 and GS-15 applicants from outside of government as
6  effectively as the three GS-15 park manager specialists
7  that were there.
8    Q.  Do you know the name of the person who rated and
9  ranked the non-status applicants?
10   A.  That was Joyce Sasser.
11   Q.  Were you in fact rated and ranked by Ms. Joyce
12 Sasser?
13   A.  Yes, I was.
14   Q.  Do you recall the number that was assigned, the
15 numerical score that was assigned to you?
16   A.  I was given a score of 97 out of 100.
17   Q.  And that information is contained in the Report
18 of Investigation?
19   A.  Yes, ma'am, it is.
20   Q.  Concerning another reason that you gave about
21 alleging that you were discriminated against, you
22 indicated that there were critical elements that were

---

6 (Pages 21 to 24)

Sandra Aguilar                                    vs.                    Department of Interior
Deposition of Sandra Aguilar                                            Thursday, October 21, 2004

Page 53

1   A. Yes.
2   Q. I have a question about the interview process.
3   Are you alleging that you were discriminated against on
4   the basis of race, national origin and age when you were
5   not interviewed for the position of administrative
6   officer?
7   A. Yes, but I'd like to clarify something that you
8   asked me previously about the interviewing process
9   referring back to the rule of three. The rule of three
10   actually applies to veterans. What I meant to refer to
11   was that in the Department of Interior's policy governing
12   interviewing, they state that if one is interviewed all
13   should be interviewed.
14   Q. Just to clarify, if one is interviewed, is it a
15   particular type of candidate that's interviewed?
16   A. No, just if the selecting official opts to
17   interview one person, then all should be interviewed.
18   Q. Just to clarify, you previously mentioned the
19   rule of three applies to veterans?
20   A. Yes.
21   Q. Are you saying that the rule is that if one
22   veteran is interviewed, then all of the people on that

Page 54

1   cert have to be interviewed? I'm trying to clarify.
2   A. I have in here one of the exhibits, the actual
3   log, dictating the rule of three for veterans.
4   Q. Does the rule of three apply to non-veterans?
5   A. No, however, as I mentioned before, that ROI
6   policy and PS policy indicates that if a selecting
7   official is interviewing one person from a certificate of
8   application -- from one certificate, then all individuals
9   should be interviewed. I have as an insert under
10   Mr. Carlstrom's -- under my rebuttals for Mr. Carlstrom,
11   it's indicated as item K in the rebuttals. It's the Vet
12   Guide which is OPM, Office of Personnel Management's
13   Veterans Guide, in Rules and Regulations dealing with
14   veterans in the selection process.
15   Q. Yes, I see that. To continue the question that
16   I asked you, are you alleging that you were discriminated
17   against on the basis of race, national, origin and age
18   when you were not interviewed for the position of
19   administrative officer?
20   A. Yes.
21   Q. What are your reasons for alleging that?
22   A. Well, because I was screened out of the

Page 55

1   process. Because the selecting officials chose five
2   candidates with this selection criteria that was not part
3   of the KSA or part of the vacancy announcement, they
4   selected five individuals to interview that were merit
5   promotion status applicants, and those five applicants,
6   those five applicants that they chose to interview were
7   all Park Service employees with Park Service knowledge and
8   experience and only one of those individuals met every bit
9   of criteria that they had imposed and that was Dottie
10   Marshall. Those individuals on the non-status certificate
11   whether they were GS-14s or 15s did not get selected for
12   interviews. That's a screening process. They chose not
13   to deal with anybody on those lists because they had
14   already predetermined who they wanted and how they were
15   going to get to that person.
16   Q. Are you alleging that the pool of applicants the
17   Agency considered for the administrative officer position
18   was not diverse?
19   A. It was not diverse.
20   Q. What are your reasons for alleging that?
21   A. Well, the department gears all of its numbers as
22   far as diversity is concerned toward the comparison of the

Page 56

1   CLF.
2   Q. Could you spell that out for the record.
3   A. It's the Civilian Labor Force. The selecting
4   official chose five individuals to interview. They chose
5   a white woman, two white men -- let me go back and start
6   again. A white woman, GS-14, who was on the GS-15
7   promotion list; a white male, I believe is a GS-14; a
8   white male who was a GS-15 listed on the noncompetitive
9   list; a black male, GS-14 -- or GS-13 on the GS-14
10   promotion list, and another male who they have determined
11   -- and I don't know what proof they have -- but they have
12   determined is a Hispanic male.
13   Given the number of applicants, there were about
14   75 applicants that applied for the position, there is no
15   indication of what the makeup of this applicant pool was.
16   Of the 75, 50 applicants qualified for the position.
17   There is no indication of the makeup of that applicant
18   pool of qualified candidates. Of the individuals that
19   went forward for interview, one black, one Hispanic, and
20   one white woman, is not a diverse pool.
21   First of all, the white Caucasian woman in this
22   instance would not be considered a minority. Because NPS

14 (Pages 53 to 56)

Case 1:07-cv-00546-RMU    Document 17-13    Filed 08/22/2008    Page 7 of 8

Sandra Aguilar                                                          Department of Interior
Deposition of Sandra Aguilar                    vs.               Thursday, October 21, 2004

Page 97

1     MS. LESLIE: One moment just off the record.
2              EXAMINATION
3     BY MR. RISELLI:
4     Q.  Ms. Aguilar, when you served as the deputy
5  director for operations at HHS, I'm not sure you indicated
6  exactly what period of time.  What was that, when to when?
7     A.  I can't recall the exact date, but I will say
8  approximately from May 1997 to January 2001.
9     Q.  Is that in your application that you submitted?
10    A.  Yes, it is.
11    Q.  How many people did you supervise in that job?
12    A.  Directly?
13    Q.  Directly or indirectly.
14    A.  Well, there were about 72 and that doesn't
15  really count the interns that we have.  72, meaning both
16  professional and support staff, most of the staff were
17  professional staff.
18    Q.  So when you were in that position, you were
19  serving at the GS-15 level?
20    A.  As the deputy director, yes, GS-15.
21    Q.  Did you receive a rating?
22    A.  Yes, I submitted that rating with the ROI.

Page 98

1     Q.  What was your rating?
2     A.  My rating was outstanding.
3     MR. RISELLI: Nothing further.
4     MS. LESLIE: Okay.  At this time we're both
5  aware that we do have a pending motion that we're asking
6  for some guidance from Judge Henry on.  That could
7  determine whether or not the Agency would make it known
8  that it needs to call you back to continue this
9  deposition.
10    THE WITNESS: Okay.
11    MS. LESLIE: So I will not say that the
12  deposition has finished, but in terms of it being complete
13  for today I'll just make it a note for the record that
14  this will conclude my questions for you today.
15    MR. RISELLI: Okay.  I would just note that the
16  pending motion relates to a totally different witness,
17  Dianne Spriggs, and has nothing to do with Ms. Aguilar.
18  But I understand what you are saying, and, you know, we'll
19  deal with the issue if it comes up later.
20    MS. LESLIE: That's appropriate and we'll make a
21  note of that for the record.
22    MR. RISELLI: And the complainant is going

Page 99

1  reserve her right to read and review the transcript.
2     MS. LESLIE: No further questions for today.
3     (Reading and signature not waived.)
4     (Whereupon, the proceedings at or about 12:44
5  p.m. were adjourned.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 100

1  DISTRICT OF COLUMBIA:
2     I, Lanieda Briggs, Certified Shorthand Reporter
3  before whom the foregoing deposition was taken, do hereby
4  certify that the within-named witness personally appeared
5  before me at the time and place herein set out, and after
6  having been duly sworn by me, according to law, was
7  examined by counsel.
8     I further certify that the examination was
9  recorded stenographically by me and this transcript is a
10  true record of the proceedings.
11    I further certify that I am not of counsel to
12  any party, nor an employee of counsel, nor related to any
13  party nor in any way interested in the outcome of this
14  action.
15    IN WITNESS WHEREOF, I have hereunto set my hand
16  and affixed my notarial seal this       day of
17           , 2004.
18
19
20       LANIEDA BRIGGS, CSR
21           NOTARY PUBLIC
22  MY COMMISSION EXPIRES:  5/31/2009

25 (Pages 97 to 100)

Sandra Aguilar
Deposition of Sandra Aguilar

vs.

Department of Interior
Thursday, October 21, 2004

---

**Page 101**

1     S T I P U L A T I O N S
2         It is hereby stipulated and agreed by and
3     between counsel for the respective parties that the
4     reading, filing, signing and notarization of the
5     deposition is waived.
6         It is further stipulated and agreed that all
7     objections, except as to form, and motions to strike are
8     reserved until the time of trial.
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**Page 102**

1     IT IS HEREBY STIPULATED AND AGREED by and between the
2     attorneys hereto as follows:
3
4         1. That the following testimony, when transcribed,
5     may be sworn to before any Notary Public of the State of,
6     and may be used with the same force and effect as though
7     sworn to in open Court at the time of Trial.
8
9         2. That the filing of the original transcript shall
10    be not waived.
11
12        3. That all objections, except as to form of the
13    question, shall be reserved for determination by the Trial
14    Court.
15
16
17
18
19
20
21
22

---

**Page 103**

1     CERTIFICATE OF DEPONENT
2         I hereby certify that I have read and examined
3     the foregoing transcript, and the same is
4     a true and accurate record of the testimony given
5     by me.
6         Any additions or corrections that I feel
7     are necessary, I will attach on a separate sheet of paper
8     to the original transcript.
9
10
11             SANDRA L. AGUILAR
12        I hereby certify that the individual
13    representing himself/herself to be the above-named
14    individual, appeared before me this
15            day of            , 2004, and
16    executed the above certificate in my presence.
17
18
19             NOTARY PUBLIC IN AND FOR
20
21    MY COMMISSION EXPIRES:
22

---

**Page 104**

1     WITNESS: SANDRA L. AGUILAR
2     DATE:
3     CASE:    SANDRA L. AGUILAR vs. DEPARTMENT OF INTERIOR
4     Please note any errors and the corrections thereof
5     on this errata sheet.  Do not write on the
6     transcript.  The Rules require a reason for any
7     change or correction.  It may be general, such as
8     "To correct stenographic error," or "To clarify the
9     record," or "To conform with the facts."
10    PAGE LINE    CORRECTION    REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20
21
22

---

26 (Pages 101 to 104)

# EXHIBIT 12

U.S. DEPARTMENT OF THE INTERIOR

+ + + + +

THE NATIONAL PARK SERVICE

+ + + + +

EEO INVESTIGATION

------------------------------------X
THE COMPLAINT OF: SANDRA L. AGUILAR  : Docket Number
                                     : FNP-2003-064
------------------------------------X

LOCATION:  National Park Service
           National Capital Region
           Park Police Headquarters
           1100 Ohio Drive, S.W.
           Washington, D.C.

DATE:  Friday, August 15, 2003

INTERVIEW OF:  SANDRA L. AGUILAR

INVESTIGATOR:  CARL BRADLEY, JR.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

Exhibit 5

---

**2**

1           P R O C E E D I N G S

2                                    12:41 p.m.

3           INVESTIGATOR BRADLEY:  My name is Carl

4    Bradley, Jr.  I'm an EEO investigator.  I have been

5    assigned to investigate a formal complaint of

6    discrimination filed against the National Park Service

7    by Ms. Sandra L. Aguilar, Docket Number FNP-2003-064.

8           The following claim has been accepted for

9    investigation.

10          Complainant alleges discrimination based on

11   race, parentheses, (Hispanic), close parentheses,

12   national origin, parentheses, (Mexican American), close

13   parentheses, and age, parentheses, (52), when you were

14   not selected for the position of administrative officer

15   GS-341-15, comma, advertised under Vacancy Announcement

16   Number NPS-NCR-03-19.  This -- you became aware of your

17   non-selection on or about July 7, 2003.

18          I am required to solicit sworn testimony from

19   those persons with knowledge or information pertaining

20   to the claim that has been accepted for investigation.

21          Inasmuch as this is sworn testimony, I am

22   required to administer an oath.

23          Do you have any conscientious objection to

24   being placed under oath?

25          MS. AGUILAR:  No.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

**3**

1           INVESTIGATOR BRADLEY:  Would you raise your

2    right hand, please?

3    Whereupon,

4                    SANDRA L. AGUILAR

5    having been first duly sworn, was called as a witness

6    herein and was examined and testified as follows:

7           INVESTIGATOR BRADLEY:  Off record.

8           (Pause)

9                       EXAMINATION

10   BY INVESTIGATOR BRADLEY:

11   Q     What is your full name?

12   A     My name is Sandra Lee Aguilar.

13   Q     Could you spell your name, please?

14   A     Last name?

15   Q     First name as well.

16   A     First name Sandra, S-A-N-D-R-A.  Lee, L-E-E-.

17   Last name is Aguilar, A-G as in "girl"-U-I-L-A-R.

18   Q     What is your current address?

19   A     My current address is 2338 Tawny Drive --

20   Tawny, T-A-W-N-Y, Drive -- Waldorf, Maryland 200 --

21   20601.

22   Q     Okay.  Are you currently employed with the

23   federal government?

24   A     No.

25   Q     Inasmuch as this complaint is filed on the

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

**4**

1    bases of race, national origin, and age, I am required

2    to identify each witness according to the bases of this

3    complaint.

4           What is your race?

5    A     Hispanic.

6    Q     What is your national origin?

7    A     Mexican American.

8    Q     What is your date of birth?

9    A     [          ]  And may I make a minor correction?

10   In the items that you read under bases of

11   discrimination, the age is listed at 52.  It should

12   read as 51.

13   Q     Okay.  (Pause)  When did you apply for the

14   position of administrative officer GS-341-15?

15   A     I sent in my application I believe it was --

16   it should have been received on March 27th, 2003, and

17   I'll double check that real quick.  (Pause)  Yes, it's

18   dated March 26, 2003, and it was sent Federal Express

19   overnight.

20   Q     Under which vacancy announcement was the

21   position in question advertised?

22   A     Under the first vacancy announcement dated

23   March 10 to March 31st, 2003.

24   Q     What's the vacancy announcement number?

25   A     The vacancy announcement number is NPS-NCR-

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

5

```
03-19.
```

1   03-19.

2   Q    What were the opening and closing dates for

3   the announcement in question?

4   A    Opening date was March 10, 2003.  Closing

5   date was March 31st, 2003.

6   Q    Where was the vacancy in question located?

7   A    The vacancy announcement was located on the

8   USA Jobs website on the -- and Office of the Interior

9   website.

10  Q    Where was the position in question located?

11  A    Oh, I'm sorry, I'm sorry.  I misunderstood.

12  It's within the National Park Service, National Region

13  -- National Capital Region.

14  Q    Was it --

15  A    It --

16  Q    -- from a particular office within the

17  National Capital Region?

18  A    It was in the Office of -- of Administration.

19  The position was actually to fill the associate --

20  associate regional director's job.

21  Q    What was the area of consideration for the

22  vacancy announcement?

23  A    The area of consideration on the first

24  vacancy was current career or career conditional

25  employees only of the Department of Interior.

6

1   Q    Was the vacancy announcement subsequently

2   amended?

3   A    It was amended.  The amended date -- the

4   amendment is showing an opening date of March 10 and a

5   closing date of April 14.  The date of the -- the date

6   the application was published --

7   Q    The application or the announcement?

8   A    Oh, I mean the vacancy announcement was

9   published -- (Pause).

10          INVESTIGATOR BRADLEY:  Off record.

11          (Pause)

12          BY INVESTIGATOR BRADLEY:

13  Q    Back on record.

14  A    The date the second announcement was

15  published was March 31st, 2003.

16  Q    How was the announcement amended?

17  A    It was amended to read the -- the area of

18  consideration was amended to read -- it was amended --

19  it amends that the grade of the position to the -- to

20  GS-14-15 whereas before it was just a 15.  The salary

21  range -- for the salary range.  The area of

22  consideration went to all sources.  The qualifications

23  -- for the qualifications and extended the closing date

24  to April 10.  Excuse me, April 14.

25  Q    What did you submit in consideration for the

7

1   position in question?

2   A    I submitted a full application that included

3   a cover letter, the -- the -- and addressed to all KSAs

4   as outlined in the vacancy announcement, my last

5   evaluation, my SF-50, my last SF-50, the -- the form of

6   self-identification, and my SF-171.

7   Q    Okay.  Were you a federal employee at the

8   time of your consideration for the position in

9   question?

10  A    No, I was not.

11  Q    Did you apply under the original or the

12  amended vacancy announcement?

13  A    I applied -- I applied under the original

14  vacancy announcement.

15  Q    Did you have prior federal status?

16  A    I did.

17  Q    Could you elaborate?

18  A    I had worked for the Clinton Administration

19  from 1994 to 2001.  I had taken a two-and-a-half year

20  hiatus and was looking for another position in federal

21  government when I applied for this position.

22  Q    At which grade level did you apply?

23  A    At the GS-15.

24  Q    How many certificates of eligibles were

25  issued?  Do you know?

8

1   A    I don't.

2   Q    Did your name appear on any of the

3   certificates of eligibles?

4   A    I was told that my name appeared on the

5   certificate of eligibility for non-competitive status.

6   Q    At what grade level?

7   A    At a 15.

8   Q    Were you assigned a rating score?

9   A    I believe I was.  The rating score that was

10  submitted to me was 97 out of a possible 100.

11  Q    Do you recall or are you aware where you

12  ranked on the non-competitive -- on the non-status

13  certificate?

14  A    No.  Not -- let me amend that.  I -- I don't

15  know for certain.  I haven't actually seen where I

16  ranked.  I believe that I was -- that there were others

17  who ranked higher than me on my -- on the same cert

18  that I appeared.

19          INVESTIGATOR BRADLEY:  Off record.

20          (Pause)

21          BY INVESTIGATOR BRADLEY:

22  Q    Having provided you with a copy of the

23  certificate of eligibles for non-status applicants.

24  A    The certificate is showing that I ranked

25  sixth on the list, the sixth.

17

```
 1    candidate was age 40 and over?
 2        A    I don't know.
 3        Q    Do you have any direct knowledge of the
 4    qualifications of the selected candidate?
 5        A    No, I don't, other than -- other than her --
 6    other than knowing that the position she held allowed
 7    her to build on skills and abilities and gain knowledge
 8    as a management -- a manager at that level.
 9        Q    Do you know whether the selected candidate
10    applied under the original announcement or under the
11    amended announcement?
12        A    I -- I was told she applied under the
13    original announcement.
14        Q    Why do you believe the selected candidate
15    was, quote, "tagged," unquote for selection for the
16    position in question?
17        A    When I had asked my husband to get a copy of
18    the vacancy announcement for me -- I had also
19    downloaded a copy on my computer but asked him to get
20    me a copy from his office -- he did point out to me
21    that the position was not all sources.  And I said I --
22    I understood that, I know that.  And he said -- and I
23    said, and the date is also a very short time line.  And
24    I asked if the position was -- was already determined
25    for somebody else.
```

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

18

```
 1        Q    When you say a short time, you mean the
 2    opening and closing dates?
 3        A    Opening and closing dates, yes.
 4        Q    Okay.
 5        A    And he said, yes, rumor has it that the
 6    position -- that the person who's going to fill that
 7    position was already determined before the vacancy
 8    announcement was announced.
 9        Q    Do you have any fact to substantiate that
10    rumor?
11        A    I don't have fact to -- to substantiate it.
12    It just was -- it seemed very clear that -- that I was
13    -- that at the very beginning I was not going to get
14    the position.
15        Q    Do you know what the selected candidate's
16    grade level was at the time the selected candidate
17    applied for the position in question?
18        A    No, I don't.
19        Q    Did you have any discussion with management
20    regarding your non-selection for the position in
21    question?
22        A    Management meaning?
23        Q    The individuals who were responsible for
24    making the selection.
25        A    For making the selection, no.
```

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

19

```
 1        Q    Are there any other comments or questions
 2    that you would like to make regarding the claim that
 3    has been accepted for investigation?
 4        A    I did monitor the process.  When I say
 5    "monitor," I monitored my application status on a
 6    regular basis.
 7        Q    Could you elaborate?
 8        A    Well, I -- I called -- I called several times
 9    because I hadn't heard anything for quite a while.  I
10    -- the first time I called was to see if my
11    application had been received.  The second time I
12    called, I called when I learned that the vacancy
13    announcement was amended and I was concerned about my
14    initial application.
15        Q    In what regard?
16        A    In what regard, well, I didn't know if my
17    initial application was disregarded or if I would have
18    to reapply under the original vacancy announcement.
19        Q    Did the -- the vacancy announcement -- did
20    the amended announcement state or make any reference to
21    those persons who applied under the original
22    announcement need not reapply for the position in
23    question?
24        A    At the time that I made the call, I had not
25    seen the second vacancy announcement.  I was told that
```

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

20

```
 1    a second vacancy announcement had come out, so I called
 2    to verify that a second vacancy announcement was sent
 3    out.  I was told that it was amended and the time line
 4    for closing was extended and that I did not have to
 5    reapply, that my original application would be still
 6    considered under the second vacancy announcement.
 7        Q    Excuse me.  Do you have any reason to believe
 8    the announcement was amended to influence consideration
 9    of the candidate who was subsequently selected for the
10    position in question?
11        A    No, I think the vacancy announcement was
12    amended not to influence that selection but to prevent
13    management from being challenged because of the non --
14    of the non-status candidates -- of their acceptance of
15    a -- because of their acceptance of a non-status
16    candidate's application under the first vacancy
17    announcement.
18        Q    Under the -- did you raise any concerns or
19    express any concerns to management when the
20    announcement was first advertised about the exclusion
21    of non-status applicants --
22        A    No.
23        Q    -- in the area of consideration?
24        A    No, I did not.  No, I -- I submitted it
25    believing they were not going to accept my application
```

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

21

1  because they had narrowed the field so -- so narrowly
2  and that -- that even though the -- this policy was in
3  place they clearly were not going to give any credence
4  to the policy.
5       The -- I feel that it's very curious that the
6  amended -- the amended vacancy announcement was not
7  published until March 31st, which was after I'd
8  submitted my application.
9       Q    Did the amended announcement affect your
10  consideration for the position in question in any way
11  other than allowed you to be included for
12  consideration?
13       A    Yeah.  I was prepared to resubmit a new
14  application.  If -- if my original application had not
15  been accepted under either vacancy announcement, I
16  would have -- I would have resubmitted a new
17  application.
18       Q    So, if I understand you correctly, you
19  submitted your announcement under the -- you submitted
20  your application under the initial announcement even
21  though the announcement specifically indicated that the
22  area of consideration was limited to current federal
23  employees?
24       A    Right, because I knew that -- that the policy
25  that stands in place was supposed to make sure that any

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

22

1  vacancy announcement was to go all sources.
2       Q    Did you express any --
3       A    So --
4       Q    -- concern to management at the time you
5  applied for the position in question that there are
6  regulations that state that positions or vacancies at
7  grade level GS-13 or above should be open and announced
8  available for -- to all sources?
9       A    No.  I -- I had -- I wasn't plan -- I hadn't
10  planned at that point in time of submission to -- to
11  make a call and -- and -- and discuss that with
12  management.  I did, however, plan to do it had I been
13  rejected.  Had my application been rejected I would
14  have then called and stated that -- that under current
15  policy I should be considered for the position.
16       Q    Once the vacancy announcement was amended to
17  include the applicants from all sources, did you submit
18  an amended application or would your application have
19  been different?
20       A    No, it would have been exactly the same.
21       Q    Okay.  Are there any other comments that you
22  would like to make on the record regarding the
23  selection process for the position in question?
24       A    Yes.  I -- I'm very disturbed -- I've been a --
25  I've been a manager and I've been a member of selection

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

23

1  panels and I've been a selecting official and -- and
2  I've gone the whole gamut of -- of writing position
3  descriptions, of -- of finding FTEs and to fill
4  position descriptions with -- with -- with viable
5  individuals.  I have written KSAs and I have had my
6  previous administrative officers publish vacancy
7  announcements.
8       And when those applicants come in, I've been
9  very careful in the past to make sure that once the
10  initial screening of applicants was done to determine
11  who qualified and who didn't qualify that when the cert
12  lists were moved forward to my attention that a panel
13  reviewed all applications equally and gave every
14  applicant equal consideration their professional
15  merits.
16       Q    How -- I'm sorry.
17       A    This -- this particular process, I was told,
18  was different than that.  The -- the -- an
19  administrative assistant ranked and rated non-
20  competitive status applicants whereas the merit status
21  applicants were given the benefit of a full panel
22  review.
23       Q    You said non-competitive status applicants.
24  There's a difference between status applicants and --
25  and non-status applicants, and there's also a category

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

24

1  of non-competitive status applicants.
2       A    Mm-hmm.  Okay.
3       Q    You would have been -- applied as a non-
4  status --
5       A    I mean, I -- non-status.
6       Q    Did you have reinstatement eligibility?
7       A    No, I did not.
8       Q    Okay.  So you would have been considered --
9  you would not have been considered a non-competitive
10  status applicant?
11       A    Right.  I would have been considered non-
12  competitive.
13       Q    So, what difference in the selection process
14  are you raising with respect to non-status eligibles as
15  opposed to competitive and non-status competitive
16  eligibles?
17       A    The fact that they were treated differently
18  in the evaluation process.  The list that I -- the cert
19  list that I was on was not given the benefit of a full
20  panel peer review whereas those on the other list were.
21       Q    Are you aware if there are specific
22  regulations with respect to the screening and rating of
23  non-status applicants, also referred to under the
24  delegated examining unit, as opposed to those who are
25  status applicants?

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

25

1    A    That -- there are -- in fact, there's --
2    there's a lot of legal room there for managers to -- to
3    -- to utilize to -- a lot of -- how can I put this?
4    There is -- there's some pretty soft areas in policy
5    and law whereby the managers can -- can choose to
6    select applicants from --
7        Q    Any certificate.
8        A    -- any certificate.  My -- my concern is that
9    -- that everyone that was sent forward was not given a
10    fair and equal review.
11        Q    How -- it was fair -- unequal in what
12    respect?
13        A    Okay.  In a panel of peers who review
14    applications, they are normally professional staff at a
15    GS-13, 14, or 15 level, people who are very familiar
16    with the position who know what the qualification --
17    what kind of qualifications it takes to fill that kind
18    of position.  An individual at a GS-7, 8, 9, and even
19    10 level who ranks and rates an individual does not
20    necessarily know all of the needs and -- and skills
21    required to fill an upper level management position.
22        So my point is, an administrative staffer
23    reviewed and evaluated and ranked my application.  That
24    was fine for an initial process and that went forward
25    on the certificate list.  However, so did the same for

26

1    the merit status individuals.
2        The difference is that from that point, the
3    merit status candidates were then given a panel review
4    of their peers.  The certificate list that I was, was
5    just left there for consideration only by the regional
6    director.
7        Q    Were you the highest-ranked -- applicant on
8    the non-status certificate of eligibles?
9        A    No, I was not.  I was sixth-ranked, but I
10    believe that several individuals who ranked above me
11    were all military and were given point preferences.
12    And I believe that without the point preference I would
13    have been the highest rated candidate.
14        Q    Well, do you know there's a requirement that
15    those applicants who receive -- have veterans
16    preference, they have to be given consideration before
17    any non-veterans applicants?
18        A    Oh, absolutely.  And the -- and the law
19    states very clearly how -- how they can get preference
20    points depending on the war campaign that they were in
21    and what -- and given years that they had served and
22    received veteran status and whether or not they have
23    any type of disability.  And the point preference on
24    the 30 percent disability is 10 -- 10 points and on
25    just a general veterans status it's five points.  I

27

1    understand that very clearly.
2        However, these individuals on the same list
3    -- list that I appeared did not get the benefit of an
4    interview or a peer review panel, either.  And -- and I
5    believe that -- that the veterans on this list just
6    gave a greater excuse to management to avoid anyone --
7        Q    If --
8        A    -- that appeared on this list for -- as -- as
9    an eligible.
10        Q    If management chose to make a selection from
11    the non-status certificate of eligibles, how would you
12    have been able to be selected if there were applicants
13    who were -- who had veterans preference who were ranked
14    higher than you?
15        A    If a veteran had been selected, I would have
16    asked, how did that veteran qualify?  And if that
17    veteran met all of the qualifications under the law, it
18    would have -- I would accept that applicant to be more
19    acceptable to management than me, given that person's
20    qualifications and the veteran status points that that
21    person received.
22        However, if anyone on this list were
23    interviewed and not selected for the position,
24    including the -- well, and including the veterans, I
25    then have to ask, given the interviews and the non-

28

1    selection, what waiver did they ask of OPM to exclude
2    the selection of one of five veterans?
3        Q    Do you know -- you mentioned earlier that the
4    applicants whose names appeared on the competitive and
5    non-competitive certificate of eligibles.  Are you
6    aware if scores assigned to those applicants, if those
7    scores appeared on the certificate?
8        A    I haven't seen the certificate, so I -- I
9    couldn't tell you.  (Pause)  I don't see a score.  All
10    I see is --
11        Q    Usually on competitive and non-competitive
12    status certificate of eligibles, names are either
13    listed alphabetically and they don't contain a rating
14    or a score.
15        A    Mm-hmm.
16        Q    Is it your contention that you felt that a --
17    you believe that a rating panel should have reviewed
18    and rated the qualifications of both the status and
19    non-status --
20        A    Yes.
21        Q    -- applicants?
22        A    Of everyone equally, absolutely.  And I feel
23    that had -- had -- had my -- had -- had the individuals
24    on the certificate that I appeared on been paneled, I
25    truly don't believe -- and this is not taking anything

33

1    Q    Those individuals who are GS-13, if they were
2  qualified for competitive status, then their names
3  would appear on a GS-14 certificate.
4    A    Fourteen for eligibles, yes.
5    Q    So there wouldn't be a GS-13 certificate of
6  eligibles because --
7    A    Okay.  All right.  You're -- you're
8  absolutely right.
9    Q    -- the position was advertised at that grade
10  level.
11    A    That's right.  You're absolutely right.
12    Q    Okay.  But like I said, I will request copies
13  of all of the certificate of eligibles that were used
14  for the position in question.  And if I understand you
15  correctly, you say that there was one applicant who was
16  one applicant who was a GS-13 at the time whose name
17  should have appeared on the -- either the GS-14
18  competitive or the -- on the GS-14 competitive status
19  certificate?
20    A    It did because he was interviewed.
21    Q    Okay.  Was there anyone whose name appeared
22  on the -- either the GS-14 or the GS-15 non-status
23  certificate of eligibles?  Do you know if any of those
24  applicants were interviewed?
25    A    I -- I don't know.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

34

1    Q    Okay.  Well, I certainly will inquire that of
2  -- that from the selecting officials when I interview
3  them next week.
4    Okay.  Are there any other questions or
5  comments you'd like to make on record at this point?
6    A    No.
7    INVESTIGATOR BRADLEY:  Your testimony will be
8  reduced to a typewritten transcript.  You will be
9  provided with an original and a copy of the
10  transcripts.  The copy is for your personal records,
11  but please do not discuss or disclose any information
12  contained therein.
13    Please read through the original transcript.
14  Make whatever changes or amendments you deem
15  necessary.  However, I ask that you make any and all
16  such corrections on the errata sheet which appears at
17  the end of the transcript.
18    THE WITNESS:  Okay.
19    INVESTIGATOR BRADLEY:  Simply refer to the
20  page and line of the text that you wish to amend.  And
21  return the signed original transcript to me within
22  three days after you receive it.
23    Again, I will then interview the witnesses
24  who were responsible for making the selection for the
25  position in question.  I will also interview an

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

35

1  individual from Personnel to get clarification of the
2  agency's guidelines with respect to the selection
3  process used for the position in question.
4    I will provide you with a copy of the
5  testimony of both Mr. Lawler and Mr. Carlstrom and
6  afford you an opportunity to rebut management's
7  articulation of the reason for making the selection.
8    In addition, with those statements, I also
9  indicated that I've requested some documents from
10  Personnel, and that information will be included in the
11  report of investigation, a copy of which will be
12  provided to you by the National Park Service EEO
13  Office.  And at that time, they will afford you the
14  option of requesting a hearing with an administrative
15  law judge at the Equal Employment Opportunity
16  Commission, whose decision is binding, or the right to
17  request a final agency decision from the agency.
18    If there are no further comments, this
19  concludes this interview, and I appreciate your
20  cooperation with the investigation of this complaint.
21    Off record.
22    (Whereupon, at 1:32 p.m., the proceedings
23  were concluded.)
24

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

36

REPORTER'S CERTIFICATE

1
2
3    This  is  to  certify  that  the  attached
4  proceedings before:
5
6    NATIONAL PARK SERVICE
7  In the Matter of:
8    THE COMPLAINT OF : SANDRA L. AGUILAR
9  were held as herein appears and that this is the
10  original  transcript  thereof  for  the  file  of  the
11  Department, Commission, Board, Administrative Law Judge
12  or the Agency.
13    Further, I am neither counsel for or related
14  to any party to the above proceedings.
15
16
17    *Peggy Daniely*
18    Official Reporter
19
20  Dated:    AUGUST 19, 2003

EXECUTIVE COURT REPORTERS, INC.
301-565-0064                              36

38

## SIGNATURE OF WITNESS

I have read the foregoing transcript of my verbatim deposition consisting of 36 pages, taken on the 15ᵗʰ day of August, 2003, and is a true and accurate record of my testimony except as to any corrections I have attached hereto.

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 6 | 3 | It was amended. The amendment -- the |
| 6 | 18 | consideration was amended to read all sources -- it was amended-- |
| 6 | 19 | it amends that the grade of the position was changed to -- to |
| 6 | 21 | range was changed for the salary to reflect the grade range. The area of |
| 6 | 23 | -- for the qualifications there was no change but it was extended the closing date was extended |
| 7 | 3 | a cover letter, and a response to each of the KSAs |
| 9 | 17 | I called the National Capital Region's Administration Office on Monday, July 7, 2003, and asked if anyone had been hired for the position. I was told someone had been hired. The name of the person hired is Dottie Marshall and that letters would be going out that week and that they still had to be typed up. I asked about the date Ms. Marshall. The woman I spoke to did not know the date and would have to ask her supervisor. I received written notice on July 13, the letter was dated July 9ᵗʰ and the postmark on the envelop is dated July 10ᵗʰ. |
| 9 | 24 | I was told that it would be the regional |

39

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 9 | 25 | director Terry Carlstom. He was the selecting official |
| 10 | 9 | from the merit status list. |
| 11 | 4 | of a deputy park manager at a GS-14 |
| 11 | 12 | previous job, I did that job extremely well, and of all the applicants, I am the very best qualified. |
| 13 | 21 | I believe race is a factor (strike out the words "because the") |
| 13 | 23 | there are any upper level managers GS-13 and above who are |
| 13 | 25 | I don't believe that Hispanics have been hired for management level positions in this |
| 14 | 2 | directive from the previous administration Executive Order 13171 and this |
| 14 | 5 | for federal government whenever the opportunity |
| 14 | 6 | presents itself.. |
| 14 | 12 | announcement was made. The person selected for this vacancy announcement was predetermine by Management before the vacancy announcement was posted to the public. This person is a white female. My perception of the National Capital Region's hiring practice is that its incestuous in nature, meaning that they rotate and promote the same white male and white female employees. There is very little diversity in upper management positions. And diversity to me does not mean black and white. |
| 14 | 15 | was available, first I knew that the Associate Regional Director, Dick Powers, |
| 14 | 16 | the administrator in that position was |

40

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 14 | 22 | internal instead of going to all sources. In light of its policy, Management purposely chose to restrict the area of consideration to DOI Departmentwide for current career and/or career-conditional employees only. Thus, deliberately choosing to ignored the policies and directives for hiring put forth by the previous and current White House Administrations, OPM, in addition to the Bureau policy of the National Park Service, National Capital Region. Hence, the need to amend the vacancy announcement after I sent my non-status application in for consideration. There is a |
| 15 | 6 | That policy, to my knowledge, has not |
| 15 | 11 | to implement that policy, in addition to the policies strongly encouraging the hiring of Hispanics throughout all of the Federal government, because Hispanics are grossly under-represented throughout government. I believe Management deliberately chose to ignore these strong recommendations, policies and directives for hiring Hispanics, including DOI's strong recommendations for hiring Hispanics for the National Park Service, particularly for the National Capital Region. The statement of excuse stating, "qualified Hispanics don't apply," is no longer a valid statement. I am a very qualified Hispanic and I believe that I am more qualified for this position than the person hired. The opportunity to hire a very well qualified, knowledgeable, and experienced Hispanic was deliberately disregarded. And as a manager at HHS, I |
| 15 | 12 | too had to implement those policies within my department, |
| 16 | 6 | this particular area that qualify for top management positions. Furthermore, I believe there is and has been for years a bias within the National Park Service, National Capital Region against Hispanics and that it is a systemic problem. The fact that management was brazen in its disregard of me, my application, my qualifications, knowledge, skills and experience is |

41

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 16 | 6 cont. | evident of this practice and demonstrates disparate treatment of this kind is a cavalier and deliberate act condoned by DOI and NPS. |
| 17 | 8 | as a manager -- a manager at that level. |
| 17 | 22 | I understood that, I know that. And I said --and I |
| 18 | 8 | announcement was announced. And, that it was the talk of many individuals in the regional office of the National Capital Region and that several employees were not happy about who was being considered for the position. |
| 18 | 14 | the position. I believe that the decision to not consider me for the position was further compelled by the fact that I may have forced their hand by submitting my application under the first announcement. Thus, forcing them to extend the announcement and amend it to read all sources in order to avoid a challenge. I was told that the Regional Director wanted the person they were considering in the position by May 1, 2003 and that he was not happy when the announcement had to be extended and amended. |
| 20 | 14 | of the non-competitive candidates -- of their acceptance of |
| 20 | 15 | or -- because of their acceptance of a non-competitive |
| 22 | 9 | No. |
| 22 | 10 | I hadn't planned at that point in time of submission to |
| 22 | 11 | make a call and discuss that with |
| 23 | 4 | positions, I have written position descriptions and filled position with viable |
| 23 | 7 | announcements without language barriers. |
| 23 | 8 | And when those applications came in, I was |

42

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 23 | 14 | applicant equal consideration for their professional |
| 23 | 19 | administrative specialist ranked and rated non- |
| 25 | 18 | with the position who know what the qualifications are |
| 25 | 22 | So my point is, an administrative specialist |
| 26 | 4 | of their peers. The certificate list that I was on, was |
| 26 | 6 | director. The regional director did not take my application into serious consideration. I don't think he even read it or my KSAs. He had already decided who he was going to hire. He just had to figure out how he was going to hire that person without getting into trouble. Thereby, manipulating the hiring process, by initially limiting the area of consideration, opting to not compete the non-competitive candidates under the same review and rating process by a panel that the status candidates received, avoiding interviewing the non-competitive candidates, and by choosing to not compete the non-competitive candidates against the status candidates he was then able to avoid the candidates he would have had to consider over the merit status candidates. I believe that the selectee, who was chosen from the status list would not have been able to competitively compete against those on the non-competitive list. Managers are the sources of barriers. And its they who prevent good and qualified people from outside government from getting hired, in spite of the policies in place. |
| 27 | 8 | - - that appeared on this list for serious consideration or |
| 27 | 9 | very eligible. |
| 27 | 25 | would then have to ask, given the interviews and the non- |
| 28 | 2 | the selection of one or more of the five veterans? I still could have been considered and hired, provided that management interviewed us all and seriously considered each and every application because a) the position is |

43

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 28 | 2 cont. | not restricted to preference eligibles, b) management may have found perhaps that one or more of the veterans was already a federal employee, c) if one or more of the veterans are military retirees who rank at the O4 or higher pay level then they are not eligible for preference unless they are disabled, or e) the preference eligibles on the certificate of eligibles were disqualified as not suitable for the position in accordance to the Rule of Three and Veteran Passovers. The veterans did not rank as high as I did prior to the point preferences they were given. This indicates that they did not have the level of experience nor the same skills and abilities that I have. |
| 28 | 23 | that had the individuals |
| 29 | 9 | I'm not aware that there is. However, there are policies in place, as I mentioned earlier, that strongly encourage a more open and fair hiring process and strongly encourage the hiring of highly qualified Hispanics given the opportunity to do so. I feel that the National Capital Region has every justification for hiring a Hispanic for a top level management position over the hiring of a white woman or a veteran. At the |
| 29 | 17 | for the position. And, that serious consideration be given to minorities, particularly Hispanics in Departments, Agencies and Offices that have low or no Hispanic representation, especially in upper level management positions. It's a fact that Hispanics encounter many barriers in the federal government hiring process preventing them from being hired. Those Hispanics who are employed by the federal government encounter barriers preventing them from advancement, training and consideration for upper level management positions. |
| 30 | 11 | Well, I would like the job. |
| 30 | 12 | And, if management is now willing to give me |
| 30 | 16 | back pay to the date the selectee had |

44

| PAGE | LINE | CORRECTED TESTIMONY: |
|------|------|----------------------|
| 30 | 17 | An in the event that |
| 33 | 20 | I am sure it did. It did because he was interviewed. |
| 33 | 25 | I don't know. |

Signature of Deponent _____    Date __Sept. 5, 2008__

CERTIFICATE OF NOTARY PUBLIC

The above signed did personally appear before me and signed the above document.

Date _____

Notary Public in and for the
State of

My Commission expires:

# EXHIBIT
# 13

### Sandra L. Aguilar
### 2338 Tawny Drive
### Waldorf, MD 20601-5272
Sandyaguilar@worldnet.att.net
301-870-6121

March 24, 2003

National Park Service
National Capital Region
1100 Ohio Drive, S.W.
Room 244
Washington, D.C. 20242

RE:        Response to Vacancy Announcement No. NPS-NCR-03-19
           (Associate Regional Director, Administration) GS-341-15

Dear Sir or Madam:

Enclosed please find my resume, SF-171 and other materials in response to the March 10, 2003 Vacancy Announcement for the position of Administrative Officer, announcement number NPS-NCR-03-19. I would appreciate your consideration and believe that my experience and skills make me highly qualified for this position.

My work in the public, private and nonprofit sectors have provided me with a unique set of skills and abilities that would benefit the National Park Service, National Capital Region. During my 6-year tenure with the Department of Health and Human Services and especially in the Office of Intergovernmental Affairs, I have gained a broad and pragmatic perspective of Federal government functions.

As indicated in my resume and responses to the evaluation criteria, I have several years of management experience, including more than two and one half years as the Deputy Director for the Office of Intergovernmental Affairs (IGA), at the U.S. Department of Health and Human Services (HHS). As a member of the Immediate Office of the Secretary's Management Team, I worked directly with the Secretary's senior staff including the Deputy Secretary, Chief of Staff, OPDIV and STAFFDIV heads and their deputies, and the Departments ten regional directors in addition to serving as a liaisons to the White House.

I attended and gave direct input to the senior level staff meetings and briefings, including the Assistant Secretarys' Management and Budget Department Management meetings. As the Deputy Director, I worked closely with the Director and other department heads providing direct input in substantive policy development discussions, in addition to working with other Federal agencies and tasks forces in defining objectives in coordinated initiatives.

I had oversight authority for my Division's $5.5 million budget. I served as the operations manager and budget analyst setting the budgets for the IGA Central Office and 10 Regional Offices. Under my direction as Deputy Director, I managed a staff of 72. In addition, I administered IGA's recruitment and staffing needs, employee development needs, gave staff assignments, and monitored official communications, administrative documents and materials having an impact on or relating to HHS intergovernmental activities and issues.

Page 2
RE: Response to Vacancy Announcement No. NPS-NCR-03-19

Before leaving IGA I was able to strengthen areas with inefficiencies, correct deficient procedures, implement more tighter accountability controls over spending, travel and credit card use, in addition to initiating and directing the implementation of IGA's Internet-friendly Accessability Program.

While working in the Immediate Office of the Secretary, I was directly involved with several different policy issues. These policy issues included Consultation and the Federalism Executive Orders, particularly E.O. 13132, "Federalism," the implementation and institutionalization of the Tribal Consultation process with Native American/Alaska Native tribal leaders, the Children's Health Insurance Program and SCHIP outreach/enrollment, issuance of SCHIP final regulations, welfare reform and TANF programs, the coordination of planning, resources, and technical assistance for community transportation through the HHS-DOT Coordinating Council on Access and Mobility, and several service delivery systems helping to ensure state governors, mayors and state legislative leaders and their Washington, D.C. representatives were well informed about Departmental policy decisions.

My position within IGA provided me the opportunity to strengthen my analytical and communications skills and knowledge of the Department's policies and programs and intrarelationships of the HHS components and interrelationships with other Federal departments and agencies.

As a measurement of my knowledge of the Executive Branch processes, prior to joining the Department's IGA Team, I was employed by the Office of Consumer Affairs (OCA) for three years. I served as the Special Assistant to the Director for Legislative Affairs. As liaison to Congress and the White House, my primary responsibilities were to work with Congress and the White House on a continuous basis on issues ranging from OCA's appropriations needs to proposed consumer protection legislation (i.e., fraud and privacy protection, regulations and deregulations of various industries, and financial and credit protection). As a consumer's advocate I assisted the Agency in voicing the needs of consumers and ensuring that the needs and perspectives of consumers were represented in Federal policy, programs, and legislation.

As part of my application package, I have included a copy of the following documents:

- most recent available SF-50, Notice of Personnel Action, Pay Adjustment;
- 2000 performance appraisal, Employee Performance Management Plan and Rating; and
- completed "Applicant Background Survey."

Thank you in advance for your kind consideration of this application. Please feel free to call me at the telephone number or email address listed above and on my resume should you require additional information.

I look forward to hearing from you.

Sincerely,

Sandra L. Aguilar

Enclosures.

2

U.S. DEPARTMENT OF THE INTERIOR

# APPLICANT BACKGROUND SURVEY

| GENERAL INSTRUCTIONS | YOUR PRIVACY IS PROTECTED |
|---|---|
| In boxes 1 to 3, please print using capital letters only. Read each item thoroughly before circling the appropriate codes in boxes 4 and 5. Enclose this form with your application package or mail it directly to the same address. | This information is needed to determine if our recruitment efforts are reaching all segments of the country, as required by Federal law. This is vital information not available from any other source. We can only get it directly from you.

Your voluntary responses are treated in a *highly confidential manner*. They are not released to the panel rating the applications, to the selecting official, to anyone else who can affect your application, or to the public. This form will be destroyed after the position is filled. |
| **1. Vacancy Announcement No.:**

NPS-NCR-03-19 | The only information associated with your name in our computer system is whether you have returned the completed form, so that we may follow up if no response has been received. Your responses are stored as a tally for the *group of all applicants for this vacancy* in a manner that cannot be associated with any individual application. No information taken from this form is ever placed in a Personnel file or Personnel data base. |
| **2. Position Title:**

Administrative Officer | |
| **3. Name (Last, First, MI):**

AGUILAR, SANDRA L. | Thank you for helping us provide better service. |

| 4. How did you learn about this position? (Circle up to three codes). | |
|---|---|
| 01– Private information service
02 – Magazine
03 – Newspaper
04 – Radio
05 – TV
06 – Poster
07 – Private Employment Office
08 – State Employment Office
(Unemployment Office) | 09 – Agency Personnel Department (bulletin board or other announcement)
10 – Agency or other Federal government recruitment at school or college
11 – Federal, state, or local Job Information Center
12 – Religious organization
13 – School or college counselor or other official
14 – Friend or relative working for this agency
15 – Friend or relative not working for this agency
16 – Internet or World Wide Web
17 – Other (Specify) _Referral_ |

**5. Identify yourself in each category:** (Circle the appropriate codes)

| Ethnicity: | Race (circle one or more) | Sex: |
|---|---|---|
| (D – Hispanic or Latino)

N – Not Hispanic or Latino | A – American Indian or Alaska Native
B – Asian
C – Black or African American
G – Native Hawaiian or Other Pacific Islander
E – White | M – Male

(F – Female) |

| Do you have any physical disabilities?

Y - Yes

(N - No) | If yes, do you have a targeted* disability? Y - Yes N - No

* The Equal Employment Opportunity Commission targets the following disabilities for extra recruitment efforts: Deaf, Blind, Missing Extremities, Partial/Complete Paralysis, Convulsive Disorders, Mentally Retarded, Mental Illness or Distortion Limb/ Spine. |

SEE BACK OF THIS FORM FOR THE PRIVACY ACT STATEMENT,

PUBLIC BURDEN STATEMENT AND THE PAPERWORK REDUCTION ACT STATEMENT

3

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| AGUILAR    SANDRA    L | | | | 01-19-01 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 317 | RESIGNATION | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| RUM | REG 715.202 OTHERS | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| DEPUTY DIRECTOR FOR OPERATI    HHS666 | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0301 | 15 | 03 | $93,722.00 | PA | | | | | | |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay | | |
| $85,024.00 | $8,698 | $93,722.00 | $0 | | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OS. DEPUTY SECRETARY | HE00 |
| AB | |

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 1 - None   3 - 10-Point/Disability   5 - 10-Point/Other<br>2 - 5-Point   4 - 10-Point/Compensable   6 - 10-Point/Compensable/30% | 3 0 - None   2 - Conditional<br>1 - Permanent   3 - Indefinite | 1 | YES   X NO |
| 27. FEGLI | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| 21 BASIC+OPT B(5X)+OPT A+OPT C(1X) | 9 NOT APPLICABLE | | |
| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
| K FERS & FICA | 10-14-74 | F FULL-TIME | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 1 - Competitive Service   3 - SES General<br>2 - Excepted Service   4 - SES Career Reserved | E E - Exempt<br>N - Nonexempt | 11990571  00126 | 8888 |
| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) | | |
| 110010001 | HASHINGTON, DC            DISTRICT OF COLUMBIA | | |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 2 | 0080 | 05-21-00 | 09 | 000000 |

45. Remarks

FORWARDING ADDRESS: 4422 PEMBROOK VILLAGE DR ALEXANDRIA VA 22309
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE
HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU
ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT).
RESIGNED BECAUSE: RESIGNATION BY REQUEST DUE TO A CHANGE IN
PRESIDENTIAL ADMINISTRATION.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 34  01024  02280  00031  00040 | Mary L. Smith |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | DESIGNATED APPROVING AUTH |
| HE10 | 1704 | 01-23-01 | |

3-Part   50-315

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6237

4

# EMPLOYEE PERFORMANCE MANAGEMENT PLAN AND RATING

AGUILAR, SANDRA   L.
**EMPLOYEE'S NAME (LAST,  FIRST, MI)**

SSN -

DEPUTY DIRECTOR FOR OPERATION
**POSITION TITLE**

GS/WG - | 0 | 3 | 0 | 1 | - | 1 | 5 |

DHHS/IOS/DS/OFFICE FOR INTERGOVERNMENTAL AFFAIRS
**ORGANIZATION**

Appraisal Year  **2000**

## PLAN ESTABLISHMENT

This Plan consists of __4__ elements.

[X]  The total weight of all job elements is 100 points.

[X]  The total weight of all critical job elements is greater than total weight of all non-critical job elements (i.e. least 51 points).

[X]  The lowest weighted critical element (___ points) has a higher weight than the highest weighted non-critical element (___ points).

I certify that this performance plan sets forth the job elements and standards upon which the work performance of employee will be rated:

_____    1/28/00    _____    _____
**APPRAISING OFFICIAL'S SIGNATURE**    **DATE**    **REVIEWER'S SIGNATURE**    **DATE**
  Andrew Hyman                         Kevin Thurm

I have received a copy of this plan and understand that it describes the job elements and standards upon which my work performance will be rated:

_____    1/28/00
**EMPLOYEE'S SIGNATURE**    **DATE**
Sandra Aguilar

Relationship to Within-grade increase: At least a Fully Successful Summary Rating is required for an acceptable le of competence determination for granting a within-grade increase.

## PROGRESS REVIEW

I certify that a review of progress under this plan was conducted:

_____    10/6/00    _____    10/6/00
**RATER**    **DATE**    **EMPLOYEE**    **DATE**

## PERFORMANCE RATING

| SUMMARY RATING: | POINT RANGE: | | LEVEL OF PERFORMANCE | CC |
|---|---|---|---|---|
| UNACCEPTABLE | 100-199 —— OR | Employee is rated unacceptable on one or more critical elements | ☐ | |
| MARGINALLY SUCCESSFUL | 200-299 —— OR | Employee is rated marginally successful on one or more critical elements | ☐ | |
| FULLY SUCCESSFUL | 300-399 | | ☐ | |
| EXCELLENT | 400-460 | | ☐ | |
| OUTSTANDING ✓ | 461-500 | | ☐ | |

*(handwritten "500" in box next to FULLY SUCCESSFUL)*

I derived this summary rating on the following basis (check one):

☐ Rating the job elements in the attached plan
☐ Consolidating the attached summary ratings  (Document below the method used to consolidate summary rating

This Rating is ☐ A Rating of Record        ☐ A Summary Rating

_____     12/2/00
APPRAISING OFFICIAL'S SIGNATURE      DATE
Lance Simmons  *Andy Hyman*

_____     _____
REVIEWER'S SIGNATURE                 DATE        MANAGER OF PERFORMANCE      DATE
Kevin Thurm                                      BUDGET SIGNATURE

_____     12/27/00
EMPLOYEE'S SIGNATURE                 DATE
Sandra Aguilar

(Indicates that a copy of summary rating was received)

Comments:

ELEMENT# __1__          EPMS JOB ELEMENT          __X__ Check if Critical

―――――――――――――――――――――― [ DESCRIPTION ] ――――――――――――――――――――――

Serves as agency expert for IGA management and operation policy
issues/matters within the Department as well as between Federal agencies and
their specific impact on state and local governments.

―――――――――――――――――――――― [ STANDARDS ] ――――――――――――――――――――――

Outstanding - Important authorities outside the chain of command officially
recognize the quality of his work.  Performance causes a significant,
positive impact.

Excellent - Directors's views and priorities are conveyed skillfully,
incisively, clearly and authoritatively.

Fully Successful - Maintains a good working relationship with top
Departmental officials.  Frequently reviews management and/or operational
objectives, and makes recommendations that are most often accepted.

Marginally Successful - Employee demonstrates some difficulty dealing with
people which occasionally causes some goals to be delayed.  Review of
management objectives are incomplete.  Recommendations are poorly developed
and lack direction.

Unsuccessful - Goals often are not met due to employee's difficulty in
maintaining a good working relationship with Departmental officials.  Many
complaints are received regarding employee's demeanor and actions.

―――――――――――――――――――――― [ SCORE ] ――――――――――――――――――――――

Weight: __30__        X        Value: _5_        =        Score: _150_

7

ELEMENT #_1_                    EPMS JOB ELEMENT  (Continued)

_____ [ **PROGRESS REVIEW NARRATIVE** ] _____

_____ [ **SUMMARY NARRATIVE** ] _____

ELEMENT# __2__                    EPMS JOB ELEMENT          __X__ Check if Critical

_____ [ DESCRIPTION ] _____

Monitors the implementation of Departmental initiatives for the Secretary, deputy Secretary and Director.  Identifies areas where additional analysis and coordination are needed and recommends necessary action.

_____ [ STANDARDS ] _____

Outstanding - Is sought by others as a subject matter expert. Recommendations take into account the Secretary's priorities, cross-cutting impact on constituent agencies, and implications of options being considere in decision making.

Excellent - Develops innovative approaches to further the Department's missions and goals.  Recommendations are consistently followed or accepted without significant modification.  Treats problems indepth, gives special attention to details, and considers all aspects of the problem.

Fully Successful - Recommendations are clearly thought out, achievable, timely, and totally address the issue at hand.  Recommendations are usually adopted by supervisor.  Anticipates and corrects ahead of time difficulties that would have interfered with production.

Marginally Successful - Work is not always complete and must be returned by supervisor for additional staff work.

Unsuccessful - Work is usually rejected by supervisor.

_____ [ SCORE ] _____

Weight: __25__        X        Value: _5_        =        Score: _125_

9

ELEMENT # __2__             EPMS JOB ELEMENT (Continued)

—————————————— [ PROGRESS REVIEW NARRATIVE ] ——————————————

—————————————— [ SUMMARY NARRATIVE ] ——————————————

ELEMENT# ___3___          EPMS JOB ELEMENT          __X__ Check if Critical

[ DESCRIPTION ]

Incumbent provides leadership, direction and day-to-day supervision to offi
support staff members.

[ STANDARDS ]

Outstanding - In addition to Level 4, provides technical advice and guidance
to staff.

Excellent - In addition to Level 3, provides staff with feedback on the
quality of completed work assignments.

Fully Successful - Appraises staff performance accurately within agency
timeframes.  Uses appropriate rewards and corrective action principles in
employee performance management.

Marginally Successful - Appraises staff performance within agency timeframes
Does not always use appropriate rewards and corrective action principles in
employee performance management.

Unsuccessful - Fails to appraise staff performance accurately within agency
timeframes.  Rarely uses appropriate rewards and corrective actions
principles in employee performance management.

[ SCORE ]

Weight: ___20___        X        Value: _1_        =        Score: _12 0_

11

ELEMENT #  3                    EPMS JOB ELEMENT (Continued)

_____ [ **PROGRESS REVIEW NARRATIVE** ] _____

_____ [ **SUMMARY NARRATIVE** ] _____

ELEMENT#  4                    EPMS JOB ELEMENT          X  Check if Critical

_____ [ DESCRIPTION ] _____

Communicates Secretary's views and priorities to the regional offices and departmental components to ensure that her decisions and intentions are considered in the development of management and operational policy changes. Works closely with the Special Assistants to the Director on a variety of special projects.

_____ [ STANDARDS ] _____

**Outstanding** - Is widely consulted by others and is regularly quoted.

**Excellent** - Secretary's views and priorities are conveyed skillfully, incisively, clearly and authoritatively.

**Fully Successful** - Incumbent's dissemination of information is usually done in a timely, accurate and thorough manner which results in very few question from departmental components.

**Marginally Successful** - Periodically, failures occur in adequate explanation of viewpoint, manner of communication, and/or timeliness of information, which also brings complaints or questions.

**Unacceptable** - Does not understand issues and is not able to adequately convey information.  Many complaints are received regarding incumbent's inabilities.

_____ [ SCORE ] _____

Weight:  25          X      Value:  5        =        Score:  125

13

ELEMENT # __4__                    EPMS JOB ELEMENT (Continued)

───────────────── [ PROGRESS REVIEW NARRATIVE ] ─────────────────

───────────────── [ SUMMARY NARRATIVE ] ─────────────────

**Sandra L. Aguilar**

**Evaluation Criteria**
**National Park Service, National Capital Region**
**Vacancy Announcement No. NPS-NCR-03-19**

The following are responses to the Evaluation Criteria's knowledge, skills, and abilities assessments as outlined in the Vacancy Announcement number listed above:

1.    **Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.**

As the Director for the Office of the Vice Chair at the Democratic National Committee I managed, supervised and administered a national headquarters office with a staff of 15-25. I planned and projected budget criteria and authorized spending. I evaluated and reviewed staff performances, prepared an set program timetables.

While working as the national coordinator for The Consortium for Minorities in Teaching Careers, a ten-member consortium of minority-serving institutions of higher education, I established, organized, directed and managed the day-to-day operations of the Washington, D.C. based office. In addition, I developed the program budget proposals for member institution and the Washington office, most of which were accepted by the member institutions, Department of Education grant manager, and the congressional oversight committee.

During the six years I worked at the Department of Health and Human Services (HHS), nearly three years in the Immediate Office of the Secretary (IOS), I developed extensive knowledge of HHS programs, policies and procedures, and the interrelationship of the Department's components. In carrying out my responsibilities as the Deputy Director for the Office of Intergovernmental Affairs (IGA), I had the opportunity to work closely with the HHS operating and staff divisions.

As the Deputy Director for Operations, my primary responsibility was to provide day-to-day management and supervision of Headquarters IGA staff and all ten IGA regional offices and staff, totaling 72 executive, professional and support staff members. This encompassed oversight and authorizing responsibility for all administrative systems including, time an attendance, travel, travel credit cards, office credit cards, the hiring of staff in the Headquarters office and the 10 regional offices, and the management and review of the clearance processes of administrative documents and materials having an impact on or relating to HHS intergovernmental activities.

**Evaluation Criteria No. 1 (continued, pg. 2)**          Sandra L. Aguilar,

I provided a full range of first-line supervision to Headquarters IGA staff, which included staff assignments and review, performance management, evaluation and appraisal reviews, the identification of training needs, hearing and resolving complaints, and I provided guidance on both work and administrative matters.

At the time I began working for IGA, the office was experiencing significant turnover in the regional offices due to the department's reorganization efforts. I worked hand-in-hand with the White House Liaison Office, Immediate Office of the Secretary's (IOS) Executive Office, Office of Public Health Services' Division of Commissioned Personnel, and the Program Support Center's (PSC) Division of Personnel on filling vacancies ranging from support staff positions to commissioned officers to Administration appointments. When hiring to filling vacancies (permanent or temporary hires), I worked directly with the Secretary's Executive Office and PSC to negotiate and determine salary levels for newly hired employees.

As the manager for operations, I would troubleshoot for the regional offices assisting them in gaining the technical support they need for their computer systems, intervened, advocated, and negotiate on their behalf with PSC and GSA (agencies who provided facility and operating services) for their office space, rent, parking, phone, computer lines and special amenities.

When I accepted this position in May 1998, I found many administrative structures lacking accountability controls and deficiencies in appropriate procedures and protocols. For two years I concentrated on putting into place pragmatic policies and practices acceptable to Headquarters and the regional offices assuring full accountability and tighter controls over the use of funds for travel and operations in the Headquarters and the regional offices.

I had budgetary and oversight authority for my Division's $5.5 million budget. As the operations manager and the budget analyst, I set the budgets for the IGA Central Office and 10 Regional Offices. My many responsibilities include the monitoring of operational budgets and the use of travel credit cards in the 10 Regional Director's offices, Regional Health Administrator's offices, and Headquarters.

I fully participated in budget formulation and execution through direct negotiation with the Office of the Assistant Secretary of Management and Budget and the Secretary's Executive Officer. This included reviewing and/or rewriting budgetary justifications for appropriation's legislation. Throughout each fiscal year I negotiated for additional funds for special projects, unexpected moves, rent increases and/or unanticipated PSC charges.

During midyear and end of year budget reviews, I consulted with the Director, Headquarters staff and the Regional Offices on the IGA budget to determine use of

**Evaluation Criteria No. 1 (continued pg. 3)**          Sandra L. Aguilar,

remaining funds available.  During the review periods I advised the Director and made recommendations on IGA's immediate and future budgetary needs.

Another function within my purview was the procurement and acquisition of furniture, contractual services, the purchase of supplies and technical equipment such as computers, printers, copiers, fax machines, and computer software.

In all of the managerial positions I have held I negotiated rental agreements and contracts for extended maintenance services for computers, fax machines, printers, and copiers.

### Sandra L. Aguilar

### Evaluation Criteria
### National Park Service, National Capital Region
### Vacancy Announcement No. NPS-NCR-03-19

2.    **Skill in negotiating and resolving complex problems in a leadership role with subordinates, peers, managers, and representatives at various levels.**

I am a professional with management experience in conceiving, planning, and implementing federal relations programs and community affairs. I have worked on both sides of management and know the importance of communication, diplomacy and inclusiveness.

As a manager I enjoy recognizing the good work of others. It is always a pleasure of mine to recognize outstanding individuals personally and publicly. I believe exceptional work should be recognized and rewarded. As the Deputy Director for IGA at HHS, I was able to reward several individuals for their outstanding work in the field. Individuals were awarded plaques and cash awards for forging new community relationships and innovative outreach programs for health care awareness in economic develop zones, asbestos and air particle discoveries in schools where large numbers of children were suffering asthma. In addition, I have awarded individuals who had served in an acting director capacity for a significant amount of time.

Before joining the HHS's IOS team, I participated as a member of the HHS Task Force on Alternative Dispute Resolutions. We were charged with the task of planning a program for an alternative to the complaint process. This alternative process was intended to address and help resolve issues other than civil rights complaints. The Task Force, with the help of NASA, wrote the policy and implemented the policy Department-wide. The implementation process included classes and written instructions for all employees.

As a manager, I have utilized the knowledge and skills I gain while on that Task Force. I have settled disputes between support staff through listening, communication, guidance and at times with outside employee relations assistance. Through difficult negotiations and with the assistance of employee relations I have worked out amiable solutions to employee challenges, while protecting regional directors, that resulted in the Department's favor. In addition, I have found amiable solutions to Department challenges that have benefitted the employee. On at least one occasion I had been forced to put an employee on notice for malfeasance. With the assistance of IOS' Executive Officer, I had also worked with employee relations to move and individual who needed mental health support and services. With strong recommendations from

**Evaluation Criteria No. 2 (continued, pg. 2)**          Sandra L. Aguilar,

myself and the Executive Officer this employee was put on a 6-months leave of absence while receiving medical attention and was subsequently allowed to return to work.

Working with peers, managers and representatives from various levels requires heighten skills of diplomacy and communication.  Miscommunication easily happens, therefore whenever possible, face to face communications followed by continued oral and written communication is paramount.

Another example is, during my first year as Deputy Director, IGA management created a vacancy for a Special Assistant to the Director position, a policy analyst position at a GS-15 for Native American / Alaska Native Affairs.  It took a lot of effort to develop this position and meet the expectations of all interested parties.  Before sending out the vacancy notice I created, I called a meeting that included some of my peers, division heads, managers, and community leaders.  They were the Director of IGA, ASMB, the Deputy Secretary, representatives from the General Counsel, Administration for Native Americans, Indian Health Services, Urban Indian Health Programs, Office of Tribal Self-Governance, PSC, the Secretary's Executive Officer, Director of Administration, the Special Assistant to the Director on American Indian/Alaska Natives and several Tribal Leaders from the Native American community.  Through this meeting and others that followed, we discussed the type of qualified person that could fill the position, we wrote a strong Position Description and determined the detailed key elements and criteria for the knowledge, skills and ability evaluation process to be used in the vacancy announcement in order to attract the best qualified person.  In addition to soliciting candidates from "all sources" we identified the best and most remote Native American communities to post the notice and how long to advertise the announcement, who would comprise the selection panel and who would ultimately conduct the interviews and hiring.  This was a collaborative effort that continued for several months through various forms of communications including subsequent meetings at the Department.  Progress reports on this effort were submitted to the White House addressing, in part,  the President's Executive Order on Federalism.  The success of this effort produced benefits that have thus far had lasting effects between the Department and the Native American (Indian Country) community and was showcased within the Department and the White House.  In addition, individuals who would not have normally been called into a collaborative effort to fill a vacancy were very appreciative and reciprocated in kind.

I also created a Senior Intergovernmental Affairs Policy Specialist position (the person in this position would serve as acting director or acting deputy director during White House Administration transitions) within IGA using a similar method, but without outside community involvement.

**Evaluation Criteria No. 2 (continued, pg. 3)**        Sandra L. Aguilar,

This same process was used when forging policy discussions also. The benefit of using this type of inclusion process is the elevation of respect for the office. The personal benefit was that I never had a problem putting a selection panel together.

Furthermore, I addressed, investigated, and resolved a whistle-blower complaint against a Central Office employee. Likewise, I addressed, investigated and worked, in conjunction with Public Health Service officials, to move toward a satisfactory resolution of conflict between a Regional Director and a Regional Health Administrator from the same Regional Office, and with the assistance of the Executive Officer and Administration Director, transferred an inept employee out of IGA.

In an effort to assure a smoother running Office, additional procedures were established on a micro level involving support systems, such as specific job junctions, and time-line responsibilities for each of the staff members in Central Office and in the Regions. This was an ongoing effort requiring the ful participation and cooperation of eight senior staff advisors, ten regional executive assistants, ten regional affairs specialist and thirteen support staff members—most of whom agreed with the changes and consistency of the procedures.

**Sandra L. Aguilar**

**Evaluation Criteria**
**National Park Service, National Capital Region**
**Vacancy Announcement No. NPS-NCR-03-19**

3.    **Abilities to develop, analyze, review, and appraise the effectiveness of administrative policies, programs, and practices.**

As I had indicated previously, when I accepted the position of Deputy Director for Operations, I found many administrative structures lacking accountability controls and some were deficient in appropriate procedures and protocols.

A few examples are as follows: I discovered the secretary for the Director was approving appropriations for travel for IGA Headquarters staff, including the Director's travel. That assumed authority was revoked and an audit was ordered. The audit revealed a lack of tracking of travel for the Headquarters office and all 10 regional offices for more than eight years. A change in telephone systems revealed misuse of the office telephone calling card and several repeat orders of the same office supplies indicated some pilfering. Lack of appropriate protocols for authorizing credit card use and payment of credit card invoices became evident when I reviewed each regional office's budget and spending habits.

In order to minimize misunderstandings regarding outdated policies and procedures, I implemented new standards of operating procedures. I worked closely with the Executive Officer in the Secretary's office and the Director of Administration to put into place pragmatic policies and practices acceptable to the Office of the Secretary, Administration, Assistant Secretary of Management and Budget Office, IGA Headquarters and the regional offices. Consequently, with new practices and policies full accountability and tighter controls over the use of funds for travel and operations in IGA Headquarters and the regional offices resulted in the elimination of over spending, misuse of funds, and pilfering.

I also reviewed the policy and practices for hiring staff. Several agencies and bureaus within HHS were very good at recruiting a diverse workforce, while others were not. The IOS and IGA were not very good where diversity was concerned. In addition, vacancy announcements for position within my office were written with spelling and grammatical errors, and KSA's that were not specifically relevant to the positions. I had my staff retype the vacancy announcements with my edits and changes. With revised vacancy announcements I instructed the Administration Office to post the positions "all sources" and to advertise in non-traditional markets in order to generate a greater pool of diverse applicants.

21

**Evaluation Criteria No. 3 (continued, pg. 2)**     Sandra L. Aguilar,

Furthermore, I implemented standards of operating procedures for all public relations efforts and put into place safeguards in order to minimize potential EEO and/or grievance complaints.

**Sandra L. Aguilar**

**Evaluation Criteria**
**National Park Service, National Capital Region**
**Vacancy Announcement No. NPS-NCR-03-19**

**4.     Ability to interact and communicate at all levels.**

I have more than 30 years of experience with the U.S. political system, including first hand working knowledge of the functions and operations of congressional, state, and local elected officials offices. I am a public speaker and an experienced networker with extensive outreach experience to national organizations, minority communities, institutions of higher education, government agencies, foundations, and corporations.

I can communicate and interact on all levels. I was the Director for the Office of the Vice Chair of the Democratic National Committee for four year and interacted with elected officials at all levels of government and community-based organizations.

From 1991 to 1993, I served as the Coordinator/Administrator for the Washington, D.C.-based office of the Consortium for Minorities in Teaching Careers. This nonprofit organization comprised ten minority-serving institutions of higher education. Its purpose was to develop a curriculum, recruit high school students into an inner-school program that would set them on a teaching track from high school through college and post graduate school to become teachers for the communities they grew up in. In addition to managing the day-to-day operations, I served as the government affairs representative with Congress and federal agencies. I developed proposed program budgets for member institutions and the Washington office, compiled evaluations and weekly reports, wrote and submitted quarterly and annual reports to the Board of Directors and Members of Congress, developed and wrote testimony, and tracked legislation pertaining to higher education issues. For the Consortium for Minorities in Teaching Careers I developed and maintained public affair's outreach efforts programs, and developed and disseminated material to media, educational associations and other interested organizations.

In 1994, as a consultant, I served as the Executive Director for the Hispanic American Festival, Inc. This is the largest Hispanic organization in Washington, D.C. Metro area, comprising 25 very different and diverse local Hispanic organizations representing 21 different Latin countries. As the Executive Director I developed, implemented, and coordinated month-long community-based events for the annual Festival Latino. I developed the $.5 million budget and maintained budgetary authority over all expenditures and funds raised for each event. I hired additional consultants and staffed my office with 25 volunteers. With total oversight authority, I coordinated all

23

**Evaluation Criteria No. 4 (continued, pg. 2)**       Sandra L. Aguilar,

logistics for event sites, hotel, equipment, media, entertainment from around the world, sponsors and transportation needs and personally negotiated and coordinated all contracts and logistical sites with city officials and local businesses and National Park Service officials. I wrote press releases weekly and managed the public relations program while maintaining in constant contact with city officials, media personnel, the board of directors, and responded to general public inquiries. Following the final preparations, I presented the city's largest two-day event which included, 200 vendors, three stages with eight-hours of nonstop entertainment for two days, that included a two and one-half hour parade and 600,000 participants each day.

Prior to working in the Office of Intergovernmental Affairs, I was the Special Assistant to the Director for Legislation at the Office of Consumer Affairs (OCA). I was selected for this position in October 1994. My job was to assure OCA received support from the President and the Office of Management and Budget and to gain line-item funding each year from Congress. I was fully successful in gaining the support of the Administration to maintain, and even increase the level of funding for OCA during times of government downsizing and recurrent negotiations under Continuing Resolutions for Appropriations considerations. OCA was under constant threats of closure with some members of Congress believing the agency was no longer necessary, outliving its usefulness. This thinking was contrary to the President's belief. Working directly with members of the House and Senate Appropriations Committee, the OMB Health Unit and the President's Office of Legislative Affairs, I was able to help OCA continue to operate as a needed and viable agency until September of 1997. I edited and rewrote appropriation's language, provided technical analysis on OCA programmatic responsibilities for the White House, HHS and Congress (HHS was the fiscal agent for OCA). In conjunction with the White House, the Director of OCA and key members of the House Appropriations Committee, I assisted in developing and implementing strategies on behalf of OCA and the public.

In addition to serving as the Special Assistant to the Director for Legislation I was also OCA's Liaison to the White House, Congressional, elected and appointed elected officials, and diverse consumer populations. I coordinated action on critical issues with government and private sector offices, including OCA's input into consumer related policy proposals. I developed, coordinated and maintained a network of communication with elected and appointed officials including Members of Congress, governors, attorneys general, state legislators, and mayors. In addition, I develop and implemented initiatives through the Executive Branch, Congressional, and community interactions; I researched, planned, and organized conferences and seminars and facilitated outreach programs to culturally, geographically, economically and ethnically diverse populations of consumers.

While with the Office of Consumer Affairs, I had the pleasure of speaking on several consumer related panels before consumer organizations on proposed consumer

24

**Evaluation Criteria No. 4 (continued, pg. 3)**    Sandra L. Aguilar,

protection legislation (i.e., fraud and privacy protection, regulations and deregulations of various industries, and financial and credit protection). I conducted workshops on consumer protection and consumer education while utilizing OCA's marketing brochures and consumer handbooks during the annual conferences of diverse community-based organizations. And, as a consumer's advocate I assisted OCA in voicing the needs of consumers and ensuring that the prospective of the consumer was represented in Federal policy, programs, and legislation.

While with the Office of Consumer Affairs, I participated in, and on occasion chaired, quarterly meetings with consumer affairs specialist from several different federal departments and agencies. This federal coordinating council shared consumer related information and events sponsored by their department and often coordinated media campaign efforts and resources in order to reach a larger sector of the general population at one time. In addition, the council was included as a full partner in the bi-annual Congressional Consumer Education Conference conducted for the benefit of new congressional staffers. This forum gave each department and agency an opportunity to show case their consumer protection policies and programs.

Within IGA and as a member of the Secretary's Youth Substance Abuse Prevention team I provided the Regional Directors with the information and material they needed to amplify the Secretary's message on a local level in speeches, radio addresses, and Op Eds.

As the Deputy Director for IGA I monitored the implementation of the Administration and Departmental initiatives and identified areas where additional analysis and coordination were needed and recommended necessary action. I maintained close working relationships with the Departments' IGA representatives, as well as, the White House IGA representatives. In addition, I often received correspondence through the U.S. mail or electronic email from HHS customers on a range of issues, such as, EEO complaints, child support complaints, information requests on block grants, privacy rights, organ procurement and donations, children's issues and special program funding. I respond to the incoming correspondence, then move the request or complaints onto the appropriate agency, and followed up on its progress to its conclusion.

Sandra L. Aguilar

**Evaluation Criteria**
**National Park Service, National Capital Region**
**Vacancy Announcement No. NPS-NCR-03-19**

5. **Ability as a manager to direct a support staff comprised of a range of technical and professional individuals.**

As Director for the Office of the Vice Chair of the Democratic National Committee I managed a staff of one secretary and 15 to 25 very productive interns.

As Executive Director for the Hispanic American Festival, Inc. I hired and managed 3 consultants and staffed my office with 25 volunteers.

As HHS' IGA Deputy Director for Operations, my primary responsibility was to provide day-to-day management and supervision of Headquarters IGA staff and all ten IGA regional offices with a staff, totaling 72 executive, professional and support staff members.   The staff was comprised of:
Executive Staff
- 10 Regional Directors
- 10 Regional Health Administrators

Professional Staff/Program Specialists
- 10 Assistant Regional Health Administrators

Professional Staff/Regional Specialist
- 10 Regional Executive Assistants
- 10 Regional Affairs Specialists

Professional Staff/Policy Analysts
- 8 Senior Policy Specialists

Support Staff
- 2 Administrative Assistants
- 2 Secretaries
- 10 Regional Secretaries

Interns
- 2 to 4 depending on time of year

**Evaluation Criteria No. 5 (continued, pg. 2)**          Sandra L. Aguilar,

While I was with IGA, I inherited a welfare-to-work participant who had gained tenured status. Very little direction was given to this person. Most of her training had come from the other two secretaries in addition to on the job training without the benefit of any formal training. I took it upon myself to structure a career path for her and enroll her into job related training, including time an attendance to motivate her and so that she could move into the position of time-keeper (new responsibility and promotion in a shortest amount of time). I mentored her and gave direction in order to help this employee establish a work ethic involving various job responsibilities an accountability. I worked with the employee to establish reasonable work hours to minimize the impact on her and her family due to the two hour one-way commute to and from home. I worked closely with her and her case worker addressing her problem of illnesses and absenteeism, which hurt her ability to quickly advance within the Department.

Another area that needed attention within IGA was the lack of internet linkage between regional offices and several HHS divisions. There were inconsistent standards in place for homepage layout, structure, and readability, particularly for the disabled . I initiating and directing the implementation of IGA's Internet-friendly Accessability Program. Through a coordinated effort between IGA Headquarters, the Regional Offices and their technicians and the Office of Information Resources Management, we designed new homepages for each of the regional offices, linked each office into all of the HHS headquarters operating divisions, including IGA and the Office of the Secretary. In addition, we worked with state officials and was able to link the state government and state and county health care offices and facilities to the Regional Directors' Resource Directories.

Coincidentally, at the same time, HHS was publically being criticized for its "insensitivity" to the nearly blind because of the number of popping, flashing, fading, and moving icons on its website. So, in order to come into compliance with ADA and the new policies HHS was invoking, my team removed all of their icons that could be disturbing and unreadable to the disabled and we standardized each page with acceptable print type and size. We also standardized, within our parameters, the way information flowed and was accessible, which corresponded with Department-wide standards that were being put into place.

Read the instructions before you complete this application. *Type or print clearly in dark ink.*

## GENERAL INFORMATION

**1** What kind of job are you applying for? *Give title and announcement number (if any)*
Administrative Officer/NPS-NCR-03-19

**2** If the announcement lists several job titles, which jobs are you applying for?

**3** Social Security Number

**4** Birth date *(Month, Day, Year)*

**5** Name *(Last, First, Middle)*
AGUILAR, SANDRA L.

Street address or RFD number *(include apartment number, if any)*
2338 TAWNY DRIVE

City WALDORF    State MD    ZIP Code 20601

**6** Other names ever used
Sandy

**7** Sex *(for statistical use)*
☐ Male    ☒ Female

**8** Home Phone
Area Code 301    Number 870-6121

**9** Work Phone
Area Code 301    Number 870-6121    Ext.

**0** Were you ever employed as a civilian by the Federal Government? If "NO", go to 11. If "YES", mark each type of job you held with an "X".
☐ Temporary    ☐ Career-Conditional    ☐ Career    ☒ Excepted
What is your highest grade, classification series and job title?

Dates at highest grade: FROM 05/98    TO 01/01

**1** Do you have any applications for Federal employment on file with the U.S. Office of Personnel Management? If "NO", mark here ☒ and go to 12. If "YES", write below and continue in 47 the information for each application: (a) the name of the office that has your application; (b) the title of the job; (c) the date of your Notice of Results; and (d) your rating.

## AVAILABILITY

**2** When can you start work? *(Month and Year)*
6/1/03

**13** What is the lowest pay you will accept?
Pay $_____ per _____ OR Grade 15-3

**4** Are you willing to work:

| | YES | NO |
|---|---|---|
| A. In the Washington, D.C., metropolitan area? | XX | |
| B. Outside the 50 United States? | XX | |
| C. Any place in the United States? | XX | |
| D. Only in *(list the location[s])* | | |

**5** Are you willing to work:

| | YES | NO |
|---|---|---|
| A. 40 hours per week (full-time)? | XX | |
| B. 25-32 hours per week (part-time)? | | XX |
| C. 17-24 hours per week (part-time)? | | XX |
| D. 16 or fewer hours per week (part-time)? | | XX |
| E. In an intermittent job (on-call/seasonal)? | | XX |
| F. Weekends, shifts, or rotating shifts? | | XX |

**6** Are you willing to take a temporary job lasting:

| | YES | NO |
|---|---|---|
| A. 5 to 12 months (sometimes longer)? | X | |
| B. 1 to 4 months? | | XX |
| C. Less than 1 month? | | XX |

**7** Are you willing to travel away from home for:

| | | |
|---|---|---|
| A. 1 to 5 nights each month? | X | |
| B. 6 to 10 nights each month? | X | |
| C. 11 or more nights each month? | X | |

### FOR USE OF EXAMINING OFFICE ONLY

Material
☐ Submitted
☐ Returned

Entered register:

Notations:

Form reviewed:
Form approved:

| Option | Grade | Earned Rating | Preference | Aug. Rating |
|---|---|---|---|---|
| | | | ☐ 5 Points (Tent.) | |
| | | | ☐ 10 Pts. (30%) Or More Comp. Dis. | |
| | | | ☐ 10 Pts. Less Than 30% Comp. Dis. | |
| | | | ☐ Other 10 Points | |
| | | | ☐ Disallowed | |

Initials and Date

☐ Being Investigated

### FOR USE OF APPOINTING OFFICER ONLY

Preference has been verified through proof that the separation was under honorable conditions, and other proof as required.

☐ 5-Point    ☐ 10-Point—30% or More Compensable Disability    ☐ 10-Point—Less Than 30% Compensable Disability    ☐ 10-Point—Other

Signature and Title

Agency    Date

ANNOUNCEMENT NO.    APPLICATION NO.

## MILITARY SERVICE AND VETERAN PREFERENCE

**18** Have you served on active duty in the United States Military Service? *If your only active duty was training in the Reserves or National Guard, answer "NO".* If "NO", go to 22.    ☐ YES ☐ NO

**19** Were you honorably discharged from the military service? *If your discharge was changed to "honorable" or "general" by a Discharge Review Board, answer "YES". If you received a clemency discharge, answer "NO".* If "NO", explain in 47.

**20** Did you or will you retire at or above the rank of major or lieutenant commander?

**21** List the dates, branch, and serial number for all active duty service.

| FROM | TO | BRANCH OF SERVICE | SERIAL NUMBER |
|---|---|---|---|
| | | | |

**22** Place an "X" in the box next to your Veteran Preference claim. Mark only one box. See the instructions for eligibility information.

**1** NO PREFERENCE

**2** 5-POINT PREFERENCE—You must show proof when you are hired.

10-POINT PREFERENCE—If you claim 10-point preference, you must complete a Standard Form 15, which is available at any Federal Job Information Center. ATTACH THE COMPLETED SF 15 TO THIS APPLICATION, TOGETHER WITH THE PROOF REQUESTED IN THE SF 15.

**3** Non-compensably disabled or Purple Heart recipient.

**4** Compensably disabled (less than 30%).

**5** Spouse, widow(er), or mother.

**6** Compensably disabled (30% or more).

28

3. Job Title or Announcement Number Job Are Applying For

4. Date Completed  3-26-03

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| SELF EMPLOYED | From: 06/02 To: Present | 85 | 0 |
| | Salary or earnings  Starting $  —  Volunteer per  Ending $  per | Your reason for leaving | |

| Your immediate supervisor  Name  N/A | Area Code  Telephone No. | Exact title of your job  Consultant | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

Association of Naval Services Officers (ANSO)

- Served as ANSO's Conference Coordinator for 23rd Annual Conference
- Coordinated all activities associated with the conference
- Developed and designed program layout
- Wrote funding proposals for sponsorship of Conference
- Ordered awards for key conference participants
- Ordered promotional items and negotiated costs
- Wrote all correspondence to speakers and participants for the conference
- Managed two mailings, second mailing to 3300 individuals in the Navy
- Developed agenda for the conferences
- Worked closely with ANSO Board of Directors (all military officers) for 8 months helping coordinate all activities.
- Developed luncheon and dinner programs for the conference.
- Wrote certificates of awards and appreciation for key conference participants.
- Prepared name tags, placards, conference packets for participants, speakers and presenters.

For Agency Use (skill codes)

*U.S. GPO: 1986-201-766. 20115

Case 1:07-cv-00546-RMU Document 17-16 Filed 08/22/2008 Page 5 of 26

Attach all Documents to your application at the top of page 3.

| 1. Name (Last, First, Middle) | 2. Social Security Number |
|---|---|
| Aguilar, Sandra L. | |

| 3. Job Title or Announcement Number You Are Applying For | 4. Date Completed |
|---|---|
| Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19 | 3-26-03 |

## ADDITIONAL WORK EXPERIENCE BLOCKS IF NEEDED

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month and year) | Average number of hours per week |
|---|---|---|
| Wall Flower Store.Com<br>2338 Tawny Drive<br>Waldorf, MD 20601 | From: 09/98 To: Present<br>Salary or earnings<br>Starting $ 00.0 per<br>Ending $ 00.0 per | 20<br>Place of employment<br>City Waldorf, MD<br>State |

| Exact title of your job | Your immediate supervisor | | Number and job titles of any employees you supervised |
|---|---|---|---|
| President | Name Self | Area Code 301 Telephone Number 870-6121 | |

| Kind of business or organization (manufacturing, accounting, social service, etc.) | If Federal employment (civilian or military), list series, grade or rank, and the date of your last promotion | Your reason for leaving |
|---|---|---|

Description of work: Describe your specific duties, responsibilities and accomplishments in this job. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget) write the approximate percentage of time you spent doing each.

- Established the Wall Flower Store.Com
- Designed website for the Wall Flower Store.Com
- Market and sell retail, handmade silk floras and plants

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month and year) | Average number of hours per week | For Agency Use (skill codes, etc.) |
|---|---|---|---|
| Sandra L. Aguilar<br>2338 Tawny Drive<br>Waldorf, MD 20601 | From: 01/01 To: 01/02<br>Salary or earnings<br>Starting $ per<br>Ending $ per | Place of employment<br>City<br>State | |

| Exact title of your job | Your immediate supervisor | | Number and job titles of any employees you supervised |
|---|---|---|---|
| Unemployed | Name | Area Code Telephone Number | |

| Kind of business or organization (manufacturing, accounting, social service, etc.) | If Federal employment (civilian or military), list series, grade or rank, and the date of your last promotion | Your reason for leaving |
|---|---|---|

Description of work: Describe your specific duties, responsibilities and accomplishments in this job. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget) write the approximate percentage of time you spent doing each.

For Agency Use (skill codes, etc.)

THE FEDERAL GOVERNMENT IS AN EQUAL OPPORTUNITY EMPLOYER

30

Standard Form 171-A—Continuation Sheet for SF 171

Case 1:06-cv-00548-RMU    Document 45-2    Filed 08/22/2008    Page 6 of 26

• Attach all SF 171-A's to your application at the top of page 3.

OMB No. 3206-0012

| 1. Name (Last, First, Middle) | 2. Social Security Number |
|---|---|
| Aguilar, Sandra L. | |

| 3. Job Title or Announcement Number You Are Applying For | 4. Date Completed |
|---|---|
| Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19 | 3-22-03 |

## ADDITIONAL WORK EXPERIENCE BLOCKS IF NEEDED

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month and year) | Average number of hours per week |
|---|---|---|
| U.S. Department of Health and Human Services 200 Independence Ave., SW, Room 600-E Washington, DC 20201 | From: 5-24-98 to 1-20-01 | 60 |
| | Salary or earnings Starting $77,798.00/year Ending $93,722.00/year | Place of employment City Washington State Dist. Of Columbia |

| Exact title of your job | Your immediate supervisor | | Number and job titles of any employees you supervised |
|---|---|---|---|
| Deputy Director for Operations | Name Andrew D. Hyman | Area Code Telephone Number 202-690-6060 | 20 Regional Directors Special Assistants Secretaries |

| Kind of business or organization (manufacturing, accounting, social service, etc.) | If Federal employment (civilian or military), list series, grade or rank, and the date of your last promotion | Your reason |
|---|---|---|
| Intergovernmental Affairs | GS-301-15 | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job. *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Managed with full oversight authority 10 U.S. Regional Offices and Headquarters Office
- Prepared, submitted and dispersed $5.5 million in appropriated funds
- Monitored and approved expenditures for salaries, benefits, facilities management and support, technology resources, official travel and travel card use
- Managed budgets for Headquarters Office and Regional Offices
- Hired personnel
- Principal liaison with regional offices regarding various an sundry intergovernmental operations matters. Identified and resolved management and program area problems
- Analyze Departmental plans an decision-making authorities impacting regional operations; identify weaknesses in plans and recommend alternatives; implement policies and procedures of operating plans that involved participation and direct negotiations with OPDIV and STAFFDIV officials responsible for the implementation of secretarial regional-related directives
- Developed and coordinated the development of operating policy
- Managed with full oversight responsibility all administrative systems, travel management, time and attendance, and employee performance management
- Advised Director, Secretary and Deputy Secretary and other Departmental officials on perspectives of intergovernmental partners regarding HHS issues
- Assisted with the coordination and implementation of Administration and Secretarial initiatives at all levels of government
- Initiated and convened meetings with Regional Directors, Department officials, White House IGA representatives, and when necessary, with elected officials or their Washington representatives on behalf of IGA Director
- Addressed various audiences on Department and Administration issues
- Liaison for IGA with White House
- Served as Acting Director in director's absence

| 1. Name (Last, First, Middle) Aguilar, Sandra L. | | | 2. Social Security Number |
|---|---|---|---|
| 3. Job Title or Announcement Number You Are Applying For Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19 | | | 4. Date Completed 3-24-03 |

**ADDITIONAL WORK EXPERIENCE BLOCKS IF NEEDED**

☐

| Name and address of employer's organization (include ZIP Code, if known) U.S. Department of Health and Human Services 200 Independence Ave., SW, Room 600-E Washington, DC 20201 | Dates employed (give month and year) From: Sept. 1997 To: 5-23-98 | Average number of hours per week 55 |
|---|---|---|
| | Salary or earnings Starting $71,011.00/year Ending $72,752.00/year | Place of employment City Washington State Dist. Of Columbia |
| Exact title of your job Special Assistant to the Director | Your immediate supervisor Name Lance Simmens      Area Code Telephone Number 202-690-6060 | Number and job titles of any employee supervised 0 |
| Kind of business or organization (manufacturing, accounting, social service, etc.) Intergovernmental Affairs | If Federal employment (civilian or military), list series, grade or rank, and the date of your last promotion GS-301-14      11-13-96 | Your reason for leaving Advancement |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job. If you describe more than one type of work (for example, carpentry and painting or personnel and budget), write the approximate percentage of time you spent doing each.

- Liaison for IGA to White House, governors, mayors, local elected officials, government affairs associations, and diverse advocacy groups

- Developed, coordinated and maintained network of communication with regional directors, elected and appointed officials including governors, attorneys general, state legislators, and mayors

- Coordinated action on critical issues with White House, government agencies, governor's offices, including White House events and policy development

- Tracked White House and Secretarial initiatives through Executive Branch, Congressional, and community interactions

- Developed strategies for outreach and communication with intergovernmental, advocacy and community groups.

For Agency Use (skill codes)

THE FEDERAL GOVERNMENT IS AN EQUAL OPPORTUNITY EMPLOYER
PREVIOUS EDITION USABLE      NSN 7540-00-935-7157      171-205      ☆ U.S. G.P.O. 1986-491-248/40082

Standard Form 171-A (Re
Office of Personnel Manag
FPM Chapter 295

32

| 1. Name *(Last, First, Middle)* | | | | 2. Social Security Number |
|---|---|---|---|---|
| Aguilar, Sandra L. | | | | |

| 3. Job Title or Announcement Number You Are Applying For | 4. Date Completed |
|---|---|
| Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19 | 3-24-03 |

**ADDITIONAL WORK EXPERIENCE BLOCKS IF NEEDED**

| 5. Name and address of employer's organization *(include ZIP Code, if known)* | Dates employed *(give month and year)* | | Average number of hours per week |
|---|---|---|---|
| **U.S. OFFICE OF CONSUMER AFFAIRS** 750 17th Street, NW, Suite 650 Washington, D.C.  20006 | From: **Oct. 1994** to **Sept. 1997** | | **50** |
| | Salary or earnings Starting $ **59,022** per **year** Ending $ **68,721** per **year** | | Place of employment City **Washington** State **Dist. of Columbia** |

| Exact title of your job | Your immediate supervisor | | Number and job titles of any employees supervised |
|---|---|---|---|
| **Special Assistant to the Director** | Name **Bernice Friedlander** | Area Code **202**  Telephone Number **395-7919** | **0** |

| Kind of business or organization *(manufacturing, account-ing, social service, etc.)* **Consumer Affairs** **U.S. Gov't.** | If Federal employment *(civilian or military),* list series, grade or rank, and the date of your last promotion **GS-301-14**  **(11-13-96)** | Your reason for leaving **Advancement** |
|---|---|---|

Description of work: Describe your specific duties, responsibilities and accomplishments in this job.  *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Liaison for USOCA with White House, Congressional, elected and appointed elected officials, and diverse consumer populations

- Develop, coordinate and maintain network of communication with elected and appointed officials including Members of Congress, governors, attorneys general, state legislators, and mayors

- Facilitate outreach to culturally, geographically, economically and ethnically diverse populations of consumers

- Identify, track, research and analyze legislation

- Coordinate action on critical issues with government and private sector offices, including USOCA's input to White House events and policy development

- Develop and implement initiatives through Executive Branch, Congressional, and community interactions

For Agency Use (Skill codes, etc.)

THE FEDERAL GOVERNMENT IS AN EQUAL OPPORTUNITY EMPLOYER
PREVIOUS EDITION USABLE       NSN 7540-00-935-7157         171-205

Standard Form 171-A (Rev.
Office of Personnel Management
FPM Chapter 295

**24** READ WORK EXPERIENCE IN THE INSTRUCTIONS BEFORE YOU BEGIN.

- Describe your current or most recent job in Block A and work backwards, describing each job you held during the past 10 years. If you were unemployed for longer than 3 months within the past 10 years, list the dates and your address(es) in an experience block.
- You may sum up in one block work that you did more than 10 years ago. But if that work is related to the type of job you are applying for, describe each related job in a separate block.
- INCLUDE VOLUNTEER WORK (non-paid work)—If the work (or a part of the work) is like the job you are applying for, complete all parts of the experience block just as you would for a paying job. You may receive credit for work experience with religious, community, welfare, service, and other organizations.

- INCLUDE MILITARY SERVICE—You should complete all parts of the experience block just as you would for a non-military job, including all supervisory experience. Describe each major change of duties or responsibilities in a separate experience block.
- IF YOU NEED MORE SPACE TO DESCRIBE A JOB—Use sheets of paper the same size as this page (be sure to include all information we ask for in A and B below). On each sheet show your name, Social Security Number, and the announcement number or job title.
- IF YOU NEED MORE EXPERIENCE BLOCKS, use the SF 171-A or a sheet of paper.
- IF YOU NEED TO UPDATE (ADD MORE RECENT JOBS), use the SF 172 or a sheet of paper as described above.

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervise |
|---|---|---|---|
| Festival Latino, Inc. 1994<br>1730 Rhode Island Ave., N.W., #708<br>Washington, D.C. | From: 5/2/94 To: 8/31/94 | 60 | |
| | Salary or earnings | Your reason for wanting to leave | |
| | Starting $ 5K per month<br>Ending $ 5K per month | Four month contract | |

| Your immediate supervisor Name | Area Code | Telephone No. | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|---|
| Ed Pena. Atty | 301 | 589-2222 | Executive Director | |

- Establish Festival Headquarters for general operation. Manage day-to-day Festival headquarters office activities.
- Prepare budgets and accounting system for Board approval on each component of the Festival. Work directly with Chair and Treasurer of the Board on all financial accounting, auditing, and cost controls.
- Establish place and time for Board meetings. Staff all Board meetings. Report to the Board of Directors and Board of Trustees weekly.
- Secure all permits, license, contracts, requests and insurance for Festival activities.
- Secure all entertainment for all relevant Festival events.
- Identify and hire contractors and coordinators for each component, meet with each individual and collectively. Coordinate and manage all Festival personnel and activities. Establish place and time for Coordinators meeting.
- Develop list of elected and appointed officials, embassies, media, sponsors, entertainers and volunteers.
- Establish bank accounts.
- Secure sponsorship and funds for events through calls, correspondence and proposals.
- Manage monies from Kiosk sales and contributions
- Spokesperson and liaison with City of Washington and Federal Governments agencies, media and interested persons. Attend all meetings with public officials, and other relevant individuals and organizations.
- Create, organize, schedule and implement all festival events.
- Secure all media coverage.

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| Scholarships Today<br>4422 Pembrook Village Dr.<br>Alexandria, VA 22309 | From: 4/10/94 To: Present | 25 | 2 |
| | Salary or earnings | Your reason for leaving | |
| | Starting $ 00.0 per<br>Ending $ 00.0 per | | |

| Your immediate supervisor Name | Area Code | Telephone No. | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|---|
| Self | 703 | 780-4924 | President | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

Established and implemented non-profit scholarship-matching, research and academic services organization.

Developed marketing strategies.

Developed data bases.

Hired and supervise two part-time employees

Developed and disseminated material related to the services.

Conducted scholarship and internship program research.

For Agency Use (skill codes, etc.)

**Page 2** IF YOU NEED MORE EXPERIENCE BLOCKS, USE SF 171-A (SEE BACK OF INSTRUCTION PAGE).

34

AGUILAR  SANDRA  L.
3. Job Title or Announcement Number You Are Applying For
Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

4. Date Completed
3-26-03

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| Inter-American Development Bank<br>1300 New York Ave., N.W.<br>Washington, D.C.  20577 | From: 9/23/93 To: 5/6/94 | 40 | 0 |
| | Salary or earnings<br>Starting $2,280 per mo<br>Ending $2,280 per mo | Your reason for leaving<br>Consulting contrac<br>commitment | |

| Your immediate supervisor | | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|---|
| Name<br>Maria del mar Cole | Area Code<br>202 | Telephone No.<br>623-2210 | Consultant/Executive Assistant | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised.  *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

Assist primary consultant.

- Assist in researching material available in bank
- Assist in soliciting information from local and global sources
- Assist in technical writing and documentation of study project

Assist division chiefs in day to day activites within Capital Markets, Resource Mobilization, and Investments departments.

For Agency Use (skill codes, etc.)

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| Export-Import Bank of the U.S.<br>811 Vermont Ave., N.W.<br>Washington, D.C.  20571 | From: 5/93 To: 8/93 | 40 | 0 |
| | Salary or earnings<br>Starting $1,600 per mo<br>Ending $1,600 per mo | Your reason for leaving<br>10-week temporary assignment. | |

| Your immediate supervisor | | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|---|
| Name<br>Dan Dowd | Area Code<br>202 | Telephone No.<br>566-4631 | Consultant/Computer Graphics Specialist | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised.  *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

o Developed and designed text and graphics format onto computer files for electronic retrieval

o Transferred Agency's insurance forms from paper hard copy to computer fo retrieval and printout.

For Agency Use (skill codes, etc.)

3. Job Title or Announcement Number You Are Applying For

**Administrative Officer** (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

Date Completed 3-26-03

ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| SELF EMPLOYED | From: 9/93  To: 11/93 | 9 | 0 |
| | Salary or earnings Starting $ 25.00 per hr Ending $ 25.00 per hr | Your reason for leaving Project ended. | |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Name N/A | Area Code Telephone No. | Consultant | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Coordinator for minority outreach project in Maryland, Virginia and Washington, D.C.
- Developed and implemented outreach program
- Targeted and identified Hispanic communities in the tri-state area
- Disseminated program material
- Planned and organized media local campaign

For Agency Use (skill codes, etc.)

Standard Form 171-A (BACK) (Rev. 6-88)
U.S. Office of Personnel Management
FPM Chapter 295

36

3. Job Title or Announcement Number You Are Applying For

Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

Date Completed

3-26-03

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| NEW Leadership, Center for the American Woman and Politics, Eagleton Institue of Politics, Rutgers University New Brunswick, NJ 08901 | From: 6/7/93 To: 6/18/93 | 40 | 0 |

| | Salary or earnings | Your reason for leaving |
|---|---|---|
| | Starting $1,000 per wk Ending $1,000 per wk | Consulting Position Two-weeks only. |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Name Kathy Kleeman | Area Code, Telephone No. 908 828-2210 | Faculty in Residence | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

Provided the following leadership skills and techniques training for: 24 women from 12 universities and colleges from across the country:

- Action Strategies/Lobbying
- Communication
- Delegation
- Leadership
- Meeting  Planning and Conducting
- Networking
- Understaning and Exercise of Power
- Public Relations/ Promotion
- Trust-building
- Consulting
- Political Process

- Budgeting/Finance
- Creativity
- Fundraising
- Management
- Membership Development
- Planning and Organization
- Advocacy
- Projects/Activities
- Public Speaking
- Visioning
- Outreach

For Agency Use (Skill Codes, etc.)

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| Sandra L. Aguilar 4422 Pembrook Vlg. Dr. Alexandria, VA 22309 | From: 2/93 To: 5/93 | | |

| | Salary or earnings | Your reason for leaving |
|---|---|---|
| | Starting $ per Ending $ per | |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Name | Area Code  Telephone No. 703 780-9499 | Unemployed | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

For Agency Use (Skill Codes, etc.)

THE FEDERAL GOVERNMENT IS AN EQUAL OPPORTUNITY EMPLOYER

PREVIOUS EDITION USABLE

Standard Form 171-A (Rev. 6-88)
U.S. Office of Personnel Management
FPM Chapter 295

AGUILAR, SANDRA L.

3. Job Title or Announcement Number You Are Applying For Document 17-16 Filed 08/22/2008 Page 13 of 26 Date Completed
3-26-03

Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-02

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employee you supervised |
|---|---|---|---|
| CONSORTIUM FOR MINORITIES IN TEACHING CAREERS 5 Thomas Circle, N.W. Washington, D.C. 20005 | From: 11/91 To: 1/93 **Salary or earnings** Starting $44,450 per yr Ending $44,450 per yr | 60 **Your reason for leaving** Funding for progr was discontinued | 0 |

| Your immediate supervisor Name | Area Code | Telephone No. | Exact title of your job Coordinator/ | If Federal employment (civilian or military) list series, grade rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|---|
| Dr. Jud Taylor | 310 | 516-3519 | Administrative Asst. | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. *If you descr more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Coordinated ten-member consortium of minority-serving institutions of higher education, nationwide.
- Established, organized, directed and managed Washington, D.C. based office.
- Budgetary authority - $98,000 from a $1.0 million grant
- Served as liaison within member institutions and with public and private organizations including federal agencies, foundations, other minority-serving institutions i.e. Consortium of Native American Indian Colleges and Universities
- Served as government affairs representative with Congress and Division of Fund for Post-Secondary Education, Department of Education
- Developed and disseminated material to interested educational organizations, media, and other interested organizations
- Conducted research on Federal legislative and regulatory developments affecting minority educational institutions
- Prepared written testimony for Congress
- Prepared quarterly progress reports for member institutions and Members of Congress
- Assist Board of Directors and Steering Committee in all planning and implementation of programs
- Planned, developed and implemented meetings and conferences in Washington, D.C.; Los Angeles, California; and San Juan, Puerto Rico

1. Name *(Last, First, Middle Initial)*
AGUILAR, SANDRA L.

2. Social Security Number

3. Job Title or Announcement Number You Are Applying For
**Administrative Officer** (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

4. Date Completed
3-26-03

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization *(include ZIP Code, if known)* | Dates employed *(give month, day and year)* | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| CONGRESSIONAL HISPANIC CAUCUS<br>557 House Annex II<br>Washington, D.C.   20515 | From 12/89   To 5/90 | 15 | 0 |
| | Salary or earnings | Your reason for leaving | |
| | Starting $500.00 per mo<br>Ending $500.00 per mo | Contract ended. | |

| Your immediate supervisor | | | Exact title of your job | If Federal employment *(civilian or military)* list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|---|
| Name | Area Code | Telephone No. | | |
| Margarita Roque | 202 | 226-3430 | Consultant | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Served as consultant on issues of concern on the status and advancement of the Hispanic community
- Provided assistance with conference planning on behalf of the Caucus

*U.S. GPO: 1986-201-766.80115

Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19    Date Completed 3-26-03

**ADDITIONAL WORK EXPERIENCE BLOCKS**

| Name and address of employer's organization *(include ZIP Code, if known)* | Dates employed *(give month, day and year)* | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| EQUITY RESEARCH CORP.<br>5. Thomas Circle, N.W.<br>5th Floor<br>Washington, D.C. 20005 | From: 10/89  To: 12/91 | 20 | 0 |

| | Salary or earnings | Your reason for leaving |
|---|---|---|
| | Starting $1,200 per mo<br>Ending $1,200 per mo | Career Advancement |

| Your immediate supervisor | Area Code, Telephone No. | Exact title of your job | If Federal employment *(civilian or military)* list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Name: Miriam Cruz | 202 387-3333 | Consultant/<br>Project Manager | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. *If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Developed and managed programs
- Assisted in the development of collaborative agreements and consortia efforts between national majority and minority educational institutions and national and international institutions of higher education, government agencies, foundations and corporations
- Served as federal relations liaison with Members of Congress, Congressional staff and federal agencies
- Identified public and private sector funding sources for educational projects directed at higher education institutions
- Assisted in the research and preparation of proposals for funding
- Assisted in the developed and disseminated material to interested educational organizations, media, and other interested organizations
- Conducted research on Federal legislative and regulatory developments affecting minority educational institutions
- Planned, organized and implemented conferences and seminars

For Agency Use (skill codes, etc.)

*U.S. GPO: 988-201-766, 20115

● Attach all SF 171-A's to your application at the top of page 3

| 1. Name (Last, First, Middle Initial) | | 2. Social Security Number |
|---|---|---|
| AGUILAR, SANDRA L. | | |

3. Job Title or Announcement Number You Are Applying For
**Administrative Officer** (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

4. Date Completed
3-26-03

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employes you supervised |
|---|---|---|---|
| Sandra L. Aguilar<br>4422 Pembrook Village Dr.<br>Alexandria, VA 22309 | From: 3/89 To: 10/89 | | |
| | Salary or earnings | | Your reason for leaving |
| | Starting $ per | | |
| | Ending $ per | | |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Name | Area Code Telephone No. | Unemployed | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised.   If you describe more than one  type of work  (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

_For Agency Use (skill codes, etc.)_

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employes you supervised |
|---|---|---|---|
| FIERRO AND ASSOCIATES<br>1901 North Fort Myer Drive<br>Suite 1200<br>Rosslyn, VA 22209 | From: 4/89 To: 4/90 | 10 | O |
| | Salary or earnings | | Your reason for leaving |
| | Starting $ 600 per mo | | Two short-term |
| | Ending $ 600 per mo | | contracts. |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Manny Fierro | Area Code Telephone No.<br>703 243-2876 | Consultant/Coordinator | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised.   If you describe more than one  type of work  (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

● **Planned and assisted in the planning, organization, and coordination of conferences and seminars nationally for the National Indian Gaming Association**
● **Developed and maintained NGA's data base**

_For Agency Use (skill codes, etc.)_

*U.S. GPO: 1986-201-766:80115

Standard Form 171-A (BACK) (Rev. 6-88)
U.S. Office of Personnel Management

2. Social Security Number

3. Job Title or Announcement Number You Are Applying For

**Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19**

4. Date Completed
3-26-03

**ADDITIONAL WORK EXPERIENCE BLOCKS**

Name and address of employer's organization *(include ZIP Code, if known)*

DEMOCRATIC NATIONAL COMMITTEE
430 South Capital, S.E.
Washington, D.C. 20003

Dates employed *(give month, day and year)*
From 6/85     To: 3/89

Average number of hours per week
65

Number of employe you supervised
2-FT 712-

Salary or earnings
Starting $ 45,500 a yr
Ending $ 54,600 a yr

Your reason for leaving
Position terminat
under new adminis

Your immediate supervisor
Name
Sen. Polly Baca

Area Code, Telephone No.
303  252-1010

Exact title of your job
Director, Office of
the Vice Chair

If Federal employment *(civilian or military)* list series, grade or
rank, and, if promoted in this job, the date of your last promotior

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised.  *If you descri*
*more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.*

- Directed, supervised and administered division
- Authorized spending, planned and projected budget criteria
- Hired staff; supervised staff
- Evaluated and reviewed staff performances
- Developed, implemented and maintained constituency outreach programs including the state legislators, minority and ethnic communities e.g. Hispanic and African Americans, Asian/Pacific Islanders, Native American Indians and middle eastern Asians, and national organization
- Served as Secretariat for visiting foreign officials
- Prepared and set program timetables
- Served as public relations officer and disseminated information to all DNC Committee members, elected officials, constituents, and interested organizations
- Performed formal and informal forms of speeches and participated in panel discussions, training sessions and roundtable meetings
- Supervised research, writing, editing of position papers, speech outlines, media communications
- Analyzed research resources and provided research and statistical analysis on state election results
- Served as federal relations liaison and interacted daily with Congressional members, state and local elected officials, national organizations for specific elected officials (i.e. Governor's Association, Conference of Mayors, National Conference of State Legislatures), trade associations, Labor, diverse communities, and foreign visitors
- Planned and coordinated conferences, seminars, meetings and special fundraising events
- Prepared all quarterly, semi-annual and annual reports

. . .continued

For Agency Use (skill codes, etc.)

Standard Form 171-A (BACK) (Rev. 6-88
U.S. Office of Personnel Managemen
FPM Chapter 29!

42

1. Name (Last, First, Middle Initial)
2. Social Security Number
3. Job Title or Announcement Number You Are Applying For
Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19
4. Date Completed
3-26-03

ADDITIONAL WORK EXPERIENCE BLOCKS

Item    (Continued)

## DEMOCRATIC STATE LEGISLATIVE LEADERS ASSOCIATION

### State Legislative Liaison

- Developed outreach programs
- developed one-year and two-year programs for the DSLLA and state legislators in general
- Coordinated and implemented special issue oriented programs for the DSLLA
- Developed and implemented special conferences and seminars for the DSLLA at all National Conference of State Legislatures' (NCSL) meetings and conferences
- Devised agendas and programs for seminars, conferences, and meetings
- Developed and exchanged generic media spot announcements
- Developed State Legislators Speakers Bureau
- Communicate and coordinate DNC and DSLLA services and programs with state party officials and their offices.

For Agency Use (skill codes, etc.)

3. Job Title or Announcement Number You Are Applying For

Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

4. Date Completed

3-26-03

ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employees you supervised |
|---|---|---|---|
| DEVI COMPUTERS, INC.<br>Aurora, CO | From: 6/83   To: 12/83 | 60 | 12 |

| | Salary or earnings | Your reason for leaving |
|---|---|---|
| | Starting $ 24K   per Yr<br>Ending $ 24K   per Yr | Returned to State Legislature |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grade or rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|---|
| Name<br>Jag Sohdi | Area Code, Telephone No. | Office Manager | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. If you describe more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

**A Consulting and Retail Firm**

- Managed day to day operations of consulting firm
- Supervised staff of 12 including retail and technical staff
- Assisted computer programmers in testing and implementing specially contracted computer software programs custom designed for customers
- Maintained firms general ledgers on computer spread sheet
- Designed and organized in-house financing (worked through and with State Regulatory Agency/IRS/state Banking Division)
- Designed client contracts
- Designed and maintained customer financing filing system
- Created advertising for retail store
- Instructed classes of adults in word processing

For Agency Use (Skill Codes, etc.)

*U.S. GPO: 1988-201-766. 80115

| 1. Name (Last, First, Middle Initial) | | | 2. Social Security Number |
|---|---|---|---|
| AGUILAR, SANDRA L. | | | |

| 3. Job Title or Announcement Number You Are Applying For | 4. Date Completed |
|---|---|
| Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19 | 3-26-03 |

## ADDITIONAL WORK EXPERIENCE BLOCKS

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of employee you supervised |
|---|---|---|---|
| COLORADO STATE LEGISLATURE/SENATE State Capital Building Denver, CO 80203 | From: 2/83    To: 6/85 | 50 | 0 |
| | Salary or earnings | Your reason for leaving | |
| | Starting $ 23K per yr Ending $ 23K per yr | Career Advancemen | |

| Your immediate supervisor | Exact title of your job | If Federal employment (civilian or military) list series, grade o rank, and, if promoted in this job, the date of your last promotion |
|---|---|---|
| Name | Area Code  Telephone No. | |
| Sen. Ray Peterson 303 866-2318 | Legislative Asst. | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised. If you describ more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

- Served as liaison for the Democratic Senate with Executive Agencies, State House of Representatives, lobbyists, and constituents
- Assisted legislators with constituent case work
- Secured media coverage for legislators
- Provided statutory research and information on pending legislation for Senate Leaders, Senators, their constituents, and special interest groups

For Agency Use (skill codes, etc.)

*U.S. GPO: 1988-201-766, 20115

Standard Form 171-A (BACK) (Rev. 6-88
U.S. Office of Personnel Managemen
FPM Chapter 29!

45

3. Job Title or Announcement Number You Are Applying For

**Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19**

4. Date Completed
3-26-03

**ADDITIONAL WORK EXPERIENCE BLOCKS**

| Name and address of employer's organization (include ZIP Code, if known) | Dates employed (give month, day and year) | Average number of hours per week | Number of emplo you supervised |
|---|---|---|---|
| COLORADO STATE LEGISLATURE/HOUSE OF REPRESENTATIVES State Capital Building Denver, CO 80203 | From: 1 / 81   To: 1 / 83 | 60 | 25 inter |
| | Salary or earnings Starting $ 22K  per yr Ending $ 22K  per yr | Your reason for leaving Position terminat under new leader: | |

| Your immediate supervisor | | Exact title of your job | If Federal employment (civilian or military) list series, grad rank, and, if promoted in this job, the date of your last promot |
|---|---|---|---|
| Name Rep. Federico Pena | Area Code  Telephone No. | Special Assistant | |

Description of work: Describe your specific duties, responsibilities and accomplishments in this job, including the job title(s) of any employees you supervised.   If you desc
more than one type of work (for example, carpentry and painting, or personnel and budget), write the approximate percentage of time you spent doing each.

- Managed and supervised office for the three Democratic House Leaders; and served as administrative assistant to the House Democratic Leader
- Served as liaison for House leadership with Senate leadership, Statehouse Democratic Caucus, Governor's office, executive agencies, special interest groups, and media
- Supervised 25 interns
- Provided statutory research and information on pending legislation for House Leaders, their constituents, and special interest groups
- Planned, organized and implemented conferences, meetings and special constituent hearings for state and congressional elected officials
- Secured media coverage for special announcements and functions

3. Job Title or Announcement Number You Are Applying For
**Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19**

4. Date Completed
3-26-03

**ADDITIONAL WORK EXPERIENCE BLOCKS**

**ADDITIONAL ACTIVITIES:**

Facilitator, Campaign Management II, Political Leadership: The Women Who Ran the '92 Campaigns, Women's Voices, Washington, DC, 1993

Coordinator, The Hispanic Inaugural Gala, "An American Reunion", the 52nd Presidential Inaugural, Adelante con Clinton National Campaign Committee, Washington, DC, 1993

Coordinator, Historically Black Colleges and Universities and Hispanic-Serving Institutions Presidents' Dialogue and Conference, Washington, DC. 1990

**ELECTIONS AND APPOINTMENTS:**

Elected, Secretary for the 4th Congressional District 1985-1987

Elected, Affirmative Action Committee, 4th Congressional District, 1983-1986

Appointed, Secretary of the Human Services Committee, City Council, Commerce City, Colorado, 1977-1978

Appointed, Oral Examiner, Department of Human Services, State of Colorado, 1981-1982

Appointed, Council of Governments, Adams County, Colorado, 1983-1985

Commissioned, Notary Public, State of Colorado, 1983-1985

**For Agency Use (skill codes, etc.)**

● Attach an SF 171-A's to your application at the top of page 3.

1. Name *(Last, First, Middle Initial)*

AGUILAR, SANDRA L.

3. Job Title or Announcement Number You Are Applying For

Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19

2. Social Security Number

4. Date Completed
3-26-03

**ADDITIONAL WORK EXPERIENCE BLOCKS**

## CIVIC EXPERIENCE:

Voter Registration Poll Judge, Adams County Election Commission, Adams County, Colorado, 1976

Voter Registration Poll Judge, Adams County Election Commission, Adams County, Colorado, 1978

Election Judge, Adam County Election Commission (local, county, state, and national election), Adams County, Colorado; 1973-1984

## AWARDS:

Secretary's Award for Distinguished Service, U.S. Department of Health and Human Services, Washington, DC, 1998

Quality Step Increase, Office of Consumer Affairs, Washington, DC, 1996

OCA Special Performance Award, 1995

Award of Appreciation, NEW Leadership, Center for the American Woman and Politics, Eagleton Institute of Politics, Rutgers University, New Brunswick, NJ, 1993

Award of Appreciation, National Democratic Convention, Washington, D.C., 1988

Award of Appreciation, LULAC National Education Services Center, Inc., Washington, D.C., 1987

Certificate of Appreciation, Fairfax County Public Schools, State of Virginia, 1987

Tribute, House of Representatives, State of South Carolina, 1985

Tribute, House of Representatives, State of Colorado, 1985

Tribute, State Senate, State of Colorado, 1983

Tribute, House of Representatives, State of Colorado, 1982

For Agency Use (Skill Codes, etc.)

1. Name *(Last, First, Middle Initial)*
AGUILAR, SANDRA

2. Job Title or Announcement Number You Are Applying For
**Administrative Officer (Assoc. Regional Dir., Admin.) NPS-NCR-03-19**

4. Date Completed
3-26-03

**ADDITIONAL WORK EXPERIENCE BLOCKS**

**HONORS:**

> Dean's List, Strayer College, 1990 and 1991

**MEMBERSHIPS:**

> Board of Directors, American GI Forum, Washington, DC Chapter, 1996; Dialogue on Diversity, 1996; Hispanic PAC, USA, 1992

> Co-founder, National Hispanic Democratic Women's Network, 1993
> Washington, DC Steering Committee, Adelante con Clinton, 1992

> National Association of Hispanic Federal Employees, 1994-1996; Clinton/Gore Administration Association, 1994-1996; Greater Washington Ibero American Chamber of Commerce, 1995; League of United Latin American Citizens, 1990-1993; MANA, 1992-199

For Agency Use (skill codes, etc.)

*U.S. GPO: 1986-201-766 40115*

Standard Form 171-A (BACK) (Rev. 6-
U.S. Office of Personnel Management
FPM Chapter

Case 1:07-cv-00543-RWR   Document 11-11   Filed 08/17/2007   Page

## EDUCATION

**25** Did you graduate from high school? *If you have a GED high school equivalency or will graduate within the next nine months, answer "YES".*

**26** Write the name and location *(city and state)* of the last high school you attended or where you obtained your GED high school equivalency.

Adam City High School, Commerce City, CO

YES **X**  ▶ *If "YES", give month and year graduated or received GED equivalency:* 5/70

NO  ▶ *If "NO", give the highest grade you completed:*

**27** Have you ever attended college or graduate school?   YES **X**  ▶ *If "YES", continue with 28.*
NO  ▶ *If "NO", go to 31.*

**28** NAME AND LOCATION *(city, state and ZIP Code)* OF COLLEGE OR UNIVERSITY.. *If you expect to graduate within nine months, give the month and year you expect to receive your degree:*

| Name | City | State | ZIP Code | MONTH AND YEAR ATTENDED From | To | NUMBER OF CREDIT HOURS COMPLETED Semester | Quarter | TYPE OF DEGREE *(e.g. B.A., M.A.)* | MONTH AND YEAR OF DEGREE |
|---|---|---|---|---|---|---|---|---|---|
| 1) Barnes College | Denver, CO | | | 3/83 | 9/83 | | 24 | BSBA | |
| 2) Strayer College | Washington DC | | 20005 | 9/90 | 9/91 | | 54 | BSBA | |
| 3) | | | | | | | | | |

**29** CHIEF UNDERGRADUATE SUBJECTS *Show major on the first line*

| | NUMBER OF CREDIT HOURS COMPLETED Semester | Quarter |
|---|---|---|
| 1) Business Administration | 24 | 54 |
| 2) | | |
| 3) | | |

**30** CHIEF GRADUATE SUBJECTS *Show major on the first line*

| | NUMBER OF CREDIT HOURS COMPLETED Semester | Quarter |
|---|---|---|
| 1) | | |
| 2) | | |
| 3) | | |

**31** If you have completed any other courses or training related to the kind of jobs you are applying for *(trade, vocational, Armed Forces, business)* give information below.

| NAME AND LOCATION *(city, state and ZIP Code)* OF SCHOOL | MONTH AND YEAR ATTENDED From | To | CLASS-ROOM HOURS | SUBJECT(S) | TRAINING COMPLETED YES NO |
|---|---|---|---|---|---|
| School Name 1) City  State  ZIP Code | | | | | |
| School Name 2) City  State  ZIP Code | | | | | |

## SPECIAL SKILLS, ACCOMPLISHMENTS AND AWARDS

**32** Give the title and year of any honors, awards or fellowships you have received. List your special qualifications, skills or accomplishments that may help you get a job. *Some examples are: skills with computers or other machines; most important publications (do not submit copies); public speaking and writing experience; membership in professional or scientific societies; patents or inventions; etc.*

PLEASE SEE ATTACHED SUPPLEMENTAL STATEMENT

**33** How many words per minute can you:
TYPE?  TAKE DICTATION?
80 wpm

*Agencies may test your skills before hiring you.*

**34** List job-related licenses or certificates that you have, such as: *registered nurse; lawyer; radio operator; driver's; pilot's; etc.*

| LICENSE OR CERTIFICATE | DATE OF LATEST LICENSE OR CERTIFICATE | STATE OR OTHER LICENSING AGENCY |
|---|---|---|
| 1) | | |
| 2) | | |

**35** Do you speak or read a language other than English *(include sign language)? Applicants for jobs that require a language other than English may be given an interview conducted solely in that language.*   YES    NO **X**  ▶ *If "YES", list each language and place an "X" in each column that applies to you.*
▶ *If "NO", go to 36.*

| LANGUAGE(S) | CAN PREPARE AND GIVE LECTURES Fluently | With Difficulty | CAN SPEAK AND UNDERSTAND Fluently | Passably | CAN TRANSLATE ARTICLES Into English | From English | CAN READ ARTICLES FOR OWN USE Easily | With Difficulty |
|---|---|---|---|---|---|---|---|---|
| 1) | | | | | | | | |
| 2) | | | | | | | | |

## REFERENCES

**36** List three people who are not related to you and are not supervisors you listed under 24 who know your qualifications and fitness for the kind of job for which you are applying. At least one should know you well on a personal basis.

| FULL NAME OF REFERENCE | TELEPHONE NUMBER(S) *(Include Area Code)* | PRESENT BUSINESS OR HOME ADDRESS *(Number, street and city)* | STATE | ZIP CODE |
|---|---|---|---|---|
| 1) Bernice Friedlander | 301-436-2124 | 940 25th St., NW #114-S Washington | DC | 20037 |
| 2) Bettie Baca | 202-401-8276 | 4011 Oxford Street Annandale | VA | 22003 |
| 3) Mike Blank | 301-443-3921 | 5600 Fishers Lane, Rm 17-21 Rockville | MD | 20857 |

Page 3

50

**37** Are you a citizen of the United States? *(In most cases you must be a U.S. citizen to be hired. You will be required to submit proof or identification if you are hired.)* If "NO", give the country or countries to which you owe allegiance.

|  | YES | NO |
|---|---|---|
|  |  | x |

NOTE: It is important that you give complete and truthful answers to questions 38 through 44. If you answer "YES" to any of them, provide your explanation(s) in Item 45. Include convictions resulting from a plea of nolo contendere *(no contest)*. Omit: 1) traffic fines of $100.00 or less; 2) any violation of law committed before your 16th birthday; 3) any violation of law committed before your 18th birthday, if finally decided in juvenile court or under a Youth Offender law; 4) any conviction set aside under the Federal Youth Corrections Act or similar State law; 5) any conviction whose record was expunged under Federal or State law. We will consider the date, facts, and circumstances of each event you list. In most cases you can still be considered for Federal jobs. However, **if you fail to tell the truth or fail to list all relevant events or circumstances, this may be grounds for not hiring you, for firing you after you begin work, or for criminal prosecution (18 USC 1001).**

|  | | YES | NO |
|---|---|---|---|
| **38** | During the last 10 years, were you fired from any job for any reason, did you quit after being told that you would be fired, or did you leave by mutual agreement because of specific problems? | | x |
| **39** | Have you ever been convicted of, or forfeited collateral for **any felony violation?** *(Generally, a felony is defined as any violation of law punishable by imprisonment of longer than one year, except for violations called misdemeanors under State law which are punishable by imprisonment of two years or less.)* | | x |
| **40** | Have you ever been convicted of, or forfeited collateral for **any firearms or explosives violation?** | | x |
| **41** | Are you now under charges for **any violation of law?** | | x |
| **42** | During the last 10 years have you forfeited collateral, been convicted, been imprisoned, been on probation, or been on parole? Do not include violations reported in 39, 40, or 41, above. | | x |
| **43** | Have you ever been convicted by a military **court-martial?** If no military service, answer "NO". | | x |
| **44** | Are you delinquent on any Federal debt? *(Include delinquencies arising from Federal taxes, loans, overpayment of benefits, and other debts to the U.S. Government plus defaults on Federally guaranteed or insured loans such as student and home mortgage loans.)* | | x |

**45** If "YES" in: 38 - Explain for each job the problem(s) and mark your reason(s) for leaving. Give the employer's name and address.
         39 through 43 - Explain each event. Give place of occurrence and name/address of police or court involved.
         44 - Explain the type, length and amount of the delinquency or default, and steps you are taking to correct errors or repay the debt. Give any identification number associated with the debt and the address of the Federal agency involved.

NOTE: If you need more space, use a sheet of paper, and include the item number.

| Item No. | Date (Mo./Yr.) | Explanation | Mailing Address |
|---|---|---|---|
|  |  |  | Name of Employer, Police, Court, or Federal Agency |
|  |  |  | City     State    ZIP Code |
|  |  |  | Name of Employer, Police, Court, or Federal Agency |
|  |  |  | City     State    ZIP Code |

|  | | YES | NO |
|---|---|---|---|
| **46** | Do you receive, or have you ever applied for retirement pay, pension, or other pay based on military, Federal civilian, or District of Columbia Government service? | | x |
| **47** | Do any of your relatives work for the United States Government or the United States Armed Forces? Include: *father; mother; husband; wife; son; daughter; brother; sister; uncle; aunt; first cousin; nephew; niece; father-in-law; mother-in-law; son-in-law; daughter-in-law; brother-in-law; sister-in-law; stepfather; stepmother; stepson; stepdaughter; stepbrother; stepsister; half brother; and half sister.* If "YES", provide details below. If you need more space, use a sheet of paper. | x | |

| Name | Relationship | Department, Agency or Branch of Armed Forces |
|---|---|---|
| William Nieto, Jr. | Husband | National Park Service |

## SIGNATURE, CERTIFICATION, AND RELEASE OF INFORMATION

# YOU MUST SIGN THIS APPLICATION.   Read the following carefully before you sign.

- A false statement on any part of your application may be grounds for not hiring you, or for firing you after you begin work. Also, you may be punished by fine or imprisonment (U.S. Code, title 18, section 1001).
- If you are a male born after December 31, 1959 you must be registered with the Selective Service System or have a valid exemption in order to be eligible for Federal employment. You will be required to certify as to your status at the time of appointment.
- I understand that any information I give may be investigated as allowed by law or Presidential order.
- I consent to the release of information about my ability and fitness for Federal employment by *employers, schools, law enforcement agencies and other individuals and organizations, to investigators, personnel staffing specialists, and other authorized employees of the Federal Government.*
- I certify that, to the best of my knowledge and belief, all of my statements are true, correct, complete, and made in good faith.

| **48** SIGNATURE *(Sign each application in dark ink)* | **49** DATE SIGNED *(Month, day, year)* |
|---|---|
| *Sandra L. Aguilar* | 3-26-03 |

51

# EXHIBIT 14

Read the instructions before you complete this application. *Type or print clearly in dark ink.*

## GENERAL INFORMATION

**1** What kind of job are you applying for? *Give title and announcement number (if any)*

Administrative Officer/NPS-NCR-03-79

The announcement lists several job titles, which jobs are you applying for?

Associate Regional Director, Administration

**3** Social Security Number

**4** Birth date *(Month, Day, Year)*

**5** Name *(Last, First, Middle)*

AGUILAR, SANDRA L.

Street address or RFD number *(include apartment number, if any)*

2338 TAWNY DRIVE

| City | State | ZIP Code |
|---|---|---|
| WALDORF | MD | 20601 |

**6** Other names ever used

Sandy

**7** Sex *(for statistical use)*  ☐ Male  ☒ Female

**8** Home Phone: Area Code 301  Number 870-6727

**9** Work Phone: Area Code 301  Number 870-6727

**10** Were you ever employed as a civilian by the Federal Government? If "NO", go to 11. If "YES", mark each type of job you held with an "X".

☐ Temporary  ☐ Career-Conditional  ☐ Career  ☒ Excepted

What is your highest grade, classification series and job title?

Dates at highest grade: FROM 05/98  TO 07/07

**11** If you have any applications for Federal employment on file with the U.S. Office of Personnel Management? If "NO", mark here ☒ and go to 12. If "YES", write below and continue in 47 the information for each application: (a) the name of the office that has your application; (b) the title of the job; (c) the date of your Notice of Results; and (d) your rating.

## AVAILABILITY

**12** When can you start work? *(Month and Year)* 5/1/03

**13** What is the lowest pay you will accept?

Pay $ ___ per ___ OR Grade 15-3

**14** Are you willing to work:

| | YES | NO |
|---|---|---|
| A. In the Washington, D.C. metropolitan area? | XX | |
| B. Outside the 50 United States? | XX | |
| C. Any place in the United States? | XX | |
| D. Only in *(list the location(s))* | | |

**15** Are you willing to work:

| | YES | NO |
|---|---|---|
| A. 40 hours per week (full-time)? | XX | |
| B. 25-32 hours per week (part-time)? | | XX |
| C. 17-24 hours per week (part-time)? | | XX |
| D. 16 or fewer hours per week (part-time)? | | XX |
| E. In an intermittent job (on-call/seasonal)? | | XX |
| F. Weekends, shifts, or rotating shifts? | | XX |

**16** Are you willing to take a temporary job lasting:

| | YES | NO |
|---|---|---|
| A. 5 to 12 months (sometimes longer)? | X | |
| B. 1 to 4 months? | | XX |
| C. Less than 1 month? | | XX |

**17** Are you willing to travel away from home for:

| | YES | NO |
|---|---|---|
| A. 1 to 5 nights each month? | X | |
| B. 6 to 10 nights each month? | X | |
| C. 11 or more nights each month? | X | |

FOR USE OF EXAMINING OFFICE ONLY

Material ☐ Submitted  ☐ Returned   Entered register:

Rotations:

Form reviewed:

Form approved:

| Option | Grade | Earned Rating | Preference | Aug Rating |
|---|---|---|---|---|
| 341 | 15 | E | ☐ 5 Points (Tent)  ☐ 10 Pts (30%) Or More Comp Dis  ☐ 10 Pts. Less Than 30% Comp Dis  ☐ Other 10 Points  ☐ Disabled  ☐ Being Investigated | |

Initials and Date 4/10/03

FOR USE OF APPOINTING OFFICER ONLY

Preference has been verified through proof that the separation was under honorable conditions, and other proof as required.

☐ 5 Point  ☐ 10 Point—30% or More Compensable Disability  ☐ 10 Point—Less Than 30% Compensable Disability  ☐ 10 Point—Other

Signature and Title

| Agency | Date |
|---|---|

## MILITARY SERVICE AND VETERAN PREFERENCE

**18** Have you served on active duty in the United States Military Service? *If your only active duty was training in the Reserves or National Guard, answer "NO".* If "NO", go to 22. ☐ YES ☐ NO

**19** Were you honorably discharged from the military service? *If your discharge was changed to "honorable" or "general" by a Discharge Review Board, answer "YES". If you received a clemency discharge, answer "NO".* If "NO", explain in 47.

**20** Did you or will you retire at or above the rank of major or lieutenant commander?

**21** List the dates, branch, and serial number for all active duty service.

| FROM | TO | BRANCH OF SERVICE | SERIAL NUMBER |
|---|---|---|---|
| | | | |
| | | | |

**22** Place an "X" in the box next to your Veteran Preference claim. Mark only one box. *See the instructions for eligibility information.*

**1** NO PREFERENCE

**2** 5-POINT PREFERENCE—You must show proof when you are hired.

10-POINT PREFERENCE—If you claim 10-point preference, you must complete a Standard Form 15, which is available at any Federal Job Information Center. ATTACH THE COMPLETED SF 15 TO THIS APPLICATION, TOGETHER WITH THE PROOF REQUESTED IN THE SF 15.

**3** Non-compensably disabled or Purple Heart recipient.

**4** Compensably disabled (less than 30%).

**5** Spouse, widow(er), or mother.

**6** Compensably disabled (30% or more).

Exhibit
Page 52 of 117 pages

# EXHIBIT 15

BEFORE THE
U.S. DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

In the Matter of:                    :

SANDRA L. AGILAR                     :

    Complainant,                     :
                                        CASE NO:
    v.                               : FNP-2003-064

U.S. DEPARTMENT OF INTERIOR,         :
NATIONAL PARK SERVICE

    Agency.                          :

_____

Tuesday,
August 19, 2003

National Park Service
1100 Ohio Drive, S.W.
2nd Floor Conference Rm.
Washington, DC

Sworn statement of:

    LESLIE J. NEWMAN

EEO INVESTIGATOR:

    Carl Bradley

---

PROCEEDINGS

1:40 p.m.

INVESTIGATOR BRADLEY: My name is Carl Bradley, Jr. I'm an EEO investigator. I've been assigned to investigate a formal complaint of discrimination filed against the National Park Service by Ms. Sandra L. Agilar, Docket No. FNP-2003-064.

The following claim has been accepted for investigation. Complainant alleges discrimination based on her race (Hispanic), national origin (Mexican-American) and age (51) when she was not selected for the position of Administrative Officer, GS-341-15, advertised under vacancy announcement number NPS-NCR-03-19.

The alleged act of discrimination occurred on or about July 7, 2003.

I am required to solicit testimony from those persons with knowledge or information pertaining to the claim that has been accepted for investigation. Inasmuch as this is sworn testimony, I am required to administer an oath.

Do you have any conscientious objection to being placed under oath?

MS. NEWMAN: No, I do not.

INVESTIGATOR BRADLEY: Would you raise your

---

right hand, please?

Do you solemnly swear that the information you are about to provide in your testimony is true and correct, so help you God?

MS. NEWMAN: I do.

EXAMINATION

BY INVESTIGATOR BRADLEY:

Q    What is your full name?

A    My full name is Leslie J. Venable Newman.

Q    Could you spell your name, please?

A    My last name?

Q    Your full name.

A    Leslie J --

THE REPORTER: I got that. What's the other one.

THE WITNESS: My maiden name is Venable, V-E-N-A-B-L-E.

THE REPORTER: A-B-L-E?

THE WITNESS: Uh-huh.

THE REPORTER: Thank you.

BY INVESTIGATOR BRADLEY:

Q    Inasmuch as this complaint is filed on the bases of race, national origin and age, I'm required to identify each witness according to the bases of the

---

complaint.

What is your race?

A    African-American.

Q    What is your national origin?

A    African-American. United States of America.

Q    What is your date of birth?

A    My date of birth is [redacted]

Q    What is your current position title and grade?

A    My current position is Supervisor, Human Resource Specialist. My grade is GS-13.

Q    What's the complete organizational name of your place of employment?

A    This is the National Capital Region and I work for the Associate Regional Director of Administration in the Division of Human Resources. My organizational title is Chief, Staffing and Placement.

Q    How long have you been employed in your current position?

A    My current position, I've been employed I believe since 1997.

Q    Who is your immediate supervisor?

A    My immediate supervisor now is Dottie Marshall.

5

1  Q    And what's her title?

2  A    Associate Regional Director of

3 Administration.

4  Q    Did you have any involvement in the selection

5 process for the position of Administrative Officer, GS-

6 14, in question? -- GS-15 in question?

7  A    I was responsible for announcing the

8 position, gathering the applications and doing the

9 basic rating and ranking of the applications.

10  Q    Where was the position in question located?

11  A    The position in question is located here at

12 National Capital Region.

13  Q    In what particular office?

14  A    The Associate Regional Director of

15 Administration.

16  Q    What were the opening and closing dates for

17 the announcement in question?

18  A    The announcement was first advertised March

19 10th, with a closing date of March 31st. There was then

20 an error found based on a memo dated February 12th of

21 1999, that the position should have gone two grade

22 levels, so we re-announced it and amended it to close

23 April 14th.

24  Q    When the vacancy was initially advertised,

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

6

1 what was the area of consideration?

2  A    The area of consideration was Department

3 wide.

4  Q    Do you recall the date that the announcement

5 was amended?

6  A    I don't have that with me but I can get it

7 for you. The date we were instructed to amend it?

8  Q    Yes.

9  A    It's probably in the merit promotion file.

10  Q    How was the announcement amended?

11  A    The announcement was amended. The grade of

12 the position was amended to go two grade levels, both

13 the 14 and the 15. It also included the GS-14 salary.

14 The area of consideration was changed to all sources

15 and the closing date was extended.

16  Q    Did you have any involvement in the rating

17 and ranking process for the position in question?

18  A    The rating and ranking of the non-status

19 applicants was done by a human resource specialist that

20 I recruited from out in the Park by the name of Ms.

21 Joyce Sasser.

22  Q    What procedure was used to rate and rank the

23 non-status applicants?

24  A    There was a crediting plan developed by me

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

7

1 and Ms. Sasser used that crediting plan to come up with

2 the numerical scores that we did for the non-status

3 applicants.

4  Q    What procedure was used to rate and rank the

5 status applicants?

6  A    The status applicants? A panel was convened.

7 And I don't have the exact date. That's in the file.

8 And they were rated and ranked both at 14 and 15 on

9 the same crediting plan.

10  Q    Was there any requirement to have the non-

11 status applicants rated by a panel?

12  A    No, there was not.

13  Q    Is there any reason why status applicants

14 were rated by a panel and the non-status applicants

15 were rated by a personnel specialist?

16  A    The merit promotion plan says if you have

17 over 10 qualified promotion eligibles that a panel

18 should be convened. There's approximately 60

19 applications for this particular job and I believe 40-

20 some odd candidates were rated.

21  Q    Why weren't the non-status applicants rated

22 by a panel?

23  A    It doesn't require that in our merit

24 promotion plan or in the delegated handbook put out by

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

8

1 OPM.

2  Q    Who was the selecting official for the

3 position in question?

4  A    I believe it was a two-part; Terry Carlstrom,

5 the Associate Regional Director, and his deputy, Joe

6 Lawler. One of his deputies.

7  Q    Did you issue or prepare any of the

8 certificates of eligibles?

9  A    I issued several certificates based on what

10 we call a cut-off score for both the status and the

11 non-status. There were two non-status certificates.

12  Q    One at the GS-14 and one at the GS-15?

13  A    One at the GS-14 and one at the GS-15. And

14 there were five competitive level certs that were

15 issued, both at the 14 and 15 for promotion eligibles,

16 reassignment eligibles at both grade levels.

17       There was one re-promotion eligible and that

18 was it.

19  Q    Who was selected for the position in

20 question?

21  A    Ms. Dottie Marshall.

22  Q    Let me go back a little bit.

23       Were any of the candidates interviewed for

24 the position in question?

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

9

1    A    There were five candidates, I believe, that
2 were selected to be interviewed.
3         No.  There were four.
4    Q    Could you give me the names of those
5 candidates?
6    A    There was a Mr. Kenneth E. Brody.  There was
7 a Mr. Ricardo R. Portillo.
8    Q    Could you spell his name for the Court
9 Reporter?
10    A    Portillo.  P-O-R-T-I-L-L-O.  Ricardo was his
11 first name.
12    Q    And let me know what certificate their name
13 appeared on?
14    A    These two gentlemen were on the promotion
15 eligible GS-14.
16         This gentleman that was interviewed, Thomas
17 J. Ferranti.  His last name is F-E-R-R-A-N-T-I.  He was
18 on a reassignment certificate which means he was
19 already a grade 15.
20         Then there was Dottie P. Marshall.  She was
21 on a promotion certificate for the 15.
22    Q    Who made the decision to interview which
23 candidates?
24    A    That decision was solely up to the selecting

10

1 official who was either Mr. Carlstrom or Mr. Lawler.
2    Q    If one applicant was interviewed, was there
3 any requirement to have all candidates interviewed,
4 those whose names appeared on any of the certificates
5 of eligibles?
6    A    The merit promotion plan states -- and I did
7 give Mr. Carlstrom a copy of this -- that normally if
8 one candidates is interviewed, all other candidates
9 should be interviewed.  However, if only certain
10 candidates are chosen to be interviewed, the choice
11 must be based solely on job related criteria.
12    Q    Did any candidate-applicant whose name
13 appeared on the non-status certificate of eligibles,
14 were any of those candidates interviewed?
15    A    Not to my knowledge, no.
16    Q    Do you know Ms. Sandra Agilar, the
17 Complainant?
18    A    No, I do not.
19    Q    Was she an applicant for the position in
20 question?
21    A    Yes, she was.
22    Q    Do you know if Ms. Agilar applied under the
23 initial or the amended announcement?
24    A    I'd have to go back and look at the file.

11

1         INVESTIGATOR BRADLEY: Off record for a
2 minute, please.
3         (Off the record.)
4         INVESTIGATOR BRADLEY: Back on the record.
5    BY INVESTIGATOR BRADLEY:
6    Q    My question before we went off record was did
7 Ms. Agilar apply under the initial or the amended
8 announcement?
9    A    Based on that date received of her
10 application, March 27, 2003, it appears that she
11 applied under the initial announcement.
12    Q    Did she apply as a status or a non-status
13 applicant?
14    A    As I recall her application, she was a non-
15 status applicant at that time but the applications
16 hadn't been rated and ranked and the announcement
17 hadn't closed.  And in between that time, I think that
18 was the decision to amend and re-announce all sources
19 based on that 1999 memo that I discussed earlier.
20    Q    So if the announcement was initially
21 advertised --
22    A    Department wide.
23    Q    -- Department wide and Ms. -- the date of her
24 application was received March 27th, 2003, would she

12

1 have been eligible for consideration?
2    A    No, she would not because the area of
3 consideration was only Department wide, which means
4 that only the Department of Interior employees may
5 apply.
6    Q    Do you recall having any discussions with Ms.
7 Agilar regarding her consideration for the position in
8 question?
9    A    No.  I've never spoken to Ms. Agilar.  I
10 believe my personnel assistant, Ms. Jeanette Organ, did
11 have one or two telephone conversations with her.
12 Unfortunately, Ms. Organ is on two weeks vacation right
13 now.
14    Q    Was there any relationship between Ms.
15 Agilar's application as a non-status -- as you
16 indicate, she was non-status at the time.  Was there
17 any relationship between her application and the
18 decision to amend the announcement?
19    A    Not to my knowledge.  The decision to amend
20 the announcement, as I said before, was based on a
21 February 12, 1999 memo that was issued by then-Director
22 Bob Stanton, who, in this memo, talks about recruitment
23 for key management positions.
24         When key management positions become vacant,

13

1  they will be advertised as open to all sources.

2      Q    So why wasn't the announcement initially

3  advertised as open to all sources?

4      A    It's my understanding it was done in error

5  and it was the former Associate Regional Director, Mr.

6  Dick Powers, who I get my instructions from,

7  initially asked that it be advertised Department wide.

8           Who he discussed the area of consideration

9  with, I have no knowledge.

10     Q    Is Mr. Powers still employed?

11     A    Mr. Powers has retired.

12     Q    Did Ms. Agilar have to reapply for the

13  position in question?

14     A    Based on my recollection, she called my

15  assistant and asked that question.  I believe Ms. Organ

16  told her that this application would be fine.

17          Nothing changed in the announcement, with the

18  exception of the area of consideration and the two

19  grade levels.

20     Q    Did Ms. Agilar's name appear on any of the

21  certificates of eligibles?

22     A    Ms. Agilar's name appeared on the non-status

23  certificate for the GS-15.

24     Q    What was her rating score and ranking?

14

1      A    Her rating score -- she rated for basic

2  quals.  Then she was rated on the crediting plan and

3  her score was a 97.

4      Q    And how would she have been ranked?  What was

5  her rank amongst -- first, how many names appeared on

6  the non-status certificate at the GS-15 grade level?

7      A    There were six names that appeared.  Three of

8  those six were veterans who, of course, got veterans'

9  preference added to their score.  Two of those were 10

10  point vets and one was a 5 point veteran.

11          So, of course, based on that, they scored

12  higher and were certified above Ms. Agilar.

13     Q    From which certificate was the selection

14  made?

15     A    The selection was made from the status

16  candidates who already have government status.

17     Q    At what grade level was the selection made?

18     A    The grade was GS-15.

19     Q    Who was the selected candidate?

20     A    Dottie P. Marshall.

21     Q    Was Ms. Marshall interviewed for the position

22  in question?

23     A    My records show that she was interviewed on

24  5/14/03.

15

1      Q    Was Ms. Agilar interviewed for the position

2  in question?

3      A    My records show that there was no interview.

4      Q    Were interviews conducted for any of the

5  applicants whose names appeared on the non-status

6  certificates of eligibles?

7      A    No, they were not.

8      Q    Does the selecting official have the

9  authority to make a selection from any of the

10  certificates of eligibles that are issued?

11     A    Yes.  He has that authority.

12     Q    If a selection had been made from the non-

13  status certificate of eligibles, would veterans --

14  would those applicants who had veterans' preference,

15  would they have had to be considered or selected before

16  any other applicants whose names appeared on there?

17          You indicated that there were three

18  applicants who had veterans' preference.

19     A    Yes.  The two 10-point veterans, based on

20  rules and regulations by the Office of Personnel

21  Management, you cannot pass over unless they either

22  decline or you get an objection from the Office of

23  Personnel Management based solely on job related

24  criteria.

16

1      Q    So just so that I understand, if a selection

2  had been made from the certificate of eligibles for

3  non-status applicants, the only way that Ms. Agilar

4  could have been selected is if all three of the

5  veterans preference --

6      A    They either would have had to decline or the

7  selecting official would have requested them to go into

8  OPM with an objection based on job related criteria.

9  And it probably would have been quite difficult put in

10  an objection for all three veterans.

11     Q    Did you have any discussions with the

12  selecting officials regarding their decision about who

13  would be selected?

14     A    Conversations pertaining to --

15     Q    Why they selected this individual.

16     A    No.

17     Q    You indicated that all applicants were rated

18  against the same crediting plan?

19     A    Yes.

20     Q    Was Ms. Agilar treated differently in her

21  consideration for the position in question?

22     A    Not to my knowledge.  And the reason I did

23  bring in an outside human resource specialist was

24  because I did not want anybody to think that I was

17

1 selecting my own boss, because the Associate Regional
2 Director does supervise the Division of Human
3 Resources.
4     So I brought in an outside human resource
5 specialist from the Park to do the rating and ranking.
6     Q     How would you respond to the Complainant's
7 contention that she was adversely affected in her
8 consideration for the position in question because she
9 was not rated by a panel as were the other competitive
10 and non-competitive status applicants?
11     A     Well, like I said, I believe she was rated
12 fairly by an outside human resource specialist and we
13 did not discuss conducting a panel for non-status
14 candidates because our merit promotion plan only says
15 to rate and rank those applicants who are competing for
16 promotion.  And this outside human resource specialist,
17 I don't think, knows Ms. Agilar.
18     Q     How would you respond to the Complainant's
19 contention that she was discriminated against because
20 she was not interviewed for the position in question, a
21 were some of the other candidates.
22     A     Well, that choice was solely up to the
23 selecting official, and I believe Ms. Agilar would have
24 the right to call and ask why she wasn't interviewed.

18

1 That answer would have to come from one of those two up
2 there, Mr. Carlstrom or Mr. Joe Lawler.
3     Q     Is there any particular OPM and/or Park
4 Service merit promotion guidelines that addresses the
5 interview of candidates?
6     A     The Department of Interior's merit promotion
7 plan has this one paragraph, and it refers to 5 C.F.R.
8 572 in reference to the selecting official ensuring
9 that all candidates are treated fairly and equitably.
10 And normally, if one candidate is interviewed, all
11 others should be interviewed.  However, it's solely up
12 to the selecting official.
13     However, he should be able to respond to
14 those people that were not interviewed.
15
16     Q     Are there any circumstances when non-status
17 eligible candidates are rated by a panel?
18     A     I haven't conducted one.  If the selecting
19 official requests that, it's up to the selecting
20 official to request that.
21     Q     Is there an OPM regulation or guideline that
22 addresses the rating and ranking of non-status
23 eligibles by a rating panel?
24     A     It doesn't address it in the new -- or didn't

19

1 address it in the old delegated examining handbook and
2 it doesn't address it in this.  It just discusses the
3 completing of the rating process.  It does not discuss
4 conducting panels.
5     Q     Do you have any first-hand knowledge of the
6 qualifications of either Ms. Agilar and/or the selected
7 candidate, Ms. Dottie Marshall?
8     A     Only what I read in their application.
9     Q     Do you have any reason to believe that any
10 consideration was given to race and/or national origin
11 in the evaluation; i.e., rating and ranking process for
12 the position in question?
13     A     No.  I believe since don't know all these
14 people personally, that they were rated accurately and
15 fairly.
16     Q     Is there any identification of the candidates
17 by race and/or national origin on their applications?
18     A     They are asked to fill out a race and ethnic
19 form when they submit their application but it's solely
20 optional.  And as I recall in this case, not that many
21 did fill that out.
22     When the applications come in, it's the
23 responsibility of my assistant to immediately take
24 those off of the application, put them in a blue

20

1 envelope and mail them to the EEO office.
2     Q     Do you have any reason to believe that age
3 was a factor in the evaluation and/or selection
4 process?
5     A     No, I do not.
6     INVESTIGATOR BRADLEY: Off the record, please.
7     (Off the record.)
8     INVESTIGATOR BRADLEY: Back on the record.
9     BY INVESTIGATOR BRADLEY:
10     Q     Is the selecting official provided with the
11 rating and ranking scores of any of the candidates?
12     A     He's provided the scores once they've been
13 established based on the certificate that's sent up to
14 him.  He's not in the process of the rating and
15 ranking, if that's what you're asking.
16     Q     No.  What I'm asking is is the selecting
17 official privy to the rating and ranking scores of each
18 of the candidates whose names appear on both the non-
19 status and the status certificates of eligibles?
20     A     No.  He's only privy to the non-status that
21 are certified to him.
22     Q     And the status and non-status applicants,
23 they were all evaluated according to the same crediting
24 plan?

21

1    A    Yes, they were.

2    Q    So absent the preference, veterans preference

3  afforded to any applicant, the rating scores for both

4  the status and the non-status would have the same --

5  would be within the same range?

6    A    Yes.

7    Q    Did you have any discussions with Ms. Agilar

8  regarding her non-selection?

9    A    No, I didn't.  I've never spoken to the

10  woman.

11        INVESTIGATOR BRADLEY: Are there any other

12  comments you would like to make on the record regarding

13  the evaluation and selection process for the position

14  in question?

15        MS. NEWMAN: No.

16        INVESTIGATOR BRADLEY: Your testimony will be

17  reduced to a typewritten transcript.  You'll be

18  provided with an original and a copy of the transcript.

19  The copy is for your personal records but please do

20  not discuss or disclose any information contained in

21  your testimony.

22        Please read through the original transcript,

23  make whatever corrections or amendments you deem

24  appropriate.  However, I ask that you make any and all

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

---

22

1  such corrections on the errata sheet which appears at

2  the end of the transcript.  The errata sheet will look

3  like this.

4        Simply refer to the page and line of the text

5  that you wish to amend.  Make the corrections on the

6  errata sheet; sign the signature page.  You have to

7  sign it and have this taken care of.  Return the signed

8  original transcript in a sealed envelope.  Return it to

9  Ms. Harris' office within three days after you receive

10  it.  And your testimony will be made part of the report

11  of investigation of this complaint.

12        If there are no further comments, this

13  concludes this interview, and I appreciate your

14  cooperation with the investigation of this complaint.

15        MS. NEWMAN: Thank you.

16        (Whereupon, the proceedings were concluded at

17  12:31 p.m.)

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

---

23

1        REPORTER'S CERTIFICATE

2

3        This  is  to  certify  that  the  attached

4  proceedings before:

5        U.S. DEPARTMENT OF THE INTERIOR
6              NATIONAL PARRK SERVICE
7

8  In the Matter of:

9        SANDRA L. AGILAR

10              VS.

11        U.S. NATIONAL PARK SERVICE

12    SWORN STATEMENT OF LESLIE J. NEWMAN

13  were held as herein appears and that this is the

14  original  transcript  thereof  for  the  file  of the

15  Department, Commission, Board, Administrative Law Judge

16  or the Agency.

17        Further, I am neither counsel for or related

18  to any party to the above proceedings.

19

20
21
22        *Peggy Daniels*
              Official Reporter

23

24  Dated:    August 21, 2003
        EXECUTIVE COURT REPORTERS, INC.
        301-565-0064                    23

---

08/25/2003 18:29    3015854200    EXECUTIVE CHAPTERS

25

SIGNATURE OF WITNESS

        I have read the foregoing transcript of my

verbatim deposition consisting of 23 pages, taken on the

19th day of August, 2003 , and is a true and accurate

record of my testimony except as to any corrections I

have attached hereto.

PAGE LINE    CORRECTED TESTIMONY:

4    10    Supervisory

4    11    Resources

8    5    Regional Director

9    6    Bodie

10   8    candidate

17   2    of Administration

19   13   I

16   24   assisting in the

17   1    selection of my new

EXECUTIVE COURT REPORTERS, INC.

25

26

PAGE LINE    CORRECTED TESTIMONY:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


*Leslie J. Newman*    8-26-03
Signature of Deponent    DATE

CERTIFICATE OF NOTARY PUBLIC

The above signed did personally appear before me
and signed the above document.

_____    _____
Date    Notary Public in and for the
       State of

       My Commission expires:

# EXHIBIT 16

# REBUTTAL STATEMENTS
### by
# SANDRA L. AGUILAR
### Case No.: FNP-2003-064

RECEIVE

DEC 10 2003

NATIONAL PARK SERVICE
EQUAL OPPORTUNITY OFF

## Rebuttal to the Testimony of Leslie J. Newman

The Uniform Guidelines on Employee Selection Procedures used by the Department of Interior (DOI) states that:

> "elements used in a selection process must be job-related, requiring criteria used to determine the candidates referred and selected be related to the job to be filled."

> "In 1978, the Uniform Guidelines on Employee Selection Procedures (UGESP) were issued. The guidelines are intended to establish a uniform basis of selection procedure criteria in the Federal sector. The guide imposes employers with the criteria by which the Equal Employment Opportunity Commission would evaluate hiring practices to ensure adherence to merit principles. **The UGESP applies to both inservice placement actions and external hiring practices.**"

> "A selection procedure is any measure, combination of measures, or procedures used as a basis for an employment decision. In DOI Bureaus, this would apply, but not be limited to, job analysis, Crediting Plan, interviews, and the selection process itself."
> See Item A.

It is my perception and belief that I was discriminated against on the basis of race, national origin and age when on July 7, 2003, I was informed that I was not selected for the position of Administrative Officer (Associate Regional Director, Administration) for the National Park Service, National Capital Region. The person selected for this position was a white Anglo woman, younger in age than me.

I contend that the selection procedures used by the previous Administrative Officer, the staff in the Office of Administration and staff in the Division of Human Resources, and the selecting officials to select the candidate to fill the vacancy of Administrative Officer (Associate Regional Director, Administration) (Vacancy Announcement Number NPS-NCR-03-19) are evident of having an adverse impact on myself, an Hispanic, more importantly–an Hispanic woman. I further contend that the former Administrative Officer and the selecting officials knowingly and willfully manipulated the system before and after the vacancy announcements were published in such a manner that they were able to hire a candidate they had pre selected prior to publically announcing the vacancy.

The following are my rebuttal statements and questions to the sworn statements given by Ms. Leslie J. Newman, Supervisor, Human Resource Specialist for the National Park Services' National Capital Region.

| PAGE | | LINE STATEMENTS: |
|------|------|-------------------|

The question was, "How long have you been employed in your current position?"

4    20    Ms. Newman's response was, "My current position, I've been employed I believe since 1997.

**Rebuttal:** Ms. Newman has been with the Division of Human Resources in the Office of Administration for six years.  She should have been aware of the efforts Mr. Robert G. Stanton, the Director for the entire National Park Service from June 28, 1997 to January 2001, was making to make job acquisition easier to obtain for those outside of government and to further diversify the National Park Service and the National Capital Region.  The policy that initiated this memorandum is still in place in addition to additional policies and memoranda upholding the initial policy.  See Items B, C , D and E.

She should have known that the National Park Service was looking to hire more Hispanics, especially for the National Capital Region (NCR), which is grossly underrepresented.

As a supervisor and team member of the Office of Administration for six years she should have had a copy of Mr. Stanton's Management Succession Plan policy.  Mr. Stanton had addressed and directed his memorandum, dated February 12, 1999, to all employees.   See Items B.

I believe, that as a supervisor she should have seen to the implementation of the directive for all vacancy announcements at a GS-13 and above grade level.  If she was unable to implement the directive, she should have at the very least taken the opportunity to advise the Administrative Officer and/or the selecting officials of the policy and encouraged its enforcement.

**Q.**    Did Ms. Newman advise her supervisor and/or the selecting officials of the Stanton Memorandum's existence?  If so, when and on what date?  Is there documentation to support her efforts?  If so, please provide a copy for this case.

The question was, "Who is your immediate supervisor?"

4    23    Ms. Newman's response was, "My immediate supervisor now is Dottie Marshall."

**Rebuttal:** The question should not be who is your immediate supervisor, it should be who was your immediate supervisor before, during and after the vacancy announcement was advertised?

Ms. Marshall is the individual hired for the position of Administrative Officer (Associate Regional Director, Administration), the position for which I have filed this complaint. Ms. Newman's previous supervisor retired from the position of Administrative Officer on April 30, 2003–seven weeks after the first vacancy announcement was advertised and two weeks after the amended vacancy announcement was closed. The previous supervisor was still employed with the National Capital Region and managing all aspects of the vacancy before, during and after the first vacancy announcement was advertised. He was still employed with Regional Office when the vacancy announcement was amended and re-advertised; in addition to when the selection process began.

Q.    Was Ms. Newman aware that Ms. Dottie Marshall was being considered for the Administrative Officer position before the first vacancy announcement was published? If so, how did she know this?

Q.    Who was Ms. Newman's previous supervisor prior to May 1, 2003?

Q.    Who was Ms. Newman's supervisor during the planning, writing and posting of the first vacancy announcement?

Q.    Was this same person Ms. Newman's supervisor at the time the vacancy announcement was amended and closed?

Q.    Who was Ms. Newman's supervisor during the initial rating and ranking process?

The question was, "Did you have any involvement in the selection process for the position of Administrative Officer, GS-14, in question? – GS-15 in question?

5        7        Ms. Newman's response was, "I was responsible for announcing the position, gathering the applications and doing the basic rating and ranking of the applications.

**Rebuttal:** The selection process begins long before the selecting

-3-

officials begin their interviews. It is supposed to begin the moment the vacancy announcement is initiated in preparation of its advertisement–to solicit candidates who may believe they are qualified for the job. It begins with the determination as to when it will be advertised and to whom it will be advertised. It begins with the description of the position's responsibilities–informing potential candidates of the duties and responsibilities that are encumbered by the position. It begins with the summary of qualifications, informing potential candidates of the required level of career achievement an applicant must have acquired to be considered for the position. It begins with the criterium candidates will be measured against to determine who are the best qualified for the position.

Ms. Newman indicates that she was responsible for announcing the position, gathering the applications and doing the basic rating and ranking of the applications. So, yes, I believe she was involved in the selection process–she did the basic rating and ranking of the applications–she determined who qualified and who did not.

If she was responsible for announcing the position, then I believe she, her staff, and the staff of the Office of Administration were responsible for preparing the vacancy announcement as well (i.e., opening and closing dates, Area of Consideration, Conditions of Employment, Supervisory or Managerial Abilities, writing the Major Duties, Summary of Qualifications, the writing of the evaluation criteria and determination of the value for each level of the criterium used to assess the applicants knowledge, skills, and abilities (KSAs), and the writing of the five criteria for the Narrative Statements).

**Q.**    Did Ms. Newman, and/or her staff, and/or the staff of the Office of Administration prepared the draft vacancy announcement? If not Ms. Newman, then who did?

**Q.**    Did Ms. Newman and/or her staff, and/or the staff of the Office of Administration write the KSAs for the vacancy announcement? If not, who did?

**Q.**    Who, besides Ms. Newman and Ms. Newman's supervisor had input into the KSAs?

**Q.**    What instructions did Ms. Newman's supervisor give to her and/or other staff members of the Office of Administration regarding the KSAs and the numerical values given to each

one of them?

**Q.**    Did Ms. Newman and/or her staff, and/or the staff of the Office of Administration assign the rating scores for each KSA Title and each of the levels for each Title? If not, who did?

**Q.**    Did Ms. Newman determined the weight factors for each KSA Title? If not, who did?

**Q.**    Once Ms. Newman and/or her staff, and/or the staff of the Office of Administration completed the final draft of the first vacancy announcement, from whom did she seek approval for its announcement? Is there documentation? If so, please provide a copy for this case.

**Q.**    Ms. Newman stated she was responsible for announcing the position and Mr. Lawler says he does not remember if he reviewed or approved the vacancy announcement before it was advertised. Did Ms. Newman receive final approval of the vacancy announcement from her supervisor, the Deputy Regional Directors, and the Regional Director before she advertised the position? Were there others who also approved the vacancy announcement? If so, who else approved the announcement? Is there documentation to show who approved or did not approve the announcement? If so, please provide a copy for this case.

**Q.**    Ms. Newman stated she gathered the applications. How many applications were received for the first vacancy announcement by March 31st or with a postmark of March 31st?

**Q.**    Of the applications Ms. Newman received for the March 31st closing date, was Ms. Dottie Marshall's application among those received?

**Q.**    Ms. Aguilar's application was received on March 27th, before the first vacancy announcement closed–March 31st. Did Ms. Newman and/or her staff inform/advise anyone, specifically her supervisor(s) that her office in the Division of Human Resources/Office of Administration was in receipt of Ms. Aguilar's application? If so, who was told and when?

**Q.**    Exactly, How many applications were received for the amended/re-advertised vacancy announcement?

-5-

**Q.**   Ms. Newman stated that she was responsible for announcing the position, gathering the applications and doing the basic rating and ranking of the applications. What instructions did Ms. Newman receive from her supervisor prior to and during each task.

The question was, "What were the opening and closing dates for the announcement in question?

5       18       Ms. Newman's response was, "The announcement was first advertised March 10[th], with a closing date of March 31[st]. There was then an error found based on a memo dated February 12[th] of 1999, that the position should have gone two grade levels, so we re-announced it and amended it to close April 14[th].

**Rebuttal:** As I stated earlier, as a supervisor and team member of the Office of Administration for six years, Ms. Newman should have had a copy of Mr. Stanton's Management Succession Plan policy. Mr. Stanton memorandum, dated February 12, 1999, addressed to all employees gave specific directives regarding the designation and recruitment for key management positions. As a supervisor she should have seen to the implementation of the directive for all vacancy announcements at a GS-13 and above grade level for the region. If she was unable to implement the directive, she should have at the very least advised the Administrative Officer of the policy and encouraged its enforcement.

According to Mr. Carlstrom when asked if the vacancy announcement was amended, he stated that it was amended to reflect that it would be advertised to all sources and reduced to 14/15, so that 13's could compete, but he wasn't sure because he didn't review the vacancy announcement before it was amended. (Carstrom testimony, page 5, lines 9-13)

**Q.**   Was Ms. Newman aware of the Management Succession Plan at anytime during her six year tenure with the National Capital Region?

**Q.**   Was Ms. Newman in possession of a copy of the Management Succession Plan before the first vacancy announcement was advertised?

**Q.**   If Ms. Newman has a copy of the Management Succession Plan, who gave it to her?

Q.    If Ms. Newman was aware of the Management Succession Plan before the first vacancy announcement was advertised did she advise her supervisor(s) of its existence?

Q.    If Ms. Newman was aware of the Management Succession Plan did she make recommendations to her supervisor(s) to change the area of consideration and the grade levels before the first vacancy announcement was advertised?

Q.    Mr. Carlstrom indicated that he didn't review the first vacancy announcement before to was amended.  Who, if anyone, reviewed the vacancy announcement before it was first advertised and amended?

Q.    Ms. Newman stated that they re-announced the vacancy announcement and amended it to close April 14th.  What was the date Ms. Newman was instructed to amend the vacancy announcement?  Is there documentation?  If so, please provide a copy for this case.

Q.    Ms. Newman stated that they re-announced the vacancy and amended it to close April 14th.  Who directed her to make the changes and who approved the changes?

The question was, "When the vacancy was initially advertised, what was the area of consideration?

6        2        Ms. Newman stated, "The area of consideration was Departmentwide."

**Rebuttal:**  When asked why the announcement wasn't initially advertised as all sources, Mr. Lawler stated that he didn't know why the vacancy announcement wasn't initially advertised as all sources.  He thought that it was an administrative slip.  He also said that he didn't think that directive had been enforced widely since the previous Director had left."  (Lawler testimony, page 6, lines 9-12)  Ms. Newman stated earlier that she was responsible for announcing the vacancy.

Q.    Was this an administrative slip?

Q.    Was Ms. Newman and/or her staff responsible for the administrative slip Mr. Lawler is referring to?  If Ms. Newman and/or her staff are not responsible, then who is?

Q.    Who directed Ms. Newman to advertise the first vacancy announcement Departmentwide?  Is there documentation?  If

so, please provide a copy for this case. What was the date this directive was given?

**Q.** Did Ms. Newman advise this person to change the area of consideration to all sources?

**Q.** Did Ms. Newman advise her supervisor to change the area of consideration before the first vacancy announcement was published? If so, why wasn't it changed?

The question was, Do you recall the date that the announcement was amended?

6     6/9     Ms. Newman stated. "I don't have that with me but I can get it for you. The date we were instructed to amend it? It's probably in the merit promotion file.

**Q.** On what date was Ms. Newman instructed to amend the vacancy announcement?

**Q.** Mr. Carlstrom indicated in his testimony that he was involved in the decision to amend the announcement. Who instructed Ms. Newman to amend the vacancy announcement?

**Q.** What is the date the announcement was actually amended?

**Q.** On what date did Ms. Newman advertise the amended vacancy announcement?

**Q.** Why was the amended vacancy announcement published on March 31 and not earlier?

The question was, "How was the announcement amended?"

6     11     Ms. Newman's response was, "The announcement was amended. The grade of the position was amended to go two grade levels, both the 14 and 15. It also included the GS-14 salary. The area of consideration was changed to all sources and the closing date was extended.

**Rebuttal:** In addition to changing the area of consideration, the closing date, the salary and grade levels, some language was added to The Summary of Qualifications Required in the amended announcement. The new language is as follows:

-8-

For the GS-14 level, applicants must possess one (1) year of progressively responsible specialized experience at the GS-13 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that is typically in or related to the work of the position. **For the GS-15 level**, applicants must possess one (1) year of progressively responsible specialized experience at the GS-14 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that is typically in or related to the work of the position. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization. (This last sentence was added to the amended vacancy announcement. It was not part of the GS-15 required qualifications in the first vacancy announcement.) OPM defines "creditable service" as the conditions for completion of the period of creditable service required for career appointment.

Q. Who approved the amended vacancy announcement?

Q. This sentence was added to the amended vacancy announcement: "To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization." Why was this sentence added? Why wasn't the statement left the way it was originally?

Q. What significant meaning is attributed to the words "To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization?" In other words, are these words considered additional specific criteria to be met by applicants whereby only applicants who have worked and progressed in the NCR organization are eligible?

The question was, "Did you have any involvement in the rating and ranking process for the position in question?"

6- 18 Ms. Newman's response was, "The rating and ranking of the non-status applicants was done by a human resource specialist that I recruited from out in the Park by the name of Ms. Joyce Sasser."

**Rebuttal:** Ms. Newman did not indicate her involvement with the rating and ranking process. She just says that Ms. Sasser rated and ranked the non status candidates.

**Q.**   Did Ms. Newman rate and rank all of the 75 applicants and list them by rank? If so, on what date was this done?

**Q.**   Did Ms. Newman rate and rank the 47 qualified applicants and list them by rank? If so, on what date was this done?

**Q.**   What are the scores for all of the applicants who were certified as meeting the minimum qualifications?

**Q.**   Was Ms. Newman's supervisor privy to any of the rating scores and ranking lists before he retired?

**Q.**   Before a rating can be done on any applicant the KSAs must first be given a point value for each level of the KSA Titles in addition to a total Factor Weight. The point values given to each KSA level is one of the very first steps in the entire selection process. The point values for each KSA helps to determine which applicants are qualified, well qualified, and highly qualified. The applicants with the highest combined point value score are allowed to move forward in the selection process. To what extent were Ms. Newman, her staff, and the staff of the Office of Administration involved in writing the KSAs and determining the number value for each KSA Title and their levels?

**Q.**   What is Ms. Sasser's grade level?

**Q.**   What is Ms. Sasser's race and National Origin?

**Q.**   Ms. Newman indicates that Ms. Sasser rated and ranked the non status candidates. Did Ms. Sasser at anytime rate and rank the status candidates also? If Ms. Sasser rated and ranked all of the 47 qualified applicants, did she produce a list showing the ranking of all 47 applicants before, during, or after the applicants were divided into multiple certificates of eligibles? On what date was this list produced?

**Q.**   If a rating and ranking list was produced was it forwarded to the selecting officials? If it was forwarded to the selecting official(s) was it given to the selecting official(s) before the multiple certificates of eligibles were submitted to the selecting official(s)? On what date?

**Q.**   How many times were the non status candidates rated and ranked?

**Q.**   On what date were the non status candidates rated and ranked by Ms. Sasser?

**Q.**   In addition to rating and ranking the non status applicants, what else did Ms. Sasser do throughout the selection process?

The question was, "What procedure was used to rate and rank the non-status applicants?"

6    24    Ms. Newman's response was, "There was a crediting plan developed by me and Ms. Sasser used that crediting plan to come up with the numerical scores that we did for the non-status applicants."

**Rebuttal:** This position is a GS-15 grade level position. By all indications (not hiring a GS-13 or GS-14 eligible for promotion candidate for the position) the selecting official wanted to keep the position at a GS-15. But, even if a person who is eligible to be promoted to a GS-14 was hired, the person(s) rating and ranking the non status and/or status applicants for this position should have been a GS-15.

**Q.**   The rule is that "when filling a job, particularly through Merit Promotion, candidates should be rated and ranked using differentiating criteria to ensure the best candidates are referred." Was this same crediting plan used to rate and rank the status applicants? See Item F.

**Q.**   According to the Department's Personnel Manager, Qualification and Candidate Evaluation, the "Development of differentiating criteria is normally done by a team of personnelists and supervisors who develop a crediting plan using a job analysis process." Who, in addition to Ms. Newman, assisted or had input into the crediting plan? See Item F.

**Q.**   Was a job analysis, identifying the major job requirements and most important duties and responsibilities used to develop the crediting plan?

**Q.**   One point in my rebuttals is that I believe the KSAs were written and given numerical values that would conform to Ms. Marshall's experience, knowledge, skills and abilities. Was the crediting plan and its numerical elements based in part on the KSA Titles, KSA levels, and point factors for each KSA?

**Q.**   Who actually made the decision to have a GS-13 human resource specialist rate and rank the non status GS-14 and

GS-15 applicants?

Q.    Ms. Newman asked GS-15 level managers to rate and rank
      the status applicants. Why didn't she ask GS-15s to rate
      and rank the non status applicants?

The question was, "What procedure was used to rate and rank the
status applicants?"

7    6    Ms. Newman's response was, "The status applicants? A panel was
          convened. And I don't have the exact date. That's in the file. And
          they were rated and ranked both at 14 and 15 on the same
          crediting plan."

**Rebuttal:** Once the directive was given to panel the status
applicants any semblance of a competitive playing field ceased to
exist. As I stated in my rebuttal to Mr. Carlstrom's testimony, merit
status candidates were granted additional considerations for
eligibility by a panel, and cut-off levels determined after the
paneling were different from the initial rating and ranking scores,
and given the fact that there are no indications of how the
decisions were actually made by the panel and what type of
individualized considerations were used or not used, this process
is perceived to have been unfairly advantageous to merit status
candidates.

Q.    How many people served on the panel that rated the status
      applicants for this particular position?

Q.    What are the titles and the grade levels for each panel
      member?

Q.    Was the crediting plan used to rate and rank the non status
      applicants the same one used to rate and rank the status
      applicants?

Q.    What date were the status applicants rated and ranked?

Q.    How many times were the status applicants rated and
      ranked (i.e., for basic qualifications, by human resource
      personnelist, panels, others)?

Q.    Whose decision was it to panel only the status applicants?

Q.    Were all of the status applicants paneled or just the merit
      promotion applicants?

Q.   If only merit promotion status applicants were paneled why weren't the competitive, re-promotion, and re-assignment applicants paneled?  Whose decision was it to not panel these other status applicants?

Q.   How many panels did Ms. Newman put together?  For whom?

Q.   Were the panel members who rated and ranked the merit promotion status applicants National Park Service employees?

Q.   Sometimes a panel is comprised of individuals chosen by the selecting official who he/she feels affiliates with his/her way of thinking and this affiliation can result in benefitting a particular applicant or a specific type of group of applicants. How many people in total were asked to serve as panel members for this particular position?

Q.   Were any of the potential panelists non Park Service employees?

Q.   Did Ms. Newman present more than one list of potential panelists to her supervisor and/or the selecting official?

Q.   If Ms. Newman presented more than one list of potential panelists to her supervisor and/or the selecting official, how many times did she present lists of potential panelists?

Q.   If Ms. Newman presented more than one list of potential panelists to her supervisor and/or the selecting official, what reasons did they give for objecting to the list(s) she presented to them?

Q.   What was the makeup of the panel (i.e., men, women, race, ethnicity, age)

Q.   How many panels were convened to rate and rank status applicants?  What dates?

Q.   Of the status applicants that were rated and ranked by the panel, were there ten or more merit promotion status applicants in each grade level?  If so, which grades?

Q.   If there were less than 10 merit promotion status candidates in any grade level than what is the policy for paneling less then 10 status candidates?

**Q.** Does the Department of Interior apply its policies and requirements for paneling merit status candidates to non status candidates?

**Q.** Does the National Park Service apply its policy and requirements for paneling merit status candidates to non status candidates?

**Q.** Were there different panels for each merit promotion status grade level? If not, why not?

**Q.** Were just the National Park Service merit promotion status applicants paneled?

**Q.** Was there an EEO representative on the panel or serving as an observer?

The question was, "Was there any requirement to have the non status applicants rated by a panel?"

7        12        Ms. Newman's response was, "No there was not."

**Rebuttal:** I am not aware of a rule, law, or policy prohibiting the paneling of non status applicants. In fact, while I was the Deputy Director for Operations at the Department of Health and Human Services paneling all qualified applicants was a standard operating procedure. It was considered the most fair and equitable process to assess qualified candidates. It is my understanding that the National Park Service policy requires a panel to rate and rank applicants if there are more than 10 applicants in any one grade level.

I feel that the panel that rated and ranked the status applicants should have been allowed to rate and rank all of the applicants. That would have been fair and the playing field may have been a little more equitable. Ms. Sasser, a GS-13, should have been brought in just to determine who had the minimum qualifications for the position–not rate and rank anyone higher than her grade. Instead, Ms. Sasser was allowed to rate and rank the GS-14 and GS-15 non status applicants while a panel of three GS-15s were allowed to rate and rank the status applicants. One person at a GS-13 grade level cannot rate applicants the same way or with the same thought processes as three GS-15s who are managers performing at that level.

Ms. Newman stated that there is no requirement to have non status applicants rated by a panel. But The Uniform Guidelines on Employee Selection Procedures posted on the DOI website states

-14-

that, "A selection procedure is any measure, combination or measures, or procedures used as a basis for an employment decision. In DOI Bureaus, this would apply, but not be limited to, job analysis, Crediting Plan, interviews, and the selection process itself." Although the statement does not specifically list paneling as one of the above procedures, it does include the words "but not limited to" and "and the selection process itself." I interpret this to mean that paneling procedures are part of the selection process. And, The Uniform Guidelines on Employee Selection Procedures applies to both inservice placement actions and external hiring practices.

**Q.** Are there any requirements preventing non status applicants from being paneled?

**Q.** Did Ms. Newman advise her supervisor and/or the selecting official of the National Park Service's policy and/or OPM's Uniform Guidelines on Employee Selection Procedures governing the selection process?

**Q.** Did Ms. Newman advise her supervisor and/or the selecting official that they could panel the non status applicants?

**Q.** How many GS-15s in total qualified for this position?

**Q.** How many GS-14 merit promotion applicants in total competed on the GS-15 certificate of eligibles?

**Q.** Mr. Carlstrom indicated in his testimony that, "we had a panel that looked at all the 47 people that has applied, all of the applicants." Were the non status applicants paneled at any time during the selection process? If so, by whom? And, by how many people? What date?

**Q.** Mr. Carlstrom was asked if the panel had access to the list of non status eligibles. He stating he would prefer the investigator check with Leslie Newman. When asked again if the rating panel would have had access to the applications and/or the certificates for the non status he said, "I understand they looked at all 47." Is this true? Did the panel have access to the list of non status eligibles?

**Q.** Who actually made the decision to not panel the non status candidates?

The question was, "Is there any reason why status applicants were rated by a panel and the non-status applicants were rated by a personnel specialist?"

Ms. Newman's response was, "The merit promotion plan says if you have over 10 qualified promotion eligibles that a panel should be convened.  There's approximately 60 applications for this particular job and I believe 40–some odd candidates were rated."

**Rebuttal:**  She didn't answer the question. The merit promotion plan might say that if there are more than 10 qualified promotion eligibles a panel should be convened, but I understand the National Park Service policy to state that if there are more than 10 qualified applicants _in any one grade_ then the applicants in that grade are to be rated by a panel.  And that's a policy in addition to the Uniform Guidelines on Employee Selection Procedures.  Further, there is nothing that says non status applicants cannot be paneled.  And, a panel consists of more than one person.

Selecting officials are given a specific process to follow with some latitude in the selection process.  Mr. Carlstrom and/or Ms. Newman (if the decision to not panel the non status applicants was hers) could have just as easily directed the panel to rate and rank the non status candidates as he/she had the status candidates.  By paneling the merit promotion status candidates only Mr. Carlstrom and/or Ms. Newman gave the status individuals the maximum opportunity to score well in order to be considered for the position.

Paneling the non status applicants would have given the non status equal access and equal consideration.  By limiting the field of candidates to a select group put before a panel severely hinders an outside applicant's ability to be treated fairly in kind leaving one to believe the odds are stacked against her/him.  Also, by not paneling non status with the status candidates the selecting officials denied me equal treatment and equal opportunity to compete for the position.  This is one of the most common practices (no panel for the non status candidates) government officials use to keep Hispanics out of federal government service.  This is disparate treatment.

**Q.**  Does the merit promotion plan distinguish between status and non status applicants?

**Q.**  Define qualified promotion eligible.

**Q.**  Are all applicants or candidates for a position considered promotion eligible?

The question was, "Why weren't the non-status applicants rated by a panel?"

7     23     Ms. Newman's response was, "It doesn't require that in our merit

**Rebuttal:** I understand that the National Park Service policy on paneling applicants states that when there are 10 or more applicants in any grade then those applicants are to be rated and ranked by a panel. The National Park Service policy on paneling may supercede other policies, but cannot be less than the OPM, the Merit Protection Plan, or the Uniform Guidelines on Employee Selection Procedures.

Ms. Newman has not indicated how many qualified non status applicants were either the equivalent of or actually are GS-13 and 14 promotion eligibles, or GS-15s before Ms. Sasser rated and ranked them. If there were 10 or more non status applicants who qualified in each grade level before Ms. Sasser rated and ranked them then, according to the National Park Service policy, each grade level with 10 or more applicants should have been paneled.

Q.     Was the decision to not panel the non status applicants Ms. Newman's decision? If it was not her decision, then whose decision was it?

Q.     Was Ms. Newman aware of the Department of Interior's, the National Park Service's, OPM's, and EEOC's guidance on the selection process and that non status applicants are to be treated fairly and equitable and given the same opportunities as merit status candidates?

Q.     If Ms. Newman was aware of the Department of Interior's, the National Park Service's, OPM's, and EEOC's guidance on the selection process and that non status applicants are to be treated fairly and equitable and given the same opportunities as merit status candidates, did she advise her supervisor and/or the selecting officials and share this information with them?

The questions were, "Did you issue or prepare any of the certificates of eligibles?' 'One at the GS-14 and one at the GS-15?"

8     9/13     Ms. Newman's response was, "I issued several certificates based on what we call a cut-off score for both the status and the non-status. There were two non-status certificates."

One at the GS-14 and one at the GS-15. And there were five competitive level certs that were issued, both at the 14 and 15 for promotion eligibles, reassignment eligibles at both grade levels.

There was one re-promotion eligible and that was it.

**Rebuttal:** The practice of issuing multiple certificates of eligibles is a requirement. It is a way to separate individual applicants by grade and status. Coupled with a paneling it is also a nice and neat way to help insure that the individual favored is given the best opportunity to come out near or at the top of the ranking certificate for selection. It is also a guaranteed way of preventing anyone outside government and/or outside the organization from being considered for the job without looking suspicious. The process of multiple certificates is a blessing for merit promotion applicants, but it does nothing to assist applicants outside government in gaining employment.

**Q.**     What were the cut-off scores for each certificate?

**Q.**     What were the high and low scores for each certificate?

**Q.**     Who determined the cut-off scores?

**Q.**     How were the cut-off scores determined for the status applicants?

**Q.**     How were the cut-off scores determined for the non status applicants?

**Q.**     Ms. Newman stated in a statement to Mr. Mike Jurach that the cut-off score for non status eligibles was 97. She also stated that the cut-off scores for GS-14 status applicants was 87 and 92.3 for GS-15 status applicants. The difference in cut-off scores are significant. Why were the cut off scores different for status and non status applicants?

**Q.**     Were all 47 applicants rated and ranked before they were separated by grade and status, and before any of the certificates of eligibles were prepared?

**Q.**     I believe that Ms. Newman was quite involved the with selection process from the very beginning starting with the preparation of the announcement, the initial rating process, the preparation of certificates of eligibles to the closing of the files once a candidate was chosen and hired. Would Ms. Newman please describe her part in the entire selection process from start to end, starting with the announcement of Mr. Powers retirement ending with the hiring of Ms. Marshall?

-18-

The question was, "Who was selected for the position in question?"

8      21      Ms. Newman's response was, "Ms. Dottie Marshall."

**Rebuttal:** As I stated in my rebuttal to Mr. Carlstrom's testimony, Ms. Marshall, a white woman, was the candidate of choice for this position since before the vacancy announcement was published. I was told at the time I submitted my application that someone was already picked for this position and that the person's name was Dottie Marshall. A rumor is idle hearsay until it becomes truth. Well, her selection proved the rumor to be true.

The Department of Interior and the National Park Service tout thier desire to increase diversity. In the Department Strategic Human Capital Management Plan, FY 2003-2007, "diversity" is defined (in their words) " in broad terms, including but not limited to racial, religious, color, gender, national origin, disability, sexual orientation, age, education, geographic origin, and skill charactheristics." "Having a diverse workforce is essential to providing services to the culturally and linguistically diverse populations that visit the Department's facilities and lands. Having a diverse workforce helps recruitment and retention of highly skilled employees from the entire civilitan workforce and conveys the message that DOI provides equal opportunities to all." See Item G.

The National Capital Region, in addition to the National Park Service as a whole, employs more white men and white women than any other group. In fact, there are more white women employed than the aggregate total of all minorities combined. They admit they have a problem with diversifying their workforce and they have designed ways to address this issue. They have identified their needs and they set goals, targets, and time lines.

So, what do they do? They hire another white woman, regardless of their own policies, rules and rhetoric. The Department and the National Park Service allowed the National Capital Region officials, managers and staff to ignore and dismiss the directives by hiring another white woman without fear of consequences because there is no accountability nor enforcement. It appears, and I am sure that this is not just my perception, that the National Park Service and the National Capital Region don't really care about diversity and they really don't want minorities penetrating their organization. Minorities, especially Hispanics are tolerated when forced upon them, but they don't go out of their way to look for them, recruit them or hire them–at least not on the east coast.

Further, the Selection Certificate Ms. Marshall's name appeared on and was selected from was issued by Joyce Sasser on April 24,

2003, (Mr. Powers was still the supervising official at the time this Certificate was issued). This same Selection Certificate was valid through close of business on May 23, 2003. However, the selecting officials, Mr. Carlstrom and Mr. Lawler did not sign the Selection Certificate until May 27, 2003. This makes the Selection Certificate null and void; and the selection and hiring of Ms. Marshall illegal.

**Q.**   Has Ms. Newman had the opportunity to work for or with Ms. Marshall during her tenure with the National Park Service before Ms. Marshall was selected for this position?

**Q.**   If so, in what capacity?

**Q.**   Was Ms. Newman aware of the various memoranda, policies, and rules from the Department of Interior, the National Park Service, OPM, and the White House directing the National Park Service to recruit and hire Hispanics before Ms. Marshall was hired?

**Q.**   Was the Selection Certificate Ms. Marshall's name appeared on and selected from extended beyond the May 23, 2003 closing date? If there is documentation extending the validity of the Selection Certificate, please provide the documentation.

**Q.**   If documentation is provided that shows the Selection Certificate was extended, was this documentation backdated to reflect a valid date for the selection?

The question was, "Let me go back a little bit." "Were any of the candidates interviewed for the position in question?"

9      1      Ms. Newman's response was, "There were five candidates, I believe that were selected to be interviewed."

"No there were four."

**Rebuttal:** Mr. Carlstrom and Mr. Lawler also indicated that of the five candidates chosen for interviews only four interviewed. All five candidates chosen to interview were National Park Service employees. Everyone who prepares for an interview wants to be able to do their best, look their best, and be at their best in order to give the best positive and best first time impression when meeting face to face with a potential employer. Of the four candidates that interviewed two, Mr. Ricardo R. Portillo, a GS-13 eligible for promotion to GS-14, and Mr. Thomas J. Ferranti, who was a GS-15 eligible for reassignment, were geographically the furthest from

-20-

Washington, DC. It was stated that Mr. Portillo was in the western region of the country and Mr. Ferranti was in Alaska. The other two candidates who interviewed were in the National Capital Region. Ms. Dottie P. Marshall, a GS-14 eligible for a GS-15 promotion and Mr. Kenneth E. Brody, a GS-13 eligible for a GS-14 promotion, were the only two interviewees that were local and in the same National Capital Region.

Q. Did Ms. Newman give advise or make recommendation on how the interviews could be conducted?

Q. Did Ms. Newman and/or her staff arrange the time and dates for each interview with each candidate?

Q. Were any of the candidates brought in by the Regional Office by plane, train, or automobile for the interview? If not, why not?

Q. Were any of the candidates interviewed by telephone? If so, who?

Q. Were any of the interviews conducted by teleconferencing? If so, with whom?

Q. The guidelines for interviews recommends that the same questions be asked of each person who is interviewed. Did Ms. Newman prepare the questions for the interviews? If not, who did?

Q. Was Ms. Newman asked to participate in the selection of applicants to be interviewed?

The question was, "If one applicant was interviewed, was there any requirement to have all candidates interviewed, those whose names appeared on any of the certificates of eligibles?"

10     6     Ms. Newman's response was, "The merit promotion plan states – and I did give Mr. Carlstrom a copy of this – that normally if one candidate is interviewed, all other candidates should be interviewed. However, if only certain candidates are chosen to be interviewed, the choice must be based solely on job related criteria."

Q. Throughout Mr. Carlstrom's and Mr. Lawler's testimony they stated that the selection of candidates they chose to consider for interviews for this position were based on looking at promotion eligibles, persons who were familiar with the National Park Service and the National Capital

Region, and who had a park operational background. In your expert opinion as a human resource specialist and personnelist, what exactly would the "job related criteria" be for this particular job–Administrative Officer (Associate Regional Director, Administration)?

Q.   Does Ms. Newman have a copy of the of Merit Promotion Plan she gave to Mr. Carlstrom that states the rule–if one candidate is interviewed , all candidates should be interviewed? If so, please provide a copy for this case.

The question was, "Did any candidate-applicant whose name appeared on the non-status certificate of eligibles, were any of those candidates interviewed?"

10        15        Ms. Newman's response was, "Not to my knowledge. no."

**Rebuttal:** When asked who made the decision not to interview any of the non status candidates, Mr. Carlstrom stated that, "we mutually came to that agreement by looking at the promotion eligibles."

However, when Mr. Carlstrom was asked, "Did any of the applicants who were interviewed, were their names on any of the certificates of eligibles for non-status applicants?" Mr. Carlstrom's response was, "They were incorporated within the promotion eligibles. Ferranti was a 15 – – is a 15. The others were promotion eligible."

Q.   What procedures should be followed when an applicant on a non status list is chosen to be interviewed over other non status applicants?

Q.   Mr. Carlstrom stated that there were non status applicants who were incorporated within the promotion eligibles. Who were they, what were there grades, were they former Park Service employees, and could they have been considered veterans with veterans preference?

Q.   Mr. Carlstrom stated that there were non status applicants who were incorporated within the promotion eligibles. Is this procedure allowed? If so, please provide the rule(s) that allow for this kind of procedure.

Q.   Is Ms. Newman one of the "we" Mr. Carlstrom is referring to?

The question was, "My question before we went off record was did Ms. Aguilar apply under the initial or the amended announcement?"

11      9        Ms. Newman's response was, "Based on that date received of her application, March 27, 2003, it appears that she applied under the initial announcement."

Q.    Was Ms. Aguilar's application received before the vacancy announcement was amended?

Q.    How many applications did Ms. Newman receive before the closing date?

Q.    What actions were taken by Ms. Newman and/or her staff when Ms. Aguilar's application was received?

The question was, "Did she apply as a status or a non-status applicant?"

11      14       Ms. Newman's response was, "As I recall her application, she was a non-status applicant at the time but the applications hadn't been rated and ranked and the announcement hadn't closed. And in between that time, I think that was the decision to amend and re-announce all sources based on that 1999 memo that I discussed earlier.

Q.    Was Ms. Aguilar the only non status applicant that submitted an application before the closing date of the first vacancy announcement?

Q.    Did Ms. Newman advise Mr. Powers or Mr. Lawler or Mr. Carlstrom that non status applicants had applied before the closing date of the first vacancy?

Q.    Did Ms. Newman advise Mr. Powers or Mr. Lawler or Mr. Carlstrom of the grade levels of any of the applicants?

Q.    Did Ms. Newman give Mr. Powers or Mr. Lawler or Mr. Carlstrom the names of any of the applicants before the closing dates?

The questions were, "So if the announcement was initially advertised – Department wide and Ms. – the date of her application was received March 27[th], 2003, would she have been eligible for consideration?"

Ms. Newman's response was, "No, she would not because the area of consideration was only Department wide, which means that only the Department of Interior employees may apply.

**Rebuttal:** This is true. I knew the area of consideration was Departmentwide only when I applied for the position. However, I also knew that the policy to open upper level positions to all sources existed. I applied for the position because I wanted the job. I knew that I was qualified and that I could bring some valuable experience, knowledge, skills and insight to a position that was not as big as the one I had held previously, but was every bit as challenging.

When the vacancy announcement was first published I read the entire vacancy announcement and understood that the area of consideration was limited to employees of the Department of Interior. But, as I stated, I knew that policies to hire from outside Departments and government had existed, but I wasn't sure that they were still in effect. I researched the policies and found that none of the OPM, White House or Department policies had been rescinded.

So, I decided to submit my application anyway. It was a great position, I knew that I was qualified and could do the job well. By submitting my application I knew that what I was doing, was in effect, posing a challenge to management. I wanted to show management that there are skilled and talented people, particularly Hispanic women who are qualified and available to be hired for these type of positions. I had hoped management would readvertise the position all sources or amend the existing vacancy announcement allowing people like me outside of government an opportunity to apply and fully compete for the position.

The question was, "Do you recall having any discussions with Ms. Aguilar regarding her consideration for the position in question?"

12      9

Ms. Newman's response was, "No. I've never spoken to Ms. Aguilar. I believe my personnel assistant, Ms. Jeanette Organ, did have one or two telephone conversations with her. Unfortunately, Ms. Organ is on two weeks vacation right now."

**Rebuttal:** I called several times and talked with Ms. Jeanette Organ. The last time I called I talked with someone else—I don't remember her name. She told me Ms. Organ was no longer available.

Here are the dates I called Ms. Organ (who was listed as the contact person on the vacancy announcement) and the questions I

1.  Monday, 3-31-03 – Asked if they received my application. I was told yes they did.

2.  Monday, 4-7-03 – Learned on Thursday or Friday that the vacancy announcement had been amended and extended. Called and asked if this was true and if I needed to resubmit another application package. I was told it was amended to include all sources and GS-14s; and, that the closing date had been extended to April 14, 2003.

3.  Thursday, 5-1-03 – Called to ask about the status of my application and if a selection had been made. I was told no selection. Interviews had not started.

4.  Tuesday, 5-8-03 – received in the mail an "Inquiry As To Availability" form. I marked it, signed it and mailed it back in on Wednesday, 5-9-03.

5.  Friday, 5-16-03 – Called in the morning to ask if interviews had started and/or if a selection had been made. I had not heard from anyone. No answer and was not able to leave a message. I called again in the afternoon. I was told there was no selection yet, not sure about interviews.

6.  Monday, 5-26-03 – Called and asked about the interviews–had they started, had they been completed. The answer I was given was, "Don't know."

7.  Wednesday, 6-18-03 – Called to ask about status. I was told they had not received the certificate yet and that they should be getting something soon. I was also told that I should call back next week and that letters will be going out soon.

8.  Monday, 7-7-03 – Called and asked about the status. I was told someone was hired. Her name is Dottie Marshall and that letters will be going out this week–they still had to be typed up. I asked when Ms. Marshall was hired. The young woman said she did not know and suggested I ask the supervisor. I told her that would not be necessary.

The question was, "Was there any relationship between Ms. Aguilar's application as a non-status – – as you indicate, she was non-status at the time. Was there any relationship between her application and the decision to amend the announcement?"

particular vacancy announcement were done? If not, why
not? But if Ms. Newman did give advise, I would like Ms.
Newman to explain and expand on her explanations.

**Q.**    If Ms. Newman advised her supervisor and/or management
about the memo or other related policies, on what dates did
she do this? Is there documentation? If so, please provide
copies of the documentation for this case.

The question was, "So why wasn't the announcement initially
advertised as open to all sources?"

13        4        Ms. Newman's response was, "It's my understanding it was done in
error and it was the former Associate Regional Director, Mr. Dick
Powers, who I get my instructions from, initially asked that it be
advertised Department wide."

"Who he discussed the area of consideration with, I have no
knowledge."

**Rebuttal:** Ms. Newman stated that it was her understanding that
the vacancy announcement was not advertised all sources in error
and that the former Associate Regional Director, Mr. Dick Powers,
asked that it be advertised Departmentwide. Since Ms. Newman is
the personnelist for this position, a Human Resource Specialist and
a supervisor with the organizational title of Chief, Staffing and
Placement, I believe she shares part of the responsibility for
mismanaging the vacancy announcement. She may have received
instructions from the former Associate Regional Director, but if she
had advised him of the existing policy and the memorandum and
he did not abide by her advice or the policy, then it was her
obligation to go above him to the Regional Director and bring the
matter to the Regional Director's attention.

When asked if he had any involvement in developing the vacancy
announcement Mr. Lawler said, "You know, that's normally done by
a personnelist. I might have reviewed it. I can't tell if I reviewed it.
And, when asked if he knew why the announcement wasn't initially
advertised as all sources, Mr. Lawler said that it was an
administrative slip.

I don't believe this was an error or an administrative slip. I believe
that even after Mr. Powers and Mr. Carlstrom were reminded of the
policy they were not concerned enough to change the vacancy
announcement until after I sent in my application and they realized
I could pose a serious challenge to them. Ms. Newman did not
take on the responsibility to ensure that the organization was not
compromised. She did not ensure that the organization remained

-27-

in compliance. No one is willing to accept responsibility for the flagrant disregard for the rules and policies in place. Where is the accountability?

**Q.**    When Ms. Newman received her instructions from Mr. Powers to advertise the vacancy announcement Departmentwide does she recall if he stated why he wanted the area of consideration Departmentwide?

**Q.**    On what date did Mr. Powers ask that the Vacancy announcement be advertised Departmentwide? Is there documentation? If so, please provide documentation for this case.

**Q.**    Was the decision to advertise the vacancy announcement Departmentwide Mr. Powers' decision? If it was not his decision, then whose decision was it?

**Q.**    Did Mr. Powers ask or instruct Ms. Newman and/or her staff to amended the vacancy announcement to reflect a change in the area of consideration as all sources?

**Q.**    On what date did Ms. Newman receive her instructions from Mr. Powers to amend the vacancy announcement? Is there documentation? Please provide copies of the documentation.

The question was, Is Mr. Powers still employed?

13      11      Ms. Newman's response was, "Mr. Powers has retired."

**Rebuttal:** I believe the former Administrative Officer (Associate Regional Director for Administration), Mr. Dick Powers is an integral player in this entire process. He did not retire from his position until April 30, 2003. I believe he was making decisions about the entire solicitation and selection process for this position alone and in concert with Mr. Carlstrom and Mr. Lawler.

I further believe that Mr. Powers chose Ms. Marshall as his replacement and set the stage for her selection. I believe that Mr. Carlstrom and Mr. Lawler did not disagree with Mr. Powers choice of replacement and allowed the process to be manipulated as well as played key roles personally by participating in the continuation of the manipulation of the selection process.

**Q.**    Until what date did Mr. Powers continue to render advise, give guidance and assist with the vacancy announcements and selection process?

-28-

**Q.**    How long did Mr. Powers monitor the selection process?

**Q.**    Did Ms. Newman continue to work with Mr. Powers after he retired on this vacancy and/or on any other business pertaining to her office and the Office of Administration?

The question was, "Did Ms. Aguilar have to reapply for the position in question?"

13    14    Ms. Newman's response was, "Based on my recollection, she called my assistant and asked that question. I believe Ms. Organ told her that this application would be fine."

"Nothing changed in the announcement, with the exception of the area of consideration and the two grade levels."

**Rebuttal:** There was another change made to The Summary of Qualifications Required.

**Q.**    Why was the language for the GS-15 qualifications changed?

The question was, "What was her rating score and ranking?"

14    1    Ms. Newman's response was, "Her rating score – she rated for basic quals. Then she was rated on the crediting plan and her score was a 97.

**Q.**    Who's decision was it to rate and rank Ms. Aguilar and the other the non status candidates by a GS-13 Human Resource Specialist?

**Q.**    What did Ms. Newman do to determine which applicants were qualified for the position?

**Q.**    Ms. Newman rated Ms. Aguilar for basic qualifications. Was a list of rated and ranked applicants who were rated for basic qualifications given to the selecting officials before the non status applicants were rated by Ms. Sasser? If so, what was Ms. Aguilar's ranking? What was Ms. Marshall's ranking?

The question was, "And how would she have been ranked? What was her rank amongst – first, how many names appeared on the non-status certificate at the GS-15 grade level?"

Ms. Newman's response was, "There were six names that appeared. Three of those six were veterans who, of course, got veterans' preference added to their score. Two of those were 10 point vets and one was a 5 point veteran."

"So, of course, based on that, they scored higher and were certified above Ms. Aguilar."

**Rebuttal:** Listed amongst the GS-15 non status applicants is one woman, a Hispanic woman. Second, subtract the veterans preference points from the veterans and it shows that the Hispanic woman tied with three others with the 2nd highest points of 97--two of them veterans. The other two applicants scored higher with 100 points (again, minus the veterans preference). My point is that all six non status GS-15 applicants were relatively equal. A panel of GS-15 peers would have been able to determine who was really the very best qualified for the job. But, because a panel was not convened for this group of very, very well qualified applicants, nor were they included with the status applicants who were paneled, coupled with the selecting officials admission of wanting to look at only the merit promotion applicants the whole process of qualifying, rating and ranking, and certifying these non status applicants was just an exercise in futility and the applicants who spent time and effort applying for a position they desired did so in vain.

**Q.**     How many applicants were listed on the GS-15 non status certificate before Ms. Sasser rated and ranked them? What were the scores for these applicants before the selection certificate was issued?

**Q.**     Why was the top ranking veteran, who is a federal employee, not listed with the status candidates?

**Q.**     Why wasn't the top ranking veteran, who is a federal employee, incorporated with the status candidates as was Mr. Ferranti?

The question was, "From which certificate was the selection made?"

14        13       Ms. Newman's response was, "The selection was made from the status candidates who already have government status."

**Rebuttal:** More specifically, the selection was made from the GS-15 merit promotion selection certificate.

The key words here are: already have government status. The perception is that it did not matter who scored and rated high, if a

candidate was not already a government employee they would not be considered. Further, it didn't matter if the candidates were government employees, they would not be considered further because they were not National Park Service Employees, more specifically, National Capital Region Employees.

The question was, "At what grade level was the selection made?

14      18      Ms. Newman responded by saying, "The grade was GS-15.

**Rebuttal:** Of course the selection was made at the GS-15. It was the only level the selection was going to be made. The original vacancy announcement was for a GS-15. Ms. Marshall was pre selected for the position, she was one of three GS-14s finalist who were eligible for promotion to a GS-15, and she was the only applicant who was a National Park Service employee with National Capital Region knowledge who had park operational background. The other two merit promotion candidates listed on the selection certificate with Ms. Marshall were not National Park Service or National Capital Region employees. They were applicants who were working for the Departments of Labor and Health and Human Services respectively.

The question was, "Who was the selected candidate?

14      20      Ms. Newman's response was, "Dottie P. Marshall."

**Rebuttal:** According to the Qualification and Candidate Evaluation process used by DOI's Human Resources Office: "When filling a job, particularly through Merit Promotion (and Merit Promotion was the way the selecting officials decided to go at the beginning of the selection process), candidates should be rated and ranked using differentiating criteria to ensure the best qualified candidates are referred. Development of differentiating criteria is normally done by a team of personnelists and supervisors who develop a crediting plan using a job analysis process. When developing a job analysis the supervisor must ensure that the criteria is job related in accordance with the Uniform Guidelines on Employee Selection Procedures."

"Job analysis is information about a position to be filled that helps to identify the major job requirements and links them to skills, education, training, etc., needed to successfully perform the functions of that job. The purpose of the job analysis is to identify the experience, education, training, and other qualifying factors, possessed by candidates who have the potential to be the best performers of the job to be filled. It can also be used to identify

-31-

documents and other elements vital to the candidate evaluation, referral and selection process, such as measurement methods and interview requirements."

"There are two key elements of a job analysis:

1.    Identification of major job requirements (MJR) which are the most important duties and responsibilities of the position to be filled. They are the main purpose or primary reasons the position exists. The primary source of MJR is the most current, official position description.

2.    Identification of knowledge, skills and abilities (KSAs) required to accomplish each MJR and the quality level and amount of the KSAs needed. Most job analyses deal with KSAs that are measurable, that can be documented, and produced meaningful differences between candidates. Typically, possession of KSAs is demonstrated by experience, education, or training. The goal of KSAs is to identify those candidates who are potentially best qualified to perform the position to be filled; they are most useful when they provide meaningful distinctions among qualified candidates. Source documents for KSAs may be the position description, Office of Personnel Management qualification standards and job classification standards."

As I had indicated in my rebuttal to Mr. Carlstrom's and Mr. Lawler's testimonies, I believe Ms. Marshall was pre selected. Before the vacancy announcement was advertised Mr. Carlstrom had determined that Mr. Power's replacement would be hired by May 1, 2003. It was known by several people in the Regional Office that Mr. Carlstrom wanted Mr. Powers' replacement on the job by May 1. The name Dottie Marshall was circulated amongst some of the staff in the Regional Office as the replacement of choice. I believe that Mr. Powers determined who would replace him prior to his leaving. And, I believe Mr. Carlstrom and Mr. Lawler were in agreement with his choice. Further, I believe they were all involved in establishing the vacancy announcement, determining the points and weights for the Knowledge, Skills, and Abilities (KSAs), in addition to helping to determine who Mr. Powers' replacement would be before the first vacancy announcement was published. The opening date of the vacancy announcement was March 10, 2003. Mr. Powers did not retire from the National Capital Region until April 30, 2003. Mr. Powers had the most input into how the vacancy announcement would be set up (i.e., what to ask in the KSAs, how to write up the KSAs, what rating each level of the KSAs would be given, what Factor Weights would be given to each KSA, the area of consideration, the grade and salary levels, and the opening and closing dates), in addition

to the crediting plan used to rate and rank applicants.

My point here is that the staff of the Office of Administration write up the vacancy announcements according to the instructions they receive from their supervisors and upper level management. They produce drafts and make recommendations but, are ultimately told what to write and how to write it. Ms. Newman is the supervising Human Resource Specialist for the Division of Human Resources–she reported directly to Mr. Powers. Mr. Powers was still employed with the regional office when the applications for his position were received and during most of the selection process. In fact, he was still Ms. Leslie Newman's supervisor during this time. Ms. Newman indicated that she developed the crediting plan that was used to rate and rank the candidates. The crediting plan is usually developed by the personnelist and the supervisor in charge of the position's selection process.

The question was, "Were interviews conducted for any of the applicants whose names appeared on the non-status certificates of eligibles?"

15        7        Ms. Newman's response was, "No, they were not."

Rebuttal: I refer back to my response to page 10, line 15 when I indicated that  Mr. Carlstrom was asked the same question.  His response was, "They were incorporated within the promotion eligibles.  Ferranti was a 15 – – is a 15.  The others were promotion eligible."

The question was, " Does the selecting official have the authority to make a selection from any of the certificates of eligibles that are issued?

15    ·    11        Ms. Newman's response was, "Yes.  He has that authority."

Rebuttal: When selecting officials do not select an applicant from the first certificate they have the option of selecting from among the multiple certificates.  The use of multiple certificates is a favorite instrument selecting officials use when the desire is to limit the choice of candidates to those most favored by the selecting official and/or avoid veteran applicants and applicants from outside the agency–as it has been demonstrated in this case.  It is a way around OPM's Uniform Guidelines on Employee Selection Procedures because it gives the impression of a fair and impartial process–but its not.  It just allows the selecting official a more selective way of hiring a person he/she favors (favors by way of personal knowledge of the individual, or through in-house

recommendations from friends or colleagues, or in-house political pressure).

The question was, "If a selection had been made from the non-status certificate of eligibles, would veterans – would those applicants who had veterans' preference, would they have had to be considered or selected before any other applicants whose names appeared on there?"

"You indicated that there were three applicants who had veterans' preference."

15        19        Ms. Newman's response was, "Yes. The two 10-point veterans, based on rules and regulations by the Office of Personnel Management, you cannot pass over unless they either decline or you get an objection from the Office of Personnel Management based solely on job related criteria."

**Rebuttal:** It is incumbent upon each veteran applicant to provide proof for the level of preference claimed. In order to be eligible to receive any preference each veteran applicant must have submitted three items with their application. They are: SF-50, DD-214, letter from OPM and, for those claiming 10-point preference an SF-15. The burden of proof is on the applicant. If these documents were not part of the applicants application package they should not been given any preference points.

It is not fair to give anyone a 5- or 10-point advantage without these documents accompanying their application–this is not any different than what I have to do to prove I am eligible for a GS-15 position.

Further, Ms. Newman's statement about not being able to passover a veteran unless the veteran declines is correct. Her statement about "getting an objection from the Office of Personnel Management based solely on job related criteria" is incorrect. It is up to the Agency to obtain a sustainable objection for adequate reasons. The reason may include medical disqualifications, suitability disqualifications, or other reasons considered by the Office of Personnel Management to be disqualifying.

In the **VetGuide** (available through the Office of Personnel and Management) under the section **Disqualification of Preference Eligibles** it states: A preference eligible (that is a 10-point CP, which is a veteran that has been determined to have a 10 percent disability but less than 30 percent, or a 5-point TP, which is a veteran who has served during specific years) can be eliminated from consideration only if the examining office sustains the

agency's objection to the preference eligible for adequate reason. These reasons, which must be recorded, include medical disqualification under CFR Part 339, suitability disqualification under 5 CFR Part 731, <u>or other reasons considered by the Office of Personnel Management or an agency under delegated examining authority to be disqualifying</u>. See Item H.

The VetGuide states that agencies have delegated authority for determining suitability in accordance with 5 FR Part 731. But, not over veterans with 30% disability.

Under 5 U.S.C. 3317,3318 and 5CFR 332.402, 332.404, 332.405, 332.406, and Parts 339 and 731 the issues of Disqualification of 30 Percent or More Disabled Veterans are outlined. One particular provision states that: If an agency proposed to pass over a disabled veteran on a certificate to select a person who is not a preference eligible, or to disqualify a disabled veteran based on the physical requirements of the position, it must at the same time notify both the Office of Personnel Management (OPM) and the disabled veteran of the reasons for the determination and of the veteran's right's to respond to OPM within 15 days of the date of the notification.

Veterans given rating of XP are given the ten points for preference because the individual has a 30 percent disability or the ten points given because this person is allowed Derived Preference. If this person is given Derived Preference, I don't think he can use the preference points to gain another Federal job. In addition, I question the issue of allowing a veteran who has probably used his preference to gain Federal employment and already has a Federal job–such as the 10-point veteran who was given a score of 110--to use his preference to move to another or different Federal job.

As for disqualifying preference eligible veterans, I argue that the National Capital Region would have had legitimate reasons for passing over the veterans. The very fact that I am an Hispanic woman, and the White House, OPM, the Department of Interior and the National Park Service all have directives and mandates to recruit, hire, and retain more Hispanics in an effort to address the gross underrepresentation within federal government service. One of the targeted EEO groups identified by the National Park Service is Hispanic women, of which there are very few in upper level management positions and Hispanic women have been on the decline within the National Park Service. The need to hire more Hispanics, and in particular Hispanic women for upper level management positions, may equal and/or out-weigh the need to hire veterans. Thus, the argument for hiring an Hispanic woman while passing over veteran's with preference may be allowed. I believe that of the 75 applicants, and particularly of the 47

qualified, I was the very best and most qualified individual before preference and any other consideration was given to anyone, including Park Service employees with Park Service knowledge and experience. I was not only the highest scoring woman, I was the highest scoring minority.

Q.  Did the veterans self proclaim their preferences?

Q.  Did Ms. Newman receive proof of preference through documentation in each of the veterans application packages? If so, please provide copies from each veterans application package for this case.

Q.  Displace veterans are supposed to be given priority consideration. Were any of the veterans displaced veterans.

Q.  Did the veteran who was given an XP rating with a 10-point preference submit his application under the merit Protection Plan or did he submit his application under non merit status?

Q.  Why is the veteran with the XP rating allowed to use his 10-point preference if he already has a Federal job?

The question was, "So just so that I understand, if a selection had been made from the certificate of eligibles for non-status applicants, the only way that Ms. Aguilar could have been selected is if all three of the veterans preference – "

16      6      Ms. Newman's response was, "They either would have had to decline or the selecting official would have requested that I go into OPM with an objection based on job related criteria. And it probably would have been quite difficult put in an objection for all three veterans."

Q.  Did Ms. Newman prepare in any way for the possibility of a selection over a veteran with preference? If not, why not?

Q.  Did Ms. Newman receive any guidance or any indications from the selecting official that the certificate with the names of veterans was not going to be considered for selection?

The questions were, "Did you have any discussions with the selecting officials regarding their decision about who would who would be selected? Why they selected this individual?

-36-

**Rebuttal:** Ms. Newman may not have had a conversation with the selecting officials about their decision to hire Ms. Marshall, but she may have known or been aware of discussions about Ms. Marshall as the individual for the position before the vacancy announcement was first advertised.

**Q.** Was Ms. Newman aware of any discussion about or any mention of Ms. Marshall's name as a possible choice for the position?

The question was, "Was Ms. Aguilar treated differently in her consideration for the position in question?"

16    22    Ms. Newman's response was, "Not to my knowledge. And the reason I did bring in an outside human resource specialist was because I did not want anybody to think that I was selecting my own a boss, because the Associate Regional Director does supervise the Division of Human Resources."

"So I brought in an outside human resource specialist from the Park to do the rating and ranking."

**Rebuttal:** The human resource specialist that was brought in was a GS-13 who was allowed to rate and rank GS-14s and GS-15s for an upper level management position. Because Ms. Newman did not panel my application and the applications of the other non status applicants, I was put at a disadvantage. One GS-13 person subordinate to my GS-15 cannot rate and rank me the same way a panel of my peers would. A panel of individuals of the equivalent grade as those on the non status GS-15 certificate of eligibles would have assessed the skills, knowledge, abilities and experiences much differently than a GS-13 who has never held a GS-15 position and/or has never had the same level of responsibility.

So, yes, I was treated differently. The human resource specialist that was brought in should have only determined who was qualified for the position not rate and rank the applicants for a position higher than the one she held. This entire process was not above board.

Realistically, because this position was located in the very office that normally works to staff the regional office and because the Director for this office was on his way out and it was his position that was being filled, the Regional Office should not have handled the process. In order to avoid all of these conflicts of interests, the Regional Director should have had another Bureau handle the

-37-

entire process, the drafting of the vacancy announcement, advertising the announcement, solicitation of applicants, acceptance of applications, rating and ranking of applicants, paneling, all of it. Once the process was completed and the final candidates were determined, then and only then should the selecting official in the Regional Office have had access to the final list of candidates for interviews and selection.

The question was, "How would you respond to the Complainant's contention that she was adversely affected in her consideration for the position in question because she was not rated by a panel as were the other competitive and non-competitive status applicants?"

17        11        Ms. Newman's response was, "Well, like I said, I believe she was rated fairly by an outside human resource specialist and we did not discuss conducting a panel for non-status candidates because our merit promotion plan only says to rate and rank those applicants who are competing for promotion. And this outside human resource specialist, I don't think, knows Ms. Aguilar."

**Rebuttal:** What reason would Ms. Newman have for suggesting that the human resource specialist may or may not know me. This has no bearing on the contention of being adversely affected by not being rated by a panel.

As for the merit promotion plan saying to rate and rank only those applicants who are competing for promotion--aren't most applicants, such as the GS-14 non status applicants, competing for promotion? Yes the Merit Protection Board protects merit status employees and there are rules that state that merit status applicants are to be rated and rank. But, the Uniform Guidelines on Employee Selection Procedures states that all applicants are to be applied to all applicants. The number of applicants in each grade level is determined by the number that actually meet the minimum requirements for that grade level. If applicants do not meet the minimum requirements for the next grade level up, they are then rated to determine if they qualify in their current grade level. It is my understanding that the National Park Service's policy on paneling is that if there are 10 or more applicants in any one grade level then those applicants must be rated and ranked by a panel.

So, by the National Park Service's policy, if there were 10 or more applicants that qualified for the position at the GS-15 grade level then all of them regardless of status should have been paneled by the same group of people.

Q.        Who is the "we" Ms. Newman is referring to?

-38-

**Q.** Was the decision to panel or not panel the non status candidates Ms. Newman's decision?

**Q.** If it was not Ms. Newman's decision to panel the non status applicants did Ms. Newman suggest a panel for the non status applicants or suggest including the non status applicants with the status applicants to her supervisor and the selecting official?

**Q.** Were there at least 10 applicants who qualified for this position at the GS-15 grade level? If so, why didn't Ms. Newman comply with the National Park Service's policy on paneling 10 or more applicants in the same grade?

The question was, "Is there any particular OPM and/or Park Service merit promotion guidelines that addresses the interview of candidates?"

18    6    Ms. Newman's response was, "The Department of Interior's merit promotion plan has this one paragraph, and it refers to 5 C.F.R. 572 in reference to the selecting official ensuring that all candidates are treated fairly and equitably. And normally, if one candidate is interviewed, all others should be interviewed. However, it's solely up to the selecting official."

"However, he should be able to respond to those people that were not interviewed."

**Q.** If Mr. Ferranti was selected to be interviewed from the non status list of applicants and the selecting official chose not to interview any of the other non status applicants, did Ms. Newman advise the selecting official to interview all of the other non status applicants? If not, why not?

The question was, "Are there any circumstances when non-status eligible candidates are rated by a panel?"

18    18    Ms. Newman's response was, "I haven't conducted one. If the selecting official requests that, it's up to the selecting official to request that."

**Rebuttal:** Just because Ms. Newman has not conducted or instructed a panel to rate non status eligible applicants does not mean that it is not done. As I have stated before, as a Deputy Director and selecting official I have requested panels for non status and status candidates—usually in a combined forum. By not

including the non status applicants with the merit status applicants' panel leaves them at a great disadvantage. The merit status applicants were given a greater opportunity to be judged by more than one person, to be judged better by a group of judges who held GS-15 positions, and given the opportunity to score higher by way of the collective scores given by the panel. The selection process was not fair nor was it equitable.

**Q.** Did Ms. Newman make any recommendations to her supervisor and/or the selecting official to paneling the non status applicants?

**Q.** Was Ms. Newman told not to panel the non status applicants? If so, by whom?

**Q.** Did Ms. Newman recommend or advise the selecting official to include the non status applicants in the panel that was being conducted for the merit status applicants? If not, why not?

The question was, "Is there an OPM regulation or guideline that addresses the rating and ranking of non-status eligibles by a rating panel?"

18      24      Ms. Newman's response was, "It doesn't address it in the new – or didn't address it in the old delegated examining handbook and it doesn't address it in this. It just discussed the completing of the rating process. It does not discuss conducting panels."

**Rebuttal:** Again, I reiterate my understanding of the NPS policy on conducting panels. If there are 10 or more qualified applicants in any one grade level then a panel must be convened for that grade.

Also, OPM's 1978 Uniform Guidelines on Employee Selection Procedures states that the guidelines are intended to establish a uniform basis of selection procedure criteria in the Federal sector. The guide imposes employers with the criteria by which the Equal Employment Opportunity Commission would evaluate hiring practices to ensure adherence to merit principles. **The UGESP applies to both inservice placement actions and external hiring practices.**"

"A selection procedure is any measure, combination of measures, or procedures used as a basis for an employment decision. In DOI Bureaus, this would apply, but not be limited to, job analysis, Crediting Plan, interviews, and the selection process itself."

The question was, " Do you have any reason to believe that any

consideration was given to race and/or national origin in the evaluation; i.e., rating and ranking process for the position in question?"

19    13    Ms. Newman's response was, "No. I believe since don't know all these people personally, that they were rated accurately and fairly.

**Rebuttal:** Actually, consideration toward race and national origin should have been given before the rating and ranking process ever began. The Department of Interior and the National Park Service were given directives and have policies in place to bring about greater diversity within its workforce. Most of the workforce in the Department of Interior work in four of the largest bureaus. In September 2001, it was estimated that supervisors and managers represented 12 percent of the workforce. Of the overall workforce, 75 percent are white. Of the 75 percent white workforce, nearly 65 percent are male. Of the total population, 4.9 percent are Hispanic–5.9 percent below the civilian labor force. The National Park Service is the second largest bureau with the second largest number of employees. Currently, the number of people working in the 341 job series at the National Capital Region, which is the job series I applied to at the National Capital Region, is 15. Of the 15, 12 are women–80%. The breakdown by race and ethnicity is 3 white men–20%, 9 white women–60%, and 3 Black women–20%. By their own admission in statements given in the Department of Interior's Strategic Human Capital Management Plan FY 2003-2007, "the Department has not done a good job of attracting, hiring, developing, and retaining a diverse workforce, as required by Federal law and Department policy."

In addition to the Management Succession Plan mentioned earlier, there are memoranda by Mr. John Berry, issued after Mr. Stanton's memo, supporting the same explicit directives for targeted recruitment initiatives. The directives are in place to assure diverse applicant pools, and to remove any unjustified barriers that would prevent equal employment opportunities for all applicants. In addition, the memo states that all managers and supervisors will be held accountable for ensuring equal opportunity and nondiscrimination in accordance with Departmental Directives.

Ms. Newman did not do enough to ensure that there was a diverse applicant pool, she not did do enough to ensure that all applicants were treated equally throughout the selection process. As the person in charge of the technicalities and the methodologies for the selection process, I believe her responsibilities did not end with the determination of who was qualified and who was brought in to do the rating and ranking. She had an obligation to her office, to her position, to her organization, and to the applicants who trust that they will be given every fair and equitable opportunity to

compete for a viable position free and clear of any impropriety or conflict of interest. And, she had an obligation to ensure that all directives and policies were followed, including those that direct every NPS personnelist to ensure that there is real diversity within an applicant pool and real diversity within a rating and ranking panel.

Q.    Considering the directives from the White House, OPM, the Department and the National Park Service giving instructions to recruit and hire more minorities, particularly Hispanics what considerations did Ms. Newman give to race and/or national origin before, during and after she rated the applicants for qualifications?

Q.    Ms. Newman was asked if she had any reason to believe that any consideration was given to race and/or national origin in the evaluation. She stated "No" and that she believed since she didn't know all the people personally, that they were rated accurately and fairly. Does this mean that she knows the ethnicity of each applicant?

The question was, "Is there any identification of the candidates by race and/or national origin on their applications?"

19    18    Ms. Newman's response was, "They are asked to fill out a race and ethnic form when they submit their application but it's solely optional. And as I recall in this case, not that many did fill that out."

"When the applications come in, it's the responsibility of my assistant to immediately take those off of the application, put them in a blue envelope and mail them to the EEO office.

**Rebuttal:** I included a completed Applicant Background Survey in the application package I sent in for this position. I self identified as an Hispanic woman. I was discriminated against because no one took notice that a Hispanic woman applied for the position given the mandates and directive imposed on the National Capital Region. No one took notice of the Survey I submitted.

Ms. Newman says that not many applicants filled out the Survey. If Ms. Newman, who is Chief of the Human Resources Division, did not have enough Applicant Background Surveys for the EEO Office to determine if the applicant pool was sufficiently diverse, then whose responsibility was it to follow up with the other applicants to request that the Survey be sent in in order to ensure that there was a diverse applicant pool? What good does it do for someone like me to take the time of filling out the Survey and sending it in if no one really pays attention to it and it does not help achieve the purpose it was meant to achieve. If managers/selecting officials

are not held accountable for ensuring the compliance of policies and mandates that have been put in place to achieve diversity then why should those of us who are willing to self-identify continue to self-identify when we are ignored, dismissed, or rejected?

Q.    If the race and ethnic forms are collected and separated from the applications, are Ms. Newman and/or her staff able to identify who submitted a self-identifying form and who did not?

Q.    What measures did Ms. Newman and her staff take to encourage the submission of these forms?

Q.    What follow-up measures did Ms. Newman and her staff take to encourage applicants to submit the forms after her office received their applications?

Q.    How was I identified?

Q.    Can Ms. Newman confirm receipt of my Applicant Background Survey form?

Q.    Did Ms. Newman and her staff forward my Applicant Background Survey form to the NPS EEO Office for statistical computation?

Q.    When is it determined a vacancy announcement has attracted enough applicants of diverse backgrounds to move all applicants forward in the selection process?

Q.    What attempts did Ms. Newman make to ensure that there was real diversity amongst the applicant pool for this position? Is there documentation? Is so, please provide copies for this case.

The question was, "Do you have any reason to believe that age was a factor in the evaluation and/or selection process?"

20        5        Ms. Newman's response was, "No, I do not."

**Rebuttal:** I believe the selectee is younger than me. Age is a factor here because Ms. Marshall, the selectee, has been with the National Park Service, National Capital Region for several years. She is not going to be leaving the organizations any time soon. I believe that the selecting official did not select someone older, like me, because he may be inclined to believe that someone older would leave the organization before someone who is younger.

-43-

    **Q.**    Did Ms. Newman ask the EEO Office to survey the applicant pool to determine if age would be a factor?

    **Q.**    Did Ms. Newman advise her supervisor and the selecting official of the need to be mindful of age discrimination concerns?

The question was, "Is the selecting official provided with the rating and ranking scores of any of the candidates?"

20    12    Ms. Newman's response was, "He's provided the scores once they've been established based on the certificate that's sent up to him. He's not in the process of the rating and ranking, if that's what you're asking."

The question was, "No. What I'm asking is is the selecting official privy to the rating and ranking scores of each of the candidates whose names appear on both the non-status and the status certificates of eligibles?"

20    20    Ms. Newman's response was, "No. He's only privy to the non-status that are certified to him."

**Rebuttal:** But, if he asks he can have those scores and Ms. Newman's response to the previous question was he is provided the scores once they've been established based on the certificate that's sent up to him.

Assuming everything is equal, by not giving the scores of the merit promotion applicants to the selecting official–then that allows the selecting official the ability to select anyone on that list. However, with the Selecting Officials adding addition Park Service knowledge and experience (which was not part of the KSAs) as part of the selection criteria it puts those not in the Park Service system at a big disadvantage.

    **Q.**    Did the selecting official ask for and was he given the scores of the status candidates?

The question was, "And the status and non-status applicants, they were all evaluated according to the same crediting plan?"

21    1    Ms. Newman's response was, "Yes, they were."

**Rebuttal:** The status and the non status applicants may have been evaluated by the same crediting plan. Unfortunately, particularly

for me, it was an unfair process. Two things were allowed to happen: a) the selecting official changed the criteria for the position mid-stream by requiring National Park Service and National Capital Region knowledge, experience and park operation background field work, and b) the status applicants were evaluated against the crediting plan by a panel of three GS-15 managers, while the non status applicants were evaluated against the same crediting plan by one GS-13 personnelist.

The question was, "So absent the preference, veterans preference afforded to any applicant, the rating scores for both the status and the non-status would have the same – would be within the same range?"

21          6          Ms. Newman's response was, "Yes."

**Rebuttal:** I challenge Ms. Newman to prove it.

I say that they can't be the same. They can't even be perceived as the same. Absent the veterans preference for any applicant the averages for the rating scores for both the status and non status are not the same. The scores stand on their own. The cut-off scores are different for the non status applicants, different for the merit promotion GS-13s, different for the merit promotion GS-14s and different for the merit status GS-15s. The scores can not be within the same range even though all applicants were evaluated against the same crediting plan because the level of evaluating criteria for each grade level are different. A GS-15 is not evaluated on the same level as a GS-13 or GS-14 promotion eligible because the GS-13s and Gs14s have not had an opportunity to learn, experience, and perform at the same level of a GS-15, nor have they had the same level of responsibilities and number of tasks required at that level.

In addition, the very fact that a panel rated the merit promotion applicants giving them a combined score of three as opposed to the single score of one for the non status applicants makes the scoring range very different.

# EXHIBIT 17

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x
SANDRA L. AGUILAR,              :
          Plaintiff,           :
  vs.                          : Civil Action
DIRK KEMPTHORNE, Secretary,    : No. 07-0546 (RMU)
Department of Interior,         :
          Defendant.           :
- - - - - - - - - - - - - - - -x

Washington, D.C.
Thursday, June 19, 2008

The deposition of JOYCE M. SASSER, called

for examination by counsel for Plaintiff in the

above-entitled matter, pursuant to Notice, in the

offices of Gebhardt & Associates, 1101 Seventeenth

Street, N.W., Suite 807, Washington, D.C., convened

at 10:08 a.m., before Catherine B. Crump, a notary

public in and for the District of Columbia, when were

present on behalf of the parties:

JARDIM REPORTING ASSOCIATES
(703) 867-0396

---

2

APPEARANCES:

On behalf of the Plaintiff:

  CLARISSA H. WU, ESQ.
  Gebhardt & Associates, LLP
  1101 17th Street, N.W., Suite 807
  Washington, D.C.  20036
  (202) 496-0400

On behalf of the Defendant:

  BRIAN HUDAK, ESQ.
  U.S. Attorney's Office
  555 4th Street, N.W.
  Washington, D.C.  20530
  (202) 514-7143

  MEL S. HUTSON, ESQ.
  Department of the Interior
  Office of the Solicitor
  1849 C Street, N.W. MS-6440
  Washington, D.C.  20240
  (202) 208-3051

---

3

C O N T E N T S

EXAMINATION BY COUNSEL FOR

WITNESS                    PLAINTIFF        DEFENDANT

JOYCE M. SASSER                4              --

E X H I B I T S

SASSER DEPOSITION EXHIBITS              MARKED

  No. 1                                    23

---

4

1                P R O C E E D I N G S

2      Whereupon,

3                    JOYCE M. SASSER

4    was called for examination by counsel for Plaintiff

5    and, having been first duly sworn by the notary

6    public, was examined and testified as follows:

7          EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8    BY MS. WU:

9        Q.   Could you please state your name for the

10   record?

11       A.   Joyce M. Sasser.

12       Q.   Thank you.  All right.  I'm going to be

13   asking you a series of questions today.  If there's

14   any question I ask you that you don't understand,

15   please feel free to ask me to repeat or to clarify

16   it.

17       A.   All right.

18       Q.   And as best as you're able to, please give

19   all responses verbally instead of nodding or shaking

20   the head so they can be transcribed.

21       A.   Yes.

22       Q.   If you need a break at any time, just let us

5

10:08:47 1  know and we can take one.

10:08:48 2      A.  Okay.

10:08:51 3      Q.  All right.  Are you currently employed by

4  the agency?

10:08:52 5      A.  Yes.

10:08:53 6      Q.  What is your position there?

10:08:55 7      A.  Human resources specialist.

10:08:57 8      Q.  And what's your current address?

10:09:59 9      A.  3356 Sixth Street, Southeast, Apartment 103,

10:09:16 10  Washington, D.C.

10:08:05 11     Q.  Okay.  And have you taken any medications or

10:09:14 12  anything today that might prevent you from answering

10:09:17 13  any question that I ask honestly?

10:09:19 14     A.  No.

10:09:20 15     Q.  All right.  Thank you.  How long have you

10:09:23 16  served in your position?

10:09:24 17     A.  Close to 20 years.

10:09:26 18     Q.  Close to 20 years?

10:09:27 19     A.  Yes.

10:09:28 20     Q.  All right.  Could you tell us a little bit

10:09:32 21  about what your job duties are?

22          MR. HUDAK:  Objection to form.  You may

6

10:09:38 1  answer.

10:09:39 2          THE WITNESS:  Well, as a human resources

10:09:41 3  specialist, I'm responsible for classifying various

10:09:44 4  types of positions, general schedules and wage grade

10:09:49 5  positions.  I'm responsible for the recruitment.

10:09:52 6  Part of my job that I do, the staffing part, I put

10:09:54 7  out vacancy announcements.  I write crediting plans

10:09:59 8  if I'm asked to write them or assist the manager with

10:10:00 9  writing crediting plans.

10:10:02 10         Also, I do training and development, some

10:10:06 11  portions of that and some portions of the employee

10:10:09 12  labor relations surrounding benefits.  I don't have

10:10:13 13  the sole responsibility of the entire employee labor

10:10:16 14  relations, but I do work the benefits side of it.

15  BY MS. WU:

10:10:19 16     Q.  Okay.  And you said that you are involved in

10:10:22 17  developing crediting plans.  Could you tell us a

18  little bit about that?

10:10:26 19         MR. HUDAK:  I'll object to the form, but you

20  can answer it.

10:10:29 21         THE WITNESS:  The only time that I will

10:10:33 22  actually develop a crediting plan is if I'm working

7

10:10:37 1  with a manager that doesn't know how to create one.

10:10:40 2  My job is to advise them on how they could pull

10:10:42 3  together their own crediting plan for the job that's

10:10:45 4  being advertised.

10:10:46 5          If they have a problem writing the crediting

10:10:50 6  plan, then I will get the position description or

10:10:51 7  whatever I need to try to come up with a tool for

10:10:55 8  them, and then I will give it to them to see if it

10:10:57 9  meets their expectations or whatever.  Then they sign

10:11:01 10  off on it and then we'll use it to rank and rate

10:11:02 11  against the applicants that apply to the position.

10:11:04 12     Q.  What is a crediting plan?

10:11:06 13     A.  It's like a measuring tool.  Once you

10:11:10 14  determine basic qualifications for applicants that

10:11:14 15  have applied to a particular position, then you also

10:11:19 16  have to rank and rate that same application against

10:11:22 17  the crediting plan.  It's like a measuring tool to

18  obtain the additional 30 points, because the basic

19  quals only gives you 70 points.  The crediting plans

10:11:29 20  are the measuring tools to use to rank and rate the

10:11:34 21  KSAs, the knowledge, skills, and abilities, that will

10:11:35 22  give you the additional 30 points.  So it's the 70

8

10:11:38 1  plus the 30 to equal to the hundred.

10:11:40 2      Q.  Okay.  And am I correct in understanding

10:11:45 3  that the crediting plans are based on the KSAs?

10:11:51 4          MR. HUDAK:  I'll object to the form.

10:11:51 5          You may answer it if you can.

10:11:54 6          THE WITNESS:  The crediting plan is a

10:11:58 7  measuring tool that's used to rank and rate the

10:12:02 8  knowledge, skills, and abilities that are listed in

10:12:04 9  the vacancy announcement in order to get the

10:12:06 10  additional 30 points, because with the basic quals,

11  you're only going to get 70 points for the basic

10:12:12 12  quals.  In order to get the additional 30 points to

10:12:15 13  equal the 100, you have to rank and rate against the

10:12:19 14  crediting plan or the measuring tool, they call it.

10:12:21 15  BY MS. WU:

10:12:21 16     Q.  Okay.  And how do you get the 70 percent

10:12:24 17  qualifications?

10:12:25 18         MR. HUDAK:  I'll object to the form.

10:12:25 19         You may answer.

10:12:27 20         THE WITNESS:  You have to rank and rate for

21  basic quals based on their Office of Personnel

10:12:34 22  Management qualification requirements for whatever

10:12:35  1  the position is, whichever position it is.  All
10:12:38  2  positions have qualification standards put out by OPM
        3  and you have to meet the OPM qualification standards
        4  for basic qualifications to even be eligible for the
10:12:50  5  job.
10:12:51  6  BY MS. WU:
10:12:52  7     Q.  All right.  Let's see.  Could you give me an
10:13:03  8  example of an OPM qualification standard?
10:13:07  9        MR. HUDAK:  Object to the form.  Vague,
10:13:12 10  speculative, undefined, calls for a narrative,
        11  amongst others.
10:13:16 12        You may answer if you can.
10:13:18 13        THE WITNESS:  Well, an example of a
10:13:21 14  qualification standard would be, for example, the
10:13:24 15  contracting series, the 1102 series.
10:13:28 16        MS. WU:  Okay.
10:13:27 17        THE WITNESS:  The qualification standards, it
10:13:30 18  says that you have to have a degree in contracting.
10:13:35 19  If you do not have a degree in contracting, then you
10:13:39 20  cannot meet basic qualifications for that position.
10:13:41 21  BY MS. WU:
        22     Q.  Okay.  And where do you find the basic

10:13:44  1  qualifications for any given position?
10:13:47  2     A.  You can go on the OPM website.  They're all
10:13:49  3  listed there.
10:13:49  4     Q.  Okay.  Are they included in the vacancy
10:13:53  5  announcement or are they --
10:13:53  6     A.  Their qualifications, yes.  They have to be
10:13:56  7  included in the basic vacancy announcement, what the
10:14:00  8  qualifications are.
10:14:01  9     Q.  So the basic qualifications comprise 70
10:14:06 10  percent of a total score and crediting plans comprise
10:14:09 11  30 percent; is that right?
10:14:10 12     A.  Yes.
10:14:11 13     Q.  Okay.  Are there any situations in which an
10:14:16 14  employee might score above a hundred percent or is it
10:14:18 15  always a hundred percent?
10:14:21 16     A.  It's always a hundred percent unless the
10:14:25 17  person has veterans preference.
        18     Q.  Okay.  Are there any other types of
10:14:28 19  preferences that would bump an employee up over a
10:14:30 20  hundred percent?
10:14:31 21     A.  No.
10:14:34 22     Q.  And did you say that you also work on

10:14:37  1  developing vacancy announcements?
10:14:40  2     A.  Yes.
10:14:42  3     Q.  Could you tell us about what the process is
10:14:43  4  like?
10:14:43  5        MR. HUDAK:  Object to the form.
10:14:44  6        You may answer if you can.
10:14:48  7        THE WITNESS:  Writing vacancy announcements,
10:14:50  8  you have to have a position description with the
10:14:54  9  duties in it in order to write a vacancy
10:14:58 10  announcement.  You have to know to go and obtain the
        11  qualification standards for that particular vacancy
10:15:02 12  announcement, which is the OPM website.  You have to
10:15:06 13  pull all of the tools together.  You have to have a
10:15:09 14  crediting plan written by the supervisor with the
10:15:12 15  KSAs that they want to go into the vacancy
        16  announcement.
10:15:12 17        You have to pull all of those tools together
10:15:14 18  in order to write a vacancy announcement.  Then
10:15:16 19  you've got your C-TAP, your IC-TAP, your interagency
10:15:20 20  stuff.  All of that has to go into the vacancy
10:15:23 21  announcement.  You have to pull all of that together
        22  for a vacancy announcement.

10:15:24  1  BY MS. WU:
10:15:24  2     Q.  And who pulls all of that together?
10:15:27  3     A.  The specialist does in coordination with the
10:15:30  4  manager that the position is being advertised for or
10:15:34  5  whatever the division is.
10:15:30  6     Q.  Were you involved in creating the vacancy
10:15:38  7  announcement that is at issue in this litigation?
10:15:41  8     A.  No, I wasn't.
10:15:42  9     Q.  Do you know who was?
10:15:43 10     A.  I have no idea.
10:15:44 11     Q.  Were you at all involved in the selection
10:15:47 12  process for the position at issue?
10:15:48 13     A.  I wasn't involved in the selection process,
10:15:51 14  no.
10:15:51 15     Q.  Okay.  Did you review any of the application
10:15:56 16  packages?
10:15:56 17     A.  Yes.
10:15:56 18     Q.  Okay.  At what stage did you review
10:16:02 19  application packages?
10:16:02 20     A.  I review application packages to determine
10:16:07 21  basic qualifications.
10:16:09 22     Q.  So the 70 percent; is that right?

13

10:16:10  1     A.   Yes.

10:16:11  2     Q.   And do you remember around how many

·  ·  3  applications you reviewed?

·  .15  4     A.   I don't recall how many there were.

10:16:17  5     Q.   Okay.  Do you know if you reviewed all of

10:16:20  6  the applications that came in or only some of them?

10:16:23  7     A.   Just some of them.

10:16:25  8     Q.   Do you know which ones you reviewed?

10:16:28  9     A.   I don't recall whose application I reviewed.

10:16:35 10     Q.   Do you know if you reviewed only non-status

10:16:40 11  or status or was there any grouping in the

10:16:46 12  applications you reviewed?

10:16:47 13          MR. HUDAK:  I'll object to the form.

10:16:50 14  Compound amongst others.

10:16:52 15          THE WITNESS:  If I remember correctly, I

10:16:55 16  think I reviewed the non-status applicants.

10:16:50 17  BY MS. WU:

10:16:59 18     Q.   Okay.  And you rated them based on their

10:17:04 19  qualification standards; is that correct?

10:17:06 20     A.   Their basic qualifications, yes, initially.

10:17:09 21     Q.   Did you also review them on their crediting

·  22  plans?

14

10:17:13  1          MR. HUDAK:  I'll object.  Them, the

10:17:16  2  non-status applicants?

3          MS. WU:  Yes.

4          MR. HUDAK:  Okay.

10:17:17  5          THE WITNESS:  Yes, I did.  The non-status

10:17:23  6  applicants, yes.

10:17:23  7  BY MS. WU:

10:17:24  8     Q.   So you reviewed them for a hundred percent

10:17:29  9  of their evaluation; is that right?

10:17:29 10          MR. HUDAK:  Object to the form.

10:17:29 11          THE WITNESS:  I didn't review them for a

10:17:32 12  hundred percent.  I reviewed them based on their

10:17:39 13  application against the measuring tool.  I had no way

10:17:39 14  of knowing if it was going to turn out to be a

10:17:41 15  hundred percent or 80 percent or even 75 percent.  I

10:17:44 16  had no way of knowing that until the applications had

10:17:47 17  been reviewed.

·  18  BY MS. WU:

10:17:49 19     Q.   Okay.  But you reviewed them based on their

10:17:54 20  basic qualification standards and their crediting

10:17:56 21  plans?

22     A.   Yes.

15

10:17:57  1     Q.   Did anybody else review them in addition to

2  you?

10:18:01  3     A.   The applications that I reviewed, is this

10:18:03  4  what you're asking me?

5     Q.   Yes.

10:18:05  6     A.   Did anyone review the applications that I

10:18:08  7  reviewed?

10:18:08  8     Q.   Yes.

10:18:09  9     A.   Not to my knowledge.

10:18:18 10     Q.   What did you do with the applications after

10:18:21 11  you reviewed them?

10:18:21 12     A.   I gave them to the senior staffing

10:18:25 13  specialist.

10:18:25 14     Q.   Who was that?

10:18:26 15     A.   Leslie Newman.

10:18:29 16     Q.   Okay.  Is that what would normally be done

10:18:37 17  with applications?

10:18:39 18          MR. HUDAK:  I'll object to the form.

10:18:42 19          THE WITNESS:  Okay.  Normally, if I'm the

10:18:47 20  specialist that's handling the whole process of

10:18:51 21  ranking and rating, no, that's not what happens, but

10:18:55 22  since I was assisting her with the ranking and

16

10:18:58  1  rating, that's the norm.  When I finish with the part

10:19:01  2  that I'm working on, I'm to give it to her.

10:19:04  3  BY MS. WU:

10:19:05  4     Q.   And Leslie Newman, she's a senior staffing

5  specialist, you said?

10:19:10  6     A.   She was the chief of staffing and placement.

10:19:22  7     Q.   When you are the staffing specialist, who

10:19:26  8  reviews all of the applications?  What's the normal

10:19:29  9  process that you would go through with the

10:19:31 10  applications?

10:19:32 11          MR. HUDAK:  I'll object to the form.  Vague,

10:19:35 12  calls for speculation, but you may answer it if you

13  can.

10:19:39 14          THE WITNESS:  When I finish reviewing all

10:19:43 15  applications, I then give it to my assistant to

10:19:46 16  prepare the certificates.  Once she prepares the

10:19:51 17  certificates, I then look over all of the

10:19:54 18  certificates to make sure everything is in order.  If

10:19:57 19  it is, I either sign them or my chief will sign them

10:20:01 20  and we will give them to the selecting official after

10:20:05 21  copies have been made of everything.  We then pass it

10:20:07 22  to the selecting official for them to do their

10:20:10  1    interviews or whatever it is they do.

10:30:13  2    BY MS. WU:

10:20:  3        Q.  Okay.  Do you know who the selecting

10:...15  4    official was for the position at issue?

10:20:16  5        A.  No, I do not.

10:20:19  6        Q.  Okay.  You said that you would look over the

10:20:20  7    certificates?

10:20:20  8        A.  Yes.

10:20:26  9        Q.  Are those certificates of eligibles?

10:20:29 10        MR. HUDAK:  I'll object to the form.  Calls

10:30:31 11    for speculation.  You're talking in the general

10:20:33 12    sense.  I think it's vague and ambiguous.

          13        You may answer it if you can.

10:20:37 14        THE WITNESS:  They are called certificates of

10:20:42 15    eligibles, yes.

10:20:42 16    BY MS. WU:

10:20:42 17        Q.  And you said that you would look over

10:20:43 18    certificates of eligibles to make sure everything was

10:20:46 19    in order.

          20        A.  Yes.

10:20:47 21        Q.  Can you explain a little bit more about

10:  22    that?

---

18

10:20:49  1        MR. HUDAK:  I'll object to the form, object

10:20:51  2    to the preface.  It's vague, ambiguous, and calls for

10:20:54  3    speculation.  The question itself calls for a

10:20:58  4    narrative among other things.

          5    BY MS. WU:

10:09:58  6        Q.  Go ahead.

10:20:59  7        A.  The reason I review the certificates before

10:21:02  8    they go to the selecting official is to make sure

10:21:05  9    that we have veterans preference eligibles on that

10:21:09 10    certificate, that they are placed on there where

10:21:12 11    they're supposed to be placed on there.  I just make

10:21:10 12    sure everybody is placed in score order like they're

          13    supposed to be, that the vet is where he's supposed

10:21:19 14    to be if there happens to be one on the cert.  You

10:21:22 15    just make sure everything is in order and legal

10:21:28 16    before you pass it on to the selecting official.  You

10:21:17 17    have to make sure everybody is on there in score

          18    order.

10:21:02 19        Q.  Did you see the selection certificates for

10:21:34 20    the applications that you reviewed?

10:21:36 21        A.  Yes.

10:21:37 22        Q.  And was everything in order?

---

10:21:39  1        A.  As far as I could tell, yes.

10:21:42  2        Q.  Okay.  How many selection certificates were

10:21:45  3    generated from the applications you reviewed?

10:21:48  4        A.  I don't recall how many certificates there

10:01:50  5    were.

10:21:51  6        Q.  Customarily, how many certificates result

10:21:54  7    from a review of a group of applications?

10:21:57  8        MR. HUDAK:  I'll object to the form.  Vague,

          9    speculation, among other things.

10:22:01 10        THE WITNESS:  It would depend on who applied

10:22:05 11    and how they applied.  There could be three

10:22:09 12    certificates.  There could be two.  There could be

10:22:10 13    one even.  It depends on how the applicants applied

          14    because you have all sorts of vacancy announcements.

10:02:10 15    You've got merit promotion.  You've got DEU.  So it

10:22:20 16    depends on how they applied, how many certificates

10:22:22 17    it's going to be.

          18    BY MS. WU:

10:22:33 19        Q.  Okay.  So you stated that after you review

10:22:35 20    applications, you generally pass them on to the

10:22:37 21    selecting official for either selection or interview;

10:22:41 22    is that correct?

---

20

10:22:41  1        MR. HUDAK:  I'll object to the form.  It

10:22:44  2    mischaracterizes, is talking in a general sense here,

10:22:45  3    and it's speculative.

10:22:47  4        You can answer it if you can.

10:22:48  5        THE WITNESS:  No.  That's not correct.  What

10:22:51  6    I said is once I have reviewed all applications, I

10:22:55  7    then pass them to my assistant to prepare

10:22:59  8    certificates of eligibles, and once she does that, I

10:23:00  9    review them to make sure everybody is in score order

10:23:04 10    according to their scores, and then the whole packet

10:23:10 11    gets Xeroxed so we can have copies of what we

10:23:11 12    submitted to the selecting official.  Then it goes to

10:23:13 13    the selecting official for them to do their

          14    interviews.

10:23:15 15    BY MS. WU:

10:23:15 16        Q.  Okay.  And you said that you've been in your

10:23:21 17    position for 20 years; is that correct?

10:23:24 18        A.  Almost 20 years, yes.

10:23:20 19        Q.  In that 20 years, how many selection

10:23:30 20    processes have you been involved in, roughly?

10:23:34 21        A.  I can't give you a total number.  It's been

10:23:38 22    quite a few in 20 years, I assure you.  I'm

10

37

```
10:41:44   1        MS. WU:  Okay.
10:41:45   2        THE WITNESS:  She had to have met the basic
           3   qualifications before you can rank and rate against
           4   the crediting plan.
10:41:50   5   BY MS. WU:
10:41:51   6        Q.  Oh, okay.  So nobody who didn't meet the
10:41:54   7   basic qualifications made it onto the certificate of
10:41:57   8   eligibles?
10:41:58   9        A.  No.
10:41:58  10        Q.  Oh, okay.  Do you remember what about
10:42:08  11   Ms. Aguilar's application package made her meet the
10:42:12  12   basic qualifications for the position?
10:42:14  13        MR. HUDAK:  I'll object to the form.
          14        You can answer it.
10:42:15  15        THE WITNESS:  I don't remember everything
10:42:16  16   that was in this particular applicant's application.
10:42:23  17   No, I do not.
10:42:24  18   BY MS. WU:
10:42:25  19        Q.  All right.  Have you ever given a deposition
10:42:31  20   before?
10:42:32  21        A.  I believe this is my first.
          22        Q.  First ever?
```

38

```
10:42:35   1        A.  Um-hum.
10:42:49   2        Q.  Are you aware of any other applicants or
10:42:57   3   employees who have brought charges of race or
10:43:01   4   national origin discrimination against the agency?
10:43:04   5        A.  No.
10:43:05   6        MR. HUDAK:  Against the agency?
10:43:07   7        MS. WU:  Yeah.
10:43:11   8        MR. HUDAK:  I'll object to the question.
10:43:11   9   It's completely -- in fact, can I get a proffer of
10:43:15  10   some sort of relevance or responsiveness to this
10:43:17  11   discovery at all?  I mean, that question is so open
10:43:17  12   ended and so vague and so all encompassing that it
10:43:21  13   cannot be at all reasonably calculated to lead to
10:43:25  14   discovery of relevant and admissible evidence in this
10:43:25  15   action.
10:43:20  16        MS. WU:  Your objection is noted.
10:43:27  17        MR. HUDAK:  Are you going to proffer?
          18        MS. WU:  No,
10:43:30  19        MR. HUDAK:  Okay.  You can answer the best
10:43:32  20   you can, but I think that question is well outside
10:43:34  21   the bounds of discovery in this actions.
          22        Please make that noted for the record.
```

39

```
10:43:36   1        THE WITNESS:  No.  I have no knowledge of
           2   any.
10:43:40   3   BY MS. WU:
10:43:40   4        Q.  Okay.  Have you ever participated in any
10:43:44   5   other cases about discrimination?
10:43:48   6        A.  No.
10:43:51   7        Q.  All right.  Is there anything else you
10:43:55   8   remember about the process that you would like to
10:43:58   9   tell us?
10:43:59  10        MR. HUDAK:  I'll object to the form of the
10:44:01  11   question.  Vague, ambiguous.  It's completely open
10:44:05  12   ended, calls for a narrative.
10:44:06  13        You can answer it if you can.
10:44:08  14        THE WITNESS:  No.  I don't remember anything.
10:44:10  15   I've told you pretty much all I remember.
10:44:13  16        MS. WU:  All right.  Do you have any?
10:44:16  17        MR. HUDAK:  No.  We'll read and sign.
10:44:17  18        MS. WU:  Okay.  Thank you very much.
          19        THE WITNESS:  Not a problem.
          20        (Whereupon, at 10:44 a.m., the taking of the
          21   deposition was concluded.)
          22        (Signature not waived.)
```

40

CERTIFICATE OF NOTARY PUBLIC

I, CATHERINE B. CRUMP, the officer before whom the
foregoing deposition was taken, do hereby testify
that the witness whose testimony appears in the
foregoing deposition was duly sworn by me; that the
testimony of said witness was taken by me
stenographically and thereafter reduced to a
transcript under my direction; that said deposition
is a true record of the testimony given by the
witness; that I am neither counsel for, nor related
to, nor employed by any of the parties to the action
in which this deposition was taken; and further, that
I am not a relative or employee of any attorney or
counsel employed by the parties hereto nor
financially or otherwise interested in the outcome of
the action.

_____
Catherine B. Crump


Notary Public in and for the
District of Columbia

My commission expires:  December 31, 2012

CERTIFICATE OF DEPONENT

I have read the foregoing 39 pages, which contain the correct transcript of the answers made by me to the questions therein recorded.

_____
Joyce M. Sasser

. . .

I hereby certify that the individual representing him/herself to be the above-named individual, appeared before me this _____ day of _____ and executed the above certificate in my presence.

_____
Notary Public

My Commission Expires:

INSTRUCTIONS FOR READING AND SIGNING THIS TRANSCRIPT

The witness whose deposition was taken in this matter has requested to read and sign this transcript. After reading the transcript, the witness should fill out and sign the last two pages in front of a notary public and those two pages should be returned to the attorney responsible for taking this deposition so that it may be filed with the original transcript.

Thank you for your attention to this matter.

JARDIM REPORTING ASSOCIATES, LLC
1221 N. Powhatan Street
Arlington, Virginia  22205
(703)807-0396
jardimreporting@yahoo.com

---

42

ERRATA SHEET
To the deponent:  Please read the transcript of your deposition and indicate on the lines below your corrections.  Then sign and have your signature notarized.
PAGE#, LINE#   CORRECTION   REASON FOR CORRECTION

PURSUANT TO 28 U.S.C., SECTION 1746, I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT I AM THE DEPONENT AND THAT THIS CERTIFICATE OF DEPONENT AND ERRATA SHEET WERE PREPARED BY ME.

_____        _____
Joyce M. Sasser                    (Signature)

Subscribed to and sworn by:

_____
Notary Public        My Commission expires:

# EXHIBIT
# 18

*Sandra L. Aguilar*
*2338 Tawny Drive*
*Waldorf, MD 20601*
*301-870-6121*

December 8, 2003

Mr. Tulio Diaz
Field Director
Washington Field Office
Equal Employment Opportunity Commission
1400 L Street, Suite 200
Washington, DC 20005

RE: Docket Number FNP-2003-064

Dear Diaz:

Enclosed please find a "Request for Hearing Form" regarding complaints of discrimination based on race, national origin, and age that I have filed against the Department of Interior, National Park Service, and the National Capital Region. I certify to you that I have also sent a copy of this form to the appropriate person at the National Park Service, Ms. Dianne A. Spriggs.

In addition, please find enclosed my rebuttal statements to Mr. Terry R. Carlstrom's, Mr. Joseph M. Lawler's and Ms. Leslie J. Newman's sworn testimony. I am submitting my rebuttal statements at this time, which is after the Report of Investigation was sent to me, mainly because I feel I was not given sufficient time to complete my research, make my statements and pose questions. I had asked for and was given three weeks beyond the initial date of request for my statements, however, I needed more time.

I have submitted questions with the rebuttal statements that I would like to be asked of the above mentioned individuals. The questions are posed at this time because I was not given the opportunity to ask questions or submit my questions or request witnesses at the time of my deposition. Therefore, I have had to respond in length to each testimony in addition to incorporating my questions, which are just as important as those asked by the investigator.

Please feel free to contact me at the above address and phone number. I look forward to hearing from you regarding my request for a hearing.

Sincerely,

Sandra L. Aguilar

Enclosures.

✓ CC:   Ms. Dianne A Spriggs, EEO Program Manager
        National Park Service, Department of the Interior

# EXHIBIT
# 19

DELEGATED EXAMINING UNIT

## KSA DEFINITION FORM

Title, Series, Grade: <u>Associate Regional Director, Administration,</u>
<u>GS-341-15</u>

KSA Title: <u>Knowledge of administrative/management support functions such</u>
<u>as human resources, budget, contracting/procurement, property</u>
<u>management, information management, and any other related administrative</u>
<u>support services.</u>

Vac. Ann. No.  <u>#NCR-03-19</u>

### LEVEL DESCRIPTION

**Level III**  <u>Demonstrated knowledge of laws, regulations, and policies</u>    3
<u>involved in administrative management. Experience in or has supervised</u>
<u>at least four (4) of the functions listed above at a Regional, state or</u>
<u>large field area/office.  Has direct experience in or has supervised the</u>
<u>functions listed.</u>

**Level II** <u>Demonstrated knowledge of laws, regulations, and policies</u>    2
<u>involved in administrative management. Experience in or has supervised</u>
<u>at least three (3) administrative functions as listed above. Experience</u>
<u>may have been gained as a manager or administrative officer at a park or</u>
<u>similar level office environment. Program responsibilities required an</u>
<u>in-depth knowledge of administrative principles, practices and</u>
<u>procedures.</u>

**Level I** <u>Experience in or has supervised at least two administrative</u>    1
<u>functions listed above. Experience may have been gained as a division</u>
<u>chief at a regional or state office level or field area/office setting.</u>
<u>Program responsibilities required functional knowledge in the area in</u>
<u>which experience or supervision demonstrated.</u>

Factor Weight ___1___

Personnelist _Leslie J. Newman_    Date _____

Supervisor's Signature _____    Date _____

SME's Signature (If applicable)

_____    Date _____

Exhibit 2
Page 47 of 117 pages

DELEGATED EXAMINING UNIT

KSA DEFINITION FORM

Title, Series, Grade:  <u>Associate Regional Director, Administration</u>
<u>GS-341-15</u>

KSA Title: <u>Skill in negotiating and resolving complex problems in a</u>
<u>leadership role with subordinates peers, managers, and representatives</u>
<u>at various levels.</u>

Vac. Ann. No.  <u>#NCR-03-19</u>

LEVEL DESCRIPTION

Level III  <u>Experience demonstrates promoting cooperation and teamwork at</u>
<u>various levels within an organization including subordinates, peers,</u>
<u>management, and outside representatives. Lead the negotiation of</u>
<u>agreements on difficult, complex, or controversial issues. Developed</u>
<u>innovative techniques to solve problems and meet the needs of several</u>
<u>levels in an organization. Facilitated groups with differing</u>
<u>goals/agenda within and outside the organization to resolve conflicts or</u>
<u>problems. Developed action plans, assigned responsibilities, monitored</u>
<u>progress, and devised alternate solutions when needed.</u>   9

Level II  <u>Experience demonstrates promoting cooperation and teamwork</u>
<u>within an organization including subordinates or peers, or management.</u>
<u>Facilitated groups with differing goals/agenda within OR outside the</u>
<u>organization to resolve conflicts or problems. Formulated resolution and</u>
<u>made recommendations to others, coordinating progress review and</u>
<u>ensuring changes made are implemented and consistent with project goals.</u>   6

Level I  <u>Regularly held or encouraged team work sessions to solve</u>
<u>problems; promoted teambuilding or other training to increase</u>
<u>effectiveness; experience leading groups to resolve problems to</u>
<u>accomplishing a goal. Experience in negotiating agreements or served as</u>
<u>a project facilitator.</u>   3

Factor Weight  3

Personnelist  _Leslie J. Newman_  Date

Supervisor's Signature _____  Date

SME's Signature (If applicable)

_____  Date

DELEGATED EXAMINING UNIT

KSA DEFINITION FORM

Title, Series, Grade:   Associate Regional Director, Administration
                        GS-341-15

3. KSA Title: **Ability to develop, analyze, review and appraise for
effectiveness administrative policies, programs, and practices.**

Vac. Ann. No.   **#NCR-03-19**

LEVEL DESCRIPTION

**Level III**  Demonstrated ability to develop, analyze, examine and    6
evaluate a full-range of administrative services in support of a number
of offices with a widely diverse work force and considerable variances
in support and program needs.  This experience related to highly complex
administrative decisions, guidelines, and strategies affecting a broad
spectrum of program areas related to administration (human resources,
contracting, property, budget, information management, etc.).
Established policy affecting a broad area of responsibility.  Ensured
oversight procedures were established in compliance.

**Level II** Demonstrated ability to develop, analyze, examine and examine    4
complex administrative decisions, programs and practices and the ability
to apply them to a variety of situations to resolve issues. Established
policy on a limited area of responsibility. Established oversight
procedures to ensure compliance with law and regulation.

**Level I** Ability to develop, analyze, review and appraise administrative    2
policies, programs and practices; ability to apply them to common
situations to resolve issues or advise others. Provided input or policy
or procedures. Monitored the progress of an organization towards goals
and responsible for periodically evaluating and making appropriate
adjustments.

Factor Weight ___2___

Personnelist _Leslie J. Newman_   Date _____

Supervisor's Signature _____   Date _____

SME's Signature (If applicable)

_____   Date _____

Exhibit 2
Page 49 of 117 pages

DELEGATED EXAMINING UNIT

KSA DEFINITION FORM

Title, Series, Grade:  <u>Associate Regional Director, **Administration**</u>
<u>GS-341-15</u>

KSA Title: <u>Ability to interact and communicate at all levels.</u>

Vac. Ann. No.  <u>#NCR-03-19</u>

## LEVEL DESCRIPTION

**Level III**  <u>Experience communicating on all levels from congressional</u>
<u>representatives to local officials, on substantive issues.  Issues</u>
<u>presented were complex or controversial. Public speaking ability to</u>
<u>communicate effectively with groups/individuals where various sentiments</u>
<u>are expressed, frequently dealing with group conflict/animosity.</u>
<u>Experience writing program plans and policies which were accepted and</u>
<u>instituted, or developed written analyses and proposals on extremely</u>
<u>complex issues.</u>

**Level II** <u>Experience communicating with upper management within the</u>
<u>agency on substantive issues. Issues presented were occasionally complex</u>
<u>or controversial. Public speaking ability to communicate effectively</u>
<u>with groups/individuals on a wide variety of subjects with some</u>
<u>experience dealing with controversial issues. Significant work</u>
<u>experience which required the ability to develop written proposals,</u>
<u>analyses, instructions and policy.</u>

**Level I** <u>Experience communicating with local management on substantive</u>
<u>issues with only occasional dealings with higher level officials. Issues</u>
<u>presented were non controversial but gained acceptance and support of</u>
<u>polices and programs. Provided input into development of written</u>
<u>proposal, policy, etc.</u>

Factor Weight  _2_

Personnelist  _Leslie J. Newman_   Date

Supervisor's Signature  _____   Date

SME's Signature (If applicable)

_____   Date

Exhibit 2
Page 50 of 117 pages

DELEGATED EXAMINING UNIT

KSA DEFINITION FORM

Title, Series, Grade:  <u>Associate Regional Director, Administration</u>
<u>GS-341-15</u>

5. KSA Title: <u>Ability as a manager to direct a support staff comprised of a</u>
<u>range of technical and professional individuals.</u>

Vac. Ann. No.  <u>#NCR-03-19</u>

LEVEL DESCRIPTION

**Level III** <u>Managerial experience with responsibility for planning and</u> 6
<u>directing a variety of critical programs, and an interdisciplinary</u>
<u>professional and technical staff. Experience coordinating diverse</u>
<u>operations; planning and organizing work, and ensuring goals are</u>
<u>achieved through delegation and performance accountability, successful</u>
<u>resolution of employee relations and disciplinary problems. Experience</u>
<u>using position management to establish or improve the organization</u>
<u>structure to accomplish the mission and utilize the strengths of staff.</u>
<u>Experience in all facets of workforce planning, family workforce issues,</u>
<u>employee empowerment, delegation of work, effective utilization of</u>
<u>performance evaluation and incentive awards programs, and advocating</u>
<u>training opportunities.</u>

**Level II** <u>Experience with responsibility for planning, directing and</u> 4
<u>leading the work of a professional and technical staff. Experience</u>
<u>establishing clear program goals, creating effective work groups,</u>
<u>delegating decision-making authority and responsibility. Demonstrated</u>
<u>the ability to assess the capabilities, limitations, and needs of others</u>
<u>while providing guidance, coaching and assistance. Experience operating</u>
<u>an effective employee recognition program.</u>

**Level I** <u>Experience indicates responsibility for assigning, directing and</u> 2
<u>reviewing work of subordinate employees. Evaluated work performance</u>
<u>training needs, and all duties normally assigned in supervisory</u>
<u>positions.</u>

Factor Weight  <u>2</u>

Personnelist  _Leslie J. Newman_    Date _____

Supervisor's Signature _____  Date _____

SME's Signature (If applicable)

_____  Date _____

Exhibit 2
Page 51 of 117 pages

# EXHIBIT
# 20

# Transmutation Table for the Maximum Number of Matching Points (30)

| Number of Points | Equals (=) | Transmuted Rating (not including VP) |
|:---:|:---:|:---:|
| **30** | **=** | **100** |
| 29 | = | 99 |
| 28 | = | 98 |
| 27 | = | 97 |
| 26 | = | 96 |
| 25 | = | 95 |
| 24 | = | 94 |
| 23 | = | 93 |
| 22 | = | 92 |
| 21 | = | 91 |
| 20 | = | 90 |
| 19 | = | 89 |
| 18 | = | 88 |
| 17 | = | 87 |
| 16 | = | 86 |
| 15 | = | 85 |
| 14 | = | 84 |
| 13 | = | 83 |
| 12 | = | 82 |
| 11 | = | 81 |
| 10 | = | 80 |
| 9 | = | 79 |
| 8 | = | 78 |
| 7 | = | 77 |
| 6 | = | 76 |
| 5 | = | 75 |
| 4 | = | 74 |
| 3 | = | 73 |
| 2 | = | 72 |
| 1 | = | 71 |
| 0 | = | 70 |

# EXHIBIT
# 21

NATIONAL PARK SERVICE

MERIT PROMOTION PLAN

IMPLEMENTATION GUIDELINES

Effective June 9, 1999, the Department of the Interior (DOI) issued the Departmental policy on Merit Promotion. This policy is contained in 370 DM 335. Along with this policy, DOI issued a Personnel Handbook for implementing the new Merit Promotion Plan. Several sections in the new Handbook refer to situations in which an agency has the option of determining their own procedures. These implementation guidelines cover those sections in the DOI Personnel Handbook where agency discretion may be used. The following guidance is to be used when implementing the procedures contained in the Personnel Handbook for the Department of the Interior.

COVERAGE

The competitive procedures outlined in this implementation guideline and in the DOI Merit Promotion Plan (MPP) apply to all promotions outlined in Exhibit 1 of the DOI MPP and to the positions of Captain and above in the U. S. Park Police (USPP) and all Federal Wage System positions. These competitive procedures apply to all permanent positions.

Page 6, Section 5. Vacancy Notification and Announcements

Accepting Applications.

Applications will be accepted as specified in the vacancy announcement. Applicants may not mail their applications through any Government in-house mailing system. The use of the "blue" envelope is also prohibited.

Page 6, Section 6. Evaluating Candidates

Page 6. Job Analysis

A job analysis must be developed for all positions. Once the job analysis is completed, the personnelist will review the document to insure that all rules and regulations have been met, that the rating criteria is reasonable and ratable and that the SME has met all of his/her obligations in the process. The personnelist and the SME will sign the job analysis form jointly.

Page 6.  Minimum Qualifications

Applicants for positions announced through the merit promotion system must meet basic qualifications, including time-in-grade requirements, by the closing date of the announcement.

Page 6.  Rating and Ranking

Regardless of the number of applicants, qualitative distinctions must be made among those eligible for promotion in terms of relative merit and ability. When there are 10 or fewer promotion eligibles, qualitative distinctions must be documented in the merit case file. Documentation may consist of a statement signed by the Personnel Specialist saying that each qualified applicant was evaluated based on the level of possession of the KSA's identified for the position, that numerically scoring the applicants would not result in significant and meaningful distinctions, and that, therefore, all applicants were rated as best qualified. All applicants will then go on the certificate in alphabetical order. If there are more than 10 promotion eligibles, rating and ranking must be completed by a Personnel Specialist, SME or a rating panel. A crediting plan, using at least three levels (excluding basic qualifications) will be used for the rating process. The best qualified applicants will then go on the certificate in alphabetical order. If an SME or panel is used for the rating and ranking process, the SME or panel members may not be the supervisor of the position. In addition, the SME/panel members will be given two copies of the attached form, "Guidance to Subject Matter Expert Form". They will sign the agreement and return one copy to the Personnel Specialist for the case file and will retain the other one.

In determining the number of applications to be sent to the selecting official for consideration as "best qualified", one of two methods may be used.

1.  A cutoff score is established as a dividing point between the best-qualified and the qualified candidates. The cutoff point normally will be where there is a significant score difference between two consecutive candidates.

2.  All applicants whose rating equals or exceeds the total of all the KSA's at level three will be considered as best-qualified. For example, if there are five KSA's, which the selecting official has weighted 5, 5, 4, 3, and 2 points, the total of the KSA's at level three would be determined as follows:

    KSA  A  - 5 points x 3 = 15
    KSA  B  - 5 points x 3 = 15
    KSA  C  - 4 points x 3 = 12
    KSA  D  – 3 points x 3 =  9
    KSA  E  – 2 points x 3 =  6

In this example, all applicants with a rating of 57 or higher would be best-qualified.

Page 7, Section 7. Referral and Selection

Page 7.  Referrals.

All National Park Service Merit Promotion Certificates will be valid for no more than 120 calendar days.  Extensions to the certificate may be made in rare situations up to a total of 180 days.  No selections or extensions may be made from the certificates after the 180 day period has expired.  If additional identical positions become vacant during the next 90 days after the 180 day period, the certificate may be reissued to meet this need.  However, the total life of this reissued certificate may not exceed 60 days.

Page 8, Section 9. Complaints and Release of Information

Page 9.  Corrective Actions.

Applicants who lose consideration due to administrative error will be given priority consideration for the next like position within the region/support office/Center/park/WASO. Priority consideration will be given for the same position, at the same grade, and for the same organizational unit from which consideration was lost. An applicant may accept or decline any and all such positions.  If an applicant accepts or declines a position, their priority consideration ends. If an applicant applies for and is accepted for a position anywhere in the NPS, then their eligibility for priority consideration ceases.  There is no Servicewide consideration for administrative error.

# EXHIBIT
# 22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SANDRA L. AGUILAR, | ) |
| Plaintiff, | ) |
| v. | ) Civil Case No. 07-0546 (RMU) |
| DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior, | ) |
| Defendant. | ) |

## DEFENDANT'S RESPONSES TO
## PLAINTIFF'S FIRST SET OF WRITTEN INTERROGATORIES

Defendant Dirk Kempthorne ("Defendant"), Secretary, U.S. Department of the Interior ("Agency"), by and through undersigned counsel, hereby responds to Plaintiff's first set of requests for admissions (the "Interrogatories") pursuant to Federal Rule of Civil Procedure 33.

## GENERAL OBJECTIONS

Defendant objects to the Interrogatories, including the Instructions and the Definitions, to the extent they are vague, ambiguous, overbroad, unduly burdensome, or seek to impose burdens upon Defendant beyond those called for or permitted by the Federal Rules of Civil Procedure and/or the Local Civil Rules. Defendant responds below pursuant to his obligations under the Federal Rules of Civil Procedure and the Local Civil Rules.

Defendant reserves the right to supplement, amend and/or correct his responses should the need arise.

SPECIFIC RESPONSES

INTERROGATORY NO. 1: *Identify every person who is believed to have knowledge of any issue(s) raised in Plaintiff's Complaint, along with a summary of the knowledge each person is believed to possess.*

RESPONSE TO INTERROGATORY NO. 1: Defendant objects to Interrogatory No. 1 to the extent it is vague, ambiguous, overbroad and unduly burdensome. Subject to and without waiving the foregoing objection, Defendant refers Plaintiff to employees noted in the Report of Investigation ("ROI") conducted in connection with this matter. Additionally, Defendant identifies the following individuals:

- Ms. Joyce Sasser, Human Resources Specialist, National Capital Parks-East, participated in reviewing the basic qualifications of the relevant applicants.

- Mr. Richard Powers, former Associate Regional Director, Administration, National Capital Region (retired), has knowledge concerning the Agency's decision to amend Vacancy Announcement NPS-NCR-03-19.

- Ms. Jeanette Organ, Human Resources Assistant, prepared the relevant certificates of eligibles at Ms. Leslie Newman's request.

INTERROGATORY NO. 2: *Explain in detail the reason(s) Vacancy Announcement NPS-NCR-03-19 ("announcement") was amended in or around March 2003 and the closing date extended to April 14, 2003. Include in your answer an explanation for each change that appeared in the announcement and any objection(s) raised to amending the announcement, including any*

*objection(s) raised by the Administrative Officer who held the position while the selection process was ongoing.*

RESPONSE TO INTERROGATORY NO. 2: Defendant objects to Interrogatory No. 2 on the grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant to this proceeding nor likely to lead to the discovery of relevant, admissible evidence. Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to the ROI, and in particular, Ms. Newman's statement contained in the ROI at Tab 8. Specifically, Ms. Newman has stated that the closing date was extended because there was an error found in the original announcement based on a memo dated February 12, 1999, which stated that the position should have been announced at two grade levels.

INTERROGATORY NO. 3: *Identify each person(s) who influenced the decision to amend the announcement, including any EEO personnel, each person(s) who was involved in the decision to amend the announcement, the role each such person played in the decision to amend the announcement, and the name(s) of each person who raised an objection to amending the announcement, including the Administrative Officer who held the position while the selection process was ongoing.*

RESPONSE TO INTERROGATORY NO. 3: Defendant objects to Interrogatory No. 3 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to the ROI. Moreover, Defendant states that Ms. Newman informed Mr. Powers of the aforementioned February 12, 1999, memorandum. Mr. Powers then told Ms. Newman to amend the vacancy announcement as described above.

- 3 -

INTERROGATORY NO. 4:  *Describe in detail the process and procedures used to assess, evaluate, rate and rank the approximately seventy-five (75) applicants who applied for the Administrative Officer position ("position") advertised in the announcement.  Include in your answer the name(s), job title(s) and supervisor's name(s) of each person involved in the herein referenced process and procedures.*

RESPONSE TO INTERROGATORY NO. 4:  Defendant objects to Interrogatory No. 4 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  Subject to and without waiving the foregoing objections, Defendant generally refers Plaintiff to the ROI, and in particular, Ms. Newman's statement contained therein at Tab 8.

Defendant further responds that Ms. Newman, former Supervisor, Human Resources Specialist, developed a crediting plan to review the applicants' applications.  Applicants who were determined to be ineligible were not ranked or rated because they did not meet the basic qualifications for the position advertised based on the Office of Personnel Management ("OPM") qualification standards.  The applicants were then divided between status applicants (*i.e.*, Federal government employees) and non-status applicants (*i.e.*, non-Federal government employees), and grouped together based on their respective eligibility for GS-14 and/or GS-15 level positions.

After being separated from status applicants, non-status applicants were rated and ranked based on OPM's Delegated Examining procedures, specifically OPM's Delegated Examining Operations Handbook, Chapter 5, Section B: "Rating the Applicants."  Ms. Sasser applied the crediting plan to the non-status applicants to confirm their respective numerical score.  Approximately six persons, including Plaintiff, appeared on the GS-15 certificate of eligibles for non-status applicants.  At least three persons on this list received a veteran's preference and were

ranked higher than Plaintiff. A fourth person scored at least three points higher than Plaintiff and also was ranked higher than her. Plaintiff and another non-status GS-15 applicant received the same numerical score of 97 points.

Status applicants who were eligible for promotion were placed on a merit promotion rating sheet alphabetically. Due to the large number of promotion-eligible status applicants, a rating panel was established in order to develop a list of the best qualified candidates to be certified to the selecting officials on the certificates of eligibles. The panel members rated each promotion-eligible status applicant's application and generated an individual rating for each such applicant. The individual ratings were then combined and averaged to generate final ratings for each such applicant. After the final ratings are established, a threshold was established as a dividing point between the qualified and best-qualified candidates.

Ms. Newman (her former supervisor was Mr. Powers) was involved in the process used to create the certificate of eligibles. Ms. Sasser (her former supervisor was Ms. Katrina Roberts), at Ms. Newman's request, reviewed the applications for basic qualifications and applied the crediting plan to rate and rank the non-status applicants. At Ms. Newman's request, Ms. Sasser signed all of the certificates of eligibles.

INTERROGATORY NO. 5: *Describe in detail the process and procedures used to assess, evaluate, rate and rank the approximately forty-seven (47) applicants who were rated as "Qualified" for the position. Include in your answer the name(s), job title(s) and supervisor's name(s) of each person involved in the herein referenced process and procedures.*

RESPONSE TO INTERROGATORY NO. 5: Defendant objects to Interrogatory No. 5 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Subject to and without

waiving the foregoing objections, Defendant refers Plaintiff to Defendant's response to Interrogatory No. 4.

INTERROGATORY NO. 6:  *Explain in detail the reason(s) a second rating was issued to the applicants prior to the merit promotion applicants being paneled.*

RESPONSE TO INTERROGATORY NO. 6:  Defendant objects to Interrogatory No. 6 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  Moreover, Defendant objects to Plaintiff's characterization or implication that a "second rating" was issued to the applicants.  Subject to and without waiving the foregoing objections, Defendant responds that the following initial steps were taken in processing the applicants.  First, all of applicants were evaluated to determine if they were eligible to apply for the position, which included time-in-grade consideration (for status applicants), citizenship, and basic qualifications for the GS-341 occupational family as established by OPM qualification standards.  Once this information was determined, the applicants were then rated as described in Defendant's response to Interrogatory No. 4 to establish their respective numerical scores.

INTERROGATORY NO. 7:  *Describe in detail the process and procedures used to assess, evaluate, rank and issue the second rating prior to the merit promotion applicants being paneled.  Include in your answer the name(s), job title(s) and supervisor's name(s) of each person involved in the herein referenced process and procedures.*

RESPONSE TO INTERROGATORY NO. 7:  Defendant objects to Interrogatory No. 7 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to Defendant's response to

- 6 -

Interrogatories Nos. 4 and 6.

INTERROGATORY NO. 8: *Describe in detail the process and procedures used to select the panelists for the panel that ranked and reviewed the applicants. Include in your answer the name(s), job title(s) and supervisor's name(s) of each person involved in the herein referenced process and procedures.*

RESPONSE TO INTERROGATORY NO. 8: Defendant objects to Interrogatory No. 8 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, Defendant responds as follows. Ms. Newman (supervisor identified above) consulted the Personnel Handbook for the Department of the Interior Merit Promotion Plan, which states that evaluation panels are established to rate and rank candidates and should generally consist of individuals at the same or higher grade level than the full performance level of the position to be filled who are familiar with the requirements of the job and occupation. Ms. Newman searched for panel members who satisfied those requirements. Ms. Newman knew of Vicky McGraw and John Hale and the work they performed as park superintendents. As Ms. Newman recalled, she called the NPS Washington Office and someone there suggested John Tyler as a potential panel member. Ms. Newman believes that she then talked to Mr. Tyler's supervisor to confirm his background. Ms. Newman then selected Ms. McGraw, Mr. Hale and Mr. Tyler to serve as panel members to rate and rank the promotion-eligible status applicants.

INTERROGATORY NO. 9: *Explain in detail the reason the selecting officials rejected one or more lists of panelists before choosing the panel that reviewed the applicants. Include in your answer the number of lists that were rejected and the reason for each such list rejection.*

- 7 -

RESPONSE TO INTERROGATORY NO. 9: Defendant objects to Interrogatory No. 9 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Defendant further objects to the characterization that the "selecting officials" rejected one or more lists of panelists. Subject to and without waiving the foregoing objections, Defendant responds that Ms. Newman convened the panel that rated and ranked the promotion-eligible status applicants, and the selecting officials were not involved in that process. Defendant further refers Plaintiff to Defendant's response to Interrogatory No. 8.

INTERROGATORY NO. 10: *Describe in detail the process and procedures used to determine which applicants, including Dottie P. Marshall and Plaintiff, would receive interviews for the position.*

RESPONSE TO INTERROGATORY NO. 10: Defendant objects to Interrogatory No. 10 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, Defendant generally refers Plaintiff to the ROI, and in particular Mr. Carlstrom's statement contained therein at Tab 6A and Mr. Lawler's statement contained therein at Tab 7A. As Mr. Carlston stated, he used his discretion and decided to interview the applicants who were contained on the promotion-eligible status list. Mr. Carlstrom stated that he decided not to interview the non-status applicants because he was interested in interviewing qualified candidates who would best meet the needs and requirements of the position and had familiarization with the National Park Service ("NPS"), given its security needs and competitive sourcing issues. Mr. Lawler recalls that both he and Mr. Carlstrom decided to interview the promotion-eligible status applicants because they were interested in having, among other things, someone with detailed knowledge of the Agency's budget process and knowledge of competitive sourcing.

- 8 -

INTERROGATORY NO. 11: *List and explain in detail each and every reason Dottie P. Marshall was found to be more qualified or suitable for an interview than Plaintiff.*

RESPONSE TO INTERROGATORY NO. 11: Defendant objects to Interrogatory No. 11 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Moreover, Defendant objects that the information sought is irrelevant, and not likely to lead to the discovery of relevant, admissible evidence. Further, Defendant objects that the Interrogatory is duplicative and seeks information already in the possession, custody, or control of Plaintiff. Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to (i) the ROI, and in particular Mr. Carlstrom's statement contained therein at Tab 6A and Mr. Lawler's statement contained therein at Tab 7A; and (ii) Defendant's response to Interrogatory No. 10. Defendant further responds that Messrs. Carlstrom and Lawler used the certificates of eligibles for the status applicants (which included Ms. Marshall), and returned all of the non-status applicants' certificates of eligibles (which included Plaintiff) unused. Additionally, as Mr. Carlstrom stated in his request to the NPS Director to appoint Ms. Marshall to the position of Associate Regional Director, Ms. Marshall's park administrative experience (*i.e.*, as Deputy Superintendent-GW, where she managed most of the operational and support components for this complex urban park unit; Regional Budget Officer for NCR; and Administrative Officer at NCPC and Manassas), coupled with her intimate knowledge of all aspects of budget formulation, made her an outstanding candidate for the position.

INTERROGATORY NO. 12: *List and explain in detail each and every criteria, not identified in the announcement, that was utilized to determine which applicants would receive interviews for the decision. Include in your answer a specific explanation for the reason behind using the following five (5) criteria: current or prior NPS experience, current knowledge of the issues facing the NCR*

- 9 -

*and the local parks, current or prior experience within the NCR, current or prior experience within the NCR Parks, and knowledge of the NCR budget.*

RESPONSE TO INTERROGATORY NO. 12: Defendant objects to Interrogatory No. 12 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  Moreover, Defendant objects to Plaintiff's characterization that the Agency considered criteria that were not identified in the vacancy announcement.  Subject to and without waiving the foregoing objections, Defenadnt responds that the Agency decided to interview the promotion-eligible status applicants and appropriately considered Ms. Marshall's work experience because it was relevant to the position. Mr. Carlstrom stated that he and Mr. Lawler looked at the five areas noted in Interrogatory No. 12 during the interviews of all of the status applicants because they were interested in identifying the applicants' experience given the requirements of the position.

INTERROGATORY NO. 13: *Explain in detail the reason(s) the criteria identified in Interrogatory No. 12 did not appear in the announcement.*

RESPONSE TO INTERROGATORY NO. 13: Defendant objects to Interrogatory No. 13 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome.  Moreover, Defendant objects to Plaintiff's characterization that the Agency considered criteria that were not identified in the vacancy announcement.  Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to Defendant's response to Interrogatory No. 12. Moreover, Defendant responds that the five areas listed in Interrogatory No. 12, were not "criteria" for the position.  Rather, as a part of their evaluation process, Messrs. Carlstrom and Lawler examined each promotion-eligible status applicant's respective experience in the five noted areas to assess such applicants' experience given the requirements of the position.

INTERROGATORY NO. 14: *Describe in detail the process and procedures used to determine which applicants, including Dottie P. Marshall and Plaintiff, would be placed on one or more of the six Certificates of Eligibility for the position. Include in your answer a detailed explanation for the reason six Certificates of Eligibility were prepared in the name(s) of each person(s) involved in the preparation of one or more of the Certificates of Eligibility.*

RESPONSE TO INTERROGATORY NO. 14: Defendant objects to Interrogatory No. 14 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Moreover, Defendant objects to the Interrogatory as there were seven, not six, certificates of eligibles. Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to the ROI, and in particular, Ms. Newman's statement contained therein at Tab 8. As Ms. Newman explained in such statement, she issued the various certificates based on the applicants' status or non-status and relation to the threshold described in Defendant's response to Interrogatory No. 4. Defendant further responds that Ms. Newman prepared (a) two non-status certificates (one at the GS-14 level and one at the GS-15 level); (b) two status certificates (one for each GS-14 and GS-15); (c) one re-promotion eligible certificate at the GS-15 level; (d) one certificate for non-competitive reassignment eligibles at the GS-15 level; and (e) one certificate for competitive promotion eligibles at the GS-14 level.

Based upon Ms. Newman's aforementioned statement, Defendant further responds as follows. The non-status applicants were placed on separate scored certificates and were based on OPM's Delegated Examining Operations Handbook for non-status applicants. The Department's Merit Promotion Plan controlled the placement of status applicants on certificates. The number of certificates was determined based on the individual "status" of each applicant (*i.e.*, promotion eligibles changed to a lower grade, reassignment eligibles, VEOA, reinstatement eligibles.)

- 11 -

As a general matter, a status applicant could have been listed on several certificates depending on how the position was advertised. Non-status applicants also could have been listed on more than one certificate (*i.e.*, different grade levels, or reinstatement eligible depending on their prior service and current status). As demonstrated in Plaintiff's SF-50, which she submitted with her application, she was a prior excepted service employee. Therefore, she had no reinstatement eligibility under competitive service procedures.

Ms. Organ, at Ms. Newman's instruction, prepared the certificate of eligibles. Ms. Sasser, at Ms. Newman's request, signed the certificates of eligibles.

INTERROGATORY NO. 15: *Explain in detail how directives and mandates issued by the White House, OPM, EEOC, Department of the Interior, and/or the National Park Service concerning recruitment, hire and retention of Hispanic employees to address the under representation of Hispanics in federal government service influenced or impacted the announcement, rating, ranking, interview, and selection processes, if at all.*

RESPONSE TO INTERROGATORY NO. 15: Defendant objects to Interrogatory No. 15 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Indeed, the Interrogatory fails to identify with reasonable particularity the alleged directives and mandates to which it refers. Moreover, Defendant objects that the information sought is irrelevant, and not likely to lead to the discovery of relevant, admissible evidence. Subject to and without waiving the foregoing objections, Defendant responds that it complied with all applicable laws and regulations and refers Plaintiff to the other responses contained herein.

INTERROGATORY NO. 16: *Describe in detail each and every reason Dottie P. Marshall was selected for the position advertised in the announcement. Include in your answer the name(s), job title(s) and supervisor's name(s) of each person involved in the herein referenced selection and the role each such person played in the selection process.*

RESPONSE TO INTERROGATORY NO. 16: Defendant objects to Interrogatory No. 16 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Defendant further objects that the Interrogatory is duplicative and seeks information already in the possession, custody, or control of Plaintiff. Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to the ROI. Defendant further responds that the relevant selecting officials were Mr. Carlstrom (his former supervisor was former Deputy Director Randy Jones) and Mr. Lawler (Mr. Carlstrom served as his supervisor during the relevant time period). The roles both of these individuals played in the selection process are described in the ROI and its attachments.

INTERROGATORY NO. 17: *Identify the date upon which each application for the position was received in the NCR NPS Office of Administration throughout the original period of the vacancy announcement and the extended period of the amended vacancy announcement.*

RESPONSE TO INTERROGATORY NO. 17: Defendant objects to Interrogatory No. 17 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Moreover, Defendant objects that the information sought is irrelevant, and not likely to lead to the discovery of relevant, admissible evidence. Further, Defendant objects that the Interrogatory is duplicative and seeks information already in the possession, custody, or control of Plaintiff. Subject to and without waiving the foregoing objections, Defendant responds that Ms. Marshall's application was received in the NPS Office on April 14, 2003; and Plaintiff's application was received in the NPS Office as

indicated in the ROI.

INTERROGATORY NO. 18: *Describe in detail each and every reason Dottie P. Marshall was found to be more qualified for the position advertised in the announcement than Plaintiff. Include in your answer the name(s), job title(s) and supervisor's name(s) of each person involved in the herein referenced finding or decision and the role each such person played in the finding or decision.*

RESPONSE TO INTERROGATORY NO. 18: Defendant objects to Interrogatory No. 11 on the grounds that it is vague, ambiguous, overbroad and unduly burdensome. Defendant further objects that the Interrogatory is duplicative and seeks information already in the possession, custody, or control of Plaintiff. Subject to and without waiving the foregoing objections, Defendant refers to the ROI and its attachments thereto. Defendant further refers Plaintiff to Defendants' other responses contained herein.

Dated: January 14, 2008             As to Objections,
       Washington, DC

JEFFREY A. TAYLOR
D.C. Bar #498610
United States Attorney

RUDOLPH CONTRERAS
D.C. Bar #434122
Assistant United States Attorney

BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Sandra Aguilar,      Plaintiff, <br><br> v. <br><br> DIRK KEMPTHORNE, Secretary, <br> United States Department of the Interior, <br><br>      Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civ. Action No. 07-0546 (RMU) <br> ) <br> ) <br> ) <br> ) <br> ) |

### DEFENDANT'S VERIFICATION OF INTERROGATORY RESPONSES

I have read Plaintiff's First Set of Written Interrogatories and Defendant's responses thereto. I declare under penalty of perjury that Defendant's responses to Interrogatory Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 14, 15 and 17 contain information that I provided, and that the information I provided is true and correct.

_Leslie J. Newman_    01-28-08
Leslie Newman          Date

**RECEIVED**

JAN 2 9 2008

**P.L.C.R.**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Sandra Aguilar, | ) |
|       Plaintiff, | ) |
| | ) |
|    v. | ) |
| | ) Civ. Action No. 07-0546 (RMU) |
| DIRK KEMPTHORNE, Secretary, | ) |
| United States Department of the Interior, | ) |
| | ) |
|       Defendant. | ) |
| | ) |

## DEFENDANT'S VERIFICATION OF INTERROGATORY RESPONSES

I have read Plaintiff's First Set of Written Interrogatories and Defendant's responses thereto. I declare under penalty of perjury that Defendant's responses to Interrogatory Nos. 1 and 3 contain information that I provided, and that the information I provided is true and correct.

_Richard S. Powers_    1-21-08

Richard Powers          Date

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Sandra Aguilar, | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) Civ. Action No. 07-0546 (RMU) |
| DIRK KEMPTHORNE, Secretary, | ) |
| United States Department of the Interior, | ) |
|  | ) |
| Defendant. | ) |

## DEFENDANT'S VERIFICATION OF INTERROGATORY RESPONSES

I have read Plaintiff's First Set of Written Interrogatories and Defendant's responses thereto. I declare under penalty of perjury that Defendant's responses to Interrogatory Nos. 1, 4, 5, 6, 7, and 14 contain information that I provided, and that the information I provided is true and correct.

Joyce Sasser          Date   01/28/08

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Sandra Aguilar, | ) |
|         **Plaintiff,** | ) |
|  | ) |
|  | ) |
|     **v.** | ) |
|  | ) Civ. Action No. 07-0546 (RMU) |
| DIRK KEMPTHORNE, Secretary, | ) |
| United States Department of the Interior, | ) |
|  | ) |
|         **Defendant.** | ) |
|  | ) |

## DEFENDANT'S VERIFICATION OF INTERROGATORY RESPONSES

I have read Plaintiff's First Set of Written Interrogatories and Defendant's responses thereto. I declare under penalty of perjury that Defendant's responses to Interrogatory Nos. 1, 10, 11, 12, 13, 15, 16 and 18 contain information that I provided, and that the information I provided is true and correct.

                            _Joseph M Lawler_  1/18/08

                            Joseph Lawler                Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Sandra Aguilar, | ) |
|        Plaintiff, | ) |
| | ) |
| | ) |
|    v. | ) |
| | ) Civ. Action No. 07-0546 (RMU) |
| DIRK KEMPTHORNE, Secretary, | ) |
| United States Department of the Interior, | ) |
| | ) |
|        Defendant. | ) |
| | ) |

## **DEFENDANT'S VERIFICATION OF INTERROGATORY RESPONSES**

I have read Plaintiff's First Set of Written Interrogatories and Defendant's responses thereto. I declare under penalty of perjury that Defendant's responses to Interrogatory Nos. 1, 10, 11, 12, 13, 15, 16 and 18 contain information that I provided, and that the information I provided is true and correct.

_____  _____
Terry Carlstrom                   Date  1/22/08

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Sandra Aguilar, )
)
 Plaintiff, )
)
 v. )
) Civ. Action No. 07-0546 (RMU)
DIRK KEMPTHORNE, Secretary, )
United States Department of the Interior, )
)
 Defendant. )
)

## DEFENDANT'S VERIFICATION OF INTERROGATORY RESPONSES

I have read Plaintiff's First Set of Written Interrogatories and Defendant's responses thereto. I declare under penalty of perjury that Defendant's responses to Interrogatory Nos. 1 and 14 contain information that I provided, and that the information I provided is true and correct.

_Jeanette Organ_ 1/24/08
Jeanette Organ Date

# EXHIBIT
# 23

# PERSONNEL HANDBOOK

## FOR THE

## DEPARTMENT OF THE INTERIOR
## (DOI)

# MERIT PROMOTION PLAN

# TABLE OF CONTENTS

Introduction ................................................................................ i

Section 1.      Purpose and Scope ....................................................... 1

Section 2.      Rights and Responsibilities .............................................. 1

Section 3.      Definitions of Commonly Used Terms ........................................ 1

Section 4.      Relationship of the Merit Staffing Program to the
                Department's Career Transition Assistance Plan ........................... 4

Section 5.      Vacancy Notification and Announcements ..................................... 5

Section 6.      Evaluating Candidates ................................................... 6

Section 7.      Referral and Selection ................................................... 7

Section 8.      Accretion of Duties ...................................................... 7

Section 9.      Complaints and Release of Information ......................................... 8

Section 10.     References ................................................................ 9

Section 11.     Exhibits ................................................................. 10

        Exhibit 1.  The Competitive Process
        Exhibit 2.  CTAP
        Exhibit 3.  Sample Vacancy Announcement Language - CTAP
        Exhibit 4.  Vacancy Announcement Language for Nonpayment of Relocation Expenses
        Exhibit 5.  Job Analysis Matrix
        Exhibit 6.  Guidance on Devising Crediting Plans
        Exhibit 7.  Merit Promotion Rating Sheet
        Exhibit 8.  Merit Promotion Panel Rating Sheet
        Exhibit 9.  Selection Certificate
        Exhibit 10.  Documentation of Accretion of Duties

**INTRODUCTION**

The information provided in this Handbook is designed to provide guidance for implementing the Department of the Interior (Department) Merit Promotion Plan (Plan) (370 DM 335). The Plan contains the key principles of the Federal merit promotion policy, as implemented by the Department. Bureaus may use this Handbook to implement the Department's Plan. Bureaus may want to set specific operational procedures where flexibilities and discretionary actions are allowed, and must ensure that such procedures are based on strict conformance with merit principles.

**Section 1.  Purpose and Scope**

This Handbook applies to all competitive service positions in the Department.  Personnel actions that are covered by or excluded from merit promotion and placement procedures are listed in the Plan (see 370 DM 335 (c)(1) and (c)(2) and Exhibit 1 of this Handbook).

**Section 2.  Rights and Responsibilities**

**Servicing Personnel/Human Resource Professionals -** Human resource professionals will be held accountable for implementing the Department's Plan; for advising managers and selecting officials to ensure that the selection programs produce a high quality workforce to accomplish the mission and goals of the Department;  and providing periodic education and training to management and employees on the Department's merit promotion practices and selection procedures.

**Equal Opportunity Program Professionals -** Are generally responsible for assisting in the identification of recruitment sources for underrepresented groups, maintaining Federal Equal Opportunity Recruitment Program (FEORP) files, and advising and assisting management, as appropriate, in identifying barriers to representation.

**Management -** Management will be held accountable for ensuring that their role in the selection process as well as selection decisions are consistent with the Department's Plan, Merit Principles and other applicable laws.  Management has the right to select or not to select from among properly ranked and certified candidates and to select from other appropriate sources, such as reassignment, reinstatement, VRA, student career experience etc.  Management also has the right to promote or not to promote an employee based on merit factors.

**Employees -** Employees are responsible for submitting the required application materials for placement opportunities in a timely manner;  becoming familiar with the Department's Plan and specific Bureau policies; and availing themselves of self development and job training opportunities.

**Bureau and Office Directors -** Bureau and office directors are responsible for implementing the Department's Plan and for issuing any individual Bureau guidance that ensures selections based on merit after fair and open competition.

**Section 3.  Definitions of Commonly Used Terms**

**Accretion of Duties**.  Promotion of an employee whose position is reclassified at a higher grade because of the performance of additional duties and responsibilities.  (See Section 8.  Accretion of Duties).

**Agency**.  For this Handbook, the term "agency" refers to the Department.

**Area of Consideration**.  The organizational and/or geographic boundaries within which a search is made for eligible candidates to be considered for a specific merit promotion and placement action.  All areas of consideration must be set to promote fair and open competition and to maintain a diverse work force.  Appropriate areas of consideration may be as small as an individual office, for example, or as large as Government wide.

**Best Qualified Candidates**.  Those applicants determined by the rating and ranking process to possess the job-related knowledge, skills, and abilities required or desired in applicants for a particular position to a greater degree than other qualified applicants being considered and who are subsequently referred to the selecting official.

**Career Ladder**.  Grade range from the entry level through and including the previously established full performance level of a position.

**Career Promotion**.  Promotions without current competition when the employee competed earlier for an assignment intended to prepare the employee for the position being filled, and the intent was made a matter of record and made known to all potential candidates.

**Certificate**.  A document referred to the selecting official containing the names of eligible candidates.

**Change to Lower Grade**.  For this Handbook, the term "change to lower grade" refers to a voluntary reduction in an employee's current grade level or representative rate.

**Competitive Service.**  All civilian positions that are: (a) in the executive branch of the Federal Government not specifically excepted from civil service laws by or pursuant to statute, by the President, or by the Office of Personnel Management (OPM), and not in the Senior Executive Service; and (b) all positions in the legislative and judicial branches of the Federal Government and in the Government of the District of Columbia specifically made subject to the civil service laws by statute.

**Crediting Plan.**  A plan used to rate and rank qualified applicants for a position.  It consists of the quality ranking factors (developed through the process of job analysis) with typically three quality level descriptions for each factor.

**Detail**.  A temporary assignment of an employee to a different position for a specified period, with the employee returning to his or her regular duties at the end of the assignment.  While on detail the employee continues to hold his official position from which detailed and keeps the same status and pay.

**Evaluation Panel**.  Evaluation panels are established to rate and rank candidates, and generally consist of individuals at the same or higher grade level than the full performance level of the

2

position to be filled who are familiar with the requirements of the job and occupation. Qualified candidates are evaluated on the basis of the quality ranking factors identified for the position.

**Federal Equal Opportunity Recruitment Program (FEORP).** The Federal Equal Opportunity Recruitment Program requires agencies to establish targeted recruitment programs for categories of positions where a determination of underrepresentation, manifest imbalance, or conspicuous absence of women and/or minorities has been made.

**Full Performance Level**. The highest grade level to which an employee may be promoted through successive noncompetitive career promotions.

**Job Analysis.** The analysis of a position to identify the basic duties and responsibilities; the knowledge, skills and abilities required to perform the duties and responsibilities; and the factors that are important in evaluating candidates for the position.

**Knowledge, Skills, and Abilities (KSA's).** Also referred to as Knowledge, Abilities, Skills, and Other Characteristics (KASOCs). The attributes required to perform a job which are generally demonstrated through qualifying experience, education, or training. Knowledge is a body of information applied directly to the performance of a function. Skill is a present, observable competence to perform a task with ease and proficiency. Ability is a present competence to perform an observable behavior or a behavior that results in an observable product.

**Priority Consideration.** The referral and considering candidates who are entitled (based on having something happen to them such as being affected by a reduction-in-force), before considering other candidates.

**Promotion.** The change of an employee to a higher grade or to a position with a higher representative rate.

**Qualified Candidates**. Those applicants who meet both the qualifications standards outlined in the OPM Qualification Standards Handbook (the former X-118) and any selective placement factors identified for the position.

**Quality Ranking Factors**. Job related KSAs, documented through job analysis, used in rating and ranking all eligible candidates to distinguish the best qualified ones.

**Rating and Ranking.** The determination of best qualified candidates based on the degree to which each candidate meets the quality ranking factors (KSAs) of the position. This process is completed by a personnel specialist, subject matter expert, or an evaluation panel.

**Reassignment.** A change of an employee from one position to another in the same grade in the same agency.

**Reinstatement**. The reemployment of a former employee with competitive status.

3

**Repromotion**.  Noncompetitive promotion or placement, permanent or temporary, of an employee to a  grade or full performance level previously held on a permanent basis in the competitive service.

**Selective Placement Factor**.  Mandatory knowledge, skills, and/or abilities that are essential for successful performance in the position to be filled, in addition to the basic qualifications outlined in OPM's Qualification Standards Handbook.  Applicants not meeting this factor are ineligible for further consideration.  Selective placement factors must be job related and their validity documented through job analysis.

**Temporary Promotion**.  A promotion to a higher graded position for a specified period of time to accomplish project work, fill positions temporarily pending reorganization or downsizing, or meet other temporary needs.  Temporary promotions for more than 120 days are subject to competitive procedures.  Service during the previous 12 months in higher graded positions either by noncompetitive temporary promotion or detail counts toward the 120-day limit.  Temporary promotions can be made in any increment up to a maximum period of 5 years.  Temporary promotions may be made permanent when such a possibility was publicized in the original competition notice.

**Transfer**.  A change of an employee, without a break in service of one full workday, from a position in one agency to a position in another agency.

**Well Qualified.**  Eligible candidates who possess the knowledges, skills, and abilities which clearly exceed the minimum qualifications requirements for the position, as determined by the crediting plan.

## Section 4.  Relationship of Merit Staffing Program to the Department's Career Transition Assistance Plan

The Department's Career Transition Assistance Plan (CTAP), dated 9/8/97, is a program that provides assistance to individuals who have been or are likely to be separated by reduction-in-force (RIF), in finding other employment.  The CTAP has four components: 1) Career Transition Training and Support Services, 2) Special Selection Priority (SSP), 3) Reemployment Priority List (RPL), and 4) Interagency Career Transition Assistance Plan (ICTAP).

CTAP will have varying effects on staffing activities and there is an order of selection when filling competitive service vacancies that exceed 120 days, as noted in the Department CTAP.  All vacancies must be advertised unless the personnel action being taken is an exception (such as temporary appointments less than 121 days, details, reassignments, career ladder promotions, accretion of duties, et. al.), or a determination has been made by the servicing personnel office (through contact with other bureaus in the local commuting area of the vacancy) that there are no  Special Selection Priority (SSP) candidates available.   CTAP and ICTAP requirements must be stated in all vacancy announcements. Sample vacancy announcement language was supplied by

4

the Office of Personnel Management and is contained in Exhibit 3. The selecting official must select a well-qualified eligible applicant under the SSP component of CTAP before selecting any other candidate from within or outside the Department, unless doing so would cause another employee to be separated by RIF. In addition, the reemployment priority list (RPL) must be cleared before filling any competitive service position from outside the Department, regardless of whether the organization plans to make a temporary, term, or permanent appointment. Please refer to the Department CTAP Plan for complete guidance.

## Section 5. Vacancy Notification and Announcements

**Areas of Consideration**. Managers, in consultation with servicing personnel/human resources offices determine the area of consideration and the length of time a vacancy announcement will remain open (See 370 DM 335, 2-B). CTAP may affect the area of consideration and open period of the vacancy announcement.

**Special Consideration**. Supervisors should make every reasonable effort to ensure that employees under their direct supervision receive appropriate consideration for vacancies which occur under the supervisor's immediate jurisdiction while the employee is on an approved, extended absence. Additionally, each employee is responsible for informing his or her supervisor of those promotional opportunities for which he/she wishes to be considered during periods of legitimate absence and for providing his/her supervisor with an updated written application and other required forms for those vacancies.

**Preparation of Vacancy Announcement**. As a minimum, vacancy announcements should contain the following information: a number that identifies the vacancy; issuing office; opening and closing dates; address of office receiving applications; position title, series, and grade; entrance pay; number of positions; duty location; duties of the job; qualifications required, including selective placement and ranking factors; evaluation methods to be used; the full performance level of the job; area of consideration; instructions on how to apply; equal employment opportunity nondiscrimination statement; veterans preference information; and any other special requirements, such as CTAP language including the definition of well-qualified. Further, because it is against the law to use Government franked envelopes and mail services to submit applications (18 USC 1719), the vacancy announcement should indicate that applications submitted in violation of this requirement will not be considered.

**Payment of Relocation Expenses**. The decision to pay or not pay moving and related expenses must be made prior to issuing the vacancy announcement. A statement addressing the payment or nonpayment must be included in the vacancy announcement. (See Exhibit 4).
**Distribution of Vacancy Announcement**. An approved announcement system, as determined by the Department, will be used to advertise all competitive service vacancies with an area of consideration of Department wide or greater. For limited areas of consideration within a Bureau, local methods of announcing a vacancy may be employed.

**Accepting Applications**.  Bureaus have the discretion to establish cutoff dates for receipt of applications based on either postmark or the closing date of the vacancy announcement.  Bureaus also have the discretion to decide whether facsimiles or electronic mail transmissions of application materials are acceptable or not acceptable.

## Section 6.  Evaluating Candidates

**Job Analysis.**  In accordance with Federal regulations, a job analysis must be conducted when filling a position.  The job analysis is used to document the relationship between the basic duties and responsibilities and the knowledge, skills and abilities required to perform the duties and responsibilities.  Methodology for conducting and documenting the job analysis is left to bureau discretion.  (See Exhibit 5).

**Minimum Qualifications**.  Applicants must meet minimum qualification requirements including all selective placement factors and time-in-grade.  Cutoff dates for meeting qualification standards and time-in-grade requirements will be left to Bureau discretion (see 370 DM 335, 2(C)).  Applications not containing sufficient information to determine qualifications may not receive consideration.  Bureaus are to ensure that applicants are made aware that submission of performance appraisals and narrative statements addressing the knowledge, skills, and abilities identified for the position enhance their prospects for inclusion in the best qualified group from which selection may be made.  (See Employees in Section 2).

**Crediting Plan.**  Crediting plans are used to rate and rank applications meeting minimum qualification requirements, including  any selective placement factors, against the knowledge, skills and abilities (KSAs) identified through the job analysis.  The crediting plan is developed prior to applicants' being screened for minimum qualifications.  Candidates' experience, education, training, awards, outside activities, self development and supervisory appraisals will be reviewed and evaluated against the crediting plan.  (See Exhibit 6).

**Rating and Ranking**.  Bureaus must document qualitative determinations which could include the use of a crediting plan in determining which candidates are referred as best qualified.  Methodology for qualitative determinations is left to bureau discretion.  (See Exhibit 7).

**Evaluation Panels**.  Evaluation panels are convened as appropriate to conduct rating and ranking of qualified applicants.  Selecting officials, in conjunction with the servicing personnel office, determine  when  a panel is needed.  Factors in making this decision include the complexity and organizational level of the  vacant position, any controversy surrounding the vacancy and the number of applicants.  If  convened, these panels consist of subject matter experts at an equivalent or higher grade level than the full performance level of the position being filled; typically the number of panel members is three.  (See Exhibit 8).

## Section 7.  Referral and Selection

**Referrals.**  Selecting officials should have the opportunity to make a choice from among an adequate number of best qualified candidates and an applicant pool that is as diverse as possible.  The rater (or raters) shall designate the best qualified group based on their evaluation of the candidate's application package against the qualitative job-related criteria.  Referrals will be made to the selecting officials in alphabetical order on the selection certificate and will include each candidate's application package.  Selecting officials are encouraged to make selections in a timely manner, however, it is within  bureau discretion to set time limits on the life of the certificate.  (See Exhibit 9).

**Interviews.**  Selecting officials must ensure that all candidates are treated fairly and equitably.  Normally, if one candidate is interviewed, all other candidates should be interviewed.  However, if only certain candidates are chosen to be interviewed, the choice must be based on job-related criteria.  The selecting official is responsible for ensuring that interviews are properly conducted, that all questions are job-related, and that every effort is made to obtain the same information from each candidate.  The interviewer may not ask about or discuss a candidate's race or ethnic background, color, sex, age, disability, religious beliefs, marital or family status, political affiliation, sexual orientation, or labor organization affiliation or activity.  If distance precludes a personal interview, a telephone interview may be conducted.  The payment of expenses for preemployment interviews is authorized in certain situations (refer to 5 CFR 572).

**Noncompetitive Selections.**  The selecting official may choose to fill a vacancy noncompetitively as long as such action is consistent with appropriate approved exceptions to merit promotion procedures (Veterans Readjustment Appointment, Student Career Experience Program, reassignments), and CTAP requirements.

### Section 8.  Accretion of  Duties

Promotion resulting from the upgrading of an employee's position because of additional duties and responsibilities is an accretion of duties.  For all cases in which the reclassification of a position would result in the promotion of the incumbent, the supervisor over the position must identify the specific changes in the duties and responsibilities between the old and the new positions and the cause of the changes.

The Personnelist shall analyze the job, evaluate the changes, and prepare a summary indicating that the changes did or did not result in a position which is a clear successor to the incumbent's prior job and to what extent the previous position was absorbed by the new one.  This summary can be made a part of the evaluation statement prepared after mandatory desk audit.

Supervisors who anticipate requesting a personnel action of this type should not hesitate to seek the advice and assistance of the appropriate Personnelist(s) before initiating  such action.

Documentation of accretion of duties promotion must include evidence that (1) the employee is continuing to perform the same basic function in the new position; (2) the former position is

absorbed into the new one; and (3) the promotion does not directly affect other employees in the unit who report to the same immediate supervisor.  (See Exhibit 10).

A noncompetitive promotion is not appropriate when supervisory duties are added to a nonsupervisory position causing it to be classified to a higher grade.

Following are examples of when noncompetitive promotions are not appropriate as a result of planned management action:

> A supervisor identifies an employee in his unit he wants to succeed him when he retires and coaches that employee as his assistant.  The employee may not be promoted noncompetitively.  Competitive promotion procedures must be used to identify the understudy.

> A supervisor identifies an employee who appears to have superior ability and singles the employee out for the performance of the more difficult duties.  If the position is identified (because of the additional higher level duties), as being at a higher grade, the employee may not be noncompetitively promoted.  Competitive promotion procedures must be followed to identify the employee to be given the additional work.

## Section 9.  Complaints and Release of Information

**Grievance Procedures**.  The Bureau Personnel/Human Resource Office shall respond promptly to questions or complaints  about the program or about a specific selection action.  An employee of the Bureau may submit a complaint under the Bureau's grievance procedure or under a negotiated grievance procedure as appropriate.  Nonselection from a list of properly ranked and certified applicants is not grievable.

**Use of Complaint Processes**.  An employee cannot use the grievance procedures and the EEO complaint process at the same time for the same issue.

**EEO Procedures**.  If a candidate feels that he/she has been discriminated against in the merit process on the basis of race, color, religion, sex, national origin, physical or mental disability, sexual orientation, or age, every effort will be made to handle the matter on an informal basis with the assistance of an EEO counselor.  If the matter cannot be resolved informally, the candidate may submit a formal complaint according to the procedures for handling equal employment opportunity complaints.

**Corrective Actions.**  Bureaus should develop procedures to address corrective actions due to procedural violations or administrative error.

**Release of Information including FOIA.**  The following information may be released to an applicant or his/her designee when requested:

8

Whether the requesting applicant was qualified and/or referred for selection; who was selected; the requesting applicant's own supervisory appraisal and rating on the ranking elements; procedures used to arrive at the final scores, and cut off scores;  or any other information allowed by the Freedom of Information Act or the Privacy Act.

## Section 10.  References

This section provides a listing of references to other related documents, laws, and policies.

*Code of Federal Regulations*

| | |
|---|---|
| 5 CFR 300 | Employment (General) |
| 5 CFR 310 | Employment of Relatives |
| 5 CFR 315 | Career and Career-Conditional Employment |
| 5 CFR 316 | Temporary and Term Employment |
| 5 CFR 330 | Recruitment, Selection, and Placement (General) |
| 5 CFR 335 | Promotion and Internal Placement |
| 5 CFR 340 | Other Than Full-Time Career Employment (Part Time, Seasonal, On-Call, Intermittent) |
| 5 CFR 720 | Affirmative Employment Programs |

*Departmental Manual*

| | |
|---|---|
| 370 DM 315 | Career and Career-Conditional Employment |
| 370 DM 300 | Employment (General) |
| 370 DM 338 | Qualification Requirements |
| 370 DM 339 | Qualification Requirements (Medical) |

*Other*

Department of the Interior Career Transition Assistance Plan

**Section 11.  Exhibits**

The following pages contain sample documentation material that may be used during merit staffing activities.   Exhibits 1, 2, 3 and 4 provide additional guidance and the minimum requirements for documenting staffing and placement decisions.  Exhibits 5-8 (forms) are samples only and may be used as guides for documenting decisions, modified, or reproduced for local use.

Exhibit 1 - The Competitive Process

**The Competitive Process**
(as found in the Merit Promotion Plan)

| Proposed Action | Position | and | Competition Required |
|---|---|---|---|
| Reassignment | at same grade under same pay schedule | position is one with known promotion potential and employee will gain eligibility for noncompetitive career promotion to grade higher than previously held on a permanent basis in the competitive service | yes |
| | | position is not one with known promotion potential | no |
| Change to lower grade | lower grade under same pay schedule | position is one with known promotion potential and employees will gain eligibility for noncompetitive career promotion to grade higher than previously held on a permanent basis in the competitive service | yes |
| | | position is not one with known promotion potential | no |
| Assignment from one pay schedule to | higher representative rate under a different pay schedule | | yes |
| | same or lower representative rate under different pay schedule | employee's pay will be set at a higher rate | yes |
| | | employee's pay will be at same or lower rate, but position is one with known promotion potential | yes |
| Assignment from one pay schedule to (cont.) | same or lower representative rate under different pay schedule (cont.) | employee's pay will be set at same or lower rate, but the position is not one with known promotion potential | no |
| Reinstatement or | at a higher grade | | yes |

11

| Proposed Action | Position | and | Competition Required |
|---|---|---|---|
| transfer | than previously held | | |
| | at same or lower grade than previously held | position is one with known promotion potential and the employee will gain eligibility for noncompetitive career promotion to grade higher than that previously held on a permanent basis in the competitive service | yes |
| | | position is not one with known promotion potential | no |
| Detail | same grade and is not one with known promotion potential | detail is for any length | no |
| | higher grade or to position of same grade with known promotion potential | the detail is for 120 days or less | no |
| | | the detail is for more than 120 days | yes |
| Selection for training leading to promotion | | successful completion of training is a condition of eligibility for promotion | yes |
| Promotion from position of known promotion potential | originally identified as the target position to which employee would advance without competition

or

full performance level of a career ladder | competitive procedures were fully applied at the time of placement into position of known promotion potential and all competitors were informed that selection for the entry position could lead to promotion without further competition | no |
| Promotion | upgraded by classification | incumbent's position upgraded without significant change in duties and responsibilities because of classification error | no |

| Proposed Action | Position | and | Competition Required |
|---|---|---|---|
| | | or new or revised standards | |
| | | incumbent's position reconstituted into a successor position with clearly and solely identifiable duties of the former position and there are no other employees serving in similar or identical positions within the same organization to whom the duties could have been assigned | no |
| | | incumbent's position reconstituted into successor position and position is not a clear successor or there are other employees serving in similar or identical positions within the same organization to whom the duties could have been assigned | yes |
| Promotion | to position to which employee was detailed for training or evaluation | the employee was selected for detail under full competitive procedures and all competitors were informed that the detail could lead to promotion without further competition | no |
| Temporary promotion or extension of temporary promotion | higher grade under same pay schedule or under a different pay schedule when action is processed as a promotion or represents a promotion under rules above | the temporary promotion is for 120 days or less total in 12 month period | no |
| Conversion of temporary promotion to permanent promotion | | the employee was selected for temporary promotion under full competitive procedures and all competitors were informed that the temporary promotion could lead to permanent without further competition | no |

| Proposed Action | Position | and | Competition Required |
|---|---|---|---|
| Promotion without time limitation | higher grade under same pay schedule | is not covered by promotion rules above | yes |

Exhibit 2.  Career Transition Assistance Plan (CTAP)

| Component | Purpose | When to Clear |
|---|---|---|
| Special Selection Priority (SSP) | Priority consideration of well-qualified displaced and surplus DOI employees who apply for vacancies in the local commuting area. | When filling competitive service positions from within or outside the Department, unless selection causes another employee to be separated by reduction-in-force. |
| Reemployment Priority List (RPL) | Priority consideration of displaced and surplus DOI employees and employees who are fully recovered from a compensable injury after more than one year. | When filling competitive (temporary, term, or permanent) positions from outside the Department. |
| Interagency Career Transition Assistance Plan (ICTAP) | Priority consideration of well-qualified displaced employees from other Federal agencies who apply for vacancies in the local commuting area. | When filling competitive service positions from outside the Department. |

(See the Department's CTAP for complete details).

Exhibit 3.  Sample Vacancy Announcement Language - CTAP

VACANCY ANNOUNCEMENT LANGUAGE TO EXPLAIN
the
CAREER TRANSITION ASSISTANCE PLAN (CTAP)
and
INTERAGENCY CAREER TRANSITION ASSISTANCE PLAN (ICTAP)

Below are two sets of vacancy announcement language, supplied by the Office of Personnel Management (OPM), to explain CTAP and ICTAP: a longer version and a shorter version.

**I.      Longer Version**

SPECIAL SELECTION PRIORITY PROVISIONS FOR SURPLUS OR DISPLACED FEDERAL EMPLOYEES UNDER A CAREER TRANSITION ASSISTANCE PLAN (CTAP)

A.      CTAP (for Non - DoD Agencies Only)

If you are currently an employee who has received a Reduction in Force (RIF) separation notice, a Certificate of Expected Separation (CES), or notice of  proposed separation for declining a direct reassignment or transfer of function outside of the local commuting area, you may be entitled to special selection priority under the Career Transition Assistance Plan (CTAP). To receive this priority consideration you must:

1.  Be a current (Insert Bureau Name) career or career-conditional (tenure group I or 11) competitive service employee who has received a RIF separation notice, a Certificate of Expected Separation (CES), or notice of proposed separation for declining a directed reassignment or transfer of function outside of the local commuting area, and you are still on the rolls of [insert Bureau Name].  You must submit a copy of the RIF notice, CES, or notice of proposed separation with your application.

2.  Be applying for a position that is at or below the grade level of the position from which you are being separated.  The position must not have a greater promotion potential than the position from which you are being separated.

3.  Have a current (or last) performance rating of record of at least fully successful or equivalent.  This must be submitted with your application package.

4.  Be currently employed by (Insert Bureau Name) in the same commuting area of the position for which you are requesting

16

selection priority.

5. File your application by the closing date of the vacancy announcement and meet all the application criteria (e.g., submit all required documentation, etc.).

6. Be rated well-qualified for the position. To be rated "well-qualified," CTAP applicants must attain an eligibility rating on this examination of (Insert Score) or higher, not including points for veteran's preference.

B.    <u>ICTAP</u> (for all Federal Agencies)

SPECIAL SELECTION PRIORITY PROVISIONS FOR DISPLACED FEDERAL EMPLOYEES UNDER THE INTERAGENCY CAREER TRANSITION ASSISTANCE PLAN (ICTAP)

If you are a displaced Federal employee, you may be entitled to receive special selection priority under the Interagency Career Transition Assistance Plan (ICTAP).  To receive this priority you must:

1. Be a displaced Federal employee. You must submit with your application  a copy of the appropriate documentation, such as a RIF separation notice, a Standard Form 50 reflecting your RIF separation, or a notice of proposed removal for declining a directed reassignment or transfer of function to another commuting area.  The following categories of persons are considered displaced employees:

a.  Current or former career or career-conditional (Tenure group I or 11) competitive service employees who:

1) Received a specific RIF separation notice; or

2) Separated because of a compensable injury or illness, whose compensation has been terminated, and whose former agency certifies that it is unable to place; or

3) Retired with a disability and whose disability annuity has been, or is being, terminated; or

4) Upon receipt of a RIF separation notice, retired on the effective date of the RIF and submits a Standard Form 50 that indicates "Retirement in lieu of RIF," or retired under the discontinued service retirement option; or

5)  Received a notice of proposed removal for declining a directed reassignment or a transfer of function or directed reassignment to another commuting area.

b.  Former Military Reserve or National Guard Technicians who are

17

receiving a special OPM disability retirement annuity under Section §8337(H) or § 8456 of Title 5 United States Code.

   2.  Be applying for a position at or below the grade level of the position from which you have been separated.  The position must not have a greater promotion potential than the position from which you were separated.

   3.  Have a current (or last) performance rating of record of at least fully successful or the equivalent.  You <u>must</u> submit a copy of this performance rating with your application package. (This requirement does not apply to candidates who are eligible due to compensable injury or disability retirement)

   4.  Occupy or be displaced from a position in the same local commuting area of the position for which you are requesting selection priority.

   5.  File your application by the closing date of the vacancy announcement and meet all of the application criteria (e.g., submit all required documentation, etc.)

   6.  Be rated well-qualified for the position. To be rated "well-qualified," ICTAP applicants must attain an eligibility rating on this examination of *(insert Score)* or higher, not including points for veteran's preference.

## II.   <u>Shorter Version</u>

Individuals who have special priority selection rights under the Agency Career Transition Assistance Program (CTAP) or the Interagency Career Transition Assistance Program (ICTAP) must be well qualified for the position to receive consideration for special priority selection.  CTAP and ICTAP eligibles will be considered well qualified if  *(insert definition of well qualified).*

Federal employees seeking CTAP/ICTAP eligibility must submit proof that they meet the requirements of 5 CFR 330.605 (a) for CTAP and 5 CFR 330.704 for ICTAP.  This includes a copy of the agency notice, a copy of their most recent Performance Rating and a copy of their most recent SF-50 noting current position, grade level, and duty location. Please annotate your application to reflect that you are applying as a CTAP or ICTAP eligible.

Exhibit 4.  Vacancy Announcement Language for Nonpayment of Relocation Expenses


Travel, transportation, and relocation expenses will not be paid by the Department.   Any travel, transportation and relocation expenses associated with reporting for duty in this position will be the responsibility of the selected employee.

Exhibit 5.  Job Analysis Matrix

| Job Analysis | | | | | |
| --- | --- | --- | --- | --- | --- |
| A. Duties of the position | B. KSAs necessary to perform duties | C. Ratable (Y/N?) | D. Selective factor (Y/N?) | E. Importance | Rationale for decisions in columns C, D, E |
| | | | | | |

Exhibit 6.  Guidance on Devising Crediting Plans

# Guidance on Devising Crediting Plans

**A.  Crediting Plan.**  A crediting plan (or rating schedule/evaluation plan) is a plan developed to rate and rank candidates for a specific position.  It is designed to measure the level at which eligible applicants possess the job related knowledge, skills, and abilities that are necessary for successful performance in the job to be filled. This is done through a review of the applicant's total education, training, experience, activities, awards, supervisory appraisals, and background in relation to each knowledge, skill, or ability identified.

**B.  Validity.**  Validity refers to the accuracy with which the crediting plan identifies the best qualified candidates.  Careful construction of the crediting plan based on a job analysis and consistent application of the evaluation criteria developed during that analysis are key elements in the preparation and use of a valid crediting plan.

**C.  Job Analysis.**

(1)  A job analysis is defined as a systematic examination of a position to determine the duties and worker characteristics which are important for successful job performance.

(2)  To conduct a job analysis, the servicing personnel specialist meets with the selecting official and/or a subject matter expert.  Where a face-to-face meeting is not possible, the job analysis may be conducted by telephone or the selecting official/subject matter expert may complete the forms on his/her own.

(3)  The following guides are useful for preparing the job analysis:

    (a)  Office of Personnel Management Qualifications Standards Handbook;
    (b)  Official position description;
    (c)  Classification standards and evaluation statements;
    (d)  Functional statements;
    (e)  Organization charts;
    (f)  Occupational literature; and
    (g)  Performance standards.

**D.  Conducting the Job Analysis.**

(1)  The first step is to identify and record the major duties of the position.

(2)  Next to each duty, list the knowledge, skills, and abilities (KSAs) necessary to perform those duties. A KSA may pertain to more than one duty.

    (a)  Knowledge - A body of information applied directly to the performance of a function.  It includes information about persons, places, facts, events, systems, ideas, theories, methods, procedures, principles, concepts, or cases, that a person mentally possesses as a result of formal education, training, or personal experience.

(b) Skill - A present, observable competence to perform a task with ease and proficiency. It often requires the use of equipment, machinery, or tools and implies measurable performance.

(c) Ability - A present competence to perform an observable behavior or a behavior that results in an observable product. It is often broader and more abstract than skills or knowledge.

(3) After identifying all the KSAs and characteristics, you must further refine them.

(a) Which KSAs can be rated from an application and which must be evaluated by another method, e.g., interviews, reference checks, written tests, or assessment centers?

Generally, when developing a crediting plan, you should list as rating criteria only those KSAs that can be evaluated from an application or other supplementary written information.

(b) Which are necessary to have entering on the job and which may be picked up at a later date after a reasonable amount of training? Those necessary for immediate performance are selective factors. They should not be so stringent that they disqualify all but those people who may already be working in the office. Program knowledge can often be learned on the job. They often are not appropriate selective factors for lower grade positions.

Selective factors should <u>not</u> be those things that can be learned in the position but something that must be brought from outside, for example, knowledge of a language other than English.

(c) Of those KSAs that remain, which are most important to doing the work? How do the KSAs rank against each other? (These considerations are important in order to document weighting.) When determining its importance, you should consider the amount of time a KSA will be used, the difficulty/complexity of the KSA, and the consequences of performing the KSA well or poorly. Importance can be stated by a 1, 2, 3 scale (Most important - least important) with documentation as to why that "rating" was chosen.

(4) Once these determinations have been made, you should have left a reasonable number of KSAs (4-6) to use in an actual crediting plan.

(5) Make sure your KSAs are properly written. They should start with "Knowledge of..."; "Ability to..."; or "Skill in...".

(6) Verify that you are dealing with only one factor in each KSA.

**E.  Defining Performance Levels or Benchmarks.**

(1) A performance level or benchmark is a written, descriptive statement of experience, education, training, awards, appraisal, et cetera, which shows how an applicant could have acquired a KSA at a particular level of competency.

(2) Many Bureaus use a three level benchmark system such as; Superior, Good, and Satisfactory. In rare cases, a quality ranking factor may have only 2 levels, (speaking a foreign language may be desirable, but not mandatory. Someone speaking that language could get an extra point.)

(3) The use of a numerical system is required. Using a 5-point system allows for interpolation between described levels;

23

Superior - 5
Good    - 3
Satisfactory - 1

If a rater (i.e., personnelist, subject matter expert, or evaluation panel member) feels a person does not quite meet an upper level but is better than a lower level, he/she could give 4 or 2 points.  This method allows for some judgment and subjectivity.  Other point system may be used.

(4)  The KSAs should be weighted according to their importance.  It is advised that no KSA should be more than triple weighted (example:  point spread of 3-15).

(5)  Benchmarks should be concrete examples: types of experience -- classifying professional, technical, clerical jobs; writing technical reports, analyzing budget documents; education -- course work in statistics, one college level course in English composition; training -- supervisory training course, OPM course in management analysis.

(6)  Benchmarks should not be written in terms of years of experience, limited/extensive experience, or specific programs/settings.

(7)  There should be a progression in the benchmarks.  This progression may revolve around an action, an object, a purpose, or any combination thereof.

    (a)  Action -    **Applying** regulatory material
                     **Interpreting** regulatory material
                     **Developing** regulatory material

    (b)  Object -    Writing **standard letters**
                     Writing **technical reports**
                     Writing **regulations**

    (c)  Purpose -  Preparing budget materials for **the office**
                     Preparing budget materials for a **major program in the agency**
                     Preparing budget materials for the **whole agency**

(8)  In general, avoid benchmarks that go beyond the required level of performance of the job.  Example, KSA -- Ability to do simple arithmetical computations:

Superior:  Knowledge of calculus.  This should not be a KSA because calculus may never be used in the job and is no indication of a person's ability to add, subtract, multiply, and divide.

(9)  There may be many examples for one particular benchmark.  Although you may wish to include several, raters must be warned that the benchmarks are <u>not</u> all inclusive.  Raters must exercise judgment in applying benchmarks to a candidate's qualifications statement.

**Crediting Plan Format**

Vacancy No.:
Position Title, Series, Grade:
Organization:
Location:

<u>Element No. 1</u>

POINTS OR EQUIVALENT
WEIGHTED SCORES     RANKING FACTORS

|  |  |
|---|---|
| 10 | Superior level |
| 6 | Good level |
| 2 | Satisfactory level |

| <u>Example</u> | <u>Ability to read and interpret regulatory material.</u> |
|---|---|
| 10 points | Experience developing regulatory material. |
| 6 points | Experience in a position such as claims examiner, where incumbent was required to interpret the applicability of regulations to difficult cases. |
| 2 points | Similar experience to above but regulations are applied to clear-cut cases. |

Exhibit 7.  Merit Promotion Rating Sheet

*Merit Promotion Rating Sheet*

| Date: | Announcement No.: |
| Position: | Location: |

Rater:

| Name | Ranking Factors* | | | | | | Total Score | Comments |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

\*   If this symbol appears next to a numbered factor, it indicates a weighted factor.  Scores for weighted factors should be totaled (factor X weight) under the corresponding factor number.

Exhibit 8.  Merit Promotion Panel Rating Sheet

*Merit Promotion Panel Rating Sheet*

Date:

Announcement No.:

Position:

Location:

Score for Highly Qualified:

Panel Members:

| Name | Ranking Factors* | | | | | | Total Score |
|------|---|---|---|---|---|---|-------------|
|      | 1 | 2 | 3 | 4 | 5 | 6 |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |
|      |   |   |   |   |   |   |             |

\*    If this symbol appears next to a numbered factor, it indicates a weighted factor.  Scores for weighted factors should be totaled (factor X weight) under the corresponding factor number.

Exhibit 9.  Selection Certificate

| *SELECTION CERTIFICATE* | | | | |
|---|---|---|---|---|
| ISSUING OFFICE<br>DIV OF PERSONNEL MGT | ISSUE TO | | TYPE OF REFFERAL | GRADE LEVEL CERTIFIED |
| ANNOUNCEMENT NO. | POSITION TO BE FILLED (TITLE, SERIES, GRADE) | | | DUTY STATION |

TYPE OF APPT./WORK SCHEDULE (MARK ONE) :  _____  PFT  _____  PPT (NO. OF HRS/WK _____)  _____  TEMP NTE _____

| ACTION | DATE INTERVIEWED | NAME | PRESENT POSITION (TITLE, SERIES, GRADE) | PRESENT AGENCY & DUTY STATION |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| ISSUING OFFICER (SIGNATURE) | TITLE | DATE |
|---|---|---|

OFFICE FOR HUMAN RESOURCES REVIEW:

THIS CERTIFICATE IS VALID THROUGH CLOSE OF BUSINESS _____/_____/_____

| SELECTING OFFICIAL (SIGNATURE) | TITLE | DATE |
|---|---|---|
| CONCURRING OFFICIAL (SIGNATURE) | TITLE | DATE |
| AUTHORIZING OFFICIAL (SIGNATURE) | TITLE | DATE |

| | | |
|---|---|---|

*** INSTRUCTIONS TO SELECTING OFFICIAL AND REQUIRED AREAS OF COMPLETION ON REVERSE ***

## SECTION 1.  INSTRUCTIONS TO SELECTING OFFICIAL

- For certificates of promotion eligibles, if one candidate on a certificate is interviewed, all should  be interviewed.  Candidates on noncompetitive certificates may be interviewed at the selecting official's discretion.

- Interviews may be conducted in person or by telephone.  You may request an appropriate Service employee to conduct an interview at a location near the candidate.

- Complete Section 2, below, concerning outreach and recruiting efforts.

- State specifically, under Section 3, the justification for selection of the successful candidate.  Certificates will not be processed without this information.

- Obtain approval of concurring official and authorizing official of your selection before returning the certificate to the servicing personnel office.  The exception to this approval order is that selections requiring the Director's approval must be returned to the Chief, Branch of Headquarters Personnel Operations prior to being forwarded to the authorizing official.  Follow the procedures in your region for allowing review by the Regional Office for Human Resources.

- Use the following symbols in the Action block: **S** - Selected, **D** - Declined, **NS** - Not selected but considered

## SECTION 2.  DESCRIBE AFFIRMATIVE OUTREACH AND OTHER RECRUITING EFFORTS

## SECTION 3.  JUSTIFICATION FOR SELECTION OF THE SUCCESSFUL CANDIDATE

Exhibit 10.  Documentation for Accretion of Duties

| Old Position | New Position |
|---|---|
| *Title, Series, Grade* | *Title, Series, Grade* |

Briefly list the additional duties and responsibilities which form the basis for the upgrade:



Describe the circumstances which led to the assignment of additional duties and responsibilities to this position:




Signature of Supervisor:
    Date:

Describe duties that justify the higher grade:



Position audit results indicate higher level duties performed

     Date of Audit

| (√) appro .box | Staffing and Classification Determination | Competition |
|---|---|---|
| | Incumbered position upgraded without significant change in duties and responsibilities because of classification error or new or revised standards. | Not Required |
| | Incumbered position reconstituted into a successor position with clearly and solely identifiable duties of former, the incumbent will continue to perform the work assigned and described by the previous position, and there are no other employees serving in similar or identical positions to whom the duties could have been assigned. | Not Required |
| | Incumbered position reconstituted into a successor position and the position is not a clear successor or there are other employees in identical positions to whom the duties could have been assigned. | Required |

Classifier                 Date

Staffing                                                    Date

# EXHIBIT
# 24

# Rating Sheet

*#of day 1*
*4/21/03*
*gp*

| SSN: ███████████ | Case Number: NPS-NCR-03-19 |
|---|---|
| Name: AGuilar, Sandra L. | Position: Administrative Officer GS- 341- 14/15 |

**Education:** High school 5/70

**Experience:**

**KSA's**

| | | | | |
|---|---|---|---|---|
| 1 | 3 | 6 | | |
| 2 | 6 | 7 | | |
| 3 | 6 | 8 | | |
| 4 | 6 | 9 | | |
| 5 | 6 | 10 | | |

Total 27

**Transmuted Score** 97

**Veterans' Preference**

**Final Score** 97

**Rater:** *(signature)*     **Date** 4/17/03

(Updated 05/08/02 KML)

Exhibit 12 B
Page 1 of 1 pages

# EXHIBIT
# *25*

Capital Reporting Company

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------:

SANDRA L. AGUILAR,            :

           Plaintiff,    :

      vs.            : Civil Action No.

DIRK KEMPTHORNE,              : 07-0546 (RMU)

Secretary of the Interior,    :

         Defendant.     :

----------------------------:

Baltimore, Maryland

Wednesday, June 11, 2008

Deposition of:

ARNOLD J. GERBER,

called for oral examination by counsel for

Defendant, pursuant to notice, at the U.S.

Attorney's Office, 36 South Charles Street, 4th

Floor, Baltimore, Maryland, 21201, before Robert

Michael Jakupciak, RPR, of Capital Reporting

Company, a Notary Public in and for the State of

Maryland, beginning at 10:00 a.m., when were present

on behalf of the respective parties:

# Capital Reporting Company

| | Page 2 |
|---|---|
| 1 | On behalf of the Plaintiff: |
| 2 | CLARISSA H. WU, ESQUIRE |
| | GEBHARDT & ASSOCIATES, LLP |
| 3 | 1101 17th Street, N.W., Suite 807 |
| | Washington, D.C. 20036-4718 |
| 4 | (202) 496-0400 |
| 5 | On behalf of the Defendant: |
| 6 | BRIAN HUDAK, ESQUIRE |
| | Department of Justice |
| 7 | U.S. Attorney's Office |
| | 555 4th Street, N.W. |
| 8 | Washington, D.C. 20001 |
| | (202) 514-7700 |
| 9 | |
| 10 | and |
| 11 | MEL S. HUTSON, ESQUIRE |
| | Department of the Interior |
| 12 | 1849 C Street, N.W., MS 6440 |
| | Washington, D.C. 20240 |
| 13 | (202) 208-3051 |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

**Page 4**

1    E X H I B I T S (Cont'd.)*
2    GERBER EXHIBIT NUMBER          PAGE NO.
3    12   Strategic Plan for Improving ...... 165
         Diversity
4
     13   Memorandum dated 5-9-00 ........... 169
5
     14   Dottie Marshall's Application ..... 173
6
     15   Sandra Aguilar's Application ...... 173
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   (*Exhibits attached to transcript.)

**Page 3**

## C O N T E N T S

2    THE WITNESS: ARNOLD J. GERBER
3    EXAMINATION                 PAGE NO.
4       By Mr. Hudak ...................... 5
5       By Ms. Wu ........................ 146
6       By Mr. Hudak ..................... 182

## E X H I B I T S*

GERBER EXHIBIT NUMBER          PAGE NO.
12   1   Declaration ...................... 7
13   2   Second Announcement ............... 99
14   3   Certificate of Eligibles .......... 104
15   4   Certificate of Eligibles .......... 104
16   5   Certificate ...................... 139
17   6   Certificate ...................... 139
18   7   Certificate ...................... 139
19   8   Certificate ...................... 139
20   9   Certificate ...................... 139
21   10  Modified Plan .................... 162
22   11  3-21-2000 Memorandum .............. 163

**Page 5**

## P R O C E E D I N G S

| | |
|---|---|
| 2 | WHEREUPON, |
| 3 | ARNOLD J. GERBER, |
| 4 | called as a witness, and having been first duly |
| 5 | sworn, was examined and testified as follows: |
| 6 | EXAMINATION BY COUNSEL FOR DEFENDANT |
| 7 | BY MR. HUDAK: |
| 8 | Q  Mr. Gerber, good morning.  My name is |
| 9 | Brian Hudak.  I'm from the United States Attorney's |
| 10 | Office for the District of Columbia, and I represent |
| 11 | the defendant in this action. |
| 12 | Would you please state your full name for |
| 13 | the record? |
| 14 | A  Yes.  Arnold.  A-R-N-O-L-D.  J. Gerber. |
| 15 | G-E-R-B-E-R. |
| 16 | Q  I know you have been deposed or provided |
| 17 | testimony in some other cases before, but just a |
| 18 | couple ground rules for the deposition today. |
| 19 | If you don't understand a question that I |
| 20 | ask you, please let me know and I'll rephrase it or |
| 21 | try to clarify it as best as possible. |
| 22 | If you answer a question, however, I will |

2  (Pages 2 to 5)

Capital Reporting Company

Page 6

1  assume that you understood it as I stated it,
2  without the need for further clarification.
3          Please let me finish my question before
4  you provide your answer and I'll let you finish your
5  answer before I ask the next question. It's just
6  hard for the court reporter to take down two people
7  talking at the same time. And I usually get yelled
8  at by the court reporter before I start talking over
9  people. So I do apologize.
10         I think those are the only ground rules.
11  Do you have any questions about your deposition here
12  today?
13     A   Not at this time.
14     Q   Okay. Great. From my understanding, you
15  were retained by the plaintiff to provide opinion
16  testimony in this case; is that correct?
17     A   Could you define opinion?
18     Q   Well, you prepared a declaration, correct,
19  in connection with this matter?
20     A   I did.
21     Q   And in that declaration you provided
22  certain opinions?

Page 7

1      A   In addition, I cited facts, laws, rules,
2  regulations and policy. And so it isn't confined to
3  opinion.
4      Q   Okay. I understand. But you formulated
5  certain opinions based upon your review of the facts
6  in this case and your knowledge and review of
7  applicable authoritative sources?
8      A   Yes.
9      MR. HUDAK: Why don't we go ahead and mark
10  Gerber Exhibit 1.
11         (Gerber Exhibit Number 1
12          was marked for identification.)
13  BY MR. HUDAK:
14     Q   Would you please take a look at the
15  document marked Gerber Exhibit 1?
16     A   Yes.
17     Q   Do you recognize this document?
18     A   Yes. I recognize this document.
19     Q   And what is it?
20     A   It's my expert witness declaration in the
21  complaint, EEOC complaint of Sandra L. Aguilar
22  versus Gale Norton, Secretary of Interior.

Page 8

1      Q   Do you understand that the plaintiffs have
2  designated this report as an expert report under the
3  Federal Rules of Civil Procedure in connection with
4  the District Court action pending by Ms. Aguilar
5  against Ms. Norton?
6      A   May I ask counsel?
7      THE WITNESS: Is that a correct statement,
8  that we have entered that?
9      MS. WU: Only answer as to your own
10  factual knowledge. If you don't know if it was
11  entered, then just answer honestly that you don't
12  know.
13     A   Okay. I don't have firsthand knowledge of
14  that.
15     Q   Okay. We'll get into conversations you
16  have had with plaintiff's counsel in a bit.
17         Why don't we just turn to page 13 and 14
18  of the declaration, Gerber 1. I just want to walk
19  through your background a little bit. I know it's
20  fully stated or it is stated here. If you would
21  look on page 13, it's entitled Federal Managerial
22  and Technical Experience. Then it looks like it

Page 9

1  spans three pages, this part of your declaration; is
2  that correct?
3      A   Yes. That's correct.
4      Q   What did you hope to convey on these three
5  pages?
6      MS. WU: Objection as to relevance. Go
7  ahead and answer.
8      A   That's my resume' of Federal work that I
9  performed over a period of approximately 35 years in
10  the Federal sector. And it represents the
11  experience that I gained there and I think it also
12  indicates the kinds of expert knowledges that I
13  would have based on that experience.
14     Q   Okay. Great. In what year did you
15  graduate high school?
16     A   I believe 1963.
17     Q   Upon graduating high school what did you
18  do?
19     A   I probably spent a summer working at
20  various jobs. Some of those escape me right now.
21  Part-time employment I'm sure for the summer.
22         And then in the fall I entered college at

3 (Pages 6 to 9)

Capital Reporting Company

Page 38

1  for any particular vacancy announcement?)
2          - - -
3      A   I think the answer to your question is
4  there may be, depending upon how the position was
5  advertised, and -- there may be more than one, a
6  possibility of more than one certificate of
7  eligibles.
8      Q   Okay.  Now, after the certificate of
9  eligibles or certificates of eligibles are compiled,
10  they are then forwarded to the selecting official or
11  officials; correct?  As a general matter?  I see you
12  nodding your head.
13      A   I will say at some point that's going to
14  happen.
15      Q   Okay.  And the selecting official or
16  officials, generally, will review the certificates
17  of eligibles and use their -- they have a pretty
18  wide latitude in who they select from those
19  certificates of eligibles; is that correct?
20      MS. WU:  Just a point of clarification.
21  Are you talking about selecting officials on an
22  interview panel or do you mean the final decision

Page 39

1  maker?
2      Q   I'm talking about the people that review
3  the list and say we want to hire this person, here
4  is our recommendation.
5      A   All right.  Are you saying that you're
6  going to omit the perhaps more usual process whereby
7  a panel conducts interviews with the people on the
8  best qualified list?
9      Q   Okay.  So that happens between the best
10  qualified list and the selecting official, there's a
11  panel that interviews people as a general practice?
12      A   It's pretty usual.  It doesn't happen
13  every time, but that is a usual way to do it.
14      Q   Okay.  And what type of discretion does
15  that interview panel have in choosing who to
16  interview for a particular position as a general
17  matter?
18      A   I don't know.
19      Q   What OPM guidelines are there for
20  addressing, that are addressed to that panel about
21  who they have to interview or who they can choose
22  not to interview?

Page 40

1      A   It would be up to the agency.
2      Q   And after the interview panel assembles
3  and interviews who they interview, generally they
4  make a recommendation to the ultimate selecting
5  official that this is the person we want for the
6  position.
7          Is that generally the flow?
8      A   Well, it depends on how the, how the
9  agency structures it.  They may have the panel
10  assign scores based on their interviews with the
11  candidates and/or they may average the panel scores
12  and, the scores of the panel members and assign one
13  particular score to each applicant based on the
14  average.
15      Q   Okay.
16      A   But ultimately I would think there is a
17  recommendation that goes to the selecting official.
18      Q   Okay.  Now, from your answers in this
19  series of questions you almost consistently said it,
20  it depends, because there is, each process for each
21  vacancy announcement can differ?
22      A   And agencies establish policies on how

Page 41

1  they fill positions.
2      Q   Within the policies they have established.
3  It can differ -- I mean the agency established
4  policies, but vacancy announcement A for one agency
5  and the process it follows through selection
6  compared to vacancy announcement B within the same
7  agency may be different?
8      A   They may, but the fundamental and most
9  important issues here I think in what you're asking
10  me about is that the agency, A, has established a
11  policy for how it is going to advertise vacancies
12  and go through the selection process, and B, that
13  the agency actually is then responsible for
14  following the process that it has established.
15      Q   Okay.  Now, the policies that it
16  establishes, those are internal policies that it
17  establishes; right?
18      A   They're internal to the agency.  To the
19  extent that they're not prescribed by OPM.
20      Q   They aren't regulations promulgated by the
21  agency that are subject to notice and comment, for
22  example; is that correct?

11 (Pages 38 to 41)

Page 58

1    A   Cases that resulted you mean in a finding?
2    Q   No, no, no. I'm just saying where the
3  allegations were that this person was not hired and
4  the selecting officials chose not to hire this
5  person because of their race, ethnicity, national
6  origin, gender, disability.
7    A   Yes.
8    Q   Okay. What training have you had in order
9  to be able to investigate claims of intentional
10 discrimination?
11   A   What -- can you elaborate on your question
12 when you ask about training?
13   Q   Do you have any education, formal
14 education in the area of investigating intentional
15 discrimination?
16   A   I would have to say I don't -- I can't
17 point to a specific course that relates to the
18 investigation of, as you define it, intentional
19 discrimination.
20       However, I do have a Master's Degree in
21 Public Personnel Management, which encompasses
22 practically the whole range of personnel issues.

Page 59

1    Q   Have you taken any informal training
2  courses in the investigation of intentional
3  discrimination claims?
4    A   No, I have not. But I will tell you that
5  in the course of fact finding to develop
6  occupational standards, I would say that my
7  investigative skills and my skill at determining the
8  basis for agency actions and agency procedures and
9  so forth is quite high.
10       In addition to which, I mentioned to you
11 that I was in charge of the oversight program which
12 involved investigating all aspects of human
13 resources management, including things done rightly
14 and things done wrongly. And I supervised a staff
15 in these investigations and these were formal
16 investigations which often led to formal sanctions
17 against Department of Veterans Affairs officials.
18   Q   Have you ever served as an investigator in
19 an EEO case at an agency level?
20   A   No.
21   Q   Have you ever served as an investigator --
22 strike that.

Page 60

1        Have you ever served as an administrative
2  law judge with the EEOC?
3    A   No.
4    Q   Okay. After the plaintiff initially
5  contacted you and sent you the files, what was the
6  initial determination that you made?
7    A   Well, my initial determination was that
8  the decision not to interview and not to select the
9  client under that vacancy announcement represented a
10 prohibited personnel practice based on
11 discriminatory factors and non-merit factors.
12   Q   Did you conclude that Ms. Aguilar had been
13 intentionally discriminated against?
14   A   Did I conclude -- I don't believe the word
15 intentional is listed here. And --
16   Q   I'm asking about your initial
17 determination.
18   A   I didn't say -- I never said, I never
19 stated intentional. I don't believe I said that,
20 but, you know, I would like to review that and just
21 see.
22   Q   Sure. I wasn't asking you about your

Page 61

1  report. I was asking you about your initial
2  determination that you described before, when you
3  reviewed the case file, you made an initial
4  determination and then you compiled the report.
5  Your initial determination --
6    A   Yeah.
7    Q   -- was it your opinion that this was a
8  case of intentional discrimination?
9    A   I didn't know initially.
10   Q   Did you ever find out that this was, you
11 know, that, in your opinion, Ms. Aguilar was
12 intentionally discriminated against for being
13 Hispanic?
14   A   The answer is I don't know if it was
15 intentional or unintentional, but she was
16 discriminated against.
17   Q   You don't know one way or another whether
18 or not --
19   A   I don't -- no. Are you asking me can I
20 prove that it was intentional?
21   Q   Yes.
22   A   I cannot prove that it was intentional.

16 (Pages 58 to 61)

Capital Reporting Company

Page 62

1  Was it institutional?  Sure.
2      Q    Okay.
3      A    Absolutely it was institutional.
4      Q    And that's -- when you say in, I guess
5  it's your summary, in paragraph 5 on page 3, that it
6  is my professional opinion that the decision to
7  non-select Ms. Aguilar under the vacancy
8  announcement constituted a prohibited personnel
9  practice based upon non-merit and discriminatory
10  factors in violation of 5 U.S.C. 2302(b)(1), (4),
11  (6), (11), and (12), the discrimination factors
12  reference in there, the discriminatory factors,
13  that's institutional discrimination as you would
14  describe it?
15      A    Without question.
16      Q    Okay.  Now, also on page 4, paragraph 7 of
17  your declaration, the last sentence of the
18  carry-over paragraph:  Therefore, it is my opinion
19  that the complainant was discriminated against on
20  the basis of her national origin, Hispanic, in
21  violation of Section 2302(b)(1); that's
22  institutional discrimination, not intentional

Page 63

1  discrimination, as you have drawn the distinction;
2  correct?
3      A    Well, I've said to you that I'm sure it
4  was institutional.  I don't know if it was
5  intentional.
6      Q    You can't prove it?
7      A    I can't prove it.
8      Q    And it's not your opinion in this expert
9  report or the opinion that you have here today that
10  it was intentional?
11          MS. WU:  Objection.  That was not the
12  testimony as stated.
13  BY MR. HUDAK:
14      Q    Well, let me ask the question.
15          Is it your opinion here today that it was
16  intentional discrimination?
17          MS. WU:  Objection; asked and answered.
18  He has already stated repeatedly he doesn't know,
19  based on your definition of intentional, whether it
20  was intentional or unintentional.
21          MR. HUDAK:  Thank you for your speaking
22  objection.  Can you please repeat the question?

Page 64

1          - - -
2          (Whereupon the following portion of the
3  testimony was repeated by the Court Reporter:
4          QUESTION: And it's not your opinion in
5  this expert report or the opinion that you have here
6  today that it was intentional?)
7          - - -
8      A    My answer is I don't know.
9      Q    Okay.  Now, after you reached your initial
10  determination as you described it, before you
11  submitted this finalized report in November of '04,
12  did you exchange any drafts of the report with the
13  plaintiff or plaintiff's counsel?
14          MS. WU:  Objection; privileged.
15          MR. HUDAK:  He's a testifying expert.
16  There's no privilege.
17          MS. WU:  Of course there's privilege.
18          MR. HUDAK:  No, there isn't.  There really
19  isn't.
20          Are you directing the witness not to
21  answer on privilege grounds?
22          MS. WU:  I'm not directing the witness not

Page 65

1  to answer.  Let me clarify what you just asked.
2          Are you asking whether or not any drafts
3  were exchanged?
4          MR. HUDAK:  That's what my question was.
5          MS. WU:  Between who?
6          MR. HUDAK:  Between yourself and the
7  plaintiff or plaintiff's counsel.
8          MS. WU:  Okay.
9      A    The answer, whether I exchanged drafts of
10  this with --
11      Q    Yes.  Drafts before you finally submitted
12  this in its final form, did you exchange drafts with
13  the plaintiff or plaintiff's counsel?
14      A    Well, the specific answer is no.  We did
15  not -- I did not exchange a draft with Ms. Wu.
16      Q    Okay.  Let me ask you a different question
17  then.
18      A    Okay.
19      Q    With any of plaintiff's counsel, did you
20  exchange drafts?
21      A    Are you asking about Mr. Roselli?
22      Q    I'm asking about anyone you understood to

17 (Pages 62 to 65)

Capital Reporting Company

Page 106

1    Q    That indicates that it's a GS-14
2  certificate of eligibles; right?
3    A    Yes.
4    Q    Okay.  You understand that the agency
5  formulated two non-status certificates of eligibles,
6  one for GS-14 and one for GS-15; is that correct?
7    A    I see what you put in front of me and as
8  I've just testified, I'm not sure that I had seen
9  Exhibit 4 earlier.  I do recall Exhibit 3.
10    Q    Okay.  But you reviewed deposition
11  transcripts in this proceeding from Ms. Newman and
12  Mr. Carlstrom, and do you recall them saying that
13  they formulated two non-status certificates of
14  eligibles, one for GS-14 eligible candidates and one
15  for GS-15 eligible candidates?
16    A    I don't recall that level of detail, but I
17  recall the 15.
18    Q    Okay.  Now, Ms. Aguilar's name is on the
19  15; right?
20    A    Yes.
21    Q    And it's the sixth of six names?
22    A    Yes.

Page 107

1    Q    Okay.  Now, you said that it was a
2  discriminatory factor to exclude applications from
3  all sources when the agency had advertised the
4  announcement as accepting applications from all
5  sources; right?
6    A    I said it was discriminatory because the
7  agency failed to follow its own policy with regard
8  to why it advertised this job as all sources.  The
9  purpose of advertising it as all sources was to
10  expand the area of consideration in order to
11  hopefully obtain a more diverse group of applicants.
12    Q    Okay.  Do you believe that Roger Heller,
13  who is the top rated individual on the GS-15
14  certificate of eligibles, was discriminated against
15  based upon his national origin or race?
16        MS. WU: Objection; calls for speculation,
17  relevance, he's not at issue in this case, and
18  three, incredibly speculative as to why he was
19  excluded or whether race is an issue for Mr. Heller.
20  BY MR. HUDAK:
21    Q    Do you understand, based upon your review
22  of the record, that they excluded everyone on this

Page 108

1  certificate of eligibles from consideration; right?
2    A    That is what they did.
3    Q    Okay.  And it says at the bottom,
4  certificate returned, unused, selection made from
5  merit promotion procedures.
6        Do you see that handwriting there?
7    A    I see that.
8    Q    So Roger Heller, he appears on this list;
9  was he discriminated against based upon his national
10  origin and/or race?
11    A    I don't know Mr. Heller's national origin
12  or race.  I do know Ms. Aguilar's national origin
13  and ethnicity.
14    Q    So -- and she's Hispanic?
15    A    Yes.
16    Q    Okay.  So it's your testimony here today
17  that you believe she was discriminated against
18  because she was on a certificate, she's Hispanic and
19  her certificate wasn't used?
20    A    I believe she was discriminated against
21  because she was not interviewed.
22    Q    Okay.  So if Roger Heller wasn't

Page 109

1  interviewed, do you believe he was discriminated
2  against?
3        MS. WU: Objection; asked and answered and
4  objection as to relevance.  You can answer if you
5  know.
6    A    I don't know.
7    Q    Don't know.  It depends on what his race
8  and ethnicity is; right?  Is that a yes?
9    A    That's yes.  I don't know.
10    Q    Francis Wilson?
11    A    Same answer.  I don't know.
12    Q    And it depends upon her race and
13  ethnicity?
14    A    Don't know.
15    Q    No, it would depend upon her race and --
16    A    Yes.  And any other potential
17  discriminatory factor.  I'm not going to limit it to
18  race and ethnicity.  There are other potential
19  discriminatory reasons here for not having
20  interviewed every single one of those candidates.  I
21  don't know which one of those reasons applies or
22  ones of those reasons applies.

28  (Pages 106 to 109)

Page 122

1 refrain to asking him questions about HR, he can
2 give you HR answers.
3    Q    Okay. So failure to consider all
4 applications, you said that's discriminatory.
5       How is it discriminatory?
6    A    Failure to consider all applications?
7    Q    Yeah. How is that discriminatory?
8    A    It was discriminatory because the agency
9 failed to follow its own diversity hiring policy.
10    Q    What discriminatory effect did that have?
11    A    It results in no additional minority
12 Hispanic employment. That is the result. That is
13 institutional discrimination.
14    Q    So if -- would your answer change if a
15 Hispanic person was interviewed for this position?
16    A    Would my answer change?
17    Q    Yeah.
18    A    You mean from outside?
19    Q    You said that the failure to interview all
20 the applications that were eligible, not to consider
21 all the applications was discriminatory.
22    A    Yes.

Page 123

1    Q    I'm asking this specific thing. I'm not
2 asking for institutional-wide. I'm asking for this
3 specific vacancy announcement.
4       How was that discriminatory? What
5 discriminatory effect did it have?
6       MS. WU: Objection; asked and answered.
7    A    Maybe I'll try a different approach, which
8 is there are only two ways that I know of to improve
9 the representation of Hispanic employees in an
10 agency. One way is to bring more employees in at
11 the intake level and have them progress up through
12 the ranks. That takes a very long time to do. The
13 other way is to broaden the area of consideration
14 and that, also, by the way, works at the intake
15 level as well. And that's what I worked with NAHFE
16 on.
17       Broadening the area of consideration,
18 which the agency correctly did when it readvertised
19 the position. What it did incorrectly was having
20 broadened the area of consideration, it then said,
21 we won't consider anybody who applied. That's a
22 sham.

Page 124

1    Q    Okay. People on the non-status
2 certificates that weren't selected, they're white
3 people on that list; right?
4    A    I don't know.
5    Q    There were black people on that list?
6    A    I don't know.
7    Q    There were males on that list?
8    A    I don't know. And as you pointed out
9 earlier, the veterans didn't employ me, I was
10 employed by Ms. Aguilar.
11    Q    There were women on that list? You know
12 that; right? At least one?
13    A    Well, we knew that Sandra Aguilar was on
14 the list.
15    Q    So I'm asking the specific decision in
16 this case. I'm not asking for institutional-wide.
17 The specific decision in this case, what
18 discriminatory effect did it have by not
19 interviewing the status applicants, or the
20 non-status applicants?
21    A    Number one is it deprived Ms. Aguilar of
22 even the opportunity for an interview. The decision

Page 125

1 that was made based on a non-merit factor, which is
2 stated in Mr. Carlstrom's deposition, was that he
3 considered prior NPS experience to be of primary
4 importance. Therefore, he picked from only the
5 in-house Merit Promotion Certificate, which had
6 three candidates on it. In so doing he disregarded
7 what we have here as eleven candidates. That's
8 obvious to me.
9    Q    Okay. But eleven candidates, regardless
10 of their race, ethnicity, gender, national origin,
11 disability, he disregarded everyone on those lists;
12 right?
13    A    So therefore, what he did --
14    Q    Is that a yes?
15    A    Yes.
16    Q    Okay.
17    A    In preselecting Ms. Marshall, what he did
18 was, in effect, he stacked the deck against the
19 other eleven so that they don't even get to compete.
20       MR. HUDAK: I'm going to move to strike
21 that as non-responsive.
22       MS. WU: You asked him a question and he

32 (Pages 122 to 125)

Page 126

1 is doing his very best to answer it.
2      MR. HUDAK: And I appreciate it. If you
3 can answer the question yes or no. I'm pretty much
4 here on out going to be asking yes or no questions,
5 and if you want to provide further elaboration, your
6 counsel can ask you questions and you can submit a
7 supplemental report.
8      Q   Are you aware of any DOI or NPS policy
9 that requires promotion, that is promotion eligible,
10 that is status applicants, to be ranked for
11 vacancies by a three-person panel?
12     A   I don't know.
13     Q   Okay. Same question for non-status
14 applicants.
15     A   I don't know.
16     Q   Are you aware of any policy that
17 prohibited DOI or NPS to use multiple certificates
18 of eligibles in the processing of the vacancy
19 announcement?
20     A   No.
21     Q   Are you aware of any -- strike that.
22         Are you aware of any NPS or DOI policies

Page 127

1 that required them to use multiple certificates in
2 the processing of the vacancy announcement?
3     A   The answer is I'm not sure, because
4 evidently they were required to readvertise the
5 position, to open it up to non-status candidates.
6 So I'm not aware of all the intricacies of the
7 policy.
8     Q   Okay. Turn to page 6.
9         MS. WU: Of what?
10        MR. HUDAK: His report.
11 BY MR. HUDAK:
12    Q   In paragraph 10, from the paragraph that
13 continues over from the previous page, the sentence
14 that says the record shows that the non-status
15 certificate was signed and returned unused. The
16 document does not bear a return date, which is
17 certainly improper if not illegal.
18        Do you see that --
19    A   Yes.
20    Q   -- sentence there?
21    A   Yes, I see that.
22    Q   What law did it violate? You say here

Page 128

1 that it might be illegal. What law do you think it
2 might violate?
3     A   I said it was improper, if not illegal.
4 Whether, the legality of it I leave to attorneys.
5 It is improper as a certainty.
6     Q   What policy or regulation or statute is
7 that opinion based upon?
8     A   Well, I can't cite you a statute.
9     Q   Policy? Regulation? Anything?
10    A   Well, it is a hiring document which was
11 issued by a human resources specialist, dated on
12 April 23rd of '03. We don't know when it was
13 returned. So, therefore, it raises a number of
14 issues, one of which is the spector of preselection.
15 Since we didn't know when it was returned, was this
16 decision made before or after Mr. Lawler made a
17 decision to select Ms. Marshall? I don't know.
18    Q   You understand that it was Mr. Lawler and
19 Mr. Carlstrom that selected her; right?
20    A   Well, I'm not clear on exactly which one
21 finally signed here.
22    Q   But you understand that they were the

Page 129

1 selecting panel in this vacancy announcement?
2     A   Well, I don't understand. But I accept
3 your statement.
4     Q   Are you aware of any particular policy
5 that says when you return the non-status certificate
6 unused, as you have, to fill in the date?
7     A   I'm going to give a common sense answer
8 here.
9     Q   I don't want a common sense answer. Are
10 you aware -- it's yes or no.
11    A   Then I'm going to say I can't cite offhand
12 which regulation requires the dating of a document,
13 but I will tell you this. No selection action can
14 be implemented prior to the date that the selection
15 document has been signed and dated.
16        Now, I think it's one of these things
17 where not dating the document renders it invalid.
18 But I can't cite the chapter.
19    Q   Do you know generally the authority I
20 should consult if I want to find the answer to this?
21    A   I don't.
22    Q   Did you have a specific authority in mind

33 (Pages 126 to 129)

Capital Reporting Company

| Page 206 |
| --- |

1    Q  Do you believe that Mr. Carlstrom or Mr.
2  Lawler intentionally discriminated against Ms.
3  Aguilar by just deciding she's on this one
4  certificate, she's Hispanic and we don't want to
5  interview anyone on this list in form or in
6  substance?  Do you believe that they did that?
7      MS. WU:  Objection as to speculation,
8  objection as to form, compound question and
9  objection as to asked and answered.  And also
10  objection to the extent that it calls for a legal
11  conclusion, the definitions of intentional and
12  unintentional discrimination.
13    A  I don't know if the discrimination was
14  intentional.  I know that it occurred.
15    Q  Did you consult any peer-reviewed journals
16  or other publications in formulating your opinions?
17    A  No.
18    Q  Would you say if someone had a different
19  opinion on the matters discussed in your declaration
20  that their opinion was, would be unreasonable or
21  false?
22    A  I can't speculate because I have not seen

| Page 207 |
| --- |

1  another opinion on any of these issues.
2    Q  I'm not asking you to speculate.  I'm
3  asking you in your professional opinion, you're
4  making your opinions out there, if someone just
5  disagreed with you, do you think it's --
6    A  It's hypothetical.  I would have to know
7  why they disagreed.  I can't speculate on why.
8    Q  Let's say if someone said that they just
9  believe that NPS experience was indeed a merit
10  qualification or factor and it was permissible for
11  the agency to rely upon that in forming a selection.
12      Would you believe that that opinion would
13  be mistaken or unreasonable?
14    A  I believe that since prior NPS experience
15  was not a criteria in the advertisement of this
16  position, nor was it a criteria in any of the KSAs,
17  nor was it a criteria in the rating and ranking
18  scheme for the KSAs, that they would be wrong.
19    Q  Is experience in a GS-15 position a stated
20  requirement or part of the KSAs?
21    A  I believe you would have to answer that by
22  looking at the rating and ranking factors and the

| Page 208 |
| --- |

1  scoring scheme and determine for yourself whether
2  quality of experience was deserving of
3  consideration.
4    Q  And it's your position that quality of
5  experience cannot take into account where your
6  experience was gained?
7      MS. WU:  Objection as to serious
8  mischaracterization of testimony.
9    A  I didn't say that.
10    Q  Okay.  Do you believe that where you
11  gained your experience is at all relevant in
12  selecting a person for this position with the
13  National Park Service, National Capital Region?
14    A  We're only dealing in what the experience
15  is, what was the grade level of the experience, and
16  what was the quality of the experience.  I will tell
17  you unequivocally, experience gained at Grade 12 is
18  not comparable to experience gained at Grade 15.  So
19  that I believe answers your question.
20    Q  Is it at all relevant where the person
21  gained the experience in calculating the quality of
22  the experience for a position with the -- let me

| Page 209 |
| --- |

1  finish, let me just finish my question.  For a
2  position with the National Park Service in the
3  National Capital Region?
4    A  I'm only going to confine my remarks to
5  what that announcement actually said, the basis on
6  which the candidates were rated.  The selection
7  judgment made by Mr. Carlstrom had nothing to do
8  with the criteria in this announcement.
9    Q  Okay.  Is there any criteria in this
10  announcement then that discusses a need or a
11  preference for someone with GS-15 experience?
12    A  I've explained that.
13    Q  Please answer my question.
14    A  I've explained that.  I've answered your
15  question.
16    Q  Are you refusing to answer this question?
17    A  Yes.
18      MS. WU:  He's not refusing to answer your
19  question.  He has tried in the best way that he
20  knows how to answer your question.  If you don't
21  accept the answer, then he can do nothing more than
22  repeat it.

53 (Pages 206 to 209)

Capital Reporting Company

| Page 210 |
| --- |

1    MR. HUDAK: I don't believe he has
2  answered this question and I would ask the court
3  reporter to read it back and I would appreciate an
4  answer to my question.
5         - - -
6         (Whereupon the following portion of the
7  testimony was repeated by the Court Reporter:
8         QUESTION: Is there any criteria in this
9  announcement then that discusses a need or a
10  preference for someone with GS-15 experience?)
11         - - -
12  BY MR. HUDAK:
13    Q   Please answer that question.  Is there any
14  criteria in this announcement that expresses a
15  preference or expresses a criteria, GS-15
16  experience?
17    A   No.
18    Q   Okay.
19         MR. HUDAK: I don't have any further
20  questions.
21         MS. WU: All right.  I don't have any
22  either.  We will read and sign.

| Page 211 |
| --- |

1         (Whereupon, at 3:43 p.m., the
2         deposition of ARNOLD J. GERBER
3         was concluded.)
4         * * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

| Page 212 |
| --- |

1    ACKNOWLEDGEMENT OF DEPONENT
2
3
4  I, ARNOLD J. GERBER, do hereby acknowledge I
5  have read and examined the foregoing pages of
6  testimony, and the same is a true, correct and
7  complete transcription of the testimony given by
8  me, and any changes or corrections, if any, appear
9  in the attached errata sheet signed by me.
10
11
12
13
14
15
16
17
18
19  _____    _____
20  Date              ARNOLD J. GERBER
21
22

| Page 213 |
| --- |

1  STATE OF MARYLAND        )
2              ss:
3  ANNE ARUNDEL COUNTY      )
4         I, ROBERT M. JAKUPCIAK, an RPR and Notary
5  Public within and for the State of Maryland, do
6  hereby certify:
7         That the witness whose deposition is
8  hereinbefore set forth, was duly sworn and that the
9  within transcript is a true record of the testimony
10  given by such witness.
11         I further certify that I am not related to
12  any of these parties to this action by blood or
13  marriage and that I am in no way interested in the
14  outcome of this matter.
15         IN WITNESS WHEREOF, I have hereunto set my
16  hand this _____ day of _____, 2008.
17
18         _____
19
20  My Commission Expires:
21  November 5, 2011
22

54  (Pages 210 to 213)

Capital Reporting Company

Page 214

1  Capital Reporting Company
2  1821 Jefferson Place, N.W.
3  3rd Floor
4  Washington, D.C.  20006
5  (202) 857-3376
6       E R R A T A   S H E E T
7  Case Name:  Sandra Aguilar vs. Dirk Kempthorne
8  Witness Name:  ARNOLD J. GERBER
9  Deposition Date:  June 11, 2008
10 Page No.   Line No.    Change/Reason for Change
11
12
13
14
15
16
17
18
19
20
21 _____    _____
22 Signature              Date

Page 215

1  Clarissa H. Wu, Esquire
2  GEBHARDT & ASSOCIATES, LLP
3  1101 17th Street, N.W., Suite 807
4  Washington, D.C.  20036-4718
5
6  IN RE:  Sandra Aguilar vs. Dirk Kempthorne
7
8  Dear Ms. Wu:
9      Enclosed please find your copy of the
10 deposition of ARNOLD J. GERBER, along with the
11 original signature page.  As agreed, you will be
12 responsible for contacting the witness regarding
13 signature.
14     Within 30 days of receipt, please forward
15 errata sheet and original signed signature page to
16 counsel for Defendant.
17     If you have any questions, please do not
18 hesitate to call.  Thank you.
19 Yours,
20
21 Robert M. Jakupciak, RPR/Notary
22 cc:  Brian Hudak, Esquire

55 (Pages 214 to 215)

# EXHIBIT
# 26

| (The Information on this certificate is for United States Government use only.) | UNITED STATES OFFICE OF PERSONNEL MANAGEMENT CERTIFICATE OF ELIGIBLES *(Continuation Sheet)* | CERTIFICATE NO. DOI-1-NPS-NCR-03-0011 PAGE NO. 1 of 1 |
|---|---|---|

| ACTION | RATING | VET. PREF | NAME (ADDRESS AND PHONE, IF ANY, ARE SHOWN IF APPLICATION IS NOT ATTACHED) |
|---|---|---|---|

CERTIFICATE OF ELIGIBLES

CERTIFICATE NUMBER:  DOI-1-NPS-NCR-03-0011
ISSUED ON    April 24, 2003

TYPE OF APPOINTMENT:   CAREER/CAREER CONDITIONAL
OCCUPATION:            Administrative Officer
PAY-SERIES-GRADE:      GS-341-14
LOCATION:              WASHINGTON, DC

| AGENCY ACTION | DOB | RATING/VET | | | |
|---|---|---|---|---|---|
| RNO D | 8-27-60 | 108.0 CPS | Torres, Barbara P. 2446 Streamview Drive Waldorf, MD  20603-3953 | SSN: | ▮▮▮▮ |
| UK | 6-21-44 | 107.0 CP | Wilson, Francis M. 7927 Bressingham Drive Fairfax Station, VA  22039-3158 | SSN: | ▮▮▮▮ |
| UK | 6-17-57 | 98.0 TP | Smith, Michael J. 740 Genter Street La Jolia, CA  92037 | SSN: | ▮▮▮▮ |
| UK | 7-14-50 | 95.0 TP | Kull Jr., Robert C. 332 Hughes Drive Newport News, VA  23608 | SSN: | ▮▮▮▮ |
| UK | 9-18-68 | 92.0 TP | Blackwell, Larry J. 6471 Glidar Street Alexandria, VA  22310 | SSN: | ▮▮▮▮ |

Certificate issued by  _[signature]_  4/23/03
                        Human Resources Specialist        Date

ANTICIPATED EOD  _____

_[signature]_, Dep. R.D.
Signature of Selecting Official          Date

_Certificate returned unused. Selection made from Merit Promotion._

THIS CERTIFICATE IS VALID ONLY FOR THE POSITION, GRADE, & DUTY LOCATION SHOWN ABOVE.

OPM FORM 1844-A
April 1980

Exhibit

(The information on this certificate is for United States Government use only.)

# UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
## CERTIFICATE OF ELIGIBLES
### *(Continuation Sheet)*

| ACTION | RATING | VET PREF | NAME (ADDRESS AND PHONE, IF ANY, ARE SHOWN IF APPLICATION IS NOT ATTACHED) |
|---|---|---|---|

### CERTIFICATE OF ELIGIBLES

CERTIFICATE NUMBER:  DOI-1-NPS-NCR-03-0012
ISSUED ON  April 24, 2003

TYPE OF APPOINTMENT:  CAREER/CAREER CONDITIONAL
OCCUPATION:  Administrative Officer
PAY-SERIES-GRADE:  GS-341-15
LOCATION:  WASHINGTON, DC

| AGENCY ACTION | RATING/VET | | |
|---|---|---|---|
| | 110.0 XP | Heller, Roger G. USAID/Indonesia Unit 8135 FPO AP 96520-8135 | SSN: |
| | 107.0 CP | Wilson, Francis M. 7927 Bressingham Drive Fairfax Station, VA 22039-3158 | SSN: |
| | 102.0 TP | Craig Jr., Leon 1440 Boulder Lane Hanover, MD 21076 | SSN: |
| | 100.0 NV | Feinberg, Samuel J. 1133 Blue Wing Terrace Largo, MD 20774 | SSN: |
| | 97.0 NV | Westerman, Philip L. 7255 Mountain Ash Drive, SE Grand Rapids, MI 49546 | SSN: |
| | 97.0 NV | Aguilar, Sandra L. 2338 Tawny Drive Waldorf, MD 20601 | SSN: |

Certificate issued by _____  4/23/03
Human Resources Specialist  Date

ANTICIPATED EOD _____

_____  Dep R.D.  _____
Signature of Selecting Official  Date

Certeficate returned unused.
Selection made from Merit Promotion Procedures

THIS CERTIFICATE IS VALID ONLY FOR THE POSITION, GRADE, & DUTY LOCATION SHOWN ABOVE.

OPM FORM 1844-A
April 1980

Exhibit 2
Page 42 of 117 pages

# EXHIBIT
# *27*



# United States Department of the Interior

**NATIONAL PARK SERVICE**
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

IN REPLY REFER TO:

| *SELECTION CERTIFICATE* | **COMPETITIVE** | | |
|---|---|---|---|
| ISSUING OFFICE DIVISION OF HUMAN RESOURCES | ISSUE TO: REGIONAL DIRECTOR, NATIONAL CAPITAL REGION | TYPE OF REFERRAL PROMOTION | GRADE LEVEL CERTIFIED GS-14 |
| ANNOUNCEMENT NO. NPS-NCR-03-19 | POSITION TO BE FILLED (TITLE, SERIES, GRADE): ADMINISTRATIVE OFFICER (ARD, ADMN.) GS-341-14/15 | | DUTY STATION : WASHINGTON, DC |

TYPE OF APPT./WORK SCHEDULE (MARK ONE) : __X__ PFT _____ PPT (NO. OF HRS/WK ____) ___ TEMP NTE :

| ACTION | DATE INTERVIEWED | NAME    DOB | PRESENT POSITION (TITLE, SERIES, GRADE) | PRESENT AGENCY & DUTY STATION |
|---|---|---|---|---|
| NS | 5/15/03 | Brodie, Kenneth E. ✓ R/NO - C    1-9-62 | Supv. Human Resources Specialist, GS-201-13 | NPS, Natl. Capital Region Washington, DC |
| NS | | Martin, Ralph R/NO - 9    12-12-62 | Management Analyst, GS-343-13 | Environmental Protection Agency, Alexandria, VA |
| NS | 5/15/03 | Portillo, Ricardo R. ✓ R/NO - 9    8-19-46 | Administrative Officer, GM-341-13 | NPS, Pacific West Region Boulder City, NV |
| NS | | Smith, Michael J. R/NO - 9    6-17-57 | Program Analyst, GS-343-13 | Naval Medical Command San Diego, CA |
| NS | | Welch, Ruth R/NO - 9    3-23-64 | Asst. Field Manager, Administration GS-301-13 | Bureau of Land Management Milwaukee, WI |
| | | | | |
| | | | | |

| ISSUING OFFICER (SIGNATURE) JOYCE SASSER  *Joyce M. Sasser* | TITLE HUMAN RESOURCES SPECIALIST | DATE 04/24/03 |
|---|---|---|

OFFICE FOR HUMAN RESOURCES REVIEW:

PROPOSED EOD DATE: _____

THIS CERTIFICATE IS VALID THROUGH CLOSE OF BUSINESS    May 23, 2003

| SELECTING OFFICIAL (SIGNATURE)  *Morgan M. Lawler* | TITLE *Dep. Reg. Director* | DATE 5/27/03 |
|---|---|---|
| CONCURRING OFFICIAL (SIGNATURE) | TITLE *Regional Director* | DATE 5/27/03 |
| AUTHORIZING OFFICIAL (SIGNATURE) | TITLE | DATE |

Exhibit 13 A
Page 1 of 2 pages.



# United States Department of the Interior

### NATIONAL PARK SERVICE
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

IN REPLY REFER TO:

| *SELECTION CERTIFICATE* | ***COMPETITIVE*** | | |
|---|---|---|---|
| ISSUING OFFICE DIVISION OF HUMAN RESOURCES | ISSUE TO: REGIONAL DIRECTOR, NATIONAL CAPITAL REGION | TYPE OF REFERRAL REASSIGNMENT | GRADE LEVEL CERTIFIED GS-14 |
| ANNOUNCEMENT NO. NPS-NCR-03-19 | POSITION TO BE FILLED (TITLE, SERIES, GRADE): ADMINISTRATIVE OFFICER (ARD, ADMN.) GS-341-14/15 | | DUTY STATION : WASHINGTON, DC |

TYPE OF APPT./WORK SCHEDULE (MARK ONE) :  __X_  PFT     ____  PPT (NO. OF HRS/WK ____)     ___ TEMP NTE :

| ACTION | DATE INTERVIEWED | NAME | PRESENT POSITION (TITLE, SERIES, GRADE) | PRESENT AGENCY & DUTY STATION |
|---|---|---|---|---|
| NS | | Bradshaw, Karen L.  *00B*  *R/NO - 9*     *6-16-64* | Administrative Officer, GS-341-14 | Dept. of Justice, Washington, DC |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| ISSUING OFFICER (SIGNATURE)  JOYCE SASSER | TITLE HUMAN RESOURCES SPECIALIST | DATE 04/24/03 |
|---|---|---|

OFFICE FOR HUMAN RESOURCES REVIEW:

PROPOSED EOD DATE: _____

THIS CERTIFICATE IS VALID THROUGH CLOSE OF BUSINESS  May 23, 2003

| SELECTING OFFICIAL (SIGNATURE) | TITLE *Dep R.D.* | DATE |
|---|---|---|
| CONCURRING OFFICIAL (SIGNATURE) | TITLE | DATE |
| AUTHORIZING OFFICIAL (SIGNATURE) | TITLE | DATE |

Exhibit 13 A
Page 2 of 2 pages

5

# United States Department of the Interior

### NATIONAL PARK SERVICE
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

IN REPLY REFER TO:

---

*SELECTION CERTIFICATE*      **COMPETITIVE**

| ISSUING OFFICE DIVISION OF HUMAN RESOURCES | ISSUE TO: REGIONAL DIRECTOR, NATIONAL CAPITAL REGION | | TYPE OF REFERRAL PROMOTION | GRADE LEVEL CERTIFIED GS-15 |
|---|---|---|---|---|
| ANNOUNCEMENT NO. NPS-NCR-03-19 | POSITION TO BE FILLED (TITLE, SERIES, GRADE): ADMINISTRATIVE OFFICER (ARD, ADMN.) GS-341-14/15 | | | DUTY STATION: WASHINGTON, DC |

TYPE OF APPT./WORK SCHEDULE (MARK ONE): __X_ PFT  ____ PPT (NO. OF HRS/WK ____)  ___ TEMP NTE:

| ACTION | DATE INTERVIEWED | NAME | PRESENT POSITION (TITLE, SERIES, GRADE) | PRESENT AGENCY & DUTY STATION |
|---|---|---|---|---|
| NS | | Clutch Jr., Dan B. | Project Manager, GS-301-14 | Dept. of Health and Human Services Silver Spring, MD |
| S | 5/14/03 | Marshall, Dottie P. | Park Manager, GS-025-14 | NPS, George Washington Memorial Parkway McLean, VA |
| NS | | Primrose-Coates, Edna | Program Analyst, GS-343-14 | Dept. of Labor Washington, DC |
| | | | | |
| | | | | |
| | | | | |

| ISSUING OFFICER (SIGNATURE) JOYCE SASSER | TITLE HUMAN RESOURCES SPECIALIST | DATE 04/24/03 |
|---|---|---|

OFFICE FOR HUMAN RESOURCES REVIEW:

PROPOSED EOD DATE: _____

---

THIS CERTIFICATE IS VALID THROUGH CLOSE OF BUSINESS   May 23, 2003

| SELECTING OFFICIAL (SIGNATURE) | TITLE Dep Reg. Director | DATE 5/27/03 |
|---|---|---|
| CONCURRING OFFICIAL (SIGNATURE) | TITLE Regional Director | DATE 5/27/03 |
| AUTHORIZING OFFICIAL (SIGNATURE) | TITLE | DATE |

Exhibit 2
Page 44 of 117 pages



# United States Department of the Interior

NATIONAL PARK SERVICE
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

IN REPLY REFER TO:

| *SELECTION CERTIFICATE* | ***NON-COMPETITIVE*** |
|---|---|

| ISSUING OFFICE DIVISION OF HUMAN RESOURCES | ISSUE TO: REGIONAL DIRECTOR, NATIONAL CAPITAL REGION | TYPE OF REFERRAL REASSIGNMENT | GRADE LEVEL CERTIFIED GS-15 |
|---|---|---|---|
| ANNOUNCEMENT NO. NPS-NCR-03-19 | POSITION TO BE FILLED (TITLE, SERIES, GRADE): ADMINISTRATIVE OFFICER (ARD, ADMN.) GS-341-14/15 | | DUTY STATION : WASHINGTON, DC |

TYPE OF APPT./WORK SCHEDULE (MARK ONE) :  __X_ PFT  ____ PPT (NO. OF HRS/WK ____)  ___ TEMP NTE :

| ACTION | DATE INTERVIEWED | NAME | PRESENT POSITION (TITLE, SERIES, GRADE) | PRESENT AGENCY & DUTY STATION |
|---|---|---|---|---|
| NS | | Beckett, Corey A.  R/NO – 9   11-19-68 | Supv. Program Analyst, GS-343-15 | Dept. of Navy, Arlington, VA |
| NS | 5/15/03 | Ferranti, Thomas J.  R/NO – E   11-29-54 | Administrative Officer, GS-341-15 | NPS, Alaska Region Anchorage, AK |
| | | Roche, Charles P.  R/NO – 9   1-18-50 | Deputy Director-Finance/Admin. Management, GS-301-15 | Merit Systems Protection Board, Washington, DC |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*DOB* (handwritten above NAME column)

| ISSUING OFFICER (SIGNATURE) JOYCE SASSER | TITLE HUMAN RESOURCES SPECIALIST | DATE 04/24/03 |
|---|---|---|

OFFICE FOR HUMAN RESOURCES REVIEW:

PROPOSED EOD DATE: _____

THIS CERTIFICATE IS VALID THROUGH CLOSE OF BUSINESS  May 23, 2003

| SELECTING OFFICIAL (SIGNATURE) | TITLE Dep. Reg. Director | DATE 5/27/03 |
|---|---|---|
| CONCURRING OFFICIAL (SIGNATURE) | TITLE Regional Director | DATE 5/27/03 |
| AUTHORIZING OFFICIAL (SIGNATURE) | TITLE | DATE |

Exhibit 14 



# United States Department of the Interior

**NATIONAL PARK SERVICE**
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

IN REPLY REFER TO:

| SELECTION CERTIFICATE | *NON-COMPETITIVE* |
|---|---|

| ISSUING OFFICE DIVISION OF HUMAN RESOURCES | ISSUE TO: REGIONAL DIRECTOR, NATIONAL CAPITAL REGION | TYPE OF REFERRAL  REPROMOTION | GRADE LEVEL CERTIFIED GS-15 |
|---|---|---|---|
| ANNOUNCEMENT NO.  NPS-NCR-03-19 | POSITION TO BE FILLED (TITLE, SERIES, GRADE):  ADMINISTRATIVE OFFICER (ARD, ADMN.) GS-341-14/15 | | DUTY STATION :  WASHINGTON, DC |

TYPE OF APPT./WORK SCHEDULE (MARK ONE) :  __X__ PFT    ____ PPT (NO. OF HRS/WK ____)    ___ TEMP NTE :

| ACTION | DATE INTERVIEWED | NAME | PRESENT POSITION (TITLE, SERIES, GRADE) | PRESENT AGENCY & DUTY STATION |
|---|---|---|---|---|
| NS | | McKenna, John ✓  DOB  9-12-49  R/NO - 9  5/16  Work Phone | Park Manager, GS-025-14 | NPS, Northeast Region  Gettysburg, Natl. Mil. Park  Gettysburg, PA |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| ISSUING OFFICER (SIGNATURE)  JOYCE SASSER | TITLE  HUMAN RESOURCES SPECIALIST | DATE  04/24/03 |
|---|---|---|

OFFICE FOR HUMAN RESOURCES REVIEW:
PROPOSED EOD DATE: _____

THIS CERTIFICATE IS VALID THROUGH CLOSE OF BUSINESS  May 23, 2003

| SELECTING OFFICIAL (SIGNATURE) | TITLE  Reg. Dir. | DATE  5/14/03 |
|---|---|---|
| CONCURRING OFFICIAL (SIGNATURE) | TITLE | DATE |
| AUTHORIZING OFFICIAL (SIGNATURE) | TITLE | DATE |

Exhibit 14
Page 3 of 3 pages

# EXHIBIT
# 28

1

BEFORE THE
U.S. DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

In the Matter of:                    :

SANDRA L. AGILAR                     :

    Complainant,                     :
                                         :    CASE NO:
    v.                               :    FNP-2003-064

U.S. DEPARTMENT OF INTERIOR,         :
NATIONAL PARK SERVICE                :

    Agency.                          :
                                     :

Tuesday,
August 19, 2003

National Park Service
1100 Ohio Drive, S.W.
2nd Floor Conference Rm.
Washington, DC

Sworn statement of:

JOSEPH M. LAWLER

EEO INVESTIGATOR:

    Carl Bradley

Exhibit 7A

---

2

1                P R O C E E D I N G S

2                          1:40 p.m.

3        INVESTIGATOR BRADLEY: My name is Carl

4 Bradley, Jr. I'm an EEO investigator. I've been

5 assigned to investigate a formal complaint of

6 discrimination filed against the National Park Service,

7 filed by Ms. Sandra L. Agilar, Docket No. FNP-2003-064.

8        The following claim has been accepted for

9 investigation. Complainant alleges discrimination

10 based on her race (Hispanic), national origin (Mexican-

11 American) and age (51) when she was not selected for

12 the position of Administrative Officer, GS-341-15,

13 advertised under vacancy announcement number NPS-NCR-

14 03-19.

15        She became aware of the alleged act of

16 discrimination on or about July 7, 2003.

17        I am required to solicit sworn testimony from

18 those persons with knowledge or information pertaining

19 to the claim that has been accepted for investigation.

20 Inasmuch as this is sworn testimony, I am required to

21 administer an oath.

22        Do you have any conscientious objection to

23 being placed under oath?

24        MR. LAWLER: No.

25        INVESTIGATOR BRADLEY: Would you raise your

---

3

1 right hand, please?

2        Do you solemnly swear that the information

3 you are about to provide in your testimony is true and

4 correct, so help you God?

5        MR. LAWLER: Yes.

6            EXAMINATION

7        BY INVESTIGATOR BRADLEY:

8   Q   What is your full name?

9   A   Joseph M. Lawler.

10   Q   Inasmuch as this complaint is filed on the

11 bases of race, national origin and age, I'm required to

12 identify each witness according to the bases of this

13 complaint.

14        What is your race?

15   A   I'm white.

16   Q   What is your national origin?

17   A   Let's see. I'm Irish-American.

18   Q   What is your date of birth?

19   A   [        ]

20   Q   And how old would that currently make you?

21   A   53.

22   Q   What is your current position title and

23 grade?

24   A   Deputy Regional Director, GS-15.

---

4

1   Q   What's the complete organizational name of

2 your place of employment?

3   A   It's the National Park Service, National

4 Capital Region.

5   Q   Are you employed within a particular office

6 in the National Capital Region?

7   A   I'm the Deputy Regional Director so I'm in

8 the Office of the Regional Director.

9   Q   How long have you been employed in your

10 current position?

11   A   Seven years.

12   Q   Who is your immediate supervisor?

13   A   Terry Carlstrom.

14   Q   And what is his title?

15   A   He's the Regional Director.

16   Q   Did you have any involvement in the selection

17 process for the Administrative Office position in

18 question?

19   A   Yes.

20   Q   What's the nature of your involvement?

21   A   Collectively we interviewed the applicants

22 and pretty much made the decision as a joint decision.

23   Q   Did you have any involvement in the rating

24 and ranking of applicants?

5

1    A    Not rating and ranking. That was done by a
2  personnelist and by a panel, I believe.
3    Q    Where was the vacancy in question located?
4    A    It's here in this building right outside the
5  door. It's the Associate Regional Director for
6  Administration for this region of the Park Service.
7    Q    Did you have any involvement in developing
8  the vacancy announcement?
9    A    You know, that's normally done by a
10 personnelist. I might have reviewed it. I can't tell
11 if I reviewed it. The Personnel Office normally does
12 that. We probably had a standard one that was done for
13 the predecessor and it's probably fair to assume that.
14 I really can't recall whether I reviewed the vacancy
15 announcement.
16   Q    What was the area of consideration for the
17 position in question?
18   A    It was -- eventually it became all sources, I
19 believe.
20   Q    What was it initially?
21   A    I think it was initially -- it was within our
22 Department.
23   Q    Was the vacancy announcement amended?
24   A    It was amended. There had been a directive

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

6

1  by our former Director for certain positions to go to a
2  wider audience, and I guess that meant all sources for
3  jobs such as this. And we were contacted -- again, my
4  recall. I think we were contacted by the Washington
5  Office to follow that directive on this particular
6  announcement.
7    Q    Do you know why the announcement wasn't
8  initially advertised as all sources?
9    A    I really don't. Maybe it was an
10 administrative slip. I don't think that directive had
11 been enforced widely since the previous Director had
12 left.
13        I don't remember it being an issue on any
14 other jobs.
15   Q    Was the announcement amended in any other way
16 other than expanding the area of consideration?
17   A    Not that I'm aware of, no. That would be a
18 question for the personnelist but I don't think it was.
19   Q    At what grade level was the announcement
20 initially advertised?
21   A    I can't recall. Maybe it was the 15.
22   Q    What grade level was the announcement
23 subsequently advertised?
24   A    I think it was brought down to a 14/15. And

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

7

1  again, I could be wrong on that. That's my recall.
2    Q    Did you have any involvement in the rating
3  and ranking process?
4
5    A    No. Just the interview process and, along
6  with the Regional Director, discussing the applicants
7  and their strengths and together coming to a consensus
8  on the best candidate.
9    Q    What information was provided by Personnel to
10 you and Mr. Carlstrom after the rating and ranking
11 process, after the certificates had been issued?
12   A    What information?
13   Q    What documentation.
14   A    The applications, the KSAs and the list of
15 eligible candidates.
16   Q    Do you recall receiving certificates of
17 eligibles for both status and non-status applicants?
18   A    I believe we probably had five or six
19 different lists to choose from, and some were status.
20 Some were non-status.
21   Q    Were any or all of the candidates whose names
22 appeared on the certificates interviewed?
23   A    Were any and all?
24   Q    Any and/or all.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

8

1    A    Some were but not all.
2    Q    Who made the decision about which candidates
3  were going to be interviewed?
4    A    I think the Regional Director and I scanned
5  them and we discussed it and we pretty much decided who
6  we thought would be the lead people based on what we
7  felt our needs were for this job.
8    Q    Were candidates who were selected for
9  interviews, were they chosen from all of the
10 certificates?
11   A    I don't think so. I don't think we looked at
12 non-status. I think we looked at just status only.
13   Q    Why didn't management look at the non-status
14 certificate of eligibles?
15   A    I guess it was our decision or our thinking,
16 our collective thinking that the needs were so pressing
17 and so important to us and so critical to us continuing
18 to get our work done that we wanted to have experienced
19 people in our organization who could walk in the door
20 with a good background in how we operate and do our
21 business, and aware of the current administrative
22 thrust in our organization so they could come in and
23 perform real quickly at a top rate.
24   Q    Could you elaborate on what those pressing

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

9

1  needs were?

2      A    I can elaborate somewhat.  My greatest

3  concern -- I don't know what -- if you asked this

4  question of the Regional Director.  From my own

5  perspective, we have a real glaring need in a couple of

6  areas.  One of them is we have a construction program

7  that's very active, big, multi-million dollar

8  construction job.  So an intimate knowledge of that

9  process and all the approvals and all the requirements

10 and getting the contracts out the door and supervising

11 those kind of projects.  That's certainly critical to

12 us.

13          Secondly, the budget is not really a very

14 rosy forecast over the next few years and I really felt

15 someone with really detailed knowledge of the NPS

16 budget process would be extremely helpful.  And the

17 eventual successful candidate was top drawer in that

18 category, as well as in the construction category.

19          We also have a current emphasis on out --

20 well, out-sourcing is not the word.  Competitive

21 sourcing.  Putting some of our in-house jobs up for

22 competition.

23          So someone who knows about that and about our

24 maintenance jobs and about delivery of those services

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

10

1  within our parks.  Someone with a park operational

2  background would be very helpful.

3      Q    How many applicants were interviewed?

4      A    I believe we interviewed four.  We had

5  planned to interview a fifth and the gentleman declined

6  for some -- I think it was health reasons.  Yes.  He

7  declined.  They thought they move would not be good at

8  the time.  So four eventually.

9      Q    From which certificates did those applicants

10 come from?

11     A    I'd have to look at them.  I know the

12 individuals names.  I'd have to look at which

13 certificates they were on.

14     Q    Could you articulate the names of those

15 individuals?

16     A    Sure.  We interviewed Dottie Marshall, who

17 eventually was our selectee.  A gentleman named Tom

18 Ferranti, who's in Alaska; another gentleman right here

19 in our Regional office named Ken Brody; and I believe

20 the fourth gentleman was Ricardo Portillo, who's from

21 one of our Western parks.

22     Q    Do you recall which candidate declined?

23     A    I think his name was John McKenna, and he's

24 up in Gettysburg.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

11

1      Q    Were all of the applicants asked the same

2  questions?

3      A    Yes.

4      Q    Did you maintain or keep notes of the

5  interviews?

6      A    I kept some notes.  I'll be honest.  My boss

7  is a much better notekeeper and I rely on his notes

8  probably even more than my own, but I did have some

9  notes that I scratched down during the process as well.

10     Q    Who was selected for the position in

11 question?

12     A    The woman's name is Dottie Marshall.

13     Q    What was the selected candidate's position

14 title and grade at the time of her consideration for

15 the position in question?

16     A    She was the Deputy Superintendent of our park

17 across the river, George Washington Memorial Parkway.

18 And GS-14.

19     Q    From which certificate was the selection

20 made?

21     A    That one I guess it had to be a promotion,

22 the merit promotion certificate.

23     Q    What was the basis for the selection of Ms.

24 Marshall?  I'd like for you to elaborate on that.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

---

12

1      A    Some of the things I talked to in the

2  previous question.  Dottie Marshall brought all those

3  experiences to us.  Probably the best person in this

4  region, including our current budget officer, in terms

5  of her knowledge and expertise in developing a budget,

6  especially a budget that goes through the NPS budget

7  process.

8          She's been doing that.  She was previously

9  our budget office for the region.  So she brings a

10 tremendous amount of expertise from the technical side

11 as well as the strategic side of it because she knows

12 the committee processes.  She knows that very well.

13 Knows the staff very well.

14          Extremely in depth knowledge of budget.

15 That's one.

16          Two, her most recent experience has been in a

17 very active park setting as the Deputy Superintendent

18 where she had lots of responsibilities for the

19 operations of the park.

20          So she would be able to do her new job with a

21 tremendous background in what our superintendents are

22 facing as they try to accomplish their mission in the

23 parks because she's been there recently.  She knows

24 what the problems they're facing so she brings that

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

13

1 knowledge to us, as well as her detailed knowledge of
2 budget.
3           And she's worked her way through the ranks.
4 She knows an awful lot about administration because of
5 her previous background as administrative officer in
6 several parks.
7           She's got a long, successful track record in
8 this region and throughout the Park Service.  She's
9 well known and well respected.
10      Q    Do you know the Complainant, Ms. Sandra
11 Agilar?
12      A    I do not know her.
13      Q    Did Ms. Agilar's name appear on any of these
14 certificates of eligibles?
15      A    Obviously she must have since we're in this
16 process.  I'm sure in the non-status certificate, she
17 would have been.
18      Q    Why weren't any of the non-status applicants
19 interviewed?
20      A    I guess some of what I talked about in the
21 rationale for selecting Ms. Marshall, as well as the
22 answer to the previous question is our needs were
23 immediate.  They're pressing:  They're important to us.
24           We felt that an individual with a current

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

14

1 skill set that matches up to our current needs would be
2 most helpful.  And this person clearly had that skill
3 set, as did some of the others, but I think Dottie was
4 the best.
5           So we were looking for candidates that
6 matched up to our current needs based on the management
7 challenges and areas of emphasis we just talked about.
8      Q    Was any consideration given to race in making
9 the selection for the position in question?
10      A    No.
11      Q    Was any consideration given to national
12 origin?
13      A    No.  We really selected the best qualified
14 person.  We interviewed a diverse group of people.
15      Q    Could you elaborate on that?
16      A    Yes.  As far as I can tell, I don't know Mr.
17 Portillo but he's got a Hispanic surname and I believe
18 he's of Hispanic origin.  Ken Brody, one of the
19 gentleman we interviewed, is a top-notch person.  He's
20 on our staff here currently, is an African-American.
21 And of course, Ms. Marshall is a white female.  So it's
22 a pretty diverse pool of interviewees.
23      Q    Was any consideration given to age in making
24 the selection?

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

15

1      A    No, no.
2      Q    It is the contention of Ms. Agilar that she
3 was not given equal consideration because she was not
4 interviewed as were other applicants.  How would you
5 respond to that contention?
6      A    She was not given --
7      Q    Equal consideration for the position in
8 question because she was not afforded an interview, as
9 were some of the other applicants.
10      A    That's a tough one to answer.  I guess most
11 applicants always feel they have a better opportunity
12 of being selected if they go face to face with the
13 interviewers.  In this case, we had -- I don't know how
14 many people we had.  Maybe 24, 30, 35 people that were
15 on the certs provided to us.
16           I've just never interviewed that many people
17 for a job.  Whenever we have that many applicants, we
18 try and do some kind of initial screening among
19 ourselves and then talk to who we think are the top
20 four to five people.
21           So, her point might be valid but
22 realistically we're not going to interview 35 people,
23 40 people, for a job.  I don't know who does that.
24      Q    Did you have any conversations or discussions

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

16

1 with Ms. Agilar regarding her non-selection for the
2 position in question?
3      A    No.  No.  I think they're notified via our
4 Personnel Office.  I think it's by a letter.
5      Q    Did the rating panel provide any
6 recommendations to either you and/or Mr. Carlstrom of
7 those candidates to be interviewed for the position in
8 question?
9      A    No.  They provided -- my understanding of how
10 the rating panel worked, or how they participated in
11 it, was they reviewed the applicants and then developed
12 their cut on whom they thought the best qualified
13 people were, and then we just were the recipients of
14 those lists.
15           But no recommendations.
16      Q    Did you and Mr. Carlstrom individually and/or
17 collectively make the decision about which candidates
18 would be interviewed?
19      A    When we made the decision?
20      Q    Yes.  About which candidates -- which
21 applicants would be interviewed?
22      A    Yes.
23      Q    Do you have any recollection or do you recall
24 the rating score assigned to Ms. Agilar on the non-

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

17

1 status certificate of eligibles?

2   A   Do I have any recollection?

3   Q   Yes.

4   A   No.

5   Q   Do you know if any applicants with veterans'
6 preference were ranked above or below Ms. Agilar?

7   A   I believe there were veterans at the top of
8 the cert. So unless she's a veteran, she probably
9 would have been below those people.

10      I believe there are some compensable
11 veterans, if that's the term, on the top of the cert.

12   Q   Were any of those candidates interviewed for
13 the position in question?

14   A   For the same reason we didn't interview Ms.
15 Agilar. We wanted people that possessed the current
16 skill set and knowledges and abilities to come in here
17 and work at a high level from day one on our current
18 issues.

19   Q   Are there any other comments you would like
20 to make on the record regarding the claim under
21 investigation in this EEO complaint?

22   A   No. Really not.

23      INVESTIGATOR BRADLEY: Your testimony will be
24 reduced to a typewritten transcript. You'll receive an

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

18

1 original and a copy. The copy is for your personal
2 records but please do not discuss or disclose any
3 information contained in your testimony.

4      Please read through the original transcript,
5 make whatever corrections or amendments you deem
6 appropriate. However, I ask that you make any and all
7 such corrections on the errata sheet which appears at
8 the end of the transcript.

9      Simply refer to the page and line of the text
10 that you wish to amend, sign the signature page, and
11 return the signed original transcript in a sealed
12 envelope to Ms. Joy Harris within three days after you
13 receive --

14      MR. LAWLER: That's how it will come to us,
15 through Joy Harris, I suspect. So it will get
16 delivered to us?

17      INVESTIGATOR BRADLEY: Yes. It will be
18 delivered to you in a sealed envelope, as well. No one
19 will know what's contained in your testimony. And
20 return it to Ms. Harris.

21      The transcript of your testimony will be
22 included in the report of investigation pertaining to
23 this complaint of discrimination.

24      MR. LAWLER: That's fine. Understood.

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

19

1      INVESTIGATOR BRADLEY: Are there any other
2 questions or comments you'd like to make?

3      MR. LAWLER: No.

4      INVESTIGATOR BRADLEY: If there are no further
5 comments, this concludes this interview. And I
6 appreciate your cooperation with the investigation of
7 this complaint.

8      (Whereupon, the proceedings were concluded at
9 2:00 p.m.)

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

20

1          REPORTER'S CERTIFICATE

2

3      This  is  to  certify  that  the  attached
4 proceedings before:

5      U.S. DEPARTMENT OF THE INTERIOR
6      NATIONAL PARRK SERVICE
7

8 In the Matter of:

9          SANDRA L. AGILAR

10             VS.

11      U.S. NATIONAL PARK SERVICE

12      SWORN STATEMENT OF JOESEPH M. LAWLER

13 were held as herein appears and that this is the
14 original transcript thereof for the file of the
15 Department, Commission, Board, Administrative Law Judge
16 or the Agency.

17      Further, I am neither counsel for or related
18 to any party to the above proceedings.

19

20
21                    *Peggy Daniels*
22                    Official Reporter

23

24 Dated:   August 21, 2003
      EXECUTIVE COURT REPORTERS, INC.
           301-565-0064                    20

22

## SIGNATURE OF WITNESS

I have read the foregoing transcript of my verbatim deposition consisting of 20 pages, taken on the 19th day of August, 2003 , and is a true and accurate record of my testimony except as to any corrections I have attached hereto.

PAGE LINE    CORRECTED TESTIMONY:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

EXECUTIVE COURT REPORTERS, INC.

22

---

23

PAGE LINE    CORRECTED TESTIMONY:

_____

_____

_____

_____

_____

_____

_____

_____

_____          8/26/03
Signature of Deponent              DATE

### CERTIFICATE OF NOTARY PUBLIC

The above signed did personally appear before me and signed the above document.

_____          _____
Date                      Notary Public in and for the
                          State of

                          My Commission expires:

EXECUTIVE COURT REPORTERS, INC.

23

# EXHIBIT
# 29

1

BEFORE THE
U.S. DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

In the Matter of:          :

SANDRA L. AGILAR           :

         Complainant,      :
                                     CASE NO:
     v.                    : FNP-2003-064

U.S. DEPARTMENT OF INTERIOR, :
NATIONAL PARK SERVICE        :

         Agency.           :

Tuesday,
August 19, 2003

National Park Service
1100 Ohio Drive, S.W.
2nd Floor Conference Rm.
Washington, DC

Sworn statement of:

         TERRY R. CARLSTROM

EEO INVESTIGATOR:

    Carl Bradley

Exhibit 6A

---

2

1                P R O C E E D I N G S

2                                      1:03 p.m.

3          INVESTIGATOR BRADLEY: My name is Carl

4 Bradley, Jr.  I'm an EEO investigator.  I've been

5 assigned to investigate a formal complaint of

6 discrimination filed against the National Park Service

7 by Ms. Sandra L. Agilar, Docket No. FNP-2003-064.

8          The following claim has been accepted for

9 investigation.  Complainant alleges discrimination

10 based on her race (Hispanic), national origin (Mexican-

11 American) and age (51) when she was not selected for

12 the position of Administrative Officer, GS-341-15,

13 advertised under vacancy announcement number NPS-NCR-

14 03-19.

15          The alleged act occurred on or about July 7,

16 2003.

17          I am required to solicit sworn testimony from

18 those persons with knowledge or information pertaining

19 to the claim that has been accepted for investigation.

20 Inasmuch as this is sworn testimony, I am required to

21 administer an oath.

22          Do you have any conscientious objection to

23 being placed under oath?

24          MR. CARLSTROM: No.

25          INVESTIGATOR BRADLEY: Would you raise your

---

3

1 right hand, please?

2          Do you solemnly swear that the information

3 you are about to provide in your testimony is true and

4 correct, so help you God?

5          MR. CARLSTROM: You bet.

6                EXAMINATION

7 BY INVESTIGATOR BRADLEY:

8     Q     What is your full name?

9     A     Terry R. Carlstrom.

10    Q     Inasmuch as this complaint is filed on the

11 bases of race, national origin and age, I'm required to

12 identify each witness according to the bases of the

13 complaint.

14          What is your race?

15    A     Caucasian.

16    Q     What is your national origin?

17    A     Swedish.  Half Swedish, half Austrian,

18 American.

19    Q     What is your date of birth?

20    A     [          ]

21    Q     And how old would that currently make you?

22    A     It makes me 62.  I'm painfully aware.

23    Q     What is your current position title and

24 grade?

---

4

1     A     Currently I'm the Regional Director, National

2 Capital Region in the Senior Executive Series, Grade 4.

3     Q     How long have you been employed in your

4 current position?

5     A     About seven years.

6     Q     Did you have any involvement in the selection

7 process for the position in question?

8     A     Yes.

9     Q     Were you the selecting official?

10    A     Along with Joe Lawler.

11    Q     And what is Mr. Lawler's title?

12    A     Deputy Regional Director.

13    Q     What was the extent of Mr. Lawler's

14 involvement?

15    A     We went through the applicants together and

16 then got the information from the panel and proceeded

17 to select those folks that we would interview.

18    Q     Where is the position in question located?

19    A     It's right across the hall.  Associate

20 Regional Director of Administration, 2nd floor,

21 Headquarters, National Capital Region.

22    Q     Did you have any involvement in establishing

23 the vacancy announcement for the position in question?

24    A     In terms of the vacancy announcement, looked

5

1 at the elements of it.  Yes.

2

3    Q    What was the area of consideration for the

4 position in question?

5    A    Well, initially the area of consideration was

6 Department wide, and then we expanded it to all

7 sources.

8    Q    Was the announcement amended?

9    A    It was amended to reflect that it would be

10 advertised to all sources and the -- I believe we

11 reduced it to a 14/15, so 13's could compete as well,

12 although I'm not sure.  I didn't review the vacancy

13 announcement before it got amended.

14    Q    Did you have any involvement in the decision

15 to amend the announcement?

16    A    Yes.

17    Q    What was the basis for your decision for

18 amending the announcement?

19    A    It was called to our attention that in -- I

20 think it was February of 1999, the then-Director of the

21 National Park Service, Robert Stanton, had put out a

22 memo indicating that positions should be advertised

23 service wide -- or, excuse me -- all sources, if they

24 were above and including grade 15.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

6

1    Q    Who brought this to your attention?

2    A    Initially it was brought to my attention by

3 Mel Reed, of the EEO office, who had contacts in the

4 Washington Office.  I don't recall who contacted him.

5    Q    Did you have any involvement in the rating

6 and ranking of the applicants' qualifications?

7    A    No.  Are you talking about the numerical

8 numbers associated with the ratings?

9    Q    Yes.  Yes.

10    A    No, not directly.

11    Q    What information was provided to you by

12 Personnel after the rating and ranking process had been

13 completed?

14    A    The cert with all the applicants.  There was

15 something like 40 or 46-47 various folks that applied

16 for the position.

17    Q    Did you also receive the applications of

18 those candidates whose names appeared on all of the

19 certificates of eligibles?

20    A    Yes.

21    Q    Did you receive separate certificates for

22 non-status and status --

23    A    Yes.

24    Q    -- employees?  I mean applicants.  Excuse me.

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

7

1    A    Yes.

2    Q    Once you received the certificates of

3 eligibles, what action did you take?

4    A    We had a panel that looked at all the 47

5 people that had applied, all of the applicants.  And

6 from that, a list of individuals were defined as being

7 those that would be most qualified for the position.

8 And there was some 24 associated with that paring down

9 of the list.

10    It was primarily concentrated -- I looked at

11 all of them.  I did not look at each individual

12 application in total.  I scanned through them.  And the

13 panel provided me with a list of potential people that

14 we might want to look at for further evaluation through

15 the interview process.

16    Q    Did you have any interaction with the panel

17 after they completed their rating and ranking process?

18    A    No.

19    Q    Did you have any interaction with the rating

20 panel after the certificates were issued?

21    A    No.

22    Q    I was just a little confused when you said

23 that the panel provided you with a list of --

24    A    The panel provided me with a list of

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

8

1 individuals to go through the interview process but I

2 had no interaction with the panel during their rating

3 or after they completed their rating.

4    Q    In addition to the certificate of eligibles

5 for both status and non-status applicants, did you also

6 receive a list from the rating panel?

7    A    Yes.

8    Q    Does the rating panel normally provide the

9 selecting official with a list of applicants to be

10 interviewed?

11    A    Well, it was within my prerogative if I

12 wanted to go forward and interview those individuals or

13 additionals.  From a management perspective, I was

14 interested in those folks who -- and we were consistent

15 in doing that -- applying it to those that were

16 promotion eligible that were on the list.

17    And there were some 24 within that category.

18 And within that category, I was looking at those that

19 had the kind of background that we had defined in the

20 KSAs.

21    Q    How many names did the rating panel provide

22 to you of candidates to be interviewed?

23    A    I don't -- I said 24.  Those were the numbers

24 that were on the promotion eligible list.  I don't

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

9

1 recall the exact number that the panel gave to me.

2    Q    Did the panel have access to the list of non-

3 status eligibles?

4    A    I would prefer you check with Leslie Newman.

5    Q    Was consideration given to any of the --

6    A    I gave consideration to all 47 applicants.  I

7 didn't read all 47 of the applications in total.  I

8 scanned through them.  I identified in my mind that

9 some of these -- there were too many for me to review

10 in total, so a panel was put together to go through the

11 process of identifying those that would be in a

12 position for further interviews.  And on that basis, we

13 selected our interviewees.

14    Q    I'm just a little confused about -- I guess

15 part of this process.  I understand that the rating

16 panel did their rating and ranking of the applicants

17 and certificates of eligibles were issued for the

18 competitive and non-competitive status applicants.  And

19 there were certificates issued for the non-status

20 candidates.

21         If I understand you correctly, after you

22 received all of the certificates of eligibles, the

23 rating panel subsequently provided you with a list of

24 those candidates that were best desired for interview?

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

10

1    A    Well, to the best of my recollection.  Yes.

2    Q    But would the rating panel have had access to

3 the applications and/or the certificates for the non-

4 status?

5    A    I understand they looked at all 47.

6    Q    Okay.  How many candidates were interviewed?

7    A    Well, we had selected five to be interviewed

8 initially.

9    Q    Could you give me the names of those

10 candidates?

11    A    Yes.  I wrote them down.

12         Portillo.  He's like me, a National

13 Recreation Manager.  Tim Brody, who is the Chief of

14 Employer Relations here in the National Capital Region.

15 Dottie Marshall, Assistant Superintendent at George

16 Washington Memorial Parkway; and Ferranti, who is the

17 Associate Regional Director-Administration in Alaska;

18 and McKenna, who was the Administrator -- the head of

19 Administration for Gettysburg.  He was removed from

20 further consideration, but four were interviewed.

21    Q    Did any of the applicants who were

22 interviewed, were their names on any of the

23 certificates of eligibles for non-status applicants?

24    A    They were incorporated within the promotion

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

11

1 eligibles.  Ferranti was a 15 -- is a 15.  The others

2 were promotion eligible.

3    Q    Why weren't any of the non-status applicants

4 interviewed?

5    A    That's part of management prerogative, I

6 guess.  In this particular situation, this is a very

7 important position within the National Capital Region

8 and familiarity with what goes on as it relates to the

9 National Park Service and as it relates to the National

10 Capital Region is critical.

11         I can't have somebody walk in the door that

12 might not be able to start from the get-go with all the

13 things we're dealing with; with competitive sourcing,

14 with the competitive sourcing being the primary one.

15 But all our contracting activities that we currently

16 have, our huge line item construction program, our

17 security needs and requirements attendant to the

18 national icons, the Lincoln, the Jefferson, the

19 Washington Monument, including Reservation One, as it

20 relates to security, and the security of the Mall at

21 large.

22         All of those are connected directly with our

23 administrative needs and requirements.  So, I made that

24 determination that that was primary.  And that was a

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

12

1 key element in my thinking as I went through the

2 interview process, who could best meet those needs and

3 requirements and familiarization with the National Park

4 Service and the way it functions and the region, as it

5 relates to the National Park Service in these times of

6 security needs and competitive sourcing.

7    Q    Did both you and Mr. Lawler interview each of

8 the four applicants?

9    A    Yes.  Yes, we did.

10

11    Q    Were all the applicants asked the same

12 questions?

13    A    Yes, they were.

14    Q    Did you keep or maintain any notes of the

15 interviews?

16    A    Yes.  Leslie Newman has them.

17    Q    Okay.  -- for the position in question?

18    A    Dottie Marshall.

19    Q    From which certificate was Ms. Marshall

20 selected?

21    A    Promotion eligible.

22    Q    At what grade level was the selection made?

23    A    At a 15.

24    Q    What was Ms. Marshall's position title and

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

-13

1 grade at the time of her consideration for the position
2 in question?
3    A    14.  George Washington Memorial Parkway
4 Assistant Superintendent.
5    Q    What was the basis for your selection of Ms.
6 Marshall?
7    A    Expanding upon what I just said, her
8 familiarization with the National Capital Region and
9 experiencing positions not only within the Region, the
10 budget office within the Region, going back to 1981,
11 but also her experiences as the budget officer for
12 National Capital Park Central, involved in the
13 Everglades for a short period of time in the budget
14 officer's position.  Came back here after nine months
15 in that position and then was the budget officer of the
16 National Capital Region, and was then involved in the
17 Holocaust Memorial creation as the budget officer and
18 liaison with that group during its conception,
19 implementation and finally the construction activities.
20        And became budget officer, exhibiting again
21 the needs and requirements of managing a large budget
22 in the National Capital Region.  Then she was selected
23 to be the Acting Director of the Kennedy Center during
24 the time of transition from when we went to the

14

1 National Park Service to the Kennedy Center Board and
2 was removed from the National Park Service.  Was
3 instrumental in implementing that as well.
4        And then nine years of experience as an
5 Assistant Superintendent in a major national park.
6    Q    Do you know Ms. Sandra Agilar?
7    A    No.
8    Q    Was Ms. Agilar an applicant for the position
9 in question?
10    A    Yes.
11    Q    Do you know whether Ms. Agilar applied under
12 the initial or the amended announcement?
13
14    A    I don't recall.
15    Q    Did she apply as a status or a non-status
16 applicant?
17    A    As a non-status.
18    Q    At what grade level?
19    A    15, I believe.  I'm just recalling.  As I
20 recall.
21    Q    Did her name appear on any of the
22 certificates of eligibles?
23    A    It was on the non-status list that, as I
24 recall, had some veterans associated with that same

15

1 lists, that same list of eligibles.
2    Q    Do you know whether Ms. Agilar fell within
3 the area of consideration at the time she applied for
4 the position in question?
5    A    If she fell with in --
6    Q    The area of consideration at the time she
7 applied?
8    A    It was Department wide.  I don't think she
9 was employed with the Department of Interior.  I don't
10 recall.
11    Q    Is there any relationship between Ms.
12 Agilar's application and the decision to amend the
13 announcement to expand the area of consideration?
14    A    No.  And I can reiterate again it was based
15 upon I guess an oversight that was particular to the
16 entire National Park Service, a memorandum by a
17 previous Regional Director.  And it was called to our
18 attention and we felt it was best to again re-advertise
19 and expand the area of consideration.
20    Q    Were any of the -- well, was Ms. Agilar
21 interviewed for the position in question?
22    A    No.
23    Q    Were any of the candidates whose names
24 appeared on the non-status certificate of eligibles

16

1 interviewed for the position in question?
2    A    No.
3    Q    Who made the decision not to interview any of
4 those candidates?
5    A    Well, we mutually came to that agreement by
6 looking at the promotion eligibles.
7    Q    Were you aware of the rating and ranking
8 scores assigned to Ms. Agilar on the certificate of
9 non-status eligibles?
10    A    Did I see the number --
11    Q    Yes.
12    A    -- listed with the other?  Yes.  But I don't
13 recall what it was.
14    Q    Do you recall whether the names of any
15 candidates whose names appeared on the non-status
16 certificate of eligibles were designated as veterans'
17 preference?
18    A    I believe there were, yes.  As I recall,
19 there were some.
20    Q    Is there any requirement to select those
21 candidates with veterans' preference over those who do
22 not have non-veterans' preference?
23    A    Are there --
24    Q    Is there any requirement, any regulation?

17

1   A   Are there requirements?

2   Q   Yes.

3   A   As it relates -- excuse me.

4       INVESTIGATOR BRADLEY: Off the record.

5       (Off the record.)

6       INVESTIGATOR BRADLEY: Back on the record.

7       THE WITNESS: Yes.  There are requirements for

8   veterans based upon preference of military service,

9   whether it's active duty associated with wartime or

10  not, and if they've fulfilled the requirements of duty,

11  there are preference points identified.

12      In this particular case with all other things

13  being equal, we did not look at the cert to determine

14  whether or not some of those individuals would be in

15  that particular classification.  We had enough people

16  within the competitive -- in a position to

17  competitively compete for the jobs that we felt that it

18  was adequate for us to look at those positions and that

19  they would meet our needs.

20  Q   Was any consideration give to race in making

21  the selection for the position in question?

22  A   None whatsoever.

23  Q   Was any consideration given to national

24  origin?

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

18

1   A   None whatsoever.

2   Q   Was any consideration given to age?

3   A   None whatsoever.

4   Q   Were you aware of Ms. Agilar's race and/or

5   national origin at the time of her application for the

6   position in question?

7   A   No.

8   Q   How would you respond to Ms. Agilar's

9   contention that she was discriminated against because

10  she was not considered equally with the other

11  candidates because she was not interviewed for the

12  position in question?

13  A   I think I'd have to go back.  If I can go

14  back just for a minute --

15  Q   Sure.

16  A   -- to the race question.

17  Q   Sure.

18

19  A   Of the individuals, I didn't identify that

20  one of them is an African-American.  One of them.

21  Q   Are you saying the individuals who were

22  interviewed?

23  A   Yes.  That I saw.  One works here, so

24  obviously, I know.  Another one that applied is a

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

19

1   Hispanic.  Of course, one's a white female and one was

2   a white male.  So within the applicants that were

3   interviewed, the one that withdrew was a white male but

4   there was diversity involved with our selection at that

5   time.

6       As far as the question about whether or not

7   we were interested in looking at other individuals, in

8   particular Ms. Agilar, in terms of her capabilities as

9   it related to what I indicated earlier about we had a

10  specific thing in mind with regard to selecting someone

11  who had familiarity with the National Park Service, no.

12  Would it have made a difference?  I don't know.

13      I certainly could have chosen to interview

14  all 47 but that would have been a very difficult

15  situation.

16      So within my prerogative, I narrowed it down

17  with the assistance of the panel to those individuals

18  within the KSAs that we felt -- we felt -- could best

19  meet the needs we have within the National Capital

20  Region and the requirements of the job.

21  Q   Did you and Mr. Lawler have a second choice?

22  A   A second choice?

23  Q   Yes.

24  A   I tell you what.  It was pretty tough.  The

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

20

1   other three was actually a second choice.  If we went

2   and looked, I use a very crude numerical numbering

3   system.  I may have identified a second or may not

4   have.

5       But if you would ask me if we had a second

6   choice, it may have well been -- and I'll paraphrase

7   that.  If you're asking me, it probably would have been

8   Ken Brody.

9   Q   Did you have any discussions with Ms. Agilar

10  regarding her non-selection for the position in

11  question?

12  A   No.

13  Q   You indicated that you did keep notes or you

14  did provide the interview notes to Ms. Newman.

15  A   Ms. Newman.

16  Q   Would those notes contain the order of

17  ranking from you and Mr. Lawler?

18  A   No.  It's my -- he uses a similar system than

19  I use.  It's a grid system.  I just have filled out

20  KSAs, the particular areas I want to question, alluding

21  to your earlier statement where I can have consistency

22  in what I'm doing.  And I'm asking each individual to

23  assure that the same questions are asked.

24      And my responses are there in a grid kind of

EXECUTIVE COURT REPORTERS, INC.
(301) 565-0064

21

1 form for each interview on the X axis, the Y axis

2 having the specific questions.

3    Q    And you say Ms. Newman has access to that

4 information?

5    A    Yes.  She has it.

6    Q    Are there any other comments you would like

7 to make on the record regarding the claim that is under

8 investigation in this complaint?

9    A    Only that as related to the needs of the

10 National Capital Region, the requirements of the

11 position and the requirements and demands dealing with

12 security, dealing with the competitive sourcing that we

13 are involved with now and the nature of line item

14 construction program and other administrative

15 requirements, that through a process of selection and

16 by re-advertising to expand the area of consideration,

17 I firmly believe we made the best selection that we

18 possibly could have off the list that was provided to

19 us.

20         INVESTIGATOR BRADLEY: Your testimony will be

21 reduced to a typewritten transcript.  You'll be

22 provided with an original and a copy.  The copy is for

23 your personal records.  Please read the original

24 transcript and make whatever corrections or amendments

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

---

22

1 you deem appropriate on the errata sheet which appears

2 at the end of the transcript.

3         Sign the signature page and return the signed

4 original transcript in a sealed envelope to Ms. Joy

5 Harris's office within three days after you receive it.

6         MR. CARLSTROM: You bet.

7         INVESTIGATOR BRADLEY: If there are no further

8 comments, this concludes the interview.  And I

9 appreciate your cooperation with the investigation of

10 this complaint.

11         (Whereupon, the proceedings were concluded at

12 1:28 p.m.)

13

EXECUTIVE COURT REPORTERS, INC.

(301) 565-0064

---

23

1              REPORTER'S CERTIFICATE

2

3         This  is  to  certify  that  the  attached

4 proceedings before:

5         U.S. DEPARTMENT OF THE INTERIOR
6              NATIONAL PARRK SERVICE
7

8 In the Matter of:

9              SANDRA L. AGILAR

10                  vs.

11         U.S. NATIONAL PARK SERVICE

12    SWORN STATEMENT OF TERRY R. CARLSTROM

13 were held as herein appears and that this is the

14 original  transcript  thereof  for  the  file  of  the

15 Department, Commission, Board, Administrative Law Judge

16 or the Agency.

17         Further, I am neither counsel for or related

18 to any party to the above proceedings.

19

20
21                    *Peggy Daniels*
22                  Official Reporter

23

24 Dated:   August 21, 2003
         EXECUTIVE COURT REPORTERS, INC.          23
              301-565-0064

---

24

SIGNATURE OF WITNESS

I have read the foregoing transcript of my

verbatim deposition consisting of 22 pages, taken on the

19th day of August, 2003 , and is a true and accurate

record of my testimony except as to any corrections I

have attached hereto.

PAGE LINE      CORRECTED TESTIMONY:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

EXECUTIVE COURT REPORTERS, INC.          24
              301-565-0064

25

PAGE LINE    CORRECTED TESTIMONY:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Signature of Deponent            Date

CERTIFICATE OF NOTARY PUBLIC

The above signed did personally appear before me
and signed the above document.

_____                  _____
Date                      Notary Public in and for the
                          State of

                          My Commission expires:

                                                    25
        EXECUTIVE COURT REPORTERS, INC.
              301-565-0064

# EXHIBIT
# 30

**REBUTTAL STATEMENTS**
by
**SANDRA L. AGUILAR**
Case No.: FNP-2003-064

### Rebuttal to the Testimony of Terry R. Carlstrom

Under Section 1607.17 of the Code of Federal Regulations, Title 29, Volume 4, Parts 900-1899, Revised as of July 1, 2000, there is a section titled the Uniform Guidelines on Employee Selection Procedures (Part 1607) it states "Equal employment opportunity is the law of the land. In the public sector of our society this means that all persons, regardless of race, color, religion, sex, or national origin shall have equal access to positions in the public service limited only by their ability to do the job. There is ample evidence in all sectors of our society that such equal access frequently has been denied to members of certain groups because of their sex, racial, or ethnic characteristics. The remedy for such past and present discrimination is twofold: a) vigorous enforcement of the laws against discrimination, and 2) affirmative, voluntary efforts on the part of public employers to assure that positions in the public service are genuinely and equally accessible to qualified persons, without regard to their sex, racial, or ethnic characteristics. Without such efforts equal employment opportunity is no more than a wish." See Item A.

My interpretation of the Code, now and when I was the Deputy Director for Operations at the U.S. Department of Health and Human Services and as so mentioned has also served as a selecting official, with regard to the use of selection procedures, is that the selection process used is to be fair and trustworthy, giving all applicants equal consideration under the same set of standards, by utilizing procedures that have been demonstrated to have minimal adverse impact. In addition to, taking into consideration, alternative selection procedures that would further reduce adverse impact to any particular groups as identified in Title 29.

It is my perception and belief that I, an Hispanic woman, was discriminated against on the basis of race, national origin and age when on July 7, 2003, I was informed that I was not selected for the position of Administrative Officer (Associate Regional Director, Administration) for the National Park Service, National Capital Region. The person selected for this position was a white Anglo woman, younger in age than me.

I contend that the selection procedures used by the previous Administrative Officer, the staff in the Office of Administration and staff in the Office of Human Resources, and the selecting officials to select the candidate to fill the vacancy of Administrative Officer (Associate Regional Director, Administration) (Vacancy Announcement Number NPS-NCR-03-19) are evident of having an adverse impact on myself, an Hispanic, more importantly–an Hispanic woman. I further contend that the former Administrative Officer and the selecting officials knowingly and willfully manipulated the system before and after the vacancy announcements were published in such a manner that they were able to hire a candidate they had pre selected prior to publically announcing the vacancy.

The following are my rebuttal statements and questions to the sworn statements given by Mr. Terry R. Carlstrom, Regional Director for the National Park Services' National Capital Region.

RECEIVED
DEC 10 2003
NATIONAL PARK SERVICE
EQUAL OPPORTUNITY OFFICE

The question was, "How long have you been employed in your current position?"

4    5          Mr. Carlstrom responded by saying, "About seven years."

**Rebuttal**: Yes, Mr. Carlstrom has been serving in his current position for seven years. But, prior to being appointed the Regional Director, he served as the Acting Regional Director following the retirement of Robert G. Stanton on January 3, 1997. Mr. Carlstrom was also the Deputy Regional Director for the National Capital Region from August 1994 to January 1997. Mr. Robert Stanton returned to the National Park Service as its National Director on June 28, 1997, as a Presidential appointee and served in that capacity until January 2001.

Mr. Carlstrom worked directly under Robert Stanton for three years as Mr. Stanton's Deputy Director and as Regional Director he worked under Mr. Stanton for four more years. Mr. Carlstrom knew about the efforts Mr. Stanton was making to make job acquisition easier to obtain for those outside of government and to further diversify the National Park Service and the National Capital Region. He knew Mr. Stanton wanted to hire more Hispanics, especially for the National Capital Region (NCR), which is grossly underrepresented. To date there is only one Hispanic manager at a GS-12 level at NCR. To my knowledge there has never been an Hispanic manager above a GS -12. I believe the last and only Hispanic manager in the National Capital Region was hired 12 years ago. As of March 31, 2000, the Department of the Interior recorded a workforce numbering 57,159. Of the 57,159 only 4.8% were Hispanics Americans. Awareness of Hispanic underrepresentation had been growing for years. The White House, in 1996, directed government officials to put policies and programs in place to address this issue. Henceforth, the National Park Services' Management Succession Plan dated February 1999, was put into force, of which Mr. Carlstrom was involved.  See Item B.

In addition, Executive Order 13171 was issued on October 12, 2000, addressing the issue of continued underrepresentation of Hispanic Americans in the federal workforce and it directs departments and agencies to develop remedies to improve the representation of Hispanic Americans in Federal employment, including broadening the area of consideration, ensuring that selection factors are appropriate and achieve the broadest consideration of applicants and do not impose barriers to selection based on nonmerit factors, and consider appointing Hispanic Federal executives to rating, selection, performance review and executive resources panels and boards. See item C.

On January 18, 2001, Executive Order 13197, Government Accountability for Merit System Principles was implemented. This Executive Order established Civil Service Rule X, which gives the Office of Personnel Management the authority to require and hold accountable agencies to

establish and enforce an Human Resource Management Accountability System.

Currently, the number of people working in the 341 job series at the National Capital Region, which is the job series I applied to at the National Capital Region, is 15. Of the 15, 12 are women—80%. The breakdown by race and ethnicity is 3 white men—20%, 9 white women—60%, and 3 Black women—20%.

**Q.**   How many vacancies in the National Capital Region have been filled since Mr. Carlstrom became Acting Regional Director and Regional Director?

**Q.**   Of those vacancies how many were managerial positions and at what grade levels?

**Q.**   During the seven years Mr. Carlstrom has been the Regional Director, how many people has he hired, appointed, or transferred to his region prior to April 30, 2003? Of those that he has hired, appointed, or transferred to his region, how many are white, Black, Hispanic, Asian/Pacific Islanders, and Native Americans or Alaskan Natives?

**Q.**   When was Mr. Carlstrom's last SES recertification?

**Q.**   Who recertified him?

**Q.**   Why was he recertified?

The questions was, "Did you have any involvement in establishing the vacancy announcement for the position in question?"

4    24    Mr. Carlstrom responded by saying, "In terms of the vacancy announcement, looked at the elements of it. Yes."

**Rebuttal:** As a manager charged with the responsibility for hiring employees and approving the employee hires by his management team for the region, it is incumbent upon that manager to review every aspect of a vacancy announcement, cite changes that need to be made in order to keep the agency in compliance and to sign-off on it's final language, dates and criteria, especially when the Director of Administration who has first-line oversight is leaving or is absent. Mr. Carlstrom has been the Regional Director for seven years and a senior staff member of the National Park Service. As a senior staff member he has been a member of the Park Service's National Leadership Council from at least 1998. This Council approved the Modified Plan for Management Succession (as instructed by the President and the then National Park Service Director, Robert Stanton) and the distribution of copies to all managers and employees in

-3-

February of 1999. Mr. Carlstrom knew of this policy, was involved in its creation, was responsible for its distribution to his Regional Office and Park managers and is responsible for implementing this policy. He purposely chose not to comply. Mr. Carlstrom admits that he looked at the elements of the vacancy announcement, the primary elements would include the area of consideration, grade level, opening and closing dates, and the KSAs. It was at this time he should have implemented the policy.

I believe Mr. Carlstrom was well aware of all aspects of the vacancy announcement, as was his former Administrative Officer (Associate Regional Director for Administration), Mr. Dick Powers. Mr. Powers did not retire from his position until April 30, 2003. Mr. Carlstrom determined that Mr. Power's replacement would be hired by May 1, 2003. It was know by several people in the Regional Office that Mr. Carlstrom wanted Mr. Powers replacement on the job by May 1. They had both predetermined who would replace Mr. Powers. The name Dottie Marshall was circulated amongst some of the staff in the Regional Office as the replacement of choice. I believe that Mr. Powers, prior to his leaving, and in concert with Mr. Carlstrom and Mr. Lawler, was involved in establishing the vacancy announcement, determining the weights for the Knowledge, Skills, and Abilities (KSAs), and helped determine who his replacement would be before the first vacancy announcement was published. Mr. Powers was still employed with regional office when the applications for his position were received and during the most of the selection process. In fact, he was still Ms. Leslie Newman's supervisor. Ms. Newman is the supervising Human Resource Specialist for the Division of Human Resources–she reports directly to Mr. Powers. She was the person responsible for advertising the vacancy, collecting the applications, and rating and ranking the applicants for basic qualifications.

Furthermore, the Human Resource Staffing Specialists write up the vacancy announcements according to the instructions they receive from their supervisors and upper level management. They produce drafts and make recommendations but, are ultimately told what to write and how to write it.

The position advertised was for Administrative Officer (Associate Regional Director, Administration) with the emphasis on Administrative Officer. The opening date of the vacancy announcement was March 10, 2003. Mr. Powers did not retire from the National Capital Region until April 30, 2003. Mr. Powers had the most input into how the vacancy announcement would be set up (i.e., what to ask in the KSAs, how to write up the KSAs, what rating each level of the KSAs would be given, what Factor Weights would be given to each KSA, the area of consideration, the grade and salary levels, and the opening and closing dates).

The most important and key elements used to determine if applicants qualify for a position are the assessments of how well an applicant's knowledge, skills and abilities match up to the required knowledge, skills

-4-

and abilities needed for the job. This is how the elements of the KSAs were listed in the vacancy announcement for this particular position, of which Mr. Carlstrom approved:

The first KSA Title called for Administrative/management, support functions such as human resources, budget, contracting/ procurement, property management, information management, and other related administrative support services. The Factor Weight for this KSA was only one (1), with rating scores of 3 for Level III, 2 for Level II, and 1 for Level I.

The second KSA Title called for Skill in negotiating and resolving complex problems in a leadership role with subordinates, peers, managers, and representatives at various levels. The Factor Weight for this KSA was three (3), with rating scores of 9 for Level III, 6 for Level II, and 3 for Level I.

The third KSA Title called for Ability to develop, analyze, review and appraise for effectiveness of administrative policies, programs, and practices. The Factor Weight for this KSA was a two (2), with rating scores of 6 for Level III, 4 for Level II, and 2 for Level I.

The fourth KSA Title called for Ability to interact and communicate at all levels. The Factor Weight for this KSA was two (2), with rating scores of 6 for Level III, 4 for Level II, and 2 for Level I.

The fifth KSA Title called for Ability as a manager to direct a support staff comprised of a range of technical and professional individuals. The Factor Weight for this KSA was (2), with rating scores of 6 for Level III, 4 for Level II, and 2 for Level I.

KSAs number three through five are consistent in rating score and weight. However, KSAs number one and two show a tremendous deviation, not just between one another, but also in comparison to the other three KSAs. I believe it is more than coincidental to see that KSA number two plays up to the selectee's, Ms. Dottie Marshall's, strengths while KSA number one is played down, because she is weak in this particular requirement. The primary function for this position is for Administrative Officer. KSA number one should have had a much higher rating over KSA number 2. KSA Titles 3 and 5 should have had a higher rating then KSA Titles 2 and 4. KSA Titles 1, 3 and 5 should have had Factor Weights greater than KSA Titles 2 and 4. Unless of course, the position description was changed or the Regional Office structure was changed to meet Ms. Marshall's personal qualifications prior to Mr. Powers departure. I believe that while Mr. Powers served in his position as Administrative Officer he did not have oversight responsibility for the Regional Budget Office and the Budget Officer did not report to the Administrative Officer. I believe that for several years the Budget Officer reported directly to the Regional Director. However, in this vacancy announcement it is very clear that the Administrative Officer will have oversight authority over the Budget Office

-5-

and Budget Officer Budget is Ms. Marshall's strongest suite as is project management.

**Q.**   Why was Mr. Dick Powers not interviewed or asked to give testimony for this complaint?  I don't believe it matters that he is no longer in Federal service.

**Q.**   What are the "elements" Mr. Carlstrom is referring to here?

**Q.**   Mr. Carlstrom indicated that he was involved in establishing the vacancy announcement.   Was his involvement in concert with that of Mr. Dick Powers?

**Q.**   Why was the vacancy initially announced Departmentwide only?

**Q.**   It is not unusual to employ a former employee on a contractual basis for consultation services, particularly if the former employee is an expert in a particular area.  To what extent did Mr. Carlstrom use Mr. Dick Powers as a consultant for Administration Guidance after he left the Park Service?  And, when was his ability to access his computer stopped?  When did his consultation services end?

**Q.**   Was Mr. Carlstrom involved in the writing of the KSAs?  Did he approve the final version of the KSAs?

**Q.**   Was Mr. Carlstrom involved in assigning the point values to each of the KSAs?

**Q.**   Was Mr. Carlstrom involved with determining which of the KSAs would carry the greatest point values and weight and which of the KSAs would carry the lowest point value and weight?

**Q.**   Was the position description for this position changed within 6 months prior to Mr. Powers' retirement from the National Capital Region?  And if so, what changes are reflected in the major duties section of the vacancy announcement for the position?

**Q.**   Does the bureau of the Region keep copies of memos and correspondence from the Director's office?

The question was, "What was the area of consideration for the position in question?"

5       5       Mr. Carlstrom's response was, "Well, initially the area of consideration was Departmentwide, and then we expanded it to all sources."

**Rebuttal:** In March of 2000, Mr. John Berry, Assistant Secretary for Policy,  Management and Budget for the Department of Interior stated in a

-6-

memo addressed to the Head of Bureaus and Offices that one of his
priorities was Diversity. One of the goals, outlined in this memo, was
recruitment of a workforce that reflects the nation. Mr. Berry made the
requirement of bureaus to utilize targeted recruitment initiatives to assist in
assuring diversity in all applicant pools and to monitor the merit staffing
process and remove any unjustified barriers that would prevent equal
employment opportunities for all applicants. In addition, the memo states
that all managers and supervisors will be held accountable for ensuring
equal opportunity and nondiscrimination in accordance with Departmental
Directives. See Item D.

Stated within the National Park Service's Mission Statement are several
principles. Among them are the following:

- Outstanding Employees: Empowering a diverse workforce
  committed to excellence, integrity, and quality work.

- Wise Decisions: Integrating social, economic, environmental, and
  ethical considerations into the decision -making process.

- Effective Management: Instilling a performance management
  philosophy that fosters creativity, focuses on results, and requires
  accountability at all levels.

Before empowering a diverse workforce, the National Park Service and
the National Capital Region must first hire a diverse workforce. According
to Ms. Leslie J. Newman, Human Resource Specialist for the National
Capital Region, it was the former Administrative Officer, Mr. Dick Powers'
instruction to advertise Departmentwide (Newman testimony, page13, line
5). Furthermore, Mr. Powers made this preferences known to others in
the Regional Office before and after the vacancy announcement was
published. Mr. Carlstrom admitted to Mr. Mike Jurach, EEO Counselor,
that they knew of the National Park Service's Management Succession
Plan policy and were in the process of amending and extending the
vacancy announcement before they received my application. I allege that
management was not going to change the vacancy announcement even
after the Regional EEO Office advised them to. I allege that the National
Capital Regional Office–the Office itself never opens their full time
vacancies to "all sources."

According to Ms. Newman the decision to amend and re-announce the
vacancy announcement was made in between the time my application
was received and the closing date of the first vacancy announcement
(Newman testimony--page 11, line 17). The opening date of the first
vacancy announcement was March 10, 2003, with a closing date of March
31, 2003. My application was received on March 27, 2003. It has been
my experience that it takes perhaps one hour to change/amend and
resubmit for publication any amended vacancy announcement. The
amended vacancy announcement was not published until March 31, 2003.

I believe Mr. Carlstrom would not have changed the vacancy announcement had I not sent in my application.

Q.    If it was Mr. Powers decision to limit the area of consideration to Departmentwide, did Mr. Carlstrom and/or Mr. Lawler approve of this decision? If so, why?

The question was, "Was the announcement amended?"

5    9    Mr. Carlstrom's response was, "It was amended to reflect that it would be advertised to all sources and the – I believe we reduced it to a 14/15, so 13's could compete as well, although I'm not sure. I didn't review the vacancy announcement before it got amended."

**Rebuttal:** Mr. Carlstrom stated earlier that he was involved with the establishment of the vacancy announcement and that he looked at the elements of it. The first vacancy announcement was advertised for a GS-15. I believe Mr. Carlstrom and his then Administrative Officer and Associate Regional Director for Administration, Dick Powers made the decision to keep it at a GS-15 before it was advertised. The position was previously a GS-15 position prior to the vacancy announcement.

Q.    Mr. Carlstrom would not have had to amend the announcement if he had instituted the Management Succession Plan. Why didn't Mr. Carlstrom continue to implement the Management Succession Plan once Mr. Stanton left the National Park Service?

The question was, "Did you have any involvement in the decision to amend the announcement?"

5    16    Mr. Carlstrom's response was, "Yes,"

Q.    Did Mr. Carlstrom give the directive to change the area of consideration, the salary, the closing date, the language, and to re-advertise and vacancy announcement?

Q.    To whom did Mr. Carlstrom give this directive?

Q.    What were Mr. Carlstrom's instructions?

Q.    Did Mr. Carlstrom review and approve the amended vacancy announcement before it was re-advertised? If not, who was the approving official?

Q.    When was the decision made to amend the announcement, what was the exact date? Is there documentation?

Q.   How many people, total, applied for the position under the first vacancy announcement, prior to the extension?

Q.   Of those who applied under the first vacancy announcement, how many were outside the area of consideration (Department of Interior)?

Q.   Of those who applied under the first vacancy announcement, how many were from within the region?

Q.   Of those who applied under the first vacancy announcement, how many were from within the Department?

Q.   Of those who applied under the first vacancy announcement, how many were from within the Park Service?

Q.   Of those who applied under the first vacancy announcement, How many were from outside the region?

Q.   How many additional applicants applied for the position after the vacancy announcement was amended and extended?

Q.   Of those additional applicants, how many were from within the Department?

Q.   Of those additional applicants, how many were from within the Park Service?

Q.   Of those additional applicants, how many were from within the region?

Q.   Of those additional applicants, how many were from outside the region?

Q.   Who determined the length of time the first vacancy would be open?

Q.   Who determined the length of time the second amended vacancy would be open/extended?

The question was, "What was the basis for your decision for amending the announcement?"

5    19    Mr. Carlstrom's response was, "It was called to our attention that in – I think it was February of 1999, the then-Director of the National Park Service, Robert Stanton, had put out a memo indicating that positions should be advertised service wide –or, excuse me –all sources, if they were above and including grade 15.

**Rebuttal:** Mr. Carlstrom stated that the policy was brought to his attention. He should have had a copy of the policy in his files as should each of his managers. Had Mr. Carlstrom re-read the policy he may have stated to his administration staff that vacancies for key management position are to be advertised all sources and at multi-grade levels to include GS-13, GS-14, and GS-15.

Q.  Was Mr. Carlstrom aware of the Management Succession Plan policy dated February 1999, prior to Mr. Reid advising him of its existence?

Q.  Did Mr. Carlstrom give Mr. Lawler and Mr. Powers a copy of the Management Succession Plan during Mr. Carlstrom's tenure as Acting Regional Director or as Regional Director?

Q.  If Mr. Powers became aware of the Management Succession Plan prior to his retirement, did Mr. Carlstrom advise him about the Plan? If not, who had advised him of the Plan's existence?

Q.  If Mr. Carlstrom knew that the vacancy announcement was wrong, why did they wait until the closing day (March 31, 2003) of the first announcement to publish the amended/extended version?

Q.  Did management ignore the policy believing that if they chose to select a candidate from the first vacancy announcement they would not be challenged?

Q.  Why was this policy not part of the National Park Service's and National Capital Region's Standards for Operating Procedures?

The question was, "Who brought this to your attention?"

6     2     Mr. Carlstrom's response was, "Initially it was brought to my attention by Mel Reid, of the EEO office, who had contacts in the Washington Office. I don't recall who contacted him."

**Rebuttal:** The Management Succession Plan policy has been in place for more than 5 years. It designates and defines key management positions as GS-13, GS-14, and GS-15s. It also instructs and requires all National Park Service managers to advertise all key management positions, as described in the policy, to all sources when they become vacant, and advertise these position as multi-series "including, as a minimum, the current occupational series of the vacancy and the GS-340 Program Management Series as well."

-10-

According to the testimony of Ms. Leslie J. Newman the decision to amend and re-announce the vacancy announcement was made in between the time my application was received and the closing date of the first vacancy announcement (Newman testimony--page 11, line 17). I believe that had I not sent in my application the vacancy announcement would never have been changed to all sources, nor amended to include GS-13s eligible for promotion to GS-14 and GS-14s eligible for promotion to GS-15s, nor would the closing date have been extended, and the Management Succession Plan would not have been enforced.

Q.    Why did Mr. Reid have to bring the policy to Mr. Carlstrom's attention?

Q.    What was the date Mr. Reid first brought this policy to Mr. Carlstrom's attention? Is there documentation showing the date?

Q.    How many times did Mr. Reid advise management of the policy's existence before the first vacancy announcement was amended?

Q.    Did Mr. Reid give Mr. Carlstrom a copy of the policy? If so, is there documentation to prove this.

Q.    If Mr. Reid gave Mr. Carlstrom a copy of the policy, why then did he have to give Mr. Carlstrom a copy?

Q.    On what date was the copy of the policy given to Mr. Carlstrom? Is there documentation? If so, please provide a copy of the documentation to prove this.

Q.    Did Mr. Reid or anyone in his office advise the previous Administrative Officer, Associate Regional Director for Administration, Mr. Dick Powers and his staff, of the existence of this policy before, during or after the first vacancy announcement was published? If so, is there documentation to prove this.

6      10      The question was, " Did you have any involvement in the rating and ranking of the applicants' qualifications?"

Mr. Carlstrom's response was, "No, not directly."

**Rebuttal:** The Regional Director and/or Deputy Regional Director, oversees and approves/disapproves all activities including those within the Office of Administration. Prior to the announcement of the vacancy, he knew that Mr. Dick Powers, the then Administrative Officer would be retiring. Any changes to the job description for this

position would have had to be approved by the Regional Director. Any changes to the standard vacancy announcement, including position title, opening and closing dates, salary, area of consideration, travel and moving expenses, supervisory or managerial abilities, major duties, summary of qualifications required, the KSAs in addition to the ratings and weights given to each of the KSAs would have been made by the Administrative Officer with input from the Deputy Regional Director and/or the Regional Director, with the final approval made by the Regional Director.

The KSAs are the very first steps in the selection process. The rating and ranking of applicants to determine their qualifications is done by evaluating the applicants skills and abilities against the positions' KSAs listed in the vacancy announcement.

Q.    What, exactly, was Mr. Carlstrom's involvement in developing the numerical point value of the KSAs?

Q.    Did Mr. Carlstrom approve the KSAs?

Q.    Who was responsible for determining what the actual number would be for each of the KSAs on each of the qualifying levels of experience? For instance, KSA Title Two was given numerical rating factors of 9 for Level III, 6 for Level II, and 3 for Level I.

Q.    How and who determined the Factor Weight for each of the KSAs?

The question was, "Once you received the certificates of eligibles, what action did you take?"

7    4    Mr. Carlstrom's response was, "We had a panel that looked at all the 47 people that had applied, all of the applicants. And from that, a list of individuals were defined as being those that would be most qualified for the position.

It was primarily concentrated – I looked at all of them. I did not look at each individual application in total. I scanned through them. And the panel provided me with a list of potential people that we might want to look at for further evaluation through the interview process.

Rebuttal: This is an important GS-15 management position with administrative policy, human resources, finance, and budgetary responsibilities. Mr. Carlstrom admits that he scanned through the 47 qualified applications that were divided into several different certificates of eligibility. There were probably a lot more applicants

-12-

than he expected or wanted. He admits that he did not really look at any of them in depth. I believe that Mr. Carlstrom did not want to go through the process of reading each of the 47 qualified applications or work through a process of elimination himself.

In light of all the time and effort this was going to take, I believe Mr. Carlstrom asked Ms. Newman to panel the 47 candidates. The question is, which of the certificates were paneled and by whom? I believe the non status applicants may have been rated and ranked by one person, the Human Resource Specialist brought in by Ms. Newman. Once the 47 candidates were rated and ranked for qualifications a list of qualified eligible applicants was given to Mr. Carlstrom. It is my experience that only candidates listed on Certificates of Eligibles can be offered a job under this type of competitive process. So, why didn't Mr. Carlstrom select someone from that list? Why then did he panel a select group of candidates? He admits he depended on the panel to provide him with a list of merit status candidates for further evaluation for the interview process. At what point in time did the paneling of the merit status group take place? Is asking a panel to provide a selecting official with a recommended list of candidates from a select group and not other groups of candidates for interviewing purposes allowed and legal? Or is this an abuse of power and position? According to the testimony of Ms. Leslie J. Newman, non status candidates, including myself, did not have the benefit of a panel review.

Q.    Who are the "we" Mr. Carlstrom is referring to? Does the we include Mr. Dick Powers and both Deputy Directors?

Q.    There are two Deputy Directors working under Mr. Carlstrom. Were both Deputy Directors asked to participate in the selection process? If not, why not?

Q.    What is the race and national origin of the other Deputy Director?

Q.    How many applications were there in total (75)?

Q.    Why was the job not offered to anyone of the 47 applicants on the Certificate of Eligibles?

Q.    What was the makeup of the panel that rated and ranked the 47 applicants (one person, two persons, three persons)? Who were they?

Q.    Did Mr. Carlstrom receive a rating and ranking certificate of the 47 applicants listing them in order of rank from the top down?

Q.   What was the distribution of the 24 applicants Mr. Carlstrom is referring to here?  Are these the status applicants he is referring to on page 8, lines 17 and 24?

Q.   What was the distribution of the remaining 23 applicants?

Q.   How many applicants did the Ms. Sasser, the Human Resource Specialist rate and rank?

Q.   Were all qualifying applicants given a ratings score?  If yes, by whom?

Q.   If all qualifying applicants were given a rating score, what was the minimum rating score needed to qualify?

Q.   If all qualifying applicants were given a rating score, what was the maximum score given?

Q.   If all qualifying applicants were given a rating score, were any of the top ten applicants merit promotion status candidates?

Q.   If all qualifying applicants were given a rating score, what was the rating and ranking of the individual selected?  How did she rank in comparison to the other qualifying candidates in her grade level?  Where did she rank compared to all other candidates?

Q.   If all qualifying applicants were given a rating score, what was my rating and ranking?

Q.   Were all qualified applicants given a ratings score before they were paneled?

Q.   Did Ms. Sasser rate and rank the candidates before any of the applications were forwarded to Mr. Carlstrom?

Q.   Did Ms. Sasser rate and rank the candidates before any of the applicants were paneled?

Q.   How many applicants applied for this position under the merit promotion system?

Q.   How many applicants were competitive?

Q.   How many applicants were non status?

Q.   Were the GS-14 non status applicants given the same cut-off score of 87?

-14-

Q. Why were the GS-15 merit status candidates given a lower cut-off score of 92.3 compared to the cut-off score of 97 for the non status GS-15 candidates?

Q. How was the cut-off score determined for each grade level?

Q. What was considered the perfect score for ratings and rankings at each grade level and for each of the certification processes?

Q. Why were the non status applicants given a higher cut-off score?

Q. Was the cut off score of 97 for the non status GS-15s the same for the merit status GS-15s during the initial rating and ranking process?

Q. What was the cut off score for the promotion merit status candidates who were GS-14s eligible for promotion to GS-15 during the initial rating and ranking process?

Q. Was non consideration of my application due to forcing the Regional Director to amend and re-advertise the vacancy?

Q. Did Dottie Marshall apply as a non status applicant? Under which vacancy announcement?

Q. Did Dottie Marshall apply as a merit status applicant? Under which vacancy announcement?

Q. Did the Office of Administration or the Division of Human Resources receive an application from Dottie Marshall for the first vacancy announcement?

Q. Other than veterans, were any of the applicants identified as disabled?

Q. What were the different types of Certificates of Eligibility used?

Q. How many Certificates of Eligibility were there?

Q. What was the highest rating score and the lowest rating score on all Certificates of Eligibility issued?

Q. What were the ratings for each applicant on each Certificate of Eligibility list?

-15-

Q.   Were there any Hispanics on the panel? If not, why were there no Hispanics on the panel?

Q.   Who made the decision to not panel the non status candidates?

The question was, "In addition to the certificate of eligibles for both status and non-status applicants, did you also receive a list from the rating panel?"

8        7        Mr. Carlstrom's response was, "Yes."

**Rebuttal:** Mr. Carlstrom indicated that a panel looked at all 47 applicants and that the 47 were pared down to a list of individuals to be interviewed. Mr. Carlstrom indicated that he did not look at each application, he scanned through them. The panel provided him with a list of people for further evaluation through an interview process (the interview process is optional).

However, according to the Ms. Leslie J. Newman, a human resource specialist was brought in from a park to do the rating and ranking of the applicants because she did not want it to appear as though she was assisting in the selection of her new boss. She further indicated that all of the applicants were rated against the same crediting plan.

Q.   Exactly, at what point in time in the selection process was a panel convened to rate and rank the candidates—during the same time the non status candidates were rated and ranked or after the non status candidates were rated and ranked?

Q.   Why was it necessary to further panel the merit status candidates if Certificates of Eligibility were already issued—twice?

Q.   What were the rating scores for each of the individuals interviewed?

Q.   What were the rating scores for each of the veterans before they received preference points?

As far as I can determine, initially, staff specialist(s) determined which of the 75 applicants met the minimum qualifications for the position. Several Certificates of Eligibles along with the 47 applications were sent to Mr. Carlstrom.

After Mr. Carlstrom had an opportunity to review the 47 applicants he sent them back to be rated and ranked to determine the best

-17-

qualified. The question is, did one person rate and rank all 47 applicants or were they paneled? And, if the applicants were paneled, who paneled them? According to Mr. Carlstrom, 47 applicants were paneled. According to Ms. Newman, "40 some odd candidates were rated." Neither makes a distinction between the 47 being all qualified candidates or qualified status candidates only.

According to Mr. Carlstrom (page 8, lines 4-7) he received a list from the rating panel in addition to Certificates of Eligibles for both status and non status candidates. Was this list a list of eligibles with the highest scores from the top? If it was, then this certificate of eligibles could have been used for the appointment to the position.

In addition to this list of eligibles scored by a human resource specialist, multiple Certificates of Eligibles were issued. The applicants were separated by grade and status then listed on different Certificates of Eligibles—usually listed alphabetically for status candidates and by ranking for non status. The groups were identified as federal employees who qualified for promotion, re-assignment and re-promotion; and a second group identified as non federal or non status employees.

In the Report of Counseling, Ms. Newman stated to Mr. Juach that she sent to Mr. Carlstrom thirteen status applicants and eleven non status applicants. Of the non status 5 were on the GS-14 Selection Certificate and 6 on the GS-15 Selection Certificate.

I believe that after the selecting officials reviewed the list with the rating and ranking scores in addition to the multiple status certificates, Mr. Carlstrom and Mr. Lawler decided their candidate was not close enough to the top and there were still several candidates more qualified than her so they decided to panel a select group of applicants based on their ability to be promoted and with the new criteria they imposed on the process at this time. This select group of candidates were the merit promotion status candidates only. Ms. Marshall was a merit promotion candidate. According to Ms. Newman, the status applicants were rated by a panel. I believe this panel was a panel of three. The non status candidates were not rated by the same panel or any other panel. According to Ms. Newman, non status candidates were not paneled because, "It doesn't require that in our merit promotion plan or in the delegated handbook put out by OPM."

I contend that the merit promotion plan and/or the delegated handbook doesn't say you can't or shouldn't panel the non status applicants. In fact, The Uniform Guidelines on Employee Selection Procedures states that, "the selection process used is to be fair and trustworthy, giving all applicants equal consideration under the

-18-

same set of standards, by utilizing procedures that have been demonstrated to have minimal adverse impact. In addition to, taking into consideration alternative selection procedures that would further reduce adverse impact to any particular groups as identified in Title 29. It also states that, "All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights." On the Department of Interior Web Site *Human Resources Presents...Personnel Manger* under the Uniform Guidelines on Employee Selection Procedures in paragraph two, it states, "In 1978, the Uniform Guidelines on Employee Selection Procedures (UGESP) were issued. The guidelines are intended to establish a uniform basis of selection procedure criteria in the Federal sector. This guide imposes employers with the criteria by which the Equal Employment Opportunity Commission would evaluate hiring practices to ensure adherence to merit principles. **The UGESP applies to both inservice placement actions and external hiring practices.**" See Item E. And, the merit system principles state that all employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and iwth proper regard forthier privacy and constitutional rights. See Item F.

As a mater of fact, I have, in the past, as Deputy Director and as a selecting official for HHS requested panels to review, rate, and rank all applications I received for a position--contrary to Ms. Newman's belief, even if she has not done it, this is not an unusual practice.

The panel then submitted a list of individuals defined as being those that are best qualified for the position. The eleven non status candidates were not paneled. Unfortunately the panel did not have access to the non status candidates, therefore, their list of best qualified was based on only half the sample of candidates available.

Initially, the playing field was level. The 75 applicants were screened to determine who qualified. Then, if I understand this correctly, 47 applicants were deemed to be qualified. Of the 47 applicants, the non status were rated and ranked by the GS-13 Human Resource Specialist, Ms. Sasser; the merit promotion applicants were rated and ranked by a panel of three GS-15s. Of the 47 candidates, 24 met the cut off scores. The non status were ranked by the ratings each received and the merit promotion applicants were listed alphabetically.

The different set of standards here is that after the initial rating and ranking for qualifications the selecting officials implemented a change in the criteria. They decided they wanted to consider only those with Park Service experience and knowledge. They decided to panel the merit promotion candidates only (no longer a level playing field). But I don't believe they had 10 merit promotion eligibles in each grade level to panel. Ms. Newman stated to Mr. Juach that she sent to Mr. Carlstrom thirteen status applicants. So, if there were less than 10 merit promotion eligibles for each grade, did they include the other status candidates in order to justify the need for a panel?

The selecting officials decided to panel the merit promotion status candidates, which allowed the merit promotion status candidates to be further reviewed, rated and ranked by a panel of the three GS-15s managers who are familiar with the range of duties and responsibilities for this kind of position. The non status candidates did not benefit from a review, rating and ranking by the same panel nor any other panel. According to Ms. Newman, the non status candidates received a rating and ranking by only one person, a human resource specialist, a GS-13 (Newman testimony, page 6, Lines 24, page 7, lines 1-3). There's nothing to indicate the non status candidates receiving any other further ratings and rankings. The cut-off score of 97 for the non status candidates was determined by both Ms. Newman, also a GS-13, and Ms. Sasser, the Human Resource Specialist, a GS-13. By his own admission Mr. Carlstrom and Mr. Lawler mutually agreed to look at promotion eligibles only. So it didn't matter if the vacancy announcement was limited to the Department or All Sources, they had decided early on who they were going to pick and how they were going to pick her. I believe that I became an unexpected obstacle and they were determined to push me aside and use the system in such a way that they would be assured of getting the candidate they wanted without looking as though they did anything illegal or questionable.

For merit promotion status candidates, Ms. Newman indicated in her statements to Mr. Mike Jurach, the cut-off score for GS-14 status applicants was 87, and for the GS-15 status applicants the cut-off score was 92.3 as determined by the panel of three compared to a cut-off score of 97 for non status GS-15s as determined by one.

Ms. Newman gave no indication of how the re-assignment or re-promotion groups were scored.

The standards used to rate the two primary groups were different. Granted, we were all rated against the same crediting plan. But one person's subjective rating is different from the subjective and collective ratings of a panel, which if often different and more

thorough. Also, the ratings given by a GS-13 Human Resource Specialist, who has never held an upper level managerial position nor has the level of knowledge or experience of a GS-15, are considerably different from the ratings given by a panel of GS-15s who are in top level management positions.

So, the status candidates were given three times the advantage of doing better than the non status candidates who were not paneled. The difference is like a professor grading a term paper compared to a student intern grading the same term paper. The student intern does not have the same breadth of life and work experiences or expert knowledge of the field of study as does the professor.

In her statements to Mr. Mike Jurach, Ms. Newman stated that on February 24, 2003, I think she meant April 24, 2003, 13 status applicants on five different competitive level certificates (two for each GS-14 and GS-15 promotion eligibles, two for each GS-14 and GS-15 reassignment eligibles, and one for a re-promotion eligible) and eleven non status applicants (5 on the GS 14 Selection Certificate and 6 on the GS-15 Selection Certificate) were referred to Mr. Carlstrom for review. But the timing on this is not clear. Were the competitive level certificates referred to Mr. Carlstrom before or after the merit status candidates were rated by the panel?

I believe that Ms. Marshall was identified by Mr. Carlstrom, Mr. Lawler, and the previous Administrative Officer and Associate Regional Director for Administration, Dick Powers as the most desirable person to promote to the position of Administrative Officer before the vacancy announcement was posted the first time. I believe that these three individuals determined which of the KSAs would better fit and match Ms. Marshall's knowledge and abilities. I believe that the cut-off scores for merit status candidates were set purposely low so as to assure Ms. Marshall would make the Certificate of Eligibles list. I further believe that Ms. Newman presented to the selecting officials the initial certificates of eligibles and that perhaps because Ms. Marshall did not rank as highly as they had hoped the selecting officials then directed Ms. Newman to panel the merit promotion status candidates only.

I believe that if all of the qualified applicants, both status and non status, were reviewed, rated and ranked competitively against one another by the same panel, then Ms. Dottie Marshall may not have made the cut off score to be placed on the list of eligibles or may have placed closer to the middle of the list. I believe that had everyone been reviewed, rated and ranked by the same panel I would have been rated and ranked higher than the other five individuals on the non status list and status lists. I believe that I would have received a rating and ranking score higher than the veterans with preference because three GS-15 managers would

-21-

have a different perspective toward the job than a GS-13.

I do not know Ms. Marshall's collective rating score as a GS-14, eligible to be promoted to a GS-15 by the panel of three, nor do I know her initial rating score. But, I am sure her averaged score was lower than my raw score of 97. As a GS-14, the standard used to rate Ms. Marshall was a standard in which she only had to demonstrate that she <u>participated</u> in management activities. The rating I received by the human resource specialist as a GS-15, eligible for a GS-15 was scored at a higher standard. As a GS-15 I had to <u>demonstrate</u> that I did more than just participate in management activities. I had to show I made management decisions and gave managerial direction with full accountability. I, a GS-15, had only one person rate me. Ms. Marshall, a GS-14 had the benefit of a panel of three of her piers rate and rank her. And, because the selecting officials chose to look at and interview the status candidates only, I can categorically state that the minimal efforts made to rate and rank the non status candidates was simply an effort of futility meant to give the impression that a fair and equitable selection process was attempted. This is in part why Executive Order 13197 was put into effect--to force accountability where none exists.

As a former Deputy Director for Operations and selecting official at the U.S. Department of Health and Human Services, I find the games that have been demonstrated here to be appalling and an example of how laws, policies, procedures and rules can be interpreted and/or misinterpreted and used as institutional barriers. These barriers are willingly utilized by those who choose to use specific selection processes in place to hide their personal biases and/or to promote their favored candidate and/or to keep the white population in control of key positions.

Mr. Carlstrom, in response to the next question, used the term, "It's my prerogative." By preferring not to panel, rate and rank everyone on an equal and fair basis or use alternate selection procedures, in accordance with and as outlined in the Uniform Guidelines On Employee Selection Procedures Section 1607.6 and 1607.13, he as one of the selecting officials chose to discriminate against me by not assuring that a fair and equitable selection process was used. I believe Mr. Carlstrom, Mr. Lawler, and Mr. Powers violated several Departmental and Agency directives, (i.e. Strategic Plan for Improving Diversity in the Department of the Interior--December 3, 1997, Mr. John Berry memorandum regarding Zero Tolerance of Discrimination--2000, Mr. John Berry memorandum regarding Policy and on Implementing the Department of the Interiors Diversity--March 21, 2000 (see Item D), Mr. John Berry memorandum regarding Eliminating Barriers to Diversity--May 9, 2000, and Ms. Gale Norton memorandum

-22-

regarding Policy on Equal Opportunity and Zero Tolerance of Discrimination—August 24, 2001. See Items G, H, I, and J.

Q.   Mr. Carlstrom had the opportunity to select a candidate from the list of qualified candidates and from the multiple certificates. Why didn't he make a selection from those lists?

Q.   Were the selecting officials given the first list of eligibles showing the rates and ranks of all qualified candidates before they were given the non status and status certificates of eligibles?

Q.   What did Mr. Carlstrom do after he received the list of 24 candidates and the multiple certificates?

Q.   Were the members of the panel of three Mr. Carlstrom selected from the same region?

Q.   Did Mr. Carlstrom pick the panelist? If so, did he select the panelist because they know of Dottie Marshall and the other Park Service employees personally?

Q.   Did any of the panelist work with or supervise Dottie Marshall and or other Park Service candidates?

The question was, "Does the rating panel normally provide the selecting official with a list of applicants to be interviewed?"

8          11          Mr. Carlstrom's response was, " Well, it was within my prerogative if I wanted to go forward and interview those individuals or additionals. From a management perspective, I was interested in those folks who – and we were consistent in doing that – applying it to those that were promotion eligible that were on the list."

"And there were some 24 within that category. And within that category, I was looking at those that had the kind of background that we had defined in the KSAs.

Rebuttal: First of all, Mr. Carlstrom did not answer the question. The determination to panel a selected group has noting to do with the decision to interview. Mr. Carlstrom requested a panel rate and rank merit promotion individuals. Dottie Marshall's name would only appear on the merit promotion list. Further he chose to interview only those candidates from the merit promotion eligible lists recommended by the rating panel who were Park Service employees. And, he chose to interview only Park Service employees from the other status candidate lists.

-23-

I believe the general rule throughout the federal government is if there are more than 10 well qualified candidates in the same grade you panel all of them and if you interview one from a selection certificate list–you interview all from that same list. Mr. Carlstrom believes he followed the general rule. If he did, he did so in a very limited manner. I don't believe he followed the intent of the rule, thus creating an unfair barrier to candidates who were not status candidates and candidates who were from other Departments and Agencies.

I believe I was discriminated against for the following reasons: I was not considered equally with the other candidates because the selection process was skewed to suit the selecting officials desire to hire a pre selected individual while ignoring the mandates and policies in place to recruit and hire qualified Hispanics, in addition to not being interviewed. I am a well qualified Hispanic woman. I was not selected because I am not the white woman with park service experience.

**Q.**    Other than prerogative, what were the underlying reasons for not paneling and not interviewing the non status applicants along with the status applicants?

**Q.**    Mr. Carlstrom stated that of the 24 applicants forwarded to him he was looking at those that had the kind of background that they had defined in the KSAs. If this is true, why was I not given more consideration?

**Q.**    How did Mr. Carlstrom come by the number 24 he is referring to?

**Q.**    If 24 promotion eligibles went forward, what happened to the other 23 candidates?

**Q.**    Mr. Carlstrom admitted he was only interested in looking at and interviewing those that were promotion eligible. Does this mean he was not interested in hiring the best qualified candidate?

**Q.**    Candidates listed on the non status list scored extremely high. Why was he not interested in hiring the best qualified candidate from that list?

The question was, "Did the panel have access to the list of non-status eligibles?"

9          4          Mr. Carlstrom's response was, "I would prefer you check with Leslie Newman.

**Rebuttal:** Again, Mr. Carlstrom did not answer the question. The Human Resource Staffing Specialists take their instructions directly from the selecting official. They do not make independent decisions during a selection process. They do, however, advise and make recommendations and then follow the subsequent instructions the selection official give them. According to Ms. Leslie Newman non status candidates were not rated by a panel, therefore, the panel did not have access to the list of non status eligibles. She stated that its not required in the merit promotion plan or in the delegated handbook put out by OPM. I already stated that the Uniform Guidelines on Employee Selection Procedures applies to both status and non status applicants. The Uniform Guidelines on Employee Selection Procedures used by the Department of Interior (DOI) states that, "elements used in a selection process must be job-related, requiring criteria used to determine the candidates referred and selected be related to the job to be filled."

"In 1978, the Uniform Guidelines on Employee Selection Procedures (UGESP) were issued. The guidelines are intended to establish a uniform basis of selection procedure criteria in the Federal sector. The guide imposes employers with the criteria by which the Equal Employment Opportunity Commission would evaluate hiring practices to ensure adherence to merit principles. **The UGESP applies to both inservice placement actions and external hiring practices.**"

"A selection procedure is any measure, combination of measures, or procedures used as a basis for an employment decision. In DOI Bureaus, this would apply, but not be limited to, job analysis, Crediting Plan, interviews, and the selection process itself."

Selecting officials are given a specific process to follow with some latitude in the selection process. Mr. Carlstrom could have just as easily directed the panel to rate and rank the non status candidates as he had the status candidates, that would have given the non status equal access and equal consideration. By limiting the field of candidates to a select group put before a panel severely hinders an outside applicant's ability to be treated fairly in kind leaving one to believe the odds are stacked against her/him. Also, by not paneling non status with the status candidates the selecting officials denied me equal treatment and equal opportunity to compete for the position. This is one of the most common practices (no panel for the non status candidates) government officials used to keep Hispanics out of federal government service. This is disparate treatment.

The definition of Disparate Treatment is: Discrimination occurs where an employer intentionally discriminates against an employee

why did they go through the process of paneling anyone?

I believe they may have flipped through my application package just so that they could say they gave me "consideration." However, in spite of my grade level, extended knowledge and experience, and previous Federal service work experience my application was pushed aside because I did not have Park Service experience, and even if I did, it still would not have mattered–look at Mr. Ferranti. He is a GS-15 National Park Service employee with Park Service experience and he is currently doing the very same job that Mr. Carlstrom advertised and he did not get hired for this position. The bottom line is that nobody other than the employee they were looking for, Dottie Marshall, was going to get the job.

According to Mr. Lawler when asked if candidates who were selected for interviews were selected from all of the certificates, Mr. Lawler stated that they didn't look at non status. They looked at just status only. If this is true, then Mr. Carlstrom did not give any consideration to the non status applicants.

Q.    On what date did Mr. Carlstrom give "consideration" to all 47 applicants? Is there documentation?

Q.    On what date were the non status applicants rated and ranked?

Q.    On what date were the panel members asked to serve on the panel? Is there documentation?

Q.    On what date did the panel review, rate and rank the merit status applicants?

The question was, "But would the rating panel have had access to the application and/or the certificates for the non status?

10        5        Mr. Carlstrom's response was, "I understand they looked at all 47."

Rebuttal: Mr. Carlstrom earlier testified that, "We had a panel that looked at all the 47 people that had applied, all of the applicants. And from that, a list of individuals were defined as being those that would be most qualified for the position. And there was some 24 associated with that paring down of the list."

It is the decision of the selecting official to panel applicants. The Human Resource Specialist follows the directives of the selecting official. A panel is generally made up of three or more persons at the same or higher grade levels. According to the Personnel

Handbook for DOI, Merit Promotion Plan, under **Evaluation Panel**:
Evaluation panels are established to rate and rank candidates, and
generally consist of individuals at the same or higher grade level
than the full performance level of the position to be filled who are
familiar with the requirements of the job and occupation. Qualified
candidates are evaluated on the basis of the quality ranking factors
identified for the position. And, the DOI Uniform Guidelines on
Employee Selection Procedures (UGESP) impose employers with
the criteria by which the Equal Employment Opportunity
Commission would evaluate hiring practices to ensure adherence to
merit principles. The UGESP also states that the Guidelines applies
to both inservice placement actions and external hiring practices.
The Human Resource Specialist, Leslie Newman stated in her
testimony that the non status candidates were not rated by a panel,
they were rated by a GS-13 Human Resource Specialist only.

Q.    Who is "they" Mr. Carlstrom is referring to here?

Q.    Which rating panel is Mr. Carlstrom referring to?

Q.    Did Mr. Carlstrom instruct Ms. Newman to panel all 47
      candidates? If not, why not?

Q.    Were the 24 applicants Mr. Carlstrom is referring to the merit
      promotion applicants or a combination of merit promotion
      applicants and non status applicants?

Q.    Who's decision was it to panel the merit status candidates?

Q.    Who's decision was it to not panel the non status
      candidates?

Q.    Is there a requirement to separate the merit status
      candidates from the non status candidates?

Q.    What instructions did Mr. Carlstrom and/or Mr. Lawler,
      and/or Ms. Newman give to the panel with regard to
      narrowing down the list of merit status candidates?

Q.    How many status applicants did the panel rate? How many
      in each grade, were there at least 10 in each pay grade?

Q.    Were there more than 10 status candidates in any of the
      grades?

Q.    How many panels were convened and for what grade levels?

Q.    Were all of the competitive applicants reviewed, rated, and
      ranked by the same panel? If not, how were the re-

assignment and re-promotion candidates rated and ranked?

**Q.** Were merit promotion applicants rated in the same manner as those who were of competitive status? If not, how were they (the merit promotion applicants) selected for the Cert. List?

**Q.** How many candidates did the panel of three forward to the selecting officials?

The question was, "How many candidates were interviewed?"

10    7    Mr. Carlstrom's response was, "Well, we had selected five to be interviewed initially."

**Rebuttal:** Mr. Carlstrom chose to interview candidates from the final list of merit status candidates forwarded to him from the panel and candidates from the other status lists. He indicated earlier that the panel provided him with a list of potential people that he might want to look at for further evaluation through the interview process and that from a management perspective he was interested in those folks that were promotion eligible. The selecting officials specifically chose only the candidates that were/are park service employees with park service experience and knowledge. According to Ms. Newman the decision to interview which candidates was solely up to the selecting official (Newman testimony, page 9, line 24). Of the individuals interviewed two were GS-13 eligible for promotion to GS-14, both male. On was a GS-14 eligible for promotion to GS-15, a female, and a GS-15 who was listed on a reassignment certificate, also a male.

By not interviewing candidates on the non status list Mr. Carlstrom again intentionally chose to set up another barrier to those of us outside federal government, particularly Hispanics. Mr. Carlstrom's bias toward Park Service employees is quite evident. Moreover, he was interested in only one person and that person was one of three listed on the GS-15 merit promotion status list of candidates. That candidate was Ms. Marshall, the selectee.

**Q.** I'm not aware of any rule or practice that allows a panel to provide the selecting official with a list of candidates to be interviewed. If this procedure is an acceptable practice then why were the applications for non status candidates not given to the panel for recommendation?

**Q.** How did Mr. Carlstrom select the candidates to be interviewed?

**Q.**    Mr. Carlstrom mentioned that it was his prerogative to go forward and interview those individuals or additionals who were promotion eligible. Were the candidates Mr. Carlstrom wanted to interview identified before the status applicants were paneled?

**Q.**    Why was I not interviewed?

**Q.**    Why were the veteran applicants not interviewed?

**Q.**    Why didn't the selecting officials interview merit status candidates that were not National Park Service employees?

**Q.**    Other than the five Park Service candidates selected for interviews, how many of the eligible candidates were National Park Service employees?

**Q.**    Why did the selecting officials ignore the "rule of three" for interviews?

The question was, "Did any of the applicants who were interviewed, were their names on any of the certificates of eligibles for non-status applicants?

10          24          Mr. Carlstrom's response was, "They were incorporated within the promotion eligibles. Ferranti was a 15 – – is a 15. The others were promotion eligible.

**Rebuttal:** Mr. Carlstrom identifies Mr. Ferranti, a GS-15 who is the Associate Regional Director-Administration in Alaska. By his own identification Mr. Carlstrom has the ideal candidate. A GS-15 National Park Service employee who is already doing the job Mr. Carlstrom advertised and who could walk right into the position with little down time.

**Q.**    With the exception of those candidates who are eligible for lateral moves all other candidates who applied for this position are considered promotion eligible. Why didn't Mr. Carlstrom select non status promotion eligibles for interviews?

**Q.**    Why did Mr. Carlstrom separate applicant Ferranti, a GS-15 eligible for reassignment from the non status list, and incorporate him with the promotion eligibles list? Is this allowed?

**Q.**    Why did Mr. Carlstrom pick one candidate from the non status list to interview and not others on the same non status list?

-30-

Q.    Mr. Carlstrom indicates here that Mr. Ferranti was listed on
       the non status list and he took his name from that list as an
       individual to interview and not others from that list. Was Mr.
       Ferranti selected from the non status list of applicants
       because he was the only person on that list that was a Park
       Service employee?

Q.    Was Mr. Ferranti listed on the non status list because he is a
       veteran wanting to use his veteran status and preference?

Q.    Was Mr. Ferranti not selected because he does not have
       National Capital Region experience and knowledge?  What
       are the reasons for not selecting him?

Q.    As a non status applicant what was Mr. Ferranti's score
       compared to my score and the scores of the other non status
       GS-15 applicants?

The question was, "Why weren't any of the non-status applicants
interviewed?"

11        5        Mr. Carlstrom's responded by stating, "That's part of management
                    prerogative, I guess. In this particular situation, this is a very
                    important position within the National Capital Region and familiarity
                    with what goes on as it relates to the National Park Service and as
                    it relates to the National Capital Region is critical."

"I can't have somebody walk in the door that might not be able to
start from the get-go with all the things we're dealing with; with
competitive sourcing, with the competitive sourcing being the
primary one. But all our contracting activities that we currently
have, our huge line item construction program, our security needs
and requirements attendant to the national icons, the Lincoln, the
Jefferson, the Washington Monument, including Reservation One,
as it relates to security, and the security of the Mall at large."

"All of those are connected directly with our administrative needs
and requirements. So, I made that determination that that was
primary. And that was a key element in my thinking as I went
through the interview process, who could best meet those needs
and requirements and familiarization with the National Park Service
and the way it functions and the region, as it relates to the National
Park Service in these times of security needs and competitive
sourcing."

Rebuttal: If Mr. Carlstrom only scanned through the 47 qualified
applicants then how does he knows that the highly rated non status
GS-15s or non status GS-14s were not qualified for the job? The
non status candidates received very high ratings.

-31-

Mr. Carlstrom, from the very beginning wanted a Park Service employee for this position and he changed the criteria after the vacancy announcements were published so that he could hire the person he wanted. I am not aware that changing the criteria for the position after it has been published in a vacancy announcement is a managers prerogative. The published KSAs did not list prerequisites for park service experience. Nowhere in the KSAs were there requirements for demonstrated experience and knowledge or even general experience and knowledge having to do with any "familiarity with what goes on as it relates to the National Park Service and as it relates to the National Capital Region," particularly as a critical element. Nor was there any mention of required knowledge of the Park Service's competitive sourcing, construction programs, security issues and needs in the KSAs. Mr. Carlstrom made determinations throughout the selection process, in addition to requiring familiarization with the National Park Service and the way it functions and the way the region functions as it relates to the National Park Service as a means of ensuring that the candidate he wanted to hire would be able to meet his requirements. None of these requirements, absolutely none of them were mentioned in the KSAs in the first nor second vacancy announcement. In fact, under the Merit Promotion Guidelines, as I understand it, these type of requirements are no longer allowed. This is yet another barrier put into place to keep people from outside the park service from entering into the National Capital Region's federal workforce. All five of the candidates chosen for interviews were park service employees. Further, of the three candidates listed on the GS-15 competitive selection certificate of eligibles only the selectee, Dottie Marshall, was a park service employee. The other two candidates on that particular list were employees of the Department of Health and Human Services and the Department of Labor respectively and they were not interviewed–so much for the rule of interviewing one–you interview all. Mr. Carlstrom applies to the rules only as the rules suit him.

The position, according to the description in the vacancy announcement, is primarily an advisory position for all administrative areas and manages all directly related program areas through subordinate supervisory components and staff, meaning the Administrative Officer has supervisory authority over staff professionals who are responsible for the day-to-day business in each of the components Mr. Carlstrom listed. The two primary roles are: oversight and policy services as well as administrative program management, program management meaning management over all of the administrative policy and administrative functions.

Besides, if Mr. Carlstrom really wanted someone who could walk into a GS-15 position from the "get-go" with little or no training, then

he would have hired a GS-15 who had done the job of an Administrative Officer instead of a GS-14 Budget Officer with little or no real administrative experience outside of budget development and project management in need of on the job training. According to Ms. Marshall's resume she has little or no experience with administrative policies, administration (i.e., travel, time cards, credit card use, facilities management, procurement, office equipment rentals and leases, repair contracts, computer software and services, etc.), human resources (i.e., the writing of position descriptions, vacancy announcements, KSAs, the hiring, evaluating, training, promoting, awarding and disciplining of personnel and effective supervision), or experience with employee relations, unions or EEO and complaint processes.

**The Knowledge, Skills, and Abilities (KSAs)** required for this position were listed in the vacancy announcement as follows:

1. Knowledge of administrative/management support functions such as human resources, budget, contracting/procurement, property to administrative support services.

2. Skill in negotiating and resolving complex problems in a leadership role with subordinates peers, managers, and representatives at various levels.

3. Ability to develop, analyze, review, and appraise the effectiveness of administrative policies, programs and practices.

4. Ability to interact and communicate at all levels.

5. Ability as manger to direct a support staff comprised of a range of technical and professional individuals.

**The major duties** listed for this position are as follows:

Incumbent serves as the Associate Regional Director, Administration for the National Capital Region (NCR). The position has direct line authority for the planning, policy, execution, management and supervision of all administrative information systems, and financial management activities throughout the Region. This includes such activities as human resources, finance, contracting, property, office services, fiscal management, and information technology. The primary functions of the position are to provide effective and efficient delivery of administrative services throughout the Region. Provides administrative and technical support and advisory services to approximately 14 parks/monuments/historic sites, as well as the Regional Director's staff. The position is the primary advisory position for all

administrative areas and manages all directly related program areas through subordinate supervisory components and staff. The position is the primary advisory position for all administrative areas and manages all directly related program areas through subordinate supervisory components and staff. The position supervises directly and indirectly 45 personnel within the NCR Regional Office and has responsibility for oversight of all administrative programs. The Office of Administration is comprised of Contracting, Human Resources, Office Services/Property, Finance, Budget and Information Technology Services. It has two primary roles; oversight and policy services as well as administrative program management. Incumbent supervised the National Capital Region Special Emphasis Recruitment Officer and in so doing, coordinates closely with the EO Manager in the development and implementation of the Regional affirmative action program.

**The Supervisory or Managerial Abilities** required for this position are as follows:

Candidates must have demonstrated in their work experience or training that they possess, or have the potential to develop, the qualities of successful supervision, such as the ability to: Assign to and review work of subordinates, train and work effectively with subordinates from a variety of backgrounds and with different level/areas of training. Accomplish the quality and quantity of work expected within set limits of cost and time. Plan own work and carry out assignments effectively with limits of cost and time. Plan own work and carry out assignments effectively. Communicate with others effectively both orally and in writing in working out solutions to problems or questions relating to the work. Understand and further management goals as they affect day-to-day work operations. And develop improvements in or design new work methods and procedures.

**The Summary of Qualifications Required** for this position are:

**For the GS-14 level,** applicants mus possess one (1) year of progressively responsible specialized experience at the GS-13 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that it typically in or related to the work of the position. **For the GS-15 level,** applicants must possess one (1) year of progressively responsible specialized experience at the GS-14 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that is typically in or related to the work of the position. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression <u>for the</u>

<u>occupation in the organization</u>. (This sentence was added to the second vacancy announcement. It was not part of the GS-15 required qualifications in the first vacancy announcement.) **OPM defines "creditable service" as the conditions for completion of the period of creditable service required for career appointment.**

Q.    Under who's direction was this requirement added in the last sentence of the second vacancy announcement of The Summary of Qualifications Required?

Q.    What was the purpose for adding this sentence to the second vacancy announcement?

Q.    What significance is applied to the term "for the occupation in the organization?"

Q.    I posses all of the skills and knowledge required for the position as outlined in the KSA. Did Mr. Carlstrom personally read the cover letter, KSA responses, and the SF-171 I submitted? If not, why?

The question was, "What was the basis for your selection of Ms. Marshall?

13        7        Mr. Carlstrom's response was, "Expanding upon what I just said, her familiarization with the National Capital Region and experiencing positions not only within the Region, the budget office within the Region, going back to 1981, but also her experiences as the budget officer for National Capital Park Central, involved in the Everglades for a short period of time in the budget officer's position. Came back here after nine months in that position and then was the budget officer of the National Capital Region, and was then involved in the Holocaust memorial creation as the budget officer and liaison with that group during its conception, implementation and finally the construction activities."

"And became budget officer, exhibiting again the needs and requirements of managing a large budget in the National Capital Region. Then she was selected to be the Acting Director of the Kennedy Center during the time of transition from when we went to the National Park Service to the Kennedy Center board and was removed from the National Park Service. Was instrumental in implementing that as well."

"And then nine years of experience as an Assistant Superintendent in a major national park."

**Rebuttal:** Ms. Marshall was the targeted candidate since before the

vacancy announcement was published. I was told at the time I submitted my application that someone was already picked for this position and that that person's name was Dottie Marshall. A rumor is idle hearsay until it becomes truth. Well, her selection proved the rumor to be true.

The statements made are very similar to Mr. Lawler's statements. It almost sounds rehearse. I read Ms. Marshall's resume. In my view, as someone who has done this type of work for years, Ms. Marshall has very little administration/administrative experience as is called for in the Major Duties of the job announcement. I believe I not only rated and ranked higher than Ms. Marshall, the positions I have held were higher than hers and my range of responsibility was much greater than hers. Again, Mr. Carlstrom chose this particular candidate for her familiarity with the regional office and her park service experience within the region, which was not a requirement of the job. He indicated that he could not "have somebody walk in the door that might not be able to start from the get-go with all the things we're dealing with." Anyone competing at the GS-15 level, particularly those who are already GS-15s with the experience of serving as a GS-15 with all of the duties and responsibilities for more than two years and who has been responsible for an organization larger than a Regional Office can walk into this type of position with little down time. By his actions, Mr. Carlstrom demonstrated a lack of respect for those of us who have worked long and hard to gain the qualifications needed to obtain a GS-15 grade level.

I am one of the very few Hispanic women who has obtained a GS-15 grade level. I have never used my heritage or ethnicity to advance in my career. I am proud of my accomplishments and the hard work and long hours I endured to get to this level. Mr. Carlstrom's determination to hire a favored colleague is quite evident in his description or her budgetary credentials. What he and she failed to do was showcase any of her experience as it had to do with being an Administrative Officer.

The selecting officials, even after the vacancy announcement was amended, had no intention of making a selection from any other Certificate of Eligibility list other than the one Dottie Marshall's name appeared on, regardless of the names of other candidates who are/were Park Service employees or candidates who are not Park Service employees whose names appeared on the lists. They were determined to hire her no matter what. It was well known and rumored that Dottie Marshall was pre selected for the position of Administrative Officer (Associate Regional Director, Administration) before the vacancy announcement was published. When I applied for the position I was told that I would not get the job because it was slated for Dottie Marshall.

**Q.**  What is the age, race, ethnicity, and national origin of the individual selected?

**Q.**  The Federal government is directed to select the most qualified individual for each vacancy and position available. There were other Park Service employees with greater experience and serving at a higher grade level than Ms. Marshall. Why were they not considered the best candidates and hired?

**Q.**  Why didn't Mr. Carlstrom panel all of the candidates?

**Q.**  Did Mr. Carlstrom know that Ms. Aguilar had been a Deputy Director for Operations and Budget at the Department of Health and Human Services and was responsible for the operations of 10 regional offices in addition to the day-to-day operations of the headquarters office?

**Q.**  Given the previous position Ms. Aguilar held would Mr. Carlstrom consider her capable of doing the job of Administrative Officer, Associate Regional Director, Administration?

**Q.**  Did Mr. Carlstrom read Ms. Aguilar's resume and application package?

**Q.**  Ms. Aguilar served for more than two years as the Deputy Director for Operation at HHS at GS-15 grade level with a full range of administrative, policy, planning, budgetary, financial and operational responsibilities for 10 regional offices and a headquarters office. In accordance to the KSAs, what qualifications made this GS-14 selectee more qualified than Ms. Aguilar?

Current statistics show the National Park Service has in its permanent workforce 2,453 professional positions. Of the 2,453 positions 822 are held by white women, 42 are held by Black women, 30 are held by Hispanic women, 27 are held by Asian Americans/Pacific Islanders, and 16 are held by American Indian/Alaskan Native.

Comparing the years of 2002 and 2003, the National Park Service hired more white women than any other minority group of women. In permanent positions for the professional workforce 32 white women were hired compared to a total of 9 minority women (5 Black, 2 Hispanic, 2 Asian American/Pacific Islander, and 0 American Indian/Alaskan Native). In the administrative category the National Park Service hired 22 white women compared to a total of 3 minorities, none of whom are Hispanic (2 Black, 1 Asian

American/Pacific Islander)

Here are the current statistics for the National Park Service's permanent workforce nationwide for the categories of professional and administrative employment:

|  | 2002 | 2003 |
|---|---|---|
| White Male (Prof) | 1,393 or 57.2% | 1,391 or 56.7% |
| White Female (Prof) | 790 or 32.7% | 822 or 33.5% |
| Hispanic Male (Prof) | 42 or 1.7% | 44 or 1.8% |
| Hispanic Female (Prof) | 28 or 1.2% | 30 or 1.2% |
| White Male (Admin) | 3,036 or 50.1% | 3,074 or 50.1% |
| White Female (Admin) | 2,010 or 33.2% | 2,032 or 33.1% |
| Hispanic Male (Admin) | 150 or 2.5% | 156 or 2.5% |
| Hispanic Female (Admin) | 119 or  2.0 | 119 or 1.9% |

In addition, there are currently only 3 Hispanic males serving in a GS-15 grade level (2 recently promoted).  There are no Hispanic women at the GS-15 grade level compared to 113 white males and 40 white women (a combined total of 87% white representation).  Quotas are not allowed to be considered in government.  But if they were then the figures exhibited for this grade level would show such extremity at both ends of the spectrum that drastic measures would have to be taken in order to level out the workforce balances.  At the rate these positions are filled by qualified Hispanics I don't think the National Park Service will ever reach parity.

The fact that a white female was chosen for this position is of no consequence—she is still white.  According to the information I requested from the National Capital Region's Civil Rights Office, the National Park Service has identified Park Management as one of 12 major mission –related occupations targeted for recruitment efforts in its Affirmative Employment Program Plan.  The selected 12 major mission-related occupations were identified because they represent the most populous job series that afford the Park Service the best opportunity to diversify its work force.  Further the 12 occupations were identified as underrepresented for one or more of the EEO groups.

The National Park Service defines Severe Underrepresentation as a situation in which minorities and/or women are not present in a specific occupations within the work force.  The National Capital Region, in addition to the National Park Service as a whole, employs more white men and white women than any other group.  In fact, there are more white women employed than the aggregate total of all minorities combined.

The question was, "Do you know whether Ms. Aguilar applied under the initial or the amended announcement?"

14    14    Mr. Carlstrom's response was, "I don't recall."

**Rebuttal:** I believe he does know. If he didn't I don't think he would have changed the first vacancy announcement–he had no reason to. According to Mr. Lawler's testimony when asked if he knew why the announcement wasn't initially advertised as all sources, Mr. Lawler replied in part, "I don't think that directive (Management Succession Plan policy) had been enforced widely since the previous Director had left. I don't remember it being an issue on any other jobs."

In addition, when Mr. Carlstrom was asked, "Do you know whether Ms. Aguilar fell within the area of consideration at the time she applied for the position in question?" Mr. Carlstrom replied (page 15, line 8 ), "It was Department wide. I don't think she was employed with the Department of Interior. I don't recall."

The question was, "Do you know whether Ms. Aguilar fell within the area of consideration at the time she applied for the position in question?"

15    8    Mr. Carlstrom stated, "It was Departmentwide. I don't think she was employed with the Department of Interior. I don't recall."

**Rebuttal:** By his statement, Mr. Carlstrom is admitting he knew I applied for the position under the first vacancy announcement. Yet, in an earlier statement he stated that he did not recall if I applied for the position under the initial or amended announcement (Carlstrom testimony, page 14 , line14).

As I stated earlier, I believe that Mr. Carlstrom would not have amended or changed the closing date of the first vacancy announcement if I had not submitted my application prior to March 31, 2003. The amended vacancy announcement was published on March 31, 2003, the closing date of the first announcement.

I believe that the selecting officials have discriminated against me by violating the Equal Protection Clause of the Fourteenth Amendment (The Equal Protection Clause of the Fourteenth Amendment explains that "no State shall..deny to any person within its jurisdiction the equal protection of the laws.") and because NCR is an institution that accepts federal funds is also in violation of Title VI (Title VI provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. Section 2000d.

Section 1981(A) provides that: All persons within the jurisdiction of the United states shall have the same right in every State and Territory to make and enforce contracts..and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

The question was, " Is there any relationship between Ms. Aguilar's application and the decision to amend the announcement to expand the area of consideration?"

15          11          Mr. Carlstrom's response was, "No. And I can reiterate again it was based upon I guess an oversight that was particular to the entire National Park Service, a memorandum by a previous Regional Director. And it was called to our attention and we felt it was best to again re-advertise and expand the area of consideration.

**Rebuttal:** So, if the National Park Service has a fire safety policy in place and the National Park Service chooses to ignore or forget that the policy exists--does that mean that Mr. Carlstrom, a Regional Director is also allowed to ignore or forget that a fire safety policy is in existence? Citing an oversight is no excuse. Where is the accountability here?

The memorandum may have been called to Mr. Carlstrom's attention, but the fact of the matter is that he had not put the policy into practice from the very beginning of its existence. The memorandum was issued and put into place by Robert Stanton, an African American, the Director of the entire National Park Service and who had previously been a Regional Director--Mr. Carlstrom's boss.

Mr. Carlstrom worked under Robert Stanton and was part of the team that wrote the policy outlined in the memorandum. In addition, the vacancy announcement was not amended until the very last moment. The first vacancy announcement limiting the area of consideration to Departmentwide was published on March 10, 2003 with a closing date of March 31, 2003. The amended vacancy announcement was published on March 31, 2003. Again I cite Leslie Newman's statement indicating that the decision to amend and re-announce the vacancy announcement was made in between the time my application was received and the closing date of the first vacancy announcement (Newman testimony--page 11, line 17).

Q. Mr. Carlstrom's known about the policy for more than seven years. Why did he wait until now to make the change?

Q. Why did Mr. Carlstrom wait until March 31 to publish the amended vacancy announcement?

Q. Was the vacancy announcement amended out of fear of being challenged?

Q. Was Mr. Carlstrom advised of the memorandum's existence a couple of days before the announcement closed?

Q. On what date was he advised of the memorandum's existence?

Q. How many times did Mr. Reid and his office staff advise Mr. Carlstrom, Mr. Lawler, and Mr. Powers of the memorandum's existence before the vacancy announcement was amended?

Q. On what date did he give direction to amend and extend the vacancy announcement?

Q. Whom did Mr. Carlstrom direct to make the changes in the vacancy announcement?

Q. What was the date the vacancy announcement was actually amended?

Q. On what date was the amended vacancy announcement actually posted on USAJobs and the Department's website?

The question was, "Who made the decision not to interview any of those candidates?

16  5  Mr. Carlstrom's response was, "Well, we mutually came to that agreement by looking at the promotion eligibles."

**Rebuttal:** Mr. Carlstrom is the Regional Director. It was ultimately his decision to not interview non status candidates and to consider status candidates only.

Mr. Carlstrom has two Deputy Directors working under him, one white male and one African American male.

Q. Why didn't the second Deputy Director participate in the selection process?

**Q.**     Mr. Carlstrom said "we." Whom is he referring to when he says "we?" Is it Mr. Lawler, the white male Deputy?

**Q.**     Mr. Carlstrom and Mr. Lawler requested a panel of three for the status candidates but not for the non status candidates. Mr. Carlstrom and Mr. Lawler interviewed a select group of status candidates but they did not interview any of the non status candidates. Does Mr. Carlstrom considered this a fair and equitable process?

The question on page 16, line 20 was, "Is there any requirement to select those candidates with veteran's preference over those who do not have veterans' preference?"

17        7

Mr. Carlstrom's response was, "Yes. There are requirements for veterans based upon preference of military service, whether it's active duty associated with wartime or not, and if they've fulfilled the requirements of duty, there are preference points identified."

"In this particular case with all other things being equal, we did not look at the cert to determine whether or not some of those individuals would be in that particular classification. We had enough people within the competitive – in a position to competitively compete for the jobs that we felt that it was adequate for us to look at those positions and that they would meet our needs.

**Rebuttal:** They had enough people within the competitive ranks to competitively compete for the job and that was adequate to them? There will always be enough people within the competitive ranks to compete for job. If this is the standard for which status applicants are selected for Federal service jobs then there is no way anyone form outside government will ever gain Federal service employment, particularly minorities, since so many of the workforce within Federal government is white. For some of the same reasons Hispanic experience difficulties in getting hired into federal government service so do veterans. One of the tricks, a common practice of avoidance brought to my attention as a selecting official was that when veterans appear on a non status Certificate of Eligibility the selecting official is allowed to avoid having to select a veteran with preference by not interviewing anyone that appears on that same list. By doing this the selecting official avoids the difficulties of qualifying a decision to select a non veteran over the veterans on the list, in addition to avoiding OPM's ramifications for not selecting a qualified veteran, and being forced to hire a veteran. Or, if there is no way around avoiding the Certificates with veterans–then the option is to drop the Certificates and re-advertise the vacancy at a later date and hope that the same veterans or new

Another common practice of avoidance is to request multiple certificates of eligibles. Multiple certificates allow the selecting official a lot of latitude and flexibility. These multiple certificates are broken down by grade and status giving the selecting official several options for selecting a candidate, particularly if the selecting official is looking for one particular candidate. The selecting official also has the option of selecting directly from one of the certificates and or interviewing candidates selected from these certificates.

In this case, I believe that after all qualified candidates were initially rated and ranked by the same person and the Certificates of Eligibles were forwarded to the selecting officials. The selecting officials saw that there were several candidates who rated and ranked higher than their favored candidate and they decided to panel the merit status candidates only so that their favored candidate would have a better opportunity to rate high or higher than the non status candidates and perhaps rate higher than the other status candidates. When the panel completed its rating and ranking of the merit status candidates they then forwarded to the selecting officials their final list of best qualified status candidates. The selecting officials took this list as the panel's recommendations for interviews. This so called multi cert list of recommendations gave the selecting officials the opportunity to select from their most desired certificate(s). As I stated earlier, according to Ms. Newman, 13 status applicants on five different competitive level certificates (two for each GS-14 and GS-15 promotion eligibles, two for each GS-14 and GS-15 reassignment eligibles, and one for a re-promotion eligible) and eleven non status applicants (5 on the GS 14 Selection Certificate and 6 on the GS-15 Selection Certificate) were issued and referred to Mr. Carlstrom. Mr. Carlstrom chose to interview a select few from the status certificates only.

The general rule for interviewing under the merit promotion rules is that if you interview one from a particular list then you interview all from that same list. Mr. Carlstrom chose only Park Service employee to interview, avoiding altogether the non status list with veterans. He picked these individuals from the certificates their names appeared on. For instance, the certificate Ms. Marshall's name appeared on shows she was one of three best qualified candidates. At Mr. Carlstrom's own admission he interviewed only Ms. Marshall from this list and not the other two candidates who were not park service employees. These practices and those that I have listed above, in addition to others are common amongst those who wish to avoid hiring Hispanics, other minorities and veterans. I find these not so subtle practices of discrimination despicable. And, unless selecting officials and their supervisors are held

-43-

accountable, these type of practices will continue.

Under the Merit system principles, Section 2302., subsections (b)(4) and (6) Prohibited personnel practices, it states,"Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority deceive or willfully obstruct any person with respect to such person's right to compete for employment; and shall not, with respect to authority grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment. Please refer back to Item F.

If Mr. Carlstrom's intent was never to look at the non status list or to give those candidates serious consideration then his actions from the start of this selection process automatically disqualified me and all veterans from further consideration. The fact is, Mr. Carlstrom choose not to consider anyone on the non status list and he chose not to consider anyone from outside the Agency. If he had, by law he may have had to hire an Hispanic woman or a veteran for the position. His obligation to consider the veterans was met when he glanced at the non status applicants.

As for the requirement to select a veteran with preference over non veterans, the requirements are such that a non veteran can be selected under certain circumstances.

In the **VetGuide** (available through the Office of Personnel and Management) under the section **Disqualification of Preference Eligibles** it states: A preference eligible can be eliminated from consideration only if the examining office sustains the agency's objection to the preference eligible for adequate reason. These reasons, which must be recorded, include medical disqualification under CFR Part 339, suitability disqualification under 5 CFR Part 731, or other reasons considered by the Office of Personnel Management or an agency under delegated examining authority to be disqualifying.

Agencies have delegated authority for determining suitability in accordance with 5 FR Part 731. But, not over veterans with 30% disability.

Under 5 U.S.C. 3317,3318 and 5CFR 332.402, 332.404, 332.405, 332.406, and Parts 339 and 731 the issues of Disqualification of 30 Percent or More Disabled Veterans are outlined. One particular provision states that: If an agency proposed to pass over a disabled veteran on a certificate to select a person who is not a preference

eligible or to disqualify a disabled veteran based on the physical requirements of the position, it must at the same time notify both the Office of Personnel Management (OPM) and the disabled veteran of the reasons for the determination and of the veteran's right's to respond to OPM within 15 days of the date of the notification.  See Item K.

In my particular case, I know these laws are in place.  Initially, the veterans and me, a Hispanic woman were on a level playing field until the veterans were given 5 and 10 point preferences.  However, the White House, OPM, the Department of Interior and the National Park Service all have directives and mandates to recruit, hire, and retain more Hispanics in an effort to address the gross underrepresentation within federal government service.  One of the targeted EEO groups identified by the National Park Service is Hispanic women, of which there are very few and Hispanic women have been on the decline.  The need to hire more Hispanics, and in particular Hispanic women for upper level management positions, may equal and/or out-weight the need to hire veterans.  Thus, the argument for hiring an Hispanic woman while passing over veteran's with preference may be allowed.  I believe that of the 75 applicants, and particularly of the 47 well qualified, I was the very best and most qualified individual before preference and any other consideration was given to anyone, including Park Service knowledge and experience.  I was not only the highest scoring woman, I was the highest scoring minority.  Had Mr. Carlstrom paneled the non status applicants along with the status applicants I am sure that at the end of a rating panels evaluation of applicants I would have ranked at the top.

I don't believe the reasons, needs, or desires to hire another white woman with merit status over a more well qualified Hispanic woman or a more well qualified veteran with preference will pass scrutiny.  Usually Hispanics encounter difficulties getting hired into Federal service because they lack  Federal service experience.  In this case the Hispanic has Federal service experience, but did not get hired because she lacks <u>Agency</u> experience, another barrier (Agency experience was not a requirement listed in the KSAs).

Q.    If a vacancy announcement is advertised all sources, is it not incumbent upon the selecting officials to give serious and meaningful consideration, and interviews to those well qualified applicants that have in good faith submitted their applications?

Q.    If a vacancy announcement is advertised all sources, is it not incumbent upon the selecting officials to give serious and meaningful consideration to those applicants from sources other than the Federal government workforce?

**Q.**  What does Mr. Carlstrom mean when he says, "In this particular case with all other things being equal?" In what areas of the selection process does he believe equality took place?

**Q.**  When it was realized that veterans—disabled veterans had qualified for the position? Was Title 38, U.S.C. Affirmative Action for Certain Veterans given any consideration?

**Q.**  The top candidate on the non status list is a federal employee with USAID. He was given a rating that includes additional points for veterans preference showing a 30% disability. Did this candidate apply as both status and non status? If so, whose choice was it to not list the veteran on the merit status list and not compete him against the merit status candidates? If Mr. Carlstrom took one applicant from the non status list of eligibles and incorporated him into the status list, could he not do the same for this person?

**Q.**  Were any of the other veterans on the certificate lists Federal employees in non-military positions?

**Q.**  Did any of the veterans or applicants identify themselves as career or career-conditional?

**Q.**  I am a GS-15 who held a GS-15 position for more than two years. I scored a 97 out of 100. The top veteran is a GS-15 who scored 110 points. The selectee was a GS-14. How can the selectee be considered equally qualified with GS-15s?

**Q.**  Granted, there may have been enough diversity by grade level, but there may not have been enough diversity by ethnicity. How diversified, by race and ethnicity, was the list of the 47 qualified applicants?

**Q.**  Were any of the veterans listed on the certificates of eligibles previously considered and/or passed by the Department of Interior or the National Park Service? If so, how many times were they considered and/or passed over?

**Q.**  Were any of the veterans serving in a career conditional appointment at the time he/she submitted their application and/or during the selection process?

**Q.**  Were any of the veterans listed on the certificates of eligibles retired officers of the rank of major, lieutenant commander or higher?

**Q.**   If so, were any of these officers disabled veterans?

**Q.**   Were any of these veteran officers Reservists or retired Reservists?

The question was, "Was any consideration given to race in making the selection for the position in question?"

17        22        Mr. Carlstrom's response was, "None whatsoever."

**Rebuttal:** Mr. Carlstrom and the individuals involved in the selection process should have given serious consideration to race and ethnicity. This regional office doesn't exactly have a stellar record when it comes to hiring minorities for upper level positions, particularly for position at the GS-13 through GS-15 grade levels. The words minority or diversity do not mean black and white. There are other groups within the general population that are encompass by these terms. Currently, in this regional office there are three leadership positions: the Regional Director–white male, a Deputy Director–white male, a second Deputy Director–Black male. Before this position was advertised there were 15 people serving in the 341 job series for Administrative Officer within the National Capital Region, 3 white men, 9 white women, and 3 Black women. Now, with the selection of Ms. Marshall there are 10 white women.

Further, I believe the officials involved with this entire process picked their favored employee, a white woman who is a federal employee at the expense of the qualified candidates who applied, at the expense of the position, and at the expense of the Agency. I feel that the position and the Agency did not gain the benefit of a different qualified candidate.

The U.S. Equal Employment Opportunity Commission (EEOC) in its report on Employment of Minorities, Women, and People with Disabilities states that, "Title VII prohibits discrimination with regard to any personnel action, or term, or condition, or privilege of employment, based upon race, color, sex, national origin, or religion, this includes applicants for employment." I believe that the selectee was chosen because she is a white woman and the selecting officials did not want anyone other than a white person in that position, as evidenced by his pattern for hiring managers. The EEOC also states that, "In addition to the laws and regulations prohibiting discrimination on the basis of race, color, sex, national origin, religion, age, disability, and retaliation, the federal government acts pro-actively in the area of affirmative employment. I interpret "federal government" to mean agents and representatives of the government such as selecting officials and Regional Directors. I served in Federal service for several years

-47-

Q. What is the current composition of management at the GS-13, GS-14, GS-15 and SES levels at NCR? (by race, ethnicity, and gender)

Q. With such strong emphasis to further diversify the federal workforce, particularly in the National Park Service, did Mr. Carlstrom request a diversified pool of candidates based on race, ethnicity, national origin, sex, and age? If not, why didn't he?

Q. How many minorities applied for this position? Give the number reported to the EEO Office.

Q. Of that number of minorities who applied for this position, how many were Hispanic? Give the number reported to the EEO Office.

Q. How many Applicant Background Surveys were submitted for this position? Give the number submitted to the EEO Office.

Q. What efforts were taken to encourage applicants to submit a self identifying Applicant Background Survey before and after applications were submitted?

Q. Do you receive reports on workforce diversity and underrepresentation figures? If so, what are the titles of the reports and how often do you receive them?

Q. In the nine years Mr. Carlstrom has served in the National Capital Region, has he attended any diversity training classes or programs? If so, where and when?

The question was, "Was any consideration given to national origin?"

18        1        Mr. Carlstrom's response was, "None whatsoever."

**Rebuttal:** Mr. Carlstrom and the individuals involved in the selection process should have given serious consideration to national origin. The bar was raised high and a Mexican American woman met the challenge. But despite the policies, mandates, and directives that obligated Mr. Carlstrom and his managers to give race and ethnicity every consideration, he did not. What's more, Mr. Carlstrom, was a member of the National Park Services' National Leadership Council; the very Council that approved the Plan for Management Succession. The main goal of the Management Succession Plan was to "meet the National Park Service's need for management skills and work force diversity by

the end of the century." A goal that has fallen very short of its mark. And, again, I refer to Mr. Berry's memo, that was issued after Mr. Stanton's giving a explicit directives recruitment of a workforce that reflects the nation, utilize targeted recruitment initiatives to assure diverse applicant pools, and remove any unjustified barriers that would prevent equal employment opportunities for all applicants. In addition, the memo states that all managers and supervisors will be held accountable for ensuring equal opportunity and nondiscrimination in accordance with Departmental directives.

Further, Mr. Carlstrom has not hired Hispanics in the Regional Office, nor has he sought to hire Hispanics, nor has he promoted Hispanics to upper managerial positions in the seven years he as been the Regional Director. In this instance he chose a white woman with less administrative managerial experience over a well qualified Mexican American woman with greater administrative managerial experience, bringing the total to 10 white women in upper level managerial positions in his Region. You lead by example. The disparate impact is such that applicants who are not park service employees or park service employees with intimate knowledge of the region, regional office, parks and facilities within the region are prevented from acquiring the upper level management positions advertised because of the barriers the selecting officials choose to use at any given time. This is particularly true for Mexican Americans, other Latinos, and other minorities—if minorities are not hired they don't gain the experience the Regional Office is requiring. And, if minorities are hired, they are hired at a lower level with little hope of advancing. There are not many Hispanics in the National Park Service nationwide. Many have left, many are leaving, and many are not being hired to replace them.

Again, I cite Regents of University of California v. Bakke, as referenced in the Syllabus for Grutter v. Bollinger (b) (c). Please refer to Item M. It states, "All government racial classifications must be analyzed by a viewing court under strict scrutiny. But not all such uses are invalidate by strict scrutiny. Race based action necessary to further a compelling governmental interest does not violate the Equal Protection Clause so long as it is narrowly tailored to further that interest. Not every decision influenced by race is equally objectionable, and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the government's reasons for using race in a particular context."

"The Court endorsed Justice Powell's views that student body diversity is a compelling state interest that can justify using race in university admissions. The Court deferred to the Law School's educational judgement that diversity is essential to its educational

The article further reports that the government has a decent track record when it comes to hiring minorities: Blacks represent more than 17 percent of the federal workforce—about 6 percent higher than the nation's labor force, Native American representation in the government is about 1 percent higher than in the private sector, Asians and Pacific Islanders do as well in the government as they do in the private sector.

The article continues by indicating that civil service rules direct agencies to reflect the nation's diversity, and a 1997 Merit Systems Protection Board study recommended that agencies dedicate more resources to hiring qualified Hispanics.

According the OPM report the majority of Hispanics are clustered in the government's entry-level and middle pay grades and in blue-collar jobs. In 2002, about 38,000 Hispanics were in General Schedule grades 9 through 12, with about 32,000 in grades 5 through 8, in addition to 14,000 classified as holding blue-collar jobs. The report further indicated that some agencies "can do better" and provide examples of successful approaches to Hispanic recruitment.

Mr. Ponce further stated in the article, "As grade levels go up, the Hispanic representation goes down." He noted for the article that the report lists 504 Hispanic employees in "senior pay" positions and about 1,800 at the GS-15 level, the top rung of the pay scale for most federal workers. Mr. Ponce also stated, "It would seem that agencies should be hiring more on the high end of the pay scale," at the GS-13 through executive levels.

The article also references a statement made by Kay Coles James, the OPM Director, in her cover letter for the report. In a direct reference to Hispanics she pledges, that the administration "will continue to reach out to the many talented and skilled citizens within the Hispanic community."

**Q.**    How was I identified?

**Q.**    There were 75 applicants. In an ideal world a diverse applicant pool might reflect nine Hispanics, nine African Americans, four Asian/Pacific Islanders, one or two Native Americans, and 52 white applicants. Of the 47 qualified applicants a diverse pool to select from might include four Hispanics, 3 African Americans, two Asian Pacific Islanders, and one Native American. A diverse pool to interview might include two Hispanics, two African Americans, two Asian Pacific Islander, two Native Americans. Did Mr. Carlstrom instruct personnel to solicit applicants from diverse communities within the Washington, D.C. Metropolitan area?

If not, why not?

Q.    How many Hispanics work at NCR? What are the breakout numbers in terms of full time, part time and seasonal workers and at what grade levels?

Q.    How many Hispanics have applied for managerial positions over the last three years at NCR?

Q.    Of those Hispanic applicants who applied for managerial positions, how many made the Certification of Eligibility list? And, for what positions at NCR?

Q.    When was the last time an Hispanic was hired for a managerial position at NCR?

Q.    How many Hispanics were hired at NCR and for what positions over the last 10 years?

Q.    How many opportunities were there for minorities, particularly Hispanics to apply for managerial positions at NCR at the GS-12 and above grade levels over the last 5 years?

Q.    The National Capital Region, as does all other regional offices are to report all of their hires to the National Park Service's Equal Employment Office. These reports are then complied into what is known as the National Park Services Equal Employment Opportunity Report. Its purpose is to show whether nor not minorities are reaching parity within the federal government workforce. This report is then sent to the Department of Interior and OPM. OPM compiles all of the reports it gets from all Departments and Agencies and then sends it to Congress for oversight. When was the last report sent to the NPS EEO?

Q.    What did the National Capital Region's report say with regard to Hispanic Employment?

Q.    Again, why is it that given the directives and this most recent opportunity to hire a Hispanic, a very well qualified Mexican American woman, for the Administrative Officer position within NCR, Mr. Carlstrom chose not to?


The question was, "Was any consideration given to age?"

18        3        Mr. Carlstrom's response was, "None whatsoever."

**Rebuttal:** Job market bias for those over the age of 50 is a fact. I believe Ms. Marshall, the selectee is younger than I am. Age is a factor here because for people over the age of 40 and especially for those over the age of 50, employment becomes more difficult to gain. Ms. Marshall, the selectee, has been with the National Park Service, National Capital Region for several years. She is not going to be leaving the organization any time soon. I believe that the selecting official did not select someone older, like me, because he may be inclined to believe that someone older would leave the organization before someone who is younger.

For those of us who are of Hispanic heritage--we get a double whammy--gaining employment after the age of 50, regardless of our qualification, becomes even harder. Not only are we looked upon as an undesirable minority, we are also looked upon as incompetent and undependable.

Q.  What was the composition of the applicant pool for this position by age and sex? How many applicants were under the age of 40? How many over the age of 40, but under 50? How many over the age of 50, but under the age of 60?

Q.  What was the composition of each Certificate of Eligibility list by age and sex?

Q.  What is the age, race, ethnicity, and national origin of the individual selected?

Q.  What are the ages of individuals hired over the last 5 years?

The question was, "Were you aware of Ms. Aguilar's race and/or national origin at the time of her application for the position in question?"

18        7        Mr. Carlstom's response was, "No."

**Rebuttal:** I believe he did know or assumed to know that I am Hispanic. One of the other candidates Mr. Carlstrom refers to is assumed to be Hispanic (see page 18, lines 23, 24 and page 19, line 5). I believe his reference is to the name Portillo. Mr. Lawler made the same assumption in his testimony (Lawler testimony page 14, lines 16-22). Aguilar is an Hispanic name, therefore, Ms. Aguilar is Hispanic.

Furthermore, Mr. Bill Nieto works for the National Capital Region. Mr. Carlstrom and Mr. Lawler know Bill Nieto and they know he is Hispanic because he self identifies as Hispanic. The name Nieto

was written next to my name on the Certificate of Eligibles that my name appeared on. I am sure that with the names Aguilar and Nieto the association to Hispanic heritage was made.

The question was, "How would you respond to Ms. Aguilar's contention that she was discriminated against because she was not considered equally with the other candidates because she was not interviewed for the position in question?

18       19       Mr. Carlstrom's response was, to go back to the race question. He stated, "Of the individuals, I didn't identify that one of them is an African-American. One of them."

**Rebuttal:** Mr. Carlstrom did not answer this question. He attempted to address it following the subsequent question. But he still does not answer the question regarding my contention that I was discriminated against because I was not considered equally with the other candidates. Instead, he refers back to the question of race and identifies the race of those he did interview. He further states that he was not interested in other individuals, myself included, in terms of capabilities. He further states that, "he had a specific thing in mind with regard to selecting someone who had familiarity with the National Park Service."

The question was," Are you saying the individuals who were interviewed?"

18       23       Mr. Carlstrom's response was, "Yes. That I saw. One works here, so obviously, I know. Another one that applied is a Hispanic. Of course, one's a white female and one was a white male. So within the applicants that were interviewed, the one that withdrew was a white male but there was diversity involved with our selection at that time."

"As far as the question about whether or not we were interested in looking at other individuals, in particular Ms. Aguilar, in terms of her capabilities as it related to what I indicated earlier about we had a specific thing in mind with regard to selecting someone who had familiarity with the National Park Service, no. Would it have made a difference? I don't know."

"I certainly could have chosen to interview all 47 but that would have been a very difficult situation."

"So within my prerogative, I narrowed it down with the assistance of the panel to those individuals within the KSAs that I felt –we felt – could best meet the needs we have within the National Capital

Region and the requirements of the job.

**Rebuttal:** Mr. Carlstrom admits that because I lacked National Park Service familiarity, I, therefore lacked the capabilities to do the job. By choosing to select the most desirable candidate through barriers such as the use of limited areas of consideration, multiple certificates of eligibles, further paneling of the merit status candidates and not competing non status candidates against merit, reassignment, and re-promotion status candidates, and by selecting Park Service candidates for interviews from the lists that included Park Service employees the selecting officials denied me equal treatment and equal opportunity to compete for the position. In support of this claim I cite Northeaster FLA. Chapter, Associated Gen. Contractors of America v. Jacksonville, 508 U.S. 656 (1993), the Supreme Court considered whether an association challenging an ordinance that gave preferential treatment to certain minority-owned businesses in the award of city contracts needed to show that one of its members would have received a contract absent the ordinance in order to establish standing. The court found that no such showing was necessary. It was explained that, " 'the injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit...And in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of contract." Id., at 666. "The court concluded that in the face of such a barrier, ' to establish standing, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."

Mr. Carlstrom interviewed only park service employees regardless of which list they appeared on while ignoring and not interviewing other individuals whose names were listed with these park service employees. Federal employees from other Departments or Agencies were on an equal playing field until the interviewing process. It was at that time that they were purposefully dismissed from consideration. Where's the fairness in that? This practice of interviewing and selecting Park Service employees only in itself is indicative of an internal incestuous policy and exemplifies the job protective attitudes of white management.

Mr. Carlstrom admits that he was not interested in looking at other individuals, in particular Ms. Aguilar because he wanted someone who was familiar with the National Park Service, a criteria or pre requisite not listed as a requirement within the KSAs. He also admits that he does not know if interviewing me would have made a difference. But, then again, he was not interested in me or in making a difference.

-56-

He further stated that he could not have chosen to interview all 47 applicants because that would have been a very difficult situation. The fact is he could have if he wanted to. The certificate dates could have been extended to accommodate the length of time it would have taken to interview all 47 applicants. He could have interviewed the 23 best qualified, but he didn't. He could have interviewed the top three candidates from each Certificate of Eligibles list, but he didn't. Better yet, he could have rated and ranked all 47 candidates through a panel and then interviewed the top 10-15 applicants listed, but he didn't.

Mr. Carlstrom also indicated that he used his prerogative to narrow down the list of interviewees with the assistance of the panel. This would have reduced considerably the number of applicants to be interviewed. Of course it was, especially since he selected a specific group to be paneled. Also, the issue here is Mr. Carlstrom did not interview the six candidates on the non status certificate list along with the top ranking candidates from the status certificates. He didn't even interview the other candidates that appeared on the same lists he selected the interviewees from.

As for the identity of the candidates Mr. Carlstrom interviewed, how does he know what their ethnicity or national origins are. He stated one of the applicants he interviewed was an Hispanic. Was Mr. Carlstrom guessing because he looked Hispanic? Or because he has an Hispanic sounding name? He could be, Native American, Portuguese, Italian, Irish, Middle Eastern, Scandinavian, Philippino, or Hawaiian or of some other ethnic origin.

Q.  How does Mr. Carlstom know that the person he is referring to as Hispanic is Hispanic?

Q.  Did that person self identify to Mr. Carlstrom at any time before, during or after the interview that he is Hispanic?

Q.  Did this person send in his self identifying background survey indicating that he is Hispanic? And was this information divulged to Mr. Carlstrom?

Q.  Is this person listed as one of the few Hispanics in the National Park Service? If so, what is his position and grade level?

Q.  Who is included in the "we" Mr. Carlstrom is referring to here?

Q.  Did Mr. Carlstrom check with the EEO Office to determine if Hispanics had applied for the position? If not, why not?

-57-

The question was, "Did you and Mr. Lawler make a second choice?"

| 19 | 24 |
|----|----|

Mr. Carlstrom's response was, "I tell you what. It was pretty tough. The other three was actually a second choice. If we went and looked, I used a very crude a numerical numbering system. I may have identified a second or may not have."

"But if you would ask me if we had a second choice, it may have well been – and I'll paraphrase that. If you're asking me, it probably would have been Ken Brody."

**Rebuttal:** Mr. Carlstrom stated that he may have identified a second choice or he may not have. I am sure that if he had, he would have remembered who that person was because that person would have made a favorable impression on him. As for choosing a second choice and indicating that choice would have been Ken Brody, an African American– did he, at that moment, choose Mr. Brody to make the investigator (who was African American) believe he, Mr. Carlstrom, was not biased?

According to Ms. Newman, Mr. Brody is a GS-13. He was listed on the promotion eligible GS-14 certificate.

**Q.** Other than his Park Service experience in the administration office at the National Capital Region, what qualifications does Mr. Carlstrom think that Mr. Brody has that may have prepared him for this position? What qualifications does Mr. Brody have that are equal to or are above my qualifications or the qualifications of the other GS-15s listed on the reassignment and non status certificates and, or for that matter, the GS-14s that are status and non status?

**Q.** Did Mr. Carlstrom choose Mr. Brody as a second choice because he is African American?

The questions were, "You indicated that you did keep notes or you did provide the interview notes to Ms. Newman." "Would those notes contain the order of ranking from you and Mr. Lawler?"

| 20 | 18 |
|----|----|

Mr. Carlstrom's response was, "No. It's my – he uses a similar system than I use. It's a grid system. I just have filled out the KSAs, the particular areas I want to question, alluding to your earlier statement where I can have consistency in what I'm doing. And I'm asking each individual to assure that the same questions are asked."

"And my responses are there in a grid kind of form for each interview on the X axis, the Y axis having the specific questions."

**Rebuttal:** A similar question was asked of Mr. Lawler. Mr. Lawler stated in his testimony that he did keep some notes. He further elaborated by saying, "I'll be honest. My boss is a much better notekeeper and I rely on his notes probably even more than my own."

~~Q.    Did you write the~~ *5A*

The question was, "Are there any other comments you would like to make on the record regarding the claim that is under investigation in this complaint?"

21        9

Mr. Carlstrom's response was, "Only that as related to the needs of the National Capital Region, the requirements of the position and the requirements and demands dealing with security, dealing with the competitive sourcing that we are involved with now and the nature of line item construction program and other administrative requirements, that through a process of selection and by re-advertising to expand the area of consideration, I firmly believe we made the best selection that we possibly could have off the list that was provided to us."

**Rebuttal:** Again, Mr. Carlstrom admits that his choice of Dottie Marshall was based on her park service knowledge and experience and on criteria that had little to do with the KSAs.

I understand how institutional knowledge and experience gained by an applicant can be a plus when a position opens within the same organization an applicant works for. However, when selecting officials make institutional knowledge of a specific area and experience gained within that area the only criteria from which they make their selection and disregard the actual criteria used to solicited applicants for the position, then the solicitation of applicants is based on false pretenses. In addition, Mr. Carlstrom's blatant manipulation of the selection process and circumvention of the system caused harm to not only me but to the veterans as well. Let me recap my allegations regarding this selection process.

Unfairness of selection procedure is generally characterized as a condition in which members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences are not reflected in differences in measures of job performance. In this particular case the opposite is true. An Hispanic scored very high and still was not given serious consideration for the position.

I was discriminated against by Mr. Carlstrom, Mr. Lawler, Mr. Powers and the National Park Service as a result of their blatant

disregard for and manipulation of the laws, rules, regulations and
policies governing equal access, equal opportunity, and equal
consideration in the selection process. Mr. Carlstrom, et. al, did not
discriminate against me just because I am a 51 year old woman
and an Hispanic, he discriminated against me in favor of the white
woman he and the other officials, had pre selected for the position.
Their conspiratorial and contrived efforts to ensure she would get
the position went so far as to write the KSA to fit her personal skills
and abilities, created a hand-picked panel for the merit promotion
eligible applicants only after it became clear that she did not rank
near the top of the initial Certificate of Eligibility list, chose only
status candidates who were Park Service employees to interview
furthering their opportunity to select her over more qualified (and
perhaps, ethnic) Park Service employees.  The following are the
key facts of my complaint:

1.      I believe the KSAs written for the first vacancy
        announcement were purposely written in generic terms so
        that the preselected candidate, who has very little
        experience in Administration, could qualify for the position.
        More importantly, the deviation in the KSAs, particularly
        between KSAs Titled One and Two, are considerable
        compared to the other KSAs.  It appears they were
        purposely rated in such a manner so that the preselected
        candidate's strengths could be rated high for KSA Title Two
        and her weaknesses would fall in line with the low ratings
        given to KSA Title One.  The position is Administrative/
        Administration.  It is my experience that upper level
        management position descriptions convey that the position
        covers a number of responsibilities nearly equal in duty
        responsibilities.  An Administrative Officer's job is to manage
        and give direction to the various components under his/her
        purview.  In addition, an Administrative Officer strategizes,
        develops, plans, and implements policy and serves as an
        advisor.  The Administrative Officer at times must use skill,
        tact, and diplomacy when negotiating and resolving complex
        problems that may arise with subordinates' issues,
        colleagues, project managers and community
        representatives. However, complex issues and problems
        don't arise often and certainly not without some prior
        knowledge of the complexity of the issue.  And when a
        complex issue is in need of an Administrative Officers
        attention, it is only after his/her manager has put forth every
        effort to resolve a problem and it is then up to the
        Administrative Officer to offer alternative solutions.  I don't
        believe that an Administrative Officer in this particular
        position would be facing serious complex issues in need of
        negotiations and resolution on a day to day basis.
        Therefore, KSA Titles one, three and five should have had

higher ratings and Factor Weights than the other two KSAs.

2. The first vacancy announcement was purposely limited to an area of consideration and time in order to limit the applicant pool. This was done so that Mr. Carlstrom, Mr. Lawler, and Mr. Powers would be assured the person they preselected for the position (Ms. Dottie Marshall, a Park Manager, GS-14, for the National Capital Region) would be one of a few to apply for the job.

3. Mr. Carlstrom chose to ignore the existence of the National Park Service's Plan for Management Succession. He had to be reminded that the policy existed, even though he was a member of the team that wrote the policy and as Regional Director was responsible for the distribution of the policy amongst his regional managerial staff and employees and its implementation. He has not implemented this policy nor has he taken the policy seriously throughout his seven-year tenure. I believe he did not respond to the advise of the EEO Director, Mr. Mel Reid, until after my application was received in the Office of Administration on March 27, 2003.

4. The receipt of my application for the Administrative Officer (Associate Regional Director, Administration) position forced Mr. Carlstrom to amend and extend the closing date of the first vacancy announcement in order to comply with the National Park Service's Plan for Management Succession.

5. The vacancy announcement opened on March 10, 2003 and was scheduled to close on March 31, 2003. The vacancy announcement was amended to reflect a change in the Area of Consideration (from Departmentwide only to All Sources), the closing date was extended to April 14, 2003, and the Salary Range was changed from a GS-15 to a multi grade level of GS-14/GS-15. In addition, the Summary of Qualifications Required for the GS-15 level was amended to include this sentence: To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression <u>for the occupation in the organization.</u>

6. The presence of discriminatory intent can be inferred from the fact that there were differences in treatment. The standards were not the same for all qualified candidates. Therefore, several candidates did not receive an equal opportunity.

   • Mr. Carlstrom admitted he did not personally review the non status candidates applications, he only

-61-

have been used.

• In addition to the merit status candidates being given the advantage of an additional and different rating and ranking process, the selecting officials changed the criteria for which their selection would be based. During their consideration of all qualified applicants, the selecting officials decided to add critical elements that were not listed as requirements within the KSAs. They determined the additional critical elements to be a) familiararity with the National Park Service and as it relates to the National Capital Region, b) experience from within the organization, c) knowledge of current administrative needs, d) intimate knowledge of the requirements, approvals, and the processes for contracts, e) detailed (demonstrated?) knowledge of the budget process, f) experience with competitive sourcing, and g) someone with a park operational background and experience. When I was a Federal employee, at the Department of HHS as Deputy Director for Operations and Budget and as a selecting official it was my responsibility to ensure that any applicant's lack of Federal service and/or lack of Agency experience and knowledge was not used as a disqualifying prerequisite during a selection process for a position. Hispanics, continue to encountered difficulties getting hired into Federal service. For years Hispanics were kept from gaining jobs in the Federal government because they did not have the kind of Federal and/or Agency experience and knowledge many jobs required. Now that we are gaining Federal experience the barriers are still held in place. I know, and I am assuming Mr. Carlstom knows that these type of requirements are recognized as barriers. Unfortunately, they are still being used. In this case the Hispanic woman did not get considered for the job or hired not because she lacks Federal experience, but because she lacks <u>Agency</u> experience. The glass ceiling is still held tight.

• Mr. Carlstrom and the other selecting official chose to interview status candidates only, thereby eliminating the more qualified GS-15 non status candidates. The selecting officials chose only Park Service employees to interview from amongst the status candidates recommended by the panel and from the status lists that did not receive a panel review. In addition, the selecting officials ignored the rule of three when they conducted their interviews. When Mr. Carlstrom

-63-

chose Mr. Brody to interview, he was supposed to interview all of the other candidates on the list Mr. Brody's name appeared on. Mr. Carlstrom was supposed to do the same thing when he selected Dottie Marshall to interview. He should have interviewed the other two GS-14s eligible for promotion in addition to Ms. Marshall.

- All five of the candidates chosen for interviews were Park Service employees. Three of the Park Service candidates chosen for interviews were not of this region, one was a GS-15, one a GS-13, and there is no indication of a grade level for the third person–according to the additional criteria imposed on the candidates these three would not have been hired because they lacked regional knowledge and experience. The other two candidates chosen for interviews were regional employees. One was a GS-13–he would not have been hired because he lacked a park operational background. The other regional employee was a GS-14 has Park Service knowledge and experience, she has a park operational background, and she has worked in this region of several years– she was hired for the job.

- The selecting officials did not interview anyone from the non status lists of candidates, thus sidestepping the list with veterans and the only Hispanic woman. Mr. Carlstrom and the other selecting official circumvented the system by not interviewing any of the veterans and chose to ignore the laws governing the Rule of Three and Veteran Passovers.

7.   Given the directives and mandates by the White House, OPM, the Department of Interior and the National Park Service to recruit, hire, and retain more Hispanics in an effort to address the gross underrepresentation within federal government service; and the fact that one of the targeted EEO groups identified by the National Park Service is Hispanic women; and the fact that Hispanics, particularly Hispanic women have never held a management position within the National Capital Region; and for the fact that this may have been the first time a very well qualified Hispanic woman presented an opportunity for hire to the National Capital Region, the selecting officials who are identified as the Regional Director and Deputy Regional Director (both white males) chose to select a less qualified white woman over a very qualified Hispanic woman for the position, even though the representation of  white women within the Region

is 60% over parity.

8.  I am a very well qualified candidate; I believe better qualified than the selectee. I feel that I was discriminated against as a result of the premeditated collective selective actions of the selecting officials, the deliberate disregard and neglect of the affirmative plans and policies in place, and by the preparations, determinations and publications of the vacancy announcements prepared by all of the individual(s) involved, which are indicative of a deliberate scheme and conspiracy to prevent anyone other than the selectee from attaining the position of Administrative Officer (Associate Regional Director, Administration) at the National Capital Region. They discriminated against me–a Hispanic woman, other minorities, veterans, non park service employees and other park service employees for the benefit of hiring a specific white woman park employee, Dottie Marshall, the selectee. I don't believe this is an isolated experience. There appears to be a pattern here, particularly with regard to their indifferent, apathetic and neglectfulness of the affirmative plans and policies. Just because an issue like this has not been brought to their attention before, does not mean that what they have been doing is right, nor should they gain licence to continue such practices, nor should they feel that they were and are absolve from any responsibility for not carrying out the laws, rules, regulations, and policies that have been put in place by the Administration, OPM, their Department and their Agency.

With the Management Succession Plan in place, The Uniform Guidelines on Employee Selection Procedures, 1607.4 (E) Consideration of user's equal employment opportunity posture, states that "In carrying out their obligations, the Federal enforcement agencies will consider the general posture of the user with respect to equal employment opportunity for the job or group of jobs in question. Where a user has adopted an affirmative action program, the Federal enforcement agencies will consider the provisions of that program, including the goals and timetables which the user has adopted and the progress which the user has made in carrying out the program and in meeting the goals and timetables. While such affirmative action programs may in design and execution be race, color, sex, or ethnic conscious, selection procedures under such programs should be based upon the ability or relative ability to do the work.

9.  Further, the competitive selection certificate Ms. Marshall's name appeared on was issued on April 24, 2003. It shows

that Ms. Marshall was interviewed on May 14, 2003. The certificate was valid through close of business of May 23, 2003. The Regional Director and Deputy Director (both selecting officials) did not sign the certificate of selection until May 27, 2003. Their failure to sign and date the document by close of business May 23, 2003, makes the certificate null and void. Therefore, based on this technicality the certificate was dead and Ms. Marshall should not have been hired.

# EXHIBIT 31

**REBUTTAL STATEMENTS**
by
**SANDRA L. AGUILAR**
Case No.: FNP-2003-064

### Rebuttal to the Testimony of Joseph M. Lawler

Under Section 1607.17 of the Code of Federal Regulations, Title 29, Volume 4, Parts 900-1899, Revised as of July 1, 2000, there is a section titled the Uniform Guidelines on Employee Selection Procedures (Part 1607) it states "Equal employment opportunity is the law of the land. In the public sector of our society this means that all persons, regardless of race, color, religion, sex, or national origin shall have equal access to positions in the public service limited only by their ability to do the job. There is ample evidence in all sectors of our society that such equal access frequently has been denied to members of certain groups because of their sex, racial, or ethnic characteristics. The remedy for such past and present discrimination is twofold: a) vigorous enforcement of the laws against discrimination, and 2) affirmative, voluntary efforts on the part of public employers to assure that positions in the public service are genuinely and equally accessible to qualified persons, without regard to their sex, racial, or ethnic characteristics. Without such efforts equal employment opportunity is no more than a wish." See Item A.

My interpretation of the Code, now and when I was the Deputy Director for Operations at the U.S. Department of Health and Human Services and as so mentioned has also served as a selecting official, with regard to the use of selection procedures, is that the selection process used is to be fair and trustworthy, giving all applicants equal consideration under the same set of standards, by utilizing procedures that have been demonstrated to have minimal adverse impact. In addition to, taking into consideration, alternative selection procedures that would further reduce adverse impact to any particular groups as identified in Title 29.

It is my perception and belief that I, an Hispanic woman, was discriminated against on the basis of race, national origin and age when on July 7, 2003, I was informed that I was not selected for the position of Administrative Officer (Associate Regional Director, Administration) for the National Park Service, National Capital Region. The person selected for this position was a white Anglo woman, younger in age than me.

I contend that the selection procedures used by the previous Administrative Officer, the staff in the Office of Administration and staff in the Office of Human Resources, and the selecting officials to select the candidate to fill the vacancy of Administrative Officer (Associate Regional Director, Administration) (Vacancy Announcement Number NPS-NCR-03-19) are evident of having an adverse impact on myself, an Hispanic, more importantly–an Hispanic woman. I further contend that the former Administrative Officer and the selecting officials knowingly and willfully manipulated the system before and after the vacancy announcements were published in such a manner that they were able to hire a candidate they had pre selected prior to publically announcing the vacancy.

-1-



RECEIVED
DEC 10 2003
NATIONAL PARK SERVICE
EQUAL OPPORTUNITY OFFICE

As of March 31, 2000, the Department of the Interior recorded a workforce numbering 57,159. Of the 57,159 only 4.8% were Hispanics Americans. Awareness of Hispanic under-representation had been growing for years. The White House, in 1996, directed government officials to put policies and programs in place to address this issue. Henceforth, the National Park Services' Management Succession Plan dated February 1999, was put into force. See Item B.

In addition, Executive Order 13171 was issued on October 12, 2000, addressing the issue of continued underrepresentation of Hispanic Americans in the federal workforce and it directs departments and agencies to develop remedies to improve the representation of Hispanic Americans in Federal employment, including broadening the area of consideration, ensuring that selection factors are appropriate and achieve the broadest consideration of applicants and do not impose barriers to selection based on nonmerit factors, and consider appointing Hispanic Federal executives to rating, selection, performance review and executive resources panels and boards. See item C.

On January 18, 2001, Executive Order 13197, Government Accountability for Merit System Principles was implemented. This Executive Order established Civil Service Rule X, which gives the Office of Personnel Management the authority to require and hold accountable agencies to establish and enforce a Human Resource Management Accountability System.

The Department of Interior and the National Park Service tout their desire to increase diversity. In the Department Strategic Human Capital Management Plan, FY 2003-2007, Section 2, "diversity" is defined (in their words) " in broad terms, including but not limited to racial, religious, color, gender, national origin, disability, sexual orientation, age, education, geographic origin, and skill characteristics." "Having a diverse workforce is essential to providing services to the culturally and linguistically diverse populations that visit the Department's facilities and lands. Having a diverse workforce helps recruitment and retention of highly skilled employees from the entire civilian workforce and conveys the message that DOI provides equal opportunities to all." See Item D.

The National Capital Region, in addition to the National Park Service as a whole, employs more white men and white women than any other group. In fact, currently, white male representation is at about 65 percent. Further, there are more white women employed than the aggregate total of all minorities combined. They admit they have a problem with diversifying their workforce and they have designed ways to address this issue. They have identified their needs and they set goals, targets, and time lines.

However, by their own admission in statements given in the Department of Interior's Strategic Human Capital Management Plan FY 2003-2007, "the Department has not done a good job of attracting, hiring, developing, and retaining a diverse workforce, as required by Federal law and Department policy."

So, what do they do? They hire another white woman, regardless of their own policies, rules and rhetoric. The Department and the National Park Service allowed the National Capital Region officials, managers and staff to ignore and dismiss the directives by hiring another white woman without fear of consequences because there is no accountability nor enforcement. Currently, the number of people working in the 341 job series at the National Capital Region, which is the job series I applied to at the National Capital Region, is 15. Of the 15, 12 are women–80%. The breakdown before the vacancy was filled by race and ethnicity was 3 white men–20%, 9 white women–60%, and 3 Black women–20%.

The following are my rebuttal statements and questions to the sworn statements given by Mr. Joseph M. Lawler, Deputy Regional Director for the National Park Services' National Capital Region.

**PAGE        LINE  STATEMENTS:**

The question was, "How long have you been employed in your current position?"

4              11    Mr. Lawler's response was, "Seven years.

**Rebuttal:** Like Mr. Carlstrom, Mr. Lawler has been serving in his current position for seven years. He too worked under Mr. Robert G. Stanton. Mr. Stanton served as the Director for the entire National Park Service from June 28, 1997 to January 2001.

As a management official Mr. Lawler's was aware of the efforts Mr. Stanton was making to make job acquisition easier to obtain for those outside of government and to further diversify the National Park Service and the National Capital Region. The National Park Services' Management Succession Plan dated February 1999, was put into force, of which Mr. Lawler should have received a copy. I believe he knew Mr. Stanton wanted to hire more Hispanics, especially for the National Capital Region (NCR), which is grossly underrepresented. As I stated in my rebuttal to Mr. Carlstrom's statements, to date there is only one Hispanic manager at a GS-12 level at NCR. To my knowledge there has never been an Hispanic manager above a GS - 12. I believe the last and only Hispanic manager (a male) hired in the National Capital Region was 12 years ago.

Q.     Mr. Lawler has been in his current position for seven years. During these seven years how many vacancies in the National Capital Region have been filled since Mr. Lawler became Deputy Regional Director?

-3-

Q.   Of these vacancies, how many did Mr. Lawler assist in with the selection?

Q.   Of those vacancies how many were managerial positions and at what grade levels?

Q.   Of those hired, appointed, or transferred to his region during Mr. Lawler's tenure and prior to April 30, 2003, how many are white? How many are Black? How many are Hispanic? How many are Asian/Pacific Islanders? How many are Native Americans or Alaskan Natives? What are their grade levels?

The question was, "Did you have any involvement in the selection process for the Administrative Office position in question?"

4           19   Mr. Lawler's response was, "Yes."

**Rebuttal:** Mr. Lawler admits to his involvement in the selection process, but to what extent?

Mr. Lawler is one of the two Deputy Directors for the National Capital Regional Office. As one of the Deputies he has oversight authority over several division managers, park managers, program managers and maintenance crews. As an operations manager the Director for the Office of Administration would have to report to him. I think it safe to assume that Mr. Dick Powers, the former Administrative Officer and Associate Regional Director for Administration, reported to Mr. Lawler in addition to Mr. Carlstrom, the Regional Director.

As a manager charged with the responsibility for hiring employees and approving the employee hires for the region, it is incumbent upon that manager to review every aspect of a vacancy announcement, cite changes that need to be made in order to keep the agency in compliance and to sign-off on it's final language, dates and criteria. It is even more critical that the Deputy sees to the need for compliance before it is brought to the Director's attention.

-4-

I believe Mr. Lawler was involvement in the selection process from the development of the KSAs, through the development of the of all aspects of the vacancy announcement, to the selection of the candidate for hire as was his former Administrative Officer (Associate Regional Director for Administration), Mr. Dick Powers. Mr. Powers did not retire from his position until April 30, 2003. I believe that Mr. Lawler knew that Mr. Powers was retiring and that Mr. Carlstrom wanted to hire Mr. Power's replacement by May 1, 2003. I also believe that the three of them pre-determined who would replace Mr. Powers. The name Dottie Marshall was circulated amongst some of the staff in the Regional Office as the replacement of choice. I believe that Mr. Powers, prior to his leaving, and in concert with Mr. Carlstrom and Mr. Lawler, was involved in establishing the vacancy announcement, determining the weights for the Knowledge, Skills, and Abilities (KSAs), and helped determine who his replacement would be before the first vacancy announcement was published.

The position advertised was for Administrative Officer (Associate Regional Director, Administration) with the emphasis on Administrative Officer. The opening date of the vacancy announcement was March 10, 2003. Mr. Powers did not retire from the National Capital Region until April 30, 2003. Mr. Powers had the most input into how the vacancy announcement would be set up (i.e., what to ask in the KSAs, how to write up the KSAs, what rating each level of the KSAs would be given, what Factor Weights would be given to each KSA, the area of consideration, the grade and salary levels, and the opening and closing dates).

It is not unusual for managers to be called back to serve as consultants, some are paid some are not. And if this was the case with Mr. Powers, then Mr. Lawler and/or Mr. Carlstrom would have to approve the paperwork indicating Mr. Powers was hired as consultant for a specific length of time. I believe that Mr. Powers was called upon as a consultant because of his institutional memory and knowledge of the process because Mr. Lawler and Mr. Carlstrom don't usually do the type of administrative work that Mr. Powers did and they would need some help.

I believe Mr. Lawler was involved in the selection process from

-5-

the beginning, prior to Mr. Powers' retirement, to the end when the selection was made. He was certainly assisting Mr. Carlstrom (according to Mr Carlstrom's testimony) in determining which candidates would be paneled and who would get the job.

Q.    In preparation of the selection process, did Mr. Lawler review and approve the first vacancy announcement?

Q.    To what extent was Mr. Lawler's involvement in establishing the first vacancy announcement?

Q.    If Mr. Lawler reviewed and approved the first vacancy announcement, which is one of the initial steps in the selection process, why didn't he implement the Management Succession Plan, which calls for vacancies at the GS-13 and above levels to be announced all sources and multiple grades?

The question was, "What's the nature of your involvement?

4        21        Mr. Lawler's response was, "Collectively we interviewed the applicants and pretty much made the decision as a joint decision."

Rebuttal: I believe Mr. Lawler's involvement was more than someone who interviewed the status candidates and made a decision. According to Mr. Carlstrom when asked what was the extent of Mr. Lawler's involvement (Carlstrom testimony page 4, lines 1-17), Mr. Carlstrom stated, "We went through the applicants together and then got the information from the panel and proceeded to select those folks that we would interview." Mr. Lawler helped select the applicants packages that would go to a panel for further review.

Q.    Did Mr. Lawler take the opportunity to thoroughly read any of the applications submitted for this position? If so, which ones?

Q.    Did Mr. Lawler read my application package? If, yes, why then was I not considered for the job?

-6-

Q.    Did Mr. Lawler take the opportunity to look at and review the applications of the top ten qualified candidates before the status candidates were sent to a panel?

Q.    Mr. Carlstrom is Mr. Lawler's evaluating supervisor. Did Mr. Lawler make the selection or did Mr. Carlstrom make the selection and Mr. Lawler agreed with him?

The question was, "Did you have any involvement in the rating and ranking of applicants?"

5          1          Mr. Lawler's response was, "Not rating and ranking. That was done by a personnelist and by a panel, I believe."

**Rebuttal:** I don't believe Mr. Lawler was involved in the rating and ranking of the candidates along with the human resource specialists. As he says, that was done by a personnelist. According to Ms. Leslie Newman the name of the Human Resource Specialist brought in to rate and rank the applicants is Ms. Joyce Sasser.

However, as the Deputy Director with oversight responsibilities for the Office of Administration, Mr. Lawler may have been involved with and had input into the planning and/or approval of the KSAs that were written and given a numerical point values before the vacancy announcement was published and before the applicants received a rating and ranking for basic qualifications and by the Human Resource Specialist and the panel.

Q.    Did Mr. Lawler appoint and/or approve of Ms. Sasser, the Human Resource Specialist, to be the rating and ranking specialist for this position? If not, who did?

Q.    Applicants are rated for basic qualifications against the point values for each KSA. The KSAs and their point values are determined, usually by the selection official(s), before the vacancy announcement is advertised. Who was responsible for determining what the actual numeric value would be for each of the KSAs on each of the qualifying levels of experience? For instance, KSA Title Two was given numerical rating

-7-

factors of 9 for Level III, 6 for Level II, and 3 for Level I.

**Q.**    Was Mr. Lawler involved either directly or indirectly with determining the numerical point values given to each of the KSAs used for the rating and ranking of applicants for basic qualifications before the vacancy announcement was published?  If so, to what extent?

**Q.**    If Mr. Lawler was involved with the numerical point values given to each of the KSAs, why was KSA Title One given such low point values and KSA Title Two given very high point values?

**Q.**    If Mr. Lawler was not directly involved with the numerical point values given to each of the KSAs, did he contribute his opinion on how to rate the KSA elements?

**Q.**    Was Mr. Lawler directly or indirectly involved with the development of the crediting plan used to rate and rank the applicants?

The question was, "Where was the vacancy in question located?"

5            4            Mr. Lawler responded by saying, "It' here in this building right outside the door.  It's the Associate Regional Director for Administration for this region of the Park Service."

**Rebuttal:** Mr. Lawler is the Deputy Regional Director for Operations. I believe that the Office of Administration falls under Mr. Lawler's supervision.   Mr. Lawler is the first-line supervisor to the Associate Regional Director for Administration and has oversight authority over the Office of Administration.

**Q.**    Logistically, how close is the Office of Administration to Mr. Lawler's office?

**Q.**    Does the Associate Regional Director for Administration report to Mr. Lawler?

The question was, "did you have any involvement in developing

-8-

the vacancy announcement?"

5          9          Mr. Lawler's response was, "You know, that's normally done by a personnelist. I might have reviewed it. I can't tell if I reviewed it. The Personnel Office normally does that. We probably had a standard one that was done for the predecessor and it's probably fair to assume that. I really can't recall whether I reviewed the vacancy announcement."

**Rebuttal:** Mr. Lawler gave his testimony on August 19, 2003. The selection was made on May 27, 2003. The interviews were done the week of May 12, 2003 (Ms. Marshall was interviewed on May 14). On April 24, 2003, 13 status and 11 non status candidates were referred to Mr. Carlstrom and Mr. Lawler for review. On April 14, 2003, the second vacancy announcement closed. On March 31, 2003 the first vacancy announcement was amended and readvertised. On March 27, 2003, my application package was received. On March 10, 2003, the vacancy was publically announced. Between the months of January and March 2003, Mr. Powers upcoming retirement and subsequent vacancy were issues to be addressed by management.

My point here is that the development of the vacancy announcements and, I think it safe to assume, discussions surrounding filing this important vacancy were ongoing. Mr. Lawler does not give a straight answer here. He is evasive. Mr. Lawler either knows or he doesn't know the extent of his involvement in the development of and review of the vacancy announcement. Mr. Lawler's statements of, "I might have reviewed it. I can't tell if I reviewed it" are unacceptable. The vagueness of his response tells me that he is either lying or he is trying to cover up his involvement. If these are the kinds of responses he gives when asked about other activities going on in his region, as a manager I would be very concerned about his ability to do the job of Deputy.

Q.          Did Mr. Lawler receive a draft copy of the vacancy announcement before it was published from Mr. Carlstrom or Mr. Powers or anyone from the Office of Administration staff?

Q.          Mr. Lawler indicated that he might have reviewed the

-9-

vacancy announcement. Did Mr. Lawler verbally approve and/or sign off on the first vacancy announcement? Is there Documentation?

The question was, "What was the area of consideration for the position in questions?"

5          18          Mr. Lawler's response was, "It was – – eventually it became all sources, I believe.

The questions was, "What was it initially?"

5          21          Mr. Lawler's response was, "I think it was initially – – It was within our Department."

    **Q.**    As Deputy Regional Director for Operations did Mr. Lawler question why the area of consideration was Departmentwide only?

    **Q.**    As Deputy Regional Director for Operations did Mr. Lawler give a directive to change the area of consideration before the vacancy was first published? If not, why not?

The question was, "Was the vacancy announcement amended?"

5          24          Mr. Lawler's response was, "It was amended. There had been a directive by our former Director for certain positions to go to a wider audience, and I guess that meant all sources for jobs such as this. And, we were contacted – again, my recall. I think we were contacted by the Washington Office to follow that directive on this particular announcement."

**Rebuttal:** The directive Mr. Lawler is referring to here is the Management Succession Plan. A directive that was implemented in February 1999, about three years after Mr. Lawler became Deputy Director. Mr. Lawler should have had a copy of this plan in his office.

    **Q.**    Who gave orders to amend the vacancy announcement?

-10-

**Q.** What was the date this person gave the order to amend the vacancy announcement? Is there documentation?

**Q.** With regard to the directive Mr. Lawler refers to, was Mr. Lawler contacted personally by the Washington Office about the policy? If so, who contacted him?

**Q.** If Mr. Lawler was not contacted personally, then how did he learn about the directive?

**Q.** Mr. Carlstrom stated in his testimony that Mr. Mel Reid of the EEO Office brought the policy to his attention. Did Mr. Reid or anyone from the EEO Office bring the matter of the policy to Mr. Lawler's attention? If so, what was the date Mr. Lawler was advised?

**Q.** Does Mr. Lawler have a copy of the Management Succession Plan in his office? If so, when did he first receive it?

**Q.** The vacancy announcement was initially advertised Departmentwide only. It had to be amended because of the directive by the former Director. Mr. Lawler has been a Deputy Director in the regional office for seven years. The Management Succession Plan policy has been in existence for more than four years. Why was this policy not part of the National Capital Region's Standards for Operating Procedures?

The question was, "Do you know why the announcement wasn't initially advertised as all sources?

6          9          Mr. Lawler's response was, "I really don't. Maybe it was an administrative slip. I don't think that directive had been enforced widely since the previous Director had left."

"I don't remember it being an issue on any other jobs."

**Rebuttal:** The "directive" has been a policy for more than four years. Why hadn't Mr. Lawler taken on the responsibility of enforcement? It is his job to ensure compliance. In this

-11-

instance, in my opinion, compliance means ensuring that a pool of candidates is solicited from a wide and diverse area of consideration, hiring people from outside the Federal government including minorities, particularly Hispanics.

According to Ms. Leslie J. Newman, Human Resource Specialist for the National Capital Region, it was the former Administrative Officer, Mr. Dick Powers' instruction to advertise Departmentwide (Newman testimony, page13, line 5). Furthermore, Mr. Powers made this preferences known to others in the Regional Office before and after the vacancy announcement was published. Mr. Powers did not want to change the announcement, so it wasn't an "administrative slip." Why didn't Mr. Lawler or Mr. Carlstrom give a direct order to change the vacancy announcement before March 10?

Mr. Carlstrom admitted to Mr. Mike Jurach, EEO Counselor, that they knew of the National Park Service's Management Succession Plan policy and were in the process of amending and extending the vacancy announcement before they received my application. However, according to Ms. Newman the decision to amend and re-advertise the vacancy announcement was made in between the time my application was received and the closing date of the first vacancy announcement (Newman testimony--page 11, line 17). The opening date of the first vacancy announcement was March 10, 2003, with a closing date of March 31, 2003. My application was received on March 27, 2003. I think Mr. Lawler knew why the vacancy announcement was amended and I content that it was not because they were advised of the policy. I believe that if I had not sent in my application they would not have changed or amended the vacancy announcement–because they would not have been challenged by merit status applicants.

Also, the fact that this directive has not been enforced or that it hasn't been an issue for any other jobs is indicative of how little they think of the policy and the person who implemented it. I get the impression Mr. Lawler believes that this policy is of no significance.

Stated within the National Park Service's Mission Statement are several principles. Among them are the following:

- Outstanding Employees: Empowering a diverse workforce committed to excellence, integrity, and quality work.

- Wise Decisions: Integrating social, economic, environmental, and ethical considerations into the decision -making process.

- Effective Management: Instilling a performance management philosophy that fosters creativity, focuses on results, and requires accountability at all levels.

Before empowering a diverse workforce, the National Park Service and the National Capital Region must first hire a diverse workforce; and that requires a philosophy that fosters a focus on results and requires accountability at all levels.

Q.    If it was Mr. Powers decision to limit the area of consideration to Departmentwide, did Mr. Lawler approve of this decision?

Q.    Did Mr. Lawler advised Mr. Powers of the Management Succession Plan's existence prior to Mr. Powers' retirement?

Q.    Did Mr. Lawler discuss implementing the Management Succession Plan for this vacancy announcement with Mr. Carlstrom?

Q.    As a former Deputy Director for Operations and Budget it has been my experience to advise my Director of inconsistencies within the organization.  Did Mr. Lawler advise Mr. Carlstrom about any of the inconsistencies in the first vacancy announcement?

The question was, "Was the announcement amended in any other way other than expanding the area of consideration?"

6        17      Mr. Lawler's response was, "Not that I'm aware of, no.  That would be a question for the personnelist but I don't think it was."

**Rebuttal:** Does this mean that Mr. Lawler, who has oversight

-13-

authority over the Office of Administration, did not review and approve the amended vacancy announcement?

In addition to changing the area of consideration, the salary, grade levels, and some language was added to the amended vacancy announcement. The Summary of Qualifications Required in the amended announcement was changed to reflect some added language. It reads as follows:

**For the GS-14 level,** applicants must possess one (1) year of progressively responsible specialized experience at the GS-13 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that it typically in or related to the work of the position. **For the GS-15 level**, applicants must possess one (1) year of progressively responsible specialized experience at the GS-14 level that has equipped the applicant with the particular knowledge, skills, and abilities to perform successfully the duties of the position and that is typically in or related to the work of the position. To be creditable, specialized experience must have been equivalent to at least the next lower grade level in the normal line of progression for the occupation in the organization. (This last sentence was added to the second vacancy announcement. It was not part of the GS-15 required qualifications in the first vacancy announcement.) OPM defines "creditable service" as the conditions for completion of the period of creditable service required for career appointment.

**Q.**     Did Mr. Lawler read and review the amended announcement before it was published?

**Q.**     Did Mr. Lawler approve the amended vacancy announcement before it was published? If so, on what day? Is there documentation?

**Q.**     Did any of the staff in the Office of Administration seek Mr. Lawler's approval for the amended vacancy announcement before it was published? If so, when? Is there documentation?

**Q.**     Did Mr. Powers discuss the amendments with Mr. Lawler before the vacancy was readvertised?

-14-

The question was, "At what grade level was the announcement initially advertised?"

6        21        Mr. Lawler's response was, "I can't recall.  Maybe it was the 15."

**Rebuttal:** "I can't recall" is not an acceptable response.  If, in the subsequent question, he thought that the grade level was brought down to a 14/15 then he must have known it was a 15.  As a Deputy he would know the grade level for that position and every position under his purview.  He would know the grade levels before, during and after the vacancy announcements.  Furthermore, Mr. Dick Powers, the former Administrative Officer was a GS-15 and worked under Mr. Lawler.

The question was, "What grade level was the announcement subsequently advertised?"

6        24        Mr. Lawler's response was, "I think it was brought down to a 14/15.  And again, I could be wrong on that.  That's my recall.

**Rebuttal:** What does he know?  Mr. Lawler seems to have a terrible problem with his recall abilities.  Maybe a new Deputy Director is needed in that Regional Office.

The question was, "Did you have any involvement in the rating and ranking process?"

7        5        Mr. Lawler's response was, "No.  Just the interview process and, along with the Regional Director, discussing the applicants and their strengths together coming to a consensus on the best candidate."

**Rebuttal:** Mr. Lawler may not have been involved with the actual rating of the applicants or the ranking of the qualified candidates, but as the Deputy Regional Director for Operations Mr. Lawler is responsible for overseeing the operations of the Office of Administration.  Mr. Dick Powers did not retire until April 30th.  I believe Mr. Powers, who reported to Mr. Lawler,

-15-

was supervising the selection process of his replacement. The staff of the Administration Office would naturally defer to Mr. Powers and Mr. Powers would defer to Mr. Lawler and Mr. Lawler would defer to Mr. Carlstrom.

Q.    Did Mr. Lawler and Mr. Powers have any interaction with Ms. Newman and/or Ms. Sasser before the rating and ranking process took place? Did Mr. Lawler give the Human Resource Specialists, Ms. Newman and Ms. Sasser, instructions, directly or indirectly? If so, what were the instructions? Is there any documentation?

Q.    Did Mr. Lawler have any interaction with any member of the panel before they started and before they completed their rating and ranking process?"

Q.    Did Mr. Lawler have any interaction with any of the panel members after the applicants were rated and ranked, and after the issuance of the certificates process was completed?

Q.    Did Mr. Lawler directly or indirectly give instructions to the panel members? If, so, what were the instructions?

The questions were, "What information was provided by Personnel to you and Mr. Carlstrom after the rating and ranking process, after the certificates had been issued?" "What documentation?"

7        14    Mr. Lawler's responded by saying, "The applications, the KSAs and the list of eligible candidates."

Q.    Mr. Lawler indicated that once the rating and ranking was completed they received the list of eligible candidates. The selecting officials could have made a selection from that list. Why didn't they select someone from the list?

Q.    From top to bottom on the ranking list of eligibles, where did I rank? Where did Ms. Marshall rank?

Q.    When Mr. Lawler received the 47 qualifying applications

-16-

what did he do with them?

Q. Did Mr. Lawler review any of the applications in depth? If so, which ones and why?

The question was, "Do you recall receiving certificates of eligibles for both status and non-status applicants?

7    18    Mr. Lawler's response was, "I believe we probably had five or six different lists to choose from, and some were status. Some were non-status."

Q. At what point exactly during the selection process did Mr. Lawler receive the five or six different list to choose from?

The question was, "Who made the decision about which candidates were going to be interviewed?"

8    4    Mr. Lawler's response was, "I think the Regional Director and I scanned them and we discussed it and we pretty much decided who we thought would be the lead people based on what we felt our needs were for this job."

**Rebuttal:** According to Ms. Newman the decision to interview and who would be interviewed is up to the selecting officials. When asked the same question, Mr. Carlstrom in his response stated, "we mutually came to that agreement by looking at the promotion eligibles." (Carlstrom testimony, page 16, lines 5-6)

Mr. Carlstrom is Mr. Lawler's evaluating supervisor. Mr. Lawler, regardless of what he knows or doesn't know is going to go along with what ever his supervisor wants.

Q. At what point in the selection process did Mr. Lawler scan the applications and decide on who would be the lead people?

Q. What procedures or process did Mr. Lawler use to sort through the applicants to determine who would be the lead people?

-17-

**Q.**    Were any of the needs Mr. Lawler refers to listed within the KSAs that were published in the vacancy announcement? If so, in which of the KSAs?

The question was, "Were candidates who were selected for interviews, were they chosen from all of the certificates?"

8       11    Mr. Lawler's response was, "I don't think we looked at non-status. I think we look at just status only."

**Q.**    Was Mr. Lawler instructed to look at status candidates only?

The question was, "Why didn't management look at the non-status certificate of eligibles?"

8       15    Mr. Lawler's response was, "I guess it was our decision or our thinking, our collective thinking that the needs were so pressing and so important to us and so critical to us continuing to get our work done that we wanted to have experienced people in our organization who could walk in the door with a good background in how we operate and do our business, and aware of the current administrative thrust in our organization so they could come in and perform real quickly at a top rate."

**Rebuttal:** Mr. Lawler's response sounds rehearsed, similar to what Mr. Carlstrom said, some of the same language, similar reasons.

I believe that Mr. Lawler and Mr. Carlstrom, from the very beginning wanted a particular Park Service employee for this position. They changed the criteria after the vacancy announcements were published so that they could hire the person they wanted. I am not aware that changing the criteria for the position after it has been published in a vacancy announcement is allowed. The published KSAs did not list prerequisites for park service experience, in particular regional experience and knowledge of current administrative thrust. Nowhere in the KSAs were there requirements for demonstrated experience and knowledge or even general

-18-

experience and knowledge of the National Capital Region," particularly as a critical element.  Mr. Lawler and Mr. Carlstrom made determinations throughout the selection process as a means of ensuring that the candidate they wanted to hire would be in a position to meet those requirements.  Adding new criteria and elements to the selection process mid-stream are sure ways to block undesirable candidates from proceeding on in the process.  This was a very obvious  barrier put into place to keep people from outside the park service and outside the region from entering into the National Capital Region's federal workforce.

All five of the candidates chosen for interviews were Park Service employees.  Three of the Park Service candidates chosen for interviews were not of this region, one was a GS-15, one a GS-13, and there is no indication of a grade level for the third person.  Analyzing the way the decision on who to hire was made–these individuals would not have been hired because they lacked regional knowledge and experience.  The other two candidates chosen for interviews were regional employees.  One was a GS-13–he would not have been hired because he lacked a regional park operational background. The other regional employee was a GS-14 has Park Service knowledge and experience, she has a regional park operational background, and she has work in this region of several years– she was hired for the job.

The position, according to the description in the vacancy announcement, is an advisory position for all administrative areas and manages all directly related program areas through subordinate supervisory components and staff, meaning the Administrative Officer has supervisory authority over staff professionals who are experts and responsible for the day-to-day business in each of the components Mr. Lawler and Mr. Carlstrom elaborated on. The two primary roles are: oversight and policy services as well as administrative program management, program management meaning management over all of the administrative policies and administrative functions such as time cards, leave, promotions, training, travel, budget allocation and monitoring of the expenditure manifests.

If Mr. Lawler and Mr. Carlstrom really wanted someone who could walk into a GS-15 position from the "get-go" with little or

-19-

no training, then he would have hired a GS-15 who had done or is doing the job of an Administrative Officer instead of a GS-14 Budget Officer with little or no real administrative experience outside of budget development and project management in need of on the job training. According to Ms. Marshall's resume she has little or no experience with administrative policies, administration (i.e., travel, time cards, credit card use, facilities management, procurement, office equipment rentals and leases, repair contracts, computer software and services, etc.), human resources (i.e., the writing of position descriptions, vacancy announcements, KSAs, the hiring, evaluating, training, promoting, awarding and disciplining of personnel and effective supervision), or experience with employee relations, unions or EEO and complaint processes. I believe that any of the GS-15s on the non-status list, including myself could have walk in and done the job with little down time.

Q.    How could Mr. Lawler know that the non status applicants could not do the job if he didn't read the non status resumes and KSA responses or interview them?

Q.    Mr. Lawler states that they, the selecting officials, "wanted to have experienced people in our organization who could walk in the door with a good background in how we operate and do our business, and aware of the current administrative thrust in our organization so they could come in and perform real quickly at a top rate." Was experience in the regional organization a prerequisite for the job?

Q.    Mr. Lawler and Mr. Carlstrom did not look at the non status candidates. They requested a panel of three for the status candidates but not for the non status candidates. Mr. Lawler and Mr. Carlstrom interviewed a select group of status candidates but they did not interview any of the non status candidates. Does Mr. Lawler considered this a fair and equitable process?

The question was, "Could you elaborate on what those pressing needs were?"

9          2          Mr. Lawler's response was, "I can elaborate somewhat. My

-20-

greatest concern – I don't know what – if you asked this question of the Regional Director. From my own perspective, we have a real glaring need in a couple of areas. One of them is we have a construction program that's very active, big, multi-million dollar construction job. So an intimate knowledge of that process and all the approvals and all the requirements and getting the contracts out the door and supervising those kind of projects. That's certainly critical to us."

"Secondly, the budget is not really a very rosy forecast over the next few years and I really felt someone with really detailed knowledge of the NPS budget process would be extremely helpful. And the eventual successful candidate was top drawer in that category, as well as in the construction category."

"We also have a current emphasis on our–well, out-sourcing is not the word. Competitive sourcing. Putting some of our in-house jobs up for competition."

"So someone who knows about that and about our maintenance jobs and about delivery of those services within our parks. Someone with a park operational background would be very helpful."

**Rebuttal:** The budget process is the same for all Departments, except perhaps the Department of Defense. OMB and GSA have set Standards of Operating Procedures with regard to the budget process. The budget process begins with a compilation of budget requests and needs from each division of operation and this information is put into a report to support the Agency's and Departments' annual budget request. Legislative justifications are written for the Legislative Affairs Office to further support budget requests and these request are ultimately included in the Presidents budget requests to Congress. In the interim, between budget request submissions and the signing of the budget bill for a particular Department or Agency, at times, are the Continuing Resolutions. Continuing Resolutions for a department or agency are approved by Congress and the President; it allows for continued, but limited operations in the organization affected. With regard to special line item projects, the Agency head requesting the appropriations may be asked to testify in support of the funding needs. Often, the professional staff spearheading the project

accompanies the Agency head in the event he/she may be asked to expand on an issue before the House or Senate Appropriations Committees.

Mr. Lawler should know this. As the Deputy Director, he and Mr. Carlstrom are the two individuals that must submit their regional budget to the Director of the National Park Service who in turn submits the budget for the entire Park Service to the Department of Interior's Policy, Management and Budget Office. It is up to the Director and Deputy Director to fight for and keep their budget request, not the Administrative Officer. Once the appropriated funds are allocated by the Budget Officer it is then up to the Administrative Officer to monitor and advise the Budget Officer in an effort to keep the division or in this case, the regional office in compliance. The Administrative officer administers to the spending of funds for salary and benefits, programs, projects and overhead operations, and monitors expenditures to prevent overspending. The manifests, expenditures, and variance reports are written in pretty much the same format for all Departments and Agencies.

This position is Administrative with oversight authority for policy services and administrative program management including, Human Resources, Information Technology Services, Office Services, Property, Finance and Budget Management and Policy. It provides administrative and technical support and advisory services to 14 parks, monuments, and historic sites. Mr. Lawler indicates, in his words, " that intimate knowledge of the construction program and the multi-million dollar construction job, and the process and approvals and the requirements for getting the contracts out the door and supervising those kind of projects is critical." In addition to competitive sources.

Q.     The pressing needs outlined by Mr. Lawler were never part of the KSAs. And by the selecting officials using these pressing needs as criteria for the position, they automatically disqualified anyone who did not have Park Service experience and knowledge. Why then was the vacancy announced as all sources when the intent of the selecting officials was to never consider applicants without Park Service and regional experience as viable candidates?

-22-

Q.    At what point in time did Mr. Lawler determine that the critical criteria he mentioned were necessary for the position?

Q.    Does the National Capital Regional office have a contracting division?

Q.    Does this contracting office employ professionals who are contract and negotiation experts?

Q.    Does this contracting office employ construction program officers?

Q.    Are contracts and construction projects run out of the contracting office after receiving approval from the headquarters Office of Contracting and Procurement?

Q.    Are Mr. Lawler and Mr. Carlstrom experiencing problems with the contracts office staff ?  Are these problems such that he and Mr. Carlstrom needs the Administrative Officer to step in and take control?  Is that why Mr. Lawler is looking for this kind of expertise in a candidate?

Q.    Does Mr. Lawler not have confidence in the person heading the Regional Contracting Office?

Q.    Last year the budget officer reported directly to the Regional Director.  This year the Budget Officer reports directly to the Administrative Officer.  The Administrative Officer reports directly to the Deputy Regional Director. The Budget Officer's responsibility is to formulate, disburse, and monitor expenditures, in addition to working closely with the Regional Director and the National Park Service's Budget Director.  The Administrative Officer oversees and advises the Budget Office, but is not responsible for the day to day operations of the office.  Is the Administrative Officer expected to step into the Budget Officer's position and do his job and the jobs of his staff analysts as well? When is the Administrative Officer to find time to do her job?

-23-

**Q.**     Mr. Lawler elaborated on some very important program activities taking place in the regional area. He makes it sound as though the Administrative Officer will be responsible for all of these activities. What does Mr. Lawler do? What is he responsible for?

The question was, "How many applicants were interviewed?"

10          4          Mr. Lawler's response was, "I believe we interviewed four. We had planned to interview a fifth and the gentleman declined for some – I think it was health reasons. Yes. He declined. They thought the move would not be good at that time. So four eventually."

**Rebuttal:** Mr. Lawler and Mr. Carlstrom chose to interview candidates from the final list of merit status candidates forwarded to them from the panel in addition to the candidates from the other lists. Mr. Carlstrom indicated that the panel provided him with a list of potential people that he might want to look at for further evaluation through the interview process and that from a management perspective he was interested in those folks that were promotion eligible. Mr. Lawler and Mr. Carlstrom admitted the decision to interview merit promotion candidates was a collective decision. The selecting officials specifically chose only the candidates that were/are park service employees with park service experience and knowledge. According to Ms. Newman the decision to interview which candidates was solely up to the selecting official (Newman testimony, page 9, line 24).

By not interviewing candidates on the non status list Mr. Lawler and Mr. Carlstrom intentionally chose to set up another barrier to those of us outside federal government, particularly Hispanics. Mr. Lawler's and Mr. Carlstrom's bias toward Park Service employees is quite evident. Moreover, They were interested in only one person and that person was one of three listed on the GS-15 merit promotion status list of candidates. That candidate was Ms. Marshall, the selectee. Of all the qualified applicants Ms. Marshall was the only one who met all of the specified criteria Mr. Lawler and Mr. Carlstrom itemized in their testimony.

-24-

**Q.** Based on the needs he outlined, at what point in time did Mr. Lawler identify who would be interviewed?

**Q.** Why was Ms. Aguilar not interviewed?

**Q.** Mr. Lawler stated they eventually interviewed four applicants. Why didn't the selecting officials interview the merit status applicants whose names appeared on the same selection certificate as those National Park Service employees who were chosen to be interviewed?

**Q.** Other than the five Park Service applicants selected for interviews, how many of the qualified applicants were National Park Service employees? What regions were they from?

**Q.** Why did Mr. Lawler, a selecting official, chose not to use the "rule of three" for interviews?

The question was, "From which certificates did those applicants come from?"

10          11          Mr. Lawler's response was, "I'd have to look at them. I know the individuals names. I'd have to look at which certificates they were on."

**Rebuttal:** I don't believe the certificates would have been difficult to identify. He new two of them by person, the two that work in his region, Marshall, a GS-14 eligible for GS-15 and Brody, a GS-13 eligible for GS-14. He interviewed the GS-15, Mr. Ferranti from Alaska who was up for reassignment. And the only person he assumed was Hispanic was a GS-13 from the west. How difficult is that?

**Q.** Regardless of the certificates the interviewees were selected from, they were all Park Service employees. Whose decision was it to interview only Park Service employees?

**Q.** Mr. Lawler stated in his explanations of why the non status certificates were not looked was because of some pressing needs. He indicated that, "Someone with a

-25-

park operational background would be very helpful." Of the five Park Service employees the selecting officials chose from the certificates to interview how many of them have Washington, DC area and/or National Capital Region park operational experience?

The question was, "Did you maintain or keep notes of the interviews?"

11      6      Mr. Lawler's response was, "I kept some notes. I'll be honest. My boss is a much better note keeper and I rely on his notes probably even more than my own, but I did have some notes that I scratched down during the process as well.

     **Q.**     Where are the notes Mr. Lawler wrote during the process?

     **Q.**     Did Mr. Lawler make a notation by writing the name Nieto next to Ms. Aguilar's name on the non status certificate list?, If so, why did Mr. Lawler write the name Nieto next to Ms. Aguilar's name?

The question was, "Who was selected for the position in question?"

11      12      Mr. Lawler's response was, "The woman's name is Dottie Marshall."

**Rebuttal:** The selecting officials, even after the vacancy announcement was amended, had no intention of making a selection from any other Certificate of Eligibility list other than the one Dottie Marshall's name appeared on. It appears that regardless of the names of other candidates who are/were Park Service employees or candidates who are not Park Service employees they were not going to get hired. I believe that the selecting officials were determined to hire her no matter what. It was well known and rumored that Dottie Marshall was pre selected for the position of Administrative Officer (Associate Regional Director, Administration) before the vacancy announcement was published. When I applied for the position I was told that I would not get the job because it was slated for

-26-

Dottie Marshall.  Five candidates were chosen for interviews.
They were all Park Service employees.  Three of the Park
Service applicants chosen for interviews were not of this region,
one was a GS-15, one a GS-13, and there is no indication of a
grade level for the third person.  None of these three applicants
would have been hired because (according to the selecting
officials' imposed criteria) they lacked regional knowledge and
experience.  The other two candidates chosen for interviews
were regional employees.  One was a GS-13–he would not
have been hired because he lacked a park operational
background.  The other regional employee was a GS-14 who
has Park Service knowledge and experience, she has a park
operational background, and she has work in this region of
several years– she was hired for the job.

According to the information I requested from the National
Capital Region's Civil Rights Office, the National Park Service
has identified Park Management as one of 12 major mission
–related occupations targeted for recruitment efforts in its
Affirmative Employment Program Plan.  The selected 12 major
mission-related occupations were identified because they
represent the most populous job series that afford the Park
Service the best opportunity to diversify its work force.  Further
the 12 occupations were identified as underrepresented for one
or more of the EEO groups.

Currently, the number of people working in the 341 job series at
the National Capital Region, which is the job series I applied to
at the National Capital Region, is 15.  Of the 15, 12 are
women–80%.  The breakdown by race and ethnicity is 3 white
men–20%, 9 white women–60%, and 3 Black women–20%.

Given the directives and mandates by the White House, OPM,
the Department of Interior and the National Park Service to
recruit, hire, and retain more Hispanics in an effort to address
the gross underrepresentation within the Department and
federal government service; and the fact that one of the
targeted EEO groups identified by the National Park Service is
Hispanic women; and the fact that Hispanics, particularly
Hispanic women have never held a management position within
the National Capital Region; and for the fact that this may have
been the first time a very well qualified Hispanic woman
presented an opportunity for hire to the National Capital

-27-

Region, the selecting officials who are identified as the Regional Director and Deputy Regional Director (both white males) chose to select a less qualified white woman over a very qualified Hispanic woman for the position, even though the representation of white women within the Region is 60% over parity.

**Q.** At what point during the selection process did Mr. Lawler first realize that Ms. Marshall was his choice?

**Q.** Given the directives and mandates by the White House, OPM, the Department of Interior and the National Park Service to recruit, hire, and retain more Hispanics in an effort to address the gross underrepresentation, particularly in Mr. Lawler's region, why did Mr. Lawler hire another white woman?

**Q.** The Federal government is directed to select the most qualified individual for each vacancy and position available. There were other Park Service employees with greater experience and serving at a higher grade level than Ms. Marshall. For example: Tom Ferranti is a GS-15 currently serving as the Associate Regional Director for Administration for the National Park Service in Alaska. He is already doing the same job Ms. Marshall was hired to do. Why wasn't he selected for the position?

The question was, "What was the selected candidate's position title and grade at the time of her consideration for the position in question?

11        16      Mr. Lawler's response was, "She was the Deputy Superintendent of our park across the river, George Washington Memorial Parkway. And GS-14."

**Rebuttal:** Mr. Lawler indicated that Ms. Marshall is an employee of the National Capital Region. She has worked most of her career in this region and, as he stated, she is well known.

**Q.** Is the position of Deputy Superintendent a position that is higher or lower than Mr. Ferranti's position (Associate

-28-

Regional Director for Administration) and Mr. McKenna's position (the Administrator and head of Administration for Gettysburg)–both applicants for this position?

**Q.**    Mr. Lawler indicated Ms. Marshall is well known. Were any of the panel members familiar with Ms. Marshall?

**Q.**    Did any of the panel members work with her in any capacity, supervise her in any capacity, or ever work for her in any capacity?

The question was, "What was the basis for the selection of Ms. Marshall? I'd like you to elaborate on that."

12          1      Mr. Lawler's response was, "Some of the things I talked to in the previous question. Dottie Marshall brought all those experiences to us. Probably the best person in this region, including our current budget officer, in terms of her knowledge and expertise in developing a budget, especially a budget that goes through the NPS budget process."

"She's been doing that. She was previously our budget office for the region. So she brings a tremendous amount of expertise from the technical side as well as the strategic side of it because she knows the committee processes. She knows that very well. Knows the staff very well."

"Extremely in depth knowledge of budget. That's one."

"Two, her most recent experience has been in a very active park setting as the Deputy Superintendent where she had lots of responsibilities for the operations of the park."

"So she would be able to do her new job with a tremendous background in what our superintendents are facing as they try to accomplish their mission in the parks because she's been there recently. She knows what the problems they're facing so she brings that knowledge to us, as well as her detailed knowledge of budget."

"And she's worked her way through the ranks. She knows an awful lot about administration because of her previous

background as administrative officer in several parks."

"She's got a long, successful track record in this region and throughout the Park Service. She's well known and well respected."

**Rebuttal:** Again, Mr. Lawler refers to Park Service experience and background as criteria for the position. The criteria of preexisting knowledge of the region, experience within the region, and knowledge of the Park Service was not added to the selection process until after the applicants submitted their applications and the vacancy announcement was closed.

I read the KSA responses and the SF-171 of Ms. Marshall's that were sent to me. I did not find that she had a lot of background in administration and I did not find that she was the administrative officer in any park.

Q.     Throughout Mr. Lawler's career with the National Park Service has he had the opportunity to work with Ms. Marshall? If yes, in what capacity?

Q.     Will Mr. Lawler be the first-line supervisor over this Administrative Officer position?

Q.     Mr. Lawler refers to Ms. Marshall as "Probably the best person in this region, including our current budget officer, in terms of her knowledge and expertise in developing a budget, especially a budget that goes through the NPS budget process." "She was previously our budget officer for the region." "Her most recent experience has been in a very active park setting as the Deputy Superintendent where she had lots of responsibilities for the operations of the park." and "She's got a long, successful track record in this region and throughout the Park Service. She's well known and well respected." With the exception of Mr. Brody, a GS-13, did any of the other candidates Mr. Lawler selected to interview have Washington, DC area experience and knowledge? Did they have an opportunity to work for the region?

Q.     Mr. Lawler mention that Ms. Marshall worked her way

-30-

through the ranks. Is giving her this position considered an entitlement?

Q.    Mr. Lawler stated that one of his reasons for selecting Ms. Marshall is because she has a long and successful track record in this region and throughout the Park Service. Is this position her reward?

The question was, "Did Ms. Aguilar's name appear on any of these certificates of eligibles?

13        15    Mr. Lawler's response was, "Obviously she must have since we're in this process. I'm sure in the non-status certificate, she would have been."

**Rebuttal:** Mr. Lawler response to the question sounds very cavalier. Mr. Lawler indicated earlier that he and Mr. Carlstrom did not look at the non status candidates and that he scanned the applications and he and Mr. Carlstrom decided who they thought would be the lead people based on what they felt their needs were. They both describe what those needs were—Park Service experience and intimate knowledge of the region with park operational background. It is my contention that they both approached this selection process in the same manner they would have had the amended vacancy announcement not been re-advertised all sources. Once the certificates were out of the hands of the Human Resource Specialists and into the hands of the selecting officials, the selecting officials dismissed the non status candidates as though they did not exist. Once the initial rating and ranking process was completed, the selection process ceased to be an open and fair process.

Q.    Beyond a first page glance, did Mr. Lawler read Ms. Aguilar's resume and application package?

Q.    Was Mr. Lawler aware that Ms. Aguilar had been a Deputy Director for Operations and Budget at the Department of Health and Human Services and was responsible for the day-to-day operations of the headquarters office and had oversight responsibility for 10 regional offices? If not, why wasn't he aware of this?

-31-

**Q.**    Ms. Aguilar has several years of administrative and administration experience including more than two years as the Deputy Director for Operation at HHS at GS-15 grade level with a full range of administrative, policy, planning, budgetary, financial and operational responsibilities for 10 regional offices and a headquarters office.  In accordance to the KSAs, what specific qualifications made the GS-14 selectee more qualified than Ms. Aguilar?

The question was, "Why weren't any of the non-status applicants interviewed?"

13          20      Mr. Lawler's response was,  "I guess some of what I talked about in the rationale for selecting Ms. Marshall, as well as the answer to the previous question is our needs were immediate. They're pressing.  They're important to us."

"We felt that an individual with a current skill set that matches up to our current needs would be most helpful.  And this person clearly had that skill set, as did some of the others, but I think Dottie was the best."

"So we were looking for candidates that matched up to our current needs based on the management challenges and areas of emphasis we just talked about."

**Rebuttal:** Mr. Lawler and Mr. Carlstrom imposed different criteria for selection after they received the applications of the 47 qualified candidates and made a selection based on that criteria and hired the only candidate who could conform exactly to that criteria.   No where in the KSAs did it state that Park Service knowledge and experience or National Capital Region knowledge and experience or comprehensive knowledge of Departmental policies and procedures as they relate to human resources and the budget would be helpful in determining qualified candidates' rating factors.

Mr. Lawler and Mr. Carlstrom were presented with a number of very well qualified candidates who matched up with KSAs that reflected the needs of the position as described in the vacancy announcement.  They were given an opportunity to hire a very

-32-

well qualified GS-15 Hispanic woman whose skills matched the KSA qualifications.

Current statistics show the National Park Service has in its permanent workforce 2,453 professional positions.  Of the 2,453 positions 822 are held by white women, 42 are held by Black women, 30 are held by Hispanic women, 27 are held by women who are Asian Americans/Pacific Islanders, and 16 are held by women who are American Indian/Alaskan Native.  In its permanent workforce there are also 6,131 administrative positions.  Of the 6131 administrative positions 2032 are held by white women, 276 are held by Black women, 119 are held by Hispanic women, 75 and held by women who are Asian American/Pacific Islanders, and 60 are held by women who are American Indian/Alaska Native.

**Q.**    Looking at the numbers, there aren't very many minorities within the National Park Service who would qualify for this type of position.  How does Mr. Lawler expect to diversify the regional office if he doesn't look at and seriously consider non status applicants?

**Q.**    Mr. Lawler mention he was looking for a certain skill set.  There were six highly qualified candidates with very high scores ranging from 97 to 110 on the non status list.  Why did Mr. Lawler think that these candidates would not have the skills or the abilities to do the job?  Does Mr. Lawler think that the skills and abilities of these high scoring highly qualified applicants are not transferable to similar positions?

The question was, "Was any consideration given to race in making the selection for the position in question?"

14          10          Mr. Lawler's response was, "No."

**Rebuttal:**  As I stated in my rebuttal response to the same questions asked of Mr. Carlstrom, the individuals involved in the selection process should have given serious consideration to race and ethnicity.  In this regional office there are three top leadership positions: the Regional Director–white male, a Deputy Director–white male, a second Deputy Director–Black

-33-

male. In addition to the top three leadership positions there are several park superintendents, deputy superintendents and several other leadership positions. These other leadership positions are comprised of white males, black males, white females and black females, all in management positions. Before this position was advertised there were 15 people serving in the #341 job series within the National Capital Region, 3 white men, 9 white women, and 3 Black women. Now, with the selection of Ms. Marshall there are 10 white women. The words minority and diversity do not mean black and white. There are other groups within the general population that are encompass by these terms.

Further, I believe the officials involved with this entire process picked their favored employee, a white woman who is a federal employee at the expense of the qualified candidates who applied, at the expense of the position, at the expense of the Agency, and at the expense of the Department. I feel that the position, the Agency, and the Department did not gain the benefit of a different and more qualified candidate.

The U.S. Equal Employment Opportunity Commission (EEOC) in its report on Employment of Minorities, Women, and People with Disabilities states that, "Title VII prohibits discrimination with regard to any personnel action, or term, or condition, or privilege of employment, based upon race, color, sex, national origin, or religion, this includes applicants for employment." I believe that the selectee was chosen because she is a white woman (as stated by Mr. Lawler) and the selecting officials did not want anyone other than a white person in that position, as evidenced by the pattern for hiring managers. The EEOC also states that, "In addition to the laws and regulations prohibiting discrimination on the basis of race, color, sex, national origin, religion, age, disability, and retaliation, the federal government acts pro-actively in the area of affirmative employment. I interpret "federal government" to mean agents and representatives of the government such as selecting officials and Regional Directors. I served in Federal service for several years and I know first hand that there are not very many Hispanics in Federal government positions, even fewer in GS-14 and GS-15 level positions. I am also aware that the Federal government, OPM, and the last two White House Administrations have given directives that strongly state that

-34-

Federal Departments and Agencies shall solicit Hispanic applicants and hire qualified Hispanics for middle and upper management positions. According to the U.S. Code Title 5, Part III, Subpart F, Chapter 72-Antidiscrimination: Right to Petition Congress, Subchapter I-Antidiscrimination in Employment, Section 7201. (c) (1) it states that, "each Executive agency conduct a continuing program for the recruitment of members of minorities for positions in the agency to carry out the policy set forth in subsection (b) in a manner designed to eliminate under-representation of minorities in various categories of civil service employment within the Federal service, with special efforts directed at recruiting in minority communities, in educational institutions, and from other sources from which minorities can be recruited." See Item E.

The Regional Office did not have to go out looking for qualifying Hispanics, I came to the Region. So, why is it that given the law and directives and this most recent opportunity to hire a Hispanic, a very well qualified Hispanic woman (a double minority) for the Administrative Officer position within NCR, Mr. Lawler chose not to hire me?

In the case of Regents of University of California v. Bakke, as referenced in Grutter v. Bollinger, the Supreme Court "expressed the view that the consideration of race as a factor in admissions might in some cases service a compelling government interest." Justice Powell explained his view that it would be permissible for a university to employ an admissions program in which "race or ethnic background may be deemed a 'plus' in a particular applicant's file." 438 U.S., at 317  He emphasized, however the importance of considering each particular applicant as an individual, assessing all of the qualities that individual possesses, and in turn, evaluating that individual's ability to contribute to the unique setting of higher education (in this instance to achieve a more diverse student population). See Item F.

Mr. Lawler has been the Deputy Director for this region for seven years. During his tenure he has had an opportunity to hire and/or assist in the hiring of employees. Mr. Lawler indicated that race was not given any consideration when he decided who would be selected for this position. But, I believe race is and was a factor and was a consistent factor when filling

-35-

positions in the region higher than a GS-13. I believe the hiring pattern will prove this.

**Q.** How many full time employees are currently employed at the National Capital Region Office and of this number how many are Hispanic?

**Q.** What is the composition of those full time employees by grade, race, ethnicity, and gender under the grade of a GS-13?

**Q.** What are the breakout numbers for all managerial positions at the National Capital Region and at what grades? Of these numbers and grades, what is the current composition of management at the GS-13, GS-14, GS-15 and SES levels at NCR? (by race, ethnicity, and gender)

**Q.** With such strong emphasis to further diversify the federal workforce, particularly in the National Park Service, did Mr. Lawler request a diversified pool of candidates based on race, ethnicity, national origin, sex, and age? If not, why didn't he?

**Q.** How many minorities applied for this position? Give the number reported to the EEO Office.

**Q.** Of that number of minorities who applied for this position, how many were Hispanic? Give the number reported to the EEO Office.

**Q.** How many Applicant Background Surveys were submitted for this position? Give the number submitted to the EEO Office.

**Q.** What efforts were taken to encourage applicants to submit a self identifying Applicant Background Survey before and after applications were submitted?

The question was, "Was any consideration given to national origin?"

-36-

14          13          Mr. Lawler's response was, "No. We really selected the best
                        qualified person. We interviewed a diverse group of people."

                        **Rebuttal:**  The EEO community does not recognize that in a
                        particular situation such as a selection process that a single
                        person representing a different community to be diverse.  In
                        other words, one perceived Hispanic, one African American,
                        three whites—one of which is a woman does not add up to a list
                        of diversified applicants.  The number of white women in the
                        National Park Service and the National Capital Region is so
                        high right now that white women are no longer considered
                        under-represented.  In fact, white women in the National Capital
                        Region is 60 percent above parity.  And, Mr. Lawler is assuming
                        that because one person's surname sounds Hispanic, he must,
                        therefore, be Hispanic.  Has Mr. Lawler had any diversity
                        sensitivity training in the seven years he has been the Regional
                        Deputy Director?

                        An example of a diversified pool of applicants, in an ideal world,
                        is when the applicant pool reflects the makeup of the nation.  In
                        this particular case the use of the Civilian Labor Force and
                        regional aggregate figures as a reference would have given the
                        selecting officials ideal and real figures to aim for when
                        accepting applications.

                        There were 75 applicants.  In an ideal world a diverse applicant
                        pool might reflect nine Hispanics, nine African Americans, four
                        Asian/Pacific Islanders, one or two Native Americans, and 52
                        white applicants.

                        Of the 47 qualified applicants a diverse pool to select from
                        might include four Hispanics, three African Americans, two
                        Asian Pacific Islanders, and one Native American.

                        A diverse pool to interview might include two Hispanics, two
                        African Americans, two Asian Pacific Islander, two Native
                        Americans.

                **Q.**      Did Mr. Lawler and/or Mr. Carlstrom instruct the Human
                        Resource Specialist and/or the Human Resources staff
                        or others responsible for the vacancy announcement to
                        solicit applicants from diverse communities within the
                        Washington, D.C. Metropolitan area?  If not, why not?

                                        -37-

Q.    Did the EEO office of the National Capital Region indicate to Mr. Lawler and Mr. Carlstrom that they had a diverse applicant pool to select from? If not, why not? Did they ask? If not, why not?

Q.    If the pool of applicants did not look like it was diversified enough, why wasn't the vacancy announcement extended and advertised in several minority communities?

Q.    I am a Mexican American. How many Mexican American's work full time for the National Capital Region?

Q.    Of the number of Mexican Americans working for the National Capital Region, how many are in management positions above a GS-12?

Q.    Is Mr. Lawler, as an Deputy Regional Director, aware of the mandates and directives to hire more Hispanics for upper level management positions instituted by the White House, OPM, the Department, and the National Park Service, such as those listed in the December 3, 1997 Strategic Plan for Improving Diversity in the Department of the Interior? If not, why not? See Item G.

Q.    Mr. Lawler has been the Deputy Director for this region for seven years. Does Mr. Lawler receive reports on workforce diversity and underrepresentation figures? If so, what are the titles of these reports and how often does he get them?

Q.    In the seven years Mr. Lawler has served in the National Capital Region, has he attended any diversity training classes or programs? If so, where and when?

The question was, "Could you elaborate on that?"

14        16        Mr. Lawler's response was, "Yes. As far as I can tell, I don't know Mr. Portillo but he's got a Hispanic surname and I believe he's of Hispanic origin. Ken Brody, one of the gentleman we

-38-

interviewed, is a top-notch person. He's on our staff here currently, is an African-American. And of course, Ms. Marshall is a white female. So it's a pretty divers pool of interviewees."

**Rebuttal:** Addressing the issue of Mr. Portillo's last name, as a active member of the Hispanic community I can tell you that for years the Hispanic community has been trying to educate the general population on how to identify or how not to identify Hispanics. An Hispanic surname is not indicative of one being Hispanic or of Latin decent. Mr. Lawler made a big faux pas. He assumed the name Portillo is an Hispanic surname. Then to make matters worse he assumed that because Mr. Portillo's surname sounds Hispanic then therefore he must be Hispanic. It doesn't work that way. There are a several surnames that sound Hispanic but are not. In addition, some Hispanics don't have Hispanic surnames and some do. For example, my children carry the name of Aguilar, as do I. Aguilar is an Hispanic name and my children are 100% Hispanic. However, my maiden name is not a Spanish, Hispanic, or Latin name, but I am 100% Hispanic. New Mexico Governor Bill Richardson considers himself Hispanic, he is bilingual/bicultural and he speaks fluent Spanish. His mother is a native of Mexico and his father is Anglo. He identifies himself as an Hispanic. There are millions of women who are married to or were married to Hispanic men and they carry Hispanic surnames, but they are not Hispanic. The only way to know if an individual is Hispanic is if that individual self identifies as Hispanic. I have a neighbor who's name is Juan. His children have Hispanic names also. By their own admission, they are not Hispanic nor do they claim Hispanic heritage or Hispanic culture. They are African Americans (not of Puerto Rico, Cuba, the Dominican or Carribean heritage) who like Spanish names.

Addressing the issue of Ms. Marshall being a white woman in the context of diversity, in the Department of Interior's Do's and Don'ts on Diversity Initiatives under part B, number 2, it states, " Cannot use race and national origin or gender as a factor in the selection process unless constitutional (equal protection) and Title VII requirements are met. Must consult with the Office of Equal Opportunity and Solicitor's Office before taking such actions. See Item H.

As for equal protection, white women within the National Park

-39-

Service and the National Capital Region are not an issue, especially within the area of white female professionals numbering 790 or 32.7% in 2002 and 822 or 33.5% in 2003 Departmentwide and white females in administration totaling 2,010 or 33.2% in 2002 and 2,032 or 33.1% in 2003. In addition, the total number of white women within the National Capital Region is 60% above parity .

Q.   Did the EEO office indicate to Mr. Lawler and Mr. Carlstrom that Hispanics, particularly Mexican Americans were among the list of qualified candidates? If not, why not? Did Mr. Lawler or Mr. Carlstrom ask?

Q.   Did Mr. Portillo identify himself as Hispanic to Mr. Lawler and/or Mr. Carlstrom? If not, how does Mr. Lawler know that Mr. Portillo is of Hispanic origin?

Q.   Is Mr. Portillo listed and identified as one of the few Hispanic employees within the National Park Service?

Q.   Were the names of Ricardo Portillo and Ken Brody picked for interviews to satisfy and support a token effort at diversity?

The question was, "Was any consideration given to age in making the selection?"

15        1     Mr. Lawler's response was, "No, no."

**Rebuttal:** As I stated in my rebuttal statements to Mr. Carlstrom's testimony, the job market bias of those over the age of 50 is a fact. I believe Ms. Marshall, the selectee is younger than I am. Age is a factor here because for people over the age of 40 and especially for those over the age of 50, employment becomes more difficult to gain, particularly with potentially new employers. In Federal government age is less of a factor for those already serving and moving up in their fields. For those of us who outside of Federal government service, especially those of us who are of Hispanic heritage–we get a double whammy--gaining employment after the age of 50, regardless of our qualification, becomes even harder. Not only are we looked upon as an undesirable minority, we are also looked upon as

-40-

incompetent.

**Q.**    What was the composition of the applicant pool for this position by age and sex? How many applicants were under the age of 40? How many over the age of 40, but under 50? How many over the age of 50, but under the age of 60?

**Q.**    Of the thirteen best qualified status applicants and the eleven non status applicants, what are the ages and sex of each candidate on each of the Certificates of Eligibility?

**Q.**    What is the age of the individual selected?

**Q.**    What are the ages of individuals hired for management positions within the National Capital Region over the last 3-5 years?

The questions were, "It is the contention of Ms. Aguilar that she was not given equal consideration because she was not interviewed as were other applicants. How would you respond to that contention?" "Equal consideration for the position in question because she was not afforded an interview, as some of the other applicants."

15          10     Mr. Lawler's response was, "That's a tough one to answer. I guess most applicants always feel they have a better opportunity of being selected if they go face to face with the interviewers. In this case, we had – I don't know how many people we had. Maybe 24, 30, 35 people that were on the certs provided to us."

"I've just never interviewed that many people for a job. Whenever we have that many applicants, we try to do some kind of initial screening among ourselves and then talk to who we think are the top four to five people."

"So, her point might be valid but realistically we're not going to interview 35 people, 40 people, for the job. I don't know who does that."

-41-

**Rebuttal:** Mr. Lawler's response outlined the extreme. Realistically, there were 24 well qualified candidates. Of those 24, 11 were non status candidates, six of whom were the equivalent to a GS-15. Five of the 13 status candidates were chosen for interviews. It would not have been out of the ordinary to select five or six from the status and three, or five or six from the non status to interview. The selection process is supposed to be fair and trustworthy. By selecting Park Service candidates only for interviews from the lists that included Park Service employees the selecting officials denied me equal treatment and equal opportunity to compete for the position. The Merit system principles state that any "employee who has the authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority–deceive or willfully obstruct any person with respect to such person's right to compete for employment; or grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment." See Item I.

Mr. Lawler's stated that they were not going to interview 35 people or 40 people for the job is a similar statement made by Mr. Carlstrom, who stated that he could not have chosen to interview all 47 applicants because that would have been a very difficult situation. Mr. Lawler and Mr. Carlstrom could have had the top 20 applicants from the qualified applicants list paneled and then interviewed the top five candidates forwarded by the panel, but they didn't.

I believe that Mr. Powers and the selecting officials initially planed to open the vacancy for only two weeks. They were not expecting a very many applicants. It is understood in the Federal world that when a vacancy is open for only two weeks someone has already been picked for the job. Mr. Powers and the selecting officials were probably surprised when, after the vacancy announcement was amended and extended, that so many people applied for the job. They were probably concerned that their candidate of choice would not make it to the top of the list. I believe that they narrowed the field of applicants in such a way that they were assured the applicant

-42-

they wanted would move through the process without much difficulty.

Q.    In an attempt at fairness why didn't Mr. Lawler and/or Mr. Carlstrom select a few candidates from the non status list to interview in a similar manner they selected the five status candidates?

The question was, "Did the rating panel provide any recommendations to either you and/or Mr. Carlstrom of those candidates to be interviewed for the position in question?"

16       9       Mr. Lawler's responded by saying, "No.  They provided –my understanding of how the rating panel worked, or how they participate in it, was they reviewed the applicants and then developed their cut on whom they thought the best qualified people were, and then we just were the recipients of those lists."

"But no recommendations."

**Rebuttal:** Mr. Carlstrom stated in his testimony (page 7, lines 13-15) that the panel did provide him with a list of potential people that he and Mr. Lawler might want to further evaluate through the interviewing process.

Q.    Of the lists provided by the panel to Mr. Lawler and Mr. Carlstrom for interviews, did they interview all of the recommended applicants?

Q.    Did Mr. Lawler see the initial list of the 47 qualified applicants?  If so, why didn't Mr. Lawler and Mr. Carlstrom select the top 10 applicants from that list to interview?

The question was, "Did you and Mr. Carlstrom individually and/or collectively make the decision about which candidates would be interviewed?"

16       22      Mr. Lawler's response was, "Yes."

-43-

**Rebuttal:** Mr. Lawler admits that he and Mr. Carlstrom collectively made the decision about who they would interview. But, I believe the timing is important. Mr. Carlstrom stated in his testimony (page 9, lines 6-13) that after he received the 47 applications he scanned through them and identified some in his mind and that because there were too many to review he had a panel go through the process of identifying those that would be in a position for further interviews. On that basis they selected individuals to be interviewed. Mr. Lawler stated (page 8, lines 4-7) that he and the Regional Director scanned the applications and discussed them and decided who they thought would be the "lead people" based on what they felt their needs were for the job. Of the five lists of eligible applicants they chose to panel the merit promotion applicants and then selected only Park Service employees who ranked high enough to be listed on their respective selection certificates to be interviewed. An of course, Ms. Marshall was among them, as they knew she would be.

I believe that even though they were forced to open the vacancy to include all sources they had decided either before they received the 47 applications or at the time they received the applications that they were going to consider only merit promotion Park Service status applicants for the position. Mr. Lawler admitted that he and Mr. Carlstrom decided at the time they scanned through the 47 applications who they were going to interview for the job. It was at this point in time that equal treatment and equal opportunity for anyone ceased to exist, even for the other Park Service employees. I believe that the other Park Service employees were interviewed only because the selecting officials felt they had to in order to cover their butts. It is important to note that Mr. Dick Powers, the former Administrative Officer, was still employed with the Regional Office. The vacancy announcement closed on April 14, 2003. The selection certificate Ms. Marshall's name appeared on was issued on April 24, 2003. Therefore, the panel must have met before April 24. Mr. Powers' last day on the job was April 30, 2003. The issue date for the rated and ranked non status eligibles was April 24, 2003. But the Human Resource Specialist, Ms. Sasser, signed it and dated it on April 23, 2003. Mr. Lawler signed it, but did not date it.

The question was, "Do you know if any applicants with veteran's preference were ranked above or below Ms. Aguilar?"

17       7       Mr. Lawler's response was, "I believe there were veterans at the top of the cert.  So unless she's a veteran, she probably would have been below those people."

"I believe there are some compensable veterans, if that's the term, on the top of the cert."

**Rebuttal:** Mr. Lawler should know that there were veterans at the top of the list and that they were ranked higher than me.  He signed the certificate.

Q.      Why were the veterans not given serious consideration and interviewed, especially in light of the fact that the top three veterans scored 102, 107, and 110 points respectively?

The question was, "Were any of those candidates interviewed for the position in question?"

17       14      Mr. Lawler's response was, "For the same reason we didn't interview Ms. Aguilar.  We wanted people that possessed the current skill set and knowledges and abilities to come in here and work at a high level from day one on our current issues."

**Rebuttal:** Is this not discrimination?  Mr. Lawler outright admits that they didn't interview me or the veterans because we did not possess the same skill set–Park Service knowledge, experience, and park operational background–as the individuals they chose to interview.  To my knowledge the selecting officials are not supposed to use insider knowledge as a basis for selection if the insider knowledge is not part of the evaluation criteria.  The vacancy announcement said nothing about an applicants knowledge about the Park Service and regional familiararity being a plus nor did the KSAs address such issues.

Furthermore, Mr. Lawler's and Mr. Carlstrom's intent was not to interview me.  If they would have interviewed me then they would have had to interview the three veterans.

-45-

The Uniform Guidelines on Employee Selection Procedures used by the Department of Interior (DOI) states that: "elements used in a selection process must be job-related, requiring criteria used to determine the candidates referred and selected be related to the job to be filled."

In 1978, the Uniform Guidelines on Employee Selection Procedures (UGESP) were issued. The guidelines are intended to establish a uniform basis of selection procedure criteria in the Federal sector. The guide imposes employers with the criteria by which the Equal Employment Opportunity Commission would evaluate hiring practices to ensure adherence to merit principles. **The UGESP applies to both inservice placement actions and external hiring practices.**"

A selection procedure is any measure, combination of measures, or procedures used as a basis for an employment decision. In DOI Bureaus, this would apply, but not be limited to, job analysis, Crediting Plan, interviews, and the selection process itself." See Item J.

Q.    If these "skill sets" were so important to their decision, why didn't they include them in the KSAs?

Q.    Given the laws and directives governing the treatment of veterans and minorities does Mr. Lawler believe that the non status candidates (veterans and Hispanic woman) were given every consideration? If yes, please explain what consideration means in this instance.

-46-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA L. AGUILAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Case No. 07-0546 (RMU) |
| | ) |
| DIRK KEMPTHORNE, Secretary, | ) |
| U.S. Department of the Interior, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendant's motion for summary judgment, and for good cause shown, it is hereby:

ORDERED that Defendant's motion is GRANTED, and it is further

ORDERED that JUDGMENT in Defendant's favor is hereby entered on the totality of Plaintiff's claims in this action.


SIGNED:


_____                          _____
Date                                      RICARDO M. URBINA
                                          United States District Judge